1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,        )
                                      )  Case No. 3:14-CR-267-BR
4              Plaintiff,             )
                                      )
5    v.                               )  November 5, 2015
                                      )
6    FABIAN SANDOVAL-RAMOS(1) and RAUL )
     ARCILA(3),                       )
7                                     )
               Defendants.            )
8    ═══════════════════════════════  )  Portland, Oregon

9

10                      TRANSCRIPT OF PROCEEDINGS
                 (Excerpt of the Testimony of Sommer Andersen)

11           BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:              AMANDA M. LeGORE
                                  CSR, RDR, FCRR, CRR, CE
23                                U.S. Courthouse
                                  1000 SW Third Avenue Rm 301
24                                Portland, OR  97204
                                  (503)326-8184
25

```
1  APPEARANCES:
   FOR THE PLAINTIFF:      LEAH BOLSTAD
2                          (Assistant U.S. Attorney)
                           ELISSA GOLOBORODKO
3                          (Certified Law Student)
                           U.S. Attorney's Office
4                          1000 SW Third Avenue
                           Portland, OR  97204
5                          (503)727-1000

6

7  FOR DEFENDANT SANDOVAL-
   RAMOS:                  BENJAMIN ANDERSEN
8                          121 SW Salmon Street
                           1420 World Trade Center
9                          Portland, OR  97204
                           (503)222-2510
10

11 FOR DEFENDANT ARCILA:   ROBERT SEPP
                           2350 Willamette Falls Drive, Suite 9
12                         West Linn, OR  97068
                           (503)998-7719
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Andersen – D

3

1          (The following excerpt of testimony was held on

2          Thursday, November 5, 2015; 4:52 p.m.)

3          MS. BOLSTAD:  The final witness will be Detective

4    Andersen.

5          We will finish by 5:00.

6          THE COURT:  Well, that's good to know.  I had some

7    other things in mind in addition.  But, yes, all right.

8          Detective, would you come back to the witness chair.

9          She's already sworn.

10          Yes, jurors, you'll recall this witness took the oath

11    previously.  She remains under oath.

12          Go ahead and take a seat.

13          THE WITNESS:  Thank you.

14                        <u>DIRECT EXAMINATION</u>

15    BY MS. BOLSTAD:

16    Q.  Detective, we've heard about phones seized in this case.

17          Were you able to examine those phones for evidence of

18    drug trafficking?

19    A.  Yes, I was able to examine the downloaded contents of those

20    phones.

21    Q.  Let's start with Ms. Godvin, Mr. Rosa, and Mr. Baker; their

22    phones.

23          Did you examine Ms. Godvin's phone?

24    A.  Yes, I did.

25    Q.  Did you observe any evidence suggesting that she had a

4

Andersen - D

1  source for heroin other than Mr. Rosa in March 2014?

2  A.  No.

3  Q.  Did you examine Mr. Rosa's phone?

4  A.  I did.

5  Q.  Did you observe any evidence suggesting that he had a

6  source for heroin other than Mr. Baker in -- in March 2014?

7  A.  No.

8  Q.  Did you examine Mr. Baker's phone?

9  A.  I did.

10  Q.  Did you observe any evidence suggesting that he had a

11  source for heroin, other than Mexican Bobby, in March 2014?

12  A.  No.

13  Q.  Let's talk about the traffic stop on April 2nd.

14        Did investigators seize a cell phone from Mr. Arcila?

15  A.  Yes.

16  Q.  Were you able to examine the contents of that phone?

17  A.  Yes.

18  Q.  What was the phone number assigned to Mr. Arcila's phone?

19  A.  If you don't mind, I've made a summary of those notes.  I

20  would like to refer to it, as we go, for those numbers.

21  Q.  Please do so.

22  A.  Thank you.

23  Q.  If there's an objection, we'll hear it.

24  A.  The number in Mr. Arcila's phone as the contact for that

25  phone was 971-279-0581.

1  Q.  Were you able to obtain the call logs from Mr. Arcila's

2  phone, meaning the calls received by the phone and the calls

3  placed by the phone?

4  A.  Yes.

5  Q.  And have you compiled those logs into Exhibit 126?

6  A.  Yes.

7          MS. BOLSTAD:  The Government would move to admit 126.

8          MR. ANDERSEN:  I have no objection.

9          MR. SEPP:  No objection.

10         THE COURT:  Thank you.  Received.

11         Please publish and proceed.

12  BY MS. BOLSTAD:

13  Q.  And on the screen in front of you, is this the first page

14  of that exhibit of the call logs from Mr. Arcila's phone?

15  A.  Yes.

16  Q.  I see the parties are listed at points on this sheet.

17         Are those the contacts as he had them listed in his

18  phone?

19  A.  Correct.  If there was a contact for a number stored in the

20  contacts section of the phone, the program that extracted that

21  data from the phone, as I would print these or run these

22  reports, would combine those into one item.

23         So where it shows the "to" or "from," and a phone

24  number, the name that appears next to it -- if there is one --

25  comes from that contact list from that same device.

6

Andersen – D

1  Q.  Let's talk about Mr. Ramirez-Coronel, the traffic stop on

2  April 2nd.

3           Did agents seize a cell phone from him?

4  A.  Yes.

5  Q.  Were you able to examine the contents of that phone?

6  A.  Yes.

7  Q.  And did you put the call logs from within that phone into

8  Government Exhibit 127?

9  A.  Yes.

10          MS. BOLSTAD:  Government moves to admit 127.

11          MR. ANDERSEN:  No objection.

12          MR. SEPP:  No objection.

13          THE COURT:  Thank you.  Received.

14          Publish, and proceed, please.

15  BY MS. BOLSTAD:

16  Q.  Like Mr. Arcila's phone, were the contacts as saved what is

17  shown in Exhibit 127?

18  A.  Yes.

19  Q.  So these are not your labels for the contacts, but those

20  are the labels that were in the phone itself?

21  A.  Exactly.

22  Q.  Let's go to location 2.

23          How many cell phones were seized from location 2 that

24  belonged to Fabian Sandoval-Ramos?

25  A.  Two.

Andersen - D

```
 1   Q.  And is one of those the dumpster phone?

 2   A.  Yes.

 3   Q.  We'll get to that in a moment.

 4            Is the other the iPhone?

 5   A.  Yes.

 6   Q.  Is that Government's 109?

 7   A.  I don't have a reference to know if that is accurate.  But

 8   if you say it is, I believe it would be.

