BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Assistant United States Attorney
Leah.Bolstad@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 655-8431
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:14-CR-00267-03-BR |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| RAUL ARCILA, | |
| Defendant. | **Sentencing Date:** *April 14, 2016, at 2:00 p.m.* |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and Leah K. Bolstad, Assistant United States Attorney, hereby submits the following sentencing memorandum.  For the reasons set forth below, the government recommends that the Court impose the mandatory minimum sentence of 240 months' imprisonment, a five-year term of supervised release, and a $100 fee assessment.  The victim's family is not seeking restitution.  Such a sentence properly addresses the nature and seriousness of the offense, provides just punishment, affords adequate deterrence and protects the public from further crimes of this defendant.

I.      **PROCEDURAL HISTORY**

On June 24, 2014, a federal grand jury indicted defendant Raul Arcila and five others with a Conspiracy to Distribute Heroin Resulting in Death, in violation 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (CR 1). This count carries a 20-year mandatory minimum, a maximum of life imprisonment, at least five years of supervised release, and a fine of up to $1,000,000. In Count 2, the grand jury charged defendant with a Conspiracy to Distribute Heroin, in an amount exceeding 1,000 grams, in violation 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Count 2 carries a 10-year mandatory minimum, a maximum of life imprisonment, at least five years of supervised release, and a fine of $10,000,000. Counts 9 and 10 charged defendant with Possession with Intent to Distribute Heroin (over 100 grams) on two separate dates. Counts 9 and 10 carry mandatory minimum sentences of five years, statutory maximum sentences of 40 years' imprisonment, at least four years of supervised release, and a fine of up to $5,000,000.

At his arraignment on July 1, 2014, defendant Raul Arcila entered a plea of not guilty, and the magistrate judge ordered defendant detained on both prongs, danger to the community and a flight risk, pending trial. (CR 16). On July 2, 2014, he was ordered released on conditions (CR 22), but came back into custody after a DUII and has been detained since January 27, 2015 (CR 91).

Only two defendants proceeded to trial – defendants Fabian Sandoval-Ramos and Raul Arcila. Trial commenced on Tuesday November 3, 2015, and concluded on Friday November 6, 2015. The jury returned guilty verdicts against both defendants on all applicable counts. Additionally, the jury unanimously found the government proved beyond a reasonable doubt that (1) this drug trafficking conspiracy distributed heroin, the use of which resulted in death; (2) the overdose death resulting from the use of heroin distributed by the conspiracy was a reasonably

**Government's Sentencing Memorandum**                                                                                                                **Page 2**

foreseeable result of that conspiracy; (3) that the quantity of heroin involved in the distribution conspiracy (Count 2) was 1,000 grams or more; and (4) the quantity of heroin involved in the two possession with intent to distribute charges on defendant Raul Arcila (Counts 9 and 10) was 100 grams or more.  Sentencing is scheduled for Thursday April 14, 2016, at 2 p.m.

## II.    FACTUAL BACKGROUND

### A.  Overdose Death

On Saturday March 29, 2014, members of the Westside Interagency Narcotics Team (WIN) responded to a heroin overdose death in Beaverton.  The victim was identified as Justin Delong (age 26).  Medical Examiner Larry Lewman, M.D., conducted an autopsy.  Dr. Lewman determined the cause of death to be a heroin overdose (intravenous drug abuse) and this medical opinion is based on the information Dr. Lewman found while conducting the autopsy and after viewing and analyzing forensic reports and toxicology results.  Dr. Lewman testified that but for the victim's use of heroin, he would not have died.

### B.  Search at Godvin & Rosa's Apartment

Agents examined the decedent's cell phone and determined that he recently obtained a single gram of heroin from co-defendant Morgan Godvin.  Later that same day, agents used the decedent's phone to set up another purchase of heroin from Godvin.  Meanwhile, Detective Anderson obtained a state search warrant for Godvin's Portland residence that she shared with co-defendant Michael Rosa.

On March 29, 2014, in the evening hours, agents executed the state search warrant at 878 SE 187th Avenue in Portland, Oregon.  Agents contacted co-defendant Godvin who admitted that she sold Justin Delong, the decedent, a gram of heroin for $80 the previous evening.  She said Michael Rosa supplies her with approximately an eight-ball of heroin (1/8 of an ounce or

**Government's Sentencing Memorandum**                                                                                                           **Page 3**

3.5 grams) per day. During the search warrant execution, co-defendant Michael Rosa arrived in a vehicle at the residence. Agents searched his car and found heroin, methamphetamine and over $5,000 in U.S. currency. Rosa admitted being a heroin dealer and explained he purchases 4-8 ounces of heroin (100-200 grams) from co-defendant Shane Baker every few days. Indeed, Rosa admitted he had purchased four ounces from Baker at Baker's apartment earlier in the day. During that transaction, Rosa recalled that Baker called his source of supply who Rosa believed was an English-speaking Mexican male. Agents showed Rosa an unlabeled DMV picture of Baker, and Rosa immediately identified the person pictured as his source of supply, Shane Baker.

