1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )   Case No. 3:14-CR-267-BR
4            Plaintiff,              )
                                     )
5   v.                              )   November 3, 2015
                                     )
6   FABIAN SANDOVAL-RAMOS(1) and RAUL )
    ARCILA(3),                       )
7                                    )
             Defendants.             )
8   _____)   Portland, Oregon

9
                TRANSCRIPT OF PROCEEDINGS
10                  (Jury Trial - Day 1)

11       BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:          AMANDA M. LeGORE
                             CSR, RDR, FCRR, CRR, CE
23                           U.S. Courthouse
                             1000 SW Third Avenue Rm 301
24                           Portland, OR  97204
                             (503)326-8184

25

```
1    APPEARANCES:
     FOR THE PLAINTIFF:        LEAH BOLSTAD
2                              (Assistant U.S. Attorney)
                               ELISSA GOLOBORODKO
3                              (Certified Law Student)
                               U.S. Attorney's Office
4                              1000 SW Third Avenue
                               Portland, OR  97204
5                              (503)727-1000

6

7    FOR DEFENDANT SANDOVAL-
     RAMOS:                    BENJAMIN ANDERSEN
8                              121 SW Salmon Street
                               1420 World Trade Center
9                              Portland, OR  97204
                               (503)222-2510
10

11   FOR DEFENDANT ARCILA:     ROBERT SEPP
                               2350 Willamette Falls Drive, Suite 9
12                             West Linn, OR  97068
                               (503)998-7719
13

14   INTERPRETERS:             STEVEN MUZIK
                               FERNANDO HERRAN
15
     ALSO PRESENT:             SUSAN COOKE
16

17

18

19

20

21

22

23

24

25
```

INDEX

                                           Page
Preliminary Jury Instructions....... 31
Opening Statements
   By Ms. Bolstad.................... 37
   By Mr. Andersen.................. 74
   By Mr. Sepp...................... 76

Witness Index

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Dustin Kilty | 81 | 90 | | |
| Charles Lovato | 92 | 104 | | |
| Sara Short | 106 | 115 | 118 | |
| Timothy Goshorn | 120 | 127 | 130 | |
| Timothy Goshorn | | 129 | | |

-oOo-

4

Colloquy

1           (The following excerpt of testimony was held on

2           Tuesday, November 3, 2015; 8:32 a.m.)

3           THE COURT:  We're ready to go on the record, Counsel.

4    Please take your places.

5           Call the case, please.

6           MS. BOLSTAD:  Thank you, your Honor.

7           Your Honor, this is the matter of the United States

8    versus Fabian Sandoval-Ramos and Mr. Raul Arcila.

9           I'm not sure the defense is ready with the

10   interpretation.

11          Mr. Muzik, are we all ready to go?

12          INTERPRETER MUZIK:  Yes, we are.

13          MS. BOLSTAD:  All right.  And, your Honor, the

14   defendants are present.

15          Mr. Sandoval-Ramos is represented by Mr. Andersen.

16          Mr. Arcila is represented here by Mr. Sepp.

17          With me at counsel table is Elissa Goloborodko, from

18   Willamette University school of law.  She'll be helping at the

19   trial.  Later I'll be having other people here.

20          And we're here on day 1 of trial.

21          Parties are ready to proceed, I believe, to discuss

22   jury instructions prior to the jury's arrival.

23          THE COURT:  And to complete our discussion regarding

24   the jury selection process.

25          Good morning.

1          MR. SEPP:  Good morning, your Honor.

2          THE COURT:  I want to note for the record, I received

3    a message that the parties have mutually agreed not to call

4    Mr. Sandoval-Ramos's wife as a witness.  And that would, if

5    accurate, render moot the motion filed by Mr. Audet on her

6    behalf.

7          Can counsel for all parties please confirm that no

8    party intends to call her as a witness and, therefore, that

9    motion is moot.

10          MR. SEPP:  I don't intend to call her, your Honor.

11          MR. ANDERSEN:  Nor do I.

12          MS. BOLSTAD:  And the Government does not intend to

13    call her.

14          THE COURT:  Under any circumstances, anyone?

15          MS. BOLSTAD:  Yes, your Honor.

16          THE COURT:  Okay.  Very good.

17          Then I'll ask Ms. Boyer to note on the record that

18    the motion Mr. Audet filed is now denied as moot.

19          I want to talk very concisely here -- Counsel, you

20    can be seated -- about the Government's position and the

21    defendants' positions regarding the structure of these charges.

22    I continue to have some confusion about how the parties assert

23    issues should be reflected on the verdict form, addressed in

24    the instruction.  And these are issues I want to resolve, if at

25    all possible now, before jury selection, so I can be very

Colloquy

1   direct with the jurors during the jury selection.

2          I do want to be quite specific with them at the

3   beginning of the case that this is a case that originated with

4   five -- well, actually, with six defendants, one of whom has

5   never been located, three of whom have entered guilty pleas,

6   and two of whom are here for trial arising from a heroin

7   overdose resulting in the death of Justin Delong in -- and I'll

8   get the date in front of me so I don't misspeak.

9          MS. BOLSTAD:  March 29th, 2014.

10         THE COURT:  Thank you.

11         I sent all of you another round of proposed

12  instruction -- instructions, but, as I say, I want to focus for

13  the moment on the structural presentation of the actual

14  elemental analysis of the case.

15         We spoke at some length on Friday about the Supreme

16  Court's use in **Burrage** of the term "element" and the use of the

17  term "enhancement."  The Government concedes it must prove the

18  resulting-in-death factor beyond any reasonable doubt.

19         I think it is extraordinarily confusing to the jury

20  not to call this what in practicality it is; that is to say,

21  the Government charges in Count 1 conspiracy to distribute

22  heroin resulting in death.

23         And I, as you saw in this second draft of

24  instructions, constructed the elements to include a specific

25  element of resulting in death as part of the Count 1 conspiracy

1   charge.

2          And then I constructed a lesser and included offense

3   analysis that, if the jury was unable to agree on a verdict for

4   Count 1 with an elemental piece of resulting in death, then

5   they were to determine whether the Government proved a lesser

6   included offense of conspiracy to distribute heroin or to

7   distribute heroin.

8          It was not clear to me which lesser included offense

9   the parties were actually focusing on.  And while I don't need

10  to be particularly precise on that right now, I would rather

11  know specifically what the parties' positions are.

12         The charge is a conspiracy charge, not a distribution

13  of heroin resulting in death charge.  Clearly, distribution of

14  heroin is a lesser and included offense of distribution of

15  heroin resulting in death.  But is the lesser and included

16  offense you're focusing on conspiracy to distribute heroin that

17  did not result in death?

18         I do not agree with Mr. Andersen's perspective that

19  the conspiracy the Government has to prove was one for which

20  the object was a distribution of heroin that would result in

21  death.  That's just wrong, as a matter of law, so I don't want

22  to spend a lot of time on that.  But I do want to know what

23  your positions are on the lesser included feature because it

24  matters right now.

25         Ms. Boyer -- you're not Ms. Boyer.  She's Bolstad.

Colloquy

1        Good morning, Ms. Bolstad.

2        Tell me what your position is with respect to the

3   framework for the Count 1 charge and any lesser and included

4   offense.

5        MS. BOLSTAD:  I think the framework that you have

6   drafted is about as -- the best we can do.  I agree there are

7   some confusing aspects, but I don't have an objection to how

8   you have framed it, telling the jury it's a conspiracy to

9   distribute heroin resulting in death; and making resulting in

10  death one of the elements of the crime.  But --

11       THE COURT:  So that said --

12       MS. BOLSTAD:  -- I have a lot of additional things

13  about how it's worded.

14       THE COURT:  Yes.  Well, we'll get to that.

15       Yes.  But the concept we can live with, and we can

16  spend time on the wording after a bit.

17       What about a lesser and included approach to Count 1?

18       Do you want any kind of lesser and included approach?

19       Do you -- do you want to suffer the risk of a not

20  guilty verdict, and that's the end of Count 1?

21       MS. BOLSTAD:  I want to scrap the lesser included on

22  Count 1.  I want to scrap it.

23       THE COURT:  You don't want one at all?

24       MS. BOLSTAD:  Because we have Count 2, which is

25  basically a conspiracy to distribute heroin.

1          THE COURT:  That would simplify it.

2          MS. BOLSTAD:  (Nods head.)

3          THE COURT:  If the Government's going up or down on

4  conspiracy to distribute heroin resulting in death, no lesser

5  and included.

6          MS. BOLSTAD:  Correct.

7          THE COURT:  All right.

8          Mr. Sepp.  You'll get called on first, so you get to

9  go first.

10          MR. SEPP:  Good morning.

11          I'm fine with your jury instruction.  I too would --

12  I see no point in having the lesser included offense on that

13  first one because, as she pointed out, it's just going to roll

14  into the overlapping conspiracy in Count No. 2.

15          THE COURT:  All right.  So you agree that I should

16  tell the jury Count 1 is conspiracy to distribute heroin

17  resulting in death, and not be concerned -- I shouldn't be

18  concerned at all with the lesser included offense on Count 1.

19          MR. SEPP:  No, your Honor.

20          THE COURT:  Mr. Andersen?

21          MR. ANDERSEN:  Your Honor, I think that is a workable

22  solution that makes sense to me, too.

23          THE COURT:  Thank you.

24          Okay.  So that takes care of Count 1.  The verdict

25  form, then, will be an up or down, guilty or not guilty for

10

Colloquy

1    conspiracy to distribute heroin resulting in death.

2            Now, Count 2.  Clarify for me, please.

3            This is a more traditional conspiracy to distribute a

4    controlled substance, specifically heroin, with an enhancement

5    of a thousand grams or more.  Is that right?

6            MS. BOLSTAD:  Yes.

7            THE COURT:  So the charge is not conspiracy to

8    distribute a thousand grams or more of heroin.  The charge is

9    conspiracy to distribute heroin.  And there's -- if the

10   defendant -- either one of them is found guilty, then and only

11   then the jury determines whether the Government has proved an

12   object of the conspiracy was a thousand grams or more.

13           Is that the Government's position?

14           MS. BOLSTAD:  Yes, your Honor.

15           THE COURT:  And then there isn't any lesser and

16   included offense there at all.  We don't need lesser and

17   included at all there?

18           MS. BOLSTAD:  We don't if that question of quantity

19   is phrased as a special verdict question.

20           THE COURT:  Yes, it would be, because the Government

21   has charged it.  It is classically a sentencing enhancement,

22   around this **Burrage** problem -- with which this **Burrage** problem

23   doesn't have any track.

24           I mean, we've been instructing and having specific

25   verdict forms on quantities for purposes of sentencing

Colloquy

1    enhancements that are disputed, ever -- for years now, ever

2    since it was held that a defendant has a right to a finding

3    beyond any reasonable doubt for those enhancements that

4    increase exposures.  And, here, the 1,000 grams clearly does.

5           So let me ask each of the defense counsel if you

6    agree that the premise, then, on Count 2 is a straightforward

7    presentation to the jury of conspiracy to distribute heroin.

8    In the event a defendant is found guilty, then the jury is

9    asked, did the jury -- did the Government prove beyond a

10   reasonable doubt that an object of the conspiracy was the

11   distribution of 1,000 grams or more of heroin?

12          Mr. --

13          MR. SEPP:  Yes, I agree.

14          THE COURT:  Mr. Andersen?

15          MR. ANDERSEN:  Your Honor, if I'm to understand the

16   Court that that's an object of the conspiracy, so that it was

17   the intent of the conspiracy?

18          THE COURT:  Maybe -- maybe I'm creating too high a

19   burden there.  Maybe it's that a thousand grams or more was

20   distributed in the course of that conspiracy.

21          MS. BOLSTAD:  (Nods head.)

22          THE COURT:  I think that's actually the question.

23          MR. ANDERSEN:  I would agree with the former, I do

24   have problems with the latter.

25          THE COURT:  Of course you would.

Colloquy

1    MR. ANDERSEN:  But I understand the Court's position

2  on some of the issues that I've already raised.  I don't

3  want --

4    THE COURT:  I just want to interrupt you and correct

5  something.  I don't take positions.  The Court is going to make

6  rulings; you all take positions.  I'm not an advocate here for

7  anything other than trying to get it legally correct.

8    And I'll go to the Ninth Circuit model jury

9  instructions for the verbiage, and I'll get you a verdict form.

10  We can fuss with the language specifically.  But I want to be

11  sure I agree -- getting clarity from all of you, that the Count

12  2 charge is a straight-up conspiracy to distribute heroin, with

13  a special interrogatory on quantity.

14    MR. ANDERSEN:  Yes.  I believe that that would --

15    THE COURT:  You get a chance to take an exception

16  after you see the way I worded it.

17    MR. ANDERSEN:  Thank you.

18    THE COURT:  This is how I'm going to present it to

19  the jury for opening -- for discussion.

20    We have two conspiracies.  The difference between the

21  two -- Counts 1 and 2 -- is Count 1 is where the Government has

22  to prove distribution of heroin resulting in the death of

23  Mr. Delong and, of course, the defendant's individual

24  involvements with that conspiracy.

25    And Count 2 is a conspiracy to distribute heroin

Colloquy

1  without a death factor, and where the Government also is

2  alleging a thousand grams or more.

3          Now, Counts 3 and 4 are similar to Counts 2 -- I'm

4  sorry, to Counts 9 and 10.  Similar structurally to Count 2

5  only, A, they apply to Mr. Arcila only; and, B, the quantity is

6  a hundred grams and not a thousand grams?

7          MS. BOLSTAD:  Yes, your Honor.

8          THE COURT:  And, again, the structure would be the

9  same, an enhancement interrogatory?

10          MS. BOLSTAD:  Yes, your Honor.

11          MR. SEPP:  Correct, your Honor.

12          THE COURT:  And that doesn't affect you,

13  Mr. Andersen.  All right.

14          No lesser and included offenses at all, then?

15          MR. SEPP:  No.  No, your Honor.

16          THE COURT:  Okay.  Well, there you go.

17          Ms. Bolstad, I think it would be helpful if you made

18  clear to me what language you want relative to the elemental

19  structure of Count 1, so that I don't inadvertently raise an

20  issue that I haven't yet considered.

21          MS. BOLSTAD:  Thank you, your Honor.

22          THE COURT:  With the jury, that is.

23          MS. BOLSTAD:  In the instruction on elements of Count

24  1 --

25          THE COURT:  And just for context, let me state for

Colloquy

1    the record the parties are referring to a so-called draft No. 2

2    which I e-mailed to them last night.  This is not a final

3    version in any respect.  We'll have more dialogue about these

4    before they become final, but for the record this is on the

5    draft 2.

6                 What page?

7                 MS. BOLSTAD:  And, your Honor, when I open this I get

8    different pages, so --

9                 THE COURT:  Under what heading?

10                MS. BOLSTAD:  It's under elements of Count 1.

11                THE COURT:  Okay.

12                MS. BOLSTAD:  And it would be the third paragraph

13   here.

14                THE COURT:  Okay.  The use of heroin distributed in

15   the course of this conspiracy resulted in the death of Justin

16   Delong, which means that the heroin that was distributed as an

17   object of the conspiracy was the causative factor of

18   Mr. Delong's death.

19                MS. BOLSTAD:  Yes, your Honor.

20                THE COURT:  What's erroneous with that?

21                MS. BOLSTAD:  It's not erroneous.  It is consistent

22   with **Burrage**.  However, I request that we make it even more

23   clear to the jury because of case law that has come after

24   **Burrage** saying normal jurors do not necessarily know what is

25   cause in fact and, therefore, I'm requesting the language from

1    page 50 of my requested jury instructions, paragraph 2.

2            And I can read that aloud.

3            THE COURT:  Yes.  Let me first get it in front of me,

4    though.

5            Paragraph 2, all right.

6            MS. BOLSTAD:  Of page 50.

7            What I am requesting is that the Court use this

8    entire paragraph, which is, I think, a more strict instruction

9    than what the Court's draft 2 has.

10           THE COURT:  Okay.

11           MS. BOLSTAD:  And that is, Whether the distributed

12   heroin resulted in the death of another person means that the

13   distributed heroin was the cause in fact of the person's death.

14   It is not sufficient for the heroin use to have been merely a

15   contributing factor --

16           THE COURT:  Okay.  I can stop you there.  I can't

17   imagine defendants would object to that because it is a bit

18   more stringent.

19           Mr. Sepp?

20           MR. SEPP:  No, your Honor.  That's fine.

21           THE COURT:  Mr. Andersen, I'm going to put this in

22   the next draft, so you can look at it there.

23           But, yes, we will go with this.  I won't be reading

24   from my draft 2 to the jury, but the but-for cause -- frankly,

25   I -- it's more confusing to a juror, I think.

16

Colloquy

1          But if, to protect the record, you want this

2    language -- and it does come from a model instruction, in

3    part -- I'll -- I'll include it in the next draft, so --

4          MS. BOLSTAD:  Thank you, your Honor.

5          THE COURT:  Okay.  What other fundamental concern did

6    you have?

7          I have a question about the mere presence question.

8          MS. BOLSTAD:  Right.

9          THE COURT:  And this -- you saw at the end, I left

10   some language that I wasn't sure what that referred to, whether

11   it referred only to Mr. Sandoval-Ramos.  This business of he's

12   not actually present, I don't know enough about your facts to

13   know what that is referring to.  So talk to me about that.

14         MS. BOLSTAD:  I think there are two issues here.

15   Both involve Mr. Arcila only.

16         THE COURT:  Okay.

17         MS. BOLSTAD:  Mr. Sepp, at one time, proposed an

18   alibi defense.

19         THE COURT:  Yes.

20         MS. BOLSTAD:  So my proposed instruction about alibi

21   is only if that is actually going to be a defense, which I'm

22   not sure it is.

23         MR. SEPP:  I don't anticipate using it.  It just

24   depends on -- I don't know what Mr. Baker is going to testify

25   to.  I may use it at that point.  But the mere presence is

Colloquy                                      17

 1   strictly for Mr. Arcila.

 2            THE COURT:  Okay.  So from your perspective,

 3   Mr. Sepp, you want -- you want a mere presence instruction?

 4            MR. SEPP:  Yes.

 5            THE COURT:  And you want the more classic mere

 6   presence instruction, not one that's just a mere presence

 7   instruction.  And you want it with respects to Counts 9 and 10.

 8            MR. SEPP:  Yes, Counts 9 and 10.

 9            THE COURT:  Not the conspiracy.  That's a different

10   scenario.  Actually, mere presence in conspiracy is pretty much

11   subsumed in the general instructions.

12            MR. SEPP:  Have to do more than just -- yeah.

13            THE COURT:  Just meet or be around, right?

14            MR. SEPP:  Yes.  Yes.  That's fine there, but the

15   mere presence --

16            THE COURT:  So your view is mere presence only as to

17   your client, and then what else?

18            MR. SEPP:  Oh, as to Counts 9 and 10.

19            THE COURT:  Okay.  And if a general mere presence

20   instruction is present as to Mr. Arcila only, as to Counts 9

21   and 10, do you need anything more than that?

22            MS. BOLSTAD:  No, but I think it does raise an

23   evidentiary issue of if that is the defense about Counts 9 and

24   10, that he was just in the vehicle and didn't know what was

25   going on, there is a concern I have about whether that opens

Colloquy                                    18

1    the door to this picture of Mr. Arcila with guns, holding what

2    looks to be a big quantity of drugs at the home.

3              It's not --

4              THE COURT:  But that would be a rebuttal case issue.

5              MS. BOLSTAD:  Correct, your Honor.

6              THE COURT:  All right.  We'll wait until then.

7              MR. SEPP:  Okay.

8              THE COURT:  Okay.  So what I will do is give you

9    another draft, hopefully by the end of the day, that corrects

10   typos and some things and makes these two topical changes, and

11   puts mere presence in context only with Mr. Arcila.  And then

12   we'll have a more deliberate discussion about jury instructions

13   generally.

