1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )   Case No. 3:14-CR-267-BR
4            Plaintiff,                  )
                                        )
5    v.                                  )   November 4, 2015
                                        )
6    FABIAN SANDOVAL-RAMOS(1) and RAUL  )
     ARCILA(3),                          )
7                                        )
             Defendants.                 )
8    _____)   Portland, Oregon

9

10                      TRANSCRIPT OF PROCEEDINGS
                           (Jury Trial – Day 2)

11        BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:          AMANDA M. LeGORE
                              CSR, RDR, FCRR, CRR, CE
23                            U.S. Courthouse
                              1000 SW Third Avenue Rm 301
24                            Portland, OR  97204
                              (503)326-8184

25

1   APPEARANCES:
    FOR THE PLAINTIFF:        LEAH BOLSTAD
2                            (Assistant U.S. Attorney)
                             ELISSA GOLOBORODKO
3                            (Certified Law Student)
                             U.S. Attorney's Office
4                            1000 SW Third Avenue
                             Portland, OR  97204
5                            (503)727-1000

6

7   FOR DEFENDANT SANDOVAL-
    RAMOS:                    BENJAMIN ANDERSEN
8                            121 SW Salmon Street
                             1420 World Trade Center
9                            Portland, OR  97204
                             (503)222-2510
10

11  FOR DEFENDANT ARCILA:     ROBERT SEPP
                             2350 Willamette Falls Drive, Suite 9
12                           West Linn, OR  97068
                             (503)998-7719
13

14

15  INTERPRETERS:             STEVEN MUZIK
                             FERNANDO HERRAN
16
    ALSO PRESENT:             SUSAN COOKE
17

18

19

20

21

22

23

24

25

140

1                              INDEX

2

3

4                          Witness Index

5
        FOR THE PLAINTIFF:        Direct    Cross    ReDirect    ReCross
6       Larry Lewman                157      168
        Larry Lewman                         169
7       Sommer Andersen            171      247       261
        Sommer Andersen                      258
8       Morgan Godvin              267      298
        Morgan Godvin                        306
9       Michael Rosa               311      363       368
        Michael Rosa                         367
10      Shane Baker                373      421       435
        Shane Baker                          428
11

12

13                            -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1          (Wednesday, November 4, 2015; 8:35 a.m.)

2

3                         P R O C E E D I N G S

4

5          THE COURT:  All right.  So we are back on the record

6    for day 2 of trial.  Both defendants personally present and the

7    interpreters present and participating.  Counsel for all

8    parties are present.

9          Now, before we turn to jury instructions, are there

10   any matters we need to address with respect to the morning

11   session with the jury?

12         MS. BOLSTAD:  Your Honor, I would like to address a

13   few matters before we have the jury in the room.

14         THE COURT:  Yes.

15         MS. BOLSTAD:  First, the Government has gone over a

16   few exhibits with defense counsel before today's start.

17         My understanding -- and correct me if I'm wrong -- is

18   there is no objection to the pre-admission of Exhibits 108, 29,

19   59, and 68.  68 is a modified exhibit of what it was before.

20   We simply removed the showing of any handcuffs on the two

21   defendants.

22         And, finally, the Government is -- has shown both

23   defense counsel new Exhibit 125, a text message exchanged

24   between Mr. Baker and Mr. Rosa.  They have no objection to

25   pre-admission of 125.

Colloquy

1    THE COURT:  All right.  108, No. 29, 59, 68 and 125

2  are received.

3    MS. BOLSTAD:  Correct, your Honor.

4    The stipulation, your Honor, is the other matter I

5  wished to address.  I have the Government's filing, Docket 188.

6    During trial, my preference would be to ask the Court

7  to read the stipulation to the jury at the appropriate time.  I

8  have the corrected version of stipulation No. 1, which is about

9  the lab testing.

10    THE COURT:  So filing 188 needs to be corrected, or

11  not?

12    MS. BOLSTAD:  It does.

13    THE COURT:  All right.

14    MS. BOLSTAD:  And it's the lab numbers themselves.

15  So those numbers have changed in stipulation No. 1.  The

16  correct lab report numbers that are pre-admitted are 34, 38 --

17    THE COURT:  I don't know where I'm looking here.

18    MS. BOLSTAD:  I have the document for you, your

19  Honor.

20    THE COURT:  I have 188 in front of me.

21    MS. BOLSTAD:  Oh, it's on page 3.

22    THE COURT:  Okay.  Category 3, I was looking at Roman

23  numeral I.

24    Go ahead.

25    MS. BOLSTAD:  So that first stipulation is as to lab

143
Colloquy

1   testing.  The correct exhibit numbers are 34, 38, 56, and 63.

2              THE COURT:  All right.  I've made that note.

3              You want me to read that?  I can do that.

4              MS. BOLSTAD:  Thank you, your Honor.  That's all the

5   Government has.

6              THE COURT:  Do defense counsel have any issues before

7   we go to jury instructions and verdict forms?

8              MR. ANDERSEN:  No, your Honor.

9              MR. SEPP:  Nothing your Honor.

10             THE COURT:  Okay.  Let's start with the verdict

11  forms.

12             Any concern by any party as to either of them?

13             MR. ANDERSEN:  Your Honor, would -- I'm certainly not

14  going to relitigate some of the issues that I've already raised

15  before.  But with the verdict form as to Count 1, as it is now,

16  as I understood the Court's ruling earlier, we were going to

17  treat that as one unit, instead of having a -- a special

18  verdict question on the --

19             THE COURT:  Correct.  That -- I'm sorry.  That was

20  erroneously included.  The special verdict question should not

21  appear as to Count 1.

22             Count 1 should be conspiracy to distribute heroin,

23  resulting in death.  Not guilty/guilty, and that's all.  The

24  top of page 2 on this verdict form was erroneously carried

25  over.  It should go directly to Count 2.  And that would be the

Colloquy

1   same for Mr. Arcila.

2          After the not guilty/guilty, the paragraph "If you

3   found," should be omitted; the special verdict question should

4   be omitted.

5          So thank you for catching that.

6          What about the Count 2 conspiracy with the special

7   verdict question?

8          MR. ANDERSEN:  Well, again, your Honor, with my prior

9   objections already having been overruled, I think that it looks

10  fine and it is consistent with the Court's rulings.

11         THE COURT:  Right.  So Count 2 is a more traditional

12  conspiracy count where normally the quantity is a special

13  interrogatory, and that's how I tried to set it up.  I wanted

14  to be sure this is consistent in that respect.  So the options

15  are not guilty and guilty.  And then if you found the defendant

16  not guilty, don't answer the special verdict question.  If you

17  did find him guilty, then do answer the question.

18         What I didn't understand was why you were giving

19  options of under a thousand grams, a hundred grams, less than a

20  hundred grams.  That's how you all submitted it on your

21  suggested verdict forms, but the charge is 100 grams.

22         And so if the parties want some lesser

23  quantification, for convenience, I can keep that in.  But that

24  suggestion came from your forms, not mine.

25         What's your view on that point?

1          MR. ANDERSEN:  Your Honor, I believe that -- that it

2    was charged as a thousand grams, to leave that in there.  I

3    agree, I think those hundred grams and less than a hundred

4    grams do confuse the issue.  So whether or not they prove

5    beyond a reasonable doubt --

6          THE COURT:  Does the Government need the

7    lesser-quantity options for Count 2?

8          MS. BOLSTAD:  No, your Honor.  Thank you.

9          MR. SEPP:  No.

10          THE COURT:  All right.  We'll delete those lesser

11   quantity options, so it will just read a thousand grams or

12   more.

13          The question then will be -- I'm going to have to

14   rephrase the question, then, because it was an optional

15   question of checking one of them, or more.

16          So I will have to rephrase that to read did -- did

17   the Government prove by a preponderance -- beyond a reasonable

18   doubt that the quantity was 1,000 grams or more.  And the

19   answer will be yes or no.

20          So I'll rephrase that, and you will get a chance to

21   look at that.  So we'll make the same change on Mr. Arcila's

22   form on Count 2.

23          And then for Mr. Arcila we have 100 grams or more and

24   then lesser quantities, again, for the Counts 9 and 10.

25          Does the Government require lesser quantity findings?

Colloquy

1          The verdict form tendered was for less than 100 grams

2   of heroin.

3          Frankly, I think the question ought to be did the

4   Government prove -- if the defendant's found guilty, did the

5   Government prove beyond a reasonable doubt that 100 grams or

6   more of heroin was involved, yes or no?  If the answer is no,

7   then it's necessarily less than 100 grams because they're only

8   answering the question if the defendant is found guilty.

9          MS. BOLSTAD:  And, your Honor, for the Government,

10  that works fine.

11         My form just follows the standard model jury verdict

12  form from the Ninth Circuit.

13         MR. SEPP:  We're fine.  The defense is fine with

14  that, also striking the -- that separate portion.

15         THE COURT:  We're going to rephrase the verdict forms

16  in all respects and have you look at them again.

17         All right.  On the jury instructions questions

18  themselves, have you had a chance to review them?  Do you have

19  some adjusted changes, additions, corrections, deletions?

20  Whoever has the first one, in order, I would like to go

21  page-by-page, just so I can track.

22         Do you have any, Ms. Bolstad?

23         MS. BOLSTAD:  I do, your Honor.

24         THE COURT:  What page?

25         MS. BOLSTAD:  I have a request for one that is not in

Colloquy

1   here.  So there is no page --

2          THE COURT:  Let's start with the ones that you have

3   issues on.

4          MS. BOLSTAD:  Page 13 and 14 would be my first.

5          THE COURT:  Okay.  Anybody have anything before pages

6   13 and 14?

7          MR. SEPP:  (Shakes head.) No, your Honor.

8          MR. ANDERSEN:  No.

9          THE COURT:  Okay.  On pages 13 and 14 --

10         MS. BOLSTAD:  In the final paragraph of the

11  impeachment instruction, the Government requests a rewording.

12         THE COURT:  Which final paragraph?

13         The "although when" paragraph?

14         MS. BOLSTAD:  Correct.

15         THE COURT:  Okay.

16         MS. BOLSTAD:  And I think what -- what I'm requesting

17  specifically is a separate instruction about consideration of

18  the defendant's punishment.

19         THE COURT:  All right.  Go ahead.

20         MS. BOLSTAD:  So what I would request is we keep the

21  impeachment instruction about the witnesses, and move this

22  concept of punishment consideration to a separate instruction

23  about these defendants.

24         THE COURT:  So you would propose to delete that

25  paragraph altogether, the "although when" paragraph, and have a

148
Colloquy

1    separate stand-alone do-not-consider-a-penalty instruction?

2              MS. BOLSTAD:  No.

3              THE COURT:  You want both?

4              MS. BOLSTAD:  I do.  And what I think would be better

5    for the jury is a rewording of this paragraph as to the

6    cooperators.

7              THE COURT:  All right.  Go ahead.

8              MS. BOLSTAD:  Because they should also be entitled to

9    consider punishment for them.  But this gets confusing about

10   these defendants and --

11             THE COURT:  The thing is I've already told them at

12   the front end of this impeachment instruction to consider it.

13   And the whole point of adding this paragraph was to distinguish

14   that previous instruction.  There's no point in repeating that

15   point for the cooperators.  I'm already telling them you should

16   examine the testimony to see if they get any benefit.  And I've

17   covered that thoroughly with them also in voir dire, as

18   everyone else has?  So I'm not sure what we gain.

19             But tell me what it is you propose in that paragraph.

20             MS. BOLSTAD:  Your Honor, only if you needed to

21   remind them of what you've already told them, which I don't

22   think is necessary.

23             So I don't need it reworded, but what I would request

24   is a separate 7.4 instruction.

25             THE COURT:  So what you're asking is to delete the

1  "although when" paragraph and have the separate stand-alone

2  instruction about "don't consider the penalty" concept?

3          I can do that.

4          MS. BOLSTAD:  Yes, your Honor.

5          MR. ANDERSEN:  I don't have any particular objection

6  to that, your Honor.  I think the instruction, as worded, does

7  clarify that they are supposed to take into account --

8          MR. SEPP:  Yes.

9          THE COURT:  Let me -- let me just make the point,

10  staff was telling me that one of the issues with the

11  microphones are feedback if there is any cell phone that is

12  on -- powered on near the microphone.  So, Counsel,

13  Interpreters, the Marshals, you can't be near a microphone with

14  a cell phone that is powered on, even though you have it on

15  silence.  The power is interfering.  So that might be one of

16  the issues.

17          Anyway, Mr. Sepp.

18          MR. SEPP:  Yeah, I --

19          THE COURT:  Not guilty on the phone?

20          MR. SEPP:  Not guilty on the phone.  Back there,

21  turned off.

22          I have no objection with the instruction as written

23  as it is.

24          THE COURT:  Okay.

25          MR. SEPP:  I also have no true objection to the

Colloquy

1   Government adding in a new one.

2          THE COURT:  All right.  So since everybody agrees the

3   "although when" paragraph should come out and I know as a

4   matter of law I'm to be sure the jury understands that they're

5   not to consider what penalty I will impose in the event the

6   defendants are found guilty of any charge, I'll include the

7   standard language.  I'll find a place to put it.

8          So I'll be deleting that paragraph -- "although when"

9   paragraph and adding a "don't consider the penalty"

10  instruction.

11         What else did you have, Ms. --

12         MS. BOLSTAD:  Page 14.

13         THE COURT:  Go ahead.

14         MS. BOLSTAD:  Defendant's other acts.

15         THE COURT:  Okay.

16         MS. BOLSTAD:  The Government did not request this.

17  I'm not sure the defense did.  But I don't believe there is

18  evidence that will be presented in this case about other acts.

19         THE COURT:  You mean acts outside of the conspiracies

20  or the deliveries?

21         MS. BOLSTAD:  That's correct.

22         THE COURT:  So you don't need it?

23         MS. BOLSTAD:  I didn't request it.  I don't know

24  if --

25         THE COURT:  Do either of the defendants want the

Colloquy

1   other acts instruction?

2           It's -- I've always viewed it personally as a bit of

3   an overkill but -- and it's typically needed when there is

4   testimony about prior bad acts or other -- other events that

5   are not necessarily within the chronology of the range of

6   proof, so I think Ms. Bolstad's point is well taken.  It's --

7   it can go out.  But if either of you want it in and have a

8   reason for it, tell me.

9           MR. SEPP:  No, I think I may have included it, but

10  that was before -- she wasn't planning on using any of those

11  other acts.

12          MR. ANDERSEN:  Yeah, I don't believe I requested

13  that.

14          THE COURT:  We'll delete the defendants' other acts.

15          Okay.  What else, Ms. Bolstad?

16          MS. BOLSTAD:  And then I just have requests about

17  additional instructions.

18          THE COURT:  Go ahead.

19          MS. BOLSTAD:  The first requested instruction would

20  be 2.4, stipulations.

21          THE COURT:  Okay.  That's effectively covered by any

22  agreed facts that the parties have pointed -- or that have been

23  pointed out to you.  Item 3 in the "what is evidence"

24  instruction.

25          MS. BOLSTAD:  Oh, okay.

Colloquy

1          THE COURT:  Right?

2          MS. BOLSTAD:  Is it appropriate to -- before you read

3     the stipulation to the jury during trial, to explain to them

4     what a stipulation means?

5          THE COURT:  I'll tell them this is one of the agreed

6     facts that is evidence and doesn't require any other proof.

7          MS. BOLSTAD:  Okay.  The Government also requests

8     standard instruction 7 point -- sorry.  Already covered that,

9     punishment.

10         The Government requests the quantity instruction,

11    9.6.

12         THE COURT:  And where do you want that?

13         MS. BOLSTAD:  After the Count 2 -- it could either go

14    at the end of the elements of Counts 9 and 10 or before the

15    counts that need quantity determination.

16         THE COURT:  That would be Count 2.

17         MS. BOLSTAD:  That would be Count 2, 9, and 10.

18         THE COURT:  I'll take a look at that.

19         MS. BOLSTAD:  And the reason I asked for it is

20    because there's very specific things a jury can consider about

21    quantity.  Not packaging, mixture counts.  Thank you.

22         THE COURT:  Anything else, Ms. Bolstad,

23    substantively?

24         MS. BOLSTAD:  No, your Honor.

25         THE COURT:  Mr. Andersen, Mr. Sepp, do you have

Colloquy

1  substantive issues you wanted to raise?

2          MR. SEPP:  I do not, your Honor.

3          MR. ANDERSEN:  I don't have any either, your Honor.

4  I just do want to note my objections to the formulation of the

5  elements in Counts 1 and 2, but I've already raised that.

6          THE COURT:  I think the quandary, again, arises from

7  the use of the term "element" and "enhancement" by the Supreme

8  Court.  And then the cases in **Burrage**, and the cases that

9  follow, making the issue murky.

10         Technically speaking, I think Ms. Bolstad's position

11 is the legally correct one.  The resulting in death is an

12 element -- is not an element, it is a sentencing enhancement.

13 But I think to say to the jury that it is an enhancement that

14 has to be proved separate and apart from the crime is

15 confusing.

16         And so the way I formulated the elements to Count 1

17 is to state both the two elements of the conspiracy plus the

18 resulting-in-death element is actually core to the charge.  It

19 is a resulting-in-death charge, not a conspiracy to -- to

20 distribute heroin.  Especially in the context of this case,

21 where there are two conspiracies to distribute heroin charged

22 in overlapping time periods.  Otherwise, there would make --

23 there would be no sense at all to the Government having

24 presented two charges.  It is -- it is a distinction that the

25 Government chose to make in the way it presented the case to

Colloquy                                    154

1   the grand jury.

2           So resulting in death is an element of Count 1.

3   Distributing heroin as part of a conspiracy in a quantity of

4   1,000 grams or more is a more traditional view, is the more

5   traditional distinction -- has a more traditional distinction

6   between elements and enhancements.

7           And so I think Ms. Bolstad's point of having the

8   standard instruction about quantities for the enhancement is a

9   good way to stay on firm ground there.  Those instructions were

10  developed after all the quantity litigation and the question

11  whether they had to be found by a judge or found by a jury.

12  Nobody's having any problem in this room about the fact that

13  all of these have to be found by the jury and all of them have

14  to be found by beyond any reasonable doubt.  So I think we get

15  to the same place, regardless of the layout.

16          All right.  So you'll have a draft No. 4 by the end

17  of the day, yes?

18          MS. BOLSTAD:  Sorry, your Honor, I forgot one thing.

19          THE COURT:  Yes.

20          MS. BOLSTAD:  You're going to think I'm crazy.  It's

21  probably not the first time in this trial.

22          THE COURT:  Or why limit it to this trial?

23          MS. BOLSTAD:  Right.  Why limit it.

24          THE COURT:  Go ahead.

25          MS. BOLSTAD:  The Government is going to request a

Colloquy

1    special verdict question on foreseeability.  I believe, right

2    now, under the state of the law, it's not required.  What

3    concerns me is **Burrage** left the issue open.

4            THE COURT:  All right.

5            MS. BOLSTAD:  And, two, in the Ninth Circuit, the

6    **Houston** case mentions that there might be instances in which

7    someone is so far removed from the death that due process

8    requires some showing of foreseeability.

9            THE COURT:  All right.  So what I would need, then,

10   is another special verdict question, and I need a question

11   about what foreseeability is.

12           So you write them, tender them.  I'll put them in for

13   everybody's consideration, and we'll continue to continue.

14           MS. BOLSTAD:  Thank you.

15           THE COURT:  So a draft 4 will be generated.  No doubt

16   a draft 5 will follow, and we'll go from there.

17           (Pause, Court and the law clerk conferring.)

18           THE COURT:  Okay.  Ms. Boyer, would you take a head

19   count, please, and see if perchance we can start with the jury.

20           THE CLERK:  They're all here.

21           THE COURT:  They're all here.

22           Are there any other matters we need to address?  Are

23   the parties otherwise ready to go?

24           MS. BOLSTAD:  Yes, your Honor.

25           MR. SEPP:  Yes, your Honor.

Colloquy

1    THE COURT:  Who's your first witness this morning,

2  Ms. Bolstad?

3    MS. BOLSTAD:  I'm sorry, your Honor?

4    THE COURT:  Who is your first witness?

5    MS. BOLSTAD:  We'll start with Dr. Larry Lewman.

6    THE COURT:  Will you ask him in.  He can be at the

7  witness chair when the jury comes in.

8    MS. BOLSTAD:  Yes, your Honor.

9    THE COURT:  Dr. Lewman.

10    THE WITNESS:  Good morning.

11    THE COURT:  Good morning.

12    Please come up.  Make yourself comfortable.

13    When the jury comes in, everybody will stand.  We'll

14  all be seated.  And then if you'll please remain standing,

15  you'll be sworn then.

16    THE WITNESS:  Okay.

17    THE COURT:  Okay.  Or you can stay standing now.

18  Whatever works best for you.

19    MS. BOLSTAD:  And, your Honor, to save time, would it

20  be okay to use this three minutes to lay out some exhibits so

21  that we can go into the next witness?

22    THE COURT:  Yes.

23    (Pause.)

24    THE COURT:  Please rise for the jury, ladies and

25  gentlemen.

Lewman – D                                    157

1          (Jurors enter.)

2          THE COURT:  All right.  Thank you, everyone.  Please

3  be seated.

4          Good morning, jurors.

5          THE JURORS:  Good morning.

6          THE COURT:  We're going to settle a few things here

7  at the table.

8          And as soon as Ms. Bolstad's ready to proceed, we'll

9  have the next witness sworn.

10         Just so you know, this is Dr. Larry Lewman, the

11 medical examiner, who will be testifying.

12         Thank you for being ready early.  Appreciate it.

13         All right.  Dr. Lewman, would you please stand, face

14 the jury and the deputy there.  Raise your right hand to be

15 sworn.

16         (Witness sworn.)

17         THE WITNESS:  I do.

18         THE COURT:  Thank you, sir.

19         Bring yourself close to the microphone, please.  Tell

20 us your full name, and please spell all of it.

21         THE WITNESS:  Larry V. Lewman.  L-A-R-R-Y.

22 L-E-W-M-A-N.

23         THE COURT:  Thank you.

24         Counsel.

25                        DIRECT EXAMINATION

Lewman - D

1    BY MS. BOLSTAD:

2    Q.   Good morning.

3    A.   Good morning.

4    Q.   Could you please tell the jury how you're employed.

5    A.   I'm a physician.  I specialize in pathology with a

6    subspecialty in forensic pathology.  I'm one of the four

7    forensic pathologists on the staff of the Oregon State Medical

8    Examiner's Office, which means I investigate violent,

9    unexplained deaths with the Oregon State Medical Examiner's

10   Office.

11   Q.   Could you please give the jury a summary of your training

12   in the field of medicine.

13   A.   I graduated from college, Kansas State University, in 1963,

14   with a BA in pre-medicine or pre-doctorate degree.  I then

15   attended the University of Kansas School of Medicine,

16   graduating with the MD, with the regular physician's degree, in

17   1967.

18          Following that, I was off to the institute of

19   pathology -- I was off to the institute of pathology at Case

20   Western Reserve University in Cleveland, Ohio, where I received

21   specialty training in two types of pathology or laboratory

22   medicine.

23          First, I received my training in anatomic pathology.

24   This is the medical specialty of pathology as it's practiced in

25   a hospital-type setting; doing biopsies to see if a tumor is

Lewman - D

1    malignant or not, looking at Pap smears, microscopic slides,

2    and doing autopsies of individuals who died of natural medical

3    diseases:  Cancer, heart attack, this sort of thing.

4           Following completion of that, then I received

5    specialty training in forensic or medical legal or so-called

6    criminal pathology.  If you watch CSI and some of that stuff on

7    TV, you get a vague but distorted idea of what that it's all

8    about.

9           THE COURT:  Dr. Lewman, would you pull the microphone

10   closer to you, please, and speak a little closer to it.  Thank

11   you.

12          THE WITNESS:  It involves the investigation of

13   violent, unexplained death under a coroner or medical

14   examiner's law.  Most of it is investigation of natural medical

15   disease, just people found dead in the community, no particular

16   reason; all of the violent deaths, the suicides, the homicides,

17   the traffic wrecks, and the drug overdoses.  Anything that's

18   unnatural, we investigate.

19          It starts with a complete external examination of the

20   body, and then we go from there.

21          I then assumed my position with the office of the

22   Oregon State Medical Examiner in April of 1971.  So I've been

23   there now over 44 years.

24          For the first several years, I was a deputy state

25   medical examiner, which means that I work along with the state

Lewman – D

1   medical examiner and people in the field, and all of that, for

2   several years.

3            I then was employed chief medical examiner for the

4   State of Oregon in 1997 [sic].  I stayed in that position for

5   about 19 years, where I directed the entire statewide death

6   investigation program.

7            Following that, then I got tired of some of the --

8   doing some of the -- being sort of a vital bureaucrat, I gave

9   up of the administrative part of it.  At that time the state

10  medical examiner went to my partner, and I've been there ever

11  since as a deputy state medical examiner.

12  BY MS. BOLSTAD:

13  Q.  And is there a special certification that you have to be a

14  medical examiner?

15  A.  There is.  Of course, there's the MD or the regular

16  physician's degree.  Then I hold board certificates granted by

17  the American Board of Pathology in both anatomic and forensic

18  pathology.

19  Q.  How many physicians in the state of Oregon are similarly

20  certified?

21  A.  Well, there's, of course, hundreds of thousands of

22  physicians.  There are several hundred hospital-type or

23  anatomic pathologists in the field of forensic pathology, but I

24  believe there are currently only seven in the state.

25  Q.  Do you have any academic teaching positions?

Lewman - D

1   A.   I do.   I teach at OHSU medical school, teaching nurses and

2   doctors, and people of that that ilk.   We have courses every

3   year, too, where people come to the office.   Sometimes district

4   attorneys, defense attorneys.   Occasionally a judge comes.

5   Mostly investigating police officers.   And it's a week-long

6   training session, and I teach in that.

7           I taught for several years for the Institute Of

8   Justice in Louisville, Kentucky.   And I taught around the

9   country.   Gave seminars all over the country.   You know, some

10  in Canada.   About the investigation of unexplained death.   I

11  don't do that anymore.

12  Q.   Do you give any teachings or lectures about drug-related

13  overdose deaths?

14  A.   Yes, all the time.

15  Q.   Tell -- to who -- whom do you give those lectures?

16  A.   Pretty much the same groups I just mentioned.   The -- all

17  of the pathology residents, people taking their pathology

18  training at OHSU, rotate through our office and get training in

19  forensic pathology.   And that, of course, is part of it.

20  Q.   And so have you been involved in the investigation of

21  deaths?   Have you performed autopsies of deaths related to drug

22  overdoses?

23  A.   Many times.

24  Q.   Do you have an idea of the number of times that you've

25  done --

162

Lewman - D

1  A.  Oh, hundreds.  I mean, if we go back 40-some-odd years.

2  And, oh, yeah.  I mean, heroin is the most common overdose

3  thing.  We used to see -- maybe in the '70s, maybe a handful of

4  those a year.  It was at that time what we called China white.

5  It was processed in Asia.  Came through Canada.

6          MR. ANDERSEN:  Your Honor, I object to this line of

7  testimony.

8          THE COURT:  I did not understand what you said.  Say

9  it again and more slowly, please.

10          MR. ANDERSEN:  I object to the relevance of this

11  particular testimony about where heroin came from.

12          THE COURT:  The objection is overruled.  It's

13  background evidence, and it assists the jury in understanding

14  the qualifications of the witness in the context of this case.

15          Go ahead.

16          THE WITNESS:  So, to summarize, it was fairly rare

17  when we were dealing with heroin in the '70s.  Then in the

18  '80s, '90s, hundreds, it became just epidemic.

19          We've had over 100 heroin overdoses a year.  We had

20  122 last year.  Over a hundred for the last ten years, then --

21  in the '90s.  And it's a totally different kind of heroin.  It

22  comes in from Mexico now.  We rarely see the China white stuff.

23  This is the gooey-brown stuff that comes in through Mexico.

24  BY MS. BOLSTAD:

25  Q.  You mentioned over 100 in 2014.

Lewman - D

1          Do you know the exact number of heroin overdose

2   deaths in the state of Oregon?

3   A.   Well, that's it.

4   Q.   Over 100?

5   A.   It was 122 last year.  111, 2013.  140-some, 2011.  Over

6   100 ever since -- I have it back to 2004.  We've had slightly

7   less than 100 -- more than a hundred every year, and it's not

8   going down.  This year, I haven't counted them yet.  But we see

9   them all the time.

10  Q.   Okay.  I would like to talk about this case now.

11          Did you perform an autopsy on the body of Justin

12  Delong?

13  A.   I did.  The examination was done March 31 of 2014.

14  Q.   What is an autopsy?

15  A.   An autopsy, post-mortem examination, is an examination of a

16  person's body after they have died to determine the cause and

17  the manner of death.

18          It starts, first of all, with a background

19  investigation, which is done by investigators at the scene.  We

20  research medical histories.  We don't do autopsies in a vacuum.

21  We are then going to look at the body in its natural state;

22  record evidence of wounds or injury or natural disease that we

23  see.  We're going to take out all of the organs.  We're going

24  to look at the brain and the heart, the lungs and the liver

25  with the naked eye; if necessary, under the microscope.  We

Lewman - D

1    commonly take samples of blood and the urine, whatever, for

2    toxicology studies; in which we're looking for drugs and

3    chemicals and all of that.

4            We may submit material to a criminalistics

5    laboratory.  It just depends on the case.

6            Upon completion of that, then we sign the death

7    certificate and determine the cause of death and issue an

8    autopsy report.

9    Q.  In your autopsy of Mr. Delong, did you come to a conclusion

10   about cause of death?

11   A.  I did.

12   Q.  What was it?

13   A.  He died of a heroin overdose.

14   Q.  Okay.  Could you elaborate on how you came to that

15   conclusion?

16   A.  Well, first of all, again, we get -- we have investigators

17   out in the scene that are trained deputy medical examiners.

18   The Washington County Medical Examiner went to the scene.  They

19   found needles.  They found syringes.  They -- uncapped and

20   capped.  They had cotton.  They had a belt.  They had some

21   brown, gooey stuff, which is -- my experience -- probably tar

22   heroin.

23           So we had that information to start with, and then

24   proceeded with the rest of the investigation and the autopsy.

25           There was also some statements made that he had not

1    used heroin for a while.  And this is important because all of

2    these types of drugs, there's tolerance.  You get adapted.  You

3    have to take more and more and more for the same effect.  And

4    if they quit taking it for a period of months, they're losing

5    their tolerance.  They're much more vulnerable to die from

6    heroin overdose, or any other kind of drug overdose, at that

7    particular time.

8    Q.  Did you examine the toxicology screens for -- performed by

9    the Oregon State Police Crime Lab?

10   A.  I did.

11   Q.  I'm going to show you, on the screen in front of you,

12   Government Exhibit 11.

13   A.  Yes.

14   Q.  Do you recognize this report?

15   A.  I do.

16   Q.  What is it?

17   A.  This is the examination of the urine of Mr. Delong, which

18   found codeine which is a -- really, a contaminant in heroin.

19   You don't see it in pure morphine.  6 monoacetylmorphine.  And

20   we'll talk about that.  That's one of the breakdown products of

21   heroin.  Heroin itself.  And morphine.  That's the urine

22   results.  It doesn't give you a number.  The important stuff is

23   in the blood.

24   Q.  Let's look at Exhibit No. 12.

25            Now, is this exhibit the toxicology on the blood?

Lewman - D

A.  This is the toxicology on the blood.  The alcohol is

negative, or no ethyl alcohol in him.  Acetone not detected.

          The important thing here is the urine.  It says:

Morphine, free morphine, .085 milligrams per liter.

          Monoglucuronide-bound morphine, which is one of

the -- we'll discuss this.  It's one of the metabolites or the

breakdown product as the liver breaks down the morphine.  Of

greater than 800 milligrams per liter.

Q.  So tell the jury about what happens when heroin is ingested

into the body.

          First, what is the effect that it has on the body?

A.  Well, heroin is a -- is a sedative, much like a sleeping

pill.  It's a depressant on the central nervous system, the

brain, and the respiration in particular.  Just a general

overall depressant.

Q.  And you mentioned it breaks down into those items we looked

at on the lab reports.

          What does that mean?

A.  Well, it's the liver -- it's taken in by the liver.  It's

broken down into a series of compounds.  And these -- the

levels that we just talked about are important in telling when

they died.

          All people don't just drop dead suddenly of heroin.

In fact, some do but most don't.  Most of them die over a

period of time; as in this case.

Lewman - D

1        But heroin is -- you're much like -- much like any

2   sleeping pill.  And it's morphine.  You know, you go break your

3   leg, you go to the emergency room, you get morphine.

4        Well, heroin is really two morphine radicals.  And

5   it's rapidly broken down by the liver in a couple of other

6   compounds.  There's several, but the important ones are 6

7   monoacetylmorphine and glucuronide -- and morphine-glucuronide.

8        But as we go along in time, if -- if these two -- we

9   look at these levels.  The 6 monoacetylmorphine we found in the

10  urine is important only because it tells you it's definitely

11  heroin.  It's not -- it's not morphine because you don't get

12  that in pure morphine.

13       Now, as we go along and this stuff is broken down,

14  when the levels are approximately equal of the free morphine

15  and the glucuronide, which is a metabolite, that takes about a

16  couple, three hours.  After that, the liver breaks down, and

17  the morphine level drops.  And the glucuronide -- glucuronide

18  level goes up.  And that's what we see here.  We see the .08.

19  And the morphine and the glucuronide is through the roof.  So

20  he lived a few hours after that.  And that's also evident in

21  his lungs, which are heavily congested.  They were 2500 grams.

22  Normally we see 800.  And even -- even saw a little bit of

23  pneumonia under the microscope, which is a sign that he's

24  lingered on for at least a few hours after he took the stuff.

25  Q.  And in those few hours, is his body still functioning?

1   A.  Well, he was unconscious, not functioning.  He might be

2   conscious for a while, but eventually it's going to knock you

3   out.

4   Q.  And is there something that happens that makes you lose

5   consciousness in that process?

6   A.  Yeah.  It's a central nervous system depressant.  It

7   depresses the central nervous system.  It depresses

8   respiration, so you're not getting good blood to your lungs, to

9   your heart, and your brain.

10  Q.  Dr. Lewman, can you determine the strength of the heroin

11  that was in Mr. Delong's system?

12  A.  Well, I can't.  It was enough.  I mean, first of all, this

13  stuff isn't analyzed by the FDA.  It's not like a pill you get

14  at the pharmacist.  You don't know what you're getting.  It can

15  be 5 percent, it could be 60 percent.  It's sort of like

16  Russian roulette with a needle, so you really don't know the

17  strength of the heroin.  But it was certainly enough to put

18  Mr. Delong in my office.

19            MS. BOLSTAD:  Nothing further on direct, your Honor.

20            THE COURT:  All right.  Mr. Andersen.

21                      CROSS-EXAMINATION

22  BY MR. ANDERSEN:

23  Q.  Just one follow-up on the strength.

24            There's no way from your point of view or your

25  examination to determine what -- what type of heroin or where

1  the heroin came from, or anything of that nature.  Right?

2  A.  Well, it's -- it's Mexican tar.  It's boxed up.  Exactly

3  where it came from, I don't know.  But it -- this is what we

4  see all the time.

5  Q.  Well, here's my question.

6          If you're looking at the analysis that we were --

7  that you were just discussing with the Government, the urine

8  and the blood, does that analysis tell you anything about where

9  it came from or what type of heroin it was?

10 A.  Well, looking at that alone, no.

11         MR. ANDERSEN:  Okay.  Thank you.  That's all I have.

12         THE COURT:  Mr. Sepp, any questions?

13         MR. SEPP:  Thank you, your Honor.

14                      CROSS-EXAMINATION

15 BY MR. SEPP:

16 Q.  You said that heroin is a depressant?

17 A.  Absolutely.

18 Q.  What kind of effects was -- does the heroin depressant have

19 on the body after a person uses it?

20 A.  Well, as I just talked about.  It depresses respiration, it

21 depresses breathing, it depresses the brain.

22 Q.  Would it have an effect on his -- on the user's ability to

23 remember things?

24 A.  Well, certainly.

25 Q.  And on their ability to comprehend things as they are

Lewman - X

1    happening?

2    A.  Well, in the earlier stages, probably not too much.  As we

3    go on and he has more depressant effect, then obviously he's

4    going to go unconscious.  You're not talking and explaining

5    things at that point.

6              MR. SEPP:  Thank you.  That's all.

7              THE COURT:  Redirect.

8              MS. BOLSTAD:  Nothing.  Thank you, your Honor.

9              THE COURT:  Thank you, Dr. Lewman.  You're free to

10   go.

11             THE WITNESS:  Thank you.

12             THE COURT:  Next witness, please.

13             MS. BOLSTAD:  The Government calls Detective Sommer

14   Andersen.

15             THE COURT:  All right.

16             Please face the jury and the deputy there.  Thank

17   you.

18             (Witness sworn.)

19             THE WITNESS:  I do.

20             THE CLERK:  Please take a seat.

21             THE COURT:  Bring yourself close in there to the mic,

22   please.  Tell us your full name and spell all of it.

23             THE WITNESS:  Sommer Andersen.  S-O-M-M-E-R,

24   A-N-D-E-R-S-E-N.

25             THE COURT:  Go ahead, Counsel.

171

Andersen - D

DIRECT EXAMINATION

1

2  BY MS. BOLSTAD:

3  Q.  Would you please tell the jury how you are employed.

4  A.  I'm a police officer for the City of Hillsboro.

5  Q.  How long have you work worked for the City of Hillsboro?

6  A.  Since 2006.

7  Q.  And during your time with the Hillsboro P.D., have you

8  worked as a narcotics investigator?

9  A.  Yes.

10 Q.  Any special units that you've worked in?

11 A.  I'm currently assigned to the West Side Interagency

12 Narcotics Task Force or WIN team, which is a group of people

13 put together from Hillsboro P.D., Beaverton P.D., Washington

14 County Sheriff's Office, Tigard P.D., and several federal

15 agencies.  And I've been on that team since December of 2013.

16         And then, prior to that, I spent about -- between

17 four and five years working as a street crimes detective for

18 Hillsboro P.D. on a smaller team that dealt with neighborhood

19 livability issues and lower-level drug cases and violent

20 crimes.  And I also spent several years working patrol.

21 Q.  And while working in patrol, did you have the chance to

22 interact with drug users?

23 A.  Yes.

24 Q.  Did you interact with drug dealers?

25 A.  Yes.

172

Andersen - D

1   Q.  And with the Washington Interagency Narcotics Team -- let's

2   just call that WIN -- with WIN, what are the kinds of cases

3   that you are working on?

4   A.  So at WIN, we mainly focus on middle- to upper-level drug

5   distribution organizations or people that are selling larger

6   amounts of drugs than just a street-level dealer.

7   Q.  And could you tell the jury about your training and

8   experience specifically about narcotics trafficking.

9   A.  Sure.

10          So I received training from DEA, from the sheriff's

11  office, from Hillsboro P.D., from the Oregon Police Academy.  I

12  also attend conferences, usually annually.  There's an Oregon

13  Narcotics Officers conference I'll attend, as well as a

14  California narcotics conference that's held in California.  And

15  we typically go to those at least once a year.

16  Q.  How long are each of those narcotic conferences?

17  A.  They go over a several-day period, with training throughout

18  the day.

19  Q.  Could you estimate for the jury how many narcotics

20  investigations you have been involved in?

21  A.  Several hundred, easily.

22  Q.  And how about overdose investigations?  Have you done

23  those?

24  A.  Yes.

25  Q.  Approximately how many?

173

Andersen - D

1  A.  I've been involved in probably four or five on my own, and

2  my team has responded to additional investigations as well.

3  Q.  Were you involved in a **Len Bias** heroin overdose

4  investigation in March 2014?

5  A.  Yes.

6  Q.  Who was Len Bias?

7  A.  He was a basketball player for the Boston Celtics, and he

8  died of a cocaine overdose.

9  Q.  And are these cases now called **Len Bias** investigations,

10  after his death?

11  A.  Right.  So it's a federal statute where if you are

12  participating in the delivery of drugs that results in a death,

13  it's sort of referred to as a **Len Bias** statute or the **Len Bias**

14  law.

15  Q.  So that's -- that's interesting.  On the street, when you

16  talk to drug dealers and drug users, are they familiar?  Do you

17  have conversations with them about the **Len Bias** law?

18  A.  Yes.

19  Q.  Okay.  So let's go to this investigation.  What was your

20  role?

21  A.  My role began when I got a call from my sergeant to respond

22  to the initial scene of Justin Delong's home, and then I was

23  involved from that point forward.

24  Q.  What was your goal?  What's your goal in any **Len Bias**

25  investigation?

Andersen - D

1    A.  Our goal is to work up the distribution chain as far as we

2    can go and as quickly as we can go to identify as many levels

3    in that distribution as we can, to make as large of an impact

4    as we can in dealing with the distribution chain.

5    Q.  So what do you mean by "impact"?

6    A.  So if we not only identify where the heroin came from that

7    resulted in the death, whether that was a particularly bad

8    batch or something was unique to that, if we can remove the

9    rest of that product that may still be out there in the

10   community, that would be an impact.  It would prevent further

11   overdoses, as well as identifying all of these people that are

12   responsible criminally in the chain as we go up the ladder; so

13   that they're no longer a part of the community, out selling

14   drugs in the community.

15   Q.  And so when you reach the first step in the chain, do you

16   stop?  Are you done?

17   A.  Hopefully not.

18   Q.  Okay.  In terms of impact and goals, tell us about that

19   first level.  What is your goal there, the lowest-level dealer?

20   A.  To confirm that that is the supply that the victim had

21   used, and then to get that person's cooperation to identify

22   where they obtained their heroin from.

23   Q.  And at those levels, in your experience -- that low level,

24   in your experience, does that person also tend to be a heroin

25   user themselves?

175

Andersen – D

1  A.  Yes.

2  Q.  Okay.  How about as you move up the chain of distribution?

3  What is your experience?  What -- what have you seen?

4  A.  Once we get to a certain level, where you have people whose

5  function is to deliver, you know, multiple ounces of heroin to

6  multiple customers throughout the day, typically those people

7  involved at that level are not necessarily heroin users.

8  They're more functioning in a specific role as a part of a

9  larger group.  And they're not your average person who's, you

10  know, struggling with an addiction and selling drugs to help

11  continue that addiction.  Their functioning is almost like an

12  isolated part of a business structure.

13  Q.  And you mentioned a business structure.  Are there

14  similarities between these high-level distributors and

15  legitimate business?

16  A.  Yes.

17  Q.  What are those similarities?

18  A.  So a lot of the similarities are that there are different

19  functions within the organizations.  You'll have somebody whose

20  job it is to bring the drugs to the area.  Another person whose

21  job it is to receive phone calls, to take orders from people

22  who are looking to purchase those drugs.  Others who will be

23  responsible for only going to deliver to those customers.

24  Others who might be responsible for packaging or for providing

25  vehicles.

176

Andersen - D

1          And one of the things we'll see in many cases is

2   those roles will be very compartmentalized.  So different

3   people in those roles may not know who else is involved at all

4   of the different levels.

5   Q.  Tell us about the pace of a typical **Len Bias** investigation.

6          You mentioned earlier you move quickly.  Why?

7   A.  Well, the biggest part is that most times these days drug

8   transactions are conducted in a large part through cell phone

9   contact.  And so if we don't move quickly and word of the death

10  spreads, one of the first things that will happen is people

11  will discontinue using that phone and move to a new phone.  And

12  so if a person whose job it is to sell drugs changes their cell

13  phone number and begins using a different number, it sort of

14  stops our ability to keep moving forward in the chain.

15         Especially the higher we go, the less people tend to

16  know about the person they're calling.  And so there's less to

17  go on.  They might have a nickname and a phone number or a

18  description of a vehicle.  Whereas at a lower level, you know,

19  typically you'll have someone who can very easily tell you,

20  yes, I got the heroin from my friend so-and-so, and they can

21  give you a lot more detail about who it is that they're buying

22  from.

23  Q.  How did your role in this case begin?

24  A.  My role began when I got the phone call letting me know

25  there had been a suspected overdose, and I responded to Justin

Andersen - D

1    Delong's home, arriving at about the same time as the medical

2    examiner arrived.

3    Q.  What did you observe when you arrived on that scene?

4    A.  I saw Justin Delong's body in his bedroom, in the state it

5    was described, where his legs are up on the -- up on the bed

6    and his upper torso is down on the ground.

7              I saw, you know, blood droplets, or sort of a spray

8    of blood appearing on his chest and on the wall near him.  And

9    then as we moved him later, we saw additional paraphernalia and

10   other items.

11   Q.  Did you see any white foam on his face?

12   A.  I did.

13   Q.  In your training and experience, does that mean something

14   to you?

15   A.  It can be an indication of an overdose, yes.

16   Q.  And you mentioned paraphernalia around him.  What do you

17   mean?

18   A.  So one of the things that was near him was a -- what

19   appeared to be the metal base of a tea light candle, where

20   you've got a small, round metal cylinder.  Inside of which was

21   some cotton -- a little bit of cotton and some brown residue

22   with a small, like, makeshift handle affixed to that.  As well

23   as a belt that was still looped, and additional needles, and a

24   small plastic baggie of a brown substance that looked to me to

25   likely be heroin.

178

Andersen - D

1  Q.  I'm going to show you Government Exhibit No. 6 on the

2  screen.  It's been marked and admitted.

3           What is that?

4  A.  That's a small plastic baggie with a small amount of a

5  brown substance that was later determined to be heroin.

6  Q.  I'm going to show you Government's 1.

7           Do you recognize that?

8  A.  I do.

9  Q.  What is it?

10 A.  It's that same small amount of heroin from that plastic

11 baggie.

12 Q.  And then I'm going to bring you 7, 8, and 9.  And you can

13 keep these up here.

14 A.  Okay.

15           (Witness handed exhibits.)

16           THE WITNESS:  So 7 is a Sharps container that has

17 three different -- I think it's three in there, different

18 syringes -- or hypodermic syringes that were found in his room.

19           8 is a black iPhone that I found on the bed next to

20 his body.

21           And then 9 is another cell phone that was found in

22 his room.

23           MS. BOLSTAD:  Your Honor, permission to allow the

24 jury to examine these exhibits.

25           THE COURT:  No.  They'll have them in the jury room.

179

Andersen - D

1           MS. BOLSTAD:  Okay.  Thank you.

2    BY MS. BOLSTAD:

3    Q.  Tell us about the cell phones that you found there.

4           Was one of them -- did one of them appear to be used

5    recently?

6    A.  Yes, the iPhone appeared to be used recently.

7    Q.  Was it password protected?

8    A.  No.

9    Q.  So what did you do?

10   A.  I pushed the button and swiped the screen and began to

11   review the phone's contents.

12   Q.  And prior to doing anything with the phone, did you obtain

13   a preliminary -- preliminary opinion about cause of death at

14   the scene?

15   A.  Yes.  The medical examiner -- deputy medical examiner who

16   was there, Charles Lovato, told me he believed, in his opinion

17   that it appeared to be a heroin overdosing.

18   Q.  So you started with the phones.  Told us that you -- that

19   you opened up the iPhone.  What did you do?

20   A.  So I started looking through the recent call history and

21   the recent text message history to see if there was any recent

22   obvious conversations in the call or text message history about

23   drug use or about purchasing drugs.

24   Q.  And did you find anything regarding the purchase of heroin

25   or drugs?

180

Andersen - D

1    A.  I did.

2    Q.  Tell us about that.

3    A.  So in looking through the text messages, there were several

4    different conversations.

5            If you're familiar with using an iPhone, the messages

6    are kind of grouped in a conversation bubble format, so it's

7    real easy to scroll through and kind of read the chain of text

8    messages in chronological order, as if it was a conversation.

9            And so reading through the messages, I saw messages

10   between -- what I believed to be Mr. Delong and several other

11   people, where he is actively trying to source drugs.

12   Specifically, it appeared to me, heroin.

13   Q.  Who did he first appear to reach out to for heroin?

14   A.  I believe the first person he reached out to was a contact

15   saved as "Morgan."

16   Q.  I would like to show you part 1 of what's been marked and

17   admitted as Government Exhibit 10.  Do you recognize this?

18   A.  I do.

19   Q.  What do we see here?

20   A.  So this is the -- one of the earlier, in chronological time

21   order, conversations I had found from March 28th, which was the

22   day prior to the overdose scene, responding.

23           For a contact saved as "Morgan," with a phone number,

24   where the outgoing message sent from the iPhone I was looking

25   at, said:

Andersen - D

1              Hey, it's Justin, how are you?  I want to hang

2              out.  I got money.  And I want to kick it and get

3              fucked up.

4         And I noticed that there was no response to any of

5    those messages that were sent.

6    Q.  And did you see other messages after this preliminary

7    attempt with Morgan?

8    A.  I did.

9    Q.  Who did Mr. Delong reach out to next?

10   A.  There was a contact for a person saved, I think, as "Cat."

11   And then additional contact with a person saved, I think, as

12   "Nick."

13   Q.  And before I show the jury the lengthy text message on the

14   screen, can you summarize the key points of Mr. Delong's

15   communications with Cat.

16   A.  Sure.

17        So in the text messages with the contact saved as

18   "Cat," Justin is explaining how he is having a hard time, and

19   he wants to use.  He describes how long he's been sober.  That

20   he's been using alcohol daily but hasn't been using what I

21   interpret to be heroin.  And that he's looking to obtain

22   heroin.  And he had tried calling -- or tried getting ahold of

23   Morgan but didn't receive a response, and was looking for a

24   ride from her to help him go obtain heroin.

25   Q.  You said that something -- excuse me.  You said it's

182

Andersen - D

1   something you interpret as heroin.

2           In your experience, working with drug users and

3   dealers, do they use explicit language in text messages about

4   drugs?

5   A.   Not usually.

6   Q.   Okay.  And so what is the word that Mr. Delong used when

7   asking for heroin?

8   A.   I think he used the word "black."

9   Q.   I would like to show you part 2 of Exhibit 10.

10          Is this the message exchanged between Mr. Delong and

11  Cat?

12  A.   Yes.  This is the beginning of that exchange.

13  Q.   What time did it start?

14  A.   It began at about -- looks like 10:38 p.m. on the 28th of

15  March.

16  Q.   And so was the 28th a Friday night?

17  A.   Yes.

18  Q.   Is there a discussion about using heroin or other drugs?

19  A.   There is.  So Cat is explaining that she is using methadone

20  for her addiction.

21          And Justin is talking about using black.  How he got

22  hooked on that, and he hasn't used the black for three to four

23  months.

24  Q.   And what do you take that to mean?

25  A.   "Black," I would interpret to be heroin.

183
Andersen - D

1   Q.   And does he indicate how he's feeling about that?

2   A.   How he's feeling about?

3   Q.   About not using for three to four months?

4   A.   That he's struggling and --

5   Q.   Okay.  Is there a discussion between Cat and Mr. Delong

6   about obtaining some heroin?

7   A.   Yes.

8   Q.   Tell us about that.

9   A.   Justin is explaining that he can pay for a ride and can pay

10  for some drugs.  Based -- I'm assuming, share with her.  And

11  that he's asking her for that ride to go source.

12  Q.   And do they come to an agreement in later parts of this

13  conversation about getting that ride and going to the source?

14  A.   They do.

15  Q.   Tell us about that.

16  A.   So in the text messages, you'll see where Cat's asking how

17  much it is that Justin's planning on purchasing.

18          She asked if he's going to like get a gram, and asked

19  if he would mind hooking her up with a dub.  A dub would

20  usually be a small user amount, maybe 20 dollars worth of

21  heroin.  And they talk about who it is that they're going to be

22  meeting and continue talking about how he's trying to get ahold

23  of Morgan but he already has Nick lined up if Morgan can't come

24  through for him.

25          And Cat's describing, Okay -- describe -- you know,

Andersen - D

1    how -- what time frame that Justin should tell people it will

2    take her to get out there.  And we see about an hour.

3    Q.  And at some point, does he get a new phone number for

4    Morgan Godvin?

5    A.  He does.  Cat sends a text message:  Morgan Godvin,

6    followed by a phone number.

7    Q.  So, in summary, what's the end of this discussion between

8    Justin Delong and this person identified as Cat?

9    A.  Justin provides his address and asks for her to bring a

10   kit, which she had offered.  Which I would interpret to be a

11   user kit.  Something to use -- to actually use the heroin that

12   you're purchasing.  Because he's saying he doesn't have

13   anything anymore.

14           And then she says she's on her way.  And the

15   conversation ends about ten minutes to midnight.

16   Q.  In your review of Mr. Delong's text messages, did you see

17   any conversations with a person identified as Nick Post?

18   A.  Yes.

19   Q.  Tell the jury about that.

20   A.  So in those conversations, Justin is also, I believe,

21   trying to obtain heroin from Nick, who agrees to sell to him.

22           And then it appears near the end of the conversation

23   that Nick's vehicle has broken down or he's had some sort of a

24   problem, and begins asking Justin for help with that.

25           And so it ends as -- when Justin and Nick do not end

185
Andersen – D

1   up meeting because Justin is not able to get his driver to go

2   help Nick with his vehicle problem.

3   Q.  And how are you sure that they didn't meet?  Or are you

4   sure?

5   A.  Based on the content of the messages, it seems fairly clear

6   that they did not meet.  And there's an unsent message that was

7   in Justin's phone, where he's apologizing for the fact that he

8   couldn't go meet with him.

9          So that, to me, made it pretty clear that they never

10  met.

11  Q.  Clear that who never met?

12  A.  That Justin and Nick Post never met that night.

13  Q.  Okay.  Was it clear to you that Mr. Delong did meet up with

14  Morgan Godvin?

15  A.  Yes.

16  Q.  I would like to show you part 3 of Government Exhibit 10.

17         Once he obtained the phone number for Ms. Godvin from

18  Cat, does he then communicate with that new number for

19  Ms. Godvin?

20  A.  He did.  About a quarter after 11:00, he began sending text

21  messages to that new number, which he saved it to his phone

22  contacts as Morgan 2.  And introduced himself as Justin.  And

23  asked if she could hook up a G, which I would interpret to be a

24  gram.

25  Q.  And earlier you talked about Cat requesting a dub.  I think

Andersen – D

1  you testified a dub is 20 dollars.

2  A.  That's a common slang for 20 dollars worth of drugs.

3  Q.  And how much heroin do you get for 20 dollars?

4  A.  Just a fraction of a gram.

5  Q.  Do they -- does Ms. Godvin provide him with information

6  about where he should go to get the heroin?

7  A.  She does.

8  Q.  Where was that?

9  A.  She provided her address to him as 878 Southeast 187th

10 Avenue in Portland.  And he asked if she still had his wallet.

11 She agreed that she did still have that.  And they discuss a

12 price and agree upon 80 dollars.

13 Q.  And this part 3 of Government 10, what time are these

14 messages taking place?

15 A.  Just after midnight on the 29th of March.

16 Q.  And so the 29th would be the Saturday morning?

17 A.  Yes.  They -- the chain begins just after 11:00 p.m. on the

18 28th and continues into the early morning hours of the 29th.

19 Q.  So you had a name, a phone number, and an address for

20 Ms. Godvin, just based on these texts?

21 A.  Yes.

22 Q.  Is that normal for your investigations?

23 A.  Not typically, no.  This was pretty striking, beginning to

24 go through the text messages and see that we had so much

25 information so quickly.

Andersen – D

1    Q.   What about -- what did you do to investigate the

2    information you had; the address, the phone, the name?

3    A.   Sure.   So we sent -- I sent in my team of surveillance unit

4    people that are assigned to work with me on the WIN team out to

5    that address in Gresham, to start watching in their unmarked

6    vehicles, to see what sort of things they were seeing from that

7    area.

8            And in addition to giving her physical address of the

9    878 Southeast 187th Avenue, at the very end of the messages she

10   also provides an apartment number and describes where in the

11   complex that would be.   That it's on the corner.   And, you

12   know, that she was having a traffic issue at her apartment,

13   which I would interpret to mean too many people coming and

14   going.   That the neighbors were starting to become aware that

15   people were coming and going frequently from her apartment.

16   And so my team set up and started watching that apartment.   And

17   we did see, as a team, numerous people coming and going from

18   the apartment for short periods of time.

19   Q.   Did Ms. Godvin even instruct Mr. Delong about how to knock?

20   A.   Yeah, she said to knock quietly and not cop knock.

21   Q.   What does that mean?   Do you know?

22   A.   A typical joke of a cop knock is like this.

23   (Demonstrating.)   Is one.

24           And the other would just be a loud knock, would be an

25   interpretation of that.

Andersen - D

1   Q.  Did you do any other research on this name, Morgan Godvin,

2   in your investigation leading up to that?

3   A.  I did look through prior calls for service, to see if we

4   had prior contact with Morgan Godvin or someone with that name,

5   and did find a call where it was the -- the death response of

6   Morgan's mother, where Morgan was present as well as a male

7   named Nick Post; which I also recognized from the text

8   messages, referring to Nick in Justin's phone.

9   Q.  When was that response to the scene of her mother's death?

10  A.  It was December 2013.

11        And so then, reviewing her further, I was able to

12  obtain a photograph of her from her driver's license, and would

13  be aware of what she looked like.

14  Q.  Okay.  So your surveillance team sets up at Ms. Godvin's

15  apartment.

16        During that surveillance, do you learn if anyone else

17  lives with Ms. Godvin?

18  A.  We saw additional people coming and going from the

19  apartment, but we didn't know for sure whether they were

20  residents or not until later.

21  Q.  And what day is there -- your surveillance happening?

22  A.  The same day as the overdose response, which was the 29th

23  of March.

24  Q.  During that afternoon of the 29th, did you apply for a

25  search warrant?

Andersen - D

1   A.  I did.

2   Q.  Tell the jury about that process.

3   A.  So I took all of the facts I gathered from the text

4   messages and from the surveillance we had and from the overdose

5   scene and presented all of those in an affidavit to a judge.

6           And the judge authorized the warrant at about

7   8:40 p.m.  So about six hours after we responded or I arrived

8   at the overdose scene.

9   Q.  And were you present for the execution of that search

10  warrant?

11  A.  I was.

12  Q.  Does that mean to actually go serve the search warrant?

13  A.  Yes.

14  Q.  Okay.  Tell us about what you saw at Ms. Godvin's

15  apartment.

16  A.  Okay.  So when the warrant was executed, about an hour

17  after it was signed or a little before 10:00 p.m. that night,

18  when entry was made into the front door, there's a living room

19  just inside of the front door and then stairs that lead up to a

20  second level.  And Morgan Godvin was in the living room area.

21  Q.  I'm going to show you Government's 20.

22          I'm sorry.  Government Exhibit 14.  Do you recognize

23  this?

24  A.  I do.

25  Q.  What is it?

Andersen - D

1   A.  So it's a photograph from inside the living room, looking

2   towards the front door, which is the brown-colored door in the

3   background.  And Morgan Godvin is sitting on the couch.

4   Q.  Was there anyone else present in the apartment when police

5   arrived?

6   A.  Yes.

7   Q.  Who?

8   A.  Timothy Goshorn was found upstairs.

9   Q.  Okay.  And is Timothy Goshorn -- was he the young man who

10  testified yesterday afternoon?

11  A.  Yes.

12  Q.  Anyone besides Mr. Goshorn and Ms. Godvin?

13  A.  No.

14  Q.  Did you conduct interviews at the scene?

15  A.  I did.

16  Q.  And are you aware if any evidence of drug trafficking was

17  found?

18  A.  Yes.

19  Q.  Let's go through some of the drug evidence.  First, I'll go

20  through some photos with you.  Okay?

21       MS. BOLSTAD:  So let's pull up Government Exhibit 15,

22  please.

23  BY MS. BOLSTAD:

24  Q.  Do you recognize that?

25  A.  I believe that's a photograph of Morgan Godvin's bedroom.

Andersen - D

1   Q.  How about 16?

2   A.  That's a photo of a food-type canister that you typically

3   would find in a kitchen, but this one is filled with what

4   appears to be used hypodermic needles.

5   Q.  And 17?

6   A.  This is a small safe that was found, I believe, in the

7   closet in the bedroom used by Mr. Goshorn and Mr. Rosa.

8   Q.  Do you know whose safe this was?

9   A.  Mr. Rosa's safe.

10  Q.  And what was in the safe?

11  A.  A black handgun and additional drugs.

12  Q.  Let's look at 18.

13          I'm sorry.  That's 108.

14          Here's 18.  Do you recognize this?

15  A.  Yes.  That's another container of many used needles that

16  was found next to that safe in that closet.

17  Q.  Okay.  I'm going to back up a step.  Sorry to sort of

18  rewind, but I missed something.

19          Before you executed the search warrant at

20  Ms. Godvin's house, you testified earlier that you had

21  Mr. Delong's cell phone.  Right?

22  A.  Yes.

23  Q.  Did you do something with Mr. Delong's cell phone to

24  communicate with Ms. Godvin?

25  A.  Yes.  One of my co-workers used that phone to send text

Andersen - D

1    messages to Ms. Godvin.

2    Q.  So that seems weird.  You're using a deceased person's

3    phone.  Tell us about that.

4    A.  So one of the goals of that would be we're sending messages

5    asking to meet again for additional drugs to, one, find out if

6    the phone is still active and see if we get a response; and

7    then, two, to see if the person who responds agrees to sell us

8    narcotics, which would let us know if there's additional supply

9    still in that apartment.  And then maybe if Ms. Godvin is not

10   home, it would let us know where she might be, as we agreed to

11   a new meeting place, so we would know where to find her at.

12   Q.  And when did you send those -- or sorry.

13           When did you have someone else send those text

14   messages from Mr. Delong's phone?

15   A.  I think it was a bit after 4:00 p.m.

16   Q.  Okay.  Do you know if Ms. Godvin knew if he was dead or

17   not, prior to that time?

18   A.  I know now that she did not know he was dead.  At the time,

19   I did not know.

20   Q.  And does that go towards this moving quickly idea?

21   A.  Yes.

22   Q.  You want to communicate with her before she finds out he's

23   dead?

24   A.  Correct.

25   Q.  Okay.  And so I'm going to show you what is marked and

Andersen - D

1    admitted as Government's 13; I think.

2             Do you recognize this?

3    A.  Yes.

4    Q.  Are these the messages sent from Mr. Delong's phone by law

5    enforcement?

6    A.  Yes.  And then the response is received.

7    Q.  Okay.  What are we seeing here?

8    A.  So at about 4:30 p.m., a message was sent from his phone,

9    saying, Hey, are you going to be around later?

10            The response is received, Yeah.

11            A message was sent out by us, saying:

12            Okay, cool.  I'm in Portland with no ride, but I'd

13            like to get the same as yesterday.

14            Which is inferring the same, a gram of heroin, as

15    yesterday.

16            And asked, Is there any chance you could come to

17            me, and I'd pay an extra 20.

18            Trying to see if we could lure her out of the

19    apartment.  Or, if she was not home, have her come to a place.

20            The response received was no.

21            And then we sent an additional message:

22            My friend will bring me.  If we can get 2, I have

23            the money.

24            And the response was received was, Yeah.

25            So, yes, there was enough there for 2 grams.

Andersen – D

1  Q.  Now, at this point we don't have the benefit of Mr. Delong

2  to tell you how he would normally get heroin.  Is that right?

3  A.  Right.

4  Q.  And so when you're assuming his identity, how do you know

5  how to write text messages like this?

6  A.  Well, part of it was just looking at his prior text

7  messages he had sent, and just another part of it is just

8  having looked at so many different phones over a course of time

9  and having, you know, been involved in similar-type

10  investigations or other investigations where I've reviewed text

11  messages.  These would be typical of messages sent and

12  received.

13  Q.  All right.  So this happens.

14          Is this in the afternoon of Saturday?

15  A.  Yes, about 4:30 p.m.

16  Q.  And then I skipped ahead, but it's after this time that you

17  executed the search warrant at Ms. Godvin's place?

18  A.  Right.  That was a bit before 10:00 p.m.

19  Q.  And so when the police knocked on the door of Ms. Godvin's

20  house, what was -- was that a police-style knock?

21  A.  Yes.  It was a knock, and then "Police search warrant," and

22  then we opened the door.

23  Q.  So we've gone through the photographs about what was

24  observed on scene.

25          Now I would like to look at some physical exhibits

195

Andersen - D

1  with you.

2          Are you aware of drug evidence found in the home?

3  A.  Yes.

4  Q.  Tell us about that.

5  A.  There was a small amount of heroin that was found on that

6  table in the living room where we had found Morgan Godvin

7  nearby; as well as additional heroin that was found on a table

8  upstairs in Mr. Goshorn and Mr. Rosa's bedroom; as well as

9  additional drugs in the safe that was in the closet in that

10  room.

11  Q.  Do you remember how much heroin was found on the coffee

12  table near Ms. Godvin?

13  A.  It was more than a half gram but less than a gram.

14  Q.  Okay.  Did they find any scales in the living room?

15  A.  I believe there was a scale on the table in the living

16  room.

17  Q.  I'm going to show you Exhibit 20.

18  A.  (Handed exhibit.)

19  Q.  What's that?

20  A.  It's -- it's a digital scale that was found on that living

21  room table, with brown residue on the scale itself.

22  Q.  Did you also find Ms. Godvin's cellular phone?

23  A.  Yes.

24  Q.  And was that Exhibit 21?

25  A.  Yes.

Andersen - D

1  Q.  Okay.  The text messages you talked about earlier mentioned

2  a wallet of Mr. Delong.

3           Did you find Mr. Delong's wallet at Ms. Godvin's

4  apartment?

5  A.  Yes.

6  Q.  I'm going to show you Government's 22.  Is that it?

7  A.  Yeah, it's a black wallet with an inmate ID card in the

8  name "Justin Delong."

9  Q.  Okay.  What did finding his wallet at her residence mean to

10 you?

11 A.  Well, it meant to me that they did know each other.  That

12 he likely at some point had been there.  And it confirmed that

13 text messaging that went back and forth that Friday evening,

14 the day before, about "Do you still have my wallet?" that these

15 are the right people involved in all of that.

16 Q.  Now, I'm going to show you three things from Mr. Rosa's

17 room.

18           Can you tell us about these.

19 A.  Exhibit 25 is a Galaxy cell phone that was found, I think

20 on the bed in their room.

21           And then Exhibit 23 is a -- it's a smaller ball of

22 heroin that's about a little over 8 grams, I believe.

23 Q.  Could you hold that up for the jury, so they get a sense of

24 8 grams.

25 A.  (Complying.)

Andersen – D

1           And then the last is another digital scale with

2    residue on it.  That brown residue that was found on the table

3    in that room as well.

4    Q.  Earlier, you told us about a safe in Mr. Rosa's bedroom.

5    A.  Yes.

6    Q.  Do you recall what was found in Mr. Rosa's safe?

7           So you mentioned the gun.  What -- what about drugs?

8    A.  I believe there was additional heroin found in that safe,

9    as well as -- I think -- some other drugs.

10   Q.  Do you recall the quantity of heroin?

11   A.  It was -- I think it was about a hundred grams.

12   Q.  I'm going to show you Government's 26 and 27.

13          Do you recognize 26 and 27?

14   A.  I do.

15   Q.  What are they?

16   A.  So 26 is the amount of heroin, that's roughly 100 grams,

17   that was found in the safe.

18          And 27 is a white substance that also is heroin, and

19   it's about -- a little over 4 grams.

20   Q.  Did you recognize that white substance when you were at

21   Mr. Rosa's residence?

22   A.  No.

23   Q.  Have you seen a lot of white heroin in Oregon?

24   A.  No.

25   Q.  So what did you learn about this white substance?

198

Andersen - D

1    A.   I learned that it's just not very common to find it out

2    here, just as we -- I had not seen much of it.  And that it's

3    not something that -- it's something people are curious about

4    in the user realm within our area, but typically people have

5    not been happy with its effects.

6    Q.   Does it have a -- do people refer to it as a certain name

7    on the street?

8    A.   White heroin or China white.

9    Q.   Now, earlier you testified that Mr. Rosa was not present

10   when police arrived.

11            Did Mr. Rosa arrive at the apartment later?

12   A.   He did.

13   Q.   Tell us about that.

14   A.   He arrived in a vehicle and was spotted by an officer as he

15   arrived.  And that vehicle was stopped, and he was contacted

16   and arrested.

17   Q.   Did police ask to search his vehicle?

18   A.   Yes.

19   Q.   Did he provide consent to search?

20   A.   I don't know if he provided -- I believe he provided

21   consent, yes.

22   Q.   Okay.  And tell the jury what was found in Mr. Rosa's

23   vehicle.

24   A.   So in his vehicle was additional heroin, some Suboxone

25   strips, and then cash and drug records.

Andersen – D

1   Q.  I'm going to show you 28 and 29.  If you could tell the

2   jury what these are.

3   A.  28 is 8,584 dollars cash that was found in the vehicle.

4          And 29 are two notebooks that have what appear to be

5   drug records in them.

6   Q.  I'm going to show you Government's 30, 31, 32, and 33.

7          Take some of these.

8   A.  Okay.

9   Q.  Could you go through those one-by-one and tell the jury

10  what they are.

11  A.  Yes.  Exhibit 30 is a digital scale with brown residue on

12  it that was found in a lockbox in the vehicle.

13         Item 31 is a small amount of heroin, about 3 grams --

14  actually, probably less than that.  Maybe less than a gram --

15  with packaging here -- of heroin that was found in the vehicle.

16         32 is another amount of heroin that was found in the

17  vehicle.  Maybe roughly 5 grams.

18         And then 33 is two Suboxone film strips which are a

19  film that you would put on your tongue or in your mouth.

20  Q.  Do you know what that's for, the Suboxone?

21  A.  Yeah, it's a medication that's used to treat opiate

22  addiction or to prevent opiate withdrawal.

23  Q.  So when people are trying to get off of heroin, is Suboxone

24  sometimes used medically to help get them off?

25  A.  Yes.

Andersen - D

1          MS. BOLSTAD:  Your Honor, Government's 33 was not

2     pre-admitted.  At this time I would move for its admission.

3          MR. ANDERSEN:  I have no objection.

4          MR. SEPP:  No objection.

5          THE COURT:  Thank you.  It's received into evidence.

6          Go ahead.

7     BY MS. BOLSTAD:

8     Q.  From this apartment of Mr. Rosa and Ms. Godvin, did

9     investigators submit the drug evidence to the crime lab?

10    A.  Yes.

11    Q.  And did you -- did your team request that they test it?

12    A.  Yes.

13    Q.  I'm going to show you Government's 33 -- I'm sorry, 34.

14          Do you recognize this?

15    A.  I do.

16    Q.  What is it?

17    A.  It's a list of evidence items that were submitted for

18    testing that were believed to be drugs and were found to be

19    drugs.

20          There's methamphetamine, heroin, and then the white

21    heroin that we had talked about.

22    Q.  Do you see Exhibit No. -- on the far-left column, an

23    Exhibit No. 6?

24    A.  Yes.

25    Q.  Does that correspond with your agency Exhibit No. 20?

201

Andersen - D

1  A.  Yes.

2  Q.  And then, just to add confusion to the mix, does it

3  correspond with Government's Exhibit No. 26?

4  A.  Yes.

5  Q.  Why all of these different exhibit numbers?

6  A.  Well -- well, the evidence number that we have -- so item

7  20, it's the 20th item listed on a certain receipt that we're

8  using to write out items that we're taking from the apartment.

9       And then Exhibit No. 6 on the report form, I believe,

10  would translate to the sixth item that they had processed

11  related to our requests.

12  Q.  So 6 is a lab -- the lab assigns that number to the items

13  they receive?

14  A.  Yes.

15  Q.  Okay.  And then Government -- here we are in trial.  Is

16  this the item number -- the exhibit number that the Government

17  has put on it?

18  A.  Yes.

19  Q.  Okay.  All of those numbers refer to the same thing?

20  A.  They do.

21  Q.  Did the lab confirm what that item was?

22  A.  Yes.  It was confirmed to be heroin.

23  Q.  And in what quantity?

24  A.  101.72 grams, plus or minus .02 grams.

25  Q.  Based on this lab report, did the crime lab also confirm

Andersen - D

1   any other substances from Mr. Rosa and Ms. Godvin's apartment?

2   A.   Yes.

3   Q.   Tell us about that.

4   A.   So Exhibit No. 3 on the lab report; or for our agency,

5   No. 5; and then No. 7, which is our agency No. 22, both were

6   confirmed to be meth.  Methamphetamine.

7   Q.   Were there other heroin quantities confirmed?

8   A.   Yes.

9   Q.   Tell us about that.

10  A.   So they're Exhibits 4 and 5, which is ours 10 and 10 on two

11  separate property receipts, were both found to be heroin.  One,

12  5 grams, plus or minus .02.  And the other, 8.56 grams, plus or

13  minus .02.

14       And the last one, at the bottom, their Exhibit 8 --

15  whereas ours, 26 -- also found to be heroin.  And this is the

16  white heroin that we had talked about, with a net weight of

17  4.27, plus or minus .02 grams.

18       MS. BOLSTAD:  Your Honor, at this time the Government

19  requests the reading of stipulation No. 1.

20       THE COURT:  All right.  Jurors, I told you at the

21  beginning of the case that evidence comes to you in three

22  forms:  One through the witness stand, one in the form of

23  exhibits that are received into evidence, and the third form is

24  any agreed fact or stipulation.  A stipulation is an agreement.

25  It simply means it's before you.  It doesn't require any other

Andersen – D

1    proof or evidence.

2          With respect to lab testings, the parties -- so the

3    Government and each of the defendants agree that the drugs

4    seized in this case were laboratory tested and confirmed to be

5    heroin in the amounts reflected in the lab reports that are

6    marked as Government's Exhibits 34, 38, 56, and 63.

7          The purpose of this stipulation is to save time, for

8    one; the need for extensive testimony about how they got to

9    that conclusion.

10          I told you during jury selection yesterday -- and now

11    the parties confirm it as evidence -- that there's not any

12    disagreement that Mr. Delong died of a heroin overdose.  The

13    question, of course, is whether the Government proves that

14    heroin from which he overdosed was distributed in the course of

15    the conspiracy alleged in Count 1; and that is very much an

16    issue in the case.

17          Although the laboratories did identify the drugs as

18    heroin, there is not any test or analysis in the separate

19    exhibits that established any pursuit of a particular sample or

20    that would establish any seized quantity shared the same

21    identical chemical composition as any other seized quantities.

22    So you may take that agreement as evidence.  It doesn't require

23    any other proof.

24          Go ahead, Counsel.

25          MS. BOLSTAD:  Thank you, your Honor.

Andersen – D

1  BY MS. BOLSTAD:

2  Q.  All right.  So you mentioned that you interviewed people at

3  the Rosa and Godvin apartment.

4  A.  Yes.

5  Q.  I don't want to get into what statements were made to you

6  specifically, okay, because those people will be testifying.

7           But I do want you to explain to the jury that, based

8  on what you learned at that scene, what did you do next?

9  A.  We identified the next-level supplier in the case and

10  conducted a controlled purchase of heroin from him.

11  Q.  And in order to get that information when you were

12  interviewing Mr. Rosa and Ms. Godvin, did you advise them of

13  their **Miranda** rights beforehand?

14  A.  Yes.

15  Q.  Did you explain to them they didn't have to speak with you?

16  A.  Yes.

17  Q.  Okay.  Did they understand that?

18  A.  They did.

19  Q.  Did they choose to speak with you?

20  A.  They did.

21  Q.  How long were these discussions with Ms. Godvin?

22           And we'll take her first.  How long was the

23  discussion?

24  A.  I don't know offhand how long it was, but it was a lengthy

25  discussion.

Andersen - D

1   Q.   Okay.   In your discussion with Ms. Godvin, did you inform

2   her about what had happened?

3   A.   I did.

4   Q.   And how did she seem when she heard that news about

5   Mr. Delong's death?

6   A.   She was very sad.

7   Q.   Did you get the understanding that they knew each other?

8   A.   Yes.

9   Q.   All right.   Did Ms. Godvin appear to be under the influence

10  of drugs?

11  A.   She was able to speak with me.   She was -- she wasn't so

12  under the influence that she couldn't carry on a conversation.

13  So I didn't notice anything in particular that would make me

14  think she was under the influence.

15  Q.   Did she appear to understand what you were saying?

16  A.   Yes.

17  Q.   And were her responses to your questions appropriate to the

18  questions that were being asked?

19  A.   Yes.

20  Q.   Let's talk about Mr. Rosa.   Once he arrived at the

21  apartment, was he arrested?

22  A.   He was.

23  Q.   Placed into custody?

24  A.   Yes.

25  Q.   Did you advise Mr. Rosa of his **Miranda** rights?

206

Andersen - D

1  A.  I did not, but he was advised.

2  Q.  Okay.  And in that advisal was he told, You don't have to

3  speak with the police?

4  A.  Yes.

5  Q.  Did he understand?

6  A.  He did.

7  Q.  And did he speak with the police?

8  A.  He did.

9  Q.  Was it made clear to Mr. Rosa the nature of your

10  investigation?

11  A.  Yes.

12  Q.  And tell us about -- how is it that you inform suspects in

13  a **Len Bias** case about the seriousness of the investigation?

14  A.  We typically, in these cases, don't waste a lot of time

15  starting from scratch and letting the suspect or the person

16  we're talking to really control the interview.

17          Part of it is because we have this time-sensitive

18  nature.  You know, if it were just a regular investigation, we

19  might spend more time kind of letting them tell their story

20  before we started asking more specific questions and, you know,

21  providing them with more details about what we maybe knew or

22  what we had been doing.

23          In this case, and in cases like it, we'll typically

24  be very upfront.  And we were very upfront with Mr. Rosa about

25  we're here because we're investigating a heroin overdose death.

Andersen – D

1    We're here because we believe that as of right now you are

2    involved in this chain of events leading to the death.  And

3    that what we're hoping for is to focus on who your supplier is

4    and to obtain information from you that will help us identify

5    where you're obtaining these heroin -- the heroin from.

6    Q.  At any point in these preliminary discussions with suspects

7    in a **Len Bias** case, do you tell them you're getting charged

8    right now and here's what you're looking at?

9    A.  We don't tell them that they're being charged right now,

10   but we tell them that they could be facing potentially these

11   **Len Bias** charges of substantial consequence.

12   Q.  And do you let them know what the potential penalties are?

13   A.  We do.

14   Q.  Why do you do that?

15   A.  Well, for one, to make sure that they understand the

16   seriousness of what they're looking at so that they can make an

17   informed decision about, you know, whether or not at that point

18   they feel they want to talk with us or not.

19          You know, we feel that it's fair to let them know

20   where things are at so, you know, they don't feel that it's

21   just some random traffic stop where we're hoping to make a case

22   on them.  We're letting them know that there's a much bigger

23   picture involved in that, and letting them know how serious it

24   is.  That we would like to get to that next level of supply.

25   Q.  The person above them?

208

Andersen - D

1    A.   Correct.

2    Q.   And did Mr. Rosa appear to understand what was being asked

3    of him?

4    A.   Yes.

5    Q.   Did he appear to be under the influence of intoxicants?

6    A.   No.

7    Q.   Drugs?

8    A.   No.

9    Q.   Were his answers appropriate to the questions you were

10   asking?

11   A.   Yes.

12   Q.   How was his emotional state?

13   A.   He didn't seem to be overly emotional, but he was very

14   attentive and concerned.

15   Q.   Was there a discussion of going to jail for either

16   Ms. Godvin or Mr. Rosa in this preliminary interview?

17   A.   I don't remember whether or not we discussed them going to

18   jail.

19   Q.   Did you make them any promises about not going to jail?

20   A.   No.

21   Q.   And so after your conversations with those two, did you

22   also speak with Mr. Goshorn on scene?

23   A.   Yes.

24   Q.   After your discussions with all three of them, what did you

25   do next?

209

Andersen - D

1   A.   We transported Mr. Rosa, with his cooperation, so that he

2   could help identify where his supplier lived; the apartment

3   complex where his supplier was living at the moment.

4   Q.   Where was that?

5   A.   It was in Beaverton.

6   Q.   Was it difficult to find or easy?

7   A.   No, it was easy to find.

8   Q.   Mr. Rosa, did it appear he had been there before?

9   A.   Yes.

10  Q.   Do you know how many times?

11  A.   I don't know how many times he had been there before.

12  Q.   And so once you were at that location in Beaverton, tell

13  the jury, was it a house?  An apartment?  What are we talking

14  about?

15  A.   It's a large apartment complex with lots of different units

16  in multiple separate buildings.

17  Q.   Which apartment was identified as Mr. Baker's?

18  A.   It was Apartment 86.

19  Q.   And prior to arriving at that apartment, did Mr. Rosa give

20  you an idea -- without going into the specifics, did he give

21  you an idea of how a deal with Mr. Baker typically works?

22  A.   Yes.

23  Q.   Why is it important for you to know how a deal typically

24  works with a person who is cooperating?

25  A.   Well, the big thing is to find out how it works, so we know

Andersen - D

1    what to look for, so we know who we're looking for, maybe what

2    vehicles we're looking for.  And then the second is to help

3    control safety for the person we're sending in to buy drugs on

4    our behalf, so that we can help determine is it normal that you

5    would maybe drive around together?  Do they normally get in

6    your car or do you get in theirs?  And to ask those questions

7    so we can prepare for those things, so we can control the

8    circumstances.  So that maybe if the circumstance is usually,

9    yeah, I go ahead and get in my drug dealers's car and we drive

10   around for a half an hour, that wouldn't be the kind of thing

11   we would want to do because there's too much movement and too

12   many parts to make sure we can keep the informant safe.  So we

13   might try to find a way to change those circumstances slightly

14   so that we could control it better.

15   Q.  And in this scenario, where Mr. Rosa has agreed to

16   cooperate, is he referred to as the informant?

17   A.  Yes.

18   Q.  Okay.  There's really no secrecy here now because we all

19   know he did it.  Let's just call him Mr. Rosa.  Okay?

20           So what was the typical way that a deal would go

21   down?

22   A.  He would meet Mr. Baker in the apartment.  Where this

23   particular apartment was, he would just go inside, and they

24   would meet and talk inside the apartment.  Other times,

25   Mr. Baker was not living at that apartment; and they would

Andersen - D

1  meet, you know, in various places.

2  Q.  Was that a long-term relationship between Mr. Baker and

3  Mr. Rosa?

4  A.  It had been ongoing for several months.

5  Q.  When you're using an informant in general, are you trying

6  to avoid doing things with that informant that are out of the

7  ordinary?

8  A.  Yes.

9  Q.  Do things that are out of the ordinary tend to set off

10 other players in the drug world?

11 A.  Yes.

12 Q.  Tell us about that.

13 A.  So if the typical meeting would be done a certain way and

14 all of a sudden we come in and tell the informant to do

15 something that's completely unusual, the person who we're

16 attempting to collect evidence against or to buy drugs from

17 would have a clue that something's unusual about this and it

18 would make them start wondering if maybe law enforcement was

19 involved.  Because part of being involved in the illegal drug

20 trade is that there's a constant awareness of whether or not

21 law enforcement is targeting you or whether you're being

22 followed, or things of that nature.  And so if we are changing

23 things up and making things unusual, that would make anyone

24 question why is it -- why is it different now.

25 Q.  So tell us what you did with Mr. Rosa in order to make it

Andersen - D

1  as normal as possible with Mr. Baker.

2  A.  So we asked Mr. Rosa, how does he -- you know, how does a

3  normal deal go?  He described that.  He talked about how

4  usually he presents money in an envelope.  And so we had given

5  him money in denominations he would normally use, in an

6  envelope.  And he presented that on our behalf.

7  Q.  And how much heroin did you ask Mr. Rosa to buy?

8  A.  1 ounce.

9  Q.  Why did you pick 1 ounce?

10  A.  That was an amount that earlier Mr. Rosa had said that he

11  had bought --

12       MR. ANDERSEN:  Your Honor, I object.  We're getting

13  into hearsay here.

14       THE COURT:  Is this offered for its truth?

15       MS. BOLSTAD:  No, your Honor.  It's offered to

16  explain what the investigators did next.

17       THE COURT:  Okay.  So, jurors, you can't take this

18  witness as saying what another witness said for the truth of

19  the fact that it was normally an ounce.  It's just the reason

20  why this witness is explaining she did something.  So I'm

21  overruling the objection to hearsay.  This is not being offered

22  for truth, just to explain her state of mind.

23       Go ahead.

24       THE WITNESS:  So the order he had placed most

25  recently was for 5 ounces but at that time Mr. Baker had only

1    had 4.  And so we had ordered 1 ounce, just to make up that

2    additional amount that he had requested earlier so it wouldn't

3    seem like an unusual time and place to be already requesting

4    more drugs.  And it was only that smaller amount, related to an

5    earlier order he had placed.

6    BY MS. BOLSTAD:

7    Q.  And prior to sending Mr. Rosa into that -- into that

8    residence of Mr. Baker, did investigators first show him a

9    picture of Mr. Baker?

10   A.  Yes.

11   Q.  Where did you get that picture?

12   A.  I believe it was his D.M.V. photo.

13   Q.  And do you know what year the photo was from?

14   A.  I don't.

15   Q.  Okay.  But you have a database.  Is that correct?  That

16   allows you to see people's D.M.V. photos?

17   A.  Yeah.  It may have also been a booking photo.  I don't

18   recall which photo it was that we showed.

19   Q.  Okay.  And so when you showed that photograph of Mr. Baker

20   to Mr. Rosa, was Mr. Rosa able to identify him?

21   A.  He was.

22   Q.  And what did he say?

23   A.  He said that was the person he buys from, Shane.

24   Q.  Did he know Shane's last name?

25   A.  I don't know if he did.

214

Andersen - D

1    Q.  All right.  So was a phone call placed from Mr. Rosa to

2    Mr. Baker?

3    A.  Yes.

4    Q.  A quantity ordered?

5    A.  Yes.  Actually, I -- I don't know.  Maybe it was a text

6    message and not a phone call, or it may have been both.  I

7    would have to refresh my collection on it.  But we did contact

8    him using the phone.

9    Q.  And was a deal reached?

10   A.  Yes.

11   Q.  So what happened next?

12   A.  We sent Mr. Rosa into Mr. Baker's apartment.  And, after a

13   while, he came back out, and he was in possession of an ounce

14   of heroin and no longer had our money.

15   Q.  The time period in which Mr. Rosa was in the apartment, how

16   long did that last, roughly?

17   A.  I think it was maybe 20, 30 minutes, at most.

18   Q.  And was Mr. Rosa wearing a wire during that time?

19   A.  He was.

20   Q.  And did that help you audio-record what was happening?

21   A.  Yes.  It helped us also make sure -- mainly, that he was

22   safe.  And so we -- we would be able to hear if something

23   unusual was happening or if he was being threatened or if

24   something was happening that would require our intervention.

25   Q.  And so from that 20-minute recording, we spliced it down to

215

Andersen - D

1  a much shorter version.

2           I'm going to ask for to you listen to the entire

3  thing, and then help the jury understand what it is they are

4  hearing.  Okay?

5  A.  Um-hmm.

6  Q.  So let's play Government's Exhibit 35.  And my apologies in

7  advance.  It's somewhat scratchy.

8           THE COURT:  All right.  The court reporter does not

9  need to transcribe the audio.  The exhibit itself is in

10 evidence.

11          MS. BOLSTAD:  That's correct, your Honor.  Thank you.

12          (Pause.)

13 BY MS. BOLSTAD:

14 Q.  And while we're waiting for this, let me ask -- let me just

15 fast-forward.

16          You said Mr. Rosa came out with an ounce?

17 A.  Yes.

18 Q.  Did you instruct him, prior to going in there, about the

19 rules of this deal?

20 A.  Yes.

21 Q.  What were those instructions?

22 A.  Just instructions on what to do, what not to do, and what

23 to do if things were going badly; so that we would be able to

24 intervene.

25 Q.  What were the rules about -- you're about to go get heroin.

Andersen - D

1  Here's what we want you to do with it.  Do you have rules?

2  A.  Yeah.  That he's not allowed to use any heroin while he's

3  in there.

4  Q.  And when he comes out, he's supposed to give it to

5  somebody?

6  A.  To us.

7  Q.  Okay.  Did you send the heroin that he obtained from

8  Mr. Baker to the laboratory for testing?

9  A.  I believe we did, yes.

10 Q.  And did the lab confirm what that substance was?

11 A.  Heroin.

12 Q.  In what quantity?

13 A.  I believe it was just less than 25 grams.

14 Q.  Okay.  So let's go to this audio.

15           (Audio played.)

16           (Audio stopped.)

17 BY MS. BOLSTAD:

18 Q.  So we're up to about halfway through the audio.

19           Can you tell the jury what we're hearing so far?

20 Whose voices are on this tape?

21 A.  So it's my voice and Michael Rosa's voice and my partner,

22 Detective Patrick McNair.

23 Q.  And at some point somebody says, "I'm hoping to get well."

24           Who was that?

25 A.  Michael Rosa.

Andersen – D

1  Q.  What did that mean?

2  A.  He's hoping to not be sick from using -- withdrawal of

3  heroin.

4  Q.  And in the rule discussion, is that sort of what you

5  spelled out to the jury?  About here are the rules?

6  A.  Yeah, we explained to him that he's not to be using any

7  part of our money to buy his own heroin.  He's not to be

8  getting anything extra or separating anything that he's buying,

9  to keep anything for himself.  That when he gets back from his

10  meeting with Mr. Baker, that he'll be thoroughly searched.

11  And, you know, that we would not want him to get jammed up or

12  in trouble by trying to do something outside of our direction

13  or for his own benefit.

14  Q.  All right.  And so let's play for you the rest of the

15  recording about what happens when they meet.

16          (Audio playing.)

17  BY MS. BOLSTAD:

18  Q.  All right.  That concludes Exhibit 35.

19          Why is it so scratchy?

20  A.  Because there's movement of his clothing or outer jacket,

21  or things like that, that are going to be rubbing up against

22  the microphone and keeping the audio from being crystal clear.

23  Q.  And do you try it hide such a microphone when you're

24  sending someone in to do a drug deal?

25  A.  Yes.

218

Andersen - D

1   Q.  Okay.  So is it under something?

2   A.  Yes.

3   Q.  On his person?

4        Okay.  So what happened at the end of that audio?

5   A.  So during the audio, you hear the knock.  And then during

6   the audio, I heard what sounded like Mr. Rosa saying, just one

7   for now and maybe two later or two the next day, or something

8   like that.  And then, again, him saying that he would be in

9   touch with him in a day or so.

10  Q.  And then does Mr. Rosa -- is he still on the recording when

11  he meets back up with the investigators?

12  A.  Yes.

13  Q.  Did he hand you over the ounce?

14  A.  He did.

15  Q.  Now, right before he went into Mr. Baker's place for this

16  deal, was there a text message exchanged between Mr. Baker and

17  Mr. Rosa?

18  A.  Yes.

19  Q.  Okay.  I would like to show you what's been marked and

20  pre-admitted today as Government's 125.  And we'll go to page 2

21  of that.

22        Do you see what has a red box around it on this page?

23  A.  I do.

24  Q.  Okay.  Tell us about this text message exchange.

25  A.  So these are messages sent from Mr. Baker's phone to

Andersen - D

1    Mr. Rosa's phone.  There are four of them, that begin at 1:24

2    a.m. and continue over the next five minutes, where Mr. Baker

3    is saying, Is everything cool?  Everything good with you or

4    what?  That was awfully fast.  What's up with that?  Just

5    throws up a red flag when out-of-the-regular moves.  And then

6    letting him know, When you get on Canyon, do the speed limit.

7    Q.  Are these messages from Mr. Baker's phone?

8    A.  Yes.

9    Q.  Who is the party to whom he is texting?

10   A.  Mr. Rosa.

11   Q.  And what is that person saved as in Mr. Baker's phone?

12   A.  New Mike.

13   Q.  Is that Mr. Rosa's name?

14   A.  His name is Michael.

15   Q.  Is this simply how Mr. Baker was saving him in his phone?

16   A.  Yes.

17   Q.  Do you know why it was "new Mike"?

18   A.  I don't know for sure, but I could speculate that it was a

19   new number --

20            MR. ANDERSEN:  Objection, your Honor.

21            THE COURT:  Don't speculate.

22            Jurors, disregard the speculation.  Rephrase your

23   question if you want to pursue it.

24            MS. BOLSTAD:  No, your Honor.

25   BY MS. BOLSTAD:

Andersen - D

1  Q.  This discussion of red flags, is that what we were talking

2  about earlier, about keeping in what's regular?

3  A.  Yes.  If you do something irregular or out of the ordinary,

4  it would put up a red flag or an indication that something was

5  wrong.

6  Q.  And why would this situation of getting 1 ounce from

7  Mr. Baker be out of the ordinary?

8  A.  It would be out of the ordinary because of the amount being

9  smaller than a typical order and because of the time being

10  close in proximity to a prior meet.

11  Q.  After Mr. Rosa engaged in the deal and brought 1 ounce to

12  investigators, what happened next with Mr. Rosa?  Was he

13  arrested?  Allowed to stay out of custody?

14  A.  He was allowed to stay out of custody.

15  Q.  Did you give him instructions about what he should be doing

16  for the next day or two?

17  A.  Yes.

18  Q.  Tell us those instructions.

19  A.  We told him that he should not be meeting with Mr. Baker,

20  and that he should not be using heroin or meeting with other

21  people relating to heroin.  And that he needed to be responsive

22  to our calls or requests to meet with him and that we would be

23  meeting with him in the next day or so.

24  Q.  And was that part of your understanding of the agreement

25  that you had with Mr. Rosa?

221

Andersen – D

1    A.   Yes.

2    Q.   That he was going to continue working with you?

3    A.   Yes.

4    Q.   Why did you tell him to not have further contact with

5    Mr. Baker?

6    A.   Well, I wouldn't want him committing additional crimes, so

7    that would be what he would be meeting Mr. Baker for.  I also

8    wouldn't want him doing things in the midst of our

9    investigation that's not at our direction.

10   Q.   Why not?

11   A.   Because it's not controlled by us, it wouldn't be safe for

12   him, and it could jeopardize our investigation in general.

13            THE COURT:  We'll need to take a break shortly, so

14   please find a good time to break.

15            MS. BOLSTAD:  I think this would be a good time, your

16   Honor.

17            THE COURT:  All right.  So, ladies and gentlemen,

18   we'll take the morning recess now.

19            (Electronic interference.)

20            THE COURT:  Whoa -- never mind.  We will still take

21   the morning recess.  Disregard that beeping.

22            15 minutes.

23            I need you to leave your notes on the chair where you

24   are.  Remember, please do not discuss the case or anything to

25   do with it.  We'll call for you in about 15 minutes.

Andersen – D

1           Everyone rise, please, for the jury.

2           (Jurors exit.)

3           THE COURT:  All right.  Be seated, please.

4           Ms. Bolstad, how much longer with this witness on

5  direct?

6           MS. BOLSTAD:  I think 20 to 30 minutes, your Honor.

7           THE COURT:  Okay.  Any issues we need to put on the

8  record at this point?

9           MS. BOLSTAD:  Not for the Government.

10           THE COURT:  Anyone?

11           MR. SEPP:  No, no.

12           THE COURT:  15 minutes, please.

13           You may step down.

14           THE WITNESS:  Thank you.

15           (Recess taken, 10:27 a.m.)

16           THE COURT:  Are we ready to proceed?

17           MS. BOLSTAD:  We are, your Honor.  One slight

18  procedural matter is the next witness after Andersen is going

19  to be Morgan Godvin, who is in custody.  I don't know if your

20  Honor would like a brief --

21           THE COURT:  (Nods head.)  I want the jury out of the

22  room while she's brought into the courtroom.

23           You've been handed a draft No. 4 on jury

24  instructions, a draft No. 2.  That one still has the

25  possibility of a special verdict, once we work through the idea

223

Andersen - D

1   of a foreseeability question and a foreseeability instruction.

2           And then the issue about don't consider the

3   defendant's punishment, that is addressed now at the end of

4   burden-of-proof section, where it follows the language, "If

5   you're not convinced, you must find him not guilty," "If you

6   are convinced, find him guilty."  And then, "Don't consider the

7   punishment" follows right after that.  So it's there.  You'll

8   see it tonight.

9           All right.  Anything before we bring in the jury?

10          MR. SEPP:  Nothing.

11          THE COURT:  All right.  I think Ms. Boyer has gone

12  for them.

13          Please rise for the jury.

14          (Jurors enter, 10:47 a.m.)

15          THE COURT:  Thank you, everyone.  Please be seated.

16          All set, jurors?

17          Okay.  Thank you.

18          Ms. Bolstad.

19          MS. BOLSTAD:  Thank you.

20  BY MS. BOLSTAD:

21  Q.  We just left off with Mr. Rosa purchasing an ounce.

22          Did you work with Mr. Rosa again on March 31st to

23  contact Mr. Baker?

24  A.  Yes.

25  Q.  Did you also work to obtain a search warrant on the 31st?

224

Andersen – D

1  A.  Yes.

2  Q.  For what location?

3  A.  For Mr. Baker's apartment.

4  Q.  Was that based on the deal that Mr. Rosa did with him the

5  day before?

6  A.  Yes.

7  Q.  Okay.  And so before you execute the search warrant, did

8  you do like you -- did you follow the same procedure that you

9  did for the Rosa and Godvin search warrant, where you did a

10  phone call first?

11  A.  We did.

12  Q.  Why did you do that?

13  A.  Again, to see whether or not Mr. Baker would agree to an

14  additional deal, which would let us know if, A, he's home and

15  available; and, B, if he still had heroin available that we

16  would be able to find.

17  Q.  And did you meet with Mr. Rosa in person before making that

18  phone call?

19  A.  Yes.

20  Q.  Did you go over the rules again with him?

21  A.  Yes.

22  Q.  Did you check with him whether he had contacted Mr. Baker

23  in the meantime?

24  A.  Yes.

25  Q.  And what did he tell you?

Andersen - D

1   A.   He told me he had not.

2   Q.   So he basically told you he followed your rules?

3   A.   Right.

4   Q.   Did you later learn that was not the case?

5   A.   Yes.

6   Q.   Tell the jury about that.

7   A.   So in meeting with Mr. Rosa, one of the things I did is

8   review his text message history.  And just by asking, Hey, can

9   I look at your phone again and see your messages?  He agreed.

10  So I looked through to see if he has had any other contact with

11  Mr. Baker.  And I didn't see any text messages.  There weren't

12  any there, that weren't done at my direction.

13            Later, when I was able to review Mr. Baker's cell

14  phone that corresponds with the messages sent at our direction

15  from Mr. Rosa, I did see additional contact that was on

16  Mr. Baker's phone but that wasn't on Mr. Rosa's phone, as if

17  Mr. Rosa had deleted it.  That did show that they did meet --

18  or appeared to at least agree to meet on that Sunday, the day

19  before the 30 -- what would be the 30th.

20  Q.   And when you say they agreed to meet, do you mean for a

21  drug deal?

22  A.   Yes.

23  Q.   One that wasn't approved or controlled by you?

24  A.   Correct.

25  Q.   I would like to show you Government's 37.

226

Andersen – D

1           Are these text messages between Mr. Rosa and

2    Mr. Baker?

3    A.   Yes.

4    Q.   I would like to just go through the next couple pages of

5    that with you.  Page 2.

6           THE COURT:  Keep your voice up, please, Ms. Bolstad.

7           MS. BOLSTAD:  Thank you, your Honor.

8           THE WITNESS:  And if you could go back to the prior

9    page, I believe those were ones sent at our direction the

10   afternoon of the 31st.

11   BY MS. BOLSTAD:

12   Q.   Okay.  Page 1 is at your direction?

13   A.   There's no context of the date, but those seem to me to be

14   the ones that we had sent in conjunction with our phone call.

15   I would have to look at other records to see what the time

16   stamp, if that matches the 31st or the 30th.  But I believe

17   those were from the 31st, with us.

18   Q.   Okay.  Let's go to page 2.

19          Do you recognize these text messages?

20   A.   I do.

21   Q.   Where did you find these?

22   A.   These were in Mr. Baker's cell phone.

23   Q.   So we're sort of fast-forwarding to what you learned later,

24   at Mr. Baker's?

25   A.   Yes.

227

Andersen – D

1  Q.  Now, these text messages, were these at your direction?

2  A.  No.

3  Q.  Fair to say that Mr. Rosa didn't follow the rules?

4  A.  Yes.

5  Q.  Okay.  At the time you were executing a search warrant for

6  Mr. Baker's house, did you know that Mr. Rosa had not followed

7  the rules?

8  A.  No.

9  Q.  Is that something you learned later?

10  A.  Yes.

11  Q.  Okay.  How does that impact your investigation, when one of

12  your cooperating witnesses is not following the rules?

13  A.  In many ways.

14  Q.  Tell us.

15  A.  So one problem is that now Mr. Rosa, without being directed

16  by us, has put himself in a position where he's out buying

17  heroin that we would otherwise have been able to seize.  But

18  now he's likely out either using or selling, none of which is

19  anything we would want.  So he's basically interfering with

20  what would be our later search warrant, as well as putting

21  himself in jeopardy of, you know, overdose or additional drug

22  dealing that could relate to an overdose, and all kinds of

23  things like that.

24  Q.  And let's look at page 3 of this exhibit, and page 4.

25          Do you see the portion on page 4 about losing a G?

Andersen - D

1    A.   Yes.

2    Q.   What -- based on your training and discussions, in this

3    case, what does that mean?

4    A.   A G could be a gram or a G could be a thousand dollars

5    worth of something or a thousand dollars itself.

6    Q.   All right.  So tell us about the lead-up to the search

7    warrant at Mr. Baker's and the phone call that was made.

8    A.   So we had, again, surveillance established at Mr. Baker's

9    apartment, and had had Mr. Rosa contact Mr. Baker in order to

10   order more drugs.  They did agree to meet between 3:00 and 4:00

11   p.m.  But as that time approached, Mr. Baker was no longer

12   responsive to the calls and messages we were having Mr. Rosa

13   make.

14   Q.   Did that worry you?

15   A.   Not particularly.

16   Q.   Okay.  And so did the search warrant get executed at

17   Mr. Baker's?

18   A.   It did.

19   Q.   And describe to the jury what -- actually, let's just go

20   through the photographs one by one.

21            I'm going to pull up 39.

22            Do you recognize this?

23   A.   I believe that's the living room in Mr. Baker's apartment.

24   Q.   And were you there -- what date were you there?

25   A.   March 31st.

229
Andersen – D

1  Q.  And let's look at 40.  What is this?

2  A.  It's a drawer with a box that has cash inside the drawer.

3  Q.  41.

4  A.  And this is a box that contains numerous items.  There is

5  a -- appears to be a glass pipe with residue inside it, a ball

6  of a brown sticky-looking substance, a USB flash drive, and

7  some packaging materials.

8  Q.  That brown sticky ball, what is that?

9  A.  It's heroin.

10  Q.  Is that how heroin appears in the field when you've seen

11  it?

12  A.  That's one way it can appear in the field.

13  Q.  What is another way it can appear?

14  A.  It can also appear as a brown powder or as a white chunky

15  substance like we looked at earlier.

16  Q.  Can we look at 42.  What is this?

17  A.  It looks to be a drawer in the kitchen with packaging

18  materials.

19  Q.  Government's 43.  What is this?

20  A.  It looks like a box with additional unused needles, as well

21  as, like, a rubber-band-type material.  And then it looks like

22  additional packaging.

23  Q.  And did investigators seize drugs and cash at Mr. Baker's

24  home?

25  A.  Yes.

230

Andersen - D

1  Q.  Do you know how much?

2  A.  About, I think, 4,000 dollars cash and some smaller amounts

3  of heroin.

4  Q.  Exhibit 44, is this the cash you're talking about

5  (indicating)?

6  A.  Yes.

7  Q.  You mentioned heroin on a coffee table.  I would like you

8  to look at 45.

9  A.  (Handed exhibit.)

10  Q.  Do you recognize that?

11  A.  Yes.  It's the heroin that we had seen in that box, in the

12  photo several slides back.

13  Q.  And 46, did you find this at Mr. Baker's home?

14  A.  It's a digital scale, yes.

15  Q.  I think you saw a photograph of this.  Do you recognize it?

16  A.  I do.

17  Q.  I'm holding up Government's Exhibit's No. 47.  What is

18  this?

19  A.  It's a vacuum-seal-type plastic packaging.

20  Q.  Did you also find cellular phones at Mr. Baker's residence?

21  A.  Yes.

22  Q.  I'm going to show you Government's 49 (indicating).  Do you

23  recognize that?

24  A.  It's a cell phone.  From here, I can't tell exactly which

25  phone it is.

Andersen - D

1    Q.  50 (indicating)?

2    A.  A cell phone.

3    Q.  51 (indicating)?

4    A.  A cell phone.

5    Q.  Grand total of cell phones at Mr. Baker's home?

6    A.  I believe three.

7    Q.  Did you also found -- find another quantity of heroin in

8    room "F" of Mr. Baker's --

9    A.  Yes.

10   Q.  Government's 48, is that the heroin you found?

11   A.  Looks to be.

12   Q.  Let me show it to you.

13   A.  Closer.

14   Q.  Closer.

15   A.  (Handed exhibit.)  Yes.

16   Q.  Excellent.

17           When you arrived at Mr. Baker's and did the search

18   warrant, was he home?

19   A.  Yes.

20   Q.  Was anyone else home with him?

21   A.  Yes.

22   Q.  Who?

23   A.  His girlfriend.

24   Q.  What's her name?

25   A.  Holly Smith.

232

Andersen – D

1   Q.  Did you explain to Mr. Baker why you were there?

2   A.  We did.

3   Q.  And did you explain to him the seriousness of this

4   investigation?

5   A.  Yes.

6   Q.  Did you advise him of his **Miranda** rights?

7   A.  Yes.

8   Q.  Did you tell him he didn't have to talk to you?

9   A.  Yes.

10  Q.  Did he understand?  Did he say he understood?

11  A.  He did.

12  Q.  And did he choose to speak with you?

13  A.  He did.

14  Q.  Did you have a conversation, an interview with him?

15  A.  Yes.

16  Q.  And we're not going to go into the details of what was

17  said.  But at the end of that interview, did you have an

18  agreement from Mr. Baker to work with you?

19  A.  Yes.

20  Q.  What -- what was it that you were asking him to do?

21  A.  To help provide information about his suppliers for heroin.

22  Q.  Did he provide you with information about suppliers or a

23  supplier?

24  A.  He gave us information about his current supplier, yes.

25  Q.  And did your team continue working up the chain?

Andersen - D

1    A.   We did.

2    Q.   We're going to get into that information later with

3    Detective McNair about working up the chain from Mr. Baker

4    forward.   But right now I would like to fast-forward with you

5    about photo identifications with Mr. Baker.

6                   After the March 31st buy -- let me ask you this.  Did

7    Mr. Baker help make a buy of heroin from his source?

8    A.   Yes.

9    Q.   And in that buy, how many ounces of heroin did he purchase?

10   A.   8 ounces, or a half-pound.

11   Q.   Where did that purchase occur?

12   A.   It was at a 7-Eleven in Milwaukie or Clackamas County.

13   Q.   And was surveillance on scene?

14   A.   Yes.

15   Q.   Was that vehicle followed away from the buy?

16   A.   Which vehicle?

17   Q.   Oh, I'm sorry.  Did a vehicle show up to deliver the heroin

18   to Mr. Baker?

19   A.   Yes.

20   Q.   And occupants of that vehicle did so?

21   A.   Yes.

22   Q.   When the buy was concluded at the 7-Eleven, did

23   surveillance officers follow any vehicles away?

24   A.   Yes.

25   Q.   Where did they go?

234

Andersen – D

1    A.    Mr. Baker's vehicle returned to us, and the other vehicle

2    that had arrived to deliver the heroin returned to a garage,

3    into a home on 64th Avenue, not far away.

4    Q.    And we'll call that location 1.  Is that okay?

5    A.    Sure.

6    Q.    So after Mr. Baker did that buy from his source on the

7    31st, did investigators come up with a picture of a suspect?

8    A.    Yes.

9    Q.    How?  How did they come up with that?

10   A.    Which picture are we talking about?

11   Q.    Washington D.M.V.

12   A.    Okay.  So in investigating this address where the vehicle

13   returned after the controlled heroin purchase for the 8 ounces,

14   Detective McNair obtained power subscriber from Portland

15   General Electric, or PGE, to see who it is that's on power at

16   that location.  And on power at that location was Fabian

17   Sandoval-Ramos.

18   Q.    Did you look up that name in D.M.V. records?

19   A.    Yes.

20   Q.    And did you come up with a picture?

21   A.    Yes.  Found both an Oregon D.M.V. photo from 2008 and a

22   Washington state D.M.V. photo from 2013.

23   Q.    Now, you mentioned a location.  The house on 64th.

24         Were you also looking for pictures of other

25   individuals who might be associated with that location?

235

Andersen – D

1   A.  Yes.

2   Q.  What did you learn?

3   A.  I looked through prior police records and I saw two

4   different males that were contacted over a period of time at

5   that address, and I obtained their photos.

6   Q.  And who were those individuals?

7   A.  One had the last name of Valenzuela, and the other

8   (pause) –– it will come to me in a moment.

9   Q.  And if you need to refresh your recollection by looking at

10  reports, you can do that.

11          Do you have your reports?

12  A.  I do, but I don't have them with me, here.

13  Q.  Let me give you mine.

14  A.  (Handed document.)  Thank you.  Gutierrez was the other

15  last name.  So Jose Enrique Muleno (phonetic) Gutierrez and

16  Antonio Muleno Valenzuela.  And they were associated with the

17  address at 2011 and 2012, I believe.

18  Q.  Why were you looking for individuals associated with that

19  address?

20  A.  To help identify who it was that was driving the vehicle

21  that had met with Mr. Baker.

22  Q.  Okay.  Did you show pictures of Mr. Gutierrez and –– I

23  forget.  Mr. Valenzuela?  Did you show him pictures of those

24  two?

25  A.  I did not, but another deputy did for me.

Andersen - D

1   Q.   Okay.  Was Mr. Baker able to identify those men?

2   A.   No.

3   Q.   He didn't know them?

4   A.   He did not know them.

5   Q.   Okay.  How about -- oh, I'm sorry.  Go ahead.

6   A.   He didn't know them personally or know their names.  One of

7   them he did not recognize at all.  And the other ones -- he

8   said he had seen that person with this group of individuals

9   before, but not for a while.

10  Q.   And then you mentioned that you had a name, Fabian

11  Sandoval-Ramos, as the power subscriber.  Is that correct?

12  A.   Yes.

13  Q.   And so you found a D.M.V. photo for Fabian Sandoval-Ramos?

14  A.   Yes.

15  Q.   I would like to show you Government's 59.

16          Is this the photo of Mr. Sandoval-Ramos?

17  A.   It's the Washington D.M.V. photo with the name Sandoval,

18  Fabian Sandoval-Ramos.

19  Q.   And on March 31st, did investigators have this picture

20  shown to Mr. Baker?

21  A.   Yes.  Actually, on -- it was on April 1st.

22  Q.   Oh, it was on April 1st.  I'm sorry.

23          Where was Mr. Baker at the time this picture was

24  shown to him?

25  A.   He was in custody at the Washington County jail.

Andersen - D

1    Q.   Was he in custody on this case?

2    A.   Yes.

3    Q.   Okay.  And when the picture was shown to Mr. Baker, were

4    any instructions given?

5    A.   Just, "Do you know this person?"

6    Q.   That was the simple question?

7    A.   That's my understanding.

8    Q.   Okay.  And what was Mr. Baker's response?

9    A.   That was the person he knew as Mexican Bobby.

10   Q.   What did that mean for you and your investigation?

11   A.   The contact that he had created in his cell phone or that

12   was in his cell phone with the name "Mexican Bobby," was

13   associated to that phone number that we had used -- that

14   Mr. Baker had used to call to order those 8 ounces of heroin

15   that were delivered.

16   Q.   After April 1st, was Mr. Baker shown more pictures at a

17   later date?

18   A.   He was.

19   Q.   What date?

20   A.   I think it was April 17th.

21   Q.   Okay.  Did you meet with Mr. Baker?

22   A.   I believe it was myself and Detective McNair.

23   Q.   Okay.  Why did you show him additional pictures?

24   A.   We -- at that point, we had additional photos of the people

25   that were found at what we're referring to as location 1.  And

Andersen - D

1    a new photo or a more recent photo of Fabian Sandoval-Ramos.

2    And we wanted to show him all of those photos, to see if he

3    recognized any of those other people as being involved in this

4    as well.

5    Q.   You mentioned a more recent photo.  Back with Government's

6    Exhibit 59 -- let's bring that back up.  This is what you

7    showed him on -- or what was shown to Mr. Baker on April 1st?

8    A.   Yes.

9    Q.   What is the year of this photograph?

10   A.   2013, I believe.

11   Q.   Okay.  And it's a D.M.V. photo?

12   A.   Yes.

13   Q.   And so on April 17th, when you showed him other pictures,

14   what was the year of the photo you showed him on the 18th --

15   17th?

16   A.   And I stated it was the 17th.  But I'm looking at the

17   report you handed me, and it looks like it's the 18th.  So I

18   misspoke on that.  But that was a booking photo that was taken

19   after his arrest, I believe, on April 2nd.

20   Q.   Did you also show a picture of Mr. Arcila?

21   A.   Yes.

22   Q.   And Mr. Placido Ramirez-Coronel?

23   A.   Yes.

24   Q.   Was there a fourth picture you showed?

25   A.   Yes.

239

Andersen - D

Q.  Who was that?

A.  It was Mario Coronel-Morga, who was also found in location

1.

Q.  Okay.  I would like to show you (pause, referring) --

sorry.

Before we get to those pictures, back on April 1st,

when Mr. Baker identified the Washington driver's license as

Mexican Bobby, when that happened, did anyone tell Mr. Baker if

he was right or not?

A.  Not that I know of.

Q.  All right.  And so when you come back to him a few weeks

later, does he know whether you have the guy he identified?

MR. ANDERSEN:  Objection.  I think that calls for

speculation.

MS. BOLSTAD:  I'll withdraw it.

THE COURT:  Or rephrase the question with respect to

whatever the witness may have told him relative to the

identification.

BY MS. BOLSTAD:

Q.  On the 18th, when you met with Mr. Baker to show him

photos, what did you explain to him was your purpose?

A.  I just wanted to show him photos to see if he recognized

any of the males in the photos.

Q.  Okay.  I'm going to show you Government's Exhibit 118.

Do you recognize this photograph?

Andersen – D

1    A.  Yes.

2    Q.  What is it?

3    A.  It's an April 2nd booking photo of Fabian Sandoval-Ramos.

4    Q.  And did you show this picture to Mr. Baker?

5    A.  Yes.

6    Q.  Tell us the process you used.

7         Did you show him pictures one-by-one?  All at once?

8    How did it work?

9    A.  We gave him a stack, and I think we spread them out on the

10   table, and they were kind of laid out in front of him.

11   Q.  So let's show the other pictures, and then we'll get to

12   what was said.

13        Government 119.  Did you show him this photograph?

14   A.  Yes.

15   Q.  And who is this?

16   A.  Raul Arcila.

17   Q.  Did you show Mr. Baker Government's 120, this photograph?

18   A.  Yes.

19   Q.  Who is this?

20   A.  Placido Ramirez-Coronel.

21   Q.  And did you show Mr. Baker 121?

22   A.  Yes.

23   Q.  Who is this?

24   A.  Mario Coronel-Morga.

25   Q.  Were all four of these pictures taken on April 2nd, 2014?

241

Andersen – D

1    A.   I believe they were.

2    Q.   And that's Government's 118, 119, 120, and 121?

3    A.   Yes.

4    Q.   Okay.  When you showed him the pictures, what were your

5    instructions to him?

6    A.   I just asked him if he recognized any of them.

7    Q.   And what did he say?

8    A.   He went through each one.  He told me he recognized

9    Fabian -- he pointed to Fabian Sandoval-Ramos's picture and

10   told me that's the person he knows as Mexican Bobby.

11            He pointed to the picture of Placido Ramirez-Coronel

12   and said, "That's Mexican Bobby's brother."  And told me that

13   Placido was the driver during the time that we had ordered

14   those 8 ounces several days prior.

15            And then pointed to the picture of Raul Arcila, and

16   told me that he was a passenger in the car on that same 8-ounce

17   purchase that we had him make at our direction.  And he told me

18   he did not recognize Mario Coronel-Morga.

19   Q.   When you met with Mr. Baker on April 18th, what was his

20   demeanor?

21   A.   He was very grumpy.

22   Q.   Is this a few weeks after he's been arrested on this case?

23   A.   Yes.

24   Q.   Could you tell what he was going through?

25   A.   He was -- was just not happy with being in custody and

Andersen – D

1   having gone through withdrawal, and described some of the

2   problems he had going through withdrawal.

3   Q.   Did he appear to understand what you were talking about?

4   A.   Yes.

5   Q.   Was he hesitant in any of these identifications?

6   A.   No.

7   Q.   Was there a third event?  A third time that you showed

8   Mr. Baker pictures?

9   A.   Yes.

10  Q.   Approximately what date was that?

11  A.   I think it was June 18th or July 18th.  I would have to

12  take a look, if you don't mind.

13  Q.   Please go ahead.

14  A.   (Pause, referring.)  I don't think I have it in this

15  report, but I'm fairly certain it was the middle of July, July

16  17th or 18th.

17  Q.   I'm going to show you a report.

18  A.   Thank you.  (Handed document.)

19  Q.   Take a look at that.

20  A.   (Pause, referring.)

21  Q.   And does this refresh your recollection?

22  A.   It does.

23  Q.   What date was this third meeting with Mr. Baker?

24  A.   It was July 31st.

25  Q.   Okay.  Where did you meet him?

Andersen - D

1    A.  At the U.S. Attorney's Office.

2    Q.  Was he in custody?

3    A.  Yes.

4    Q.  What was the purpose of showing him photos on this

5    occasion?

6    A.  To, again, go through the photos that we had, to see if he

7    recognized any of the people involved.  Or photos that we had,

8    to see if they were people who were involved.

9    Q.  Did you show him Government's Exhibit 118?

10   A.  Yes.

11   Q.  Was this the same photograph you showed him on April 18th?

12   A.  Yes.

13   Q.  In July, when you showed him this photograph, was he able

14   to identify the person?

15   A.  No.

16   Q.  Did he say anything about recognizing this person?

17   A.  He said he looks like the person that he knew as Mexican

18   Bobby, but said he had never met this person.

19   Q.  And was that different than what Mr. Baker had told you on

20   April 18th?

21   A.  Yes.

22   Q.  Did you show Mr. Baker, on July 31st, Government's 119?

23   A.  Yes.

24   Q.  And remind the jury, who is this?

25   A.  It's a booking photo for Raul Arcila.

Andersen – D

1   Q.   And did Mr. Baker, in July of 2014, did he recognize this

2   person?

3   A.   Yes.

4   Q.   What did he say?

5   A.   He said that this person was present during most of the

6   deals he did with the group.

7   Q.   Is that consistent with what Mr. Baker had told you in --

8   on April 18th?

9   A.   Yes.

10  Q.   And, finally, did you show him, Mr. Baker, Government's

11  Exhibit 122?

12  A.   Yes.

13  Q.   Who is in Government's Exhibit 122?

14  A.   This photo is taken from a Nevada D.M.V. photo for a person

15  known as Carlos Sandoval-Ramos.

16  Q.   Why did you show Mr. Baker a picture of Carlos

17  Sandoval-Ramos?

18  A.   Carlos Sandoval-Ramos is the power subscriber at the

19  location 2, which we haven't yet talked about.  But it's the

20  residence for Mr. Fabian Sandoval-Ramos.

21  Q.   Earlier in the investigation, had you been at location 2?

22  A.   Yes.

23  Q.   Did you help do the search at that location?

24  A.   I did.

25  Q.   Was this man at location 2?

Andersen – D

1    A.   No.

2    Q.   Have you ever met Mr. Carlos Sandoval-Ramos?

3    A.   No.

4    Q.   So he's the power subscriber at location 2?

5    A.   Yes.

6    Q.   And does he have any relationship to Fabian Sandoval-Ramos?

7    A.   I believe he was his brother.

8    Q.   And based on your investigation, have you been able to --

9    to determine if Carlos Sandoval-Ramos has any involvement in

10   this drug investigation you were doing?

11   A.   I have no information that he's involved.

12   Q.   Does he have any drug priors in his record, or arrests?

13   A.   No.

14   Q.   Did his phones come up in your investigation?

15   A.   I don't have a phone number for him, that I am aware of.

16   Q.   All right.  When you showed this photograph to Mr. Baker,

17   122, did Mr. Baker identify it?

18   A.   He did.

19   Q.   What did Mr. Baker tell you?

20   A.   He said that was Mexican Bobby.

21   Q.   Was this new information to you on July 31st?

22   A.   Yes.

23   Q.   Is it different than anything Mr. Baker ever said before?

24   A.   Yes.

25   Q.   What did you do with this information?  I mean, how does

1    that impact your investigation?

2    A.  Well, it's concerning, if you have someone who has

3    identified one person on several occasions as being a supplier

4    and then later identifies a different person.

5    Q.  I would like to show you these two photographs

6    side-by-side.

7            So I'm showing Mr. Sandoval-Ramos on the left, 122,

8    Carlos Sandoval-Ramos.

9            And on the right, remind us, 118, what is the date of

10   that photo?

11   A.  The one on the right would be from April 2nd.

12   Q.  And now on the right, I would like to show Government's 59.

13           When was the Washington driver's license photograph

14   taken on Government's 59?

15   A.  I believe in June of 2013.

16   Q.  And side-by-side, looking at these two, is your information

17   that they are brothers?

18   A.  Yes.

19   Q.  Do they look alike as brothers?

20   A.  I believe they do.

21   Q.  What are some of the facial characteristics that you know

22   to be similar?

23   A.  They have similar ears.  The overall face shape is similar.

24   They have a similar jawline.

25           MS. BOLSTAD:  Nothing further on direct, your Honor.

Andersen - X

1          THE COURT:  Mr. Andersen.

2          MR. ANDERSEN:  Thank you, your Honor.

3                        CROSS-EXAMINATION

4    BY MR. ANDERSEN:

5    Q.  Now, Detective, we covered quite a lot of ground on your

6    direct, so I want to -- I guess we'll start from the beginning

7    and kind of work through a couple points.

8          Now, you referenced -- let's get back to the original

9    investigation at Mr. Delong's house.

10         You said you pulled two cell phones from Mr. Delong.

11   Right?

12   A.  That's right.

13   Q.  And on the one that it appeared -- or the one that at least

14   you looked at, there was a number of communications.  Right?

15   A.  Correct.

16   Q.  And one of those communications, you mentioned was --

17   appeared to be between Mr. Delong and Nick Post.  Right?

18   A.  That's right.

19   Q.  And you described that a little bit as though they were

20   also looking to make a deal for what appeared to be heroin.  Is

21   that true?

22   A.  Yes, that's right.

23   Q.  Now, did you identify who Nick Post was?

24   A.  Not for certain.  I didn't have any -- I never showed

25   photos of him to Morgan or other people that I believe would

Andersen - X

1   have known him.  But his name did come up in that call I

2   referenced where -- you know, the scene of the death of Morgan

3   Godvin's mother, where Morgan Godvin was there, as well as a

4   person named Nicholas Post.

5   Q.  Did you ever interview Mr. Post?

6   A.  No.

7   Q.  You also identified another.  I believe, Cat.  Were you

8   able to get any idea of who Cat was?  Another person with whom

9   Mr. Delong was communicating?

10  A.  Yes.

11  Q.  Did you interview her as part of this --

12  A.  No.

13  Q.  -- investigation?

14        Now, she appears to have been the ride.  Correct?

15  Between -- from Mr. Delong, apparently, to Morgan Godvin.  Is

16  that your understanding?

17  A.  Yes, that's right.

18  Q.  Okay.  Now, on the --

19        MR. ANDERSEN:  Maybe we can just pull up the Nick

20  Post one.

21        (Pause, conferring.)

22  BY MR. ANDERSEN:

23  Q.  Now, on your screen there, you can see -- can you describe

24  what that is?

25  A.  The top portion is a series of messages that we talked

Andersen - X

1   about earlier, where Justin had sent messages to a contact

2   saved as Morgan.  And then the following messages are messages

3   that I believe Justin sent to a contact he had saved as Nick

4   Post.

5   Q.  And is this your -- your -- summation of all of the --

6   those communications, as you saw them on the phone?

7   A.  Yes.

8            MR. ANDERSEN:  Your Honor -- well, is this -- I would

9   like to offer this as Exhibit -- or, I'm sorry, 201.

10           THE COURT:  Isn't this already in evidence?

11           MS. BOLSTAD:  It's not, your Honor, and the

12   Government has no objection.

13           THE COURT:  All right.  No. 201.  Received.

14           MR. ANDERSEN:  201.

15           And if I can publish that?

16           THE COURT:  Oh, it's not been published.  Thank you

17   for letting us know.  Now it will be published.  Thank you.

18   Too many screens here.  I need you to check me at every turn.

19           Okay.  Go ahead, Mr. Andersen.

20           201 should be published.

21           Go ahead and review it with the witness and the jury.

22           MR. ANDERSEN:  Thank you.

23           I'm not sure that it is exactly --

24           THE COURT:  No, it's not.  But our trusty electronics

25   expert has now made it.  So --

Andersen – X

1          MR. ANDERSEN:  Perfect.

2    BY MR. ANDERSEN:

3    Q.  Now, on this -- I don't really need to go through all of

4    this.  But your understanding of this series of messages was

5    pretty much the same as the series of messages between

6    Mr. Delong's phone and Ms. Godvin's phone.  Right?  That they

7    are setting up a deal?

8    A.  Yes.

9    Q.  Now, if we could scroll down a little bit.

10          I mean, it appears as though they did reach an

11   agreement.  Is that -- is that true?  Does that seem like that

12   to you?

13   A.  Yes, it appears they reached an agreement.  And then later

14   in the messages, there's -- messages from Nick that indicate he

15   had major problem with his vehicle and needed help.

16   Q.  Right.  Right.

17          And then there's -- you mentioned, I believe, on

18   direct about this unsent message.  Right?

19   A.  Yes.

20   Q.  So there's an unsent message that Justin -- if he had sent

21   it, it would have been trying to apologize.  But it appears as

22   though he never sent that?

23   A.  Right.

24   Q.  All right.  So now -- I mean, based on this text message,

25   you have no idea whether or not they actually did meet at some

1  point.  Is that -- is that a fair statement?

2  A.  Correct.

3  Q.  It could have been Cat, on their way home, who drove by and

4  picked up Nick, who is apparently stranded on the side of the

5  highway.  Is that potentially accurate?

6  A.  What was your question?

7  Q.  Well, I'll withdraw that question.  That's just calling for

8  speculation.

9         But the point is, there is no sent message from

10  either Nick or Justin explicitly canceling that deal.  Is that

11  true?

12  A.  Well, there's a lot of context about the wheel coming off

13  his car, and saying, Hey, I have -- I have your shit on me,

14  your heroin on me.  Can you help?

15         And Justin's saying, Call Morgan.

16         And Nick's saying, She said no.

17         And then Justin saying there wasn't anything he could

18  do.

19         And there's no follow-up phone calls or messages or

20  anything that would indicate any other thing that would have

21  happened.  So I don't have anything within any of the phones

22  saying there was any additional meetings between Nick and

23  Justin.

24  Q.  And you don't have Cat's -- Cat's phone, do you?

25  A.  No.

Andersen - X

1  Q.  And you never interviewed her, like you said?

2  A.  That's right.

3  Q.  All right.  Now, let's move on to the surveillance that you

4  did on -- or that you or your team did on Morgan Godvin's

5  residence.

6           Now, you saw -- I believe you testified there was a

7  number of people coming and going from Morgan Godvin's

8  residence at the time you were surveilling?

9  A.  Yes, the team saw that.

10  Q.  Right.  And one of the -- well, let me back up for a

11  second.  You write reports about all of your investigation.

12  Right?

13  A.  I write reports about?

14  Q.  About the investigation, as it's ongoing?

15  A.  Yes.

16  Q.  Where you would summarize, basically, what the

17  investigation was?

18  A.  Yes.

19  Q.  Now, as part of that surveillance of Morgan Godvin's

20  residence, it appears as though there was an unidentified

21  female who -- who got a red box from her car and entered into

22  the apartment.  Is that true?

23  A.  Yes.

24  Q.  So that's somebody bringing something into Morgan Godvin's

25  residence?

1    A.   Yes.

2    Q.   And, in fact, that female went to the residence and then

3    left the residence, got -- went back to the car and took this

4    red shoebox and then delivered it to the -- to the apartment.

5    Is that fair?

6    A.   That sounds familiar, yes.

7    Q.   All right.  Let's talk a little bit about the wallet that

8    was found there.

9         The -- you found a wallet that you determined was

10   Justin Delong's wallet, at Morgan Godvin's house.  Right?

11   A.   It was a wallet that had his identification in it, yes.

12   Q.   And wasn't the agreement -- or at least the text message

13   communications between Morgan Godvin and Mr. Delong he was

14   going to pick up that wallet?

15   A.   Yes.

16   Q.   He was going to get that wallet from Morgan Godvin's house?

17   A.   Correct.

18   Q.   So based on the fact that his wallet was still at Morgan

19   Godvin's house, he obviously did not do that.  Right?

20   A.   Yeah, which I asked her about.

21   Q.   (Pause, referring.)  Okay.  Let me skip ahead a little bit.

22        Now, you talked about this -- the process that you

23   used to show photographs to Mr. Baker in particular.  I would

24   like to talk generally about what -- what different processees

25   there are to show pictures to individuals.

1          Now, you were not present and you were not the person

2     who showed Mr. Baker the photograph originally, when he was in

3     custody.  Right?

4     A.  That's right.

5     Q.  The Washington photograph.

6          Now -- and your understanding was it was just one

7     photograph.  Right?

8     A.  That's right.

9     Q.  Now, you mentioned, when you were testifying earlier, about

10    (pause, referring) -- well, about how it's concerning if people

11    are going to make different identifications later on.

12         Now, are there other -- let me ask the question this

13    way.

14         Are there other techniques that an investigator could

15    employ if they're trying to determine the identity of an

16    individual?  Does that make sense?

17         That might be too broad.  But could you answer that

18    question?

19    A.  I'm not sure I understand what you're asking.

20    Q.  Well, one technique, for example, would be to show a series

21    of photographs of people that appear -- or that are similar?

22    A.  Yes.

23    Q.  And you could say, Could you pick out the person you're

24    trying to identify from this collection of similar-type people?

25    A.  Correct.

255

Andersen - X

1    Q.  And that would be the same as doing, you know, sort of the

2    classic TV show show-up, where you try to identify people from

3    a lineup.  Right?

4    A.  (Nods head.)

5    Q.  And the whole point of the lineup is that you have people

6    who look similar, but you're testing the ability of the witness

7    to be able to make an identification.  Is that fair?

8    A.  Yes.

9    Q.  So you obviously can't do that when you are just showing

10   one photograph.  Right?

11          There's nobody to compare it to?

12   A.  Correct.

13   Q.  (Pause, referring.)  And then on -- when you showed

14   Mr. Baker a series of photographs a few months later -- I can't

15   remember the exact date.  I believe you said -- was it July

16   31st?  Does that sound right?

17   A.  The first time would have been in April.

18   Q.  Okay.  I'm talking about the last time, when he said that

19   he didn't know who Mr. Sandoval-Ramos was.

20          Now, in that situation, you had a -- a series of

21   photographs -- or at least two photographs of individuals who

22   you already testified look similar in your mind.  Right?

23   A.  Yes.

24   Q.  And that's kind of where he started getting confused, at

25   that point, or at least he disavowed his prior identification

1    and identified somebody different.  Right?

2    A.  Correct.

3    Q.  And there are only two such similar photographs.  It was

4    not a lineup of similar-looking -- it was not a lineup, as you

5    described earlier, of a bunch of photographs of a

6    similar-looking person.  Right?

7    A.  Correct.

8    Q.  Okay.  Let me back up again and talk in general about this

9    sort of investigation.

10          Now, obviously you are coming into the investigation

11   after this -- in particular -- or in any other investigation --

12   the death has already occurred.  Right?

13   A.  Right.  We can only do a death investigation after the

14   death has occurred.

15   Q.  Right.  So when you do -- when you interview each -- each

16   person in the purported chain, there's a pretty high degree --

17   and you need to be able to rely on them when they say what

18   happened in the past was actually true.  Right?

19   A.  Correct.

20   Q.  Okay.  So, I mean, the credibility is -- is -- seems like

21   it's pretty important in that situation.  Right?

22   A.  Yes.

23   Q.  And you do these follow-up controlled buys, to some degree,

24   to try to lend credibility.  To say, hey, if I got it from

25   person X, and they're able to then buy from person X, does that

Andersen – X

1   lend them some sort of credibility about that?

2   A.   Yes.

3   Q.   But you're still relying on them telling the truth about

4   what happened before?

5   A.   Correct.

6   Q.   And if they say to you, I had three suppliers; it could

7   have been X, it could have been Y, it could have been Z.  That

8   doesn't really help you in your investigation, does it?

9   A.   It helps that we have one of three to identify.  So we

10  would have three different places to go to look to see which of

11  those three it would be.  That would be very helpful.

12  Q.   It would be more helpful if they only said -- would it be

13  more helpful if they say three or one?

14  A.   It would be more convenient if they only had one.  But it

15  would be equally helpful if they were providing supplier

16  information.  If they were being honest and had three separate

17  suppliers and if they were continuing to be honest about those

18  suppliers, we should be able to quickly narrow down which of

19  the three was responsible in any particular case.

20  Q.   Okay.  So -- okay.  And as you've already said, it appears

21  as though at least Mr. Rosa, you know, was not on this -- let

22  me -- I'll rephrase that question.

23          In -- you've already testified -- or maybe you can

24  confirm this.  Mr. Rosa, in this particular investigation, you

25  already know that he had not -- he was not honest with you.  Is

1    that fair?

2    A.   Yeah.  He was dishonest about his meeting Mr. Baker outside

3    of our supervision.

4              MR. ANDERSEN:   That's all for this witness, your

5    Honor.

6              THE COURT:   Thank you, Mr. Sepp.

7              MR. SEPP:   Thank you, your Honor.

8                          CROSS-EXAMINATION

9    BY MR. SEPP:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   If I can direct -- direct your attention to Defense Exhibit

13   201, please.

14             And then it's -- the time would be -- be looking at

15   2312.  Do you see that?  Where it says, "G black."

16   A.   Yes.

17   Q.   Okay.  In your experience, what does "G black" mean?

18   A.   In the context of that, I would think it would be a gram of

19   heroin, would be my best guess of what that would be.

20   Q.   Okay.  And then what would be the "black" be?

21   A.   The "black" would be the heroin.  The "G" would be the

22   gram.

23   Q.   The black tar heroin?

24   A.   Black heroin, yes.  Or any heroin.  "Black" is a common

25   slang word used for "heroin."

Andersen - X

1  Q.  And then you've also testified that with each person you

2  interviewed, whether it be Ms. Godvin, Mr. Rosa, or Mr. Baker,

3  you came in almost instantly and put your cards on the table,

4  telling him that this is a **Len Bias** investigation and you're --

5  you're incriminated in it.  Is that correct?

6  A.  Yes, that's right.

7  Q.  Or involved in it?

8          Okay.  So from right up front they knew that this was

9  a serious matter?

10  A.  Right.

11  Q.  Moving to the photo ID that you attended to -- with

12  Mr. Baker and -- is it Detective McNair?

13  A.  Yes.

14  Q.  Okay.  When you showed the picture of Mr. Raul Arcila, how

15  many photos were shown at the same time?

16  A.  There were three other photos with that.

17  Q.  Okay.  And those photos were Mr. Arcila,

18  Mr. Placido-Ramirez, and Mr. Coronel-Ramirez.  Is that correct?

19  A.  No.

20  Q.  Oh, excuse me.

21          It was -- who were the -- I'm sorry.  It was Placido

22  Ramirez-Coronel?  Was that one of them?

23  A.  Yes.

24  Q.  Okay.  And then the other one was Ramirez -- Morgo

25  (phonetic) Ramirez-Coronel?

Andersen - X

1  A.  Mario Ramirez-Coronel was one of them.

2  Q.  Okay.  Of those photos was -- were there any photos of

3  individuals that were not involved or targeted by your

4  investigation?

5  A.  Mario was not a target of our investigation.

6  Q.  Not involved in the -- you didn't get -- did you show him

7  any pictures that were made that didn't come from the location

8  No. 1?

9  A.  Well, Fabian Sandoval-Ramos was not present at location

10 No. 1.  I'm not sure if I'm misunderstanding your question.

11 Q.  Okay.  I'm just trying to establish that all of these

12 pictures were photographs that were taken based on your arrest

13 on April 2nd; the arrest of Mr. Arcila, Mr. Placido, and then

14 Mario Coronel, who was just there on April 2nd.  Is that

15 correct?

16 A.  Yes, that's right.

17 Q.  And you had said that -- or testified -- excuse me -- that

18 Mr. Baker was grumpy that day, on the 31st of July?

19 A.  Yes.  That's the best word I can use to describe his

20 behavior that day.

21 Q.  I don't know -- you know what, scratch that.

22      That's a question I better -- better to ask of --

23 (Pause, referring.)

24      MR. SEPP:  I have nothing further.  Thank you.

25      THE COURT:  Redirect.

1          MS. BOLSTAD:  Briefly, your Honor.

2                   REDIRECT EXAMINATION

3    BY MS. BOLSTAD:

4    Q.  Mr. Andersen was asking you about Mr. Rosa and his source

5    of supply.  Do you remember that?

6    A.  Vaguely.  If you could help me.

7    Q.  So he was trying to talk to you about sole source of supply

8    and who Mr. Rosa's --

9    A.  Oh, yes.

10   Q.  -- was.

11          When you directed Mr. Rosa and gave them instructions

12   about who not to contact, what did you tell Mr. Rosa?

13   A.  Do not have contact with anyone related to heroin.  And

14   specifically, obviously, do not be contacting Mr. Baker without

15   our direction.

16   Q.  Was that because you were now investigating Mr. Baker?

17   A.  Exactly.

18   Q.  Does that mean you would be watching Mr. Baker?

19   A.  Exactly.

20   Q.  And the fact that Mr. Rosa broke that rule and purchased

21   more heroin from Mr. Baker, what does that tell you?

22   A.  Well, it's a huge risk on his part.  It's -- it tells me a

23   couple of things.  One, it tells me at that his -- his

24   addiction for heroin or his need to obtain heroin sort of

25   overrode what we would think would be his best judgment of

1    being responsible for an overdose that had just occurred.  And

2    knowing that somebody had just used it and overdosed and died,

3    and yet still going out and being back and involved in using

4    and obtaining more heroin, first of all.

5            And then, secondly, that knowing that we were

6    involved in investigating Mr. Baker to the same degree that we

7    had investigated him and Morgan, taking the risk of meeting

8    Mr. Baker while it's possible that we would be actively

9    surveilling him.

10   Q.  If he had a different source of supply, wouldn't it have

11   made sense for Mr. Rosa to get that heroin --

12            MR. ANDERSEN:  Object.  That's speculation.

13            THE COURT:  It is argument.

14            MS. BOLSTAD:  Thank you, your Honor.

15            THE COURT:  Objection sustained.

16            MS. BOLSTAD:  Nothing further on redirect.

17            THE COURT:  All right.  Thank you, Detective.  You

18   can step down.  And if you'll gather up as many of those

19   exhibits with you, or take them back, that would be helpful.

20            THE WITNESS:  Sure.  Thank you.

21            THE COURT:  Jurors, I'm going to ask you to step out

22   while we set up for the next witness.  You can just stretch

23   your legs in the hall.  Please leave your notes on your chairs,

24   and we'll just be a few minutes.

25            Everyone please rise for the jury.

Colloquy

1              (Jurors exit.)

2              THE COURT:  All right.  Please be seated.

3              Your next witness is Ms. Godvin?

4              MS. BOLSTAD:  Yes, your Honor.

5              THE COURT:  Will the marshals please bring her to the

6    witness chair.

7              (Pause, Court and clerk conferring.)

8              THE COURT:  Marshal, we have a chair here, which we

9    can have removed.

10             THE MARSHAL:  Whatever you want me to do.

11             THE COURT:  No, whatever you want to do.

12             THE MARSHAL:  Okay.  I'll --

13             THE COURT:  You tell us what works best.

14             THE MARSHAL:  I'll stand by, right up here by you.

15             THE COURT:  Do you want a chair here?

16             THE MARSHAL:  I'll stand by.

17             THE COURT:  All right.  Come on up.  Fine.

18             Go ahead and take a seat for a moment.  Let the

19   marshal check everything out.

20             All right.  Counsel, do you have a position as to

21   whether I should make explicit that which is -- will be obvious

22   to the jury, and that is that Ms. Godvin is in the custody of

23   the United States Marshal?  You'll be asking --

24             MS. BOLSTAD:  I'll cover it, your Honor.

25             THE COURT:  She's wearing leg restraints that make

264

Colloquy

1   noise when she moves.

2          Would you just please stand up for me.  You'll be

3   facing the jury, raising your right hand to be sworn, and then

4   seated again.  Would you now sit down, so I can see what noise

5   that might make.

6          Looks like you can do that without the -- too much --

7          THE WITNESS:  It's carpet.

8          THE COURT:  -- distraction from the chains.

9          All right.  Anything else before we bring in the jury

10  regarding this witness?

11         All right.

12         MS. BOLSTAD:  No, your Honor.

13         THE COURT:  We're all going to stand, Ms. Godvin,

14  when the jury comes in.  You just remain standing when I tell

15  everybody to sit.  Okay?

16         THE WITNESS:  (Nods head.)

17         THE COURT:  All right.  Everybody please stand for

18  the jury.

19         They'll be ready in a minute.  We can use a stretch

20  break anyhow.

21         (Jurors enter.)

22         MS. BOLSTAD:  Ms. Godvin, Mr. Barnett is right here.

23         THE COURT:  And, Counsel, Mr. Barnett, you're her

24  counsel of record?

25         MR. BARNETT:  Yes, your Honor.

Colloquy

1          THE COURT:  If at any point you have an issue, just

2    stand up and indicate you have a matter for the Court, and I'll

3    hear you.

4          MR. BARNETT:  Thank you, your Honor.

5          THE COURT:  I don't know if -- Ms. Bolstad, if you're

6    going to introduce him to the jury and let them know he's here.

7          MS. BOLSTAD:  I will.

8          THE COURT:  All right.  That will take care of it.

9          About how long is your direct for this witness,

10   Ms. Bolstad?

11         MS. BOLSTAD:  This witness, if she follows the rules

12   about just answering the question, we should be in under an

13   hour.

14         We're just going to answer what is asked.

15         THE COURT:  So, obviously, we'll be going into the

16   noon hour.

17         MS. BOLSTAD:  I believe we will.  Especially with

18   cross.

19         THE COURT:  We have 15 minutes left.  That's less

20   than an hour, by anybody's measure, for you.  So you're --

21   you're going to be allowed to just continue until you find a

22   place to break.  But don't go too much past 12:15, at the

23   latest.

24         I'll let the jurors know we're going to go into the

25   noon hour, and we'll break.

Colloquy

1              MS. BOLSTAD:  Will do.

2              THE COURT:  All right.  I thought they were ready.

3              (Jurors enter.)

4              THE COURT:  All right.  Thank you, everyone.  Please

5    be seated.

6              Ladies and gentlemen, the Government's next witness

7    is Ms. Godvin.  She's before you.

8              Ms. Godvin, please face the jurors and deputy there.

9    Raise your right hand to be sworn.

10             (Witness sworn.)

11             THE WITNESS:  I do.

12             THE CLERK:  Please take a seat.

13             THE COURT:  Before she identifies herself to you,

14   jurors, her direct testimony is going to take longer than we

15   have before the noon break.

16             I told Ms. Bolstad that she could run a little past

17   noon, find a logical break, and then we'll break for lunch and

18   we'll continue the direct.  So I just wanted you to know I'm

19   watching out for your time, but we also want to not break

20   things up unnecessarily.

21             Are you uncomfortably cold?

22             JUROR NO. 10:  No, I'm fine.  Thank you.

23             THE COURT:  We have issues.  It's too warm, it's too

24   cold.  Especially when there are a lot of people.  And if

25   you're uncomfortable, do let us know.  All right?

Godvin - D

1          Ms. Godvin, please tell us your full name, while

2      you're close to the microphone, and spell all of it.

3          THE WITNESS:  Morgan Elizabeth Godvin.  M-O-R-G-A-N,

4      E-L-I-Z-A-B-E-T-H, G-O-D-V-I-N.

5          THE COURT:  Thank you.

6          Counsel.

7          MS. BOLSTAD:  Thank you, your Honor.

8                        DIRECT EXAMINATION

9      BY MS. BOLSTAD:

10     Q.  Ms. Godvin, good morning.

11     A.  Good morning.

12     Q.  Could you tell the jury how old you are.

13     A.  I'm 26 years old.

14     Q.  Where are you from?

15     A.  I am from Portland, Oregon.

16     Q.  And I see you're wearing some interesting attire.

17     A.  I am currently an inmate at Multnomah County jail.

18         THE COURT:  You need to be a little closer to

19     microphone, so that we can hear you well.

20         THE WITNESS:  Absolutely.

21         THE COURT:  Go ahead.

22     BY MS. BOLSTAD:

23     Q.  Does that work right there?

24     A.  Does it work?  You tell me.

25         THE COURT:  Much better.

Godvin - D

268

1    BY MS. BOLSTAD:

2    Q.  Much better.  How long have you been in custody?

3    A.  About over a year.

4    Q.  Are you nervous to be here today?

5    A.  This is an intimidating experience, yes.

6    Q.  Now, do you have an defense attorney who represents you?

7    A.  I do.

8    Q.  And is he here today in court, Mr. Barnett?

9    A.  He's right there (pointing).

10   Q.  Okay.  Do you remember late March 2014?

11   A.  I do.

12   Q.  Do you remember when the police came to your apartment?

13   A.  Yes.

14   Q.  Where were you living?

15   A.  I was living at 878 Southeast 185th.  185th and Stark,

16   essentially.

17   Q.  Who did you live with?

18   A.  I lived with Michael Rosa and Timothy Goshorn.

19   Q.  How long had you lived there?

20   A.  Two and a half months.

21   Q.  What about Mr. Rosa?  How long had he lived there?

22   A.  About six weeks.

23   Q.  I'm going to show you Government's Exhibit 14.

24            Does that come up on the screen in front of you

25   there?

269
Godvin - D

1    A.  Yes, it does.

2    Q.  Do you recognize that picture?

3    A.  Yeah, that's me sitting in the living room.

4    Q.  Okay.  That's of your apartment you shared with Mr. Rosa?

5    A.  And Mr. Goshorn, yes.

6    Q.  Tell the jury about what was going on in your life in March

7    2014.  Let's start with drugs.

8    A.  I was a heroin addict.  I had been a heroin addict for a

9    couple years.

10   Q.  Did you have a job in March 2014?

11   A.  Not at that exact time, no.

12   Q.  Did you have a job a little before that?

13   A.  I had had a job up and through -- up until August 2013, I

14   had always worked full time delivering pizza.  And I also

15   majored in emergency medicine at Portland Community College,

16   and got my Oregon EMT certification in 2012.

17           And I went to jail for a possession, and I -- I was

18   terminated in August 2013.  And then I moved back in with my

19   mother.  And on December 23rd, she passed away.  And I -- so --

20   and I had been living with her.  I -- you know, I'm the one who

21   found her.  It was a really hard experience.  And then rent

22   wasn't paid for January, and they gave me a 72-hour notice.  So

23   I was trying to move all of my stuff and my dead mom's stuff

24   out of our apartment while arranging her funeral.

25           My friend recommended me to Bateman Carroll Funeral

1    Home out in Gresham and from the outer Southeast Centennial

2    area.  And I -- and so I was out at Bateman Carroll, which is

3    in Gresham, making some funeral arrangements.  And my friend

4    Tim just happened to call me.

5            I hadn't even talked to him in about six months, or

6    seen him in about a year.  And I informed him that my mom had

7    died.  Him and my mom had been rather close, and -- and that I

8    was now essentially facing homelessness and had no money.  I

9    wasn't able to get life insurance for an additional six to

10   eight weeks or so.  And so I had no money, I was facing

11   homelessness.  And he said his roommate had just moved out and

12   he had a vacancy.  And he had a lease on that apartment on

13   185th and Stark.

14           And so my aunt loaned me 400 dollars, and I moved in

15   with him.

16   Q.  What did your mother die of in December?

17   A.  She died of a morphine overdose.

18   Q.  Why was she on morphine?

19   A.  Chronic back pain and -- in combination with her COPD, from

20   smoking her whole life.

21   Q.  Sorry about that.

22   A.  Thank you.

23   Q.  You mentioned that you -- you used drugs.

24   A.  Yeah.

25   Q.  When did you start using heroin?

1  A.  I started using heroin -- well, you see, I used heroin

2  several times before ever becoming addicted to heroin.

3           You want to hear about the first time I ever did

4  heroin?

5  Q.  Yes.

6  A.  Okay.  So I moved in with my boyfriend to an apartment in

7  Gladstone.  And I was walking by the office one day, and I saw

8  my friend from Gresham, Justin Delong.  And I said, Oh, my

9  gosh.  What's up?

10          And he lived in the same apartment complex.  And it

11  was good to see a familiar face from, you know, the Centennial

12  crowd.  And me and my boyfriend started hanging out with him.

13          And he sold OxyContin.  OxyContin 80s, at the time.

14  Q.  And when you say "he"?

15  A.  Justin Delong.

16          So my boyfriend and I would use oxy with him a couple

17  times a week.  We would go over and buy it from him.  And at

18  some point he said, So this is a bad business proposal -- I

19  understand that because he made more money off the oxy -- but,

20  You should try this.  It's essentially the same high and it's

21  cheaper.  And you can smoke it on foil, just like you did the

22  OxyContin.

23          And -- so heroin didn't sound like such a four-letter

24  word when presented in that fashion.  'Cause -- well, I've

25  already been doing this prescription medication.  And if it's

Godvin - D

1    the same high and then you try it and it really is the same

2    high and -- so that -- that stigma, that fear of heroin, the --

3    it wasn't present.  So Justin Delong started selling us heroin.

4    Q.  What year was that?

5    A.  2008.

6    Q.  Was it a cheaper high to use heroin?

7    A.  Phenomenally.

8           At that point, OxyContin was a dollar a milligram.

9    So you could pay 80 dollars for one pill, and that was

10   essentially a night's worth of high.  Or you could pay 20

11   dollars for two-tenths of a gram of heroin.  That was probably

12   almost more bang for your buck.

13   Q.  When you started using heroin, how did you ingest it?

14   A.  I smoked it off of aluminum foil.

15   Q.  Over time did you start using heroin differently?

16   A.  I started using it intravenously in late 2010.

17   Q.  Does that mean with a syringe?

18   A.  Yeah.  Yeah, shooting up.

19          I got pneumonia, actually, from smoking.  And it

20   was -- it's hard on your lungs.  And at that point I started

21   shooting up.

22   Q.  You mentioned, a little bit earlier, getting caught.

23          Have you been convicted of drug crimes?

24   A.  I have.  Excuse me.  I have two possession of heroin

25   charges.

273

Godvin - D

1   Q.   Are those both felony cases?

2   A.   They are, yes.

3   Q.   In your felony convictions, was it for possessing heroin?

4   A.   Um-hmm.  Yes.  Yes.

5   Q.   Did you try drug treatment following those convictions?

6   A.   I did.  I was in Multnomah County STOP court program, which

7   is a drug court program.  I went to inpatient treatment twice

8   and detox two or three times, and I couldn't figure it out.

9   And eventually I was revoked and convicted of the felony.

10  Q.   If you had been successful with drug treatment, could you

11  have avoided those felonies?

12  A.   The -- the one from Multnomah County, I could have.  But

13  the Washington County did not offer me a drug court option.

14  Q.   How about in this case?

15         Did you try some drug treatment, since you've been in

16  custody?

17  A.   I was let out on pretrial release last November, and I -- I

18  ended up using heroin in treatment and relapsing.  It was right

19  around the one-year anniversary of my mom's death, and I was

20  having a very hard time.

21  Q.   How do you get heroin at a treatment facility?

22  A.   People like to sneak out their window.  And there was

23  Suboxone there, which is -- which is an opiate but it's not

24  tested for in standard drug tests.  So that was going around.

25  And like OxyContin is to heroin, it was a stepping stone in the

Godvin - D

1    culture there.  And girls traced a path outside of certain

2    windows that wouldn't activate the motion sensor lights, and

3    would either go to -- to be -- to have sex or to use drugs or

4    to bring drugs back into the facility.

5    Q.  Ms. Godvin, as you sit before us today, when is the last

6    time you used heroin?

7    A.  I used heroin while housed at Multnomah County jail in

8    January.

9    Q.  Have you used any since then?

10   A.  No.

11   Q.  Is that January 2015?

12   A.  Yes, sir -- yes, ma'am.

13   Q.  As you sit before us today, would you say that you're still

14   addicted to heroin?

15   A.  I will always be a heroin addict.  But -- that doesn't ever

16   go away.  Recently, at Multnomah County jail, I know that

17   there's been heroin present again, and I was able to say no.

18   And I -- I don't -- I'm going to have a hard time conveying how

19   incredibly empowering it felt for the first time in my life to

20   just say no to drugs.

21   Q.  Good.

22            Did you know Justin Delong?

23   A.  I did.

24   Q.  How did you know him?  Besides what you've told us, did you

25   know him before he started selling you Oxy?

275

Godvin - D

1    A.   Yes.   We were in the same school district, therefore

2    part -- house-party circle in 2006, 2007.   So like our senior

3    year of high school.   He's a year above me, I believe.

4    Q.   Back in early 2014 -- so January through March, when the

5    police showed up --

6    A.   Um-hmm.

7    Q.   -- did you see Mr. Delong in that time frame?

8    A.   I did not.

9    Q.   Did you see him right before he died?

10   A.   I mean, I saw him the night he died.

11   Q.   Okay.   But other than that time, had you seen much of

12   Mr. Delong?

13   A.   No.   The last time I saw him was two days before my mom

14   died.   So I remember the date.   It's December 21st, and he

15   spent the night at my house.

16   Q.   Was he helping you?

17   A.   No.   I was helping him.   He was stranded at the Hillsboro

18   MAX station.   And I had to go rescue him, and then he was dope

19   sick.   So I -- what we call -- got him well, which was offered

20   a shot of heroin to him.

21   Q.   And that was back in December?

22   A.   It was December 21st, 2013.

23   Q.   Let's talk about the night that you saw him in March.

24          Was this a Friday night?

25   A.   If you say so.

Godvin - D

1    Q.   No, I don't want to say so.

2    A.   Oh, I don't remember.

3    Q.   Okay.  Would it have -- do you remember when the police

4    came to your door?

5    A.   Yes, I remember them making entry into my apartment.

6    Q.   Okay.  In relation to when the police came, when is the

7    last time you saw Mr. Delong before that?

8    A.   Approximately 24 hours prior.

9    Q.   Okay.  How did that begin?  Why did you see him?

10   A.   He -- he just texted me.  He said, Can you hook up a G?

11   Q.   What did that mean to you?

12   A.   Well, the -- when you say hook up, that means usually

13   you -- you and your friend are going to meet up, and so let's

14   say he has the money while I have the drug dealer.  So we

15   would -- you know, I would drive him to my dealer and buy from

16   my dealer and then give it to him.  Because he's -- for

17   whatever reason, wasn't able to contact his dealer directly;

18   maybe he was out or his phone is off.

19   Q.   And did you agree to give him what he was asking for?

20   A.   I did.

21   Q.   Did you give him a price?

22   A.   I did.  80 dollars, the standard rate.

23   Q.   Okay.  Was there a discussion about Mr. Delong's wallet?

24   A.   Yeah.  The night of December 21st, when he stayed at my

25   mom's house, he had left his wallet.  And I had been very

Godvin – D

1  careful in the move, despite the haste in which I moved, to

2  hold onto it and keep it safe for him, because it had his ID in

3  it and his food stamp card, or something.

4         And –– so that night, when he actually came into the

5  apartment, he wouldn't sit down.  And I –– I just handed him

6  the gram.  And I'm like, Okay, let me go get your wallet.  It's

7  upstairs.  It's in one of my drawers.  And he's like, No, no,

8  no, no.  I've got to go.  I've got to go.  So he didn't even

9  take his wallet.

10         So the police found Justin Delong's wallet in my

11  bedroom when they searched.

12  Q.  Do you know why he was in a hurry?

13  A.  He said his ride was waiting.  His behavior was a little

14  off.

15  Q.  Before he left, did he pay you?

16  A.  He did.

17  Q.  Was it the 80 dollars?

18  A.  It was.

19  Q.  Did you provide him with the 1 gram?

20  A.  I did.

21  Q.  Where did that 1 gram come from?

22  A.  My personal bag of heroin that I had been using out of that

23  day.

24  Q.  Did you ever see Mr. Delong alive again?

25  A.  No, I did not.

Godvin - D

1    Q.   So let's talk about that 1 gram in your personal stash.

2    Okay?

3    A.   Okay.

4    Q.   Where did your personal stash come from?  Be specific.

5    A.   Michael Rosa was, you know, at the time my roommate.

6              And I would buy -- I would just have to go knock on

7    his bedroom door to buy my heroin.

8    Q.   How long had you been obtaining heroin from Mr. Rosa?

9    A.   Since right after my mom died.  So since January 2014.

10   Q.   Did you have any other source of heroin since January 2014?

11   A.   I did not.  I'm sure I could have, but I had no need to.

12   Michael was always available.

13   Q.   And was that convenient?

14   A.   It was -- I mean, it was in the same house.  I just had to

15   knock on the door.  There was none of that, I'll be there in 15

16   minutes, and then you're waiting in a parking lot for two

17   hours.  So it was incredibly convenient.

18             When I -- I -- I had intended on moving out of that

19   apartment when I got my life insurance settlement because it

20   was a bad neighborhood and not the greatest apartment to be

21   living in.  But it was just so convenient, I never quite got

22   around to it.

23   Q.   And would you pay Mr. Rosa for your -- for the heroin?

24   A.   I would.

25   Q.   How would you do that?

Godvin - D

1    A.   He would charge me 160 dollars for an eight-ball, which is

2    3 grams.  Or 320 dollars for a quarter, which is 6 grams.

3    Q.   And when you say "a quarter," do you mean like a quarter

4    ounce?

5    A.   It's what would be a quarter ounce.  I realize that

6    mathematically a quarter ounce is actually 7 grams.  But in

7    heroin, it's 6 grams.

8    Q.   A heroin ounce is actually 25?

9    A.   Right.  They have to fit it -- our standard -- you know,

10   our American math into the metric system so that -- 'cause --

11   to convert it into kilos.  So an eight-ball should be an eighth

12   of an ounce; it's actually 3 grams.  A quarter is 6.  A half is

13   12.  And then if you buy an ounce, it's actually 25 grams.  So

14   according to that logic, you get a free gram.

15   Q.   In March 2014, did Mr. Rosa take a trip?

16   A.   He went to Ohio.  He's from Ohio.

17   Q.   Do you know how long he was gone?

18   A.   Oh, maybe a week.

19   Q.   While he was gone, where did you get your heroin?

20   A.   He put Tim, Timothy Goshorn in charge of his business.

21   Left him with his work phone, his drug cell phone, and his

22   drugs, and a scale.

23   Q.   And so when Mr. Rosa was gone, where did you get your

24   heroin?

25   A.   From Tim.

1    Q.  And is that -- was it your understanding that that's

2    Mr. Rosa's heroin?

3    A.  Yes.  Absolutely.  Tim was essentially a runner.

4    Q.  What do you mean by "a runner"?

5    A.  They're like an employee of the drug dealer.  They have

6    actual -- no actual stake in the business.  They will make

7    deliveries for the drug dealer.

8    Q.  Do you know what Tim got out of that?

9    A.  Free heroin.

10   Q.  Did he get a big paycheck at the end of the month?

11   A.  No.  No dollar value.  Just free heroin.  Which, to a

12   junkie, is pretty good payment.

13   Q.  All right.  Let's talk about your personal stash a little

14   bit more.

15   A.  Okay.

16   Q.  I want you to focus on the time period of March of 2014.

17   A.  Okay.

18   Q.  How much heroin were you using a day?

19   A.  I would say, on average, I was using an eight-ball, 3

20   grams.

21   Q.  Would you use that full 3 grams all at one time?  Or how

22   did that work?

23   A.  I would do about .7 shots.  So about four .7 shots.  So

24   seven-tenths of a gram four times a day.

25   Q.  Is that how much heroin you started using at the beginning

Godvin - D

```
 1   of your heroin use?
 2   A.  Oh, no.  Absolutely not.  That is an obscene amount of
 3   heroin to be using.  Tolerance builds very quickly.
 4            The standard dose for a heroin addict, sometimes for
 5   the whole day is .2, two-tenths of a gram, 20 dollars.
 6            And then you -- a lot of people get stuck around a
 7   half gram a day.  That's 40 dollars a day, you know.  So that's
 8   what most junkies do.  That's what I did most of my junkie
 9   career, would have been a half gram a day.
10   Q.  Do you know where Mr. Rosa obtained his heroin?
11   A.  He got it from Shane.  Would you like me to explain how I
12   know who Shane is?
13   Q.  Well, first, do you know Shane's name?
14   A.  Shane Baker.
15   Q.  Okay.  Yeah, how do you know that Mr. Rosa obtained his
16   heroin from Shane?
17   A.  The fir -- when I was revoked out of STOP court for my
18   Multnomah County possession of heroin, I met his girlfriend in
19   jail.  And she gave me his number and said that I could call
20   him, and I did that.  And so I was buying heroin from him for a
21   few months.  And I can -- he was -- he was an interesting
22   character to deal with.
23   Q.  Shane Baker was?
24   A.  Yeah.  He was aggressive.  And mean, I guess.  He was mean.
25   He was not a nice guy.  Absolutely not.
```

1          And one time I -- I called him and I said, It can't

2    be the same stuff it was yesterday.  That -- that stuff wasn't

3    very good.  I almost feel sick.  Said, I promise, I promise.

4    It's different.  It's different stuff.  It's better quality.

5          And I bought it from him, and I didn't look at it

6    until I had gotten it in my car to drive away.  And I could

7    just tell by sight that it was the same.  And so I was a little

8    perturbed that he just, like, lied to my face.  And so I called

9    him.  I say, Man, this is the same.  And he said, Well, you can

10   return it, if you want.  Sorry.  I didn't realize.  I must have

11   sold you -- you know, some lie.

12         And I said, Well, are we going to have problems if I

13   return it?  Because I was thinking I could go to someone else

14   and get better quality.  And he said, No, it's fine.  So I

15   returned it, and he never accepted one of my phone calls again.

16   Q.  Is that like being a dissatisfied customer?

17   A.  Yeah.  (Laughing.)

18   Q.  So, Ms. Godvin, when about -- when did that occur with

19   Mr. Baker and you?

20   A.  August 2013.

21   Q.  Okay.  Earlier, you mentioned the concept of getting sick

22   and Mr. Delong possibly being sick.

23   A.  Um-hmm.

24   Q.  Can you tell the jury what it's like to go through heroin

25   withdrawal, from your own perspective?

Godvin - D

```
 1   A.  So it's like the worst flu that you've ever had.  But
 2   instead of that mental fogginess, you're just hyper-acute.
 3   You're very aware.  Your skin hurts.  The wind hurts your skin.
 4   Your clothes hurt your skin.  Nausea.  Sometimes accompanied
 5   with diarrhea, intense stomach cramps.  And absolutely crushing
 6   insomnia.  You do not sleep, not for one second.  And all you
 7   want is a break from the agony.  And you can't.  You're awake,
 8   and you're just hyper-acute.  You're acutely aware of
 9   everything that's going on.
10   Q.  How long does that last?
11   A.  Five days to a week.
12   Q.  Is there something that cures that feeling?
13   A.  Heroin.
14   Q.  Is there anything else that can cure that feeling?
15   A.  Outside of another opiate drug, no.
16   Q.  Let's talk about the day police showed up at your
17   apartment.
18   A.  Okay.
19   Q.  I'm going to show you Government -- I'm sorry.  Hold on
20   just a moment.
21        When the police came to your door, did you expect to
22   see Mr. Delong that day?
23   A.  I did.  I had got a text message from what I thought was
24   Mr. Delong, asking for another gram or 2 grams, or something.
25        And I said -- I said, Yeah, sure.  Come on over.
```

Godvin - D

1   Because I knew that I could just easily -- very easily obtain

2   it from Michael, and just give it to Justin because Justin was

3   in need.

4   Q.  And when the police arrived, what were you doing?  We saw

5   you on a couch.

6   A.  I was -- I was sitting on the other couch, actually, when

7   they arrived.  I was sitting -- I was about to do a shot.  I

8   had just, I think, woken up from a nap.

9   Q.  What do you mean by a shot?

10  A.  I was going to cook up a shot and inject heroin.

11  Q.  And so when the police came in, did they let you know what

12  was going on?

13  A.  Yes.

14  Q.  What did they tell you?

15  A.  I think they asked me if I had ever heard of the **Len Bias**

16  Act, which I had.  And they said something along the lines of,

17  Do you know Justin Delong?  And, you know, my heart just sank

18  because I instantly knew that that meant my friend was dead,

19  and he's dead off drugs that I sold him.  So not only is my

20  friend dead, but I'm in big trouble.

21  Q.  So you mentioned that you've heard of the **Len Bias** Act.

22  A.  Um-hmm.

23  Q.  So before this case began --

24  A.  Um-hmm.

25  Q.  -- what did you know about it?

Godvin - D

1    A.   Christopher -- Timothy Goshorn's brother -- his name is

2    Christopher, Christopher Goshorn.   He overdosed and died on

3    March 27th, 2011, off of heroin that Justin Delong had sold

4    him.   Justin Delong had been an heroin dealer for most of his

5    career.

6    Q.   And did **Len Bias** come up in that context?

7    A.   It did.   The police interrogated Tim, trying to find out

8    where Chris had got the heroin from.   And they educated him

9    about the **Len Bias** law.   And don't you want to see someone be

10   punished for this?   And his mom intervened and said, Tim, keep

11   your mouth shut.   We lost our son.   We don't need to take

12   another son away from his mother.

13   Q.   Okay.   So you knew about this when the police came to your

14   house on the 29th.

15   A.   Yes.

16   Q.   Did they advise you of your **Miranda** rights?

17   A.   They did.

18   Q.   They tell you you don't have to say a word?

19   A.   Yes.

20   Q.   Did you understand that?

21   A.   I did.

22   Q.   And did you speak with the police?

23   A.   I did.

24   Q.   Why?

25   A.   The thought of having to under -- to go through heroin

Godvin - D

```
1   withdrawal is so terrifying, it -- it's this impending doom
2   feeling.  I can't -- I can't describe it.  And now, sitting on
3   this end of it, I have a hard time even empathizing with my own
4   memory of it.  But you will do anything to avoid having to go
5   through that.  Absolutely anything.  And I'm thinking, I'm
6   going to kick -- be kicking heroin.  I'm doing an extraordinary
7   more -- or larger amount of heroin than I've ever done before
8   in my entire life.  So, therefore, I think I'm go going to get
9   sicker than I've ever been.  And I get sick.  And I was
10  absolutely terrified.
11  Q.  Would you say that you were more terrified of going through
12  heroin withdrawal than punishment?
13  A.  At that time, yeah.  That's -- addiction is very
14  shortsighted.
15  Q.  When the police were speaking with you, were you coherent?
16          Did you understand what was going on?
17  A.  Absolutely.  I remember that night very well.
18  Q.  And so you decided to speak with them?
19  A.  I did.
20  Q.  At the point you decided to speak with the police, had you
21  been charged with a crime yet?
22  A.  No.  I had been arrested.  I was put in handcuffs.  Does
23  that mean I've been charged?
24  Q.  I'm just asking you --
25  A.  I -- no, I hadn't been charged with a crime, no.  I was
```

1    being detained, but I had not yet been charged with a crime.

2    Q.  Okay.  Did the police tell you about **Len Bias** on this

3    occasion?

4    A.  Yes.  That it faces, you know, some crazy 20- or 25-year

5    prison sentence, mandatory.

6    Q.  So I'm almost done here, Ms. Godvin, and I want you to talk

7    to the jury about what you told the police when they spoke with

8    you that day.

9            Do you remember?

10   A.  Yes.

11   Q.  Okay.

12   A.  I told them that I had sold -- I mean, that Justin Delong

13   had texted me the night before.  That I had told him to come

14   over.  He came to the apartment.  He was acting a little bit

15   funny.  He wouldn't stay.  He wouldn't let me grab his wallet.

16   I had my personal heroin on the table.  I weighed him out a

17   gram.  He handed me the 80 dollars.

18           But where that heroin had came from is, when I woke

19   up that morning I decided that I was running kind of low on

20   heroin.  And I went to get more from Mike, but he was asleep.

21   And -- but his -- he had a bag of heroin just open on the

22   nightstand with a scale.

23           So normally I would buy a ball or a quarter.  But at

24   this time I just -- I was treading very lightly.  I didn't want

25   to be accused of theft, but I wanted to get heroin.

1          And also, at this time, when I would get a ball or a

2    quarter from Mike, I wouldn't have cash immediately, because I

3    would have needed to have gone to the ATM.  And I just didn't

4    see the need and he didn't see the need.  Sometimes he would

5    encourage me to finally go to the bank.  But at this time I had

6    already had a small debt with him.

7          So I weighed out a gram for myself.  I didn't want to

8    weigh out a ball without him watching me, 'cause I didn't want

9    him to think I was stealing from him or something.

10          Anyway, so I weighed out a gram.  And I just put it

11    into my -- directly into my personal bag.  And I don't know how

12    much I had in there to begin with.  I just -- it just looked

13    like it was running a little low.  So I replenished it.  I put

14    the gram in there.  And then I made the mental calculation.  I

15    add 60 dollars to the previous existing debt I had with

16    Michael.  And I now owe him 320 dollars.  And I was just going

17    to tell him when he woke up that I now owed him 60 dollars

18    more.

19    Q.  On top of the 320?

20    A.  No.

21    Q.  Total?

22    A.  Other way around.

23          The -- I think I had gotten a ball from him for --

24    I -- I don't want to break it down.  I just remember that

25    figure in my head, was -- that I then owed him 320 dollars.

289
Godvin - D

1  Q.  And did you tell the police that you did distribute heroin

2  to Mr. Delong?

3  A.  Yeah, absolutely.  That was me.

4  Q.  Did you tell the police about weighing out Mr. Rosa's

5  heroin?

6  A.  I did.

7  Q.  Did you describe whether you had any other sources at that

8  time period?

9  A.  I don't think that I did.  No.

10         THE COURT:  You don't think that you had any other

11  sources or you didn't describe --

12         THE WITNESS:  I don't think I was asked and,

13  therefore, did not describe.

14         THE COURT:  (Nods head.)  Thank you.

15  BY MS. BOLSTAD:

16  Q.  But, just to clarify, did you have any other source of

17  supply for heroin in March of 2014?

18  A.  Not that I was utilizing, no.

19  Q.  And were you charged eventually in this federal case?

20  A.  I was.

21  Q.  Were you charged with conspiracy to distribute heroin

22  resulting in death?

23  A.  I was.

24  Q.  You were facing a pretty big penalty?

25  A.  Yes.

Godvin - D

1    Q.   Do you know what that was?

2    A.   20 years.

3    Q.   As a minimum?

4    A.   Yeah, mandatory minimum sentence.

5    Q.   In that charge in the Indictment, do you know the

6    co-defendants who were listed with you?

7    A.   I know Michael.  And, you know, I've met Shane on several

8    occasions.  But the other gentlemen, I do not know.  Have never

9    met, did not know they existed.

10   Q.   And so Fabian Sandoval-Ramos over here, in the black suit,

11   have you ever met him?

12   A.   No, I have not.

13   Q.   Mr. Raul Arcila, next to Mr. Sepp, over on that side, have

14   you met him?

15   A.   No, I have not.

16   Q.   Tell the jury what the status is of your criminal charges.

17   A.   I have been pled out to conspiracy to distribute heroin,

18   over 100 grams, for a plea of 60 months in prison.

19   Q.   And is that plea -- is that plea agreement with me, the

20   Government?

21   A.   Yes, it is.

22   Q.   And have you been sentenced yet?

23   A.   No, I have not.

24   Q.   Who decides what your sentence will be?

25   A.   The judge.

Godvin - D

1    Q.  And so is our agreement necessarily what's going to happen

2    to you?

3    A.  No.  It's a tentative thing.

4    Q.  As part of your plea agreement with me, did you agree to

5    cooperate against your co-defendants?

6    A.  I did.

7    Q.  And did your agreement to cooperate, did that include

8    testifying against Mr. Rosa if we needed that?

9    A.  Yes, it did.

10   Q.  Did your agreement include testifying against Mr. Baker, if

11   we needed that?

12   A.  I don't remember that ever being discussed.

13   Q.  Okay.  And does your agreement include testifying at the

14   trial of these two defendants, if necessary?

15   A.  Again, I don't remember it ever being specifically

16   discussed.

17   Q.  Okay.  But testifying was discussed?

18   A.  Yes, it was.

19   Q.  And you said 60 months.  Is that correct?  Is that our

20   deal?

21   A.  Yes, it is.

22   Q.  Is that about five years?

23   A.  That is exactly five years in prison.

24   Q.  How do you feel about that?

25   A.  I feel that five years is much better than 20 years.

Godvin - D

1  Q.  Okay.  Do you still feel like it's a long time or --

2  A.  Yeah.  I mean, I don't want -- no, I don't want to go to

3  prison for five years.  Does anyone want to go to prison -- no.

4  You don't want to do that.  No.  It's scary.  It's very scary.

5  This whole experience has been incredibly terrifying.

6  Q.  Did you have choices, though, about how to proceed?

7  A.  Elaborate.

8  Q.  Did you -- you were -- were you aware that you did not have

9  to take a plea agreement?

10  A.  I was aware, yes.  Those are my rights.

11  Q.  Okay.  And so did you make that cost/benefit decision about

12  20 years versus five?

13  A.  Absolutely.  And I -- and I am guilty, so it kind of makes

14  sense to take the plea offer that was presented to me.

15  Q.  Because you did these things that are charged?

16  A.  Yeah.  Yeah.

17  Q.  And (pause), Ms. Godvin, is the information that you told

18  the police back on the 29th, is that the same information

19  you're providing today?

20  A.  Exactly the same.

21  Q.  Are you doing that because you think you'll get a better

22  deal or -- or is that the truth?

23  A.  It's just the truth.  It's kind of the hard, painful truth,

24  but it's the truth.

25          MS. BOLSTAD:  I have nothing further on direct.

293

Colloquy

1          THE COURT:  Jurors, two things before we break.

2          First, I want to remind you of what I'm going to call

3     a limiting instruction.

4          I told you at the beginning of the case there might

5     be times when I would tell you that you would have to either

6     disregard evidence or consider it in a limited way.

7          You heard evidence from Ms. Godvin that she

8     previously has been convicted of felony crimes, two counts of

9     possession of a controlled substance.  You're entitled to

10    consider that evidence when you consider all of the evidence in

11    the case, in deciding how much weight you'll give to her

12    testimony.

13         There are other witnesses we've been describing as

14    cooperating witnesses, who also have criminal records apart

15    from this case.

16         That evidence is available to you only for the

17    limited purpose -- only for the limited purpose of deciding

18    what weight to give to the witness's testimony.

19         The fact that she's previously been convicted of a

20    crime has no bearing at all on whether either or both of the

21    defendants are guilty of the charges here.  That's point 1.

22         Point 2, we're going to recess now.  I think it's

23    important that you get out, get some fresh air, and fill your

24    mind with things other than the serious matters going on here.

25    So I invite you to do that.

Colloquy

1          I will start again with you at 1:30.  Okay?

2          All right.  Notes on the chair.  Don't discuss the

3  case.  Don't allow anything involving it to cross your path.

4  Please enjoy your lunch break.  Follow Ms. Boyer.

5          (Jurors exit.)

6          THE COURT:  All right.  Ms. Godvin may step down, and

7  we'll need her back at 1:30, please.

8          Everyone else may be seated.

9          (Pause.)

10          THE COURT:  Ms. Bolstad, any matters for the record

11  before we resume?

12          MS. BOLSTAD:  Your Honor, I have one request.  I

13  understand the Court's ruling.

14          The heroin in this case, it is not usually my

15  practice to send it back to the jury room in deliberations.

16          Would it be --

17          THE COURT:  Well, let's talk about that.

18          We have cash in evidence?

19          MS. BOLSTAD:  Yes, your Honor.

20          THE COURT:  We have heroin in evidence.  Both of

21  which are issues around the jury's handling and just tracking

22  it and ensuring that they have it available.

23          As an alternative, you're saying, to putting it in

24  the jury room, you want to pass it around in the presence of

25  everyone in the room so they can examine it, get a feel for the

Colloquy

1    weight, see it, but then ask for it only if they need it during

2    deliberations?

3            MS. BOLSTAD:  Exactly, your Honor.  And I don't plan

4    to do that with every piece of heroin.  Maybe just a few, so

5    that they get a sense for it.

6            THE COURT:  Passing it for just a few, but none of it

7    would go to the jury unless they ask for it?

8            MS. BOLSTAD:  Correct.  And if they do ask for it, we

9    would bring an agent to the courtroom, with defense.  We just

10   need to have somebody with eyes on the heroin.

11           THE COURT:  Well, that seems prudent, given the

12   issue.

13           The same would apply to the money?

14           MS. BOLSTAD:  Yes, your Honor, unfortunately.

15           THE COURT:  Counsel, how do you feel about that

16   approach?

17           MR. SEPP:  Yeah, I don't -- I do not have a problem

18   with it, as far as they're just going to pass it around and

19   return it.  They're not going to be concentrating on just

20   the --

21           THE COURT:  The instruction I would give them is that

22   certain exhibits that are identified as actual heroin will be

23   passed among them for their brief inspection, without comment,

24   so that they know, A, what the witnesses are referring to.

25   Secondly, this is an exception to the rule that all exhibits

Colloquy

1   will go to the jury during deliberation.  And because they are

2   controlled substances, they won't initially be given to the

3   jury.

4          If they need them for their deliberation, they'll be

5   brought to the courtroom.  They'll be walked into the

6   courtroom.  They can look at them as long as they need to, and

7   then they'll go back to the deliberation room.  We would never

8   introduce an agent into the deliberation room.

9          That's the approach.

10          MR. SEPP:  I'm fine with that, your Honor.

11          MR. ANDERSEN:  As am I.

12          THE COURT:  All right.  So we'll do that.

13          Is there a point when you want it done, Ms. Bolstad,

14   relative to any other point?

15          MS. BOLSTAD:  No, your Honor.  I haven't really

16   thought about it.

17          THE COURT:  All right.  Well, think about it.  If you

18   want to do it before cross-examination, it might be a good

19   place, before the start.  But we can do it later.

20          MS. BOLSTAD:  Not with this witness.  We don't need

21   to do it, your Honor.  Thank you.

22          THE COURT:  All right.  Is there any other matter for

23   the record before we break?

24          All right.  I would like all -- all right.  I take

25   the pause -- yes, Mr. Andersen?

Colloquy

1          MR. ANDERSEN:  No, there's not.

2          THE COURT:  All right.

3          Please be back and ready to go at 1:20, so that if

4    there are issues, we can take them up.

5          Ms. Bolstad, please be sure counsel know what's

6    coming in terms of exhibits and who's next after their

7    cross-examination is complete.

8          All right.  We're in recess.

9          (Recess taken.)

10          THE COURT:  Thank you, everyone.  Please be seated.

11          I apologize for the delay in starting.

12          Are we ready for the jury?  Mr. Andersen, are you

13    ready?

14          MR. ANDERSEN:  I am.  Thank you, your Honor.

15          THE COURT:  Any matter for the Court we need to

16    address before the jury comes in?

17          MR. SEPP:  Nothing, your Honor.

18          THE COURT:  All right.  Thank you.

19          (Pause.)

20          THE COURT:  Is Ms. Godvin's counsel here?

21          THE CLERK:  I don't see him.

22          THE COURT:  Nor do I.

23          I think we need to have him present before we

24    continue.

25          We'll go ahead and do the -- we can show the exhibits

298

Godvin - X

1    while someone looks for him.

2         MS. BOLSTAD:  Okay.

3         THE COURT:  Otherwise, I don't feel comfortable

4    proceeding without him present.

5         (Mr. Barnett enters the courtroom.)

6         MR. BARNETT:  My apologies to the Court.

7         THE COURT:  Not a problem.

8         All right.  Counsel's here, so we can proceed.

9         I think Ms. Boyer is lining up the jurors now.

10        (Pause.)

11        THE COURT:  Please rise for the jury.

12        (Jurors enter.)

13        THE COURT:  Thank you, everyone.  Please be seated.

14        Ms. Bolstad, please confirm your direct is concluded.

15        MS. BOLSTAD:  It is, your Honor.  Thank you.

16        THE COURT:  Thank you.

17        Mr. Andersen, cross.

18        MR. ANDERSEN:  Thank you, your Honor.

19                    CROSS-EXAMINATION

20   BY MR. ANDERSEN:

21   Q.  Hi, Ms. Godvin.

22   A.  Hello.

23   Q.  Now, you talked about this a little in your direct earlier,

24   but I do want to go through some of the documents that you

25   signed prior to testifying today.

Godvin - X

1          The two documents I want to go through with you are

2    the plea agreement letter, briefly; and, also, a cooperation

3    agreement letter.

4          Are you familiar with both those documents?

5    A.   I am.

6    Q.   Okay.  (Pause, referring.)  So -- and this has not been

7    admitted yet but I'll just show it just to you, Ms. Godvin.

8          THE COURT:  Let's see if we can expedite this.

9          Are you going to be offering --

10         MR. ANDERSEN:  I will be.

11         THE COURT:  -- each document?

12         MR. ANDERSEN:  I will be.

13         THE COURT:  And, Ms. Bolstad, will you object to

14   their admission?

15         MS. BOLSTAD:  I have no objection.

16         THE COURT:  Counsel?

17         MR. SEPP:  No objection.

18         THE COURT:  Mark them as exhibits and identify them.

19   And then perhaps you can use the document display, so that the

20   witness can see them at the same time, unless the Government

21   has them loaded already.

22         MR. ANDERSEN:  They already have done that.

23         THE COURT:  All right.  Go ahead.

24   BY MR. ANDERSEN:

25   Q.   So I will show you --

Godvin - X

1          MR. ANDERSEN:  Thank you, your Honor.

2     BY MR. ANDERSEN:

3     Q.  I will show you what I am marking as Defendant's Exhibit

4     202.

5          Now, can you look at the -- the front of that

6     document, Ms. Godvin?  Can you identify that document?

7     A.  A plea agreement letter.

8     Q.  Okay.  And this is a plea agreement letter that you have

9     gone over and you signed with your -- with your attorney.  Is

10    that correct?

11    A.  That's correct.

12    Q.  (Pause, conferring.)  And is that your signature there?

13    A.  It is.

14    Q.  And your attorney's signature?

15    A.  It is.

16    Q.  Now, and in this plea agreement, the Government agreed to

17    do certain things and you agreed to do certain things.  Right?

18    A.  Yes.

19    Q.  And what you agreed to do was to plead guilty to Count 3 in

20    the Indictment, and the Government agreed to dismiss the

21    remaining counts.  Right?

22    A.  Yes.

23          MR. ANDERSEN:  If we could bring it back to -- I

24    think, page 1 would be where we would find that.

25          MR. BARNETT:  Your Honor, may -- may -- excuse me.

301

Godvin - X

1    May I have permission to come up and look over counsel's

2    shoulder?

3                THE COURT:  You may.  In fact, maybe you could move

4    aside a bit and have a chair close by.

5                Perhaps the detective can step back while counsel's

6    examining, and give you the seat there.

7                MR. ANDERSON:  Also, I believe this should be

8    published to the jury.  It could be available on that screen,

9    too.

10               THE COURT:  Right.  But counsel should be close by,

11   too.

12               So, yes, let's get the exhibit.  Which is number

13   what?

14               MR. ANDERSEN:  202.

15               THE COURT:  202 is the plea agreement for Ms. Godvin,

16   and should be published to the jury.

17               Thank you, Counsel.

18               MR. ANDERSEN:  Thank you, your Honor.

19   BY MR. ANDERSEN:

20   Q.  So if you look at No. 2 there on that first page, you agree

21   to plead guilty to Count 3.  Right?  That's what you just

22   discussed?

23   A.  Right.

24   Q.  And the Government agreed to dismiss the remaining counts?

25   A.  At sentencing, yes.

302

Godvin - X

1    Q.  And those remaining counts, those are -- are you familiar

2    with what the remaining counts were?

3    A.  It is the -- the conspiracy to distribute resulting in

4    death, possession with intent to distribute, and distribution.

5    Q.  Okay.  So at least one of those is that 20-year mandatory

6    minimum?

7    A.  Correct.

8    Q.  All right.  Now, I would like to show you the second

9    document we discussed, and that's the cooperation agreement

10   letter.

11            We'll bring that momentarily here.

12            MS. COOKE:  Is this for the jury?

13            MR. ANDERSEN:  This is for the jury.

14   BY MR. ANDERSEN:

15   Q.  Now, are you familiar with this document?

16   A.  I am.

17   Q.  Oh, I'm sorry.  That's -- this one is actually -- it's --

18            (Pause, Mr. Andersen and Ms. Cooke conferring.)

19   BY MR. ANDERSEN:

20   Q.  This document might be a little more familiar.

21            Is that your name right at the top there?

22   A.  It is.

23   Q.  Now, I would like to talk about a couple specific clauses

24   in this cooperation agreement.

25            MR. ANDERSEN:  And if we could zoom back and go to

1   page 2.  I'm looking specifically now at paragraph 8.

2   BY MR. ANDERSEN:

3   Q.  So paragraph 8 talks about what might constitute a breach

4   of cooperation.

5            Are you familiar with that paragraph?

6   A.  Yeah.

7   Q.  And as -- as I understand this paragraph, and in its -- its

8   very words, it says that the determination about whether or not

9   you have breached this agreement rests exclusively with the

10  USAO.

11           Do you know who the USAO is?

12  A.  That would be -- well, at -- the United States Attorney's

13  Office.

14  Q.  Okay.  So long as they make that determination in good

15  faith?

16  A.  Okay.

17  Q.  Right?

18  A.  Yes.

19  Q.  I'm just reading the next part of that sentence.  Right?

20  A.  Um-hmm.

21  Q.  And it also says in that paragraph that breach would be if

22  you have given what the Government determines to be false or

23  incomplete or misleading testimony or information.  Right?

24  A.  Correct.

25  Q.  So if you were to testify differently than you've already

Godvin - X

1   talked about with the Government, that could be considered a

2   breach potentially.  Right?

3   A.  Yes.

4   Q.  And if there was a breach -- if you look at the last

5   sentence of the -- of that paragraph 8, that could act to void

6   this agreement and also the plea agreement.  Right?

7   A.  Correct.

8   Q.  I mean, you could be back at square one, potentially

9   looking at 20 years again?

10  A.  Yes.

11  Q.  In fact, the next paragraph talks exactly about that

12  paragraph 9, the consequences of a breach.  And, as I read

13  that, you're basically stuck.  You cannot withdraw your plea.

14  You cannot -- the Government is not bound by any recommendation

15  they may have been bound by previously.  They could recommend

16  whatever they want?

17  A.  Right.

18  Q.  If they thought you were in a breach?

19  A.  Right.

20  Q.  So, I mean, that's -- that does seem -- and I think you've

21  already testified to this.  But that seems like a pretty big

22  deal, does it not?

23  A.  Yeah.

24  Q.  All right.  Okay.  Let me talk to you a little bit about

25  some of the other statements you made.

Godvin - X

1      You described -- or you had a -- you met first or you

2  spoke with the Government first when they came to your house.

3  Right?

4  A.  That's correct.

5  Q.  And then you had at least one other subsequent follow-up

6  meeting with them?

7  A.  Right.

8  Q.  How many meetings do you think you would have had with

9  them?

10 A.  I had two.

11 Q.  Did you have any meetings in the last week to prepare for

12 this testimony?

13 A.  Yes, I did.  Last Tuesday.  So that makes three, actually.

14 Excuse me.

15 Q.  Okay.  Now, in one of these meetings, you discussed with

16 the Government what happened after the police came to your

17 house.  Is that right?

18 A.  Yes.

19 Q.  And -- so what happened after?  You returned -- I mean, did

20 you talk with Mr. Rosa or Mr. Goshorn after the police came to

21 your house?

22 A.  Tim and I were let out of our handcuffs at the Taco Bell.

23 We walked back to the apartment.

24      And I immediately grabbed some things and left.  And

25 I went to a friend of the family's house in Damascas.  And at

Godvin - X

1   some time the next day, I became made aware that Mr. Rosa was

2   also out of custody.  And then I met up with him that night,

3   and paid him the 320 dollars that I owed him.

4   Q.  And did you have any indication from Mr. Rosa about whether

5   or not he was still involved in drug selling or dealing or

6   anything like that?

7   A.  Yeah.  He -- I mean, at that exact time, he -- he said he

8   was going to try to continue selling.

9   Q.  All right.  And, in fact, you returned to your apartment a

10  few days later.  Right?

11  A.  Yes.

12  Q.  Then you saw Mr. Goshorn?

13  A.  Goshorn.

14  Q.  Goshorn.  Thank you.

15          Mr. Goshorn was there, and he actually had heroin?

16  A.  He did.

17  Q.  And he was sorting it out to deal it?

18  A.  He was bagging it up, yeah.

19  Q.  Okay.  Did he have anybody else with him, Mr. Goshorn?

20  A.  He had his son there.

21  Q.  Okay.  That's all.  Thank you, Ms. Godvin.

22          THE COURT:  Counsel.

23          MR. SEPP:  Thank you, your Honor.

24                      CROSS-EXAMINATION

25  BY MR. SEPP:

Godvin - X

1   Q.  Do you know who Nick or Nicholas Post is?

2   A.  I do.

3   Q.  Who is he?

4   A.  He was my boyfriend for several years.

5   Q.  Did -- was this during the time that you were using heroin?

6   A.  Part of it, yeah.

7           THE COURT:  Mr. Sepp, your microphone, please, or

8   keep your voice up; or both.

9           MR. SEPP:  Thank you, your Honor.

10  BY MR. SEPP:

11  Q.  Did you use with him?

12  A.  Yes.  He was staying with me up until the time my mom died.

13  And then when I moved into the apartment with Timothy and

14  Mr. Rosa, he was staying somewhere else.

15  Q.  Going to the -- the night that Mr. Delong showed up at your

16  apartment, you -- you had testified that he was acting weird.

17  A.  Um-hmm.

18  Q.  Could you elaborate on that.

19  A.  He was -- methamphetamine high and the early stages of dope

20  sickness mimic each other.  Your pupils get dilated, and you

21  get edgy.  And his pupils were a little dilated, and he was a

22  little edgy.

23  Q.  Okay.  And you -- if he hadn't used heroin regularly for

24  months, would he be getting dope sick?

25  A.  No.  He would have to have used at least for three or four

Colloquy

1    days in a row.  I mean, you get -- you can become physically

2    dependent on heroin in about three days of use, three separate

3    uses.  It happens very rapidly.

4    Q.  What else did you notice about his behavior, other than

5    the -- the eyes?

6    A.  Just that he wouldn't stay.  He wouldn't sit down.  And

7    he -- he didn't let me go retrieve his wallet.  I thought that

8    was kind of odd because he wanted his wallet.  But he said he

9    was in a hurry, and he said his ride was waiting.

10                MR. SEPP:  Okay.  All right.  That's all.  Thank you.

11                THE COURT:  Redirect?

12                MS. BOLSTAD:  None, your Honor.  Thank you.

13                THE COURT:  All right.  Jurors, would you step out,

14    please, for just a moment while we change witnesses.

15                Remember, don't talk about the case.  Notes on the

16    chair.  See you in just a bit.  Use it as a leg stretch.

17                (Jurors exit.)

18                THE COURT:  Thank you, Ms. Godvin.

19                THE WITNESS:  Thank you.

20                THE COURT:  Who will your next witness be, Counsel?

21                MS. BOLSTAD:  Mr. Michael Rosa.

22                THE COURT:  All right.  And is he in custody?

23                MS. BOLSTAD:  Yes, your Honor.

24                THE COURT:  So we will switch and get -- and who is

25    his counsel?

                                    Colloquy

 1              MS. BOLSTAD:  Ms. Harris.  She's present.

 2              THE COURT:  Ms. Harris, come on up.  Go ahead and

 3     take a seat next to the prosecutor, so you can be nearby.

 4              (Pause.)

 5              MR. BARNETT:  Thank you, Judge.  Again, I apologize

 6     for the delay.

 7              THE COURT:  Didn't want to start without you.

 8              MR. BARNETT:  I was in a meeting with lawyers and

 9     they wouldn't stop talking.

10              THE COURT:  Pardon me?

11              MR. BARNETT:  I was in a meeting with a bunch of

12     lawyers, and they wouldn't stop talking.

13              THE COURT:  My, I find that hard to believe.  Hard to

14     believe.

15              (Pause.)

16              THE COURT:  Mr. Rosa?

17              THE WITNESS:  Yes.

18              THE COURT:  Good afternoon.

19              THE WITNESS:  Good afternoon.

20              THE COURT:  In a moment, we'll all be standing as the

21     jurors come in, and then we'll all take a seat.

22              At that point, stay standing, please, so that you can

23     be sworn.  You'll be facing the jury and Ms. Boyer, and we'll

24     put you under oath.

25              THE WITNESS:  Okay.

Rosa – D

```
 1              THE COURT:  Ms. Bolstad, are you ready?

 2              MS. BOLSTAD:  Yes, your Honor.

 3              THE COURT:  Counsel, are you ready?  Yes?  Yes?

 4              MR. SEPP:  Yes, your Honor.

 5              THE COURT:  And, Ms. Harris, if you need anything,

 6  just let me know.

 7              MS. HARRIS:  (Nods head.)

 8              THE COURT:  We'll address it.

 9              (Pause.)

10              THE COURT:  Please rise for the jury.

11              (Jurors enter.)

12              THE COURT:  Thank you, everyone.  Please be seated.

13              Ladies and gentlemen, the Government's next witness

14  is Michael Rosa.  He's before you.

15              Sir, would you face the jury there, raise your right

16  hand to be sworn.

17              (Witness sworn.)

18              THE WITNESS:  Yes, I do.

19              THE CLERK:  Please take a seat.

20              THE COURT:  Bring yourself close in to the

21  microphone.  Adjust it, if you need to.

22              Tell us your full name, please, and spell all of it.

23              THE WITNESS:  Michael James Rosa.  M-I-C-H-A-E-L,

24  J-A-M-E-S, R-O-S-A.

25              THE COURT:  Counsel.
```

Rosa – D

1                              DIRECT EXAMINATION

2     BY MS. BOLSTAD:

3     Q.   Good afternoon, Mr. Rosa.

4     A.   Good afternoon.

5     Q.   Please tell the jury who you are and how old you are.

6     A.   Michael James Rosa.  I'm 30 years old, and I was born and

7     raised in Ohio.

8     Q.   Where do you currently live?

9     A.   I currently reside at Multnomah County jail.

10    Q.   How long have you been in the Multnomah County jail?

11    A.   Since the 23rd of October.

12    Q.   And before October, were you in custody on a different

13    charge?

14    A.   Yes, I was.

15    Q.   Where was that?

16    A.   In Mahoning County jail, in Youngstown, Ohio.

17    Q.   Let's talk about that for a second.

18         Do you have prior felony convictions?

19    A.   Yes, I do.

20    Q.   Do you have a theft felony from 2010?

21    A.   Yes, I do.

22    Q.   Was that out of Ohio?

23    A.   Yes, it is.

24    Q.   And do you have a 2014 felony possession of heroin

25    conviction?

1   A.   Yes, I do.

2   Q.   Any other felonies?

3   A.   No.

4   Q.   Is your 2014 possession felony -- did that take place

5   before or after the event in this case, which was March 2014?

6   A.   After.

7   Q.   You said you're from Ohio?

8   A.   Yes, I am.

9   Q.   What brought you to Oregon?

10  A.   I moved out to Oregon to get a fresh start.

11  Q.   Why did you need a fresh start?

12  A.   Because I was using heroin back in Ohio, and getting myself

13  into trouble.

14  Q.   Okay.  When did you move to Oregon?

15  A.   I moved to Oregon on July 16th of 2013.

16  Q.   So a pretty specific date.  Why do you remember that date?

17  A.   I'm just good with dates.

18  Q.   And when you arrived in Oregon, did you continue using

19  heroin?

20  A.   Yes, I did.

21  Q.   Tell us about that.

22  A.   When I first moved out here, I was doing heroin.  I was

23  doing about .2 to .4 grams of heroin a day, and it just

24  escalated from there.

25  Q.   Where did you find heroin once you got here?

Rosa - D

1   A.   When I first moved out here, I just pulled up to a random

2   strip mall and looked around, and waited to see somebody I

3   thought could get me heroin.  And it was that easy.

4   Q.   Do you remember what part of Oregon that was?

5   A.   Yes.  It was on 82nd and Powell, Southeast.

6   Q.   And where did you live when you first moved to Oregon?

7   A.   When I first moved to Oregon, I lived with a friend of mine

8   that I graduated high school with, up on Mt. Hood, for three

9   weeks.  After three weeks, I moved to Southeast Portland.

10  Q.   Did you know somebody in Southeast Portland?

11  A.   My dealer.

12  Q.   Who was your dealer?

13  A.   Jesse Spencer at that time.

14  Q.   Okay.  And did you move in with Mr. Spencer?

15  A.   Yes, I did.

16  Q.   Where was that?

17  A.   It was on 73rd and Powell, Southeast.

18  Q.   And is he the person who you met on Powell and about 82nd?

19  A.   I -- well, I was introduced to him by a street kid.

20  Q.   Okay.  Why was that intro made?

21  A.   Because I wanted heroin, and he supplied the heroin.

22  Q.   Did other people live with Mr. Spencer?

23  A.   When I first moved in, he was living with another girl

24  that -- she was leaving at the end of the month.  It was only

25  about ten days before she left.

Rosa – D

1    Q.  And so was this still July 2013?

2    A.  By that time it was August.

3    Q.  Okay.

4    A.  The beginning of August.  She left at the end of August.

5    Q.  Did you continue using heroin while you lived with

6    Mr. Spencer?

7    A.  Yes, I did.

8    Q.  How much were you using per day in August 2013?

9    A.  It was probably about a half a gram a day.  Maybe a little

10   more.

11   Q.  How long did you live with Mr. Spencer?

12   A.  Until Mr. Spencer went to jail on a probation violation.

13   Q.  When was that?

14   A.  That was in November of 2013.

15   Q.  Do you remember how long he was in jail?

16   A.  I believe he was in jail until the following December.

17   Q.  December 2014?

18   A.  Correct.

19   Q.  Your supplier is in jail.  What do you do?

20   A.  I go to his supplier.

21   Q.  And who was Mr. Spencer's supplier?

22   A.  Shane Baker.

23   Q.  Do you remember when you met Mr. Shane Baker?

24   A.  I met him personally in about November.

25   Q.  So you met in person?

Rosa - D

1    A.   Right.

2    Q.   Tell the jury what that meeting looked like.

3    A.   When I first met him, I met him at a Safeway grocery store.

4    We met in a parking lot.  And he just sold me heroin.

5    Q.   Had you ever met him before that parking lot?

6    A.   I met him one time before that for a split second because I

7    used someone else to get heroin from him.  I used a girl.  And

8    she would meet him in hotels.  So I would park in the hotel,

9    and I would just wait for her to come out.  And one time he did

10   come out for a brief minute.

11   Q.   And so in this parking lot, do you have a discussion with

12   him about having a relationship of buying heroin?

13   A.   In the hotel parking lot?

14   Q.   No.  I'm sorry.  In the Safeway parking lot.

15   A.   Oh, yes.  Because he knew -- by that time, he knew that I

16   was going through the girl to get my drugs, Amy.  And so he

17   knew that I was a good customer, so he had no problems with it.

18   Q.   What made you a good customer?

19   A.   Because I was repeat business.

20   Q.   And were you a customer only for your own use, or did you

21   also sell?

22   A.   No, I also sold.

23   Q.   How much heroin did you sell?

24   A.   At which point?

25   Q.   When you met with Mr. Baker --

316

Rosa – D

1    A.   In November?

2    Q.   Yes.

3    A.   In November I was buying 2 to 4 ounces every day, every two

4    days.

5    Q.   And were you selling all of that or some of it?

6    A.   I was selling some of it, and I was also doing some.

7    Q.   Finally, on that parking lot meeting with Mr. Baker, is

8    this a formal meeting?

9         Really, tell the jury how does it -- how does the

10   conversation go.

11   A.   I mean, he jumped in my car from his car.  We talked for a

12   couple seconds about, you know, where we would be meeting,

13   things like that.  And then we -- and then we negotiated on a

14   price and, you know, how often I would be coming back to see

15   him and --

16   Q.   Okay.  Did you exchange business cards?

17   A.   No, we did not.

18   Q.   Did you draw up a formal contract of your agreement?

19   A.   No, we did not.

20   Q.   Was it just this brief conversation in a car?

21   A.   Yep.  That's all it took.

22   Q.   And from there, did you follow that agreement, moving

23   forward?

24   A.   Yes, we did.

25   Q.   Did the price ever drop with Mr. Baker?

317

Rosa - D

1  A.  At times.  Not all the time.  It was usually about the

2  same.

3  Q.  Do you remember if it was early November or late?

4  A.  I would say it would be more towards late November.

5  Q.  Okay.  In late November, do you know where Mr. Baker

6  obtained his heroin from?

7  A.  No, not specifically.

8  Q.  Was there ever a time that Mr. Baker had a problem getting

9  heroin?  Was he ever out?

10  A.  There have been --

11          MR. ANDERSEN:  Your Honor, I object to this.  I think

12  it's calling for either speculation or hearsay.

13          THE COURT:  Well, don't know if it is because I don't

14  know whether the witness is speculating or testifying from

15  personal knowledge.  But I'll take this as an objection to the

16  form of the question for lack of foundation.

17          If you want to pursue it, establish the witness's

18  personal knowledge.

19          MS. BOLSTAD:  Thank you, your Honor.

20  BY MS. BOLSTAD:

21  Q.  Mr. Rosa, was there ever a time that you tried to purchase

22  heroin from Mr. Baker when he was out?

23  A.  Yes.

24  Q.  Tell us about that.

25  A.  I called him one day, and he didn't have heroin.  And he

1    told me that he wasn't -- or that the person he usually got it

2    from was going on vacation, or they were going to be gone for a

3    week.  So then I had to -- well, he was going to get it from

4    somebody else.  Again, I don't know who that was.  But I do

5    know that he went through somebody else for at least a week.

6    Q.  Okay.  Did you continue getting heroin from Mr. Baker into

7    2014?

8    A.  Yes, I did.

9    Q.  And what quantities were you obtaining from him in early

10   2014?

11   A.  It was going up to 6 to 8 ounces every, about, three days.

12   Q.  How much did you purchase an ounce from Mr. -- from

13   Mr. Baker?  How much did it cost?

14   A.  About a thousand dollars.

15   Q.  And if you were getting 6 to 8 ounces at a time, were you

16   paying him 8,000 dollars?

17   A.  If I was buying 8, I would usually get it for 7500 dollars.

18   Q.  So a little price break?

19   A.  So a little bit, yes.

20   Q.  Did he continue to source you up through March 2014?

21   A.  Yes, he did.

22   Q.  In that time frame, did you have any other sources of

23   heroin besides Mr. Baker?

24   A.  No, I didn't.

25   Q.  Earlier, you testified that Mr. Spencer went to jail in

319

Rosa - D

1   November 2013.

2   A.  Correct.

3   Q.  Did you continue living at that apartment?

4   A.  Yes, I did.

5   Q.  For how long?

6   A.  Until February of 2014.

7   Q.  Where did you live at in February 2014?

8   A.  February 2014, I moved -- moved in with Tim Goshorn and

9   Morgan Godvin.

10  Q.  Where did they live?

11  A.  On 187th.

12  Q.  And when you lived with Ms. Godvin and Mr. Goshorn, who was

13  your source for heroin?

14  A.  Shane Baker.

15  Q.  How many customers did you have in the -- in the time

16  period of 2014, when you lived with Ms. Godvin?

17  A.  Probably 15, 20 people.

18  Q.  Was that an increase in the number of customers, or was

19  that steady from the fall 2013 through 2014?

20  A.  It was a slight increase.

21  Q.  Was there something about the heroin you were selling that

22  customers liked?

23  A.  I don't know if it was necessarily the quality of the

24  heroin, but it was probably more that I was always on time and

25  would always meet them at any time.  Consistency.

Rosa - D

1   Q.   Is that -- does that stand out in the drug world?

2   A.   That's very important in the drug world, when you're

3   talking about a drug that can be physically withdrawing.  So

4   when people aren't feeling well, they want to feel well as soon

5   as possible.

6   Q.   Let's talk about Ms. Godvin.

7   A.   Um-hmm.

8   Q.   Did you know her before you moved in with her and

9   Mr. Goshorn?

10  A.   I met her, I believe, two or three times before that.

11  Q.   How did you know her?

12  A.   I met her originally at Jesse Spencer's, when I first moved

13  in.  She was in jail and left her car in the parking lot.  So

14  when she came to pick up the car, I answered the door when she

15  knocked on it.  And that's how we first met.

16  Q.   And what did your -- what was your relationship after you

17  met?

18  A.   There really -- I mean, immediately after, there was really

19  no relationship until about October, November of 2013.

20  Q.   Okay.  And then what was the status?

21  A.   And then she started buying heroin from me.

22  Q.   Was she one of your 15 to 20 customers?

23  A.   Yes.

24  Q.   How much heroin would she buy from you?

25  A.   On average?

Rosa – D

1    Q.   On a weekly basis.

2    A.   On a weekly basis?

3    Q.   Or daily.  Whatever --

4    A.   Daily, would be about 3 grams.

5    Q.   And how much would she pay you for those 3 grams?

6    A.   180 dollars.

7    Q.   And when you lived together, how did that payment take

8    place?

9    A.   When would she pay me?

10   Q.   Yes.

11   A.   She would pay me when she got a check for her mother's life

12   insurance.

13   Q.   And so prior to the time she had her mother's life

14   insurance, how would she pay you?

15   A.   She had a running tab.  She would just -- it would be IOUs.

16   Q.   And did you trust that she would pay that?

17   A.   Yes.

18   Q.   If you didn't trust that she would pay you back, would you

19   have allowed her to use that heroin?

20   A.   No.

21   Q.   Did you -- have you heard of the term "fronting"?

22   A.   Yes.

23   Q.   To front someone?

24   A.   Of course.

25   Q.   What does that mean?

Rosa – D

1    A.   Fronting somebody would be lending –– well, pretty much

2    lending it to them until they could pay you.

3    Q.   Does fronting require a bit of trust?

4    A.   Definitely.

5    Q.   Do you trust that the person you're fronting to is going to

6    earn money from selling those drugs?

7    A.   From selling those drugs or to get money from another

8    means, yes.

9    Q.   And so is there an agreement, when you front someone drugs,

10   that that person is also selling the drugs?

11   A.   Yes.

12   Q.   Do you remember late March 2014, when you were contacted by

13   the police?

14   A.   Yes.

15   Q.   Were you living in that apartment with Ms. Godvin and

16   Mr. Goshorn?

17   A.   Yes, I was.

18   Q.   I'm going to show you what's been marked and admitted as

19   Government's Exhibit 14.

20   A.   Um–hmm.

21   Q.   Do you recognize that picture?

22   A.   Yes, it's the living room of the apartment.

23   Q.   And who's sitting there?

24   A.   Morgan Godvin.

25   Q.   We talked about how much Ms. Godvin was purchasing from you

Rosa - D

1    in late March.

2    A.   Um-hmm.

3    Q.   I forgot to ask you, how much were you using in late March?

4    A.   In late March, I was using anywhere from 3 to 4 grams of

5    heroin a day, sometimes more.

6    Q.   When did you start using heroin?

7    A.   I started using heroin in late to early 2012, '13.  About

8    December, January.

9    Q.   Was that back when you were still in Ohio?

10   A.   Correct.

11   Q.   What was the heroin like in Ohio?

12   A.   What do you mean?  The difference?

13   Q.   Please.  Describe the difference.

14   A.   The difference between the heroin from Ohio and Oregon is

15   in Ohio it's usually a lighter color and it's usually powder.

16   And in Oregon, it's black and it's tar and it's sticky.  And

17   it's just two completely different substances.

18   Q.   And you've used both?

19   A.   Yes, I have.

20   Q.   Which one's better?

21   A.   I would say that the black tar out here is better than out

22   East.

23   Q.   What makes it better?

24   A.   I have no idea.

25   Q.   Okay.  Have you heard the heroin in Ohio described as China

1   white?

2   A.  Yes, I have.

3   Q.  Did you try selling China white to customers in Oregon?

4   A.  Yes, I have.

5   Q.  Were you successful?

6   A.  To a couple people.  Most people thought the black tar out

7   here was better.

8   Q.  So sticking in that late March time frame --

9   A.  Um-hmm.

10  Q.  -- of 2014, were you using any other substances at the

11  time?

12  A.  Yes, I was.  I was also smoking meth.

13  Q.  And did you sell methamphetamine?

14  A.  No.  I mean, I would buy it for personal use, but I would

15  also buy it for my roommate.

16  Q.  Which roommate?

17  A.  Tim Goshorn.

18  Q.  Between heroin and meth, which would you say was your

19  business?  What were you in the business of selling?

20  A.  Heroin, of course.

21  Q.  Let's talk about your sources for meth.

22          Where did you get it?

23  A.  I got meth pretty much wherever I could get it.  I didn't

24  really have one specific source for meth.

25          I usually got it from my heroin customers, through

Rosa - D

1    whoever they could get it from.

2    Q.  Is that something that could be traded?  Meth for heroin?

3    A.  Definitely.  I did it quite often.

4    Q.  Help me understand, and the jury maybe, why is it that you

5    would have multiple sources for meth but only one source for

6    heroin?

7    A.  I guess it all came down to selling and just using it.  I

8    mean, I never had one specific person -- well, I never did meth

9    before I moved out here, so I didn't really know much about it.

10   And then I started selling heroin before I really started doing

11   meth.  And I kind of just fell into my source for heroin, and

12   it was a good one and so I kept it.

13   Q.  What made -- and I assume are you speaking of Mr. Baker?

14   A.  Yes, I am.

15   Q.  What made Mr. Baker a good source for heroin?

16   A.  He pretty much always had it.  And if he didn't have it, he

17   would have it in a couple of hours.  And it was never terrible.

18   Q.  Tell us about the purity of it, when you would purchase

19   heroin from Mr. Baker.  Did it seem cut or diluted?

20   A.  At times.  I would never be told one way or the other.

21   Q.  He -- would he share that information with you?

22   A.  No.

23   Q.  It's sort of take it or leave it?

24   A.  Yeah, pretty much.

25              I tried to try all of the heroin that I got first

Rosa - D

1  before I started selling it, so that I knew.

2  Q.  What -- what would it be that you knew, once you used it?

3  A.  So that I knew how good it was.  So if it was really good,

4  I can tell somebody.  Warn people that it's good, and don't do

5  too much of it.

6  Q.  And when you say "good," is that the kind of heroin that's

7  so strong it produces a bigger effect?  Or what do you mean by

8  "good"?

9  A.  It's more potent.  It will get you higher.

10 Q.  And you mentioned warning customers.  What do you mean?

11 A.  Warning them that if they do too much, something terrible

12 can happen; just like in this case.

13 Q.  You testified that in March you were using 3 to 4 grams a

14 day.  Is that right?

15 A.  Yes.

16 Q.  How did you ingest your heroin?

17 A.  I used a needle.  I injected it.

18 Q.  As you sit before us today, are you still using heroin?

19 A.  No, I'm not.

20 Q.  Is there heroin available to you in the jail facilities

21 that you you've been in?

22 A.  There has been, in some of them.

23 Q.  Have you used that heroin, in general?

24 A.  No, I haven't.

25 Q.  How long have you -- let me rephrase.

Rosa – D

1          When's the last time you used heroin?

2   A.   July 4th, 2014.

3   Q.   Is there a particular reason you remember that date?

4   A.   That's the day I was arrested in Ohio.

5   Q.   Do you still feel addicted to heroin today?

6   A.   Not physically.  I think about it.

7   Q.   How often do you think about it?

8   A.   Now, every few weeks.  Nothing major.  Something I can push

9   off, now that I'm clear-headed.

10  Q.   Prior to your arrest in July of 2014, had you tried to get

11  off heroin before?

12  A.   I have, yes.

13  Q.   What is that -- how did that go for you?

14  A.   Not well.  I --

15  Q.   Why?

16  A.   I always seem to go back.  Heroin is a very strong drug,

17  especially when you have lots of friends who do it.

18  Q.   Is it harder when it's all around you?

19  A.   Definitely.

20  Q.   What's it like to go through heroin withdrawal?

21  A.   It's like having the flu, but a hundred times worse.

22  Q.   And did you go through that when you were arrested in July

23  2014?

24  A.   I certainly did.

25  Q.   Is there any medicine you can take to feel better?

Rosa - D

1    A.    Yes.   They have suboxones and subutex that take away the

2    withdrawals.

3    Q.    And do you recall that suboxone -- did you have any with

4    you when you were arrested in this case, in March of 2014?

5    A.    Yes, I did.

6    Q.    Why did you have suboxone?

7    A.    I always kept some on hand just in case I wasn't able to

8    get heroin, just so I would be able to function.   It's a

9    fail-safe.

10   Q.    I want to ask you a few questions about Mr. Goshorn.

11           Am I pronouncing that correctly, "goss horn"?

12   A.    "Goss horn," yes.

13   Q.    Did Mr. Goshorn help you distribute heroin?

14   A.    Yes, he ran for me.

15   Q.    What do you mean he ran for you?   Like a --

16   A.    He would deliver if I was busy or sleeping.

17   Q.    In exchange for what?

18   A.    In exchange for drugs.

19   Q.    Did you pay him any money?

20   A.    Not necessarily paid him money, but if you need something,

21   all you had to do with was ask.

22   Q.    And you say he would deliver for you.   How would he know

23   where to go?

24   A.    I would either tell him where he was going, or I would just

25   hand him over my phone, and he would get calls and go meet

Rosa - D

1    people himself.

2    Q.  And so you let Mr. Goshorn use your phone?

3    A.  Correct.

4    Q.  And did you give him instructions about that process?

5    About how to use your phone?

6    A.  In so many ways.

7    Q.  Tell the jury what your instructions were.

8    A.  That he was to be on time, and that he was to meet people

9    quickly and then get back and get me my phone back.

10   Q.  What about when people called your phone, expecting to

11   speak with you?  What was he to do with that?

12   A.  Either tell them to -- well, at the time, I had another

13   phone.  So he could either have them call that other number, or

14   they would just have to wait until he got back.

15   Q.  Okay.  When you lived with Mr. Goshorn and Ms. Godvin, did

16   you sell heroin out of the apartment?

17   A.  I personally did not.

18   Q.  Why not?

19   A.  Because I did not want the traffic coming in and out of the

20   apartment and make it suspicious to the neighbors or anyone

21   watching.

22   Q.  And so you said you personally did not.  Did they?

23   A.  Yes, they did.

24   Q.  How did you feel about them having so much foot traffic in

25   and out of your apartment?

330

Rosa - D

1   A.  I wasn't too happy with it, but it technically wasn't my

2   apartment either.  So I can only say so much.

3   Q.  Did that worry you about police interest in your place of

4   living?

5   A.  Of course.

6   Q.  And so if you didn't sell out of the apartment, where did

7   you try to sell drugs?

8   A.  Southeast Portland, wherever people wanted to meet.  I

9   would deliver to them.

10   Q.  Would you deliver to people's homes?

11   A.  Yes.

12   Q.  How about people -- like public places?

13   A.  Yep.

14   Q.  What hours of the day would your operation be up and

15   running?

16   A.  Any time I was awake.  If they called and I answered, I

17   would meet them.

18   Q.  And while you were using heroin and methamphetamine, did

19   you feel like you understood what was going on?

20   A.  Yes.

21   Q.  Were you ever in -- so impaired that you couldn't function?

22   A.  There have been times, yes.

23   Q.  Using the heroin that you did, would your -- would -- would

24   you have had impaired function without using heroin?

25   A.  Definitely.

331
Rosa – D

1   Q.  Let's talk about travel.

2           Did you travel outside of Oregon in March 2014?

3   A.  Yes, I did.

4   Q.  Where did you go?

5   A.  Back to Ohio.

6   Q.  Do you remember when in March?

7   A.  It was the middle of March.  Second to the third week, I

8   believe.

9   Q.  Do you remember when you returned to Oregon?

10  A.  I remember it was the Sunday before all of this happened.

11  Q.  If I showed you a calendar from March of 2014, would that

12  help you?

13  A.  It certainly would.

14  Q.  Okay.  I'm going to put one up just on your screen --

15          MS. BOLSTAD:  Or, actually, your Honor --

16          THE COURT:  That's fine.

17          MS. BOLSTAD:  -- if there's no objection --

18          THE COURT:  Well, a calender is a calender, of which

19  we can all take notice.  The calender itself is nothing but a

20  reference point.  It's not evidentiary and in dispute.

21          Go ahead.

22          THE WITNESS:  So I got back on March 23rd.  And I

23  left, I believe, on the 14th -- 13th or 14th.  I was gone for

24  ten days.

25  BY MS. BOLSTAD:

332

Rosa - D

1    Q.   Did you use heroin while you were in Ohio?

2    A.   Yes, I did.

3    Q.   Where did you get it?

4    A.   I brought it with me.

5    Q.   How did you do that?

6    A.   I walked right onto the airplane with it.

7    Q.   Okay.  What about your customers, while you were gone, here

8    in Oregon?

9    A.   While I was gone, I had Tim working for me.  I forwarded

10   all of my calls from my phone to his phone.

11   Q.   How did you do that?

12   A.   Just a feature on your phone.

13   Q.   And so you went through a process of selecting a feature to

14   forward all calls to Tim?

15   A.   Yes.

16   Q.   And in that time period you were gone, where did the heroin

17   come from that Tim was selling?

18   A.   It still came from Shane Baker.

19   Q.   Was Tim authorized to speak with and get heroin from Shane

20   Baker?

21   A.   Yes, he was.

22   Q.   Did Tim have any other places to get heroin from?

23   A.   No, he didn't.

24         MR. ANDERSEN:  Objection, your Honor.  It's

25   speculation.

333

Rosa – D

1      THE COURT:  The objection is sustained unless you can

2  lay a foundation.  Disregard the witness's answer.

3      Go ahead.

4  BY MS. BOLSTAD:

5  Q.  Mr. Rosa, have you worked with Mr. Goss -- Goshorn in

6  selling heroin?

7  A.  Yes, I did.

8  Q.  And in the time period you've described, have you ever seen

9  Mr. Goshorn obtain heroin from any other source?

10  A.  No, I haven't.

11  Q.  Did you did you take a leadership role when it came to

12  Mr. Goshorn?

13  A.  Of course.

14  Q.  Why do you say "of course"?

15  A.  Because it was my money that was being used for it, so I

16  had final say.

17  Q.  And would -- had -- did he ever go against your rules?

18  A.  Not that I know of.

19  Q.  Did you leave Mr. Goshorn with some heroin before you left

20  for Ohio?

21  A.  In March?

22  Q.  Yes.

23  A.  Yes, I did.

24  Q.  How much heroin did you leave with him?

25  A.  I believe at that time I left him with maybe 4 ounces.

Rosa - D

1  Q.  Did he speak with you about re-upping when he was out?

2  A.  Yes.  When he ran out, he was authorized to call Shane

3  Baker and get more.

4  Q.  Do you know if that took place?

5  A.  Yes, it did.

6  Q.  And what money was used to obtain the heroin?

7  A.  The money that he got from selling the heroin I left him.

8  Q.  When you got back, did you get any of that money?

9  A.  I got the money that was left with him, the amount for the

10  heroin that I left him.

11  Q.  That was a poor question on my part.

12          When you returned from Ohio to Oregon, did Tim give

13  you money from the sale of heroin?

14  A.  Yes.

15  Q.  Even though you were gone, and you didn't appear to be

16  doing the work, why did he have to give you the money?

17  A.  Because it was mine to begin with.

18  Q.  Okay.  Any glitches while you were gone, in the heroin

19  operation that you left?

20  A.  A few.  A few.

21  Q.  Tell us about that.

22  A.  Tim decided that it would be a good idea for him to use

23  excessive amounts of drugs while I was gone, and so any profit

24  that I was supposed to get, I did not get because he did it

25  all.

Rosa - D

1    Q.   Who's the better businessman, you or Tim?

2    A.   I am.

3    Q.   When you returned from Ohio to Oregon on March 23rd, did

4    you bring back heroin?

5    A.   Yes, I did.

6    Q.   What kind of heroin did you bring here from Ohio?

7    A.   China white.

8    Q.   Is that what you described earlier?

9    A.   Yes, it is.

10   Q.   How much did you bring back?

11   A.   A half ounce, so it was 14 grams.

12   Q.   Did you bring it back for personal use or for sale?

13   A.   I brought it back for sale.

14   Q.   And were you successful in selling the China white?

15   A.   Some of it, not all of it.

16   Q.   How much did you sell?

17   A.   I'd say 10 grams of it.

18   Q.   Did you have people clamoring for more?

19   A.   No.  Sure didn't.

20   Q.   Were people more interested in the black tar heroin?

21   A.   Yes, they were.

22   Q.   When you purchased heroin from Mr. Baker, what did it look

23   like?

24   A.   When I purchased it, it was a big black ball that looked

25   like a miniature bowling ball.  Dense, hard.

336

Rosa – D

1  Q.  So not in a powder form?

2  A.  Not usually.  Every once in a while it would be.  It would

3  be a light brown.

4  Q.  Once you got the heroin from Mr. Baker, did you go through

5  the process of diluting it, so that you would have more to

6  sell?

7  A.  No, I didn't.

8  Q.  Why not?

9  A.  Because I liked my heroin to be a better quality, as much

10  as possible.

11  Q.  Customers like it more pure?

12  A.  Definitely.

13  Q.  I'm going to switch gears.

14  A.  Yep.

15  Q.  Did you know Justin Delong?

16  A.  No, I didn't.

17  Q.  Had you ever met him?

18  A.  The only time that I have ever seen Justin Delong was when

19  I was walking out of the apartment.  I glanced to my right and

20  saw Morgan sitting with him on the couch.  But, at the time, I

21  did not know that was him.

22  Q.  Do you remember when that was?

23  A.  That was on Friday, the day before.

24  Q.  The day before the police came to your house?

25  A.  Correct.

337

Rosa - D

1   Q.   How did he seem, in your observation of him?

2   A.   Well, in the literally two seconds that I saw him, I mean,

3   he seemed fine.

4   Q.   Okay.  Were they using heroin at the time?

5   A.   I didn't stay around to see.

6   Q.   And other than that occasion on Friday and a brief glimpse,

7   had you ever seen him before?

8   A.   No, I haven't.

9   Q.   On that occasion, did Ms. Godvin talk to you about heroin

10  for Mr. Delong?

11  A.   No, she didn't.

12  Q.   Are you aware if she provided him with heroin?

13  A.   I'm aware now.

14  Q.   But that wasn't something that was discussed with you

15  before she did it?

16  A.   No.

17  Q.   Okay.  In that time frame with Ms. Godvin and you living

18  together, do you know if she purchased heroin from anyone other

19  than you?

20  A.   As far as I know, no, because she would rely on me fronting

21  her in between her checks.

22  Q.   I would like to show you what has been marked and admitted

23  as Government's Exhibit 18.  It should come up on the screen.

24  A.   Um-hmm.  Yes.

25  Q.   Do you recognize that?

Rosa – D

1   A.   Yes, I do.

2   Q.   What is it?

3   A.   It's a disposable bin for used needles.  Like a biohazard

4   bin.

5   Q.   Is that your apartment?

6   A.   Yes, it was.

7   Q.   And was that your bin?

8   A.   Yes, it was.

9   Q.   When you used the 3 to 4 grams a day, tell us about that.

10  Was it all at once or spread out?

11  A.   It was spread out.  I would usually do about a half gram

12  each time.

13  Q.   And to the left of the bin, in this same picture --

14  A.   Um-hmm.

15  Q.   -- what is this item?

16  A.   That's my safe.

17  Q.   Was that in your bedroom?

18  A.   It was in the closet of the bedroom.

19  Q.   And what's in your safe?

20  A.   In the safe was a gun, some heroin, and some marijuana.

21  Q.   Why did you have a gun?

22  A.   I had a gun because somebody traded it to me for heroin.

23  Q.   When the police came to your apartment, do you remember how

24  much cash you had?

25  A.   Yes, I do.

Rosa – D

1    Q.    How much?

2    A.    8,500 dollars.

3    Q.    Was that cash from drug sales?

4    A.    Yes, it was.

5    Q.    I'm going to show you a few physical exhibits here.

6    A.    Okay.

7    Q.    Let's start with Exhibit 23.  Do you recognize that?

8    A.    Looks like heroin.

9    Q.    24?

10   A.    This is a digital scale.

11   Q.    Was that in your apartment?

12   A.    Yes, it was.

13   Q.    25?

14   A.    This is a phone.

15   Q.    Do you recognize it?

16   A.    Yes, I do.

17   Q.    Was it your phone?

18   A.    It was.

19   Q.    26?

20   A.    More heroin.

21   Q.    And 27?

22   A.    And more heroin.

23   Q.    Tell us about the difference between 26 and 27.

24   A.    26 came from Oregon, and 27 came from Ohio.

25          MS. BOLSTAD:  And, your Honor, at this time, I would

1    ask for permission to let the jury --

2            THE COURT:  Well, first of all, Ms. Boyer will

3    distribute the exhibits.

4            Jurors, what I'm going to do is clarify a ruling I

5    made this morning about your having exhibits in the jury room.

6            The standard rule is every exhibit that's received in

7    evidence is in the jury room when they deliberate.  Heroin is a

8    controlled substance, and I was speaking too broadly this

9    morning when I referred to that.  It's not going to be in the

10   jury room with you unless you ask for it during your

11   deliberations because you want to look again in -- and to

12   refresh your memory and to consider it.  In which case, at that

13   point, the courtroom will be empty.  You'll be brought into the

14   courtroom, where an agent will have the exhibits for you to

15   look and you you'll be able to look at it without comment.

16           Right now, the point of passing these around for you

17   is just to get an idea of what these exhibits look like, so you

18   have them in mind when you deliberate.  If you do want to look

19   at them further, you'll have that capacity.

20           But I -- I spoke too soon this morning.  It's just

21   not reasonable for me to put all that in front of you so that

22   you have to keep track of exhibits that are controlled

23   substances.

24           The same point with the cash.  You'll see it, but it

25   won't be available to you (laughter) in the jury room unless

Rosa - D

1    you ask for it; in which case, again, we'll bring you out.  It

2    will be available for you to look at without comment.  All

3    right?

4               So Ms. Boyer is going to hand these exhibits to you

5    one at a time.  Just pass them from one to the next, if you

6    would, without any comment.  And then she'll collect them at

7    the -- at the other end.

8               (Pause, jurors handed exhibits.)

9               MS. BOLSTAD:  And, your Honor, would you like me to

10   proceed or wait?

11              THE COURT:  No, let's not distract the jurors.

12              (Pause.)

13              MS. BOLSTAD:  Thank you.

14              (Ms. Bolstad handed exhibits.)

15              THE COURT:  Continue, Ms. Bolstad.

16              MS. BOLSTAD:  Thank you.

17   BY MS. BOLSTAD:

18   Q.  Mr. Rosa, I want to talk to you about Exhibit No. 26.

19   A.  Okay.

20   Q.  Do you know approximately how much heroin Exhibit 26 is?

21   A.  It should be about 4 ounces, if it's -- was taken from my

22   safe.

23   Q.  And this is Exhibit 26, taken from your safe.  We've heard

24   testimony about that.

25   A.  Okay.

342

Rosa - D

1   Q.   Are you referring to the safe that was in your bedroom?

2   A.   Correct.  The closet of the bedroom, yes.

3   Q.   And was it seized by the police on March 29th?

4   A.   Yes, it was.

5   Q.   Where did you get this heroin?

6   A.   From Shane Baker.

7   Q.   When did you get it?

8   A.   Earlier that day.

9   Q.   Where did you meet him for this heroin?

10  A.   I met him at his apartment in Beaverton.

11  Q.   How long does it typically take when you go to get heroin

12  from Mr. Baker?  How long do you meet with him?

13  A.   Usually about 15, 20 minutes.

14  Q.   How often do you think you've met with him for 15 to 20

15  minutes?

16  A.   How often, since the very beginning?

17  Q.   Yes.

18  A.   Probably upwards of a hundred times.

19  Q.   And during those approximate 100 times, have you ever met

20  his source of supply?

21  A.   No, I haven't.

22  Q.   Have you ever heard Mr. Baker speaking with his source of

23  supply?

24  A.   Once.

25  Q.   Tell us about that.

343

Rosa - D

1  A.   I was at his house getting that 4 ounces.  Right there,

2  yes.

3  Q.   (Indicating.)

4  A.   And I wanted more that than that 4, but he did not have

5  enough.  So he made a call to set up getting more and told me

6  that it would be a little bit.  And I told him I would just

7  grab more of later.

8  Q.   Did you hear him have that conversation with his source?

9  A.   I heard him on the phone, yes.

10  Q.   Okay.  Did you hear the other end of the conversation?

11  A.   No, I didn't.

12  Q.   What language was Mr. Baker speaking?

13  A.   English.

14  Q.   And do you know who he called?

15  A.   No.

16  Q.   And on March 29th, do you remember how much you paid for

17  this 4 ounces?

18  A.   I believe I paid -- I can't say for sure, but I would have

19  to say it would be between 3700 and 4,000.

20  Q.   If you hadn't been arrested or if you hadn't had police

21  contact on the 29th, how long would it have taken you to sell 4

22  ounces of heroin?

23  A.   Two days, max.

24  Q.   And how did your profit scheme work?

25           So you purchased approximately 4 ounces, you said,

Rosa - D

1   for 3700 to 4,000.

2   A.   Yes.

3   Q.   What would you then sell this for?

4   A.   Total?

5   Q.   However you did it.

6   A.   Well, after getting rid of all of it, I would probably make

7   around 7,000 dollars.

8   Q.   Is that your net profit?

9   A.   That's total.  So I would profit about 3,000 dollars, give

10  or take a couple hundred.  I would almost double my money.

11  Q.   Okay.  Let's now focus on the day the police showed up.  Do

12  you remember that day?

13  A.   Yes, I do.

14  Q.   Were you present inside that apartment when the police

15  arrived?

16  A.   No, I wasn't.

17  Q.   Where were you?

18  A.   I was meeting people.  I was in my car, driving around,

19  making deliveries.

20  Q.   Did you come home?

21  A.   I sure did.

22  Q.   Were the police there when you arrived home?

23  A.   Yes, they were.

24  Q.   Did they ask you if they could search your vehicle?

25  A.   Not that I can remember.

345

Rosa - D

1  Q.  Okay.  Did they search your vehicle?

2  A.  Yes, they did.

3  Q.  Was anybody else in your car with you?

4  A.  No.

5  Q.  What did they find in your vehicle?

6  A.  They found my cash, the 8500 dollars.  And then they found

7  a little bit of heroin and some meth, I believe.

8  Q.  Did you have any digital scales with you?

9  A.  I'm sure I did.

10  Q.  Why would you travel around with digital scales?

11  A.  So that I can give people exactly what they wanted and I

12  wouldn't lose out on money by trying to eye weights out that

13  are down to the half grams.

14  Q.  Are is there a lot of money at stake in a half gram?

15  A.  Not singly, but it adds up.

16  Q.  I'm going to show you what is marked as Government's 29.

17  And I would like to turn to page --

18          THE COURT:  Is this in evidence, 29?

19          MS. BOLSTAD:  Yes, your Honor.

20          THE COURT:  All right.

21  BY MS. BOLSTAD:

22  Q.  I would like to turn to pages 4 -- we'll just look at pages

23  4 and 5.

24          Do you recognize this page?

25  A.  Yes, I do.

Rosa – D

1   Q.  How do you recognize it?

2   A.  It was in a notebook that I carried with me.

3   Q.  And did you have this in your car with you when you went

4   about to sell drugs?

5   A.  Yes, I did.

6   Q.  Tell the jury what -- what kind of record this is.

7   A.  Is this is a record of people that owed me money because I

8   fronted them drugs.

9   Q.  How do you know who the people are?

10  A.  At that time they were either initials or just -- I mean, I

11  dealt with them every day, so I would remember.  Now it's been

12  a little while.

13  Q.  Did you know these people's full names?

14  A.  Not all of them, no.

15  Q.  If you did know their full names, would you have written it

16  down?

17  A.  No.

18  Q.  Why not?

19  A.  Because they're illegal drug records.

20  Q.  Did you keep track of how much you paid for heroin?

21  A.  Sometimes.  But after a few days, I would rip it out and

22  throw it away.

23  Q.  Comparing records of how much you've paid versus how much

24  people owe --

25  A.  Um-hmm.

Rosa - D

1  Q.  -- is it more important to keep one kind of record versus

2  the other?

3  A.  Definitely.

4  Q.  Tell us why.

5  A.  Because keeping a record of what I have paid doesn't really

6  do any good.  It's already over with.  The deal is already over

7  with.  But keeping a record of all of the money that people owe

8  you is a good thing to have or, I mean, you'll forget it.  Ends

9  up being a bunch of different people.

10  Q.  And I -- I see initials and I see numbers.  Do the numbers

11  refer to money or quantities of heroin?

12  A.  Cash.  Money.

13  Q.  All right.  Would you ever write down quantities of heroin?

14  A.  No.

15  Q.  Why not?

16  A.  Because the money amount is all that matters.

17  Q.  Did you have a good feel for each of your customers and how

18  much heroin each of your customers would purchase?

19  A.  Yes.

20  Q.  Did you need to write that kind of thing down?

21  A.  How much they were purchasing from me?

22  Q.  Yeah.

23  A.  No.

24  Q.  So when the police were there and you arrived home, did you

25  have a chance to speak with any officers?

Rosa - D

1    A.   Right when it happened?

2    Q.   Yep.

3    A.   Right when it happened, I got pulled out of my car and I

4    got stuck in the back seat of a police S.U.V. while I believe

5    that others were being questioned.

6    Q.   How did you feel while you were sitting in that S.U.V.?

7    A.   Not too good.

8    Q.   Were you scared?

9    A.   Yes.   Panicking.

10   Q.   Were you afraid of getting charged with a crime?

11   A.   Of course.

12   Q.   Were you afraid of going to jail?

13   A.   Of course.

14   Q.   What were you most afraid of?

15   A.   Being without heroin.

16   Q.   Have you heard of **Len Bias** investigations?

17   A.   I definitely have now.

18   Q.   Had you heard about them before the police showed up that

19   day?

20   A.   I heard a few things.

21   Q.   Did you know there are very high penalties if you sell

22   heroin that causes someone's death?

23   A.   Yes, I did.

24   Q.   And so did the police let you know that's what was going on

25   in this case?

Rosa – D

1   A.   Yes, they did.

2   Q.   When you learned that, what were you most afraid of?

3   A.   Being without heroin.

4   Q.   Even after hearing about the high penalties?

5   A.   Yes.

6   Q.   When you sold heroin to people, Mr. Rosa, did you know you

7   were selling a product that endangered people's lives?

8   A.   Yes, I did.

9   Q.   Do you know people who have died from heroin overdoses?

10  A.   Yes, I do.

11  Q.   How many?

12  A.   15.

13  Q.   What kind of people?  Are these your friends or your

14  customers, or what?

15  A.   These are people that I went to high school with, for the

16  most part.

17  Q.   So knowing all of these risks, knowing 15 people who have

18  died, why did you keep selling it?

19  A.   Because I needed to keep using it.

20  Q.   Do you remember if the police advised you of your **Miranda**

21  rights?

22  A.   Yes, I did.

23  Q.   Did they tell you you don't need to speak with us?

24  A.   Yes, they did.

25  Q.   Did you choose to speak with the police?

Rosa - D

1    A.  I did.

2    Q.  Why?

3    A.  At first because I was scared of being without heroin and

4    scared of doing the amount of time that people were talking

5    about.

6    Q.  Did you think that if you talked to them and gave them what

7    they wanted, that you wouldn't have to go to jail?

8    A.  It ran through my mind.

9    Q.  Okay.  What about the idea of if you talk to them, you

10   might end up going to jail for a long time?

11   A.  That crossed my mind as well.

12   Q.  Okay.  How do you -- how did you make the decision to

13   speak, then?  What was your motivating factor?

14   A.  Not wanting to be stuck doing all of this time.  I knew

15   that if I cooperated, that hopefully I would be able to get a

16   lighter sentence.

17   Q.  What did you tell the police on March 29th?

18   A.  I told the police where I got my heroin.

19   Q.  Did you admit to selling to Ms. Godvin?

20   A.  Yes, I did.

21   Q.  And you -- you already testified to it, but what did you

22   tell them about where you got your heroin?

23   A.  What did I tell them?

24   Q.  Yep.

25   A.  I told them where I got it.

Rosa – D

1    Q.  Did you give a name?

2    A.  I did.

3    Q.  What was the name?

4    A.  Shane Baker.

5    Q.  And did you tell the police what you've told us here today?

6    A.  Yes.

7    Q.  Okay.  About how long you purchased from Mr. Baker?

8    A.  Yes, I did.

9    Q.  Did you tell the police how much you purchased from

10   Mr. Baker?

11   A.  Yes, I did.

12   Q.  And after you told the police this information, did they

13   ask for you to assist them in trying to catch Mr. Baker?

14   A.  Yes, they did.

15   Q.  Tell us how that worked.

16   A.  After a couple hours, they asked me to call Shane Baker

17   and -- to set up a buy.

18   Q.  And what do you mean, "to set up a buy"?

19   A.  To ask him to meet up, to get heroin from him.

20   Q.  Were you nervous about setting somebody else up?

21   A.  Yes, I was.

22   Q.  Why?

23   A.  Because it's not something I ever thought I would do.

24   Q.  Have you heard of snitching?

25   A.  Yes, I have.

352

Rosa – D

1    Q.  Are there consequences on the street for people who snitch?

2    A.  Of course there are.

3    Q.  Like what?

4    A.  It could be anything from getting beat up to stabbed, to

5    anything.

6    Q.  Okay.  You had quite the decision process to make here when

7    the police were talking to you.

8    A.  Yes, I did.

9    Q.  Is it fair to say there's negative -- there's negative

10   sides to providing information.  Is there also negative sides

11   to not providing information?

12   A.  Of course there is.

13   Q.  How did you come to the decision?

14   A.  I just did what I thought was best.

15   Q.  Did you feel bad that somebody had died using heroin that

16   came from your apartment?

17   A.  Of course I did.

18   Q.  Did that play into your decision?

19   A.  Yes, it did.

20   Q.  Okay.  So did the police ask you to make a phone call to

21   Mr. Baker?

22   A.  Yes, they did.

23   Q.  And was -- was that phone call and that process, was that

24   the same day they came to your apartment, the police?

25   A.  It was the next night -- early in the morning.

Rosa – D

1  Q.  Okay.  Early in the morning, into the 30th?

2  A.  Into the 30th, yes.

3          They came Saturday night.  This was Sunday at one

4  o'clock in the morning.

5  Q.  And so what happened?

6  A.  We went down to Beaverton, where Shane Baker was staying.

7  And I wore a wire, and went and bought an ounce of heroin from

8  Shane Baker.

9  Q.  Did the police give you instructions before that buy

10  occurred?

11  A.  In which way?

12  Q.  Like did they tell you about safety procedures and what

13  they expected of you?

14  A.  Yes.

15  Q.  So tell us about the safety.

16  A.  Yes.  They told me that if anything was going wrong or if

17  he threatened me, or anything like that, to let them know and

18  they'll come in and get me.

19  Q.  And what was expected of you?

20  A.  I was expected to go in there, buy the heroin from him, not

21  use heroin while I was in there.  And, obviously, not run away.

22  And then bring them the heroin back.

23  Q.  Did you lead police to Mr. Baker's residence?

24  A.  Yes, I did.

25  Q.  Where was that?

354

Rosa - D

1   A.  It was off of 107th in Beaverton.

2   Q.  Now, earlier, you testified that this 4 ounces came from

3   Mr. Baker earlier on Saturday.  Is that right?

4   A.  Yes, it did.

5   Q.  And so the police were asking you to buy more heroin?

6   A.  Yes, they were.

7   Q.  Pretty much the same 24-hour period?

8   A.  Yes.

9   Q.  Was that unusual for your relationship with Mr. Baker?

10  A.  Sometimes.

11  Q.  So were you comfortable asking him for more heroin within

12  12 hours of having just purchased 4 ounces?

13  A.  Yes.

14  Q.  Why?

15  A.  Because I could have just had a good day and sold it all.

16  Q.  That wouldn't have been crazy, out of the blue?

17  A.  No, not at all.

18  Q.  I would like to show you Government's Exhibit 125, page 2.

19         Do you see the portion boxed in red?

20  A.  Yes, I do.

21  Q.  Do you recognize these messages?

22  A.  Yes, I do.

23  Q.  Who are they between?

24  A.  They're between Shane Baker and I.

25  Q.  What time did you have these messages with him?

1  A.  In the morning, Sunday morning.

2  Q.  On the 30th?

3  A.  On the 30th, yeah.  About 1:30 in the morning.

4  Q.  Okay.  Did he send you this text after you had ordered up

5  the additional 1 ounce?

6  A.  Yes, he did.

7  Q.  And what does he mean when he says -- or, I'm sorry.

8       What do you think this text message exchange is

9  about?

10  A.  Well, obviously, he was a little weary at first when I

11  called.  But I just told him everything was fine and I got rid

12  of everything quick, and he was okay with it.

13  Q.  Had you ever spoken with Mr. Baker about red flags?

14  A.  No.

15  Q.  Okay.  Do you know what he was talking about?

16  A.  Yes, I do.

17  Q.  What -- what is does this mean?

18  A.  Like to throw up caution, that something's out of the norm.

19  Q.  Could that something be the police are working with you?

20  A.  It could have been, yes.  Definitely.

21  Q.  Did you have customers yourself that sometimes did things

22  out of the ordinary that made you nervous?

23  A.  Every once in a while.

24  Q.  I see on the left column, is this your phone number:

25  971-804-1412?

Rosa – D

1    A.   Yes, it is.

2    Q.   And are you the person saved in his phone as "new Mike"?

3    A.   Yes.

4    Q.   Do you know why you were saved as "new Mike"?

5    A.   Because it was a new phone number.

6    Q.   How often -- how many different phone numbers did you have?

7    A.   In what time period?

8    Q.   The time period that you worked with Mr. Baker?

9    A.   The entire time that I worked with him?  I probably went

10   through six phones.

11   Q.   Why?

12   A.   Just so it would be harder for police to track you.

13   Q.   Did Mr. Baker go through a few phones?

14   A.   Yes.  He went through at least two.

15   Q.   And after this text message exchange on Sunday morning, did

16   you confirm the deal for 1 ounce?

17   A.   Yes, I did.

18   Q.   And did -- were you successful in going and getting that 1

19   ounce?

20   A.   Yes, I was.

21   Q.   Did you deliver or return the heroin to the detectives?

22   A.   Yes, I did.

23   Q.   And what happened afterwards?

24   A.   After that, they drove me back to my apartment -- well,

25   right down the street from my apartment.  And they told me to

357

Rosa – D

1    stay in contact and that we would talk the next day -- well,

2    later in the day, since it was already Sunday.  And we were

3    going to try to set up another buy for Monday.

4    Q.  Did they give you instructions about Mr. Baker?

5    A.  Yes.  They told me not to contact him again.

6    Q.  And did you understand that they were now busy

7    investigating Mr. Baker?

8    A.  Yes, I did.

9    Q.  Did you understand why they did not want you to contact

10   him?

11   A.  I can understand why, yes.

12   Q.  Did you break that rule?

13   A.  Yes, I did.

14   Q.  Tell us about that.

15   A.  After I got dropped off from getting the ounce for the

16   police, I was still withdrawing from heroin.  And after finding

17   a prepaid Visa card in my apartment that had 400 dollars on it,

18   I decided to go take that money out and go back and buy more

19   heroin from Shane Baker for myself.

20   Q.  Did you think that the police might catch you?

21   A.  It went through my head, yes.

22   Q.  Didn't you have anyone else that you could have gotten

23   heroin from?

24   A.  No, not at that time.

25   Q.  So I probably missed it, but how much heroin did you get

358

Rosa - D

1    from him after the police had told you not to do that?

2    A.  I bought another ounce of heroin off of him, after the

3    fact.

4    Q.  And were you going to use that ounce to sell or for

5    yourself?

6    A.  At the time, I was making sure that I had it for myself

7    until I was able to get more.

8    Q.  Did the police get back in touch with you on a day after

9    this?

10   A.  Yes, they did.

11   Q.  And why did they get in touch with you?

12   A.  To set up another buy for Monday.

13   Q.  And was that something you knew was coming?

14   A.  Yes, I did.

15   Q.  And when the police met with you, did you let them know you

16   had broken the rule?

17   A.  No, I didn't.

18   Q.  Did you hide that from them?

19   A.  Yes, I did.

20   Q.  And when they met with you, did you place another call to

21   Mr. Baker?

22   A.  Yes, we did.

23   Q.  And did you share any text messages with him?

24   A.  A couple.  We were trying to -- or I was trying to meet up

25   with him again, to get more heroin.

359

Rosa - D

1  Q.  How much?

2  A.  I believe it was -- I don't remember.

3  Q.  That's okay.

4  A.  I don't remember if it was 1 or 4.

5  Q.  And for that buy, was it at the police direction?

6  A.  Yes.

7  Q.  Okay.  So they were telling you to do this?

8  A.  Yes.

9  Q.  And did you reach an agreement with Mr. Baker for that

10  amount of heroin?  Whatever it was?

11  A.  No.  He ended up not answering the phone after a little

12  while.

13  Q.  Okay.  And so where were you when the police were working

14  with you?  Were you in jail or out of jail?

15  A.  I was out of jail.

16  Q.  Did you stay out of jail?

17  A.  Yes, I did.

18  Q.  Did you continue using heroin?

19  A.  Yes, I did.

20  Q.  Did you stay in Oregon?

21  A.  Until July -- or June, technically.

22  Q.  Where did you go in June?

23  A.  I went back to Ohio.

24  Q.  Were you worried about this case coming back to haunt you?

25  A.  Yes, I was.

Rosa – D

1    Q.   Were you trying to get away from this case or --

2    A.   In a sense, yes, I was.

3    Q.   Did you have any other reason to go to Ohio?

4    A.   Yes.  I wanted to go see my family before all of this

5    happened.

6    Q.   Did you sort of feel like it was coming?

7    A.   Yes, definitely.

8    Q.   And what about heroin?  Did you keep using, once you went

9    to Ohio?

10   A.   Yes.  Up until the day I was arrested.

11   Q.   And remind me, when was that?

12   A.   July 4th, 2014.

13   Q.   You have been off for a while, off of heroin?

14   A.   Yes, I have.

15   Q.   How do you feel today?

16   A.   I feel great.

17   Q.   Clear head?

18   A.   Definitely.

19   Q.   Body?

20   A.   Yep.  Healthy.

21   Q.   Are you going to use heroin again?

22   A.   I really don't want to.  I really hope not.

23   Q.   What's your plan?

24   A.   My plan, when I get out, is to finish my welding and get my

25   certificate.  Start welding again.  And go with a friend of

Rosa - D

1   mine who has a -- he's a motivational speaker.  Goes to high

2   schools.  And go talk to kids, to make sure they don't do what

3   I just did.

4   Q.  Finally, I just want to cover the plea agreement that

5   you've made in this case.

6   A.  Yes.

7   Q.  So were you charged with crimes, federally, for what you

8   did with Ms. Godvin and Shane Baker?

9   A.  Yes, I was.

10  Q.  Were you charged with a conspiracy to distribute heroin,

11  resulting in death?

12  A.  Yes, I was.

13  Q.  Do you know any of the other defendants listed in that

14  Indictment?

15  A.  Other than Shane Baker and Morgan Godvin?

16  Q.  Yeah.  Do you know any of the others?

17  A.  No, I don't.

18  Q.  Do you know Fabian Sandoval-Ramos?

19  A.  No, I don't.

20  Q.  Never met him?

21  A.  No, I haven't.

22  Q.  What about Raul Arcila?

23  A.  No, I haven't.

24  Q.  What is the status of your charges?

25  A.  As in?

Rosa – D

1    Q.  Are you pending trial?  Pending sentencing?

2    A.  I'm pending sentencing right now.

3    Q.  Have you pled out?

4    A.  Yes, I have.

5    Q.  Did you reach an agreement with the Government?

6    A.  Yes.

7    Q.  What is your understanding of the agreement you have with

8    me?

9    A.  There's a joint recommendation of 87 months to be ran

10   concurrent with my Ohio case.

11   Q.  How much time are you looking at in your Ohio case?

12   A.  Four years.  I was already sentenced.

13   Q.  Is that four years for possession of heroin?

14   A.  Yes.

15   Q.  That -- and so your deal here in this federal case is for a

16   joint recommendation of 87 months?

17   A.  Yes.

18   Q.  Do you know how many years that is?

19   A.  Yes.

20   Q.  How many?

21   A.  It's seven years, three months.

22   Q.  When you worked with the police to make those calls to

23   Mr. Baker, had you been charged with a crime yet?

24   A.  No.

25   Q.  Does your agreement with the Government require you to do

363

Rosa – X

1   certain things?

2   A.  Yes, it does.

3   Q.  Tell us, what are you required to do under the agreement?

4   A.  I am required to testify, if needed.

5   Q.  Are you required to tell the truth?

6   A.  Yes, I am.

7   Q.  Have you -- so you're still waiting to be sentenced?

8   A.  Correct.

9   Q.  And you have an agreement with me for 87 months?

10  A.  Correct.

11  Q.  Who makes the ultimate decision about what your sentence

12  will be?

13  A.  Judge Brown.

14  Q.  And that is sort of to be determined.  Is that right?

15  A.  Correct.

16          MS. BOLSTAD:  Nothing further on direct, your Honor.

17          THE COURT:  Cross.

18          MR. ANDERSEN:  Thank you.

19                      CROSS-EXAMINATION

20  BY MR. ANDERSEN:

21  Q.  Let's start where we just ended, at this cooperation

22  agreement.  Okay?

23          Mr. Rosa, who determines whether or not your

24  testimony is the truth?

25  A.  The judge, I would assume.

364

Rosa - X

1    Q.   Have you looked at this cooperation agreement that you
2    signed?
3    A.   Yes, I've seen it.
4    Q.   And is it true, on that cooperation, that it is -- I guess
5    I can read this to you, and we can put it up there, if you
6    would like.
7            But the parties agree that the determination of
8    whether these cooperation terms have been breached rests
9    exclusively with the USAO, the U.S. attorneys.  Is that your
10   understanding?
11   A.   Okay.  Yes.
12   Q.   So basically it's the Government that decides whether or
13   not your testimony today is consistent with at least what
14   you've told them in the past?
15   A.   Yeah.
16   Q.   And do you know what the consequences would be if the
17   Government determined that you were not testifying truthfully
18   or that you were omitting something or --
19   A.   They could take the deal away from me.
20   Q.   And then what would you be looking at?
21   A.   And then I could be looking at a mandatory minimum of 20
22   years.
23   Q.   And you were also caught with a firearm as well.  Right?
24            Do you think that would add any time, do you know of?
25   A.   Yeah.  It's a two-level increase.

365

Rosa - X

1    Q.  So do you know if the charge itself could add additional

2    time?

3    A.  I believe it can add up to five years additionally.

4    Q.  Okay.  So you could be looking at 25 years, potentially?

5    A.  Correct.

6    Q.  Now, you said you got heroin after the -- after the police

7    came and after you did the controlled buy with Mr. Baker, you

8    subsequently got more heroin?

9    A.  Correct.

10   Q.  And is it -- it is -- it's true, is it not, that you began

11   to sell heroin pretty quickly thereafter?  It was not just for

12   your personal use.  Right?  It was to sell, as well?

13   A.  Correct.

14   Q.  And you continued to sell for at least a few months, until

15   you left --

16   A.  That's correct.

17   Q.  So -- okay.  And you got supplied by at least one other

18   person.  Right?

19   A.  After the fact.

20   Q.  You got supplied by a man named Joe?  Right?

21   A.  Yes.

22   Q.  You also bought from a Mexican male?  Is what you described

23   him as?

24   A.  Yes.

25   Q.  Did you buy from a guy named Oscar, ever?

366

Rosa – X

1    A.   No, not personally.

2    Q.   Do you know of Oscar?  He's another source, though?

3    A.   I bought through somebody.  I didn't know him personally.

4    Q.   Okay.  Okay.  So now, as you testified also in terms of

5    the -- the deal that you reached with the Government, assuming

6    that that deal is in fact what happens, you will end up, it

7    sounds like, spending an additional three years to the four

8    years you've already got in Ohio.  Is that accurate?

9    A.   Correct.

10   Q.   So take out the Ohio, you would be looking at -- you're

11   just looking at three years and two months?

12   A.   Three years and three months.  Correct.

13        MR. ANDERSEN:  Okay.  Your Honor, at this time I

14   would like to -- if we could review these with Mr. Rosa.  I

15   don't know that we need to, but I would like to admit what I've

16   marked as Defense Exhibit 204 and 205.  Those are the plea

17   agreement and the cooperation agreement letter.

18        THE COURT:  Any objection?

19        MS. BOLSTAD:  No objection.

20        THE COURT:  Counsel?

21        MR. SEPP:  Nothing.

22        THE COURT:  204 and 205 may be received.

23        You may display them or they can just be part of the

24   record for the jury to review later, and you can argue from

25   them at closing.

Rosa - X

1      MR. ANDERSEN:  Thank you.  I would like to display

2 them now.  But that's all the questions I have.

3      THE COURT:  Thank you.

4      Mr. Sepp.

5                    CROSS-EXAMINATION

6 BY MR. SEPP:

7 Q.  Mr. Rosa --

8      THE COURT:  Over here.

9      THE WITNESS:  Yeah.

10 BY MR. SEPP:

11 Q.  You had testified that when you bought heroin --

12      THE COURT:  Your microphone, please.

13 BY MR. SEPP:

14 Q.  You had testified when you purchased heroin from Mr. Baker,

15 it comes in a sticky blob, like a bowling ball.

16 A.  Correct.

17 Q.  Okay.  And that you don't cut it when you send it to your

18 next level down?

19 A.  No, I don't.

20 Q.  And did you -- did you ever purchase methamphetamine from

21 Mr. Baker?

22 A.  One time.

23 Q.  And as part of your plea deal, did the United States

24 Government also agree to dismiss some counts?

25 A.  Yes.  I'm pleading out to the conspiracy to deliver heroin

1   charge.

2   Q.  And all remaining counts are to be dismissed?

3   A.  Correct.

4           THE COURT:  To clarify, you mean without the

5   resulting in death --

6           THE WITNESS:  Without the resulting in death, yes.

7   BY MR. SEPP:

8   Q.  So that the part of the deal was that they would strike

9   that language from the --

10  A.  Correct.

11  Q.  -- from your --

12  A.  Yes.

13          MR. SEPP:  I have nothing further.  Thank you.

14          THE COURT:  Redirect, Ms. Bolstad.

15          MS. BOLSTAD:  Just briefly.

16          If we could pull up the plea agreement for Mr. Rosa.

17          Is that Defense 2 -- 204?

18                      REDIRECT EXAMINATION

19  BY MS. BOLSTAD:

20  Q.  Mr. Rosa, in the plea agreement where "resulting in death"

21  is struck -- so let me just ask you this.  Is your

22  understanding that you no longer face a 20-year minimum?

23  A.  Correct.

24  Q.  Okay.  When you entered this plea agreement, did you agree

25  about your relevant conduct?

369

Rosa – ReD

1          And I'll ask you to look at paragraph 6, please.

2          No, I'm sorry.  Make that paragraph 7.

3     A.   Okay.

4     Q.   Did you formally agree in your plea agreement that the

5     heroin you sold resulted in the death of Justin Delong?

6     A.   Yes, I did.

7     Q.   Okay.  So you agree that that took place.

8          Is the benefit that you're receiving is that you're

9     just not going to face the 20-year minimum anymore?

10    A.   Correct.  I still start at a Level 38.

11    Q.   Is that a high level to start at?

12    A.   You can't get a higher level on a drug charge.

13    Q.   So your plea agreement required you to plead to the highest

14    level of the drug table?

15    A.   Yes, it did.

16    Q.   Okay.  Mr. Andersen asked you a couple of questions about

17    other sources.

18         Joe, a Mexican male, and Oscar.  Do you remember

19    those questions?

20    A.   Yes, I do.

21    Q.   When did you receive heroin from those other sources?

22    A.   After the raid and after my buy from Shane Baker and he got

23    arrested.

24    Q.   Why did you have to use other sources?

25    A.   Because Shane Baker was in jail.

370

Colloquy

1          MS. BOLSTAD:  Nothing further.

2          THE COURT:  All right.  Ladies and gentlemen, we'll

3    take the afternoon recess.

4          Ms. Boyer, perhaps some fresh air on the 16th floor,

5    if any of the jurors would like a little bit of fresh air on

6    the break, we'll make that available to you.

7          We do want to resume in about 15 minutes, when you're

8    ready.

9          Notes on the chair.

10         Please don't talk about the case.  You're -- you'll

11   be ready for the last session for today when you get back.

12         Thank you, ladies and gentlemen, for your attention.

13         Please rise for the jury.

14         (Jurors exit.)

15         THE COURT:  All right.  Mr. Rosa may step down.

16         THE WITNESS:  Thank you.

17         THE COURT:  And let's all be seated.

18         All right, Ms. Bolstad, what's next?

19         MS. BOLSTAD:  The Government had intended to call

20   Mr. Baker next.

21         I know his attorney, Mr. Wilner-Nugent, is here and

22   might have time constraint issues.

23         THE COURT:  All right.

24         MR. WILNER-NUGENT:  No.  I mean, I -- it's fine.

25         THE COURT:  All right.  So he'll be next.

Colloquy                                     371

1          MS. BOLSTAD:  Yes, your Honor.

2          THE COURT:  About how long?

3          MS. BOLSTAD:  I neglected to look at the clock when I

4    started Mr. Rosa.  Do we know what time that was?  Because it

5    will be about that long.

6          THE COURT:  Hold on a minute, everybody.  Don't talk.

7          (Pause, the Court and court reporter conferring.)

8          THE COURT:  1:52.  It's 3:15.  So -- all right.  Do

9    you think you'll get to another witness, maybe?

10         MS. BOLSTAD:  I have witnesses ready if we need to.

11         THE COURT:  Okay.  I just want to be sure defense

12   counsel are ready for them and know what exhibits and things

13   you'll be taking care of.  So please talk about that over the

14   recess.

15         All right.  Anything for the record before we do

16   recess for our purposes?  It will be ten minutes only.  Just

17   long enough for you to use the facilities.

18         Ms. Bolstad, anything?

19         MS. BOLSTAD:  Nothing, your Honor.

20         THE COURT:  Mr. Andersen?

21         MR. ANDERSEN:  No, your Honor.

22         MR. SEPP:  No, your Honor.

23         THE COURT:  Ten minutes, folks.

24         Mr. Wilner-Nugent, just like your colleague did,

25   you're welcome to come ahead of the bar there.  Take a seat to

372
Colloquy

1    be close.

2            If you think you need to raise anything with your

3    client or about what's going on with your client's questioning,

4    please just stand and get my attention.  And I will address it.

5            MR. WILNER-NUGENT:  I will do so.  Thank you.

6            (Recess taken, 3:13 p.m.)

7            THE COURT:  Thank you, everyone.  Sir, please be

8    seated.

9            Are there any matters we need to address before the

10   jury returns?

11           MS. BOLSTAD:  No, your Honor.

12           THE COURT:  All right.  Well, Mr. Baker.

13           Good afternoon.

14           THE WITNESS:  How are you?

15           THE COURT:  We're all going to be standing when the

16   jury comes in.

17           I'll have people sit.  You please stay standing

18   because you need to take an oath, and then you'll be seated.

19   All right?

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  All right.  So we'll just wait for the

22   clerk to tell us the jurors are ready.

23           And Mr. Wilner-Nugent is here, Mr. Baker.

24           He's free to speak up if an issue arises from his

25   perspective.

373

Baker – D

1              THE WITNESS:  (Nods head.)

2              THE COURT:  Please rise for the jury.

3              (Jurors enter.)

4              THE COURT:  Thank you, everyone.  Please be seated.

5              Jurors, the next witness is Shane Baker.  He's before

6    you now.

7              Sir, would you face them and the deputy there.

8              Raise your right hand to be sworn.

9              (Witness sworn.)

10             THE WITNESS:  I do.

11             THE CLERK:  Please take a seat.

12             THE COURT:  Bring yourself around, close to the

13   microphone, please.

14             Tell us your full name, and spell all of it.

15             THE WITNESS:  Shane Glen Baker.  S-H-A-N-E, G-L-E-N,

16   B-A-K-E-R.

17             THE COURT:  Keep your voice up so all of the jurors

18   can hear you.

19             Counsel.

20                        DIRECT EXAMINATION

21   BY MS. BOLSTAD:

22   Q.  Good afternoon, Mr. Baker.

23             Could you please tell the jury how old you are.

24   A.  45.

25   Q.  Where are you from?

Baker - D

1  A.  Originally from Alabama.

2  Q.  You married, single?

3  A.  Single.

4  Q.  I see that you're wearing some interesting attire.

5  A.  Yes.

6  Q.  Where do you currently reside?

7  A.  Inverness.

8  Q.  How long have you been in custody?

9  A.  20 months now.

10  Q.  Do you remember when you were arrested?

11  A.  March 31st, 2014.

12  Q.  And was that here in Oregon?

13  A.  Yes, ma'am.

14  Q.  Do you have any prior felony convictions?

15  A.  Yes, I do.

16  Q.  Okay.  Do you have a forged check felony from 2005?

17  A.  Correct.

18  Q.  Do you have a 2006 burglary?

19  A.  Yes.

20  Q.  Two of those?

21  A.  Um-hmm.

22  Q.  And then in 2015, do you have a felony delivery of

23  controlled substances out of Clackamas County?

24  A.  I do.

25  Q.  Do you have two convictions for that from the same case?

Baker - D

1    A.    Yes.

2    Q.    And a felon in possession of a firearm?

3    A.    Yes.

4    Q.    How long have you lived in Oregon?

5    A.    About five years.

6    Q.    Did you use heroin before you moved to Oregon?

7    A.    No, I did not.

8    Q.    When did you start using it in Oregon?

9    A.    About three years ago.

10   Q.    Tell us about when you started.

11         Where did you get it, how much were you using?

12   A.    I was using about -- started about -- starting about a 20 a

13   day, and then it increased from there.

14   Q.    And when you say a 20, do you mean an amount --

15   A.    20 dollars worth.

16   Q.    Okay.  Is that less than a gram?

17   A.    Yes.

18   Q.    And when you were arrested in March 2014, were you using

19   heroin?

20   A.    Yes.

21   Q.    How much heroin were you using a day in March?

22   A.    About -- about an eight-ball.

23   Q.    Is that about 3 grams?

24   A.    Yes.

25   Q.    Did you ever try to stop using heroin before you were

376

Baker - D

1   arrested?

2   A.   Once.

3   Q.   How did that go?

4   A.   Not too good.

5   Q.   What's it like to try to get off of heroin?

6   A.   You are very, very sick.

7   Q.   What kind of sickness?

8   A.   Throwing up, diarrhea, hallucinations, stuff like that.

9   Q.   How long does that last?

10  A.   About two weeks, maybe three, depending.

11  Q.   How do you get better when you're going through heroin

12  withdrawal?

13  A.   Use more heroin or some other type of alternative drug.

14  Q.   When you were using heroin, up to 3 grams a day, did your

15  use of heroin impact your ability to function?

16  A.   Yeah, to an extent, yes.

17  Q.   Did it keep you from being able to understand what was

18  going on?

19  A.   No.

20  Q.   Okay.  So you were always able to sort of function in

21  day-to-day living?

22  A.   Yes.

23  Q.   What about going off heroin?  Would that impact your

24  ability to function?

25  A.   Yes.

377

Baker - D

1   Q.  Negatively?

2   A.  Yes.

3   Q.  Have you ever had any close calls with overdosing on

4  heroin?

5   A.  No, I have not.

6   Q.  What about others?  Do you know anyone in your life who has

7  died from a heroin overdose?

8   A.  No.

9   Q.  Do you know that people do die from heroin over --

10  A.  Yes.

11  Q.  How do you feel today?

12  A.  I feel fine.

13  Q.  Okay.  Are you currently using heroin?

14  A.  No.

15  Q.  When's the last time you used heroin?

16  A.  20 months ago.

17  Q.  Are you nervous about testifying today?

18  A.  Somewhat, yes.

19  Q.  Okay.  Well, let's start with March 2014.

20        Could you give the jury an idea of -- how many heroin

21  customers did you have?

22  A.  About four or five.

23  Q.  Who were they?

24  A.  Michael Rosa and a couple of other people.  I don't even

25  know their last names, actually.  Two girls and a guy.

Baker - D

1   Q.   Two girls and a guy.

2   A.   Yeah.

3   Q.   How much heroin were these customers buying from you?

4   A.   About 4 ounces apiece.

5   Q.   Was each customer at about the same level?

6   A.   Yes.

7   Q.   And how often would each customer get 4 ounces from you?

8   A.   Once to twice a week.

9   Q.   How much did you -- how -- how much did you sell that 4

10  ounces to your customers for?  What did they have to pay you?

11  A.   Thousand dollars apiece.

12  Q.   So 4,000 dollars each time?

13  A.   Yes.

14  Q.   Let's talk about Michael Rosa.  When you were arrested in

15  March of 2014, had he been a customer of yours for a while?

16  A.   Yes.

17  Q.   Approximately how long had he been one of your customers?

18  A.   Six, eight months.  Something like that, maybe.

19  Q.   Have you ever met Justin Delong?

20  A.   No.

21  Q.   So he wasn't one of your customers?

22  A.   No.

23  Q.   What about Morgan Godvin?  Did she ever buy heroin from

24  you?

25  A.   Not -- not at this time, she didn't.  She did earlier.  But

1    after a while, no, she didn't.

2    Q.  Okay.  So when was the last time Morgan Godvin purchased

3    heroin from you, if you remember?

4    A.  Probably about a year prior, maybe.

5    Q.  Did you stop selling heroin to her for a reason?

6    A.  Yes.

7    Q.  What was that reason?

8    A.  Because she was just out of control, and she was reckless.

9    Q.  Do you mean reckless like having drug deals with you, or

10   what do you mean by "reckless"?

11   A.  Just because -- due to the fact that she just -- the way

12   she used the drug itself.

13   Q.  She used too much?

14   A.  Yes.

15   Q.  Did that worry you?

16   A.  Yes.

17   Q.  Why?

18   A.  Because I didn't -- I didn't want her to die, so I just cut

19   her off.

20   Q.  Was Mr. Rosa reckless?

21   A.  No.

22   Q.  Okay.  So I think we get an idea of your customers.

23          Tell the jury how it would work about where would you

24   meet your customers and what kind of agreements did you have

25   with these customers?

380

Baker - D

1    A.  I would meet them at various places.  Just wherever it was

2    convenient at the time.  So --

3    Q.  Did you and Mr. Rosa have a particular place you would

4    meet?

5    A.  No.

6    Q.  When he contacted you to purchase heroin, would you tell

7    him where to go?

8    A.  Yeah.

9    Q.  Did you ever deliver to his door?

10   A.  Occasionally, yes.

11   Q.  And did you ever sell heroin to these customers out of your

12   home?

13   A.  Occasionally, yes.

14   Q.  Tell us about your living circumstances in -- in the early

15   2014 time period.  So January through March.

16   A.  I was living in Beaverton, at the Canyon Apartments,

17   Southwest Canyon Apartments.

18          THE COURT:  I need you to speak louder, please.

19          THE WITNESS:  At the Canyon Apartments.

20   BY MS. BOLSTAD:

21   Q.  Is that where the police came and contacted you in late

22   March?

23   A.  Yes, it was.

24   Q.  And when they did, how long had you been living in those

25   apartments?

381

Baker - D

1   A.   Since January.

2   Q.   Given that you had four customers, and it didn't sound like

3   they came to you that often, was your heroin distribution

4   time-consuming?

5   A.   No, not really.

6   Q.   How much time would you spend dealing heroin on a weekly

7   basis?

8   A.   Maybe six hours a week.

9   Q.   Total?

10  A.   Yes.

11  Q.   Is it possible to have your heroin business and perform a

12  job?

13  A.   Yes, it's possible.

14  Q.   And have you, in fact, worked while selling heroin?

15  A.   Yes.

16  Q.   What kind of work did you do?

17  A.   Sandblasting, paint.

18  Q.   Sandblasting?

19  A.   Yeah, and painting.

20  Q.   When's the last time you held a job prior to March of 2014?

21  A.   I was part-time before that, here and there.  But before

22  that, it was 2010.

23  Q.   When you were selling each ounce of heroin for 1,000

24  dollars to your customers, how much were you buying that heroin

25  for in order to sell it to your customers?

Baker - D

1    A.   About 750 an ounce.

2    Q.   So you would buy at 750, sell at 1,000?

3    A.   Yes.

4    Q.   250 dollar profit per ounce?

5    A.   Yes.

6    Q.   4 ounces per customer?

7    A.   Yes.

8    Q.   One to two times a week?

9    A.   Yes.

10   Q.   Is that about -- oh, that's -- before you would sell your

11   ounces to your customers, did you sell your product as you

12   received it or did you do something to it first?

13   A.   Oh, I would cut it.

14   Q.   What do you mean you would cut it?

15   A.   I would add a substance to it, to make more of it.

16   Q.   Walk us through that, because these people don't really

17   know what it looks like to manufacture heroin.  So walk us

18   through it.

19   A.   I would purchase a type of substance from a GNC center, and

20   then I would add it to the heroin, to bring it to -- the

21   potency down.

22   Q.   So, Mr. Baker, were you buying -- what quantity of heroin

23   were you buying from your source of supply in March 2014?

24   A.   About 6 to 8 ounces at a time.

25   Q.   For purposes of an example, let's call it 8 ounces.  Okay?

383

Baker - D

1    A.  Okay.

2    Q.  So you get those 8 ounces from your source.  How much cut

3    or diluting agent would you add to the 8 ounces?

4    A.  Whenever -- after I had cut it, it would end up being

5    around 12 to 13 ounces.

6    Q.  How much were you -- how much did it cost you to buy 8

7    ounces from your source?

8    A.  750 an ounce.  It was around 6,000.

9    Q.  6,000 dollars?

10   A.  Yeah.

11   Q.  And then you would turn that 8 ounces into about 13 ounces?

12   A.  Yes.

13   Q.  Were your customers satisfied with those ounces they

14   obtained from you?

15   A.  Yes.

16   Q.  Sounds like you would obtain your 8 ounces for 6,000, and

17   then sell them downstream for about 13,000.  Is that correct?

18   A.  Correct.

19   Q.  You mentioned this product from a GNC store.  Is that like

20   a supplement or diet store?

21   A.  Yes.

22   Q.  Okay.  And do you remember the nature of the product that

23   you would add to the heroin?

24   A.  Isotol.

25   Q.  Isotol.  What does Isotol look like?

Baker - D

1  A.  It's just a white powder substance.

2  Q.  And what does the heroin look like that you got from your

3  source?

4  A.  It's brown.

5  Q.  Would it be a brown powder or a sticky brown?

6  A.  Powder, yes.

7  Q.  Powder.  How does it work, then, when you're adding a white

8  substance to a brown powder?

9  A.  You would add them both together and break -- and heat them

10  up into a liquid form and then bring them back to a solid.

11  Q.  And when you would bring it back to a solid, what color was

12  it?

13  A.  Black.

14  Q.  Just based on the math, it sounds like this was a

15  profitable scheme.  Is that right?

16  A.  Could be, yes.

17  Q.  When the police came and searched your apartment, do you

18  know how much money they found?

19  A.  I think around 4,000.

20  Q.  What did you do with your profits from selling drugs?

21  A.  Just lived off of it.  Bought a few cars.  Just lived,

22  really.

23  Q.  Did you have any habits?

24  A.  Oh, yeah.  Video poker, drugs.

25  Q.  Did you spend a lot of money on video poker?

385

Baker - D

1  A.  A little bit.

2  Q.  Let's talk about the day the police came.

3          Was your girlfriend living with you at the time?

4  A.  Yes.

5  Q.  How much were you paying in rent at that apartment?

6  A.  500 and -- I think it was 540 a week.

7  Q.  I'm going to show you Government's Exhibit 39, and it

8  should come up on the screen in front of you there.  Do you see

9  it?

10  A.  Yes.

11  Q.  Do you recognize this picture?

12  A.  Yes.

13  Q.  What is it?

14  A.  It is my living room.

15  Q.  And when the police came to your apartment, did they have a

16  search warrant?

17  A.  Yes, they did.

18  Q.  Let's go through a few photographs, okay?  And for

19  efficiency's sake, I'm going to put one up on the screen and

20  ask you to tell the jury what it is.

21          So let's look at Exhibit 40.

22  A.  This is the money that the police had seized.

23  Q.  Is this from a drawer in your house?

24  A.  Yes, it is.

25  Q.  Which room?

Baker - D

1    A.   My bedroom.

2    Q.   Government 41.

3    A.   That's --

4    Q.   Here's 41, sorry.

5    A.   Yeah, that's -- some more stuff they had seized out of my

6    living room.

7    Q.   And do you see this -- this box here?

8    A.   Yes.

9    Q.   Was that your box?

10   A.   Yes.

11   Q.   What did you use this box for?

12   A.   Just to keep my stuff in.

13   Q.   Is this heroin that you would use?

14   A.   Yes.

15   Q.   And I see to the left there, what is that object?

16   A.   That?

17   Q.   Do you see a glass object?

18   A.   Yeah.

19   Q.   What is that?

20   A.   That's a marijuana pipe.

21   Q.   How would you use heroin?

22   A.   I would smoke it on foil.

23           THE COURT REPORTER:  Smoke it on?

24           THE WITNESS:  Aluminum foil.

25           THE COURT:  On foil.

Baker - D

1   BY MS. BOLSTAD:

2   Q.  Did you ever inject heroin?

3   A.  No.

4   Q.  Why not?

5   A.  I just didn't mess with needles at all.

6   Q.  Let's look at Government's 42.

7           Is this from your house?

8   A.  Yes, it is.

9   Q.  Is it plastic bags?

10  A.  Yes.

11  Q.  Would you use those bags to sell drugs?

12  A.  Occasionally, yes.

13  Q.  And then Government's 43.  What do we see in this picture?

14  A.  Paraphernalia.

15  Q.  Okay.  Are there syringes?

16  A.  Yes.

17  Q.  What is this blue item in the box?

18  A.  That's a -- a band that people use to tie off whenever they

19  use needles.

20  Q.  Did somebody that you were living with use drugs

21  intravenously?

22  A.  Yes.

23  Q.  Is that your girlfriend?

24  A.  Yes.

25  Q.  Mr. Baker, did you also have digital scales in your

388

Baker – D

1    apartment?

2    A.   Yes.

3    Q.   Why did you have digital scales?

4    A.   To weigh up the heroin.

5    Q.   Would you weigh the heroin that you purchased?

6    A.   Yeah.

7    Q.   And would you weigh the heroin that you sold?

8    A.   Yes.

9    Q.   Why?

10   A.   Because it sells by weight.

11   Q.   Is it important to get the quantity correct for your

12   customers?

13   A.   Yes.

14   Q.   All right.  So when the police showed up, March 31st, did

15   they tell you why they were there?

16   A.   Yes.

17   Q.   What did they tell you?

18   A.   They told me they was there to serve a search warrant.

19   Q.   And did they give you an idea of the seriousness of the

20   situation?

21   A.   Yes, they did.

22   Q.   Did they tell you somebody had died using heroin?

23   A.   Yes, they did.

24   Q.   And that the police believed that heroin came from you?

25   A.   Yes, they did.

389

Baker - D

1    Q.  How did you feel when you heard that?

2    A.  I wasn't too pleased with that.

3    Q.  Were you scared?

4    A.  Yes.

5    Q.  Do you have prior experience with such a thing?

6    A.  To an extent, yes.

7    Q.  And by such a thing, I mean do you have prior experience

8    with the police talking to you about somebody who's died from

9    heroin?

10   A.  Yes.

11   Q.  So on March 31st, did the police ask for your help?

12   A.  Yes.

13   Q.  What were they asking you to do?

14   A.  To do a controlled buy.

15   Q.  And were they trying to go up the chain above you?

16   A.  Yes.

17   Q.  And find your source of supply?

18   A.  Yes.

19   Q.  And did you agree to help them?

20   A.  Yes.

21   Q.  Did they advise you of your **Miranda** rights?

22   A.  Yes.

23   Q.  And did they tell you you don't have to say anything?

24   A.  Yes.

25   Q.  Did you choose to speak with them?

Baker – D

1   A.   Yes.

2   Q.   Why did you choose to help?

3   A.   Due to the fact of -- I mean, I didn't -- to help myself,

4   eventually.

5   Q.   Were you looking out for your own skin?

6   A.   Yes.

7   Q.   Okay.  And were you using 3 grams of heroin a day at this

8   time?

9   A.   Yes.

10  Q.   Were you worried about going to jail and not having heroin?

11  A.   To an extent, yes.

12  Q.   Let's talk about your source of supply.

13          Who provided you with heroin?

14  A.   Some people I knew over in Clackamas area.

15  Q.   And I'm specifically talking about March 2014.

16          Did you have a name for the person in the Clackamas

17  area?

18  A.   Mexican Bobby.

19  Q.   Okay.  Had you met Mexican Bobby?

20  A.   No.

21  Q.   Did you talk to this person on the phone?

22  A.   Yes.

23  Q.   When you talked to the person on the phone for the first

24  time, did he introduce himself to you as Mexican Bobby?

25  A.   No.  He did not.

Baker - D

1  Q.  Explain to the jury why you called him Mexican Bobby.

2  A.  It's just a name I put into my phone at the time.  It was

3  nothing particular, you know, about the name.  I just chose the

4  name.  I put it in my phone as Mexican Bobby.

5  Q.  It's something you came up with?

6  A.  Yes.

7  Q.  Could it have been anything?  Mexican Peter?

8  A.  Anything, yeah.

9  Q.  Do you remember speaking with the police before, when they

10  came to your apartment, about Mexican Bobby?

11  A.  What do you mean?

12  Q.  When they were first asking you who supplied you with

13  heroin, did you tell them about Mexican Bobby?

14  A.  Yes.

15  Q.  And did you tell them that you had met him?

16  A.  Yeah.  Yeah.

17  Q.  And so today you're saying you had not met him?

18  A.  Well, at that time, no, I didn't.  Yeah.

19  Q.  So explain to me what -- what do you mean?

20  A.  Well, when I first -- when I first met the people, the

21  Mexican guys, I didn't know who Mexican Bobby, per se, was at

22  the time.

23  Q.  Okay.

24  A.  So all they did was give me a phone number.  So I called

25  the phone number, someone would answer, and then they would

Baker – D

1    give me a place to meet.

2           So basically it was the way I deal with my customers,

3    but they knew who I was at the time.

4    Q.  Okay.  So how did you end up coming into this source of

5    supply?

6    A.  Through a friend of mine.

7    Q.  Who was your --

8    A.  An associate.  His name is Shorty.

9    Q.  And when did you start getting sourced by Mexican Bobby?

10   A.  A couple of times after meeting with -- with the guys --

11   the Mexican guys, after that.  About -- about three or four

12   different times.  And then, after that, I started meeting them

13   on my own.

14   Q.  Okay.  And so March is when the police came.

15   A.  Um-hmm.

16   Q.  How far back had -- had you been getting sourced by Mexican

17   Bobby?

18   A.  About February.

19   Q.  Now, let's talk about -- Shorty, is it?

20   A.  Um-hmm.

21   Q.  Why did you need a source of supply in February 2014?  Had

22   something happened to your old source of supply?

23   A.  Yes, it did.

24   Q.  What happened?

25   A.  They got arrested.

393

Baker - D

1   Q.  What's the name of your old source of supply?

2   A.  I wasn't sure.  I just -- he went by Menito, is all I know.

3   Q.  And did he, the source of supply, tell you that his name

4   was Benito?

5   A.  Yeah, yeah.

6   Q.  And am I saying it right?

7   A.  Menito.

8   Q.  With an M?

9   A.  Yes.

10  Q.  Okay.  Menito.  And so did Menito get arrested in January?

11  A.  Yes.

12  Q.  Do you know why he got arrested?

13  A.  Behind the -- supposedly the case in Clackamas.

14  Q.  Okay.  So this jury doesn't really know anything about

15  that.  So I'm going to walk you through you it in a summary

16  form, okay?

17  A.  Um-hmm.

18  Q.  So what happened in January, involving Menito?  Did you

19  talk to the police?

20  A.  Yes, Clackamas.

21  Q.  Why did the police come speak with you about Menito?

22  A.  About a death in Clackamas.

23  Q.  Do you know who died?

24  A.  No, I do not.

25  Q.  Did the police, in January, did they alert you that they

Baker - D

1  thought your heroin had resulted in this death?

2  A.   Yes.

3  Q.   Okay.  So sort of what happened in late March?

4  A.   Correct.

5  Q.   When the police talked to you in January, did you cooperate

6  with them?

7  A.   Yes.

8  Q.   Did you tell the police that you were sourced by Menito?

9  A.   Yes.

10 Q.   And did your information and your assistance help them

11 catch Menito?

12 A.   Yes.

13 Q.   Is that a dangerous thing for you to do?  Did it feel

14 dangerous?

15 A.   Yes.

16 Q.   Why?

17 A.   There's repercussions behind it.

18 Q.   Okay.  Is there repercussions for basically telling the

19 police about somebody committing a crime?

20 A.   Correct.

21 Q.   And do you mean repercussions for you in a courtroom or --

22 A.   No.

23 Q.   -- out on the street?

24 A.   Out on the street.

25 Q.   Okay.  What kind of repercussions do you know of?

395

Baker - D

1    A.  Can end up in death.

2    Q.  So after you told the police about Menito, did he go to

3    jail?

4    A.  Yes.

5    Q.  Do you know how long he went to jail?

6    A.  No, I do not.

7    Q.  Was he in long enough that you needed a new source of

8    supply?

9    A.  Yes.

10   Q.  So why did you reach out to Shorty?

11   A.  Because he had a supplier.

12   Q.  Do you know Shorty's real name?

13   A.  No.

14   Q.  How do you know Shorty?

15   A.  Just from some friends of mine.

16   Q.  So you reach out to Shorty.  You knew he had a source.

17   A.  Yes.

18   Q.  How did that work?

19            Did he bring you right to his source and lead you to

20   it?

21   A.  No, no.  He was -- he was the go-between for a couple --

22   couple trips.

23   Q.  Did you need Shorty?  Did you need his help?

24   A.  Not after a while, no.

25   Q.  Okay.  What does it mean to be a go-between?

396

Baker - D

1  A.  It means that you give him the money, and he grabs it for

2  you or he gets it, or however.

3  Q.  Did Shorty -- did he get some benefit out of serving as the

4  go-between between you and Menito?

5  A.  Yeah, he -- he --

6  Q.  I'm sorry.  Between you and Mexican Bobby?

7  A.  Yes.

8  Q.  What was his benefit?

9  A.  He would make a little money off of it.

10  Q.  Like how much?

11  A.  Probably four or 500 bucks.

12  Q.  And did that introduction happen in February?

13  A.  Yeah.

14  Q.  Do you remember where that took place?

15  A.  Over -- 7-Eleven.

16  Q.  Do you know which 7-Eleven?

17  A.  I'm not sure of the road it's on.

18  Q.  Is it in Clackamas?

19  A.  Yes, it is.

20  Q.  And is that the 7-Eleven where you would end up meeting

21  this source of supply for heroin?

22  A.  Yes.

23  Q.  Was the 7-Eleven where you met Mexican Bobby, was that near

24  a park?

25  A.  Yes.

397

Baker - D

1   Q.   Okay.  Who was present when you had this meeting?

2        So you.  Who else was there?

3   A.   Me, Shorty, and a couple of Mexicans.

4   Q.   How did Shorty introduce these individuals?

5   A.   He just introduced them as friends of his.  He never gave a

6   name.

7   Q.   And how did they introduce themselves to you?

8   A.   Basically the same way.  You know, what I mean.  No names.

9   Just, Hey, how you doing?

10       And I asked if -- after a while, I asked if we could

11  do business.  He said, Yeah.  He'll have to call me back on

12  that.  He'd have to ask somebody else.  And so he called me

13  back.

14  Q.   Did Shorty vouch for you?

15  A.   Yes.

16  Q.   And did you ever see those two individuals ever again?

17  A.   Yes.

18  Q.   Okay.  Who -- when -- where did you see them again?

19  A.   Another business transaction.

20  Q.   Okay.  Did one of the two men introduce himself or --

21  sorry.  Let me move back.

22       Was one of those two men that you met the person that

23  you thought to be Mexican Bobby?

24  A.   Yes.

25  Q.   Do you remember which one?  What did he look like?

Baker - D

1    A.   Kind of a stocky frame.  What distinctly stuck out was his

2    ear lobes.  But at the time when I met him, it was in a dark

3    vehicle.  And it was just kind of like a glance back and I

4    glanced forward.  You know what I mean?  It was no standing out

5    in public.  You know, shaking hands, or anything like that.

6    Q.   So when you met the two individuals, did it take place

7    inside a car?

8    A.   Yes.

9    Q.   Whose car?

10   A.   Their car.

11   Q.   Do you remember what kind of car it was?

12   A.   If I'm not mistaken, it was a Rodeo or a Pathfinder.  One

13   of those.

14   Q.   Do you remember what color it was?

15   A.   A teal color, I believe.

16   Q.   Of those two men, did the one that you started to associate

17   with Mexican Bobby, did one seem to be in charge, or were they

18   equals?

19   A.   Pretty much -- it -- it didn't have no distinct way of if

20   it was equal or one was in charge or one wasn't.  It was

21   just -- they probably dropped it off, and that was it, you

22   know.  There was no -- no ranking system there, by no means.

23   Q.   How did you communicate when you met these two individuals?

24   What language?

25   A.   English.

399

Baker - D

1    Q.   Okay.  Did the two individuals speak English?

2    A.   No.  One did, one didn't.

3    Q.   Did the individual who you came to associate with Mexican

4    Bobby, did that guy speak English?

5    A.   Yes.

6    Q.   And when you spoke with them about doing business, did you

7    draw up a formal contract on a piece of paper?

8    A.   No.

9    Q.   Would that have been strange to do?

10   A.   Yes.

11   Q.   Did you come to an agreement about what you're willing to

12   pay and what they would be willing to source you?

13   A.   Yes.

14   Q.   But it was the kind of thing that needed approval from

15   somebody else?

16   A.   Yes.

17   Q.   Okay.  Did that approval happen?

18   A.   Yes.

19   Q.   How do you know?

20   A.   Because I was supplied with the product that I needed.

21   Q.   Okay.  How soon after this meeting?

22   A.   That day or the next day, more or less.

23   Q.   And did you tell the police about this when they came to

24   talk to you in late March 2014?

25   A.   Yes, to an extent, yes.

Baker - D

1   Q.  Do you remember the phone number that was given to you at

2   that meeting?

3   A.  I do not.

4   Q.  Okay.  And then following your meeting, did Shorty stay

5   involved?

6   A.  No.

7   Q.  Did he have any involvement with your future transactions

8   with this group?

9   A.  No.

10  Q.  Okay.  Did he have to be a go-between ever again?

11  A.  No.

12  Q.  After your meeting with the two individuals, what was your

13  relationship with Shorty after that time?

14  A.  We were still -- we still talked, we were still

15  acquaintances.

16  Q.  And did you deal heroin together or --

17  A.  No.

18  Q.  Are you just acquaintances?

19  A.  That's it.

20  Q.  Does he ever buy heroin -- I'm sorry.  Back in March and

21  February, did Shorty buy heroin from you?

22  A.  No.

23  Q.  Did you buy from Shorty?

24  A.  Yes.

25  Q.  Tell us about that.

401

Baker - D

1   A.   That's when some people that -- the guys went out of town,

2   and he had enough to supply me for -- for my needs, and that's

3   why I bought some from him again.

4   Q.   Okay.  Now, given that Shorty was introducing you to his

5   source, do you know where Shorty got the heroin before he sold

6   it to you?

7           MR. ANDERSEN:  Objection, that's speculation.

8           THE COURT:  No, the question asks whether he knows.

9           Don't guess.  If you know from personal knowledge,

10  you may answer; otherwise, say no.

11          THE WITNESS:  No, I don't really know exactly where

12  he got it from.  No, I do not.

13  BY MS. BOLSTAD:

14  Q.   So following the meeting, let's -- let's move to your first

15  deal with them.

16  A.   Okay.

17  Q.   How did it work?  Did you call the phone number they had

18  given you?

19  A.   Yes.

20  Q.   Okay.  And during the call, what do you say?

21  A.   Tell them what I want and what I -- what I -- where I could

22  meet them at.  Meet them at the 7-Eleven, meet them there.  On

23  my way there I would call them, meet them at the 7-Eleven, and

24  done deal.

25  Q.   And over those phone calls, would you ever say, I want 8

402

Baker - D

1   ounces of heroin?

2   A.  Yes.

3   Q.  Would you use that exact wording, is my question.

4   A.  Yeah, to an extent, yeah.

5   Q.  Okay.  So you would freely talk about heroin with them?

6   A.  Not just freely, but I just -- hey, just -- tell them hey,

7   so --

8   Q.  Okay.  And so that's my question that I'm trying to get at.

9   It was a bad question.

10           Would you ask for it just 8?

11  A.  Yeah.

12  Q.  And they would know what you were talking about?

13  A.  Yes.

14  Q.  Were you always buying 8 from this group?

15  A.  Pretty much, yes.

16  Q.  And do you mean 8 ounces?

17  A.  Yes.

18  Q.  How much for the 8 ounces?

19  A.  6,000.

20  Q.  6,000 dollars?

21           How often were you buying 8 ounces?

22  A.  Once, maybe twice a week.

23  Q.  Was this source, this Mexican Bobby source reliable?

24  A.  Yes.

25  Q.  If you called to order up 8, did they always have it?

Baker - D

1  A.  Yes.

2  Q.  Was there ever a time that they didn't have what you

3  needed?

4  A.  No.

5  Q.  What's the most heroin that you purchased from the Mexican

6  Bobby group at one time?

7  A.  Mmmm, maybe 10, sometimes 12.

8  Q.  And do you mean 10 ounces or --

9  A.  Yes.  Yes.

10  Q.  Or 12 ounces?

11  A.  Yes.

12  Q.  In those deals that took place after your meeting --

13  A.  Um-hmm.

14  Q.  So you remember the two guys that we're talking about?

15  A.  Yes.

16  Q.  Did they show up to your deliveries every time?

17  A.  No, not always.

18  Q.  Okay.  Tell us about who would show up at the deliveries.

19  A.  I don't know the guys' names, but I know they -- basically

20  the same -- same two for quite a few meetings.  And then one of

21  the guys, he would show up quite a bit, so -- and another guy

22  would show up because he spoke English.

23  Q.  And when you started working with the police in late March,

24  did you make a controlled buy from this group?

25  A.  Yes.

Baker - D

1   Q.   And did that English-speaking guy, did he show up?

2   A.   Yes.

3   Q.   Would -- did you recognize him when the police showed you

4   his picture?

5   A.   Yes.

6   Q.   Would you recognize him in court, if I asked?

7   A.   Yes.

8   Q.   Okay.  Look around.  Do you see the English speaker that

9   would show up?

10  A.   Yeah, right here.

11  Q.   And when you say right there, do you mean in the blue

12  button-up shirt without the handkerchief pocket square?

13  A.   Yes.

14  Q.   The one without that (pointing)?

15  A.   Yes.

16          MS. BOLSTAD:  And let the record reflect the

17  defendant -- the witness has identified Raul Arcila.

18          THE COURT:  Just to ensure that it's coming from the

19  witness and not from you leading, would you point to the

20  person, please.

21          (Witness pointing.)

22          THE COURT:  All right.  And he's sitting next to the

23  blond-haired man?

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  All right.  The record may reflect the

Baker - D

405

1    identification of Mr. Arcila.

2              Go ahead.

3    BY MS. BOLSTAD:

4    Q.  And how often would Mr. Arcila be at those deliveries?

5    A.  He came six, seven times.

6    Q.  And was he the person that you had identified as Mexican

7    Bobby?

8    A.  No.

9    Q.  Okay.  So he wasn't the one at that initial meeting with

10   the short and stocky --

11   A.  No.

12   Q.  That's not him?

13   A.  No.

14   Q.  Okay.  Did you ever see the short, stocky guy again after

15   that meeting?

16   A.  Maybe once or twice more.

17   Q.  Okay.  Do you know his name?

18   A.  No, I do not.

19   Q.  When the police were asking you questions, did you describe

20   that short, stocky man to them?

21   A.  I believe so, yes.

22   Q.  And did you give an estimate as to that man's age?

23   A.  Yes.

24   Q.  What did you say?

25   A.  In his 30s, maybe.  Late -- late 30s, early 40s, maybe.

406

Baker - D

1   Q.   What about hair?

2   A.   Short.

3   Q.   Short hair?

4   A.   Yes.  Round face.

5   Q.   Height?

6   A.   Wasn't sure of the height at the time because I always see

7   him in the vehicle.

8   Q.   You never met him standing up?

9   A.   No.

10  Q.   And did you provide the police with the information about

11  the vehicles that you remember?

12  A.   Yes.

13  Q.   Okay.  What did you tell the police about those vehicles?

14  A.   Just -- it was him.  Those vehicles -- described the

15  vehicles as -- every time, when I made a purchase, they was in

16  one of the two vehicles.

17  Q.   Okay.  And so what were the two?  Because we've heard about

18  one.

19  A.   It was -- I believe it was a Honda, a small Honda.

20  Q.   Do you remember what color?

21  A.   I want to say it was a greenish color, teal color.

22  Q.   And what was the other vehicle?

23  A.   Passport or a Pathfinder, something like that.  It was an

24  SUV.

25  Q.   Was it small or big?

407

Baker - D

1    A.   Medium-sized.

2    Q.   And do you remember the color of that SUV?

3    A.   I want to say it was a maroon color.

4    Q.   How many different individuals would show up to deliver you

5    heroin, once you started buying from the Mexican Bobby group?

6    A.   Two, maybe three.

7    Q.   Was it always the same two or was it three that would show

8    up every time?  Tell the jury.

9    A.   It was -- sometimes it was -- it was the same two.

10   Sometimes it would be one and a different one.  You know, it

11   wasn't always -- not always the same two.

12   Q.   Okay.  Just a moment, Mr. Baker.

13               (Pause, referring.)

14   BY MS. BOLSTAD:

15   Q.   When the police talked to you in March, did they tell you

16   about the serious consequences of your actions?

17   A.   Yes.

18   Q.   Did they tell you you were looking at a very serious crime?

19   A.   Yes.

20   Q.   After you described those individuals to the police, did

21   the police ask you to help them call your group and order up

22   more heroin?

23   A.   Yes.

24   Q.   And so did you do that?

25   A.   Yes.

408

Baker – D

1   Q.   Was that on March 31st?

2   A.   No.

3   Q.   When was it?

4   A.   It was a later date after that, too, as well.

5   Q.   What do you mean, "as well"?

6            So were there two separate times you made calls?

7   A.   Yes.

8   Q.   Okay.  Let's talk about the first time you made a call.

9   A.   Yeah, it was on March 31st.

10  Q.   Okay.  How did that work?  What did the police ask you to

11  do?

12  A.   They asked me to call them up and make a controlled buy.

13  Q.   And did they want you to order up a humongous quantity, or

14  what?

15  A.   No.

16  Q.   What did they ask you to do?

17  A.   They wanted to know what I normally always purchased.

18  Q.   And would that have been 8 ounces?

19  A.   Yes.

20  Q.   Did you have a deal with the police about if you did that,

21  then you could go free?

22  A.   No.  No.

23  Q.   Did you have any deal like that?

24  A.   No.

25  Q.   Which phone was used to call your source?  Was it one of

409

                          Baker – D

1   your phones or one of the police --

2   A.   My phone.

3   Q.   Okay.  Let's take a look at Government's Exhibit No. 52.

4              Do you recognize this?

5   A.   Yes.

6   Q.   Is this from your phone?

7   A.   Yes.

8   Q.   And is there a contact for Mexican Bobby?

9   A.   Yes.

10  Q.   Which -- how many numbers do you have listed for this

11  contact?

12  A.   Two.

13  Q.   Did you use both of those numbers to get ahold of Mexican

14  Bobby?

15  A.   Yes.

16  Q.   Okay.  Was one number used more frequently than others?

17  A.   Yes.

18  Q.   Which number was used more frequently?

19  A.   I'm not -- I don't remember at this time.

20  Q.   Okay.  Did the police ask you to do the normal -- the

21  normal deal that you would do, with them?

22  A.   Yes.

23  Q.   Okay.  And that's -- we heard it's for 8 ounces.

24  A.   Yes.

25  Q.   What else would normally take place that the police wanted

410

Baker – D

1   you to do?  So location, time --

2   A.  Oh, yeah, yeah.  Just to set up a location and a meeting

3   place.

4   Q.  Where was the meeting place?

5   A.  Over at the 7-Eleven that I was talking about, in

6   Clackamas.

7   Q.  And did you always have a particular time of day that you

8   would meet this group?

9   A.  It was normally up in the night, sometime.  Around seven,

10  eight o'clock at night.

11  Q.  And how about money?  How would you normally pay for 8

12  ounces?

13  A.  Cash.

14  Q.  And was your cash separated out in any particular way?

15  A.  No.

16  Q.  I'm going to play you a call that's been marked

17  Government's Exhibit 53.  And we'll listen to the call, and

18  then we'll -- I'll ask you some questions.  Okay?

19          THE COURT:  And, again, the court reporter need not

20  transcribe.

21          But I wanted to know, Mr. Andersen, do you want your

22  client to have translated the content, as best as possible, or

23  has this been reviewed with him in advance with a translator?

24          MR. ANDERSEN:  We have reviewed it, but I think the

25  translation would be appropriate.

411

Baker - D

1          THE COURT:  Okay.  So to the extent it is
2  interpretable, please interpret.
3          I understand from the prior audio there were some
4  distortions.  But do the best you can, please.
5          INTERPRETER HERRAN:  I will.
6          THE COURT:  Thank you.
7          Go ahead.
8          (Pause, audio playing.)
9          THE COURT:  Can we start over, please?
10          (Audio stopped.)
11          THE COURT:  And start over with an adjusted volume.
12          (Audio playing.)
13  BY MS. BOLSTAD:
14  Q.  Do you recognize the voices in that call?
15  A.  Yes.
16  Q.  Is one of those voices yours?
17  A.  Yes.
18  Q.  And whose the other voice?
19  A.  I'm assuming Mexican Bobby.
20  Q.  It's the person you saved in your phone as Mexican Bobby?
21  A.  Yes.
22  Q.  Okay.  At the beginning of the call, you sort of laughed
23  after you told the police it's 450 an ounce.
24  A.  Um-hmm.
25  Q.  What were you --

Baker - D

1   A.  I was referring to meth.

2   Q.  Okay.  So heroin, that you would buy from this group, was

3   750 an ounce?

4   A.  Yes.

5   Q.  And at the end of the recording, the police were asking you

6   questions about owing money.  Do you remember that?

7   A.  Um-hmm.

8   Q.  Did you owe Mexican Bobby money?

9   A.  Yes.

10   Q.  Tell us how that works.

11   A.  He had fronted me some stuff.

12   Q.  He had fronted you what?

13   A.  Some heroin.

14   Q.  How much did you owe him?

15   A.  I think 5,000, something like that.

16   Q.  And when were you planning on paying that back?

17   A.  Over the next couple weeks.

18   Q.  Would you pay it back by selling drugs?

19   A.  Yes.

20   Q.  When were you fronted those drugs?

21   A.  About a week before.

22   Q.  And was it by this Mexican Bobby who's telling you --

23   A.  Yeah.

24   Q.  -- Where's my money?

25   A.  Yeah.

Baker - D

1   Q.  So it would have been a week before March 31st?

2   A.  Yeah.

3   Q.  So after this call was placed, did you go to the 7-Eleven?

4   A.  Yes.

5   Q.  Did the police follow you?

6   A.  Yes.

7   Q.  Did they let you drive your vehicle?

8   A.  Yes.

9   Q.  And did you have your phone with you?

10  A.  Yes.

11  Q.  Did they sit in your vehicle with you, the police?

12  A.  No.

13  Q.  Was that a no?

14  A.  No.

15  Q.  So tell us what would happen.  So you get to the 7-Eleven,

16  then what?

17  A.  Made the buy.  Got back in my vehicle.  And went and met

18  the police.

19  Q.  Okay.  So there's a lot there.  Let's back up.

20      You arrive in your car.

21  A.  Um-hmm.

22  Q.  Does the deal happen in your car?

23  A.  No, it doesn't.

24  Q.  Where does the deal --

25  A.  I get out and get in their car.  I make the block, come

Baker - D

1    back to my car, and then I go.

2    Q.  Which car was it on the 31st, the first buy you did with

3    the police?

4    A.  I'm -- if I recall right, it was the SUV.  The SUV.

5    Q.  Was that the red -- I think you said -- Pathfinder?

6    A.  I believe it was, yeah, a Rodeo, Pathfinder, or something

7    like that.

8    Q.  Okay.  And you said you go around the block.  What do you

9    mean?

10   A.  Just that we go around the block.

11   Q.  And would the people delivering the heroin, would they be

12   driving?

13   A.  Yes.

14   Q.  I want to show you a picture.  Government's Exhibit 120.

15          Do you recognize this person?

16   A.  Yes.

17   Q.  Did he show up at any of the drug deals?

18   A.  Yes.

19   Q.  Did you know his name?

20   A.  No.

21   Q.  And was he present for this March 31st drug deal in that

22   red SUV?

23   A.  Yes.

24   Q.  Where was he in the car?

25   A.  I think he was driving, if I recall right.

                              Baker - D

1    Q.  And earlier you testified that Mr. Arcila was there.

2    A.  Yes.

3    Q.  Where was Mr. Arcila sitting?

4    A.  Passenger side.

5    Q.  Okay.  Did this gentleman in the picture, in Government's

6    120, did he speak English or Spanish?

7    A.  No, Spanish.

8    Q.  Did you ever have a conversation with him in English?

9    A.  No.

10   Q.  And was he at one, some, or all of the deals?

11   A.  Almost all of them.

12   Q.  Let's take that down.

13           I'm going to show you a picture, Government's 59.

14           Did the police ever show you this picture, Mr. Baker?

15   A.  Yes, they did.

16   Q.  When they showed it to you, were you in custody?

17   A.  Yes.

18   Q.  Okay.  And what did they ask you when they showed you the

19   picture?

20   A.  If this was Mexican Bobby.

21   Q.  Okay.  And is it?

22   A.  Uhm, I can't say one way or another, actually, I mean.

23   Q.  Is it hard for you to tell?

24   A.  To an extent, yes.

25   Q.  Okay.  And when I'm asking you if it's Mexican Bobby, I

416

Baker - D

1   mean the person that you met the first time with Shorty.

2   A.  He resembles him, yes.

3   Q.  Okay.  And do you see this person in court today?

4   A.  Yes.

5   Q.  Where?

6   A.  Right there (pointing).

7   Q.  And could you point again for the record, so Judge Brown

8   can see you.

9   A.  (Pointing.)

10  Q.  Okay.  Is he sitting three people to my right?

11  A.  Yes.

12  Q.  Could the record reflect that Mr. Baker has identified

13  Mr. Sandoval-Ramos?

14          THE COURT:  Yes, he has.

15  BY MS. BOLSTAD:

16  Q.  Mr. Baker, why do you think that Mr. Sandoval-Ramos, here

17  in court, is the person that you remember as Mexican Bobby?

18  A.  The resemblance.

19  Q.  Okay.  Would it help you -- 'cause earlier you said

20  something about ears.

21  A.  Yes.

22  Q.  Would it help you to see Mr. Sandoval-Ramos's ears?

23  A.  Yeah, the earlobes.

24          THE COURT:  Sir, would you please remove your

25  headset.  Thank you.

417

                        Baker - D

1          Can you see him?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  Go ahead and put them back on.

4          Go ahead.

5          MS. BOLSTAD:  Thank you, your Honor.

6  BY MS. BOLSTAD:

7  Q.  After seeing Mr. Sandoval-Ramos's earlobes, does that

8  change your mind or do you have the same opinion?

9  A.  Same opinion.

10 Q.  Did Mr. Sandoval-Ramos come to the deliveries?

11 A.  I can't -- no.  If he did, if it was him, like I say, you

12 know, he turned back to look at me at the back seat, is the

13 only way that I could resemble [sic] it or even remotely say

14 yes, because of the ears.

15 Q.  Okay.  And so unlike Placido -- I'm sorry.  Unlike this

16 picture that we showed you --

17 A.  Right.

18 Q.  -- 120 --

19 A.  Right.

20 Q.  -- are you sure that the picture in 120 came to those

21 deliveries at 7-Eleven?

22 A.  Yes.

23 Q.  Okay.  But Mr. Sandoval-Ramos, not so much?

24 A.  Not so much.

25 Q.  Let's talk about the plea agreement you made with the

418

Baker – D

1    Government.

2    A.    Yes.

3    Q.    Did you get charged with a conspiracy to distribute heroin

4    resulting in death?

5    A.    Yes.

6    Q.    Were you also charged with a conspiracy to distribute

7    heroin in an amount exceeding 1,000 grams?

8    A.    Yes.

9    Q.    And did you plead guilty to one of those charges?

10   A.    Yes.

11   Q.    Which one?

12   A.    The conspiracy exceeding 1,000 grams.

13   Q.    Okay.  And did you agree that your conduct in selling

14   heroin resulted in somebody's death?

15   A.    Yes.

16   Q.    And what is your understanding of the deal?  What -- what

17   is our agreement; between you and me?

18   A.    Basically, anywhere from twelve and a half -- twelve --

19   twelve and a half years to, I think, fifteen.

20   Q.    And does your attorney get to ask for less time?

21   A.    I think so.

22   Q.    Does he get to ask the judge for ten years?

23   A.    The minimum mandatory, yes.

24   Q.    Who makes the ultimate decision about what your sentence

25   is?

419

Baker - D

1   A.   Ms. Brown.

2   Q.   As part of the agreement that you've made with the

3   Government, does part of that agreement require you to testify?

4   A.   Yes.

5   Q.   And does part of your agreement require that you testify

6   truthfully?

7   A.   Yes.

8   Q.   What about your Clackamas case from January 2014, that

9   other death that we've discussed?

10  A.   Yes.

11  Q.   Is that part of this agreement?

12  A.   No.

13  Q.   Okay.  Were you ever charged with a **Len Bias** case from that

14  January incident?

15  A.   No.

16  Q.   Were you charged with something out of it?

17  A.   Yes.  Yes, I was.

18  Q.   And what were those charges?

19  A.   A distribution of meth, a distribution of heroin, and a gun

20  possession.

21  Q.   Sorry.  I have to return to one topic.  I overlooked

22  something.

23  A.   Okay.

24  Q.   Remember in the recording, when you were talking about

25  owing money?

420

Baker – D

1   A.   Yes.

2   Q.   Okay.  And you said that you owed money from something

3   earlier that week.  Is that accurate?

4   A.   Yeah.

5   Q.   In the week leading up to March 31st and the police, did

6   you sell drugs to Michael Rosa?

7   A.   Yes.

8   Q.   Did you sell him the normal deal that he would get with

9   you?

10  A.   Yeah.

11  Q.   How much was that?

12  A.   Four.

13  Q.   And do you remember how many times, the week before the

14  police arrived, how many times did you meet with Mr. Rosa?

15  A.   Once.

16  Q.   In that time frame of late March, were you getting heroin

17  from any other source?

18  A.   No.

19  Q.   Are you sure?

20  A.   Positive.

21  Q.   Why are you positive?

22  A.   Because I didn't have another source.

23          MS. BOLSTAD:  Nothing further.

24          THE COURT:  Jurors, we're going to conclude this

25  witness's testimony tonight, so please bear with us.  Because

421

Baker – X

1    of the logistics with marshals, and all of that.  So please be

2    patient.  Thank you for your attention.

3              Cross-examination, Mr. Andersen.

4              MR. ANDERSEN:  Thank you.

5                        CROSS-EXAMINATION

6    BY MR. ANDERSEN:

7    Q.  Now, Mr. Baker, you gave -- you talked with the police a

8    few times.  Right?  That -- the first was the night when they

9    came to your house.  Right?

10   A.  Correct.

11   Q.  And then you had at least -- how many other meetings have

12   you had with the police since then?

13   A.  One.

14   Q.  Okay.  You had one about a week after you were arrested?

15   Does that sound right?

16   A.  Yes.

17   Q.  And then did you have one subsequent to that, after that?

18   A.  No.

19   Q.  Okay.  You remember just one meeting after being arrested?

20   A.  Yes.

21   Q.  Now, you just testified that in terms of identification of

22   Mr. -- of Mr. Sandoval as Mexican Bobby, you -- I think you

23   said you're not so much.  So this could be Mexican Bobby, it

24   could not be?

25   A.  Yes.

Baker - X

Q.   That's true?  You're not really sure?

A.   I'm not really sure.

Q.   You didn't really get a very good look at him at the

beginning -- or, I mean, at the time --

A.   Correct.

          THE COURT:  Please be sure you're close to your

microphone.  I'm losing the end of your questions.

BY MR. ANDERSEN:

Q.   Just -- did you understand my last question?

A.   Yes.

Q.   Okay.  Thank you.

          Now, when you initially spoke with the police the

night you were arrested, do you remember that conversation?

A.   Yeah.

Q.   I mean, it was a while ago.  Do you have a -- at least you

remember talking with him.  Right?

A.   Yes.

Q.   Now, do you remember telling the police at that

conversation that you maybe bought 4 ounces from the Mexican

Bobby?  That's kind of what you bought generally?

A.   Yeah.

Q.   4 ounces, not 8?

A.   Depends.  It just depending on how the week went or -- you

know, it wasn't all the time that I bought 4, and it wasn't all

the time that I bought 8.  It varied.

Baker - X

1  Q.  Okay.  I mean, I think you said -- did you ever say, in

2  terms of how much -- how many ounces you bought, that it was

3  never more than 5?

4  A.  As I recall, maybe, yes, I did.

5  Q.  You might have told that to the police officers, initially?

6  A.  Yes.

7  Q.  Okay.  Now, do you remember -- do you remember meeting with

8  the agents and the investigators in July 31st of 2014?

9  A.  Yeah, I believe so.

10 Q.  So that -- that would have been a third time.  Right?  If

11 you count the first time when you were arrested?

12 A.  Yeah.  Yeah, it would have been.

13 Q.  Okay.  And at that point you interviewed with -- well, tell

14 me about that.

15       Who was at that meeting, do you remember?

16 A.  I'm not sure.  I think --

17 Q.  The Government's attorney?

18 A.  Yes.

19 Q.  Okay.  Do you remember investigators being there?

20 A.  Yes.

21 Q.  Did you have an attorney there?  Maybe you had an attorney?

22 A.  Yeah, I think I --

23 Q.  Okay.  And at that meeting, you discussed your involvement

24 in the drug trade?

25 A.  Right.  Right.  Right.

424

Baker - X

1   Q.  And do you remember saying at that meeting that you met

2   Shorty in January of 2014?

3   A.  Um-hmm.

4   Q.  And then you began purchasing heroin from Shorty?

5   A.  Yes.

6   Q.  After you met him?

7   A.  Um-hmm.

8   Q.  All right.  And do you recall telling the officers, at that

9   point, that you first met Shorty's -- who you believed to be

10  Shorty's source of supply in March of 2014?

11  A.  No, I met him before then.  I met him before March.

12  Q.  Well, do you think you told the officers at that point,

13  when you had this meeting in -- on July 31st, that you met

14  Shorty's Mexican source of supply --

15  A.  Might have, yes.

16  Q.  You might have told them March at that date?

17  A.  I don't recall.

18  Q.  So you're not really sure when you met Shorty's source of

19  supply?

20  A.  It was in February because it was -- I didn't meet Shorty

21  that much, so I know it was in February.

22  Q.  Okay.  So you told -- you were telling the truth when you

23  talked to them in July 2014?

24  A.  I am not saying I wasn't telling the truth.

25  Q.  Well, if you said March in July of 2014, now you're saying

Baker - X

1   that's not true?

2   A.   No.

3   Q.   So you're not really sure?  Is that fair?

4   A.   No, I'm not sure.

5   Q.   If could have been February, it could have been March?

6   A.   Yeah.  I didn't write the date down, so --

7   Q.   So you didn't -- so you're not -- you're not referring to

8   anything right now, when you're testifying.  You're just kind

9   of telling how you think it might be?

10  A.   No, I'm telling you how it was.

11  Q.   Okay.  Now, do you remember telling investigators in

12  that -- at that meeting that you met -- the first time you met

13  with Shorty and his Mexican source of supply, you met at a

14  park?  A neighborhood park in Clackamas?

15  A.   Yes, I did.

16  Q.   That's different than you just testified to.  You testified

17  earlier that you met at a 7-Eleven.  Right?

18  A.   That was our normal meeting place, was the 7-Eleven.  But

19  we met at the park a few times, too.

20  Q.   Okay.

21  A.   I don't remember the name of the park, right offhand, so --

22  it was in the neighborhood behind 7-Eleven.

23  Q.   It was in that same general area?

24  A.   Yes, it was.  Within a three-block radius, probably.

25  Q.   And now do you recall -- it sounds like this was kind of

Baker - X

1    a -- I think you testified earlier that it was about a weekly

2    kind of arrangement.

3    A.   Right.

4    Q.   Do you recall telling the investigators, at your July

5    meeting, 2014, that you met with Shorty and these Mexicans for

6    about six times before you went directly to Mexican Bobby?

7            Do you remember saying that?

8    A.   Yes.

9    Q.   So it sounds like you're not really purchasing directly

10   from Mexican Bobby for very long because -- when did you --

11   when did the police come to your house?

12   A.   March 31st.

13   Q.   All right.  Okay.  And now, do you remember at that

14   meeting, they -- they showed you a number of photographs?

15   A.   Yeah.

16   Q.   And do you recall when they showed you a -- I think the

17   same photograph they might have showed you earlier, you -- you

18   said that you had never met the person in that photograph?

19   A.   Yes.

20   Q.   And that was a photograph of Mr. --

21   A.   Yes.

22   Q.   -- Sandoval?

23           Now, I would like to show you a photograph, too, if I

24   may.  And maybe I can use this machine.

25           THE COURT:  Have you shown it to counsel first?

427

Baker - X

```
 1              MR. ANDERSEN:  I have.  They have it.

 2              MS. BOLSTAD:  No objection, your Honor.

 3              THE COURT:  And may it be received in evidence or is

 4    it just for the witness --

 5              MR. ANDERSEN:  It's just for the witness, at this

 6    point.

 7              THE COURT:  Go ahead.

 8              MR. ANDERSEN:  I would like to make sure that I push

 9    the right button, and see what happens.

10              I think I have.

11              (Pause, referring.)

12    BY MR. ANDERSEN:

13    Q.  Now, let me show you quickly --

14              THE COURT:  The screen is up for the jury.

15              MR. ANDERSEN:  Okay.  Yeah.

16              THE COURT:  It should not be.

17              Okay.  Go ahead.

18    BY MR. ANDERSEN:

19    Q.  Now, let me show you a photograph.

20              Do you see that photograph on your screen?

21    A.  Yes.

22    Q.  Does that look like anybody you could identify?

23    A.  It very well could be.

24    Q.  And so that could also be potentially Mexican Bobby?

25    A.  Look at the earlobes.
```

428
Baker – X

1  Q.  Right.  Okay.

2        MR. ANDERSEN:  Now –– okay.  That's –– that's all.  I

3  don't ––

4        THE COURT REPORTER:  I didn't hear you.

5        THE COURT:  "I do not wish to offer that into

6  evidence."

7        THE COURT REPORTER:  Okay.

8        THE COURT:  So, jurors, all you have is that he saw a

9  photo that could have been.

10        Go ahead, Counsel.

11  BY MR. ANDERSEN:

12  Q.  Now, that photograph, did that look like –– well, I

13  withdraw that question.

14        MR. ANDERSEN:  I believe that's all, your Honor.

15  I –– that's all for me.  Thank you.

16        THE COURT:  All right.  Mr. Sepp.

17        MR. SEPP:  Thank you, your Honor.

18                    CROSS–EXAMINATION

19  BY MR. SEPP:

20  Q.  Okay.  Now, you testified that you didn't ––

21        THE COURT:  Microphone, please.

22        MR. SEPP:  I'm sorry.

23        THE COURT:  Be sure it's close, or keep your voice

24  up.

25  BY MR. SEPP:

Baker - X

1    Q.  You testified that you started dealing with the Mexicans in

2    2014 without Shorty?

3    A.  Yeah, around February or March.

4    Q.  Okay.  And you also testified that you ID'd Mr. Raul Arcila

5    as being present during some of these transactions during March

6    of 2014?

7    A.  Yes.

8    Q.  What was the date in March, the first time that you saw

9    Mr. Arcila at one of these transactions?

10   A.  I'm not sure.

11   Q.  Do you have any dates?  That you can look to?

12   A.  Just the day I got arrested.  So, you know, between -- it

13   was -- I would say the beginning of March, maybe the end of

14   February, somewhere around there.

15   Q.  And during this meeting, this first transaction, was it

16   light or was it dark out?

17   A.  It was dark.

18   Q.  And at all of these meetings, were they conducted as you

19   explained?  You showed up at the 7-Eleven, got in a vehicle,

20   and then went around?

21   A.  That's correct.

22   Q.  Okay.  Where did you sit?

23   A.  In the back seat.

24   Q.  Can you tell me whether Mr. Arcila was wearing a jacket at

25   the first meeting?

Baker - X

1   A.   I'm not sure.

2   Q.   Was he wearing a hat?

3   A.   I'm not sure.

4   Q.   Can you describe any kind of clothing he was wearing at the

5   first meeting?

6   A.   No.

7   Q.   What about any of the meetings?

8   A.   No.

9   Q.   Do you recall the weather -- the weather on any of the

10  meetings?

11  A.   Yes, it was rainy.

12  Q.   On all of them?

13  A.   Sometime -- couple of -- sometimes it was rainy.  One time,

14  it was right after we had the bad snow.  It was snow on the

15  ground.

16  Q.   Snow on the ground?

17  A.   Um-hmm.

18  Q.   And when you got into the vehicle, was your attention on

19  receiving the product?

20  A.   Yes.

21  Q.   And did you look at the product when it was handed to you?

22  A.   Yes.

23  Q.   When you -- the first meeting that you -- Mr. Arcila was

24  at, which vehicle was it?

25  A.   I believe it was the Pathfinder, the Rodeo.

Baker - X

1  Q.  What -- what was it the second time?

2  A.  It was -- it was the same one.  And then one time it was

3  the small car, the Honda.

4  Q.  And can you sit up there and can you tell how many times

5  you met with Mr. -- you had a transaction where Mr. Arcila was

6  present?

7  A.  Not right off.  Not right offhand, no.

8  Q.  Do you have a lot of interaction with the Hispanic

9  community?

10  A.  Somewhat.

11  Q.  Do you recall at any time whether Mr. Arcila was wearing

12  prescription -- or glasses?

13  A.  I never seen him in glasses.

14  Q.  And I believe you testified to this, but you're aware that

15  if -- if there's a breach of your cooperation agreement, that

16  the United States Government has the right to withdraw it?

17  A.  Yes, I'm aware of that.

18          MR. SEPP:  Okay.  I'm not sure if Mr. Andersen

19  introduced these or not, but I would like to introduce as --

20          THE COURT:  The plea --

21          MR. SEPP:  206 and 207.

22          THE COURT:  The plea agreement and the cooperation --

23          MR. SEPP:  Cooperation agreement.  The same as the

24  last two --

25          MS. BOLSTAD:  No objection.

432

                          Baker - X

1              THE COURT:  206?

2              MR. SEPP:  206 and 207, your Honor.

3              THE COURT:  All right.  So they are received, will be

4    in evidence.

5              Jurors, you'll have those documents with you.

6              Go ahead, Counsel.

7              MR. SEPP:  Okay.

8    BY MR. SEPP:

9    Q.  And when you -- after you had cooperated with the Clackamas

10   County matter and helped with the controlled buy with Menito --

11   A.  Um-hmm.

12   Q.  -- you were still out of custody, weren't you?

13   A.  Yes.

14   Q.  And then -- and you had that knowledge in your mind when

15   you were cooperating with the investigation in this matter.

16   Correct?

17   A.  Yes.

18   Q.  Are you -- I'm sure you know, but this -- the United States

19   Government has decided -- or agreed to dismiss all of the

20   counts against you in this matter.  Correct?

21   A.  Yes.

22              MS. BOLSTAD:  Objection, your Honor.

23              THE COURT:  Except for the ones to which he's pleaded

24   guilty.

25              MR. SEPP:  Sorry, my bad.  I'll rephrase.

433

Baker - X

BY MR. SEPP:

Q.  Except for the counts to which you pled guilty, the

remaining counts that --

A.  Yes, that's correct.

Q.  Do you recall March 31st, when you were speaking with

Detective Hegland -- at the time; Andersen now -- that you had

said that you only got the heroin about once a week?

A.  Yes.

Q.  But today you testified it was about twice a week?

A.  Some weeks were twice a week.  It wasn't every week, no.

But, yes, there was.

Q.  And you -- you also told them on that March 31st, 2014,

that you had three to four customers?

A.  Yes.

Q.  And their purchase was between a half-ounce and an ounce?

A.  Yes.

Q.  But you didn't -- but you've also testified that during

this time you were selling to Mr. Rosa in amounts larger than

that.  Correct?

A.  Yes, occasionally.  Not every time.

Q.  When you -- do you recall identifying the -- looking at the

photos while you were at Washington County?

A.  Um-hmm.

            THE COURT:  Please say yes or no.

            THE WITNESS:  Yes.

434

Baker - X

1    BY MR. SEPP:

2    Q.   During that time, were you shown any photographs -- were

3    you shown a photograph lineup?

4    A.   No, not a lineup.

5    Q.   Was it one picture at a time?

6    A.   Yes.

7    Q.   And then there was a follow-up one later, where you looked

8    at pictures again?

9    A.   Yes.

10   Q.   Was that lineup done the same way, one at a time?

11   A.   Yes.

12   Q.   At the time of these transactions in March, you were using

13   heroin.  Correct?

14   A.   Yes, I was.

15   Q.   And you testified about an eight-ball, or 3 to 4 grams?

16   A.   Yes.

17   Q.   How often did you -- did you smoke the -- did you have to

18   medicate?

19   A.   Every day.

20   Q.   And how often a day?

21   A.   About three times a day.

22   Q.   (Pause, referring.) Bear with me.  I just want to make sure

23   it hasn't already been covered.

24            THE COURT:  Yes, sir.

25            (Pause, referring.)

Baker - ReD

1   BY MR. SEPP:

2   Q.  Do you recall the March 31st interview, the initial

3   interview with the detectives, that you had told them that you

4   had been getting supplied by Mexican Bobby for three to four

5   months?

6   A.  Yes.

7   Q.  Yet, today your testimony is it's only been since March of

8   2014?

9   A.  Huh?

10  Q.  Sorry.

11          Today you testified that you had been supplied by who

12  you think Mexican Bobby was --

13  A.  Um-hmm.

14  Q.  -- through March of 2014.  Is that --

15  A.  No, from January to March.  January, February, March.

16  Q.  Was there any overlap between the group you call Mexican

17  Bobby and Menito?

18  A.  No.

19  Q.  (Pause, referring.)

20          MR. SEPP:  Thank you.

21          THE COURT:  Redirect.

22          MS. BOLSTAD:  Briefly.

23                  REDIRECT EXAMINATION

24  BY MS. BOLSTAD:

25  Q.  Mr. Baker, earlier you testified that you didn't write

                        Baker - ReD

1  things down by date.  Is that true?

2  A.  Yes.

3  Q.  You didn't keep a diary of what was happening?

4  A.  No.

5  Q.  A diary of who showed up to deal you drugs?

6  A.  No.  No memos.  There was no -- no -- nothing.

7  Q.  And the difference, Mr. Baker, between January and

8  February -- I don't want you to try to pick a date.  Okay?

9  Here's my question.  How do you know when you had to go from

10 Menito as a source to Mexican Bobby?

11 A.  Because it was in January that it all transpired between

12 the Clackamas Sheriff's Department and me.

13 Q.  Is January when Menito got taken into custody?

14 A.  Yes.

15 Q.  And when Menito got taken into custody, could you buy

16 heroin from him anymore?

17 A.  No.

18 Q.  Is that when you needed a new source?

19 A.  Yes.

20          MS. BOLSTAD:  Nothing further.

21          THE COURT:  All right.  Ladies and gentlemen, thank

22 you for a long day and your very close attention to all of the

23 evidence.  We're finished for the day.

24          Would you be willing to start at 8:45 tomorrow in the

25 courtroom?  Would that be a hardship for anybody?

Colloquy

1          All right.  Let's -- let's do that, and we'll get --

2     catch a little bit of time there.

3          Remember, notes need to stay here.  You need not to

4     talk about the case or anything it involves.  I know it's been

5     a very sobering day.  But, please, don't talk about the matter.

6     There will be time for that later.  All right?

7          Thank you so much.  You're free to go.

8          Ms. Boyer.

9          Thank you, everyone, for standing.

10          See you in the morning.  Have a good evening.  Drive

11    safely.

12          (Jurors exit.)

13          THE COURT:  All right.  Mr. Baker, you may step down.

14          Thank you, everyone.  Please be seated.

15          So let's review.  We will start with the jury, then,

16    at 8:45.  So we need to be ready to go with the jury at 8:45.

17    And, yet, tomorrow I need to consider any additional changes to

18    the proposed jury instructions.

19          Ms. Bolstad, your challenge is to draft a form of

20    foreseeability instruction and question, share it with counsel,

21    tonight so that -- by e-mail, I assume, so that there is a

22    position you can articulate for me in the morning.  And then

23    I'll think about it as the morning progresses.  I won't try to

24    rule on it immediately, but we need to get to that place.

25          You still have -- it looks like -- ten witness.  Are

Colloquy

1    they all still needed?

2           MS. BOLSTAD:  They are, but a pared-down version of

3    several.

4           THE COURT:  I expected as much.

5           I think the jury now understands a lot of the

6    language and background.  And you can simply set the stage and

7    move on and hopefully we can make up some time; at least from

8    your expectation.

9           Do we need to address any matters on the record

10   tonight, for the Government?

11          MS. BOLSTAD:  No, your Honor.

12          THE COURT:  And, Mr. Andersen?

13          MR. ANDERSEN:  Your Honor, it was my daughter's fifth

14   birthday today.

15          THE COURT:  It is?

16          MR. ANDERSEN:  So maybe we could address that, but I

17   have no other matter.

18          THE COURT:  Well, wish her happy birthday.

19          Tell her it's not your fault.  It's the judge's that

20   you're not home any sooner.

21          MR. SEPP:  Nothing, your Honor.

22          THE COURT:  All right.  Can we all be in the room

23   about 8:20 tomorrow?  8:20 with the defendants present.  And

24   then we'll proceed.

25          Be sure counsel know which witnesses and exhibits you

439
                              Colloquy

1   plan to use in the morning.

2            MS. BOLSTAD:  Yes, your Honor.

3            THE COURT:  All right.  We're in recess.  Thank you,

4   everyone.

5            (Court adjourned, 4:59 p.m.)

6

7                              --oOo--

8

9   I certify, by signing below, that the foregoing is a correct

10  stenographic transcript of the oral proceedings had in the

11  above-entitled matter this 2nd day of June, 2016.  A transcript

12  without an original signature or conformed signature is not

13  certified.  I further certify that the transcript fees and

14  format comply with those prescribed by the Court and the

15  Judicial Conference of the United States.

16
             /S/ Amanda M. LeGore
17         _____

18           AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
                 CSR No. 15-0433  EXP:  3-31-2018
19

20

21

22

23

24

25