 9   Q.  Okay.  So let's talk about the iPhone.

10            Were you able to examine the contents of that phone?

11   A.  Yes.

12   Q.  And what was the phone number of it?

13   A.  The contact number for the iPhone was 503-313-6547.

14   Q.  When you examined the iPhone, in general -- oh, and let me

15   just stop here and -- did you put the information that you're

16   testifying to into a summary?

17   A.  I did.

18   Q.  And right now, are we laying a foundation for your summary

19   to be later shared with the jury?

20   A.  Yes.

21   Q.  Okay.  And so these -- these items might become known to

22   you later, they might not.

23            When you examined the iPhone from Fabian

24   Sandoval-Ramos's house, what was the phone number assigned to

25   that phone?
```

Andersen - D

1    A.   The one I just stated, 503-313-6547.

2    Q.   Did you observe evidence of drug trafficking on that phone?

3    A.   No.

4    Q.   Did it appear to be a normal usage phone?  By normal usage,

5    I mean pictures of family, friends, et cetera?

6    A.   I don't recall what photos were on the phone.

7    Q.   Okay.  Did Mr. -- did Fabian Sandoval-Ramos's iPhone, did

8    it have the number for Raul Arcila in it?

9    A.   It did.

10   Q.   Saved as the same number you testified to earlier for Raul

11   Arcila?

12   A.   It wasn't saved to the name Raul Arcila, but that phone

13   number was saved in the contact list.

14   Q.   What was it saved as?

15   A.   Pelon.

16   Q.   P-E-L-O-N?

17   A.   That's right.

18   Q.   In examining the contents of the phone seized from

19   Mr. Ramirez-Coronel, Placido Ramirez-Coronel, did that phone

20   have Mr. Raul Arcila's phone number in it?

21   A.   It did.

22   Q.   What was it saved as?

23   A.   Pelon.

24   Q.   And when you were looking in Placido Ramirez-Coronel's

25   phone, did you observe the iPhone phone number of Fabian

9

Andersen - D

1    Sandoval-Ramos, 503-313-6547?

2    A.   Yes.

3    Q.   And what was that contact number saved as in Placido

4    Ramirez-Coronel's phone?

5    A.   That was saved as one word, "Flavian," which was

6    F-L-A-V-I-A-N.

7    Q.   Was that same iPhone number for Flavian, was that number

8    saved in Raul Arcila's phone?

9    A.   Yes.

10   Q.   What was it saved as?

11   A.   As one word, "Fabi," F-A-B-I.

12   Q.   Do you believe these to be nicknames for Fabian?

13   A.   That would be my assumption.

14   Q.   Did you observe any other contacts in Placido

15   Ramirez-Coronel's phone for a similar nickname?

16   A.   Yes.

17   Q.   What was the nickname?

18   A.   Let me refer to my notes here for a moment.

19           There was a nickname "Faby," F-A-B-Y, as -- in the

20   contact list in Placido Ramirez's phone.

21   Q.   What was the number associated with F-A-B-Y?

22   A.   That was 206-473-7989.

23   Q.   Let's talk about the phone found in the dumpster at

24   location 2.

25           Were you able to examine the contents of that phone?

Andersen - D

10

1  A.  Not the call contents or the text message contents, or

2  things of that nature.

3  Q.  Okay.  Were you able to determine the phone number assigned

4  to that broken phone?

5  A.  Yes.

6  Q.  Did part of your determination involve looking at

7  Mr. Ramirez-Coronel's phone and that Faby, F-A-B-Y, number?

8  A.  Part of it, yes.

9  Q.  Okay.  Did you look into the phone number assigned as Faby

10 in the Placido Ramirez-Coronel's phone?  And what I'm asking is

11 did you request records from the cell phone company for

12 206-473-7989?

13 A.  Yes.  Those requests -- those records were requested, yes.

14 Q.  And did you receive those records?

15 A.  Yes.

16 Q.  Which phone company provided them?

17 A.  It was a prepaid phone from Verizon.

18 Q.  And did you place those records from Verizon in

19 Government's Exhibit 124?

20 A.  I believe so, yes.

21        MS. BOLSTAD:  Government moves to offer 124.

22        MR. ANDERSEN:  No objection.

23        MR. SEPP:  No objection.

24        THE COURT:  Received.

25        Please post it, and proceed.

Andersen – D

1    BY MS. BOLSTAD:

2    Q.  Tell the jury what we see in these call records, in terms

3    of the columns.

4    A.  Sure.

5         The first column on the left is labeled "Network

6    Element Name," and that's a column that refers to a geographic

7    location that covers hundreds of cell phone towers.  Lots and

8    lots of cell phone towers.  Other phone records that we'll

9    sometimes review will have specific cell phone towers

10   themselves listed for calls, where this one just gives a

11   network element.  So it's just a name for -- typically a region

12   that covers a very large number of cell phone towers.

13        The next number over is the mobile directory number,

14   which is just a number for which we've requested records.  So

15   you'll see, as -- every single line of this column has that

16   same number.

17        The next number is a dialed digit number, which is

18   the number dialed by the person making the phone call.  And the

19   next number is a call direction, which shows whether it's an

20   incoming or an outgoing call.

21        The next column is listed "Seizure DTTM," for date

22   and time.  And it lists the date -- date and time that the

23   record was created.  And the seizure duration is listed in

24   seconds for the length of seconds of that particular call.

25        And then finally, at the very end, is the calling

1  party number, which lists which phone number was used to place

2  the call.

3  Q.  When you sent that subpoena request, did you -- did you

4  refer to the ESN number from the seized phone?

5  A.  I don't know if that was included as part of the request in

6  general, but it was something that was received in response.

7  Q.  Okay.  And so what was the -- what are the last three

8  digits of the ESN on the back of the dumpster phone?

9  A.  That's E48.

10  Q.  And did that ESN number come back as listed on those

11  Verizon records?

12  A.  It did.

13  Q.  And did that give you a clue about whether the -- what the

14  phone number might be to the dumpster cell phone?

15  A.  Yes.  That same -- the whole entire number was a match from

16  the records provided by Verizon for that 206 phone number and

17  the actual device recovered in the dumpster.  Looking at the

18  back of that device, you can see that number on the back.

19  Q.  And what does "ESN" stand for?

20  A.  I'm not entirely sure, but I think it stands for, like,

21  equipment serial number or electronic serial number.

22          And it's -- I know that the purpose of that number is

23  it's a unique number that identifies a particular handset.

24          MS. BOLSTAD:  The government moves -- oh, thank you.

25  BY MS. BOLSTAD:

Andersen – D                                  13

1    Q.  We've heard evidence about Mr. Baker's calls to a Mexican

2    Bobby phone number with area code 442.