### C. Search at Shane Baker's Apartment

On March 30, 2014, at approximately 1:00 a.m., Rosa led agents to Baker's Beaverton apartment (4050 SW 107th Ave.). At 3:00 a.m., agents directed Rosa to make a controlled buy for 1 ounce of heroin from Baker out of his apartment for the price of $1,100. Rosa made the buy, and turned over the purchased heroin (25 grams) to investigators. On March 31, 2014, in the afternoon, agents obtained a state search warrant for Baker's Beaverton apartment. At 7:00 p.m., agents executed a state search warrant at Baker's apartment where they seized heroin, methamphetamine, and $4,365 in U.S. currency.

### D. Identification of "Mexican Bobby" Drug Trafficking Organization

Baker admitted selling heroin to Michael Rosa. He explained that he is sourced several times per week by a single source, "a Mexican that he has nicknamed Mexican Bobby" who is approximately 30 years old with short hair and a fat round face. (Carley Aff. ¶ 29). Baker said his source drives a red Pathfinder-type vehicle and always meets him at or near a 7-Eleven at 6335 SE Harmony Road. Baker added that when he calls "Mexican Bobby" to re-supply, it is

usually a different person of Mexican descent who arrives to deliver at that location. Baker said he believed they must live very close to that location because they arrive very quickly whenever Baker indicates he has arrived and is ready.

The same day (March 31, 2014), agents asked Baker to place a recorded call to his source, "Mexican Bobby," to order eight (8) ounces of heroin, and Baker obliged. Detective Andersen observed Baker place a call to (442) ***-4202, a number Baker had saved in his phone as "Mexican Bobby." Detective Anderson listened to the call, which was in English, and heard the male voice ask Baker if he would bring the other money owed. Baker said it would be a few more days for that, and a deal was reached for eight ounces to be delivered that night. At 10:40 p.m., surveillance agents observed Baker arrive at the 7-Eleven. Two minutes later, a small red SUV arrived. Baker got into the red SUV, the red SUV drove away but returned within one minute, and Baker exited the vehicle with the eight (8) ounces of heroin he had just purchased. Baker turned the heroin over to the law enforcement agents. Other agents followed the red SUV to a residence at 11759 SE 64th Avenue, Milwaukie (Location 1 or L1), where it pulled into an attached garage. Agents were not able to observe a license plate.

Portland General Electric (PGE) records established that co-defendant Fabian Sandoval-Ramos was the power subscriber at L1 as of July 2011. DMV records for Fabian Sandoval-Ramos listed his then most recent address as 7915 SE King Road #2 (hereinafter Location 2 or L2), a location within two miles of L1. Agents obtained a photograph of Fabian Sandoval-Ramos and showed it to Mr. Baker. The photo had no identifying marks or text on it. Baker immediately identified the male in the photograph as the individual he knows as "Mexican Bobby." On April 1, 2014, agents conducted surveillance at L1 where they observed the red SUV, a 1998 Honda Passport (827-DRK), exit the same garage and then drive around the area

**Government's Sentencing Memorandum**                                         **Page 5**

for 30-45 minutes before returning to L1.  DMV records revealed co-defendant Fabian Sandoval-Ramos is the registered owner of the red 1998 Honda Passport.

On April 2, 2014, DEA Task Force Officer Tony Carley applied for a federal search warrant for L1.  At 4:25 p.m., Judge Stewart issued the search warrant for L1.  That same day, after obtaining the search warrant for L1, but prior to its execution, agents worked with Baker to set up a second controlled buy of heroin from his source of supply.  At the direction of agents, Baker called his source of supply – the phone number in his phone saved as "Mexican Bobby" (the 442-xxx-4202 number) to order eight ounces of heroin.  Agents later determined that this number operated as a dispatch phone number for the organization.  Toll records showed that after Baker placed his order to this 442 number, a separate phone 760-296-9882 would call members of the organization to relay the order.  This 760 number was saved as "G" in Fabian Sandoval-Ramos' phone; it was saved as "Che" in Placido Ramirez-Coronel's phone.  On this particular day and time, after Baker placed the order to the dispatch phone (442), the "Che/G" number (760) shared multiple calls with Fabian Sandoval-Ramos and Placido Ramirez-Coronel.  *See* Sentencing Exhibit 1 (Gov't Trial Exhibit 129).