14             But I want to be sure I'm understanding one more

15   thing about the cooperating witnesses and the exposures they

16   were facing before they made their agreements with the

17   Government.

18             It would help me, Ms. Bolstad, if you would summarize

19   what the exposures each was facing before making a deal with

20   the Government and what the Government has agreed to recommend.

21   If I'm remembering correctly, none of them has a (c)(1)(C)

22   protection.  All of them still face a risk of a reasonable

23   sentence as determined by the Court, but the Government has

24   promised certain things.

25             So tell me what the exposure was before, for each,

Colloquy

1    please, and what the recommendations will be now.

2            MS. BOLSTAD:  Thank you, your Honor.

3            The exposure for all three cooperators is a 20-year

4    minimum.  All three were charged from the get-go with the same

5    crime these defendants face.

6            THE COURT:  And did any of them have a prior drug

7    offense that qualified for a potential life mandatory minimum?

8            MS. BOLSTAD:  I'm glad you asked.

9            There's two ways of answering the question:  The

10   reality of common practice way and the strict reading of the

11   law.

12           THE COURT:  Okay.

13           MS. BOLSTAD:  Now, let's start with Mr. Baker.  At

14   the time of this crime, Mr. Baker had very old convictions for

15   felony possession that wouldn't score any points and don't

16   score any points in his PSR.

17           Actually, all three of these defendants, at the time

18   of this offense, had prior felony possession of a controlled

19   substance offenses.  Under a technical reading of the statute,

20   the Government could charge each of those defendants with a

21   mandatory life crime.

22           THE COURT:  Let me stop you.

23           Does either defendant intend to introduce that

24   technical hypothetical exposure in front of the jury, to test

25   the bias and interest of any of the cooperators?

Colloquy

1    Not just that they were facing a mandatory 20, but

2  potentially qualify for a mandatory life; in theory, but not in

3  practice in this district.

4    MS. BOLSTAD:  Never been done in this district.

5    THE COURT:  Because there's reference to that in the

6  jury instruction, I want to take it out if it's not going to

7  come up.  But I need to know if either of you are going to --

8  you would need an evidentiary basis.

9    You would need to be able to show that the witness

10  not only knew they were facing a mandatory 20-year minimum, but

11  there was a technical exposure for up to a mandatory life, you

12  know.  You would need to know that that witness actually was

13  told that, considered that, considered that the risk, as

14  opposed to the 20-year piece.

15    If none of you have any basis for that, I think it's

16  problematic to throw that into the mix with the jury because,

17  if there's not a factual basis that it actually affected the

18  witness, that the witness was told that by a lawyer or by the

19  prosecutor, it -- it's going to be hard enough for the jury to

20  understand what really was on the mind of the witness when the

21  witness decided to -- to plead.

22    So let me just leave it at this.  Before opening

23  statements, we'll talk again.  I want a position from each of

24  you then -- each of the defense counsel -- as to whether you

25  feel the need to make an argument that there was actually a --

Colloquy

1  this factor mattered in the calculus of those witnesses.

2          So we'll set that aside for a moment.

3          Continue, Ms. Boyer -- Ms. Bolstad.

4          MS. BOLSTAD:  So the Government agrees with that.  I

5  mean, technically --

6          THE COURT:  So your premise is they were each facing

7  a 20-year mandatory minimum only, and that the mandatory life

8  was not.

9          MS. BOLSTAD:  It's not the reality, and it's not what

10 these witnesses were told.  They have never heard of life.  And

11 if they hear it in trial, that would be very surprising to

12 them.

13         THE COURT:  All right.

14         And now what are they getting from the Government?

15         MS. BOLSTAD:  Right.  So starting at the lowest

16 level, Ms. Godvin pled to Count 3, which is a heroin

17 distribution count exceeding five -- I'm sorry, exceeding 100

18 grams.  That creates a five-year mandatory minimum.  The

19 Government intends to recommend 60 months in her case.

20         THE COURT:  The minimum?

21         MS. BOLSTAD:  The minimum, but that also comes -- we

22 get to that minimum through 5K.  So it's possible for her to

23 get, I think, any number of sentences.

24         THE COURT:  Because the resulting in death is a -- is

25 part of relevant conduct, anyway?

Colloquy

1          MS. BOLSTAD:  Correct.  She starts at 38.

2          THE COURT:  I don't know if the jury needs to know

3     that.  I'm not telling you can or can't.  I'm just trying to

4     figure out the bottom line.

5          Your recommendation, then -- your promise is that

6     you'll recommend a five-year mandatory minimum for her?

7          Okay.

8          MS. BOLSTAD:  That is correct.

9          And I need to check the plea.  And I'm sorry I don't

10    have that in front of me, but I think that she's agreeing to

11    also recommend 60.

12         THE COURT:  Okay.  Go on.  I don't need any more

13    details than that.  Just that -- Mr. Baker?

14         MS. BOLSTAD:  Mr. Baker -- so he's the highest of the

15    three.

16         Mr. Baker has pled out to Count 1, distribution of

17    heroin resulting in death.  The Government has agreed to drop

18    the 20-year minimum because of his cooperation, and the

19    Government is recommending a low-end sentence.  Guideline-wise,

20    low-end is at 151, so twelve and a half years.

21         THE COURT:  Okay.

22         MS. BOLSTAD:  Finally, Mr. Rosa.

23         THE COURT:  Yes.

24         MS. BOLSTAD:  He has pled out to, I believe, Count 1,

25    distribution resulting in death.  The Government has agreed to

1    drop the 20-year minimum.

2            And, your Honor, I need to look to see what count he

3    pled to, but I know it's drop the 20.  And the Government will

4    be recommending 87 months in his case.

5            THE COURT:  All right.  So, Counsel, my perspective

6    on all of this is that defendants absolutely have the right

7    fully to explore the motivation of each of the cooperating

8    witnesses to testify, and the stakes that were high for them,

9    the risks they were facing when they chose to make the deal or

10   not.  I do not want any suggestion to the jury that either or

11   both of the defendants had a similar opportunity.  That must

12   not come out to -- in this trial.

13           These juror -- these defendants are presumed

14   innocent.  What they chose to do pretrial is their business,

15   and it's as between you and them and the Court.  It is not

16   relevant in this case, and I'm not going to let this jury move

17   beyond what the witnesses were facing to an inference of what

18   each of the defendants is facing.

19           That is not appropriate.  Not to guess or speculate

20   about whether these defendants had a similar opportunity and

21   chose to decline and whether these defendants are facing --

22   they'll be able to figure out they're facing 20-year mandatory

23   minimums, given the charge.  But they'll also know there are

24   exceptions, but we're not going to go there unless I absolutely

25   have to give an instruction to clarify.  So you need to stay

Colloquy

24

```
1    away from that, any implication about what sentence the
2    defendants are facing if they're found guilty.  That is not a
3    matter for the jury.
4              Is that clear?  Everybody?
5              Ms. Bolstad?
6              MS. BOLSTAD:  Yes, your Honor.
7              THE COURT:  Mr. Andersen?
8              MR. ANDERSEN:  Yes.
9              MR. SEPP:  Yes, your Honor.
10             THE COURT:  That said, defense counsel are free to
11   explore what the witnesses knew and what factors they
12   considered when they decided to accept the Government's plea
13   offer.
14             And I want somebody to make clear -- and if it isn't
15   made clear in the evidence itself, I will tell the jury -- that
16   the plea agreements are between the witness and the Government.
17   And the -- in the end, it still is the Court's decision.
18             There has to be some integrity to this process, so
19   that the jury understands the final decision is left up to the
20   Court, although the point is the Court wouldn't have the power
21   to sentence below 20 or the authority to do so if the
22   Government didn't open the door.
23             And that's why I was trying to phrase it that way in
24   that -- my first or second effort to describe that.  But I'll
25   do more writing on that point.
```

Colloquy

1          So that -- I'm not going to step in if you show it,

2     but if you do or there's any question about it, I'll give the

3     jury a sua sponte instruction.  Okay.

4          MR. ANDERSEN:  And, your Honor, and would we be

5     permitted to go through -- I'm assuming we would, but I would

6     like some clarification -- the cooperation agreement letter

7     itself with --

8          THE COURT:  Yes.

9          Yes.  It's a fact -- okay.

10         Let's turn to voir dire.

11         I want to be sure I have a complete witness list.

12         (Pause, Court and clerk conferring.)

13         THE COURT:  We only have 38 jurors who have reported,

14    so we'll do what we have to do.

15         I have the Government's witness list, which has on it

16    21 names.

17         I have Mr. Arcila's witness list that has two names.

18         I don't have a list, Mr. Andersen, from you.

19         Are there any other names that I need to review?

20         MR. ANDERSEN:  No.

21         THE COURT:  All right.

22         Ms. Boyer, do you have any -- Ms. Bolstad -- I don't

23    know why I'm calling you Ms. Boyer this morning.  It's the B

24    thing.

25         Ms. Bolstad, do you have any other names to add to

1   the list, beyond what's combined between you and Mr. Sepp?

2          MS. BOLSTAD:  Your Honor, I would just like to

3   clarify that my list has been updated.  It was from the joint

4   report I filed last week.  So total, I have 19, without

5   Ms. Sanchez anymore.

6          THE COURT:  All right.  The fact that I'm reading

7   names, though, doesn't mean they're going to be called.

8   They're just names the jurors should know.

9          So I don't have that report in front of me.  Let me

10  hand you the list I was looking at, which was your October 19

11  filing.  Would you strike from there the names you don't think

12  I need to review.

13          And because of the parties' stipulation that heroin

14  use was the but-for cause of Mr. Delong's death, I assume there

15  aren't going to be any expert witnesses testifying on

16  causation.  Is that right?

17          MS. BOLSTAD:  No, your Honor.

18          THE COURT:  There are?

19          MS. BOLSTAD:  There are, because the witness -- it's

20  not just about causation -- it's about --

21          THE COURT:  Your witness list was described as a fact

22  witness list, and that's why I read it somewhere.

23          Is there an expert on -- never mind, then.

24          MS. BOLSTAD:  Yes, there's an expert witness list.

25          THE COURT:  Just cross off the names that you don't

Colloquy

1   want me to read to the jury.

2           MS. BOLSTAD:  Okay.

3           THE COURT:  All right?

4           Because I'm going do that pretty quickly.

5           Now, we're going to call for the jurors.

6           Is there any review you need me to do with the

7   process we reviewed late in the day on Friday?

8           Counsel?

9           MR. ANDERSEN:  Your Honor, this might be premature,

10  but I just want to briefly mention -- or move that any

11  statements purportedly made by Mr. Sandoval's wife also not be

12  referred to in any way.  I'm assuming that that's --

13          THE COURT:  Well, I don't know what the nature of the

14  agreement is among you, as to why you're not calling her, but

15  let's make it plain.  Does anyone intend to offer evidence

16  about what the defendant's wife said to anybody?

17          MR. SEPP:  Defense -- I don't, your Honor.

18          MS. BOLSTAD:  No, your Honor.

19          Ms. Imelda Sanchez-Olivera asserted the marital

20  privilege.  Mr. Audet showed me proof of that marriage, and so

21  there is really no way around that.

22          THE COURT:  So your witnesses who interviewed her are

23  not going to talk about what she said, but that they spoke with

24  her, that they found the phone, that they found the packets.

25          MS. BOLSTAD:  Correct.

Colloquy

1           THE COURT:  All of that.

2           Okay.  Very fine.

3           Ms. Boyer, now I do mean to speak to you.  Would you

4   please get the jurors.

5           All right.  When they come in the room, the first

6   juror, as I said last week, will be in the back row, No. 1.

7           1 through 8, 9 through 16.

8           And then the following jurors will be seated in the

9   front row, ladies, where you're seating -- seated, so you're

10  going to need to move.  Everybody needs to move to the very

11  back rows, who's observing, until we have jurors situated.

12          You can move your cart in ahead of the bar, if you

13  would like.

14          DETECTIVE SOMMER:  Thank you.

15          THE COURT:  Mr. Arcila, how are you feeling today?

16  Any better than Friday?

17          DEFENDANT ARCILLA:  A little bit.

18          THE COURT:  A little bit?

19          All right.  If at any point a break is needed,

20  counsel need to tell me.  I'm going to try to go as long as I

21  can, to a logical point, before we take a break, because

22  obviously it will be a time-consuming event to take any break

23  with 38 jurors and everyone else in the room.  Get my

24  attention, if a break is needed for any reason.

25          MS. BOLSTAD:  Judge, a revised witness list.  I can

Colloquy                                    29

1   say them out loud, if that's not --

2           THE COURT:  Well, so this is different than -- you

3   re-summarized.  I can do this.

4           Thank you.

5           MS. BOLSTAD:  And, your Honor, are we on the record

6   or off?

7           THE COURT:  We are, unless you don't want to be.

8           MS. BOLSTAD:  I'm so sorry.  I do have revised

9   exhibit lists that we requested.  We sent one to Ms. Boyer and

10  I have copies for counsel.  Would your Honor like a copy?

11          THE COURT:  Yes, please.

12          MS. BOLSTAD:  And in those lists we included the old

13  exhibit number on the right column, so that people can track

14  what it used to be.

15          THE COURT:  Okay.  Okay.  (Pause, handed document.)

16          (Prospective jurors enter.)

17          (Jury selection was reported and not requested to be

18          transcribed.)

19          THE COURT:  Everything went according to expectation.

20  The other jurors have been excused.  A couple of the jurors

21  were waiting outside here and didn't have access to a bag with

22  a cell phone.  So one of them is texting, now, the office, to

23  say she's not coming, or home, or whatever.

24          As soon as that's complete, Ms. Boyer will bring them

25  in.  I will swear them.  I will give them some basic -- very

Colloquy

1   basic instructions because I don't want to take too much more

2   time, and we'll go to opening statements.

3          Have you reviewed all of the materials you're showing

4   to the jury in opening statement with counsel?

5          MS. BOLSTAD:  Yes, Counsel is aware that -- of the

6   admitted exhibits, the photographs, et cetera, I might be

7   showing in opening.  I've also shared with them two diagrams

8   that they agreed to, both this morning and last night.  One is

9   a map and one is the link chart of who's involved.

10         THE COURT:  About how long do you expect your opening

11  statement will take?

12         MS. BOLSTAD:  Could be half an hour.

13         THE COURT:  Okay.  We may take a recess after

14  Ms. Bolstad's opening statement, in light of the time of day,

15  and then we'll proceed in order of the Indictment.

16         So, Counsel, you'll go next.  And about how long are

17  you expecting?

18         MR. ANDERSEN:  I don't expect my opening will be very

19  long at all, your Honor.  I expect in the neighborhood of less

20  than ten minutes.

21         MR. SEPP:  Same, five to ten minutes, your Honor.

22         THE COURT:  Very well.

23         MS. BOLSTAD:  And just for witness preparation, your

24  Honor, just to let you know for planning purposes, I have

25  Mr. Kilty as my first witness.  I don't anticipate his going

1    beyond 15 or 20 minutes.

2              Deputy Medical Examiner Lovato.  Maybe another 20 to

3    30 minutes.

4              And then I'm going to skip to Ms. Short, from OSP,

5    another 20-minute witness.

6              THE COURT:  All right.  Ms. Boyer, please bring in

7    the jury.

8              Normally, ladies and gentlemen, we'll be rising every

9    time the jury comes into the room, but not this time because

10   they're going to be walking in and I don't want to interfere

11   with their movement.

12             (Jurors enter, 2:12 p.m.)

13             THE COURT:  Ladies and gentlemen, would you all

14   please stand.  Raise your right hands to be sworn as our jury,

15   in this case.

16             (Presiding jurors sworn.)

17             THE COURT:  Please say "yes" or "I do."

18             THE JURORS:  I do.

19             THE COURT:  Thank you.  Please be seated.

20             Jurors, thank you for your patience and working with

21   us this morning.  You are now the jury that will try this case.

22   You may notice there are 13 of you.

23             Mr. Dahl, you're our insurance policy, as the

24   alternate juror, No. 13.  You are every bit as important as the

25   other jurors because, in the event something happened and one

Preliminary Jury Instructions

1   juror wasn't able to complete his or her duty, you would be

2   pressed into completing the process.

3           So you really are a jury of 13.  If it turns out by

4   the end of the case we still have 13, then you'll be separated

5   from the other jurors.  You won't be part of the deliberation.

6   But if we're down to 12, you'll be part of it.

7           So you are very much part of this, but an important

8   insurance policy.  You've seen how much effort just went in to

9   picking a jury, and we have many witnesses coming.

10          I -- I've given you a lot of general orientation.

11  I'm not going to take a lot of your time right now because of

12  the time of day.  I would like to get right to the opening

13  statements by the lawyers.

14          I want to make a couple of points, though, about

15  scheduling.

16          Today we'll go until about 4:45.  4:30, 4:45, a

17  logical break in the testimony.  That will be the normal

18  adjourning time, so you should plan for that for the rest of

19  the week.

20          Tomorrow, the courtroom -- tomorrow, we will have you

21  in the courtroom ready to go at nine o'clock.  You're free to

22  be here from eight o'clock on.  Any -- earlier than 9:00.

23          But you won't be going down to the main jury room.

24  Ms. Boyer, at the next recess, will show you how to access a

25  jury room behind this wall.  That will be your jury room, and

Preliminary Jury Instructions

1  that will be where you'll be whenever you're not in the

2  courtroom here during trial.  Or you'll be in the hallway

3  behind us here, which is secure space; meaning none of the

4  parties, none of the witnesses, none of the lawyers will be

5  there.

6       But you'll be free to, you know, walk about.

7  Windows, the like.  Restrooms.  And at some point we'll get you

8  up to the 16th floor balcony, where there is a beautiful view,

9  and get you some fresh air, too.

10      Ms. Boyer will also give you a button to wear that

11  says "juror."  I need you to wear that all the time you're in

12  the building because, as a few of the jurors just noticed when

13  we rode up together, a lawyer steps on the elevator.  And you

14  want to be sure that you're labeled so that people don't happen

15  to talk about the case around you.  Again, everything is

16  focused on trying to keep your decision process limited to the

17  evidence presented here in front of everyone.

18      I've told you every way I know how, but I'll be

19  continuing to say it.  You cannot talk about the case with one

20  another or anyone else.  You cannot communicate in any way:

21  Speaking, texting, e-mailing, legal research about the case in

22  any way with anyone until your work is over.

23      When it's over, you're free to do whatever you want

24  by way of research and to communicate with whomever you want

25  about the case, except I always remind jurors that what is said

Preliminary Jury Instructions

1  in the jury room when you deliberate, when you decide your

2  verdict, that ought to be private among the 12 of you.  And you

3  can talk about your own opinions to other people, but you

4  shouldn't share what others say from their perspective.  That's

5  their private discussion with you as a group of 12, if you

6  understand what I'm saying.

7           So I told you a little bit about what is evidence.

8  It's the testimony of witnesses.  You're going to hear some

9  this afternoon.

10          It's the exhibits; documents, and things that are

11  received in evidence.  You'll see some of that this afternoon.

12          It's any agreed fact that I or the parties point out

13  to you.

14          Your decision about what the facts are has to be

15  based on evidence.

16          What is not evidence:  What is not evidence is what

17  the lawyers say.  They are officers of the court, and they are

18  advocates for their clients.  They will do their best to be

19  helpful to you, to explain what they think the evidence shows

20  or does not show, to alert you to things they want you to watch

21  out for or to listen for.

22          If they say things that turn out to be different from

23  how the witnesses testify, you're to rely on your memory of

24  what the witnesses say directly, not how the lawyers say the

25  witness said it.

1          What the lawyers say is not evidence.  It's intended

2     to help you.  But the evidence comes from the witness stand or

3     the documents or the things.

4          So they'll be asking questions of the witness.  The

5     question isn't evidence, but you obviously have to listen to it

6     and understand it to get what the witnesses's answer is, right?