3    A.  Yes.

4    Q.  Did you request records for the provider –– the service

5    provider for that phone number?

6    A.  For the 442 number, yes.

7    Q.  Okay.  And did you receive those –– those toll records and

8    use them for Government Exhibit 123?

9    A.  Yes.

10           MS. BOLSTAD:  Government moves to offer Exhibit 123.

11           MR. ANDERSEN:  No objection.

12           MR. SEPP:  No objection.

13           THE COURT:  Thank you.  Received.

14           Please publish, and proceed.

15   BY MS. BOLSTAD:

16   Q.  During the March 2014 time frame, based on these tolls for

17   the 442 number, were you able to determine the location, the

18   physical location of the 442 phone?

19   A.  We could get an idea based on that network element name.

20   It would give a large region.

21           So in this case, on this first page, if you look down

22   along that first column, the first many records list Los

23   Angeles gateway, followed by Los Angeles 44, which would be

24   network nicknames for that large group of towers there.

25           And it's just –– it's just a matter of where the call

1   is routed through.  I don't think it necessarily absolutely

2   confirms that the handset is present in that location.  In

3   fact, as we go forward through the list, you'll see that at

4   times the network element will jump from one to the next, even

5   within a very brief period of time.  So unlike a specific cell

6   phone tower, where you can pinpoint where that tower is

7   located, this is just listing a larger area.

8   Q.  Okay.  And although you cannot pinpoint exact location, do

9   you believe that the lengthy sequences of Los Angeles, Los

10  Angeles, Los Angeles, do you believe that that means the phone

11  was in the area of Los Angeles during those time frames?

12  A.  I believe that it could have been, yes.

13  Q.  Was there also a time period in March 2014 where the

14  network element or location identifier listed Hillsboro?

15  A.  There is.  In fact, even on this page, if we go back one,

16  there's a line where it lists Hillsboro individually in the

17  midst of other Los Angeles locations.  Whereas, going

18  forward -- like predominantly, all through the date of March

19  16th, all of the calls are routed through that Hillsboro

20  network name as a call.

21  Q.  And in the same time period, Detective Andersen, did you

22  compare the tolls from the phone with the 206 area code, the

23  phone found in the dumpster?

24  A.  Yes.

25  Q.  What was the location of that dumpster phone in the same

15

Andersen – D

1  relevant periods?

2  A.  If you would like to bring it back up to the -- the prior

3  record that we just reviewed.

4  Q.  I think that's Government's 124.

5  A.  And so we begin in Hillsboro.  And continuing to move

6  forward, we are seeing Hillsboro, Seattle, Hillsboro as a large

7  area for the call network.

8          And then later in the month, Los Angeles is listed;

9  among other locations.

10  Q.  What about from March 31st to April 2nd?

11  A.  March 31st through April 2nd, Hillsboro, Seattle shown on

12  this page here.  The next page, Hillsboro, Seattle, Seattle,

13  Hillsboro, and again.

14  Q.  And can you say with certainty where the phone was at any

15  particular date?

16  A.  No.

17  Q.  Okay.  Are you comfortable with the idea that these

18  locations are associated with that phone somehow?

19  A.  Yes.

20  Q.  Do you also have call records that you found within the

21  cell phones seized from Mr. Arcila and Mr. Ramirez-Coronel,

22  which were admitted as 126 and 127?

23  A.  Yes.

24  Q.  Did you examine those seized cell phone call logs in

25  conjunction with the toll records provided by the service

Andersen – D

1  providers for the other two phones?

2  A.  I did.

3  Q.  What were you looking for?

4  A.  I was looking to see if there was a pattern of contact or a

5  link of contact as you move from one person involved in this

6  case to another, to see who was talking to whom.

7  Q.  I would like to show you, and you alone, Government Exhibit

8  129.

9          I'll show it to you in paper form, while I'll let you

10  work on that.

11  A.  Thank you.  (Handed document.)

12  Q.  Did you make this document?

13  A.  I did.

14  Q.  How did you make it?

15  A.  What I made is –– it began with a spreadsheet, where I

16  copied and pasted the different downloads from the different

17  devices, whether it was from the phone company or whether it

18  was extracted from the phone itself.  And then put them all in

19  the same order so they were in chronological form.  So that

20  rather than looking only at one person's calls and then moving

21  on and looking at only another person's calls, I was able to

22  see all of the calls in one setting, organized by date.

23  Q.  Did you first focus on a particular time period for this

24  document?

25  A.  For this document, I focused only on April 2nd.

1  Q.  Why did you focus on that date?

2  A.  That was a date that we had a lot of information that we

3  knew that was directing certain events that were happening,

4  calls that we were directing to be placed.  And then also

5  things we knew to be true as far as traffic stops we had

6  conducted -- or a traffic stop, I should say, and then search

7  warrants that were later executed.  So I had different times to

8  refer to that I knew certain events were occurring, to compare

9  to the phone calls that were made and received.

10  Q.  Okay.  And have you checked and rechecked the accuracy of

11  your summary?

12  A.  I have.

13  Q.  And did you check it against those items received from the

14  phone companies and from the seized phones?

15  A.  I did.  And I believe them to be accurate, to the best of

16  my ability.

17          MS. BOLSTAD:  The Government moves to admit summary

18  Exhibit 129.

19          (Pause, counsel conferring.)

20          MR. ANDERSEN:  I have no objection to that your

21  Honor.

22          THE COURT:  Thank you.

23          MR. SEPP:  No objection except for that the jury be

24  known that they can compare it to the actual logs themselves to

25  show that it is indeed accurate.

1            THE COURT:  So, Jurors, a summary exhibit is offered

2    as a convenience to you, to help collect data points about

3    evidence, but the summary isn't evidence.  It is just the

4    witness's effort to collect certain parts of it.  So it's only

5    as good as the reliability of the data collected.  And it's --

6    for you to rely on the summary, you have to be able to know for

7    yourself whether it's accurate, and that would be left for you

8    to determine.

9            So as a summary, the witness is -- I'm sorry, the

10   exhibit is received.

11           Go ahead.

12   BY MS. BOLSTAD:

13   Q.  And so please explain to the jury what this document

14   contains.

15   A.  At the very top, I included a legend, which would just show