Surveillance officers at Location 2 (Sandoval-Ramos residence) observed a green Honda Civic depart L2 and it drove directly to Location 1 (stash house).  Surveillance officers observed the vehicle park away from the Location 1 house, and three men walked to that house on foot.  A few minutes later, two men emerged from L1, walked to the green Honda Civic, and traveled directly to the 7-Eleven pre-arranged buy location.  Near in time to when the green Honda Civic arrived at the 7-Eleven, Baker's phone received calls from the "Mexican Bobby" 442 phone number directing him to a different buy location.  *See* Sentencing Exhibit 2 (Gov't Trial Exhibit 131).  The entries highlighted in orange are the calls in which law enforcement agents observed

**Government's Sentencing Memorandum**                                                                 **Page 6**

Baker's phone either make or receive the call. Toll records on co-defendant's dumpster phone (760) and the number saved as "Mexican Bobby" (442) provide the evidence supporting the remainder of the entries. Based on these known facts and phone analysis, the agents determined that this organization responsible in this chain of distribution followed a similar pattern for each heroin order placed by co-defendant Baker:



Officers executed a traffic stop on the green Honda Civic in which they seized a total of 13 ounces of heroin from a trap compartment in the front passenger airbag area, directly in front of passenger Raul Arcila. One bundle was marked "8" and a second bundle was marked "5." There were only two occupants in the vehicle when it arrived in the area of the 7-Eleven, co-defendants Placido Ramirez-Coronel and Raul Arcila.

**Government's Sentencing Memorandum**                                                            **Page 7**

After being advised of his *Miranda* rights, defendant Raul Arcila (front seat passenger) made several statements. He denied any knowledge of drugs being in the vehicle, denied being involved in drug sales, and said that they were merely on their way to Home Depot. Defendant Arcila said he had no idea how the heroin got into the airbag compartment. When asked how long he had been living at the house (L1), defendant Arcila said he has lived at the house prior to being arrested for 3-4 months total. Agents asked if his fingerprints would be on the packages of heroin seized from the airbag compartment of the Honda Civic, and defendant Arcila said, "Well yeah, probably." TFO Carley asked him why, and defendant Arcila told the investigators that they already had all the answers, so he was done talking.

At 6:00 p.m., a team of agents simultaneously executed a search warrant at L1 where they observed security measures like surveillance cameras, surveillance monitors, and a front door jammer bar. Inside the home, agents observed bedrooms with mattresses haphazardly arranged on the floor spaces and very little evidence of long-term residency.



Additionally, agents seized evidence of occupancy for Raul Arcila, photographs of Raul Arcila posing with Placido Ramirez-Coronel (holding firearms), $13,230 in U.S. currency spread

**Government's Sentencing Memorandum** **Page 8**

between two locations -- $8,000 in a box near the fireplace and $5,230 in a shoe box in a bedroom closet, drug packaging material (saran wrap, heat sealers, and discarded kilogram wrappers with heroin residue), packets of lactose (a cutting agent), and digital scales.

After the traffic stop and seizure of 13 ounces of heroin, and while the search warrant was executed at L1, surveillance teams at L2 observed Fabian Sandoval-Ramos, the person Baker had positively identified as "Mexican Bobby," entering and exiting his residence (L2). SA Blankenhip pursued a telephonic search warrant application for L2, and Judge Stewart authorized the warrant at 8:50 p.m. During the search of L2, agents seized miscellaneous identification cards, insurance paperwork, and bank statements. Detectives also searched the unlocked, and unsecured community dumpster at the apartment complex. Inside, they found a white trash bag containing paperwork for Fabian Sandoval-Ramos and numerous unopened packets of lactose (a cutting agent) identical to the lactose packets seized at L1. Near the white trash bag and also in the dumpster, agents found a black Verizon smart phone that had been bent, with battery cover and battery removed.

Agents interviewed co-defendant's wife, Imelda Sanchez, who reported that her husband became very nervous that afternoon. He told her to throw away all the unopened lactose packets which she explained arrived to their apartment from FedEx. She did not know the purpose for which her husband used the lactose packages. She reported that he does travel to California frequently, and two weeks ago, the family had flown with Fabian Sandoval-Ramos to Disneyland but drove back to Oregon in a rental car. Agents arrested Sandoval-Ramos. After advising him of his Miranda rights, he denied being involved in drug trafficking and explained that his cell phone broke around 5-6 p.m., after which he put it in the dumpster. He did not have an explanation for why he directed his wife to throw away the unopened lactose packets.