7          So what they say is not evidence.

8          What you see and hear when court is not in session,

9     even if it involves people here in the courtroom, is not

10    evidence.  If I tell you at any point during the trial,

11    "Disregard that," or if I sustain an objection, that means

12    disregard that.  And the point is to make clear to you what's

13    out of the case.  When I tell you something's out, then you

14    can't consider it when you deliberate.  I'll try hard to be

15    sure it's clear what's in, so you know what you can consider.

16         Don't concern yourself with why a lawyer makes an

17    objection or why I rule as I do.  If I stopped to explain the

18    basis and the ruling, you would be here a lot longer than the

19    days we've projected.  Just trust me to -- accept the ruling,

20    please, and then move on.

21         If it's in, it's in like everything else.  If it's

22    out, you may not consider it.  All right?

23         You've been given notepads.  You're free to take

24    notes if you want.  You don't have to take notes.

25         At the end of the trial I will give each of you a

1    complete written set of instructions, so you'll have all of the

2    law and the specific legal charges in front of you.  For now, I

3    want to remind you there are four charges being considered.

4    The first two involve Mr. Sandoval-Ramos and Mr. Arcila.  The

5    last two involve only Mr. Arcila.

6            The prosecutor will explain those again in her

7    opening statement in a few minutes.

8            So you will have two verdict forms at the end of the

9    case:  One for Mr. Sandoval-Ramos, one for Mr. Arcila.  I make

10   two forms because these are two different individuals.  Each

11   has charges against him.  Each charge is to be considered

12   separately from the other.

13           And the idea of having two verdicts is just to remind

14   you these are two people, each with separate cases and

15   separate -- the right to this continued presumption of

16   innocence.  They are not guilty unless and until the Government

17   proves them guilty beyond any reasonable doubt.  They have the

18   right to this trial, the right to confront the witnesses, the

19   right not to have to prove they are innocent.

20           And so that's how we start now.  This is the

21   Government's opportunity to put that proof before you.

22           Ms. Bolstad, then, will address you on behalf of the

23   Government.  Please give her your attention.

24           Counsel.

25           MS. BOLSTAD:  Thank you, your Honor.

Opening Statement - by Ms. Bolstad

1          May it please the Court, Counsel, ladies and

2  gentlemen of the jury.

3          THE COURT:  Please stand near the microphone.  I'm

4  sorry, I need to be able to hear you.

5          MS. BOLSTAD:  Is it okay to move the microphone, your

6  Honor?

7          THE COURT:  Yes, as long as you stay near it.

8          MS. BOLSTAD:  Ladies and gentlemen, my name is Leah

9  Bolstad.  I represent the United States.

10          Before I get -- get into all of the facts, I want to

11  make introductions.

12          With me at counsel table is Detective Sommer

13  Andersen.  She is the lead investigator in this case.  She'll

14  be presenting you some testimony and evidence.

15          Also with me is Ms. Susan Cooke.  She's with our

16  litigation support team.  She will help me show you the

17  exhibits in this trial on those screens in front of you and, on

18  the witness stand, the screen for the witness.

19          Finally, Elissa Goloborodko.  As I told you before,

20  she is a law student.  She'll be helping me with this trial.

21          On Saturday, March 29th, 2014, 25-year-old Dustin

22  Kilty woke up late.  It was a Saturday.  He woke up late, as

23  most 25-year-olds are known to do.  He went to the kitchen to

24  make breakfast, to share that breakfast with his roommates.

25          He lived in an apartment with two other young men.

Opening Statement – by Ms. Bolstad

1   One of those roommates went away for the weekend.  He wasn't

2   there.  The other roommate was Justin Delong.

3           And I say "was" Justin Delong because Justin Delong

4   died on the morning of March 29th when Mr. Kilty had woken up

5   to make breakfast.  Mr. Kilty called for his roommate to wake

6   up.  Didn't hear anything in response.

7           Mr. Kilty went into his roommate's room, his good

8   friend's, and found Justin Delong, age 26, dead on the floor.

9   He went to him, and Mr. Delong's body was cold and stiff.  He

10  was clearly no longer with us.

11          Mr. Kilty immediately called 9-1-1.  Emergency

12  responders showed up at the scene of that -- of that location

13  they shared, that house in Aloha, Oregon.  There was nothing

14  that they could do.  Mr. Delong had already died.

15          Investigators also showed up to the scene,

16  immediately.  These investigators are trained to look at heroin

17  overdose cases and treat those scenes like homicides.  That

18  means they devote resources to investigating where the drugs

19  came from that resulted in this young man's death.

20          Detective Andersen and her partner, Detective McNair,

21  worked for this Washington County sheriff's interagency

22  narcotics team.  It's a task force.

23          And what they did was they immediately started

24  working up the chain of distribution.  All right?

25          The first thing they need to determine is who

Opening Statement – by Ms. Bolstad

1    distributed these drugs to Mr. Delong.  And the key piece of

2    evidence that they look for in any heroin overdose case is the

3    cellular telephone.  It's the key piece of evidence.

4         So they picked up Mr. Delong -- this young dead man.

5    They picked up his cell phone and they assumed his identity.

6    And they looked in that phone for recent -- any recent evidence

7    of who distributed the drugs.  Who was he in touch with?

8         And immediately they were able to identify Morgan

9    Godvin as the person from whom Mr. Delong obtained heroin the

10   night before.

11        So this death was on a Saturday morning.  The text

12   message is from Friday night, to paint the picture.  Mr. Delong

13   needed heroin.

14        You'll hear evidence in this case through testimony

15   that Mr. Delong had struggled to get off of his heroin

16   addiction.  He had spent several months clean.  He had a job.

17   He worked with his roommate, Mr. Kilty.  They were roofers.

18        But you will hear about the pull of this drug and how

19   desperate an addict is to get it when that need hits you.  So

20   Mr. Delong reached out to his friend Morgan on a Friday night.

21   And he asked her, can he get a gram, a single gram from her.

22        Ms. Godvin, who shared an apartment in Southeast

23   Portland with two other two young men, she agreed.

24        Mr. Delong came over to her house, picked up a gram

25   of heroin for $80, went back to his home, used it.  And his

Opening Statement – by Ms. Bolstad

1    respiratory system shut down and he died.

2              So in this case you're going to hear about the chain

3    that led to that death.  And I would like to summarize it for

4    you now.

5              It starts -- well, this is the end of the chain,

6    okay.  Ladies and gentlemen, these are two of the men who are

7    on trial:  Fabian Sandoval-Ramos, who's sitting here.  And Raul

8    Arcila, sitting behind me with his attorney.

9              Mr. Delong's death on Saturday, I've already told you

10   he obtained that heroin from Ms. Godvin.  Ms. Godvin will

11   testify in this trial.  She will tell you about what happened.

12             Ms. Godvin purchased her heroin from Michael Rosa.

13   That's one of her roommates.  You will hear from Mr. Rosa in

14   this trial.  He will testify.

15             Mr. Rosa purchases his heroin from Mr. Shane Baker.

16             You will hear Mr. Shane Baker testify in this trial.

17             All of these individuals -- Mr. Baker, Mr. Rosa, and

18   Ms. Godvin -- will admit to you that they are heroin addicts.

19   And they were definitely heroin addicts at the time this all

20   happened.  They will admit to you that they sold heroin, in

21   part, to feed their own addiction.

22             You will hear evidence from Mr. Baker about where he

23   obtained his heroin.

24             And at this stage, ladies and gentlemen, I want to

25   introduce you to you a concept that you're going to hear about

1   in trial.  And if any of you have ever ordered a pizza, you're

2   going to know what I'm talking about.

3          This is a dispatch drug trafficking organization.

4   There is a dispatch phone with a 442 area code.  That's what

5   the customers call.  And just like Domino's, Pizza Hut, there

6   are a lot of people out there who want heroin.  They call a

7   dispatch phone that's not even in Oregon, ladies and gentlemen.

8   It's at a call center.  It's -- it's not in this district.

9          And when Shane Baker would place his orders for

10  heroin, like calling Pizza Hut, the person that he calls is not

11  the guy who delivers the heroin.  The guy he calls is a

12  dispatcher who sends runners out into the field to deliver

13  these goods.  And so when Mr. Baker would place these calls,

14  runners would show up.

15         And the phones tell the story.

16         Mexican Bobby, the phone identified with the 442

17  number, that identification comes from Mr. Baker's phone.  That

18  was his code, almost like if you saved Pizza Hut in your

19  code -- in your phone, you might call it Pizza Hut.  But the

20  person that you call, who answers the phone at Pizza Hut,

21  doesn't always tell you exactly who they are.

22         That's exactly what happened here.  Shane Baker

23  placed his calls for heroin.  The dispatch phone would then

24  call people in Oregon, especially Placido Ramirez-Coronel.

25  Mr. Coronel and his partner, Mr. Arcila, would then show up to

1    deliver the heroin.  And that's a pattern that happened again

2    and again, in this case.

3         You'll also hear evidence at the end of this case

4    that connects Fabian Sandoval-Ramos to this dispatch

5    organization through the phone tolls, but also through

6    surveillance observations here in Oregon linking Mr. Fabian

7    Sandoval-Ramos with the people who delivered the drugs.

8         And at this stage, ladies and gentlemen, it's

9    important to introduce you to this idea of two locations.

10   You're going to hear a lot in this case about two locations.

11        One location -- we'll call it location 1 -- is where

12   Mr. Arcila lived.  It's basically a stash house.  It is a

13   location devoted to the manufacture and the packaging of heroin

14   for distribution in this community.  Mr. Arcila lived at that

15   location with Mr. Placido Ramirez-Coronel.

16        Location No. 2 was occupied by Mr. Fabian

17   Sandoval-Ramos.  It is not a drug stash house.  It is his

18   family home.  Fabian Sandoval-Ramos lived there with his wife

19   and his children.

20        But what's interesting about these two locations is

21   what links them.  You will hear evidence that Fabian

22   Sandoval-Ramos, he does not live at location 1, but he's the

23   power subscriber.  He pays the power bill there.

24        And when those two young men, Mr. Arcila and

25   Mr. Placido Ramirez-Coronel -- you'll hear evidence that, when

Opening Statement - by Ms. Bolstad

1   they go to deliver the drugs, they do so in a vehicle that is

2   registered in the name Fabian Sandoval-Ramos.  You'll hear

3   evidence that that vehicle, registered in his name (pointing),

4   had a trap compartment.

5           And you'll hear a lot of evidence from drug officers,

6   narcotics experts, who will tell you about these aftermarket

7   additions placed in vehicles.  Secret compartments to hide and

8   store drugs while they're delivered throughout the community.

9           This particular car had a trap in the front passenger

10  airbag area, in a hollowed-out space where there should have

11  been an airbag.  Instead, it was filled with -- at times, 13

12  ounces of heroin, which is nearly one pound.

13          Based on the investigation that you'll be presented

14  with in this case, as Judge Brown told you, there will be four

15  charges that you will need to decide:

16          No. 1, conspiracy to distribute heroin resulting in

17  death.  Both defendants are charged in that conspiracy.

18          No. 2, conspiracy to distribute heroin in an amount

19  exceeding 1,000 grams.  1,000 grams is a kilo of heroin.

20          For your reference, this is less than 1 gram of

21  heroin (indicating).  It's almost the size of a tip of a

22  pencil.  This less-than-a-gram, there's over a thousand of

23  these in a single kilogram.

24          This is what was found at Mr. Delong's residence.

25  This is what remained of the 1 gram of heroin that he had.  And

Opening Statement – by Ms. Bolstad

1   you will hear evidence that a single dose of heroin like this

2   can kill you.

3           And there are a thousand of those doses, or more.

4   There's many thousands of those doses within a kilogram of

5   heroin.

6           Two conspiracy counts.

7           Count 3 and 4 in this case, which are actually

8   labeled Counts 9 and 10, those counts only involve the

9   defendant Raul Arcila.  Those are not conspiracy counts over a

10  long period of time.  They're from a single day in time.

11          So first you'll hear evidence about March 31st, for

12  Count 9.  That's when Mr. Arcila showed up in the red Honda

13  Passport, registered in the name of Fabian Sandoval-Ramos, and

14  delivered 8 ounces of heroin to Shane Baker.

15          That event was monitored by the police.  They set it

16  up.  They obtained the heroin afterwards.  They tested the

17  heroin, and they recorded the buy.

18          Count 10 on Mr. Arcila takes place two days later, on

19  April 2nd.  After he had delivered 8 ounces to Mr. Baker on the

20  31st, he again delivered what he thought was going to be

21  another 8 ounces to Mr. Baker on April 2nd.  But instead of

22  Mr. Baker showing up, the police met Mr. Arcila at the buy

23  location.  And they arrested Mr. Arcila and the driver of the

24  vehicle, Mr. Ramirez-Coronel.  They had 13 ounces of heroin in

25  the vehicle that time.

Opening Statement – by Ms. Bolstad

1        It wasn't the same vehicle.  It was a different Honda

2    vehicle.  This one was not registered in the name of Fabian

3    Sandoval-Ramos, but it was registered to his address at

4    location No. 2.

5        It, too, had a trap compartment.  That's –– it was

6    right in front of the front passenger seat.  13 ounces of

7    heroin on this occasion.

8        The 13 ounces consisted of the 8 ounces that he

9    thought he was going to deliver to Mr. Baker, plus another

10   other 5 –– another 5 ounces for a customer we don't even know.

11       I told you about the charges.  What I want to cover

12   with you now is about things that are not big issues.  Okay?

13       Because I want you to be able to focus your attention

14   in this case on what is the issue; what is it that you are

15   going to be called upon to figure out.

16       So let's start with the easy stuff.  What are things

17   that there's not a dispute about?

18       There's three.

19       First, I do not anticipate that there is going to be

20   a dispute in this case about whether the substances seized were

21   in fact heroin.  Okay?

22       The parties have agreed –– we have an agreement that

23   the lab tested all of these seized drugs and the lab confirmed

24   the presence of heroin.  We're not even going to call chemists

25   to testify to that because everybody agrees to that fact.

Opening Statement – by Ms. Bolstad

1          The second thing that there's really no dispute about

2     here is about the quantities involved.  Right?

3          You've got a vehicle showing up with 8 ounces one

4     day, 13 ounces two days later.  There's no dispute that that is

5     over 100 grams of heroin.  Okay?

6          It's up to 200 grams.  When he delivers 8 ounces,

7     that's 200 grams.  So there's really no dispute about that

8     quantity question as to Mr. Arcila's counts.

9          The third thing that is not in dispute, and you heard

10    a little bit about it this morning, is the cause of death.  The

11    parties have stipulated that this victim died as a result of a

12    heroin overdose.  We've agreed that, if Mr. Delong had not used

13    heroin, he would not have died.

14         And so then what is at issue?  What are you called

15    upon in this trial to decide?  What facts do you need to be on

16    the lookout for?

17         Two huge issues.

18         No. 1, did these two defendants -- did these two

19    participate in a conspiracy to distribute heroin?

20         That's the first thing.  Did they have an agreement

21    to go and sell drugs, make that happen?

22         The second huge issue is did the heroin that killed

23    Mr. Delong -- we all agree it killed him.  Did he get that

24    heroin from this conspiracy?

25         And so the evidence that you'll be presented with in

1    this trial is really to address those two things.

2          You're going to hear a lot of evidence of this low

3    level of the chain.  And the reason you're going to hear about

4    the chain, the chain, the chain (snapping fingers), is because

5    the Government has to prove that the heroin that killed

6    Mr. Delong came from this conspiracy.  And so we have to build

7    that for you from the ground up.

8          And here's how I think of it, in case it helps you.

9          This trial and the evidence that you're going to hear

10   is like a book.  Sometimes it might feel like a book that's too

11   long for you, but there's five basic chapters for that book.

12   Okay?

13         And the trial will follow those chapters in

14   chronological order.

15         Chapter 1.  Somebody died.

16         In that chapter you'll hear from the medical examiner

17   who did an autopsy, determined cause of death.  But he also

18   gives you information that you need that goes to the chain.

19   He'll tell you about how long does it take for heroin to kill

20   somebody.

21         When do you think that the person ingested the

22   heroin?

23         Which helps you decide, did this heroin come from

24   this chain?

25         Chapter 2 of this story will be all about Morgan

Opening Statement – by Ms. Bolstad

1   Godvin and Michael Rosa.  So when the police posed as

2   Mr. Delong and ordered up more heroin, they learned it was from

3   Morgan Godvin.  They determined where Ms. Godvin lived:  In

4   Portland.  Southeast 187th.  They determined that she lived

5   there with somebody named Michael Rosa.

6           Detective Andersen went and got a search warrant

7   signed by a judge.  I want to search this residence.  I think

8   they distribute drugs.

9           And when the police showed up at that apartment, sure

10  enough, they saw all of the classic signs of drug distribution.

11          This is the apartment (indicating).

12          Ms. Godvin is pictured there in the blue shirt.

13          This is the living area with all of the telltale

14  signs of heroin addiction.

15          Ms. Godvin, when she testifies, will tell you what

16  she was going through at this time of life.

17          This is March 2014.  Her mother died in December

18  2013, and Ms. Godvin was in a really bad place.  She was using

19  up to 2 and 3 grams of heroin a day.  Depressed.  Her life was

20  ruined.  Jobless.  She was in a rough spot.

21          What she had going for her was the steady supply of

22  heroin from her friend and roommate, Mr. Rosa.

23          You'll hear evidence in this case that when the

24  police came into this living room and they confronted Morgan

25  Godvin with the fact that her heroin -- the heroin she

Opening Statement – by Ms. Bolstad

1   distributed last night had killed Justin Delong, she was at a

2   crossroads.  She knew Justin, Mr. Delong.  She felt bad.  And

3   she agreed to cooperate and provide information.  She told the

4   police, I get my heroin from Michael Rosa.  He lives upstairs.

5   Yes, I'm willing to cooperate.

6          She knew she was in trouble.  But as you'll hear her

7   testify, the thing she feared more than being in trouble was

8   going to jail and being without heroin.  That was terrifying

9   for her, but she did it.

10          You'll hear that the police in this apartment seized

11   over 100 grams of heroin, digital scales, multiple digital

12   scales to weigh out the heroin.

13          They also seized drug records, which are very simple.

14   Sometimes simplistic.  They're on pieces of notebook paper.

15   Amounts, adding up amounts owed and amounts paid.  And

16   customers.  Just like any business.

17          You'll hear that when the police were at this

18   location, Mr. Rosa arrived in his car and he parked.  And he

19   walked into something he probably wishes he had just kept

20   driving.  The police confronted Mr. Rosa.  They explained to

21   him what had happened, that someone died using heroin that came

22   from him.  Like Ms. Godvin, he accepted responsibility.  He

23   told the police what happened.

24          And when the police asked him if he would be willing

25   to help them work up the chain of distribution to get to the

50
Opening Statement – by Ms. Bolstad

1   higher level dealers, Mr. Rosa did what was asked of him.  He

2   said, I get my heroin from Shane Baker.  I get 4 to 8 ounces

3   every few days.  Yes, I will help you set up a buy with

4   Mr. Baker.

5          Not only did he identify Mr. Baker, he said, Shane

6   Baker is my only source of supply.  Which eliminates the idea

7   that there's other chains at issue.  Godvin only got her heroin

8   from Rosa.  Rosa only got his heroin from Shane Baker.  And so

9   then the next natural step for the police is to go to Mr. Shane

10  Baker's apartment.

11         But first, they were careful.  They were deliberate.

12  They obtained a search warrant, judicial authorization to

13  search Mr. Baker's house.  They used Mr. Rosa to make a

14  controlled buy with Mr. Baker.

15         That means that they recorded a phone call.  They

16  watched what happened.  They recorded the buy where Mr. Rosa

17  went in and purchased heroin from Mr. Baker.  And they took the

18  heroin from Mr. Rosa once he got it.

19         It was 1 ounce, or a piece, approximately 25 grams of

20  heroin.