16   which phone number belongs to which person involved in this

17   case.

18           Starting with the top, with the phone number that was

19   saved in Shane Baker's two phones as Mexican Bobby, the 442

20   number, followed by the phone that was found in the dumpster at

21   location No. 2, followed by the phone that was seized from Raul

22   Arcila with the corresponding phone number, the phone that was

23   seized from Placido Ramirez-Coronel, the phone -- the iPhone

24   that was found within location 2, and then tolls received for

25   another number as well.

1          And then below that list, in order of date and time,

2    from older to newer, with the hours listed in sort of a 24-hour

3    format where, you know, 1:00 p.m. would be 1300 hours, listing

4    the calls; date and time the call was captured up by the tolls

5    or by the download; the length of the call; the person -- or

6    the phone number that initiated the call; the phone number that

7    received the call or the destination number; the contact name,

8    if any, that was from a device.  And then a description on the

9    far right there of the summary that I had created of what

10   the -- each individual line was.

11          MS. BOLSTAD:  Could we go to the bottom of this 129.

12          MS. COOKE:  This page?

13          MS. BOLSTAD:  This page.

14          I'm sorry, the bottom of the next page.

15   BY MS. BOLSTAD:

16   Q.  I see in the middle of this a black mark for traffic stop

17   on Honda.

18          Did you enter that information?

19   A.  I did.

20   Q.  And what did you base that on from where you entered it in

21   the chart?

22   A.  I based it on our knowledge of when we had made those

23   calls, as far as when we saw movement of that vehicle, and then

24   about how long after that I recall the traffic stop occurring,

25   as well as the fact that after about that seven -- or, sorry,

Andersen – D

1    5:25 to 5:30 p.m. range, any phone calls that were placed to

2    Placido Ramirez-Coronel's phone or Raul Arcila's phone were not

3    able to be answered, did not appear to be answered; because at

4    that point they were both detained.

5    Q.   Okay.  We are having a little bit of a technical problem,

6    so I want to switch gears and move to your examination of other

7    phones in this case.  Okay?  And we'll come back to this topic

8    once we're set.

9         Did you look at Mr. Baker's phone content, about his

10   contacts with Mr. Rosa in the week leading up to Justin

11   Delong's death on March 29?

12   A.   I did.

13   Q.   Did you see messages between Mr. Baker and Mr. Rosa?

14   A.   Yes.

15   Q.   Starting on March 22, what did you observe?

16   A.   I would like to refer to my police report during this,

17   to -- to summarize the messages I had reviewed in those

18   documents.

19        Beginning on March 22nd -- give me just one moment to

20   find the right spot here.  (Pause, referring.)

21        Okay.  So I saw messages from -- back and forth

22   between Michael Rosa's phone, which was saved in Baker's phone

23   as Mikey 2, which is a phone number of 971-804-1412, with Shane

24   Baker's phones on March 22nd, 2014; March 24th, 2014; and March

25   29th, 2014.

Andersen - D

1  Q.  Why those particular dates?

2  A.  I focused on dates that were within the last week, leading

3  up to the overdose death of Justin Delong.

4  Q.  Okay.  And what did you learn?

5  A.  So I learned that on March 22nd, Michael Rosa's phone sent

6  Shane Baker's phone a message at 11:13 p.m., stating that his

7  order was short.  And I am familiar with this in prior

8  investigations.  That, you know, again, drugs are sold by

9  weight.  And so if a person orders a certain amount, it's an

10  order placed by a weight requirement or a weight request.  And

11  if what's provided doesn't weigh out to be what they expect,

12  that would be an order being short.

13        Another conversation from the 23rd, from 10:45 p.m.,

14  they discuss a meeting near Powell and 82nd Avenue in Portland,

15  where Baker, his phone sends a message to Rosa's phone, stating

16  that he had to leave the area due to cops being everywhere.

17  And Rosa responds with a message, No worries.  Not like I'm

18  out, or anything.

19        And I interpret that to mean that it wasn't a problem

20  for Rosa because he wasn't out of heroin, and it wasn't a

21  problem to wait.

22        The following day, at 10:29 p.m., Shane Baker's phone

23  sent Michael Rosa's phone a message, saying:

24             I'm on my way to town now.  Got yours on me for

25             five or six.  How many?

Andersen - D    22

1          Rosa responds:  Five.

2          And Baker replies:  Okay.  5.20 is what I have for

3          you.

4          And the message exchange continues back and forth

5   with a discussion to meet at McDonald's on Foster, at 82nd.

6   Q.  Were there other messages between Mr. Rosa's phone and

7   Mr. Baker on March 28th?

8   A.  Yes.

9   Q.  Tell us about that, in brief.

10  A.  On March 28th at 3:58 p.m., Baker's phone sent a message to

11  Rosa's phone that read:

12          What's up with you?  I need to grab that money.

13          Rosa replied, about nine hours later, at 1:14 a.m.,

14  on March 29th, 2014, saying:

15          Sorry, didn't see your message until right now.

16          I'm going to need to grab more tomorrow, anyway,

17          so I'll have it all for you.

18          Baker's phone replied:  Okay.  Just call me in the

19          morning then.

20          And the following afternoon, March 29th, 2014, at

21  1:07 p.m. -- I have a typo in my report, where it says:

22          Rosa texts Baker his address.  Baker --

23          THE COURT REPORTER:  I need you to speak slower,

24  please.

25          THE COURT:  I have a typo in my report?

Andersen – D

1           THE WITNESS:  Yes.  It should read:

2           Baker texts Rosa his address as 4200 Southwest

3      Canyon Road, 107 Ave., Beaverton, Oregon.

4  BY MS. BOLSTAD:

5  Q.  Detective Andersen, we've heard evidence in this case that

6  Mr. Rosa went to Ohio and returned in -- in March and around

7  this time period.

8           While he was gone, do you know who was using

9  Mr. Rosa's phone?

10 A.  I believe that Mr. Goshorn was using Mr. Rosa's phone.

11 Q.  Okay.  And was that with Mr. Rosa's permission?

12 A.  Yes.

13 Q.  And was Mr. Goshorn operating at Mr. Rosa's direction?

14 A.  Yes.

15 Q.  Still in furtherance of the conspiracy?

16 A.  Yes.

17 Q.  Okay.  Let's talk about Mr. Baker's phone content about any

18 contacts with the Mexican Bobby phone number in the week prior

19 to Justin Delong's death.

20          Did you see such connection between Baker and Mexican

21 Bobby?

22 A.  I did.

23 Q.  Tell us about that.

24 A.  So beginning, again, with a review starting a week prior,

25 on March 22nd, 2014, we see Baker's phone calling the Mexican

Andersen – D

24