**Government's Sentencing Memorandum**                                                         **Page 9**

DEA Agents submitted multiple items to the laboratory for fingerprint analysis, including the drug record notebooks seized from defendant Raul Arcila's residence. DEA Senior Fingerprint Specialist Sergio Solis found latent prints on those notebooks. After comparing these discovered latent prints to fingerprints prints on known fingerprint cards from the defendants, he was able to determine a total of eight (8) latent prints found in a single Steno pad notebook matched the fingerprints of three indicted defendants: Fabian Sandoval-Ramos (3), Placido Ramirez-Coronal (4), and Raul Arcila (1). Specifically, Mr. Solis identified defendant Raul Arcila's right thumb print on a single page of drug records [1-11] within DEA non-drug exhibit N-6 (bates page 3968); co-defendant Placido Ramirez-Coronel's fingerprint is on the same page. Mr. Solis identified co-defendant Fabian Sandoval-Ramos' right index finger on the underside of the Steno pad cover, and his left thumbprint appears two times on a single page of drug records [1-4] within DEA non-drug exhibit N-6 (bates page 3964).

## III.   SENTENCING CONSIDERATIONS

While not bound by the Sentencing Guidelines, district courts must consult the Guidelines and take them into account when sentencing. *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005). The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. §3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The guidelines serve as a "lodestar" at sentencing, and "cabin" or "anchor" a sentencing court's discretion. *Peugh v. United States*, __ U.S. ___, 2013 WL 2459523, *9-10

(2013).  While advisory, the Supreme Court has observed that, "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences."  *Id*.

The remaining statutory factors include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant.  18 U.S.C. §§3553(a)(1)-(2).  They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and, where applicable, the need to provide restitution to any victims of the offense.  18 U.S.C. §3553(a)(7); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50, n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting *en banc*, summarized the procedures a sentencing court must follow.  The court must first correctly determine the applicable guideline range.  *Id*. at 991.  The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties."  *Id*.  The court may not presume the guidelines are reasonable and should not give them any more or any less weight than any other factor.  *Id*.  The court "must make an individualized determination based on the facts," and explain its choice of sentence "sufficiently to permit meaningful appellate review."  *Id*. at 991-92.

### IV. GUIDELINE CALCULATION

There was no plea agreement in this case.  The government agrees with the base offense level of 38 recommended by Probation, pursuant to USSG § 2D1.1(a)(2).  PSR ¶ 31.  The government agrees with the PSR that a 2-level increase applies due to possession of a dangerous weapon in connection with a drug-trafficking offense.  USSG § 2D1.1(b)(1); PSR ¶ 32.  The

government agrees with the PSR that defendant has not clearly demonstrated acceptance of responsibility, so there is no reduction under USSG § 3E1.1.  PSR ¶ 38.

The government calculates an adjusted offense level of 40.  The anticipated guideline range for an adjusted offense level 40 and CHC IV is 360-life imprisonment.  The government agrees with defense counsel that defendant's criminal history score of 7 points over-represents his criminal history.  The government believes it would be appropriate to view defendant in CHC III.  The advisory guideline range at level 40, CHC III, however, is still 360-life.

## V.    CONCLUSION

The defendant participated in a significant heroin trafficking operation that actively distributed lethal doses of heroin to the community within the District of Oregon.  As demonstrated in painful detail at trial, heroin use and addiction has traumatic and devastating consequences within this community.  However, the impact of this organization's heroin distribution was particularly devastating to Mr. Delong and the loved ones left behind after his death.  The relatively inexpensive cost of heroin and its ready accessibility within the community are the product of heroin trafficking organizations similar to the conspiracy in which defendant was an active and upper-level participant.  Cheap though it may be for users to buy this poison, the overdose consequences to the health and safety of our citizens is a price far too high.  Congress has recognized the violent and tragic consequences of drug distribution resulting in death by assigning a 20-year (240-month) mandatory minimum for those convicted of this offense.  Those who deal heroin deal death.  The government urges the Court to impose a sentence that will serve to deter others from selling heroin to stem this epidemic.

The government recommends the mandatory minimum sentence of 240 months' imprisonment, followed by five years of supervised release, and a $100 statutory fee assessment.

This recommended sentence is based on the nature of the offense, and the history and characteristics of this offender, including the fact that this defendant played a less significant role than his co-defendant in the overall scheme. Defendant Arcila lived in a stash house, packaged drugs, and delivered those drugs to customers. This is a dangerous job with the highest exposure to criminal liability. Unlike his co-defendant, this defendant did not testify and present materially false information. While there are photographs of defendant holding firearms, the government did not actually seize any firearms at defendant's home or in his vehicle. Such a sentence properly addresses the nature and seriousness of the offense and provides just punishment to the defendant for his actions. It also promotes respect for the law and affords adequate deterrence to criminal conduct. For the reasons set forth above, the 240-month sentence satisfies the requirement of 18 U.S.C. § 3553(a) as a "sentence sufficient, but not greater than necessary" to meet the purposes of § 3553(a)(2).

Dated this 7th day of April 2016.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Leah K. Bolstad*
LEAH K. BOLSTAD, OSB #052039
Assistant United States Attorney

**Government's Sentencing Memorandum**                                                          **Page 13**