21         And in so doing they were able to confirm -- the

22  police were able to confirm.  Now we have this source,

23  Mr. Baker, who's now three levels up the chain.  And all of

24  that work took place in 24 hours.  That they were up to this

25  third-level dealer, Mr. Baker, the kind of guy who's delivering

51
Opening Statement – by Ms. Bolstad

1   8 ounces at a time.  That's a half pound of heroin.

2          And now we're talking serious money.  8 ounces of

3   heroin costs $6,000.  That's what Michael Rosa was buying every

4   few days from Mr. Baker.

5          So they used Mr. Rosa to make a call.  They set that

6   up with Mr. Baker, and they catch Mr. Baker the next –– on

7   March 31st.  That's Monday.

8          They go to Mr. Baker's house with a search warrant.

9   And when they get there, to that Beaverton apartment, they see

10  all of the signs of a heroin addiction as well as heroin

11  distribution.

12         They find rubbers, rubber bands used to get veins,

13  get working veins to intravenously inject drugs.

14         They find drug packaging materials all over.  Digital

15  scales, $4,000 in drug proceeds.

16         And multiple cell phones.  Because, remember, the

17  cell phones.  That's how business is accomplished in the drug

18  trafficking world.

19         They arrested Mr. Baker.  Mr. Baker found himself ––

20  found himself at a crossroads.  They told Mr. Baker what had

21  happened.  Someone died using heroin that came from you.

22  That's a very serious thing.  You're looking at serious time.

23  Are you willing to cooperate with us so that we can find the

24  higher levels of the chain, so that we can go after people who

25  are above you, bringing in more heroin than what you were

52

Opening Statement – by Ms. Bolstad

1  dealing?

2       Mr. Baker agreed.  He knows the system.  It's not his

3  first time in it.  He did what was probably best for him in

4  that scenario.  He made a choice.

5       But the investigators didn't just leave it up to

6  people like Mr. Baker.  Right?

7       These investigations are never about we have to

8  believe him 100 percent.  They look for corroboration.  They

9  look in Mr. Baker's phone.  Who else is his source?  Is there

10 any other source of supply?

11      No.  What Mr. Baker reported is that he gets his

12 heroin when he calls this number, this 442 number for Mexican

13 Bobby.

14      Mr. Baker's never obtained the real, full, legal name

15 from Mexican Bobby.  Because, as you'll hear, this is not a

16 business where people exchange business cards.  This is not a

17 business where people identify themselves by full legal name

18 because what they're engaged in is crime.  Anonymity is

19 important.

20      So Mr. Baker only knows this person that he calls for

21 drugs as Mexican Bobby.

22      The police use Mr. Baker to make the call.  They

23 record the call.  He orders up 8 ounces of heroin from his

24 source.  And sure enough, on March 31st the two people that he

25 described showed up with the 8 ounces, and they delivered it to

Opening Statement – by Ms. Bolstad

53

1   him in the 7-Eleven parking lot out in Milwaukie.

2           Mr. Baker provided a description because he has met

3   people who deliver the drugs before.  And he described the

4   person that he thought was Mexican Bobby in the following way,

5   which becomes important later.  He says he's about 30 years

6   old.  He has a fat round face.  He's -- he lives near -- he

7   thinks he lives near the location where he delivers the drugs,

8   that 7-Eleven, because they always show up really quickly after

9   I call.

10          He also says -- so short, round face, fat.  He says

11  he drives a red sport utility vehicle.

12          Sure enough, that vehicle is the one that shows up,

13  delivers the 8 ounces.  That vehicle is registered to Fabian

14  Sandoval-Ramos.

15          Police ask him, Do you have any other source of

16  supply, Mr. Baker?  Anyone else giving you heroin right now?

17          Nope.  This organization is reliable and they always

18  have what I need.  There's no quantity that I could order that

19  this organization would not have.

20          So when that red Passport shows up to the 7-Eleven,

21  the police are watching.  They are watching very carefully, and

22  they follow that red Passport.

23          They don't stop it, right?  They want to know where

24  is that car going to go, so that they can work up the chain.

25          They follow the red Honda Passport after it leaves

54

Opening Statement – by Ms. Bolstad

1   the buy, and it goes to location No. 1.  The red Honda Passport

2   goes into the garage, business is closed for the night.

3          Police get an address, though.  11759 Southeast 64th.

4   And police can do a lot with an address, as you'll hear.

5          They looked at the power subscriber for that address,

6   and determined Fabian Sandoval-Ramos was the guy paying the

7   bills.

8          So they looked up the name Fabian Sandoval-Ramos in

9   DMV records and they came up with a picture.  That's from

10  Mr. Fabian Sandoval-Ramos's Washington driver's license.  It's

11  Government Exhibit 59.

12         So what did they do with this picture?  Because they

13  have -- they're dealing with a ghost.  They don't know who

14  Mexican Bobby is.  So they show this picture to Shane Baker.

15  They say, Do you recognize this person?

16         And Shane Baker says (snapping fingers) that's who --

17  that's who has delivered.  That's the guy.  That's Mexican

18  Bobby.

19         So investigators think they're onto something.  It's

20  all adding up to them.

21         So the whole Shane Baker side of this book, that's

22  all Chapter 3.  Shane Baker's cooperating.  He's made a

23  controlled buy of drugs.  He's led agents to locations and

24  people.  That's what he did.  Chapter 3.

25         So Chapter 4 in this book is what the police do next.

55

Opening Statement – by Ms. Bolstad

1          Because now they have two locations that are of

2    interest, so they spend a little time getting their ducks in a

3    row.  They get a search warrant for location No. 1 on April

4    2nd, 2014.

5          This is all within days of Mr. Delong's overdose.

6    They're working quickly, so that chain is strong.

7          They do a search warrant at location No. 1 on April

8    1st, but, before they do, they want to sort of stir the pot.

9    They don't want to just show up and see what's there.  They

10   want to make another order for heroin and to see what would

11   happen.

12         So they have Mr. Baker, who's now in custody, place a

13   call to Mexican Bobby.  This is on April 2nd.  They say, Order

14   up another 8 ounces.

15         So Mr. Baker does.  An agreement is reached to

16   deliver.  Police are watching these locations, right? when this

17   happens.

18         They watch as a green Honda Civic arrives in the area

19   of location 1 right after that deal gets lined up, right?  We

20   need 8 ounces.  A car shows up at location 1.  It's a green

21   Honda Civic.  Three men go into location 1, the stash house.

22   Two men come out of location 1 and get back in the green Civic,

23   and they drive directly to the 7-Eleven.

24         When they get there, they're a little hinked up.

25   They don't see Mr. Baker.  He's not there.  He's in custody.

Opening Statement – by Ms. Bolstad

1   This is all a setup.

2          And Mr. Baker gets calls from Mexican Bobby saying,

3   Where are you?  We need you to move locations.  Go to the

4   Lowe's or go to the Home Depot.  7-Eleven's not good.

5          Baker's in custody, so he's sort of out of the loop.

6          But the police pull that car over before it can go

7   anywhere because they're pretty sure that that car is there to

8   deliver exactly what Baker ordered.

9          Inside the car -- the police run a dog around the

10  car.  The K-9 alerts to the presence of heroin.  The police

11  search the car, and inside the glove box is 13 ounces of

12  heroin.

13         The passenger of that vehicle is Raul Arcila.  The

14  driver is Placido.

15         They ask Raul, What's going on?  What's -- what are

16  you here to do?

17         Mr. Arcila denies really being involved, denies

18  knowing anything about drugs.  But then the police ask him a

19  really important question that sometimes, if you have been

20  caught doing something, you think twice about answering.

21         They say, Okay, you don't know anything about this,

22  but are your fingerprints going to be on the drugs that we

23  found in the glove box?

24         And he says, Oh, probably (nodding head).  My

25  fingerprints are probably going to be on those.

Opening Statement – by Ms. Bolstad

1          So they arrest Raul Arcila.  They arrest Placido

2     Ramirez-Coronel.  And they take those two men back to location

3     1, where they have a search warrant.

4          What do they find inside location No. 1, ladies and

5     gentlemen?

6          They find really sparse living quarters.

7          And you're going to see evidence in trial of the

8     pictures of the inside of this house.  Okay?  This is not a

9     well-furnished home where people are there for long-term

10    living.  There's mattresses on the floor.  Hardly any

11    furniture.

12         And the kitchen seems to be pretty devoted to one

13    thing and one thing only, and that's drug trafficking.  The

14    kitchen is full of packaging material.  The kitchen cupboards

15    are full of just plastic baggies and sugar, which you'll hear

16    is an ingredient that goes into heroin.  It's something that

17    drug traffickers use to take one quantity of heroin, dilute it;

18    it becomes a bigger quantity, more money.

19         Throughout the kitchen is just drug packaging, drug

20    packaging, drug packaging.  There is a heat sealer on the

21    kitchen counter, which is used to seal the bags that the heroin

22    is put into because you'll hear evidence that heroin is a

23    smelly substance.  It smells strongly of vinegar.  It's

24    something that dogs can alert on quickly (snapping fingers), so

25    you need a heat sealer to seal that product inside a bag that

Opening Statement – by Ms. Bolstad

1    nobody can smell.

2            In this picture, Government's Exhibit 77, you see the

3    cellophane.  And there was a lot of rolls of cellophane because

4    what they would do is wrap these bundles over and over and

5    over, in hopes that it would lock in the scent.

6            In the back of this picture you see a few bags of

7    lactose.  Like sugar, it's another thing that's used to dilute

8    drugs.  Okay?  Makes more product.  That means you can sell

9    more and make more money.

10           Keep those lactose bags in mind.  This is all at

11   location 1.

12           They also find drug records, which we have those

13   (indicating) as a physical exhibit in this trial.  You'll be

14   allowed to look at this in the jury room.

15           They find these ledgers with lists.  Lists of numbers

16   of who owes who, what.  Okay?

17           And you'll hear from an expert that it's pretty rare

18   to see any drug ledgers where they write down, like, "heroin,"

19   right?  Because nobody wants to write that down because, if you

20   get caught, you don't want that in a drug ledger.

21           Which brings us to Chapter 5.

22           When the police are searching this home, location 1,

23   they're wondering where's Fabian Sandoval-Ramos?  We thought he

24   would be here at location 1.  His name's on the power.  He's

25   the registered owner of the car that is at this location.

Opening Statement – by Ms. Bolstad

1    Where is he?

2            Surveillance officers at location 2 saw him.  That's

3    when they confirmed Fabian Sandoval-Ramos does not live at

4    location 1.  He lives at location 2.  They saw

5    Mr. Sandoval-Ramos going inside and outside that home in the

6    same hours where his other house, the stash house, was being

7    searched by police.

8            The people who were arrested in the car, the

9    co-defendant, Mr. Arcila, the police took his phone.  So there

10   couldn't be any contact between those two who are arrested in

11   the car and Fabian Sandoval-Ramos.  And so police saw him going

12   in and out and in and out of his home.

13           They also saw something interesting.  They saw a

14   woman come out of his home and go to the dumpster and throw

15   something out.  And the police thought something's going on at

16   location No. 2.  They applied for a search warrant.  Got their

17   ducks in a row.

18           And within hours, within hours of starting the search

19   at location 1, they were there at location No. 2 to go inside.

20           Inside, they find Mr. Fabian Sandoval-Ramos but they

21   don't find a lot of drugs.  In fact, they don't find any drugs.

22           Remember that cell phone issue that I told you about?

23           Let's go back a second.

24           Mr. Arcila, at the traffic stop, the agent seized his

25   phone.  They searched it with his consent.  Inside Mr. Arcila's

60

Opening Statement - by Ms. Bolstad

1  phone, they found text messages about drug dealing.  They found

2  references within the past three days in his phone, to pounds

3  and halves and prices.  Somewhat coded language, but you'll

4  hear about those text messages.

5        When they get to Fabian Sandoval-Ramos's house,

6  though, what do you think the police are there to look for?

7  Cell phones.  They didn't find a cell phone involved in drug

8  dealing inside, but they did go look in the dumpster.

9        You'll see Government Exhibit 115 in this trial.

10        They found a cracked, broken phone in the dumpster.

11  It was sort of near something else in the dumpster; bags of

12  unopened lactose that matched identically what was found at

13  location No. 1, the stash house where all of the drugs were

14  packaged and mixed and distributed.

15        They asked Mr. Sandoval-Ramos about this.  What's --

16  why did you put this in the dumpster?  What happened to your

17  phone?

18        And he said, My phone broke.  It broke this evening

19  between 5:00 and 6:00 p.m.  Which happens to be exactly when

20  the police were arresting his coworkers.  It's exactly when the

21  police were executing the search warrant at location 1.  And

22  that's exactly when Mr. Sandoval-Ramos, you'll hear, had his

23  phone break.  So he threw it in the dumpster with the lactose

24  and nothing else.

25        Finally, ladies and gentlemen, once we get to the end

1    there, of Chapter 5, what -- what the police did in this case

2    is they asked a DEA fingerprint analyst to take a look at the

3    drug records that were seized at location 1.  These ledgers

4    that keep track of who owes who what.

5             And the DEA fingerprint analyst carefully examined

6    each page, and he found several fingerprints.  In fact, all

7    three of the defendants involved in March 31st and April 2nd,

8    all three of their fingerprints were found in this book:

9    Fabian Sandoval-Ramos; Raul Arcila; and the driver of the

10   vehicle, Placido Ramirez-Coronel.  All three of their

11   fingerprints were in a book that only has drug records in it.

12            That's the summary of the evidence that you will hear

13   in this case.

14            The case is going to move quickly.  I have my

15   witnesses ready to go.  We're not going to waste your time.

16   And I know it's a lot of evidence to hear about, but trust me,

17   it involves building a chain from the ground up.  It requires

18   detail from the bottom of that chain to the top.

19            We're going to go through it chapter-by-chapter, not

20   going to waste your time.  At the end of the case, after the

21   presentation of all of the evidence, which consists of witness

22   testimony and physical exhibits and photographs, I will come

23   back to you and I will ask you to find both defendants guilty

24   of participating in a conspiracy to distribute heroin, guilty

25   that that conspiracy to distribute heroin resulted in the death

62

Colloquy

1  of a 26-year-old in Aloha, Oregon, on March 29th, 2014.

2             Thank you in advance for your attention.

3             THE COURT:  Thank you, Ms. Bolstad.

4             Jurors, we'll take a 15-minute recess and give you a

5  chance to stretch your legs, use the facilities, and the like.

6  Contact home or office, if you need to.

7             Remember, you may tell them you've been seated on a

8  criminal case.  The judge has ordered you not to talk about it.

9  If they push you, you tell them I've also ordered you to tell

10 me about it.  It's very serious that you don't let anyone ask

11 you.

12            And this is why:  The minute you say you're on a drug

13 case, someone will say, Oh, I know about something.  I'm trying

14 to ensure that you're not put in that situation.

15            During our recesses through the trial, I'm going to

16 ask you to please leave your notes on the chair here so they'll

17 be here when you get back.

18            We'll take just 15 minutes.  Ms. Boyer will also give

19 you some information about how to get into this floor and

20 secure space from the main hallway when you come in tomorrow

21 morning.

22            So that's all the instructions for now.

23            Thank you, everyone, for your attention.

24            Ladies and gentlemen, please rise for the jury.

25            15 minutes, please, Ms. Boyer.

Colloquy                                    63

1           Watch your step.  Take your coats with you, folks.

2  You'll have a place to leave them in the jury room; and your

3  bags, and so forth.  It will be secure back there.

4           (Jurors exit, 3:06 p.m.)

5           THE COURT:  Thank you, everyone.  Please be seated.

6           Does the Government have anything for the record at

7  the beginning of this recess?

8           MS. BOLSTAD:  No, your Honor.

9           THE COURT:  Counsel, either of you?

10          MR. ANDERSEN:  No.

11          MR. SEPP:  No, your Honor.

12          THE COURT:  All right.  Then we are in recess.

13  Defendants may use the facilities, and the marshals will

14  accommodate them.

15          Thank you, everyone.  We're off the record.

16          (Recess taken, 3:07 p.m. to 3:25 p.m.)

17          THE COURT:  Thank you, everyone.  Please be seated.

18          Counsel.

19          MS. BOLSTAD:  Thank you, your Honor.

20          Leah Bolstad.

21          Just one -- actually, two issues I have for the Court

22  was, No. 1, the Government has no objection to the audio

23  equipment in the courtroom for the audience members who might

24  need it.  I think that was requested by Mr. Andersen.

25          THE COURT:  Yes.  During the recess Ms. Boyer

Colloquy

64

1    indicated, Mr. Andersen, that you had requested on behalf of

2    your client's wife, that she be permitted to use headphones to

3    pick up the translations as they're going on during court.

4    We're happy to provide that as long as we continue to have

5    enough equipment available.

6              The primary concern is that your client is receiving

7    the transmissions.  If we run out of batteries or things, we

8    won't be able to accommodate that.

9              But I appreciate the Government noting on the record

10   no objection.

11             Your next point.

12             MS. BOLSTAD:  Next point, your Honor, is this

13   afternoon I intend to call a civilian witness named Timothy

14   Goshorn, who is on the list, and I want the Court to be aware

15   before I ask him questions.

16             He does not have an agreement with the Government,

17   but he is going to be talking about his participation in drug

18   distribution.  He's not worried about it.

19             THE COURT:  Does he have a lawyer?

20             MS. BOLSTAD:  Not with him.

21             He's here with his father and his son.  He is -- he

22   was a heroin addict.  He's been clean for one year.

23             I told him, I can't promise you anything on the state

24   side, and we don't have a deal --

25             THE COURT:  I'm going to have to talk to him in

65

Colloquy

1    advance, on the record, to ensure he knows he has a right not

2    to answer your questions and to incriminate himself.  And that

3    has to be outside the presence of the jury.

4            Do you want me to do that now?

5            MS. BOLSTAD:  If that works for you.  I've had that

6    conversation with him, but I understand --

7            THE COURT:  It needs to be on a public record, in the

8    event he later is prosecuted and challenges this.

9            So, yes, bring him in.

10           MS. BOLSTAD:  Thank you.

11           (Pause.)

12           THE COURT:  Sir, would you come forward here, please,

13   to the witness chair.

14           Just go ahead and take a seat.

15           Good afternoon.

16           MR. GOSHORN:  Good afternoon.

17           THE COURT:  Go ahead and get close to the microphone.

18   I don't need to place you under oath right now, but I do need

19   to ask you some questions and be sure you understand what might

20   be happening this afternoon.

21           Would you tell me please, first, your full name.

22           MR. GOSHORN:  Timothy Oran Goshorn.

23           THE COURT:  Would you spell it, please.

24           MR. GOSHORN:  T-I-M-O-T-H-Y, O-R-A-N, G-O-S-H-O-R-N.

25           THE COURT:  All right.

Colloquy

1          The prosecutor has just alerted me that she may be

2   asking you questions this afternoon that could result in -- in,

3   if you answer truthfully, your incriminating yourself; that is

4   to say, your admitting facts that could show you have in the

5   past engaged in criminal activity.

6          I want to be sure, first of all, you understand you

7   have an absolute right not to answer questions the answers to

8   which might incriminate you.

9          Do you understand you have that right?

10          MR. GOSHORN:  Yes.

11          THE COURT:  You also have the right to have a lawyer

12   advise you about this kind of exposure.  And if you can't

13   afford an attorney, I would appoint one to represent you, to

14   help you make that decision.

15          Do you understand?

16          MR. GOSHORN:  Yeah.

17          THE COURT:  Have you had a lawyer giving you advice

18   about these situations before?

19          MR. GOSHORN:  No.

20          THE COURT:  Is there a reason you haven't asked for a

21   lawyer?

22          MR. GOSHORN:  I don't feel like it's necessary.

23          THE COURT:  All right.

24          I don't know what the exposure might be to you, but I

25   do know that the two men who are on trial here are facing very

Colloquy

1   serious charges.  I know that other witnesses in this case were

2   facing very serious charges, including up to mandatory minimums

3   of 20 years in prison.  I don't know if that is an exposure

4   that you face.