```
1   Bobby number at 8:24 p.m. and 10:25 p.m. that same day, March

2   22nd.

3                And let me find --

4                (Pause, referring.)

5   BY MS. BOLSTAD:

6   Q.   Do you know the total number of calls placed or received

7   between Mr. Baker and the 442 Mexican Bobby number?

8   A.   I believe it was 30 calls during that time frame.

9   Q.   The one-week time frame?

10  A.   Yes.

11  Q.   How many of those 30 calls were at your direction?

12  A.   11 calls.

13  Q.   And are those 11 calls then something that you or Detective

14  McNair observed happening?

15  A.   Yes.

16  Q.   Was there any pattern of activity between Mr. Rosa's calls

17  with Mr. Baker compared to Mr. Baker's calls to Mexican Bobby

18  in that week time frame?

19  A.   Yes.

20  Q.   What was the pattern you observed?

21  A.   (Pause, referring.)  Just one moment.  (Pause, referring.)

22            So I see that Baker's phone has contacts with Mexican

23  Bobby in proximity to when there are meets with Michael Rosa or

24  conversations with Michael Rosa.

25            Prior to the text that Rosa had sent about being
```

1  shorted on March 22nd, Shane Baker's phone had called the

2  Mexican Bobby number six times on that date.

3          On March 29th, at 10:29 p.m., Baker had agreed to

4  sell 5 ounces to Rosa in Portland, as we discussed a bit ago.

5  Foster and 8 -- 82nd Avenue.  And Baker had contacted the

6  Mexican Bobby number twice on March 24th, at 10:25 p.m. and

7  again at 11:32 p.m.

8  Q.  Did you have information, when you were reviewing these

9  phone tolls, about March 29th and Mr. Rosa's meeting with

10  Mr. Baker on the afternoon of the 29th?

11  A.  I did.  I had reviewed all of this after all of my

12  interviews were concluded.

13  Q.  And on that afternoon, when Mr. Rosa reports that he was

14  with Mr. Baker when Mr. Baker contacted his source, did you

15  look for that time frame on March 29th, in the records for

16  Mexican Bobby?

17  A.  I did.

18  Q.  What did you observe?

19  A.  I saw that the phone records for that Mexican Bobby number,

20  the 442 number, showed a call from one of Baker's phones to

21  that Mexican Bobby number at 4:03 p.m.  And then additional

22  calls that evening at 8:48 p.m. and 8:54 p.m.

23  Q.  Is that consistent with what Mr. Rosa reported about when

24  he met with Mr. Baker?

25  A.  Yes.  Mr. Rosa told me he met with Mr. Baker around 4:00

Andersen – D

1    p.m. that day on the 29th.  And that Mr. Baker had called his

2    source, and that Mr. Baker was supposed to be resupplied later

3    that evening; which is why he could only sell Baker 4 ounces

4    that afternoon instead of the 5 that Rosa had requested.

5    Q.  Let's talk about the 442 number then.

6          I'm curious about -- you're seeing these patterns.

7    Is that correct?  With Baker calling Mexican Bobby?

8    A.  Yes.

9    Q.  Did you look, then, at what would happen with Mexican Bobby

10   after Mr. Baker called that number?

11   A.  Yes, to see who would Mexican Bobby call.

12   Q.  And who did Mexican Bobby call?

13   A.  Mexican Bobby didn't call.

14   Q.  Did he not call anyone on that phone that -- any of the

15   records that you've put into evidence in this case?

16   A.  Right.  There were no calls placed out that would explain

17   contacts with numbers like Placido Ramirez-Coronel or others

18   involved in this case.

19   Q.  Well, we're talking about patterns.  Did you look at what

20   would happen when Mr. Baker called that 442 number?  Did you

21   look for some other phone that might have made outgoing calls

22   after that?

23   A.  Yes.

24   Q.  What number were you able to identify a phone number that

25   made outgoing calls?

Andersen - D

1   A.   Yes.

2   Q.   What was that number?

3   A.   That was 760-296-9882.

4   Q.   And I want to show you a demonstrative.

5            I hope it doesn't break the whole system.

6            THE COURT:  We're good.

7   BY MS. BOLSTAD:

8   Q.   What does -- I'm showing you what is Government

9   demonstrative 130.

10           What -- what do you see?

11  A.   I see images of Shane Baker, Placido Ramirez-Coronel,

12  Fabian Sandoval-Ramos, and Raul Arcila at the top of the page.

13  Superimposed over a map are Shane Baker and Placido

14  Ramirez-Coronel hovering over Oregon.  And a phone number down

15  near the bottom of the page, the Mexican Bobby 442 number, with

16  a line drawn from Shane Baker, up in Oregon, down to that

17  number, the 442, which is on top of the state of California.

18           MS. BOLSTAD:  The Government asks permission for

19  publication.

20           THE COURT:  As a demonstrative?

21           MS. BOLSTAD:  Yes, 130.

22           THE COURT:  Any objection?

23           MR. ANDERSEN:  So we're not offering this into

24  evidence?

25           THE COURT:  It is only a visual aid, and it will only

Andersen - D

1    be used in closing arguments, not to go to the jury.  It is a

2    demonstrative exhibit, not a summary.

3                MR. ANDERSEN:  I have no objection.

4                THE COURT:  Go ahead.

5                MR. SEPP:  No objection.

6                THE COURT:  As a demonstrative.  So this is just a

7    picture of the testimony, so to speak.  It will be used when

8    the case is argued to you tomorrow.

9                You won't have it in the jury room with you, though.

10   So if you think it's of use, you may make notes about it.

11               Ms. Bolstad.

12               MS. BOLSTAD:  Thank you, your Honor.

13   BY MS. BOLSTAD:

14   Q.  And so is this the pattern that you've testified to that

15   you were looking at as when Shane Baker would call Mexican

16   Bobby?

17   A.  Yes.

18   Q.  And then you testified that that 442 number did not make

19   outgoing calls after said calls took place?

20   A.  Correct.

21   Q.  And what was the other number you identified that did make

22   outgoing calls?

23   A.  760 -- sorry -- 296-9882.

24   Q.  Okay.  How did you make the determination that there was

25   this other phone, 760-296-9882?

1  A.  In reviewing all of the records together as a group, we're

2  looking at one and then referring to another to see.  As Shane

3  Baker is calling that Mexican Bobby number, what -- what phone

4  numbers are calling Placido Ramirez-Coronel and Fabian

5  Sandoval-Ramos and Raul Arcila.  And I found that there was a

6  number that very commonly was calling Placido Ramirez-Coronel

7  after Shane Baker would call this Mexican Bobby number.  And

8  the number that called Placido Ramirez-Coronel after Shane

9  Baker would place those calls was that 760-296-9882 number.

10 Q.  Were you able to determine where the 760 number was

11 physically located during this pattern that you're talking

12 about?