5           Do you understand?

6           MR. GOSHORN:  Yes.

7           THE COURT:  A lawyer representing you could help you

8   figure out what risks you might have if you do in fact

9   truthfully say things that incriminate you.

10          Do you understand?

11          MR. GOSHORN:  Yes.

12          THE COURT:  Do you want me to get you a lawyer --

13          MR. GOSHORN:  You're kind of making me feel like I

14   should say yes.

15          THE COURT:  I'm not trying to make you do anything.

16          What I'm trying to avoid is this:  In the future, if

17   you're prosecuted, I don't want you making a motion in whatever

18   court in which you're accused saying, I didn't know that I was

19   facing exposure.  I wouldn't have spoken if I had been told --

20          MR. GOSHORN:  Um-hmm.

21          THE COURT:  -- all of the bad things that could

22   happen.

23          Do you see what I'm saying?

24          MR. GOSHORN:  Um-hmm.

25          THE COURT:  I don't -- I want you to be able to make

68

Colloquy

1  a decision on your own, but to do that it has to be voluntary

2  and it has to be knowing.  You have to know what you're doing,

3  and you have to know what the consequences can be.

4        Do you understand?

5        MR. GOSHORN:  Um-hmm.

6        I mean, I would like to know if there was a

7  possibility of consequences.

8        THE COURT:  And I can't promise that to you because I

9  don't know anything about what you're going to say.

10        MR. GOSHORN:  Um-hmm.

11        Well, would that be slowing down the process for

12  this --

13        THE COURT:  Well, it would probably mean you wouldn't

14  testify this afternoon because I would have to get a lawyer

15  appointed, someone who could meet with you to help you.  But

16  that's doable.

17        There's no magic -- is there, Ms. Bolstad, to your

18  testifying -- his testifying this afternoon, other than

19  convenience?

20        MS. BOLSTAD:  Just convenience, your Honor.

21        THE COURT:  All right.  And if you wanted a lawyer, I

22  would ask my staff to contact the federal defender's office

23  across the street and find you a lawyer.  It probably won't be

24  someone there because their office did represent

25  Mr. Sandoval-Ramos in an earlier proceeding.

Colloquy

1          But I just want to be sure you've thought through

2    this on your own.  I'm not trying to scare you or frighten you.

3          MR. GOSHORN:  I came into this feeling like if there

4    was any -- if there was enough information and evidence against

5    me, if they chose to prosecute me, that I would -- they would

6    have no problem doing that.

7          THE COURT:  Anyway?

8          MR. GOSHORN:  Yeah.

9          THE COURT:  Without you talking to me.

10         MR. GOSHORN:  Yeah, like my phone has enough

11   information on it to say everything.

12         That's why I feel like -- I felt like it would --

13         THE COURT:  So here -- here's the situation.

14         Lawyers are not magicians.  They don't get to change

15   the facts, but they do protect; help a client protect himself

16   from exposing himself unnecessarily.  They can't change what

17   has already happened.

18         MR. GOSHORN:  Um-hmm.

19         THE COURT:  Right?

20         And as I say, I don't know what you're facing, but

21   the Government -- the lawyer for the Government told me no

22   promises had been made to you.

23         MR. GOSHORN:  Um-hmm.

24         When -- when it said that no promises have been made,

25   that's also the promise that I'm not going to be -- nothing

Colloquy

1   will come punishment-wise towards me?

2           That promise hasn't been made.

3           THE COURT:  Has or hasn't?

4           MR. GOSHORN:  Hasn't.

5           THE COURT:  That's the point.

6           MR. GOSHORN:  That's one of the promises, that

7   there's no --

8           THE COURT:  Nobody has promised you any protection

9   yet.

10          MR. GOSHORN:  Yeah.

11          THE COURT:  Okay.  So all I'm saying is it's my

12  responsibility to be sure, if you take the witness stand and

13  testify truthfully in a way that incriminates yourself, you

14  know that you have a right not to answer those questions.

15          MR. GOSHORN:  Um-hmm.

16          THE COURT:  And if -- if you are -- if you're not

17  going to answer the questions, then tell me now.

18          MR. GOSHORN:  I intended to answer 100 percent

19  truthfully, but yes, they will severely be incriminating

20  myself, honestly.

21          THE COURT:  And I want to be sure you know that you

22  have a right to a lawyer if you want one.

23          And if you do, we'll pause you being called a

24  witness, and we'll get a lawyer involved.

25          But you don't have to have a lawyer.  The point is

71

Colloquy

1  it's your choice.

2        MR. GOSHORN:  I really don't want to --

3        MS. BOLSTAD:  Judge, if I could jump in here for just

4  a second?

5        THE COURT:  Just a minute.

6        What did you say?

7        MR. GOSHORN:  I -- obviously, I do not want to put

8  myself in jeopardy of -- you know, I -- I've changed my life

9  around 100 percent.  And I don't want the past to affect the

10  positive, you know.

11        THE COURT:  Here's another point.

12        You're going to be under oath.  There will be a

13  record made.  If ever in the future there's another proceeding

14  and you testify differently, there's a record here.

15        MR. GOSHORN:  Um-hmm.

16        THE COURT:  And it would be pointed out.

17        Do you understand?

18        MR. GOSHORN:  (Nods head.)

19        THE COURT:  Is that a yes?

20        MR. GOSHORN:  Yes.  But when you say a future

21  proceeding, what do you mean?

22        THE COURT:  Well, what if a prosecutor chose to file

23  a case against you?

24        MR. GOSHORN:  Oh, okay.

25        THE COURT:  And then you chose to testify again or

Colloquy

1   make statements that were different from what you say today.

2           MR. GOSHORN:  Um-hmm.

3           THE COURT:  Then we have perjury, maybe.

4           MR. GOSHORN:  Um-hmm.

5           THE COURT:  And then we have risks of being

6   inconsistent in your statements.

7           MR. GOSHORN:  Um-hmm.

8           THE COURT:  I want to point that out to you.

9           Do you understand --

10          MR. GOSHORN:  Yes, I do.

11          THE COURT:  Yes, Ms. Bolstad.  What did you want to

12  add?

13          MS. BOLSTAD:  Sorry, your Honor.

14          And I -- I have nothing to say about whether you

15  should get an attorney or not.  That's your decision.

16          But for the record, the Government's intent with this

17  witness is to ask him questions about statements he already

18  made, that were recorded after **Miranda** at this incident.  We

19  already have all of his statements in a recorded setting.  The

20  police have his statements.

21          So those are the things I would be asking this

22  witness today.

23          MR. GOSHORN:  That's what I thought.

24          THE COURT:  So you decide whether you want to testify

25  or not.  You decide whether you want me to appoint a lawyer to

73

Colloquy

 1  represent you before you decide.

 2          MR. GOSHORN:  I feel comfortable doing it without a

 3  lawyer.

 4          THE COURT:  Okay.  Are you thinking clearly today?

 5          MR. GOSHORN:  Yes.

 6          THE COURT:  Have you had any kind of medicine --

 7          MR. GOSHORN:  Prescribed only.  No.

 8          THE COURT:  Pardon me?

 9          MR. GOSHORN:  Prescribed medication, but nothing

10  that's altering my judgment.

11          THE COURT:  Okay.  That's the point.

12          MR. GOSHORN:  Um-hmm.

13          THE COURT:  Are you in a good frame of mind to make

14  this important decision?

15          MR. GOSHORN:  Yes.  Yes.  Yes.

16          THE COURT:  All right.  Well, I'm satisfied you can

17  testify if that's your choice.

18          MR. GOSHORN:  Okay.

19          THE COURT:  Go ahead and step down.  You are going to

20  have to wait outside.  We have some things to do first.

21          (Mr. Goshorn exits courtroom.)

22          THE COURT:  All right.  Is there any other matter

23  before we bring in the jury for opening statements?

24          MS. BOLSTAD:  No, your Honor.

25          THE COURT:  All right.  Please bring in the jury.

74
Opening Statement - by Mr. Andersen

1        Thank you.  Everyone please rise for the jury.

2        (Jurors enter, 3:37 p.m.)

3        THE COURT:  Thank you.  Everyone please be seated.

4        All right, jurors.  All set?

5        Okay.  Now we're going to hear from Mr. Ben Andersen

6   on behalf of Mr. Sandoval Sandoval-Ramos.  Please give him your

7   attention for his opening statement.

8        Counsel.

9        MR. ANDERSEN:  Thank you, your Honor.

10       Now, ladies and gentlemen, as the judge just told

11  you, I'm Ben Andersen.  I am Fabian Sandoval-Ramos's attorney.

12       Now, I'm going to say something bold right now.  I'm

13  going to tell you that I'm going to be brief.  And I'm going to

14  try to stick with that promise, and I think I can.

15       Now, you are going to hear a lot of evidence in the

16  next few days.  A lot of evidence about drug dealing, about

17  heroin, about the lifestyle.  You're going to hear a lot of

18  evidence from a number of witnesses that the Government has

19  already laid out for you.

20       I don't really want to get into the specifics of each

21  one of those witnesses.  And I'm talking primarily about Morgan

22  Godvin, about Michael Rosa, about Shane Baker.  Those are the

23  people that the Government says formed the chain.

24       But I will ask you to consider what we've already

25  talked about quite a bit.  What reasons these individuals would

Opening Statement - by Mr. Andersen

1    have to say the things that they have said and that presumably

2    they're going to say when they testify.  What motivations they

3    might have for saying what they say.

4         Now, I think you may have picked up from the

5    Government's opening as well, there is a lot of -- a lot of

6    evidence about all of these other people and about heroin and

7    about drug dealing, but there's not a whole lot of evidence

8    that you're going to hear about Mr. Sandoval.  So that's

9    something I want you to consider as well.

10        And as the judge has told you, if it's enough, it's

11   enough.  So what the job of the jury is -- is to do is to

12   examine the evidence as it will be presented to you and decide

13   if the evidence you have heard is enough.

14        And, ladies and gentlemen, I am going to return at

15   the end of this whole case and ask you to agree with me that

16   the evidence you will have heard is not going to be enough.

17        So what I'm asking you to do, ladies and gentlemen,

18   is to keep an open mind.  Let the testimony you're about to

19   hear, let the evidence that you're about to see guide your

20   decision here.

21        It is a -- it is an important duty that you have all

22   agreed to undertake here.  It is a -- this story begins with a

23   tragic occurrence.  There's no denying that.  But where it goes

24   from here is up to you.

25        So with that, I'll leave you to it.  And I think

Opening Statement – by Mr. Sepp

1    after we hear from Mr. Sepp we're going to hear some evidence.

2           Thank you.

3           THE COURT:  Thank you, Mr. Andersen.

4           And yes, ladies and gentlemen, you'll next hear from

5    Robert Sepp.  He is counsel for Mr. Raul Arcila.  Please give

6    him your attention.

7           MR. SEPP:  Thank you, your Honor.

8           Good afternoon.  I'm the attorney for Raul Arcila,

9    and I'm going to be just as brief as Mr. Andersen was.

10          This is a case that started with the tragedy.

11   However, what needs to be paid close attention to is that chain

12   of distribution.

13          With each person who testified that it was the sole

14   source, analyze that individual for his biasness, her biasness.

15   Ms. Godvin, Mr. Baker, Ms. Rosa.  They all pled.  They all had

16   certain benefits for doing that.

17          And you heard, ad nauseam, this morning during voir

18   dire that, you know, they received benefits.  And were you able

19   to analyze that according to their testimony?

20          What there is here is evidence involving Mr. Raul

21   Arcila.  It doesn't come in until March 31st.

22          Now, I'm not going to start there.  I'm going to

23   start with what the evidence might show on -- on April 2nd.

24          Indeed, he was there at the -- at the 7-Eleven.

25   There is no disputing the fact that he was a passenger in the

Opening Statement – by Mr. Sepp

1    green Honda that was the subject of the arrest on that day.

2         The evidence, however, will not show that there was

3    any sort of fingerprint evidence establishing that, (A), these

4    fingerprints were on the drugs that were collected from the

5    Honda that day.  There was no fingerprints evidence showing

6    that there was –– that he had touched whatever mechanism it is

7    that opens this hidden compartment.

8         Also, it was a hidden compartment.  The drugs were

9    found within that compartment.

10         The vehicle was not registered to Mr. Arcila.  The

11    vehicle was not insured by Mr. Arcila, nor was it driven by

12    Mr. Arcila.

13         Following this arrest on April 2nd, he was

14    transported with Mr. Ramirez to the 69th Street –– location 1,

15    as the Government has indicated.

16         During that –– during that transportation he didn't

17    say anything.  When he got there, he didn't say anything in

18    there, either.

19         What they did do is he sat quietly while the police

20    officers, detectives, DEA, dogs, all went through the house,

21    looking for evidence.

22         Now, what evidence did they discover about drug

23    distribution?

24         Quite a bit, and you'll see that.

25         What evidence did they discover linking Mr. Arcila to

Opening Statement – by Mr. Sepp

1    any of that?  Was one fingerprint.  One thumbprint.  One

2    thumbprint on a black notebook.

3             Not fingerprints right here, indicating that it was

4    ever picked up.  No fingerprints on the back -- on the back

5    side of a piece of paper, showing that it was picked up.

6             Just one thumbprint on this -- in this notebook.

7             They -- at that point they seized -- they seized

8    scales; a wrapping machine, that heat sealer; cutting stuff, as

9    in -- in the form of the powders; the lactose and the sugar.

10            As you saw from the pictures in the opening, there

11   were lots of boxes containing the wrappings or the product that

12   was used to seal the drugs.  On none of those boxes, on none of

13   the scales, and on none of the heat-sealing machine was there

14   any fingerprints found of Mr. Arcila.

15            Nor were there fingerprints found on the cash that

16   was found in a box.

17            The -- the room that his personal effects were in,

18   they did find that he had gone in there -- excuse me, that he

19   had personal effects in there.  Identification, an old W-2, and

20   a -- and some other -- other documents.

21            But in that room where his effects were they did not

22   find additional cash.  They did not find any drug

23   paraphernalia.  They did not find a thing in his room.

24            Again, all of the evidence there, all they had was

25   the one thumbprint.

Opening Statement – by Mr. Sepp

1            Going back to March 31st, where there was a setup buy

2   involving Shane Baker.  The only person that identifies

3   Mr. Arcila as a person in the vehicle, eyewitness testimony, is

4   Mr. Shane Baker.

5            That is the only evidence there.  Whether it's

6   enough, that is your determination.

7            On his phone, they did find text messages.  They are

8   not clear.  It could mean quite a few different things.  Your

9   interpretation, that is what you will come to.  However, that

10  is not a consistent way of communicating the drug deal in this

11  conspiracy.

12           This conspiracy theory is that it's Domino's.

13  Telephone calls are sent to California, and then another call

14  is sent to someone to distribute.  These are text messages that

15  they find.

16           You will also find, in that text message, the amounts

17  that they're talking about are well below the amounts that the

18  theory is on this conspiracy, where people are coming to them

19  buying ounces worth thousands of dollars, not hundreds.

20           When you look back and when you look at all of the --

21  all of the information, when you process it all, all we ask is

22  that you reserve judgment; you don't make a decision prior to

23  all of the evidence being in; and that you, in the end, hold

24  the Government to their burden of proving every element beyond

25  a reasonable doubt; and that you return a verdict of not

Colloquy

1   guilty.

2         Thank you.

3         THE COURT:  Thank you, Mr. Sepp.

4         All right.  Jurors, now, finally -- you've not heard

5   any evidence to this point.  Now, finally, we begin with the

6   evidence.

7         The Government having the burden of proof, we're

8   beginning now with Ms. Bolstad calling the witnesses on behalf

9   of the Government's case.

10        Your first witness is?

11        MS. BOLSTAD:  Thank you, your Honor.  The Government

12   calls Dustin Kilty.

13        THE COURT:  All right.  Mr. Kilty, would you come

14   here, please, all the way to the witness chair.

15        Come all -- to the front of the room and up the

16   stairs, please.

17        Good afternoon.

18        Please remain standing, face the jury and the deputy

19   there.  Raise your right hand to be sworn.

20        (Witness sworn.)

21        THE WITNESS:  I do.

22        THE CLERK:  Please take a seat.

23        THE COURT:  Bring yourself close in to the microphone

24   there.  Thank you.

25        Tell us your -- that's okay.  Tell us your full name,

1   and spell all of it.

2              THE WITNESS:  Dustin James David Kilty.  D-U-S-T-I-N,

3   J-A-M-E-S, D-A-V-I-D, K-I-L-T-Y.

4              THE COURT:  Thank you.

5              Ms. Bolstad.

6              MS. BOLSTAD:  Thank you, your Honor.

7                        DIRECT EXAMINATION

8   BY MS. BOLSTAD:

9   Q.  Good afternoon, Mr. Kilty.

10             As you know, this is a criminal prosecution involving

11  the death of Mr. Delong.

12             Did you know Mr. Delong?

13  A.  I do.

14  Q.  Tell the jury about how you knew him.

15  A.  I met him at Roof Life of Oregon, a place that we both

16  worked at.  That's where I met him, became friends with him.

17  Q.  How long had you -- did you say you worked with him?

18  A.  Yeah.

19  Q.  How long had you worked with him at the roofing -- Roof

20  Life company?

21  A.  I believe it was probably six to eight months before he

22  passed.

23  Q.  So here's what I want to cover with you.

24             I want to go over your memories of the day of the

25  death.  And then we'll rewind and we'll talk about the night

Kilty - D

1    before, okay?

2    A.  Okay.

3    Q.  So let's talk about where this occurred.

4         Where did you live?

5    A.  We lived off of Blanton Street in Aloha, Oregon.

6    Q.  Did anyone live with you?

7    A.  Yes, the son of the homeowner.  I believe Shawn Carter is

8    his name.

9    Q.  And what was the nature of your relationship with

10   Mr. Delong?

11   A.  Basically, we started out as coworkers at Roof Life.

12        He was -- I was a cleaner, a roof cleaner in the

13   maintenance department, and he was a ground guy.  And he became

14   basically my ground guy; we worked together, basically every

15   day of the week.

16   Q.  Were you just coworkers?

17   A.  Since the first day we worked together, the first day we

18   were coworkers, and every day on we were best friends after

19   that.

20   Q.  Okay.  When you lived on Blanton Street, how long had you

21   been at that location with Mr. Delong?

22   A.  I don't know the exact amount of time.  I believe it was --

23   through fixing the place up and living there, I believe it was

24   probably six weeks.

25   Q.  Okay.  And how old were you in March of 2014?  So last

Kilty - D

1   year?

2   A.   I would have been 25, I believe.

3   Q.   And how old was Mr. Delong?

4   A.   He was 26.

5   Q.   Do you remember when the paramedics came to your

6   apartment -- or to your house?  I'm sorry.

7   A.   I do.

8   Q.   Who all was home that morning?

9   A.   It was just myself -- well, Justin.

10  Q.   Okay.  And your other roommate, the third gentlemen, where

11  was he?

12  A.   I believe he was either in California or in some sort of

13  massage, chiropractic training, for the weekend or -- or past

14  week.  Something like that.

15  Q.  All right.  So tell us about what happened on Saturday

16  morning.

17  A.  Saturday morning I woke up, I believe about noon.  I woke

18  up and started making breakfast.  It was late in the day.  I

19  was going to do yardwork and stuff like that.

20       So I woke up.  I started making bacon and hash

21  browns.  Once I got done with those two, or close to being done

22  cooking those things, kept putting them in the oven to stay

23  warm -- Justin was very particular about how his eggs were

24  cooked.  And he liked even -- I tried to show him that I can

25  cook them pretty well, and he admitted I did, but he still

Kilty - D                                        84

1    liked to cook them his own way.

2            So I put those -- the bacon and hash browns in the

3    oven to stay warm and called from the kitchen to him, down the

4    hall.  Didn't get any response.