13 A.  No.  The records I received were from Verizon, and they

14 were the same as what we just looked at for the other 206

15 number, where it just lists a larger market name.

16 Q.  Do you have a general geographic area?

17 A.  In a similar way, at times, it appears to be in Oregon or

18 Washington, and at times it appears to be in California.

19 Q.  Okay.  Did you observe any phone calls between the Mexican

20 Bobby phone number and either of the numbers that you have

21 linked to Fabian Sandoval-Ramos?

22 A.  Yes.

23 Q.  Tell us about that.

24 A.  There was one call that was in the phone records provided

25 by Verizon for the 442 number from March 2nd to the number that

Andersen - D

 1   was associated to Fabian Sandoval-Ramos's iPhone.

 2   Q.  Given that the 442 phone number appears to be in the

 3   general geographic area of California during this time frame --

 4   and is that the case?  It was in California during the week

 5   before Mr. Delong's death?

 6   A.  Correct.  There's a brief period of time around the very

 7   middle part of March where it appears to potentially be either

 8   in Los Angeles or in the Oregon, Hillsboro market.

 9   Q.  What does that fact mean to you?

10   A.  That when Shane Baker would call the number he had to

11   obtain heroin, the person he was calling was likely not the

12   person who was delivering the heroin to him.  That he was

13   calling a dispatcher phone, as we've heard about.

14   Q.  Did you look for the 760 phone number in Placido's phone?

15   A.  I did.

16   Q.  What was it saved as in Placido Ramirez-Coronel's phone?

17   A.  That was saved as one word -- one word of "Che," C-H-E.

18   Q.  And that -- did you look for the 760 phone number in Fabian

19   Sandoval-Ramos's iPhone?

20   A.  I did.

21   Q.  Did you find this number in his iPhone?

22   A.  I did.

23   Q.  Was it saved as a contact?

24   A.  Yes.

25   Q.  What was the name of the contact?

Andersen - D

1    A.  It was one letter:  "G."

2    Q.  I want to turn your focus to a very specific time frame:

3    April 2nd, 2014, the hours before the buy that Shane Baker set

4    up that day.

5            Did you examine that time period closely?

6    A.  I did.

7    Q.  And did you examine it in a context of your phone tolls and

8    the seized call logs from the phones?

9    A.  I did.

10   Q.  Did you follow the same process you've already described in

11   making that summary Exhibit 129?

12   A.  Yes.

13   Q.  And did you make an additional Exhibit -- a summary Exhibit

14   131?

15           You might know the number.  It's on --

16   A.  I did not make that.

17   Q.  Did you assist in the production of that document?

18   A.  I did.

19   Q.  Is this data, in 131, from your summary 13 -- I'm sorry.

20   From your summary 129?

21   A.  It is.  I've compared it line by line, and the data on this

22   is reflected in my summary.

23           MS. BOLSTAD:  The Government moves to offer summary

24   Exhibit 131.

25           THE COURT:  As a summary, yes.

Andersen - D

1          Counsel, any objection?

2          MR. SEPP:  Sorry.  No.

3          MR. ANDERSEN:  No.

4          THE COURT:  Than you.

5   BY MS. BOLSTAD:

6   Q.  Detective Andersen, could you please go through the data on

7   summary Exhibit 131 with the jury and don't go too fast.

8   A.  Sure.

9          So what we have on the left is a list of dates and --

10  I'm sorry.  Just a list of times, followed by a summary of

11  who's calling whom, with some faces to the names, to the right.

12         And so, beginning, all of these calls are on April

13  2nd of 2014.  The first is Shane Baker calling the Mexican

14  Bobby number he has saved in his phone, at our direction, to

15  order the 8 ounces that we later seized.  And that call was

16  placed at 3:43 p.m.

17  Q.  And so this -- for this entire summary exhibit, is every

18  orange coded entry a call from Mr. Baker's phone?

19  A.  Yes.

20  Q.  Or to --

21  A.  Or to.

22  Q.  -- Mr. Baker's phone?

23  A.  Correct.

24  Q.  And were each of those orange entries actually observed by

25  you or Detective McNair on Baker's phone?

Andersen - D

1  A.  Yes.

2  Q.  Okay.  What else do you see?

3  A.  So the next line listed is a call at 4:11 p.m., where that

4  number, the 760 number, saved as Che in Placido Ramirez's

5  phone, called Placido Ramirez-Coronel.

6        That's followed by Placido Ramirez returning another

7  call to Che at 4:26 p.m.  And at 4:48 p.m., Placido

8  Ramirez-Coronel called Fabian Sandoval-Ramos.

9        At 4:49 and 4:53 p.m., there were two calls between

10  Che and Placido Ramirez-Coronel.

11        And then at 4:58 p.m., Baker calls the Mexican Bobby

12  number, the 442 number, to say that he's arrived at the

13  7-Eleven.

14  Q.  After that call was placed by Mr. Baker at 4:58, is that

15  when Detective McNair notified surveillance teams to be on the

16  lookout?  For move --

17  A.  That's my understanding of that.

18  Q.  On the lookout for movement?

19  A.  Correct.

20  Q.  Okay.  So what happened in the phone records after

21  Mr. Baker arrived at the meeting location?

22  A.  At 4:59 and 5:19 p.m., there were two calls between the Che

23  number, the 760 number, and the Placido Ramirez-Coronel number.

24        And at 5:19 p.m., the Mexican Bobby number called

25  Shane Baker, and the person on the phone asked where Shane

1    Baker was.  And Shane Baker told the person he had arrived.

2            A minute later, at 5:20 p.m., the Che number again

3    called Placido Ramirez-Coronel.  And one minute later, Shane

4    Baker received a phone call from the number he had stored as

5    Mexican Bobby, the 442 number, telling him to change locations;

6    to go to the Lowe's instead of the 7-Eleven.

7            At 5:22 p.m., Placido Ramirez-Coronel calls the 760

8    number he has saved as Che.  And one minute later, Shane Baker

9    receives a phone call from the Mexican Bobby number, the 442

10   number, again, talking about the change in location.

11           Several minutes later, at 5:27 p.m., Placido

12   Ramirez-Coronel calls the Che number again.  And then at some

13   time around that 5:30 p.m. time frame is when the traffic stop

14   occurs.  And that's noted by the yellow line that says "traffic

15   stop."

16           After that, at 5:30 and 5:32 p.m., there are two

17   calls from Che, reaching out to Placido Ramirez-Coronel,

18   followed by 5:39 p.m., Sandoval-Ramos calling Ramirez-Coronel.

19   Followed by 5:39 p.m., Fabian Sandoval-Ramos then calls twice

20   out to Che, the 760 number, which is saved in his phone under

21   the name "G."

22           At 5:41 p.m. -- actually, I'm sorry.  I take that

23   back.  The phone calls -- the two calls that were placed were