5            So I put on some music that I turned him onto, kind

6    of loud, hoping that would wake him up kind of indirectly,

7    since it was Saturday.  And nothing.

8            So I went to his door and kind of put my head in a

9    little bit and, you know, said his name a couple of times.  And

10   nothing.  So I put my head in far enough to see.  And I saw him

11   laying there, off his bed, naked.

12           And don't really know what I thought at that point,

13   but I knew I didn't want to wake him up, you know, right --

14   standing right over top of him while he was naked.  So I just

15   kind of said his name a couple of times, sternly, from the

16   door.  And didn't get a response at all.  He didn't move or

17   anything.

18           So I stepped into the room.  And as I stepped further

19   into the room, I could see past the desk that was blocking his

20   upper half and saw -- saw that he wasn't just asleep.  He was

21   obviously having some issues.

22           And so I ran over to him or jumped over to him as

23   quick as I could.  And by the amount of -- you know, blood and

24   stuff that was there, I didn't want to check vitals from his

25   face or from his neck, which I have been trained is one of the

1  better places to do so.  So --

2  Q.  Let me stop you there, Mr. Kilty.

3  A.  Yeah.

4  Q.  You mentioned you have been trained.

5         What do you mean?

6  A.  I was a volunteer firefighter for Odell Wy'East Department,

7  up in Hood River County.

8  Q.  So do you have CPR training?

9  A.  First aid, CPR, yeah.  And --

10  Q.  Okay.  So when you went over to his body, tell the jury

11  what it was that you saw.

12         Was his head in a certain position?  Feet?

13         Tell them what you saw.

14  A.  Well, so his feet -- his legs were up on the bed.  If the

15  bed's like this, his legs were up on it, body coming down.  And

16  the rest of him, you know, the box spring and mattress, so his

17  back and -- was laying on the ground with his feet up at a 90,

18  up on the bed.  Head in the corner of the room.

19         And so when I went over there I realized, you know, I

20  didn't want to -- you know, put my hands near everything that

21  was on his upper half.  So I went to grab his arm, as the next

22  best place to check vitals is the wrist, as far as I know.

23         And so I picked up his arm.  And when I picked up his

24  arm, the -- I don't know what it was, puke, or what -- white

25  stuff around his mouth kind of bubbled.

Kilty - D

1      And I thought that was a response to my touch.  At

2  that point I didn't need to get vitals.  I -- at that point I

3  was going to start doing CPR.

4      And so I kind of shifted his body off the bed, the

5  way that it was.  And doing so, his feet and legs and

6  everything stayed as they were, up in the air, without being

7  supported by the bed anymore.

8      And being a hunter and outdoorsman, I know what rigor

9  mortis is and I know what a body that's been dead for a while

10 looks like.  And --

11 Q.  How did it feel when you touched his -- I think you said

12 his wrist, to check for vitals.  What did his body feel like?

13 A.  In hindsight, it didn't -- in hindsight, you know, if it

14 wasn't personal, I would have known right away because it was

15 cold and it didn't feel right.  But I was in -- I was in a -- I

16 don't know, I wasn't able to see past that.  I was -- I had

17 more hope in me than I did reality at that point, I guess.  I

18 was hopeful that what I felt from his cold skin and stuff

19 wasn't what it actually meant.

20 Q.  Were you scared?

21 A.  At the time I don't remember being scared, no.

22     I remember wanting to help, wanting reality not to be

23 reality.

24 Q.  So what did you do to try to help?

25 A.  Well, as soon as I positioned him off the bed and realized

Kilty – D

1    that he -- not only was he dead, but he had been dead for a

2    while, I just exited the room.  Went and got my phone from my

3    room, which is the next room down.  Just called 9-1-1 as

4    quickly as I could.

5    Q.  And did you stay at your house while you waited for 9-1-1?

6    A.  I did.

7    Q.  Okay.  So let's rewind.  Let's talk about the night before

8    this.

9            Do you remember that night?

10   A.  I do.

11   Q.  Was that Friday?

12   A.  It was Friday evening, yeah.

13   Q.  Did you see Mr. Delong on Friday night?

14   A.  I did.

15   Q.  Tell us about that.

16   A.  I had received a text from him.  I had worked later.  It

17   was one of the rare days that he -- I didn't need a ground guy

18   for the day.  And he had worked with somebody else and gotten a

19   ride home from somebody else.

20           And he texted me, I don't know, maybe between 3:00

21   and 5:00 p.m., letting me know that he was home.  Because

22   normally I would wait for him or he would wait for me at the

23   office, to give him a ride home.

24           So I saw him once I got home, I believe about 7:00 or

25   8:00, and asked him if he wanted to go to my dad's house with

Kilty - D

1  me.  Which he usually did want to go.

2          And he said he wanted to stay and watch a series --

3  TV series, *House of Cards,* that I had on my computer, that I

4  wasn't very fond of, but he liked quite a bit.  And so it kind

5  of made sense, you know, if I wasn't there, for him to stay

6  there and watch it.  And I didn't think much of it.

7  Q.  Did you notice anything unusual about Mr. Delong in this

8  interaction?

9  A.  No, I really didn't.  (Shakes head.)

10  Q.  Did you see any signs of drug paraphernalia?

11          And by that I mean did you see any syringes?

12  A.  Nope.

13  Q.  Any spoons?

14  A.  I didn't even see them on the bed when I went in the next

15  morning and found him.  It was all right there.  I didn't even

16  see it then.

17  Q.  But when you left on Friday night, did you see any drug

18  use?

19  A.  Not at all.

20  Q.  Do you know if Mr. Delong had a drug problem?

21  A.  I knew that he did, yeah, from what he had said and what

22  other people have said.  I've never seen him use or anything,

23  but heard.

24  Q.  And so during the approximately one year that you'd known

25  him, working together, was it a problem?  His drug use?

Kilty - D

1           Did you ever see it?

2    A.   I never saw it.  Only problem I saw was, I suppose, the

3    aftermath of, you know, having an addiction.  But I never saw

4    him use or have any withdrawals or anything from it.

5    Q.   Okay.  Did he appear to be clean?

6    A.   Absolutely.

7    Q.   Not on drugs?

8    A.   Absolutely.

9    Q.   Have you been around drug addicts in general?

10   A.   I've been around some, yeah.

11   Q.   Okay.  Did you have the time -- the chance to observe drug

12   addicts?

13   A.   Yes, I have.

14   Q.   And in your time with drug addicts, have you observed

15   certain things about them, like missing work or being late?

16   A.   Yes.

17   Q.   Did you observe any of that with Mr. Delong in the year

18   that you knew him?

19   A.   Not at all.

20   Q.   So on that Friday night when you went to your dad's house,

21   how long were you gone?

22   A.   I don't remember the exact times, but I believe -- I

23   guess -- I think I got off -- or got home about 7:00 or 8:00,

24   left there shortly after.  So anywhere from 9:00 to probably

25   midnight or 1:00 in the morning is when I got back.

Kilty − X

1    Q.  And when you got back to your home, did you see Mr. Delong?

2    A.  I didn't.  (Shakes head.)

3    Q.  Do you know where he was?

4    A.  I assumed he was in his room.

5    Q.  Is the next time you saw Mr. Delong Saturday, when you went

6    into his room?

7    A.  It is the next time I saw him.

8            MS. BOLSTAD:  Okay.  Nothing further on direct, your

9    Honor.

10           THE COURT:  Thank you.

11           Mr. Andersen, any questions?

12           MR. ANDERSEN:  Your Honor, I have no questions for

13   Mr. Kilty.

14           THE COURT:  Okay.  Mr. Sepp?

15           MR. SEPP:  Thank you.  Just a couple.

16                        CROSS−EXAMINATION

17   BY MR. SEPP:

18   Q.  During the six to eight months [sic] that you lived

19   together, is it possible that he could have been using drugs in

20   his room and you just didn't know?

21   A.  I believe anything is possible, but I don't believe that to

22   be true at all.

23   Q.  And you had testified that you had known him for nearly a

24   year, and then you moved in together about four months later.

25   Correct?

1  A.  We had known each other about a year, total.

2          We had known each other probably six to eight months

3  before moving in together for six weeks, two months, something

4  like that.

5  Q.  And did you give him rides home to the -- did you carpool

6  with him?

7  A.  Yeah, I --

8  Q.  I'm sorry, let me repeat that.

9          Did you carpool from him -- to and from work prior to

10 moving into the Blanton address?

11 A.  Yes, every day since the first day I met him.

12          MR. SEPP:  Nothing further.  Thank you.

13          THE COURT:  Any redirect?

14          MS. BOLSTAD:  No, your Honor.

15          THE COURT:  May the witness be excused?

16          Yes?

17          MR. SEPP:  Yes, your Honor.

18          THE COURT:  Thank you, sir.  You're free to go.

19          THE WITNESS:  Thank you.

20          THE COURT:  Next witness, please.

21          MS. BOLSTAD:  The Government calls Deputy Medical

22 Examiner Charles Lovato.

23          THE COURT:  Thank you.

24          Doctor, would you come here, please, to the witness

25 chair.  Please come all the way up to the witness chair.

Lovato - D

1           Thank you.

2           Face the jury and the deputy there.  Raise your right

3  hand to be sworn.

4           (Witness sworn.)

5           THE WITNESS:  I do.

6           THE CLERK:  Please take a seat.

7           THE COURT:  Bring yourself close in to the

8  microphone, please.

9           Tell us your full name, and spell it all.

10           THE WITNESS:  Charles, C-H-A-R-L-E-S, James,

11  J-A-M-E-S, Lovato, L-O-V-A-T-O.

12           THE COURT:  Thank you.

13           Counsel.

14           MS. BOLSTAD:  Thank you, your Honor.

15                        DIRECT EXAMINATION

16  BY MS. BOLSTAD:

17  Q.  Good afternoon.

18           Would you please tell the jury how you are employed.

19  A.  I'm a deputy medical examiner for Washington County.

20  Q.  And what do you do as a deputy medical examiner?

21  A.  I am a forensic death investigator.  And what that means is

22  I receive all calls of deaths that occur in the county that

23  fall under the statute for the requirement to be -- for our

24  office to be notified.  Then I go through a set of processes of

25  making a determination as to whether they fall under the

Lovato - D

1    guidelines where we will take jurisdiction.

2              And then at some point we respond to scenes to make

3    that decision.  And if an autopsy is required, then I'll

4    coordinate with a forensic pathologist at the state office.

5    Q.  And do you do that with the Washington County Sheriff's

6    Office?

7    A.  No, the medical examiner's office.

8    Q.  So how long have you been with the medical examiner's

9    office?

10   A.  I've been with this medical examiner's office for 12 years,

11   I've been in the field for 26.

12   Q.  Where were you before?

13   A.  Snohomish County, Washington, and Larimer County, Colorado.

14             THE COURT:  Doctor, would you move back a bit from

15   the microphone, and we won't get as much feedback.  Thank you.

16             Go ahead.

17             MS. BOLSTAD:  Thank you.

18   BY MS. BOLSTAD:

19   Q.  Did you have to go through any special training to become a

20   deputy medical examiner?

21   A.  Yes.  When I was hired, the training at that time was -- I

22   went to the -- the University of St. Louis school of medicine

23   for both basic and advanced death investigation.

24             I also went through the -- it was called on-job

25   training, at that time.  And I was required to study

94

Lovato - D

1   pharmacology, physiology, anatomy, clinical diagnosis and

2   management.  And then I was required to follow cases and do the

3   autopsy work for 200 cases, and explain everything I was

4   learning and how it applied to each case.  And also explain

5   what was occurring at scenes and how that fit with what I was

6   seeing anatomically at the autopsy.

7   Q.  Were you working on March 29th, 2014?

8   A.  Yes, I was.

9   Q.  And did you respond to a scene of a death?

10  A.  Yes, I did.

11  Q.  What time did you receive the call?

12  A.  I got the call at 1:00 -- 1:20 p.m.

13  Q.  And what time did you arrive at the scene?

14  A.  I believe it was 2:24, I believe.

15  Q.  And then do you remember who was present when you did

16  arrive at that home?

17  A.  What's that?

18  Q.  Do you remember who was present?  Who was there?

19  A.  The people I saw was -- I met with Washington County Deputy

20  Cutler.  And I believe, at least initially, Corporal Sanders

21  was there.  And I believe the -- one of the roommates.

22  Q.  Okay.

23  A.  Mr. Kilty, I believe, was at the residence.

24         And also an aunt of the deceased was there.

25  Q.  So without getting into what people told you -- we're not

Lovato - D

1  going to get into that.

2  A.  Okay.

3  Q.  Tell the jury what happened when you did arrive.

4  A.  I was led back to the back bedroom where the deceased was

5  located.

6  Q.  And what did you see?

7  A.  I saw him, basically laying toward the back of the room, on

8  the -- it was a mattress that was on the floor.

9        And he was lying with his hips -- legs were on the

10  mattress, and his upper body was -- he was on his back, was

11  laying back down towards the floor.  And his arms were kind of

12  back and up.

13  Q.  Did you see any blood?

14  A.  Yes.  He was -- he was nude.  He had a large amount of --

15  of blood that's kind of consistent with coughing blood.

16        It was a fairly large pattern.  It covered his chest

17  and his face, and it -- there was some on the wall.  It covered

18  his arms.

19  Q.  Did you say coughing blood?

20  A.  Yeah.

21  Q.  What do you mean by that?

22  A.  It's kind of a -- a spray-type blood.

23        What happens is when the body starts to -- to cease,

24  the lungs start to get irritated as they start cycling down.

25  And small capillaries, the pleural lining will break and leak

Lovato - D

1    blood into the bronchial airway, and that's where the blood

2    comes from.

3            And the reason why I say it's kind of like a cough

4    blood, it's -- it's blood that was a pattern that was kind of

5    consistent with somebody who might have convulsed or had, like,

6    a seizure right towards the end of death.

7    Q.   Besides blood, did you see any other fluids coming out of

8    Mr. Delong?

9    A.   Yes.   There was a very large amount of a white frothy foam

10   that was in the mouth, coming from the mouth or from the nose.

11   Q.   Did you touch the body and get a feel for it?

12   A.   Yes.

13   Q.   What did you observe?

14   A.   He had rigor, which is a stiffening of the muscles that

15   starts to occur after death.   And it usually takes about 16

16   hours in normal conditions for it to become completely stiff,

17   to where it's really hard to move any muscle at all.

18           His -- he did have some rigor in both the small and

19   the large muscles.   When -- when I say that, I mean the neck,

20   the jaw, the fingers.   And he also had it in the joints, but it

21   was fairly easy to move still, and was still advancing.   It

22   wasn't fixed yet.

23   Q.   And so was this body -- it's not yet in full rigor?

24   A.   Correct.

25   Q.   Okay.

97

Lovato – D

1  A.  And then there was lividity, which is –– when the body

2  ceases to function, your circulatory system stops and all of

3  your blood in your body will start to pool down.  It's called

4  dependent lividity because it depends on gravity.

5        And what happens is it starts to fill in the

6  capillaries of the skin that's closest down but not being

7  pressed on, and it changes it to a kind of a purple color.

8        And as that starts to occur, which is usually about

9  two hours when you will start to see the pattern start to

10  develop, it gets darker.  And it also starts to fix.   In

11  between 10 to 12 hours, the blood is congealing.  And so what

12  happens is you press on it and it blanches; like if you press

13  your –– your hand and it turns white, that's –– you're pushing

14  the blood away from the capillaries, and then it fills back in.

15  And it happens pretty quickly like that in –– initially, in the

16  first couple of hours, couple or three hours.

17        And then, as time passes and it fixes, it will no

18  longer –– it gets slower at pushing away and slower at filling

19  back in.  At about 12 hours it's –– you can't –– you can't move

20  it.

21  Q.  And so with this body, where was the lividity?

22  A.  It was towards his back because –– you know, based on his

23  position.

24  Q.  Okay.  And timing-wise, you said it sort of takes two or

25  three hours at the front end.

Lovato - D

1     How long does it --

2  A.  Right.

3  Q.  How long does it take to reach full lividity when a body --

4  when a person dies?

5  A.  Well, we put the two together and my approximate --

6  approximate -- approximation at the time was about six to ten

7  hours.

8  Q.  Six to ten hours that Mr. Delong had been dead?

9  A.  Yes, um-hmm.

10  Q.  What time were you making that observation on --

11  A.  I was making that observation at -- I got at the scene at

12  2:34 p.m., and I was evaluating him shortly after that.

13  Q.  So would you say between 2:30 and three o'clock?

14  A.  Correct.  Um-hmm.

15  Q.  Did you observe any signs on the body of drug use?

16  A.  What I did see on the -- the right arm, toward the side of

17  the elbow, were three or four healed -- looked like healed

18  abscesses.  And then there was a couple more just little bit

19  lower, and those are fairly consistent with someone that's

20  using any type of an IV drug use or a needle.

21  Q.  And you say an abscess.  People don't necessarily know what

22  an abscess is.

23      Is it like a needle stick?

24  A.  Well, a needle stick is -- the abscess itself is -- occurs

25  when you get an infection at a site where you've breached the

Lovato - D

1   skin and some bacteria or debris gets in, that the -- the body

2   wants to try and heal that, and you wind up building up pus.

3   You get an abscess that has a pussy discharge, fluid.

4           Once it goes through that -- that phase and it breaks

5   open, as it starts to heal -- because of the tissue underneath

6   that has been damaged and is lost, once it starts to heal, it

7   has that kind of a crater look to it.

8           And it's -- that's what I was seeing, was about three

9   or four of those, along here (indicating), and a couple down a

10  little bit lower.

11  Q.  And when you say "here," what are you pointing at, for the

12  record?

13  A.  For the record, this is the inside the elbow or the

14  antecubital fossa, as it's called.

15  Q.  Okay.  So it sounds like you saw some well-healed needle

16  marks.

17          Did you see any fresh needle marks?

18  A.  I did not see any fresh needle marks.

19  Q.  Let's -- I'm going to ask you about the scene.

20          So we've talked about the body.

21          Did you observe anything worth noting around

22  Mr. Delong's body?

23  A.  Yes.  He was toward the back end of the mattress, toward

24  the wall and in across the bed.  So his torso or his upper body

25  was between the mattress and a entertainment -- entertainment

1   center along the other side of the wall.

2              And on that entertainment center, on the bottom base

3   area, was a small metal cup almost like a little measuring-type

4   cup.  And it had -- inside, it had some -- a brownish res --

5   residue type of a substance and also a piece of cotton ball

6   with -- that was brown.  And on the bottom of that container

7   was black scorch marks, from being burned.

8              And that's -- this is something we see that's fairly

9   consistent with somebody that's using it as a cooker for

10  changing their -- their drug into a liquid form for IV use.

11             There was also on the bed, closest to the door, the

12  corner closest to the door, there was -- I believe it was a

13  shirt.  And in that pile there, there was a balled-up Kleenex,

14  part of a cotton ball, two capped syringed -- needle syringes,

15  and two caps to a needle syringe.  The needle end and the --

16  and the plunger end.

17  Q.  I'm going to show you -- I'm sorry.

18             I'm going to show you what's marked as Government

19  Exhibit 2.  It will come up on the screen in front of you,

20  there.

21             Do you recognize that?

22  A.  Yes.

23  Q.  Is that what you're describing?

24  A.  Yes.

25  Q.  And are the syringes -- point those out to the jury.

1   A.  That would be this -- can they see?

2   Q.  You can touch the screen or you can just describe it.

3   A.  Okay.  Just by the -- by the butane lighter.  If you move

4   up, there's one complete syringe.

5         And I'm -- in this picture I'm not seeing -- I see a

6   cap and a cap, and I'm not -- and the cotton ball, with some

7   money.  I believe it was something like $581 was actually in

8   that little -- that little pile there.

9         And I don't see the other syringe from this

10   particular picture.

11   Q.  I'm going to show you Government Exhibit 3.  It's been

12   marked and admitted.