24   not placed from the iPhone.  They were placed from the 206

25   number that came from the dumpster.

35

Andersen – D

1          At 5:41 p.m., two additional calls from the Che

2    number to Placido Ramirez-Coronel.  And then 5:41 and 5:42

3    p.m., two more calls from Fabian Sandoval-Ramos's phone, that

4    was found in the dumpster, to the number saved as "Che" in

5    Placido Ramirez's phone.  That was also saved as "G" in the

6    other Fabian Sandoval-Ramos phone.

7    Q.  And in your summary, 129, is the exact phone that made the

8    call, is that included in that document?

9    A.  Yes.  The document includes the -- the time; as well as the

10   length of the call in seconds; the originating phone number

11   itself; the destination number; and then the name, if any,

12   saved in the contact list, next to that.

13   Q.  Below the yellow line on this page, the yellow line being

14   the traffic stop, was there the ability of Mr. Arcila or

15   Mr. Ramirez-Coronel -- were their phones able to be -- were

16   they able to take calls or place calls after the traffic stop?

17   A.  No, their phones were kept from them.

18   Q.  Okay.  Have you seen this kind of pattern before?

19   A.  Yes.

20   Q.  And in your experience in the field, does this pattern

21   represent a type of organization?

22   A.  Yes.

23   Q.  What type?

24   A.  Dispatch-runner organization.

25   Q.  The events on April 2nd, were those events highly

1  controlled and done at law enforcement direction?

2  A.  Yes.

3  Q.  Did you observe this pattern, looking at the call records

4  from earlier in the month of March?

5  A.  Yes.

6  Q.  Did you have great control or observation over the events

7  prior to March 29th?

8  A.  No.

9  Q.  Given what you observed in this controlled day and time,

10  were you able to find patterns similar, earlier in March?

11  A.  Yes.

12  Q.  Tell us about what you found, in terms of patterns.

13  A.  So just as on April 2nd, when we did the controlled buy

14  where we seized 8 ounces in Milwaukie on March 31st, this same

15  call pattern was present.

16          Shane Baker would reach out to call Mexican Bobby to

17  place his order, and then Placido Ramirez-Coronel's phone would

18  receive a phone call from the number he had saved as Che.

19  Q.  Not from the Mexican Bobby phone?

20  A.  Not from the Mexican Bobby phone.

21  Q.  That was on the 31st?

22  A.  Correct.

23  Q.  Did you see the pattern on any other dates in March?

24  A.  Yes.

25  Q.  What date?

                                                                    37
                          Andersen - X

1   A.  March 22nd, March 24th, March 27th, and March 29th.  Just

2   focusing on that week prior to -- I'm sorry -- to the death of

3   Justin Delong.

4             MS. BOLSTAD:  Nothing further are on direct, your

5   Honor.

6             THE COURT:  Mr. Andersen.

7             MR. ANDERSEN:  Thank you.

8                      CROSS-EXAMINATION

9   BY MR. ANDERSEN:

10  Q.  I'm going to look at just this demonstrative 129.

11            THE COURT:  For the jury?

12            MR. ANDERSEN:  I'm sorry.  That is -- I believe that

13  has been admitted before the jury.

14            THE COURT:  Yes.  So if you're going to ask the

15  witness about it, display it to the jury, please.

16            Thank you.

17            Go ahead.

18  BY MR. ANDERSEN:

19  Q.  And I'm on the second page there.

20            I'm just trying to make out -- now, this is a

21  summation that you said of -- of the toll records that you

22  compiled.  Correct?

23  A.  Yes.

24  Q.  Now, for example, I've looked at -- it's the second -- if

25  you look in the green section of that part highlighted, I'm

38

Andersen - X

1  looking at the second part, 4-2-14 at 17:39.

2  A.  Yes.

3  Q.  And it says it's a 34-minute -- or a 34-second call.

4  Right?  Would you agree with that?

5  A.  Yes.  There's two records that reflect that call.  The one

6  that you referenced that says 34 seconds and the one that's

7  directly above it.

8        So in red, where it says, Call placed from 206 to the

9  360 and the word -- the word "Faby" is next to it, in quotes,

10  that's the phone as it was reflected on Placido's phone.

11        The call, as it's reflected on Fabian

12  Sandoval-Ramos's and on the tolls from the 260 number -- sorry,

13  the 206 number, show it as a 34-second call.

14        So if you imagine, on Fabian Sandoval-Ramos's end, on

15  the 206 line, as you dial a number and it rings and it rings

16  and it rings and no one answers, there's a time elapse there.

17        On the records from Placido's phone, it just shows as

18  a missed call.  So there was no time length captured because

19  his phone doesn't reflect it as a call that any length of time

20  was captured on because he never answered it.

21  Q.  Okay.  So it sounds to me like these numbers -- the

22  duration numbers don't necessarily coincide with any actual

23  call.  You could -- in this situation, you have 34 seconds.

24  But it was never actually a call --

25  A.  Yeah.  If you're placing the call and there's time elapsed

Andersen - X

1   while the phone is ringing or going to voice mail, there's an

2   elapsed time recorded by the phone company, there, to bill you

3   for those minutes.

4           If you're a person who has a device and the device

5   just rings and rings and you never answer it, your phone just

6   marks that as a zero-second call that you never answered.  So

7   that's what the difference is between those two.

8   Q.   Okay.  So if you're calling me, my phone might say zero, if

9   I just let it ring forever, and your phone might say --

10  A.   The elapsed time it was ringing.

11          MR. ANDERSEN:  Sorry.  Did you get my question?

12          THE COURT REPORTER:  Yes.

13  BY MR. ANDERSEN:

14  Q.   And I think your answer was yes?

15  A.   It was the elapsed time it was ringing, yes.

16  Q.   Maybe for clarity's sake, I should re-ask that.

17          Just to clarify, if -- for example -- you wanted to

18  call me and -- and I just let it ring -- I'm sure I wouldn't do

19  that if I knew you were calling.  But my phone might say zero,

20  and your phone might say 200 seconds, or however long?

21  A.   Probably not 200, unless I was leaving a really long voice

22  mail, begging you to call me back.

23  Q.   Or just -- or if I didn't have an answering machine, or for

24  whatever reason --

25  A.   Exactly.

1    Q.   So -- I mean, it sounds to me like the numbers don't

2    necessarily coincide with any particular length of time of a

3    call necessarily.   Right?

4    A.   If they're provided from the phone company, they typically

5    would because they're produced in a way that allows the phone

6    company to bill for minutes of air time that are used.