13         Is this what you're talking about?

14   A.  Yes.

15   Q.  Okay.  And do you see syringes in this photo?

16   A.  Yes, I do.

17         That would be these -- just above the butane lighter.

18   Q.  Did you observe a belt in the room?

19   A.  Yes.

20   Q.  Tell us about that.

21   A.  It was a leather belt that was under the deceased's upper

22   body, on the floor.  It was still in a loop.

23         And next to that, on the right side of his head, was

24   another uncapped syringe, needle syringe.

25   Q.  Does a belt in a loop mean anything to you as a deputy

Lovato - D

1  medical examiner?

2  A.  Frequently that's used to -- what they call tie off or to

3  close off the upper arm when they're going to inject.

4  Q.  Okay.  So I'll show you Government's 4.

5           Is this the belt you saw?

6  A.  That's the belt.

7  Q.  And finally, let's take a look at Government Exhibit 5.

8           And next, Government Exhibit 6.

9           Did you recognize this?

10  A.  Yes.

11  Q.  Tell us what this is.

12  A.  This is a brown tarry substance that is -- looks consistent

13  with the heroin.

14  Q.  Was that found near Mr. Delong?

15  A.  Yes.  It was found under his arm.

16  Q.  And I would like to return to the needle mark question,

17  Dr. Lovato.

18           Do you have your report with you?

19  A.  Yes, I do.

20  Q.  Could you look at the bottom of the narrative portion, the

21  third paragraph from the bottom.

22  A.  Um-hmm.

23  Q.  And the final sentence there.

24  A.  Yes.

25  Q.  I'm going to ask you to read that to yourself.

Lovato - D

1    A.   Yeah.

2    Q.   And ask you, does that refresh your recollection about

3    seeing fresh needle marks?

4    A.   Yes.  It does.

5    Q.   Okay.

6    A.   On the back part of the elbow there was -- it looked like a

7    puncture or a partial puncture.  It -- it didn't have the --

8    the classic, you know, straight point to it.  And that's what

9    it appeared -- appeared like to me.  It was very fine, but at

10   the same time it was a little irregular, from what I saw.

11   Q.   And did that mark -- was it different than the healed marks

12   that you saw on other parts of his arm?

13   A.   Yes, it was.

14   Q.   Did you make a determination about what to do with

15   Mr. Delong's body?

16   A.   Yes, it was determined to take him to the state for an

17   autopsy.

18   Q.   Have you responded to other heroin overdoses?

19   A.   Yes, I have.

20   Q.   Do you send every body for an autopsy that you find?

21   A.   We have in the past few years.

22         Not always.  But sometimes if the needle is actually

23   in the arm and if there's not enough information at the time

24   where someone may be charged, and there's no charges pending,

25   then we may not.  We'll just do a toxicology test.

Lovato - X

1   Q.  So it depends on how -- perhaps how strong the case appears

2   from the get-go?

3   A.   Correct.  Plus, you know, if there's a suspect.

4           If -- if detectives are feeling like they -- they

5   don't have any information to go on at the time, then a

6   decision is made as to whether we feel like we need to do one

7   for our purposes or not.

8   Q.   Okay.  And in your experience at the medical examiner's

9   office, have you responded to more heroin overdoses or less in

10  these last five years of your career, than the first six at

11  this medical examiner's office?

12          MR. ANDERSEN:  Your Honor, I object to that.

13          THE COURT:  Sustained.

14          MS. BOLSTAD:  Nothing further on direct.

15          THE COURT:  Cross, Mr. Andersen.

16          MR. ANDERSEN:  Thank you.

17                      CROSS-EXAMINATION

18  BY MR. ANDERSEN:

19  Q.  Am I understanding you right, that the puncture wound

20  that -- was on the back of the elbow?

21  A.  I believe it was.  Either that or a very small scratch.  So

22  he's trying to -- it just wasn't -- it wasn't medical.  I made

23  sure that -- that nobody from EMS had done anything to that.

24  Q.  So when you say it was not medical, it was not performed by

25  a medical technician that had responded to the scene?

Lovato - X

1    A.  Correct.  Correct.

2    Q.  Was that, in your opinion, the site of injection in this --

3    A.  No, it was not.

4    Q.  But you couldn't --

5    A.  That was the -- that was the only thing I could decipher.

6        The classic places toward the front of the arm --

7    Q.  Right.

8    A.  -- were so covered with little specks of blood.

9        And these -- these needle punctures, IV needle

10   punctures are so fine that they look so much alike, and because

11   there was so much pattern -- I did not want to disturb the

12   pattern.  It's better for that to be done at the autopsy suite,

13   and you can do cutdowns and look and see what -- you know,

14   after you clean everything, you can look and see what you can

15   see.

16       MR. ANDERSEN:  Okay.  That's all I have.

17       THE COURT:  Mr. Sepp?

18       MR. SEPP:  No questions.

19       THE COURT:  Any redirect?

20       MS. BOLSTAD:  No, thank you.

21       THE COURT:  Thank you, Doctor.  You're free to go.

22       Next witness, please.

23       MS. BOLSTAD:  The Government calls Sara Short, from

24   the Oregon State Police crime lab.

25       THE COURT:  Ms. Short, would you come all the way to

1    the witness chair, please.  Please come all the way up.

2              Thank you.

3              Remain standing.  Face the jury and the deputy.  And

4    raise your right hand to be sworn, please.

5              (Witness sworn.)

6              THE WITNESS:  I do.

7              THE CLERK:  Please take a seat.

8              THE COURT:  Bring yourself close around to the

9    microphone, please.

10             Tell us your full name, and spell it all.

11             THE WITNESS:  My name is Sarah Short.

12             First name S-A-R-A.  Last name S-H-O-R-T.

13             THE COURT:  Thank you.

14                         DIRECT EXAMINATION

15   BY MS. GOLOBORODKO:

16   Q.  Good afternoon.  Could you please tell the Court how you're

17   employed.

18   A.  I am employed as a forensic scientist in the toxicology

19   section of the Oregon State Police forensic lab in Clackamas.

20   Q.  And how long have you worked for the Oregon State Police

21   forensic lab?

22   A.  Since August of 2006.

23   Q.  And can you tell us about your education.

24   A.  I have a bachelor's degree in biomedical sciences from the

25   State University of New York at Buffalo, and I have a master's

1  degree in forensic science from Marshall University.

2  Q.  And what did you do prior to this job?

3  A.  Prior to starting my employment with OSP in 2006, I worked

4  for the Westchester County Medical Examiner's Office in

5  Valhalla, New York.  I was a forensic toxicologist there for

6  two years.

7  Q.  Now, you said that you're a forensic toxicologist.  Is that

8  your area of focus or specialty?

9  A.  Yes.

10 Q.  And do you go through annual proficiency exam --

11 examinations at OSP?

12 A.  Yes, I do.

13 Q.  Now, while at OSP, can you estimate how many fluid analyses

14 you've done?

15 A.  Probably between 2- and 3,000 analyses.

16 Q.  And have you ever been called to testify in court about

17 your laboratory findings on prior occasions?

18 A.  Yes, I have.

19 Q.  Now, can you explain to the jury, step-by-step, what is

20 typically involved when you receive fluids to test in the lab.

21 A.  When I initially receive the samples, these can be any type

22 of biological samples.  Typically they're blood; urine; or

23 vitreous humor, which is the fluid from the eye.

24      The first step in my analysis is screening, and

25 that's just a presumptive positive or negative for various

1  categories of drugs.  So after I do that test, I'll have a

2  positive or negative result for general drug categories like

3  opiates, amphetamines, or benzodiazepines.

4        After that screening test, I do a more confirmatory

5  test called GC/MS, or gas chromatograph/mass spectrometer.  And

6  that is the standard of identification of drugs in the field of

7  forensic toxicology.  And that test identifies any drugs that

8  were positive by the screening test, and it also detects drugs

9  that aren't detected by the screening test.  Things like

10  over-the-counter medications, some prescription medications.

11        And then, if it's a blood sample, I take it a step

12  further and quantitate any drugs that I detected in that

13  confirmatory test.

14  Q.  You said quantitate.  What is the difference between

15  quantitative and qualitative?

16  A.  A qualitative test is just an identification of a drug,

17  whether it's present or not present.

18        A quantitative test takes that one step further, past

19  identification, and assigns a value to how much of that drug is

20  present.

21  Q.  All right.  Now I want to talk about the urine testing.

22        Did you analyze a urine sample taken from

23  Mr. Delong's body?

24  A.  Yes, I did.

25  Q.  Now, why did the lab test his urine?

1    A.  The biological samples are submitted by the medical

2    examiner.  So in this case they requested toxicology --

3    toxicological testing on these samples.

4    Q.  And what do you normally look for in your tests?

5    A.  The lab's testing is designed to be comprehensive and

6    broad, to detect as many drugs as possible.  So it's not a

7    targeted analysis.  It's that screening and then broad

8    confirmatory approach to detecting drugs.

9    Q.  And why does the lab do this?

10   A.  It's the standard of testing in the field of forensic

11   toxicology, is screening and then confirmatory-type tests.

12   Q.  Now, I'm going to show you an exhibit which is marked

13   Government's Exhibit 11.

14              THE COURT:  This has been previously admitted?

15              MS. GOLOBORODKO:  No, your Honor.  It's just for

16   the --

17              THE COURT:  Then it should not be on your screens.

18              You'll show -- you'll get it when it's received.

19              All right.  Go ahead, Counsel.

20   BY MS. GOLOBORODKO:

21   Q.  Do you recognize this document?

22   A.  Yes.

23   Q.  And what is it?

24   A.  This is the analytical report that I prepared after the

25   completion of my analysis of these samples.

1    Q.   Does this document describe what you tested?

2    A.   This document describes that I tested the urine sample.

3    Q.   Does it accurately document your findings?

4    A.   Yes, it does.

5    Q.   And is that your signature on the bottom?

6    A.   Yes.

7              MS. GOLOBORODKO:  I would like to offer Government's

8    Exhibit 11 into evidence.

9              MR. ANDERSEN:  I have no objection.

10              MR. SEPP:  No objection.

11              THE COURT:  It's received.  It may be published.

12              Please continue.

13   BY MS. GOLOBORODKO:

14   Q.   Now, did you analyze this specimen in the way that you

15   described; presumptive testing, followed by more specific

16   tests?

17   A.   Yes, I did.

18   Q.   And what did you find?

19   A.   I confirmed the presence of codeine, 6-monoacetylmorphine,

20   and heroin in the urine sample.  And my examination indicated

21   the presence of morphine.

22   Q.   Now, I guess, what does that mean?

23              Can you tell us what codeine, 6-monoacetylmorphine --

24   what all of those are?

25   A.   I'll start with heroin.  That is the parent drug or the

1  drug that is ingested or consumed by an individual.

2          6-monoacetylmorphine is its unique metabolite.  So if

3  6-monoacetylmorphine is detected in someone's urine, that means

4  that it came from heroin.

5          Codeine is most likely an impurity found in the

6  manufacture of heroin that's also present in the urine of

7  heroin users, and my examination indicated the presence of

8  morphine.

9          This means that -- we have strict confirmation

10  criteria before I can report a drug as being confirmed in

11  urine -- in a sample.  And the morphine in this case did -- did

12  not meet one of those criteria, but there was strong evidence

13  that it was present.  And the procedures allow for reporting a

14  drug as indicated in those circumstances.

15  Q.  Have -- now, there's morphine in there.  I guess, what is

16  morphine in the urine?

17  A.  Morphine is a narcotic analgesic.  It's an opiate.  It can

18  be taken on its own.  And it's also a metabolite of heroin.

19  Q.  So what does that mean, a metabolite of heroin?

20  A.  Heroin breaks down very quickly in the body.  It's

21  metabolized very quickly.  That's what metabolism means; it's

22  just a breakdown process that the body does naturally.

23          Heroin's metabolic pathway, after it's in the

24  bloodstream, heroin metabolizes to 6-monoacetylmorphine first,

25  and then morphine.  That's the metabolic pathway, the way the

1  body breaks it down to get it out.

2  Q.  Now, you just mentioned that you have very specific

3  confirmation requirements.  I guess, what -- what does that

4  mean?

5  A.  Some of the confirmation requirements require I have a

6  positive screening test for opiates, and I did in this case.

7          Then I have drugs detected by GC/MS, which I did in

8  this case.

9          And that they -- those drugs have a retention time

10  within 1 percent of the retention time of a reference standard

11  that's also analyzed within seven days of this sample.

12          Additionally, it has to have a spectral match.  Each

13  drug has a unique fingerprint.  After it's analyzed by GC/MS,

14  it has to match well to the reference standard.

15  Q.  So now I want to move on to the blood test information.

16          Did the lab also test a sample of Mr. Delong's blood?

17  A.  Yes.

18  Q.  And why did the lab test his blood?

19  A.  That was also requested by the medical examiner's office.

20  Q.  Now, I'm going to show you -- again, just you, what's been

21  marked as Government's Exhibit 12.

22          Do you recognize this document?

23  A.  Yes.

24  Q.  And what is it?

25  A.  It is the analytical report that I wrote after the

1    completion of my analysis of the blood.

2    Q.  And does this document describe what was tested?

3    A.  Yes.

4    Q.  And does it accurately document your findings?

5    A.  Yes.

6    Q.  And is that your signature on the bottom of the document?

7    A.  Yes, it is.

8         MS. GOLOBORODKO:  I would like to offer Government's

9    Exhibit 12 into evidence.

10         THE COURT:  Any objection, Counsel?

11         MR. ANDERSEN:  No.

12         THE COURT:  Mr. Sepp?

13         MR. SEPP:  Oh, no, your Honor.

14         THE COURT:  All right.  It's received.

15         Please publish.

16         Continue, Counsel.

17    BY MS. GOLOBORODKO:

18    Q.  So, now, you mentioned that the test did -- or the lab ran

19    tests of Mr. Delong's blood.

20         What tests were run?

21    A.  As I described earlier, on this sample I performed a

22    screening test, that initial presumptive test for general

23    categories of drugs; a confirmatory test by GC/MS; and then

24    also a quantitative test by LC/MS/MS.

25    Q.  Now, what do you normally look for in blood tests?

1  A.  The toxicology testing for blood samples is similar to the

2  one for urine.  It's broad-based and comprehensive to detect as

3  many drugs as possible.

4  Q.  And in this case, was anything found in Mr. Delong's blood?

5  A.  Yes.

6  Q.  What was found?

7  A.  My examination confirmed the presence of morphine free at

8  0.085 milligrams per liter, plus or minus 0.014 milligrams per

9  liter; and morphine-glucuronide bound at greater than .8

10  milligrams per liter.

11  Q.  Now, what is morphine free and morphine-glucuronide bound?

12  A.  Morphine free is the parent drug morphine.  It can either

13  be -- again, it's taken on its own as morphine or it can be a

14  metabolite of heroin.

15          Morphine-glucuronide is morphine's metabolite.  It

16  just has a sugar molecule, a glucuronide molecule, attached to

17  it to help make it more water soluble to get out of the body.

18  Q.  Now, did you find anything else in his blood?

19  A.  No.  The alcohol volatiles analysis for ethanol or alcohol

20  was 00, and acetone was also not detected.

21  Q.  Did you find any other drugs?

22  A.  No, I did not.

23  Q.  Now, the finding of morphine here, is this a confirmed

24  result?

25  A.  Yes, it is.

1  Q.   Okay.  Now, when you find these markers in a person's

2  blood, what does it tell you?

3  A.   From just the blood report alone, I can't tell if the

4  person ingested, consumed, or used morphine or heroin.  But it

5  indicates that there is morphine in the blood and -- as well as

6  morphine metabolite, that morphine-glucuronide in the blood

7  sample.

8  Q.   Now, looking at both the urine and blood tests, did the lab

9  find any other chemicals or controlled substances in either

10  fluid?

11  A.   No.

12  Q.   And based on these results from both the blood and urine

13  testing, what is the big picture?

14  A.   The analysis of the blood and urine together indicate to me

15  that at some point recently this person used heroin.

16          MS. GOLOBORODKO:  That's all the questions I have on

17  direct.

18          THE COURT:  Mr. Andersen, any questions?

19          MR. ANDERSEN:  Yes, thank you.

20                     CROSS-EXAMINATION

21  BY MR. ANDERSEN:

22  Q.   Now, you said -- if I'm understanding you right, you were

23  talking about, for example, the morphine free and the

24  morphine-glucuronide bound indicates it could be heroin or

25  morphine.  Is that true?

Short - X

1    A.  From the blood report alone, yes.

2    Q.  All right.  So from the blood report, at least, you

3    couldn't tell what -- what it was that -- that came into the --

4    the bloodstream in the first place?

5               Is that true; you can just tell what the metabolites

6    are?

7    A.  From the blood report alone, if the blood report was

8    standing alone and I did not have a urine sample, I would not

9    be able to determine if this person used morphine or heroin or

10   both.

11   Q.  So that's what the urine sample -- does that tell you it's

12   heroin?

13              Or how -- how do you determine if it's heroin?

14   A.  The urine sample not only contains heroin, which is not

15   frequently detected in our cases, but also contains

16   6-monoacetylmorphine, which is a unique metabolite of heroin.

17              And so that information, coupled with the morphine in

18   the blood, says to me, as a toxicologist, that this person used

19   heroin.

20   Q.  Now, does that tell you any -- any information about the

21   type of heroin or -- or where that heroin could have come from

22   or anything about the -- the heroin itself?

23   A.  No, it does not.

24   Q.  Now, can you -- I don't know if you have a copy of that.

25              Maybe we could pull up just the -- the -- your --

Short - X

1    which I believe that's --

2            THE COURT:  11.

3            MR. ANDERSEN:  11.  Thank you, your Honor.

4    BY MR. ANDERSEN:

5    Q.  Can you -- when was this testing performed, if you could

6    look up at the top there?

7    A.  My analytical report was issued May 26th of 2014.

8    Q.  So that's about two weeks -- or, I'm sorry, two months

9    after it was collected.  Is that true?

10   A.  I would have to refer to my notes to look about -- to see

11   when it was collected.

12   Q.  I -- I think we can -- if you look just below there, right

13   above the analytical report, it says at least the date of --

14   of his decease.

15           Is that --

16           MR. ANDERSEN:  Thanks for following along with me.

17   BY MR. ANDERSEN:

18   Q.  Is that date -- does that date, there, tell you any time

19   when you would assume it would have been collected?

20   A.  Yes.  It's usually very close to the date of death that

21   it's been drawn, yes.

22   Q.  Date of death.

23           Is that a normal time frame, to have two months

24   between the collection and the testing?

25   A.  It's not an untypical time frame.

1          I could look more closely at my notes to see exactly

2     when I analyzed it because there is time between my analysis

3     and when I actually write my report.

4     Q.  Okay.  I don't think that's necessary.

5          MR. ANDERSEN:  I don't have any further questions.

6          THE COURT:  Thank you.

7          Mr. Sepp, any questions?

8          MR. SEPP:  Nothing, your Honor.

9          THE COURT:  May the witness be excused?

10         MS. GOLOBORODKO:  I have one more question on

11    redirect.

12         THE COURT:  Go ahead.

13                    REDIRECT EXAMINATION

14    BY MS. GOLOBORODKO:

15    Q.  Now, if you need to look at your notes to refresh your

16    memory, you may.

17         When did you analyze these samples?

18         And please read the notes to yourself.  And then,

19    once your memory is refreshed, you can let us know.

20    A.  I will have to refer to my notes for those dates.

21         (Pause, referring.)

22         THE WITNESS:  I started the analysis on May 5th,

23    2014.  So my screening test was on May 6th of 2014, with

24    confirmatory testing on May 12th, 2014.

25    BY MS. GOLOBORODKO:

Short – ReD

1   Q.  Now, is there anything about the delay that would impact

2   your testing?