7              So if there are records that were drawn from a phone

8    download, that would be a different case.   But the records that

9    are toll specific would have a more accurate reflection of

10   number of seconds elapsed.

11   Q.   Well, but it did, when we already figured out that this 34

12   is not accurate.   Right?

13   A.   Well, we would assume -- or we would infer that that's 34

14   seconds where the phone calling from the dumpster is ringing

15   and ringing and ringing for 34 seconds, as the phone is never

16   answered on the other end.

17   Q.   Right.   So in terms of actual talk time, that 34 doesn't

18   have anything necessarily to do with any sort of talk time, is

19   what I'm asking.

20   A.   I don't know whether the phone company bills on talk time

21   or just open line time.

22   Q.   Well, I'm not talking about billing.   I'm just saying, if

23   we look at this same one we've been looking at, 34 seconds

24   doesn't mean that anybody talked to anybody else for 34 seconds

25   while on the phone line?

Andersen - X

1  A.  Correct.  It means that that line was open for 34 seconds,

2  according to Verizon.

3  Q.  Right.  So my question -- I -- I think you've answered this

4  a couple of times, but I'm not clear on the answer.

5         That 34 seconds is not tied to a specific talk time

6  of anybody talking.  Right?

7  A.  It's tied to an open line time, if -- you could put it that

8  way.

9  Q.  Okay.  Would you answer my question yes or no?

10 A.  Rephrase your question.  I'm sorry.

11 Q.  Well, my question is does the -- the 34 seconds is not tied

12 to a talk time.  Right?

13 A.  In this particular instance, no.

14 Q.  Okay.  So we can assume that all of the other numbers

15 aren't necessarily tied to a talk time.  They might be tied to

16 an open line time, which might also indicate that there was

17 talking going on, but not necessarily.  Right?

18 A.  Well, I think it would depend on the context.  Like if we

19 have calls where Mr. Baker is on the phone and we know we

20 observe those, we know that those are meaningful talk time

21 conversations.

22 Q.  Well, not necessarily a message situation either, right?

23        If we know Mr. Baker is calling somebody and you know

24 he's talking, you're not sitting there with stopwatch, timing

25 how long he's talking necessarily, are you?

Andersen - X

 1  A.  Well, if we could play a recording of a call that was made,

 2  we could compare it to the length of time the call was open on

 3  the phone tolls, and that would give us an idea of how much

 4  time has elapsed.

 5  Q.  Okay.  All right.  All right.

 6          Let's see.  I think that's all of the questions I

 7  have on that particular subject.

 8          Now, I mean, this is clear, but you can't necessarily

 9  tell who's talking on the phones just by looking at the phone,

10  right --

11          THE COURT REPORTER:  I need you to slow down, please.

12          THE COURT:  You really must slow down.

13          And it is the end of the day, and we do want to wrap

14  up the witness.  But this is obviously very important material

15  for you to clarify, so take it slower.

16          MR. ANDERSEN:  Thank you.

17  BY MR. ANDERSEN:

18  Q.  This should be a simple question.

19          You can't necessarily tell, just by looking at the

20  phone records, if any particular person was the particular

21  person actually using the phone.  Right?

22  A.  Exactly.  By the phone records alone, you couldn't be sure.

23  Q.  If I may, I'm going to switch gears.

24          And I'm going to show you an exhibit that I believe

25  is going to be Defense 207.  I think that's where we're up to.

1          (Pause, conferring.)

2          THE COURT:  Is that the next in order, Mr. Sepp?

3          MR. SEPP:  I think it's '08.

4          MR. ANDERSEN:  '08?

5          MR. SEPP:  Yeah, should be 2008 (phonetic).

6          THE COURT:  208.

7          MR. SEPP:  208.

8          MR. ANDERSEN:  Thank you.

9          MS. COOKE:  It is.

10         MR. ANDERSEN:  Thank you.

11    BY MR. ANDERSEN:

12    Q.  Well, first of all, are you familiar with just general jail

13    booking records, and things of that nature?

14    A.  Generally.

15    Q.  Could you look at that, and can you identify that?  That

16    first page of that exhibit?

17    A.  Yeah.  It looks to be a summary of the Clackamas County

18    receipt for a defendant which, in this case, is listed as

19    Placido Ramirez-Coronel.  And it has a date and time of May

20    27th, 2014, at 4:56 p.m.

21         And it lists a citizen adjacent to Placido's name of

22    Magdalena Ramirez-Coronel, with an address in Ukiah, and an

23    amount posted of bail of 15,000 dollars, with some additional

24    notes of a date to appear in court.

25    Q.  Okay.  And were you actually -- were you involved in

44
Andersen - X

1    this -- in this transaction at all?  Are you familiar with this

2    actual transaction?  The paying of bail?

3    A.  Yes.

4              MR. ANDERSEN:  Your Honor, I would like to admit

5    Defense 208.

6              THE COURT:  Any objection?

7              MS. BOLSTAD:  No objection.

8              MR. SEPP:  No objection.

9              THE COURT:  208 is received, may be published.

10             Please proceed.

11             MR. ANDERSEN:  I don't have any particular questions

12   or any particular other questions about this piece of evidence.

13   But --

14             THE COURT:  All right.  Go on with your -- conclude

15   your cross, please.

16             MR. ANDERSEN:  That is all of the cross that I have.

17   Thank you.

18             THE COURT:  Thank you.

19             Mr. Sepp.

20             MR. SEPP:  I have nothing for this witness, your

21   Honor.

22             THE COURT:  Redirect, Ms. Bolstad.

23             MS. BOLSTAD:  Nothing, your Honor.  Thank you.

24             THE COURT:  Subject to confirming the receipt of your

25   exhibits, does the Government rest?

1          MS. BOLSTAD:   The Government does rest.

2          (Conclusion of excerpt.)

3

4                        --oOo--

5

6   I certify, by signing below, that the foregoing is a correct

7   stenographic transcript of the oral proceedings had in the

8   above-entitled matter this 21st day of March, 2016.  A

9   transcript without an original signature or conformed signature

10  is not certified.  I further certify that the transcript fees

11  and format comply with those prescribed by the Court and the

12  Judicial Conference of the United States.

13

            /S/ Amanda M. LeGore
14          _____

15          AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
                CSR No. 15-0433  EXP:  3-31-2018
16

17

18

19

20

21

22

23

24

25