3   A.  No.

4            MS. GOLOBORODKO:  No further questions, your Honor.

5            THE COURT:  May the witness be excused?  Yes?

6            MR. ANDERSEN:  Yes.

7            MR. SEPP:  Yes, your Honor.

8            THE COURT:  All right.  Thank you, Ms. Short.  You're

9   free to go.

10           THE WITNESS:  Thank you.

11           THE COURT:  How long for the next witness?

12           MS. BOLSTAD:  I think 15 minutes, your Honor, we

13   could get it done.

14           THE COURT:  Jurors?  Yes?

15           Okay.  Let's get it done.

16           MS. BOLSTAD:  The Government calls Tim Goshorn.

17           THE COURT:  The more we get done today.  Thank you.

18   Appreciate it, jurors.

19           And then we'll call it a day, after this witness.

20           Sir, please come to the witness chair.  All the way

21   up, and remain standing.

22           Please face the jury and the deputy there.  Raise

23   your right hand to be sworn.

24           (Witness sworn.)

25           THE WITNESS:  I do.

1          THE CLERK:  Please take a seat.

2          THE COURT:  Bring yourself close in to the

3    microphone.

4          Now tell us your full name, and spell it all.

5          THE WITNESS:  Timothy Oran Goshorn.

6          T-I-M-O-T-H-Y, O-R-A-N, G-O-S-H-O-R-N.

7          THE COURT:  Need you to slow down just a bit when you

8    speak.

9          Counsel.

10                   DIRECT EXAMINATION

11   BY MS. BOLSTAD:

12   Q.  Good afternoon, Mr. Goshorn.

13   A.  Good afternoon.

14   Q.  Could you tell the grand -- I'm sorry.  Could you tell the

15   jury, how old are you?

16   A.  28.

17   Q.  Okay.  Were you present when the police showed up at

18   Mr. Rosa and your apartment?

19   A.  Yes.

20   Q.  Okay.  Was that back in March 2014?

21   A.  Yes.

22   Q.  Did you live there?

23   A.  Yes.

24   Q.  How long had you lived there?

25   A.  Six months, I think.

Goshorn - D

1   Q.  Who else lived there?

2   A.  Morgan Godvin.

3   Q.  At that time, in March 2014, did you use heroin?

4   A.  Yes.

5   Q.  Do you use heroin now?

6   A.  No.

7   Q.  When did you start using heroin?

8   A.  When I was 19.

9   Q.  And how old were you back in March 2014?

10          So last year?

11  A.  27, 26.

12  Q.  Okay.  So did you use heroin about seven years?

13  A.  Yeah.

14  Q.  Do you know anyone who has died from heroin?

15  A.  Many people.

16  Q.  Did you know Justin Delong?

17  A.  I did.

18  Q.  How did you know Mr. Delong?

19  A.  I met him through Morgan a year before he passed away, and

20  he stayed at my house for a couple months.  Lived with me, him

21  and his girlfriend.  And -- yeah.

22          But we lost contact after he -- he sold heroin to my

23  brother, and he passed away.

24  Q.  Your brother passed away?

25  A.  Yes, from an overdose.

1  Q.  Overdosing on heroin that Justin Delong had sold him?

2  A.  Yes.

3  Q.  Okay.

4  A.  So we kind of didn't talk after that.

5  Q.  Okay.  How many siblings do you have?

6  A.  There are six of us.

7  Q.  And so in your seven years of using heroin, did you ever

8  have any close calls with overdose?

9  A.  Once or twice.

10  Q.  Okay.  So had you ever tried to get off of heroin before

11  this year of sobriety?

12  A.  Yes.

13  Q.  Tell the jury about that.  What does that feel like?

14  A.  The actual physical feeling of it?

15  Q.  Of trying to get off heroin.

16  A.  It's un -- undescribable.  It's like the flu, the worst flu

17  ever, with thousands of paper cuts all over your body.  Not

18  being able to stop moving.  Throwing up, stuff coming out of

19  every orifice.  Like just -- it's miserable.

20  Q.  Does that last a short period of time or a long period of

21  time?

22  A.  Two weeks, three weeks.  Then no sleeping for months.

23  Q.  Is there anything that makes you feel better when you're

24  experiencing those symptoms?

25  A.  Opiates or benzos.

Goshorn – D

1  Q.  So the thing you're trying to get off of is the thing that

2  can make you feel better?

3  A.  Um-hmm.

4  Q.  Do you remember the day when the police showed up in late

5  March?

6  A.  Yes, I do.

7  Q.  Do you have a clear memory of that day or does it stand out

8  in your mind?

9  A.  It stands out.

10  Q.  Why?

11  A.  I don't know.  It was very dramatic.  It was three years

12  and a day to the day my brother died.  Life was hectic.  Just a

13  crazy time.

14  Q.  But you were using at the time?

15  A.  Um-hmm.

16  Q.  When you're using heroin, my question is this:  Are you

17  able to perceive what's going on around you --

18  A.  Yeah.

19  Q.  -- or are you out of it?

20  A.  No, it's not like people think it is.  It's -- you're not

21  just a zombie.  Like -- I know plenty of people that hold jobs

22  and have families that, you know, go for a long time with no

23  one ever knowing.

24  Q.  So you're able to function?

25  A.  Um-hmm.

Goshorn - D

1  Q.  And were you in fact able to function?

2  A.  At the time, I would say so.

3  Q.  Mr. Goshorn, did you distribute heroin also?

4  A.  Yes.

5  Q.  And did you tell the police about that when they arrived?

6  A.  Um-hmm.

7          THE COURT:  Sir, would you please say yes or no

8  instead of um-hmm, or --

9          THE WITNESS:  Yes, yes.

10          They had my phone, so there was no denying --

11  BY MS. BOLSTAD:

12  Q.  Okay.

13  A.  -- anything.

14  Q.  When they arrived, did you have any involvement in dealing

15  heroin to Ms. Godvin, what the police were there to talk about?

16  A.  No.

17  Q.  Do you know Michael Rosa?

18  A.  Yes.

19  Q.  Was he living with you at the time?

20  A.  Yes.

21  Q.  How long had he been there?

22  A.  A month.

23  Q.  And did you work with Mr. Rosa to sell drugs?

24  A.  Yes.

25  Q.  What was your role?

1  A.  He was my best friend.  And I guess I just helped him,

2  like give him a break.  And he would -- we would just -- I

3  would get my share of money and drugs and --

4  Q.  And so the jury might not be familiar with how it works.

5  When you say you helped him, walk us through that.

6          Would Mr. Rosa give you heroin to just go do whatever

7  you wanted with?

8  A.  A big part of it was that he could trust me.  And we were

9  dealing with thousands and thousands of dollars a day, so just

10  the fact that there was someone else that -- people who want to

11  buy drugs, time doesn't matter.  They'll call you at 8:00 in

12  the morning or call you at 4:00 in the morning, and all day,

13  all hours, between.  So him trying to do it, he -- you know, he

14  wanted money.  There was a lot of money to be made.  So he

15  would work so much he couldn't handle it.  So I was the only

16  person he trusted, so I would take it and sell it.

17  Q.  Would you do what he told you?

18  A.  He was like my boss, yeah.

19  Q.  Okay.  And so, for example, would you go deliver drugs to

20  customers?

21  A.  Um-hmm.

22          THE COURT:  Please say yes or no.

23          THE WITNESS:  Yes.

24          THE COURT:  Thank you.

25  BY MS. BOLSTAD:

Goshorn – D

1  Q.  But just to go back a step, about Morgan Godvin, when the

2  police arrive, had you delivered heroin to Morgan Godvin?

3           Had you given her that heroin?

4  A.  No.

5  Q.  Okay.  And had you given any heroin in late March to

6  Mr. Delong?

7  A.  No.

8  Q.  Were you present when Mr. Delong came over?

9  A.  They did not tell me because of the history.  They -- it

10  was my house, and they knew I wouldn't want him in my house.

11  Q.  So did you even know he was there?

12  A.  Nope.  I thought he was in jail.  That was my

13  understanding.

14  Q.  When you found out that Mr. Delong had died, how did you

15  feel?

16  A.  It was so many emotions.  Figuring out what day it was,

17  three years and a day after my brother died from the drugs

18  Justin had given him.  And then my roommate gave him -- I don't

19  know.  It was very emotional.

20           And I feel for anyone, you know, that -- he has a

21  family.  And I know what my family went through, and it's just

22  sad.

23  Q.  When you were working with Mr. Rosa to deliver heroin, do

24  you know where Mr. Rosa got his heroin?

25           Where did he get it from?

Goshorn - X

1    A.   Multiple people.

2    Q.   Okay.  In this late March time frame -- so the very

3    specific period of time, do you remember who he was getting

4    heroin from?

5    A.   Yeah.  I knew a name, yes.

6    Q.   What is the name?

7    A.   Shane.

8    Q.   Okay.  And had you ever gone directly to Shane, sort of

9    around Mr. Rosa?

10   A.   Not with Rosa.  One time when Mike was out of town.

11   Q.   Tell us about that.

12   A.   I -- Mike just told me to take the money to Elmer's on 92nd

13   at a certain time.  So I went there, didn't even talk to him.

14   Just gave him money, he gave me a bag, and I left.

15   Q.   And who's the him?  Is that --

16   A.   Shane, I believe.

17   Q.   And is this the late -- or March 2014 time period?

18   A.   Maybe two months before.

19          MS. BOLSTAD:  Okay.  Nothing further on direct, your

20   Honor.

21          THE COURT:  Mr. Andersen.

22          MR. ANDERSEN:  Thank you, your Honor.

23                    CROSS-EXAMINATION

24   BY MR. ANDERSEN:

25   Q.   Now, when you say multiple people, are you talking over the

Goshorn – X

1   life of --

2   A.  Over the two years, yeah.

3   Q.  So was it not uncommon for him to have multiple sources at

4   one time?

5           THE COURT:  Him, who?

6           MR. ANDERSEN:  I'm sorry.

7   BY MR. ANDERSEN:

8   Q.  For Mr. Rosa, to your knowledge, to have --

9   A.  It would be -- it would be solid for, you know, a certain

10  amount of time, six months or so.  And then someone would fall

11  off, get arrested and disappear, you know.  Move on to the next

12  person.  There would be a couple weeks or so of trying to find

13  someone.

14          So dealing with a larger amount, it's harder to find

15  people that deal with it, so --

16  Q.  Well, now, did you -- did you call the police on Mr. Rosa

17  at any time before this -- the police came and talked with you?

18  A.  I did not call the police on Mike.  I told my parents what

19  was going on because I so badly wanted to get out of the mess

20  that I had got myself into.

21          And I gave my parents some information.  And they --

22  I don't know what they actually ended up doing with it because

23  nothing happened.  So --

24  Q.  So what was the information you gave to your parents?

25  A.  That Mike was going to get drugs from Ohio.

Goshorn - X

1  Q.  And did you see him come -- after he came back from -- from

2  Ohio with drugs?

3  A.  Um-hmm.  Um-hmm.

4          THE COURT:  Please say yes or --

5          THE WITNESS:  Yes.

6          THE COURT:  Thank you.

7  BY MR. ANDERSEN:

8  Q.  And that was, what?  A week or two weeks before you got

9  arrested?  Is that accurate?

10          Or, I'm sorry, before the police came and talked to

11  you?

12  A.  Two, three weeks, yeah.

13  Q.  Okay.  Now, after the police came and talked with you, did

14  you and Mike continue to sell heroin?

15  A.  After we got busted?

16  Q.  After you got busted?

17  A.  Yes.

18          MR. ANDERSEN:  Okay.  That's all the questions I

19  have.  Thank you.

20          THE COURT:  Mr. Sepp.

21          MR. SEPP:  Just a couple.

22                  CROSS-EXAMINATION

23  BY MR. SEPP:

24  Q.  Did you see the heroin that Mr. Rosa brought back from

25  Ohio?

Goshorn – ReD

1   A.   Um–hmm.

2              THE COURT:  Please say yes or no.

3              THE WITNESS:  Yes.

4   BY MR. SEPP:

5   Q.   How much was it, do you know?

6   A.   A half ounce.  And it was white powder.

7   Q.   And how often did he go to Ohio during the time frame

8   January to March?

9   A.   A couple times, but just for vacations, to see family and

10  stuff.  It was the only time he brought anything back.

11             MR. SEPP:  That's all.  Thank you.

12             THE COURT:  Redirect.

13             MS. BOLSTAD:  Briefly.

14                    REDIRECT EXAMINATION

15  BY MS. BOLSTAD:

16  Q.   Mr. Goshorn, you mentioned the white material he brought

17  back from Ohio.  I missed it; how much did he bring back?

18  A.   Half ounce.

19  Q.   A half ounce.  Is that about –– what?

20             How many grams is that?

21  A.   Uh –– (Pause.)  7 grams.

22  Q.   Is that your memory of it or ––

23  A.   Okay.  So a ball is –– no.  14.  12 to 14, in between

24  there.  That's what it is.

25  Q.   Okay.  Did you have a chance to try what he brought back

Colloquy

1   from Ohio?

2   A.   Yes.

3   Q.   What did you think of that white stuff?

4   A.   Overrated.

5   Q.   Overrated?

6   A.   Um-hmm.

7   Q.   What do you mean?

8   A.   He paid more per half ounce than 1 ounce would cost in

9   Oregon.  And it was supposed to be -- we were charging, like,

10  five times the amount.  And it wasn't worth it.  It wasn't --

11  it wasn't equivalent.

12  Q.   Okay.  And you're talking about product quality, right?

13  A.   Um-hmm.

14  Q.   What was a better hit, your Oregon heroin or the white

15  stuff from Ohio?

16  A.   Oregon.

17  Q.   Okay.  Is that a stronger hit?

18  A.   Um-hmm.

19  Q.   Was it a cheaper hit from Oregon?

20  A.   Um-hmm.

21           Yes.  Yes.

22           MS. BOLSTAD:  Nothing further.

23           THE COURT:  May the witness be excused?

24           MR. SEPP:  Yes.

25           MR. ANDERSEN:  Yes.  Thank you.

Colloquy

1          THE COURT:  Thank you, sir.  You're free to go.

2          THE WITNESS:  Thank you.

3          THE COURT:  As are you, ladies and gentlemen.

4     Let me just remind you, do not talk about the case.

5 Your family, your friends are going to want to know how you

6 spent the day.  You tell them you've been involved in a

7 criminal case.  The judge has ordered you not to talk about it

8 and to wait until the end, and just keep repeating that.  All

9 right?

10         No Internet work about the case, no blogging, no

11 Facebook, no -- no nothing about the case or anything that it

12 involves.  This is really important.

13         That said, I want you to please leave your notes on

14 the chair, and just leave the case behind for today.  It's been

15 a long day of tough subjects.  Enjoy your evening.

16         Tomorrow, the door to the court -- to the jury room

17 will be available for you to ring the bell by eight o'clock.

18 You can come in as early as 8:00.  We'll bring you into the

19 courtroom at 9:00.

20         I'll see if I can pick up some treats on the way, to

21 help make the morning wait a little better.

22         Feel free to bring your coffee or beverage or

23 something that you would like to have in the courtroom to help

24 keep you alert and focused.  If you want to do that, you

25 certainly may.

Colloquy

1          Do any of you have questions for tonight?

2          Okay.  So we'll start with you at nine o'clock

3   tomorrow.  We'll take a break about 10:15, 10:30; 15 minutes or

4   so.  We'll take a lunch break around noon, about an hour,

5   another break in the midafternoon.  And then tomorrow evening,

6   hopefully 4:30, 4:45ish, we'll recess.

7          Thank you, ladies and gentlemen, for your work and

8   attention today.

9          Please rise for the jury.

10          (Jurors exit, 4:57 p.m.)

11          THE COURT:  Watch your step.

12          Thank you, everyone.  Please be seated.

13          So, Ms. Bolstad, for tomorrow, who's up first?

14          MS. BOLSTAD:  I think we'll start with the medical

15   examiner, Dr. Lewman.

16          Then I would like to go with Detective Andersen,

17   followed by Morgan Godvin, Michael Rosa, and Shane Baker.

18          THE COURT:  That should get us through the morning --

19          MS. BOLSTAD:  Certainly.

20          THE COURT:  -- at least.

21          Any matters for the Court, from the Government?

22          MS. BOLSTAD:  I have a -- a question, your Honor.

23          THE COURT:  Yes, ma'am.

24          MS. BOLSTAD:  We have three stipulations in this

25   case.

Colloquy

1          THE COURT:  Um-hmm.

2          MS. BOLSTAD:  I don't know what your preference is on

3    an appropriate time to read them into the record or if I should

4    do that through a witness.

5          THE COURT:  Whatever works for you.  I don't care.

6    If you want to read it and stage the stipulation at a time that

7    is logical in the evidence, that's fine.  If you want me to

8    read it at the beginning of a session, that's fine, too.

9          However you wish.

10          MS. BOLSTAD:  And so if I request you to read it,

11    I'll just make sure you have it available.

12          THE COURT:  Yes.

13          MS. BOLSTAD:  Okay.  Thank you.

14          THE COURT:  I have for you a draft No. 3 of jury

15    instructions and separate verdict forms for each defendant.

16          Please review them very carefully tonight, even for

17    typographical issues because, as you know, I've been doing a

18    lot of the writing, and it's not my expertise.

19          But I want to be sure you have a chance to work

20    through this on the versions I have.  So I'm not sending them

21    electronically, it's just a paper copy.

22          Tomorrow morning, if -- if you can, I would like to

23    take up concerns you have about the adequacy of these as a

24    statement of the law, and sufficient to take care of the

25    theories defendants may have that they want to be sure I

Colloquy

1   instruct on.

2           I had a question.  Is there a witness testifying in

3   Spanish?  Or not?

4           MS. BOLSTAD:  Not one of my witness.

5           I think, Mr. Sepp, maybe.

6           MR. SEPP:  Possibly, but I won't know.

7           THE COURT:  All right.

8           MR. SEPP:  Again, it depends on what Mr. Baker has to

9   say.

10          THE COURT:  So it may be that we delete the Spanish

11  interpretation instruction, for example, at the end of the

12  case, if no witness is testifying in Spanish.

13          MS. BOLSTAD:  The one clarification on that is one

14  exhibit --

15          THE COURT:  Yes.

16          MS. BOLSTAD:  -- No. 80, was translated from Spanish

17  into English.  And we've stipulated to the admissibility of

18  that translation.

19          THE COURT:  All right.  We can work with that.

20          That would not affect the jury -- the jury

21  instruction is the one that tells the jury that if there's a

22  translation of testimony, they're to take the English-language

23  translation.

24          But -- all right.  We'll work on that.

25          Mr. Andersen or Mr. Sepp, do you have any matters for

Colloquy

1    tonight, for the record?

2            MR. ANDERSEN:  No.

3            MR. SEPP:  Not tonight, no, your Honor.

4            THE COURT:  All right.  8:30, please, everybody in

5    your places.  And we can get on with the law issues or anything

6    else you may have identified overnight that we need to address.

7            Thank you.  It's been a hard day's work from

8    everybody's perspective.

9            (Pause.)

10           THE COURT:  Everything all right.  Mr. Sepp?

11           MR. SEPP:  Oh, yes, sorry.  No, we're just --

12           THE COURT:  I just want to be sure it's nothing that

13   needs to be addressed on the record.  Okay.

14           MR. SEPP:  No, it's not.

15           THE COURT:  All right.  Good evening, everyone.

16           We're off the record.

17           (Conclusion of proceedings, 5:01 p.m.)

18

19

20

21

22

23

24

25

Colloquy                                      137

--oOo--

I certify, by signing below, that the foregoing is a correct

stenographic transcript of the oral proceedings had in the

above-entitled matter this 2nd day of May, 2016.  A transcript

without an original signature or conformed signature is not

certified.  I further certify that the transcript fees and

format comply with those prescribed by the Court and the

Judicial Conference of the United States.

              /S/ Amanda M. LeGore
         _____

            AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
                 CSR No. 15-0433  EXP:  3-31-2018