1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,          )
                                        )   Case No. 3:14-CR-267-BR
4              Plaintiff,               )
                                        )
5    v.                                 )   November 5, 2015
                                        )
6    FABIAN SANDOVAL-RAMOS(1) and RAUL  )
     ARCILA(3),                         )
7                                       )
               Defendants.              )
8    ═══════════════════════════════════)   Portland, Oregon

9

10                       TRANSCRIPT OF PROCEEDINGS
                             (Jury Trial – Day 3)

11        BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:            AMANDA M. LeGORE
                                CSR, RDR, FCRR, CRR, CE
23                              U.S. Courthouse
                                1000 SW Third Avenue Rm 301
24                              Portland, OR  97204
                                (503)326-8184
25

```
 1    APPEARANCES:
      FOR THE PLAINTIFF:        LEAH BOLSTAD
 2                              (Assistant U.S. Attorney)
                                ELISSA GOLOBORODKO
 3                              (Certified Law Student)
                                U.S. Attorney's Office
 4                              1000 SW Third Avenue
                                Portland, OR  97204
 5                              (503)727-1000

 6

 7    FOR DEFENDANT SANDOVAL-
      RAMOS:                    BENJAMIN ANDERSEN
 8                              121 SW Salmon Street
                                1420 World Trade Center
 9                              Portland, OR  97204
                                (503)222-2510
10

11    FOR DEFENDANT ARCILA:     ROBERT SEPP
                                2350 Willamette Falls Drive, Suite 9
12                              West Linn, OR  97068
                                (503)998-7719
13

14

15    INTERPRETERS:             STEVEN MUZIK
                                FERNANDO HERRAN
16
      ALSO PRESENT:             SUSAN COOKE
17

18

19

20

21

22

23

24

25
```

442

1                                    INDEX

2

3                              Witness Index

4

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Jan Kubic | 460 | 488 | | |
| Jan Kubic | | 491 | | |
| Patrick McNair | 495 | 536 | | |
| Peter Olson | 540 | 547 | | |
| Timothy Miller | 548 | 567 | | |
| Anthony Carley | 574 | 587 | 588 | |
| Joshua Blankenship | 589 | 609 | 616 | 617 |
| Joshua Blankenship | | 613 | | |
| Daniel Riley | 619 | 632 | | |
| Daniel Riley | | 635 | | |
| Sergio Solis | 640 | 667 | | |
| Sergio Solis | | 671 | | |
| Sommer Andersen | 672 | 705 | | |

12

13                              -oOo-

Colloquy                                    443

1              (Thursday, November 5, 2015; 9:20 a.m.)

2

3                        P R O C E E D I N G S

4

5              THE COURT:  All right.  We are on the record, day 3

6    of trial, outside the presence of the jury.  Both defendants

7    are personally present with counsel and interpreters.  The

8    Government's counsel also present.

9              I understand Ms. Bolstad has not yet proposed a form

10   of instruction regarding this perceived lenity question she

11   would like included in instructions and a verdict form.

12             If I don't have something by near the end of this

13   day, I'm not going to consider it.  So if the Government wants

14   me to include that, the time is running short.  You need to get

15   a colleague on the issue, so that it can be resolved up or

16   down, whether you're going to ask for it.

17             MS. BOLSTAD:  We'll do it, your Honor.

18             THE COURT:  All right.  Last night, as the jurors

19   were leaving, a juror raised a question with Ms. Boyer about

20   testimony related to Level 38 in the sentencing guidelines.

21   One of the witnesses acknowledged that was the so-called

22   highest level for a drug offense.

23             And Ms. Boyer warned the juror off of trying to do

24   any research or looking into it.

25             I'm concerned that it may be necessary for me to give

444

Colloquy

1    the jurors some instruction generally about the function of the

2    sentencing process and -- vis-a-vis a plea agreement; when

3    there's a plea agreement and a joint recommendation, what --

4    what does that mean in the context of something like a

5    sentencing guideline offense level.  Because that piece of

6    information is a bit out of context.  It was just given to the

7    jury.  And I don't foresee that any witness on the list is

8    really competent to explain that.

9            And so I want to talk with you about the idea of my

10   simply giving the jury an instruction this morning, before we

11   get going, about the role of a plea agreement in the sentencing

12   process, the fact that there are sentencing guidelines but they

13   are -- the guidelines themselves are never mandatory.  They are

14   advisory for a sentencing judge.  That when a statute, like the

15   one implicated in Count 1, imposes a mandatory minimum -- as

16   I've already told them and I will tell them again -- mandatory

17   means that.  It's the floor of a sentencing range unless the

18   Government opens the door to the possibility of something below

19   and a judge agrees to go below based on a number of factors.

20           And then I would tell them about what the so-called

21   Section 3553(a) factors are.  That a judge's duty at sentencing

22   is to impose a reasonable sentence; one that is sufficient but

23   not greater than necessary to accomplish a number of purposes.

24           And that although the parties in a case may have an

25   agreement, that's simply a reference point along with the

1    sentencing guideline reference point, along with these other

2    matters.  And, in the end, it is up to the Court to decide.

3           So the fact that an offense level may start at a

4    certain place, Level 38 or otherwise, it is only a factor and

5    not in any way something that determines an outcome.

6           So I'm hoping something like that would set the

7    jurors' curiosity at ease.  I want to reinforce the point that

8    they're not allowed to go research these points of interest

9    until after the case.  But I want to let you know I'm thinking

10   of doing that.  And give you an opportunity to indicate whether

11   you think that's helpful or of a -- of concern.

12          MS. BOLSTAD:  For the Government, I do think it would

13   be helpful.

14          My concern would be any time we start talking about

15   3553(a) and departures and levels, it's confusing even to the

16   lawyers who practice it.  So I think less is more, but I have

17   no objection to instruction on the point.

18          THE COURT:  Along the lines I just described?

19          MS. BOLSTAD:  Well, if they're questions about Level

20   38, I --

21          THE COURT:  I don't want to go into the range that

22   exists at Level 38.

23          I want to tell them there -- there are sentencing

24   guidelines that are a starting point, and there is a sentencing

25   table that has a Level 38, but that's just a data point that

446

Colloquy

1    doesn't mean anything other than a starting point.

2              And the real factors that bear on sentencing are the

3    seriousness of the offense, the need to punish, the need to

4    promote respect for the law, the exercise of the Court's

5    judgment regarding what's enough and not too much, in light of

6    mitigating factors like cooperation and a person's personal

7    history and characteristics.  So concern -- jurors, don't

8    concern yourself about testimony about a specific level.

9    Consider what the witness was facing before the witness entered

10   into an agreement with the Government.  The fact that the

11   Government has opened the door for these witnesses to

12   sentences -- well, first of all, none of the witnesses,

13   anymore, are facing a 20-year mandatory minimum because none of

14   them have pled guilty to that offense.  But there are minimums

15   that apply.

16             I'm not going to get into the particulars for each

17   person.  But I would just tell them that I understood a

18   question had been raised by a juror after court yesterday,

19   about 11:38, and I want to give them a little information about

20   context.  And then tell them not to be concerned with a

21   particular level on a guideline table because the point the

22   jurors must keep in mind, vis-a-vis these witnesses, is that

23   they were facing a 20 -- a charge with a 20-year mandatory

24   minimum.  The Government took that exposure off the table in

25   exchange for guilty pleas to certain offenses.  And that that

Colloquy

1    is clearly a benefit.  And the question the jurors have to

2    evaluate is whether and to what extent that benefit has made

3    the testimony of the witness unreliable.

4           So I would like to -- I would like to make that kind

5    of general instruction to the jury for the reasons I've

6    indicated.

7           Mr. Andersen, your view?

8           MR. ANDERSEN:  Your Honor, I think that would be

9    helpful as well.

10          I also echo some of Ms. Bolstad's concerns about

11   giving too much information.  But I think the way the Court has

12   described it, it seems like it would be helpful for the jury to

13   know at least, (A), there's a sentencing grid/guideline.  And

14   this is sort of how it functions.  It's advisory to the Court.

15   And (B), what the factors of sentencing are.  I think that's

16   appropriate.

17          THE COURT:  And then come back to the point that they

18   should disregard any specific reference to a guideline because

19   we're not going to get into the details of how the guidelines

20   numerically operate.  But the fact that a witness knew that the

21   witness had serious exposure is something they should take into

22   account.

23          MR. ANDERSEN:  Yes.

24          MR. SEPP:  Yeah.  Yeah.  I'm fine.  I don't know if

25   you had this written down or not.  But the most recent

448

Colloquy

1    explanation you gave after this -- the Government made their

2    point, I'm in whole-heart agreement with.  I think that's good

3    and helpful.

4              THE COURT:  All right.  I'll do that.

5              So, apart from the foreseeability issue for jury

6    instructions, have you reviewed draft number -- was it 4?  I

7    think.  Draft No. 4 of the jury instructions and the verdict

8    forms, which, again, are fluid because we're still not sure

9    about whether there will be a foreseeability question on Count

10   1.

11             If you have proposed changes to those, I would like

12   to review them now.  My -- my hope is we're going to get the

13   evidence concluded today.

14             And you should know that I will instruct the jury

15   before closing argument.  Before closing argument, they will

16   have a set of the instructions in hand.  I invite you to use

17   the instructions when you argue.  I invite you to tell the jury

18   how you think the evidence falls and how they should answer the

19   questions on the verdict form.  And show them how the law that

20   I'm giving them should direct them to that result based on

21   findings of fact that you think they should make.

22             I -- I think it is helpful for the jury to do this,

23   and that is why I'm giving the law out before, so you have

24   those specific references.  That means we need to be very

25   nimble here and ready to finalize the instructions because, for

Colloquy

 1    example, if the Government rests today, mid-day or early

 2    afternoon, and the defense -- your witnesses are ready,

 3    assuming they --

 4                    MR. SEPP:  (Nods head.)

 5                    THE COURT:  If you want to call them?

 6                    MR. SEPP:  Yes.  Correct.

 7                    THE COURT:  All right.  Then we may have time today.

 8    In which case I would go ahead with instruction today and

 9    probably move argument to first thing in the morning, so that

10    it's not interrupted.

11                    I don't think strategically it's a good idea to let

12    jurors have only one set of arguments and then send them home.

13    And I would like them to have them all in context.  But if we

14    have time, I want to take advantage of it today and instruct

15    before we go home.  That's why I'm pushing.

16                    So with respect to the existing draft 4, and apart

17    from the foreseeability issues, Ms. Bolstad, what changes do

18    you propose?

19                    MS. BOLSTAD:  Your Honor, so far I don't have any

20    major objections to your instructions.

21                    I think that one thing obviously is still to

22    determine, is on page 12; the defendant's decision.

23                    THE COURT:  Not to testify.  Yes.

24                    MS. BOLSTAD:  Correct.

25                    THE COURT:  We can't solve that until we know.  Yes.

1          MS. BOLSTAD:  On page 14, I don't have a correction.

2     I just wanted to alert the court and counsel that this

3     afternoon I do intend to offer a chart and summary.  Prior to

4     that time, I will share it with the defense and let them look

5     at it before we have the witness testimony about that summary.

6     It's on the --

7          THE COURT:  All right.  And your point is if I don't

8     allow the chart and summary, we'll take out the instruction?

9          MS. BOLSTAD:  Yes.

10          THE COURT:  All right.  Mr. Andersen, issues or

11     concerns?

12          MR. ANDERSEN:  Your Honor, not -- not besides the

13     ones I've already raised.  At this point I don't have an issue.

14          THE COURT:  None at the moment?

15          MR. ANDERSEN:  None at the moment.

16          THE COURT:  All right.

17          MR. SEPP:  Same as Mr. Andersen's opinion.  No

18     objections.  Barring, of course, the foreseeability issue.

19          THE COURT:  All right.  We'll just stand by, then, on

20     those issues.

21          Who are the first witnesses for the morning,

22     Ms. Bolstad?  In the order you gave before?  Are you still

23     going --

24          MS. BOLSTAD:  The Government intends to call Sergeant

25     Kubic, followed by Detective McNair.

451

Colloquy

1        THE COURT:  Okay.

2        MS. BOLSTAD:  And then after those two, those are the

3  substantial witnesses of the morning.  After those two, it will

4  move more quickly.  I have Deputy Olson, Detective Miller,

5  Deputy Carley, Agent Blankenship, Agent Riley, and then the

6  Government is re-calling Officer Andersen for brief testimony.

7  Actually, it is on the phone.  It won't be that brief.

8        THE COURT:  I'm also going to ask to the extent a

9  witness is testifying as to a specific count of fact related to

10  a specific count, I encourage all counsel to direct the jury

11  that the questions you're about to ask relate to a particular

12  count.  Because we're getting down to the wire now and the

13  issues of what relates to what may be helpful for them to

14  understand.  But I'm not trying the case, you are, and you may

15  not want to be specific.  But to the extent you want to be

16  helpful to them in tracking your arguments at closing, it does

17  help to lay a marker from time to time.

18        MS. BOLSTAD:  Thank you, your Honor.

19        I have two updates for you.

20        THE COURT:  Yes.

21        MS. BOLSTAD:  The Government has called off two

22  witnesses:  Brad Davis and Josh Howell.

23        I alerted the defense to that this morning.  They

24  don't see the need for those witnesses either.

25        As to the remaining witnesses, I heeded the Court's

1    instruction.  I have pared down significantly the testimony

2    especially of the expert.  The expert does not intend to

3    discuss addiction and withdrawal issues.  We've covered that in

4    depth.

5            To the extent I ask these other witnesses about

6    observations, my only intention here is that although there was

7    testimony from the co-defendants yesterday about what happened,

8    I need these law enforcement officers to testify to what they

9    saw and heard.

10           THE COURT:  Yes.

11           MS. BOLSTAD:  So it might sound the same, but it's

12   coming from a very different source.

13           THE COURT:  I'm not going to interrupt unless it's so

14   obviously cumulative that I feel the need.

15           MS. BOLSTAD:  Thank you, your Honor.

16           THE COURT:  But I do appreciate that each witness has

17   an observation.  And, in the end, when we're talking about

18   circumstantial evidence of certain facts in particular, those

19   observations may -- may be helpful.

20           THE COURT:  Ms. Boyer, will you see if the jurors

21   arrived who were tied up in traffic.  And let me know how many

22   we're waiting for, please.  (Pause.)

23           MS. BOLSTAD:  Your Honor, would you like me to get

24   Sergeant Kubic on the stand?

25           THE COURT:  Let me just let you all know that the

453

Colloquy

1   sergeant's wife is Erica Hadlock, the judge of the Oregon Court

2   of Appeals.

3          At one time she was one my law clerks before she went

4   to the Oregon Department of Justice, before she went to the

5   Court of Appeals.  And so I know him in that long-ago capacity.

6   But I don't think I've seen him for years.

7          Just making that point.

8          Go ahead and ask him in.

9          MS. BOLSTAD:  Thank you, your Honor.

10         (Pause.)

11         THE COURT:  Good morning.

12         THE WITNESS:  Good morning.

13         THE COURT:  It's been a while.

14         THE WITNESS:  Yes, it has.

15         THE COURT:  Go ahead and take a seat.

16         We're waiting on jurors.  When they come in, we'll

17   all rise.  Everyone else will be seated.  Then you should

18   remain standing to take the oath.

19         We're going to be giving the jurors some preliminary

20   instructions before you're sworn.  Evidently, we're not yet

21   ready with the jurors.

22         Just make yourself comfortable.

23         (Pause.)

24         MS. BOLSTAD:  Your Honor, off the record.

25         May I play a call in court before the jury comes in?

454

Colloquy

1          THE COURT:  (Nods head.)

2          (Pause.)

3          THE COURT:  Please rise for the jury.

4          (Jurors enter, 8:57 a.m.)

5          THE COURT:  You can go ahead and take a seat there,

6   first.

7          Thank you, everyone.  Please be seated.

8          Good morning, jurors.  Thank you for coming back.

9          Before we continue with evidence today, I wanted to

10  give you a brief instruction concerning the general question of

11  sentencing in federal court.

12          I understand a question was raised after court by one

13  of you about that reference to Level 38.  One of the witnesses

14  talked about a sentencing guideline level.  So I wanted to give

15  you a little bit of background for context so that you

16  understand what that's about but also to tell you not to

17  concern yourself with specifics about a Level 38 reference, or

18  other things.

19          So here's the general information.

20          In a criminal case in federal court, the sentencing

21  decision is left to the judge.  By law, the judge must consider

22  a number of factors in determining what's called a reasonable

23  sentence.  The judge must consider is there a mandatory minimum

24  sentence?  What is the statutory maximum sentence?  And you

25  haven't heard any evidence about maximums in this case, so

Colloquy

1    don't worry about those specifics.  But I'm just giving you

2    structure here.

3            Where between a minimum and a maximum a judge

4    sentences depends on a number of factors.  One, there is a body

5    of law called the sentencing guidelines.  And there are many,

6    many, many rules and regulations a judge must consider.

7            The guidelines are reflected in a table.  Some call

8    it a bingo card, literally.  It has offense levels and it has

9    criminal history levels across the other axis.  And then

10   advisor -- advisory guideline ranges; ranges of sentences that

11   are advisory.

12           I repeat that because the judge's decision is

13   discretionary.  It isn't just you're in a box and that's the

14   sentence that is imposed.  That is not the law.  Yet the

15   guidelines exist, and a judge must consider them as a starting

16   point when considering what the sentence should be.  There are

17   a number of factors the judge must take into account for

18   sentencing purposes:  The seriousness of the crime; the need to

19   punish, as reflected in the seriousness of the crime; the need

20   to promote respect for the law, to persuade that person not to

21   do that crime again and to the extent news spreads to others,

22   that this is what happens when one engages in that conduct, the

23   hope of deterrence; the need to protect the community, so

24   community safety.  Those are certain factors a judge must

25   consider.

456

Colloquy

1            There are mitigating factors or factors in -- in the

2    interests of lenience a judge must consider.  The judge must

3    consider the personal history and characteristics of the person

4    being sentenced, the good in that person's background as well

5    as what led to whatever the act is that was criminal.

6            And the judge must consider whether there are other

7    factors like cooperation, acceptance of responsibility, those

8    kinds of things.  And, in the end, the judge decides what is

9    enough but not too much within the ranges the judge is

10   permitted to consider to determine what is reasonable.

11           When there is a plea agreement between the prosecutor

12   and the person being sentenced, what that does is eliminate a

13   lot of issues for the judge to resolve.

14           So let me tell you that without a plea agreement, the

15   prosecutor can come in and argue for any lawful sentence

16   anywhere in the -- from the minimum to the maximum.  And the

17   defendant can argue for any lawful sentence between the minimum

18   and the maximum.

19           When they have an agreement, they can argue only for

20   the sentence they've agreed to.  So that relieves the judge

21   from having to decide disputes between them.  But just because

22   they've agreed to something doesn't make it reasonable.  And,

23   in the end, a judge is left with the very solemn responsibility

24   of determining what is enough and what's too much.

25           Now, I give you that with two cautionary things I

1    want to repeat first.  Do not consider what sentence I will

2    impose if you find either of the defendants guilty of any

3    charge.  You must not do that.  Your duty is to evaluate

4    whether the evidence is sufficient to prove beyond any

5    reasonable doubt the charge or charges at issue.  You must not

6    allow bias or sympathy or concern for serious consequences to

7    enter into that.  You just can't.  And I trust you will follow

8    your oath there.

9           But it is important for you to consider sentencing in

10   this general context I've judgment described when you decide

11   whether the agreement the Government reached with each of the

12   cooperating witnesses has affected the reliability of that

13   witness's testimony.

14          We talked about that factor many times, and I know

15   you have it in mind.  But because there was this question about

16   a level, I just wanted to put that in context.  A level refers

17   to the sentencing table.  That's just a starting point, a data

18   point, a piece of advice.  It does not control the sentence.

19   That is the judge's duty.

20          It is something you can consider for purposes of what

21   was on the witness's mind when the witness decided to

22   cooperate.  And does that affect the reliability of what the

23   witness has said to you, under oath, here in court?  That's

24   your call, nobody else's.

25          Does that answer everyone -- anyone's concern about

Colloquy

1    it?

2           All right.  Remember, don't -- don't go outside of

3    what's going on in this courtroom to resolve the case.  If you

4    have issues that are not resolved, as has been paraphrased back

5    to you, it is either proved or it isn't.

6           Curiosities you have later are certainly available

7    for consideration.  And I assure you that once the case is over

8    and your verdict is returned, I'll be happy to answer any

9    questions you have about the process or the issues generally.

10   All right?

11          I also understand there was a question about whether

12   you're going to get a list of the specific charges against the

13   specific defendants.  Yes, it will come to you in a number of

14   ways.

15          First, you'll each have a working copy of a verdict

16   form.  For each of the two defendants, there will be separate

17   forms with the specific charges against the specific defendant.

18          Remember, Counts 1 and 2 are charged against both

19   Mr. Sandoval-Ramos and Mr. Arcila.  Count 1 is the conspiracy

20   to distribute heroin resulting in death.  Count 2 is a

21   conspiracy to distribute heroin.  It has a slightly different

22   time range, but it overlaps a little bit.  And the Government's

23   contention is the object of that conspiracy involved 1,000

24   grams or more of heroin.  So that's Count 1 and 2 against each

25   of the defendants.

Colloquy

1          Counts 9 and 10 are against Mr. Arcila -- Mr. Arcila

2    only, and they have to do with possession with intent to

3    distribute heroin on two particular occasions.

4          And I've asked Ms. Bolstad to be sure to -- if she's

5    asking questions about those alleged deliveries, to tie them to

6    the count number by reference, so that you know when the

7    witnesses are testifying today, what that relates to.

8          But you'll have not only verdict forms, you will have

9    my written instructions.  And the written instructions will lay

10   out specifically -- each of you will have a set.  But the

11   written instructions will lay out specifically:  Here are the

12   elements the Government must prove in order for a defendant to

13   be found guilty beyond a reasonable doubt of a certain charge.

14         All elements have to be proved.  There are two.  All

15   12 of the deliberating jurors have to agree that both are

16   proved beyond a reasonable doubt in order to find a defendant

17   guilty.

18         Any other questions or concerns you have before we

19   continue?

20         Okay.  So the Government's ready to continue the next

21   witness.  Before you is Sergeant Jan Kubic of the Multnomah

22   County Sheriff's Office.

23         Would you face the jury and the deputy there, please.

24   Raise your right hand to be sworn.

25         (Witness sworn.)

460

Kubic - D

1          THE WITNESS:  I do.

2          THE CLERK:  Please take a seat.

3          THE COURT:  And bring yourself close in to the

4   microphone.

5          Tell us your full name, and please spell all of it.

6          THE WITNESS:  My name is Jan Kubic.  My first name is

7   spelled J-A-N.  My last name is spelled K-U-B-I-C.

8          THE COURT:  Thank you.

9          Counsel.

10                        DIRECT EXAMINATION

11  BY MS. BOLSTAD:

12  Q.  Good morning.  Could you tell the jury where you work.

13  A.  I work for the Multnomah County Sheriff's Office.  I'm a

14  sergeant, and I am running our narcotics investigations unit.

15  Q.  How long have you worked at the Multnomah County Sheriff's

16  Office?

17  A.  The end of this month, it will be 21 years.

18  Q.  And how long have you been the sergeant in charge of the

19  narcotics team?

20  A.  I think I'm going on six -- year six or year seven, now.

21  Q.  What's your educational background?

22  A.  I've got an undergraduate degree in political science from

23  Reed and an Associate's degree in aviation from a now-defunct

24  aviation college in Colorado.

25  Q.  As the sergeant with the Multnomah County sheriff's

1    narcotics team, could you briefly describe your training and

2    experience in law enforcement, specifically about narcotics.

3    A.    I've been working in the narcotics investigation function

4    for probably about 15 of my 21 years with the sheriff's office.

5          I've attended ungodly numbers of hours of training,

6    conferences, specialized training for methamphetamine, heroin,

7    cocaine, marijuana, prescription drugs, and -- I apologize.

8    I -- I was up until 4:00 in the morning.  We were working last

9    night, so I'm a little punchy too.

10   Q.    Okay.  So in addition to that training, could you give the

11   jury an estimate of how many narcotics investigations you've

12   been involved in?

13   A.    Thousands.

14   Q.    Do you have any direct involvement in the investigation of

15   Justin Delong's death in this case?

16   A.    No, I do not.

17   Q.    Prior to testifying today, did you review any materials?

18   A.    Briefly, at your office I -- you showed me a timeline or

19   summary that was generated by one of the investigators; I saw

20   some pictures; and some cell phone text messages.

21   Q.    Okay.  Have you gotten down into the depths of the police

22   reports in this case?

23   A.    Not at all.

24   Q.    Okay.  So tell us about heroin.  Have some of your

25   thousands of investigations involved heroin?

Kubic - D

1  A.  Yes, they have.  Heroin has exploded in the Portland area.

2  It's probably exploded nationwide.

3          My first tour in dope was from '97 to 2003, 2004.

4  And we had heroin users and we had heroin out here, but it

5  wasn't the same as it has become now, since 2010.  It's

6  changed.  There is a just a lot more heroin.  There are a lot

7  more users.  It's readily available, and we're seeing a lot of

8  overdose deaths.

9  Q.  Where does heroin come from in the Portland area?

10 A.  Ultimately, it's coming up from Mexico.

11 Q.  And what does it look like, smell like?

12 A.  So typically, you're seeing two different forms of heroin.

13 It's either -- it's called black tar or gunpowder heroin.

14 Black tar is pretty much exactly what it looks like.  You know,

15 sort of like toffee-like.  And a little harder than toffee,

16 like cold toffee in consistency.

17         Gunpowder heroin is lightish brown to dark brown,

18 powdery.

19         They both have a distinctive vinegary smell.

20 Q.  And between those two forms, the powder, and the tar, are

21 there things that dealers can do to go back between those two

22 forms?

23 A.  Yeah.  You can take powder and warm it up and it will

24 become tar-like, gummy.  Once you have got it into tar form,

25 it's a little more difficult.  It's easier to cut into powder

 1    form.  Once it's in the toffee tar-like form, it's harder to

 2    cut.

 3    Q.  Tell the jury what a user amount of heroin looks like.

 4    A.  It depends on what sort of user you are, but not much.  A

 5    beginner user of quality heroin is making looking at a tenth of

 6    a gram.  And for reference, a gram, if you go to an old-school

 7    diner that has, still, sugar packages on the table, one of

 8    those little sugar packages is about a gram of sugar.  So we're

 9    talking an initial use, an initial dose of a tenth of one of

10    those packages.

11            Most users will eventually, if they stay with it,

12    will start increasing their dosage.  They'll move to

13    two-tenths, and up.  Serious -- a serious user might go up to a

14    gram a day.

15            I've run into people that claim to be doing 2 to 3

16    grams a day.  And I think that's probably not true, since

17    that's a lot of dope.  So about a gram a day, gram and a half

18    would be at the high end.

19    Q.  And let's talk about users -- heroin users.  This jury has

20    already heard a lot of evidence about the effects of heroin.

21            My question for you is when you are doing

22    investigations, what are the kinds of evidence you expect to

23    find with heroin users at that lowest level of the chain?

24    A.  I expect to find a lot of trash, used bindles.  So the

25    bindles of heroin that they're holding onto they're not

1   throwing out because a low-end user is operating from

2   day-to-day, fix to fix.  And they know at some point they're

3   going to run out of money for tomorrow's fix.  So a lot of them

4   will hoard all of the little bindles, all of the containers

5   they've bought their heroin with -- in.  Because they know when

6   they run out of money or run out of -- or lose their

7   connection, they're going to be reduced to swabbing the inside

8   of those plastic -- bits of plastic, bits of foil.

9   Q.   What do you mean swabbing?

10  A.   Just that.  Take a little piece of cotton, dip it in water,

11  use their thumb, finger, wipe it down, try and collect enough

12  heroin to get a fix out of.  At that point they're usually

13  slamming, which is intravenous interjecting it.  They're no

14  longer smoking or snorting the heroin.

15           And so I would expect to see a lot of used needles.

16  I expect to see the ubiquitous spoon with a little bit of

17  cotton that's blackened, where they're heating up the heroin.

18  And I would expect to see some kind of, you know, method of

19  tying their arm off.  Just everything associated with I.V. drug

20  use.

21  Q.   How about cash with low-end users?

22  A.   Not -- no.  I wouldn't expect to find more cash with them

23  than enough for a couple of days worth of fixes.

24  Q.   And then have you encountered heroin dealers who also use?

25  A.   Mid-level dealers, yes.

Kubic - D

1  Q.   What about at the highest level of the chain?  Do you

2  encounter high-level dealers who also use?

3  A.   Not who use heroin, no.

4  Q.   In your experience in the Portland metro area, are there

5  general patterns about the distribution scheme?

6  A.   Yes.

7  Q.   And do -- are you familiar with the pyramid scheme?

8  A.   Yes.

9  Q.   I would like you to explain the pyramid scheme to the jury.

10         Is this scheme something that is across the board for

11  all drugs?

12  A.   Yeah.  And let's not use the word "scheme" because that's

13  kind of pejorative.  Right?  It's not a scheme.  It's not a

14  scam, in that sense.  It's a structure.  It's like a business

15  model, like any other model.

16         You have a upper-end distributor or producer, a

17  wholesaler, who distributes to their mid-level resellers; who

18  distribute to, perhaps, a -- you know, the neighborhood

19  resellers who then distribute right down to the street level of

20  resellers.  Not unlike Coca-Cola.  Right?  They produce

21  tremendous amounts of Coca-Cola, and you can go buy a huge flat

22  of Diet Coke at Costco for not much.  Nine bucks for 32 cans.

23         And you can take those to your local mom-and-pop

24  store and then resell those cans for a buck fifty a pop; or to

25  your restaurant and resell them for a buck fifty; or you can

1   take them home and have them much cheaper.  But it's that

2   structure that exists within drugs, just like with any other

3   product.

4   Q.  Okay.  And then within that structure, the product that

5   starts at the top, does something happen to it before it

6   reaches the bottom?

7   A.  Yeah, that is the one major difference.  You're not getting

8   that nice pristine can of Diet Coke.  Somebody has opened that

9   can and maybe mixed something in.

10          So what happens, as the heroin comes into the

11  Portland area, it's fairly close to pure.  As in whatever the

12  content is when it was produced in Mexico, it's still in that

13  quantity of heroin.

14          With the gunpowder heroin, what you can do, at some

15  level you're going to start what we call stepping on it or

16  cutting it with some -- with a cutting agent.

17          So you can start out with, say, a pound of pure

18  heroin, and step on it once, which would mean cutting it with

19  another pound of cutting agent.  So now you have two pounds of

20  product, but it's only 50 percent pure if it was 100 percent

21  pure to start.

22          And it depends how many times it's been stepped on,

23  by the time it gets down to the street level, which determines

24  how good of a high you get out of that.

25  Q.  Okay.  Sergeant Kubic, you've talked about pounds and

Kubic - D

1    grams.  I would like to go through some quantities with you.

2    And before I show the jury this item, I want to just show you

3    and have you walk through this.  Okay?

4    A.   Okay.

5    Q.   I'm going to show you what has been marked as Government

6    128.

7         MS. BOLSTAD:  It should not come on the screens.

8    BY MS. BOLSTAD:

9    Q.   Sergeant Kubic, can you see that?

10   A.   I sure can.

11   Q.   Okay.  So how many grams are in an ounce?

12   A.   28.35.

13   Q.   And are you familiar with the term "piece"?

14   A.   Yes.

15   Q.   What is a piece?

16   A.   So when you're dealing in heroin in this part of the world,

17   you're not dealing in ounces, per se.  When you're buying or

18   selling ounces, you're dealing in what's called a piece.  And a

19   piece is 25 grams.

20         So it's a -- sort of an attempt to take the metric

21   system and force it into our -- our U.S. system.

22         So instead of a 28.35-gram ounce, if you ask for a

23   piece -- or also it's called on the street a Mexican ounce --

24   you're only really getting 25 grams.

25   Q.   How many ounces are in a pound?

468

Kubic - D

1    A.    16.

2    Q.    And how many grams, then, are in a pound?

3    A.    454-ish.

4    Q.    And can you look at 128 here.

5           Does this chart accurately capture those quantities

6    you're talking about?

7    A.    It does.

8    Q.    And at the bottom of the left conversion chart, do you see

9    the entry for 1,000 grams?

10   A.    I do.

11   Q.    How many pieces or Mexican ounces are in 1,000 grams of --

12   of anything?

13   A.    25 -- 40.

14   Q.    And how many pounds are in a kilogram?

15   A.    2.2.

16   Q.    Now, let's talk about some pricing data, and we'll -- we'll

17   go through this on the chart before we show the jury.

18          What are some typical dealer quantities that you've

19   encountered in narcotics investigations?

20   A.    So we'd have to preface that with what level dealer are we

21   talking about.

22   Q.    What's the lowest-level dealer quantity in your opinion?

23   A.    What's called an eight-ball, which is one-eighth of an

24   ounce or about 3.5 grams.

25   Q.    How about -- let's talk about pricing, then.

Kubic - D

1      So you've talked about 1 gram and the sugar packet.

2      What would 1 gram cost on the streets of Portland?

3  A.  Right now, running about 80 dollars to a hundred dollars

4  per gram.

5  Q.  And what about an eight-ball?

6  A.  250 for an eight-ball.

7  Q.  How much is one piece of heroin?

8  A.  That depends on your connection.  It depends how far up the

9  chain you're going to buy that piece.  It can run anywhere from

10  800 to 1200 in the Portland area.  It gets more expensive the

11  further outside Portland you get.

12  Q.  And does it get less expensive if you have a good

13  connection?

14  A.  If you have a good connection, and you're able to buy in

15  bulk, yes, it does.

16  Q.  You mentioned buying in bulk.  Is it cheaper to buy in

17  bulk?

18  A.  Absolutely.  Just like Costco.

19  Q.  How about one -- I'm sorry.  How about 8 ounces of heroin?

20  A.  Again, depending on your connection, 6,000 to 9,000

21  dollars.

22  Q.  Finally, a pound.  How much would that cost on the street?

23  A.  You -- they're getting expensive.  Pounds are upwards of

24  16,000 a pound, nowadays.

25  Q.  And then how about one kilogram, which is 2.2 pounds?  How

470
Kubic - D

1  much would that sell for -- or, I'm sorry, how much would you

2  buy that on the street?

3  A.  So that's running -- depending on the quality now -- so

4  32,000 at the low end.  We've seen it as high as 40,000 for

5  fairly -- probably completely uncut heroin.

6  Q.  40,000 dollars?

7  A.  Um-hmm.  Yes.  That's correct.  We've been quoted that

8  recently.

9  Q.  Okay.  And so does this Exhibit 128, does this accurately

10  capture what you've gone through?

11  A.  It does.

12        MS. BOLSTAD:  And, your Honor, I would like to offer

13  what's been marked as Government's 128.

14        THE COURT:  As a summary?

15        MS. BOLSTAD:  Yes, your Honor.

16        THE COURT:  Objections?  No?

17        MR. SEPP:  No.

18        MR. ANDERSEN:  No, your Honor.  I believe he's

19  testified to that.

20        THE COURT:  The exhibit may be received, published.

21        And then, jurors, this is just a summary to aid you

22  in recalling the testimony.  The actual evidence is the

23  witness's testimony, not the document.

24        Go ahead.

25        MS. BOLSTAD:  Thank you, your Honor.

1          JUROR NO. 10:  Judge, could I get some tissue.

2          THE COURT:  Tissue, yes.

3   BY MS. BOLSTAD:

4   Q.  All right.  Sergeant, I'm going to ask you about 8 ounces.

5   All right?

6   A.  Yeah.

7   Q.  How many grams are in 8 ounces?

8   A.  200 -- well, look.  I'm sorry.  Let's back that up.  If

9   we're talking --

10  Q.  Oh, pieces.  Thank you.

11  A.  200.

12  Q.  And so when we're talking about eight 25-gram quantities,

13  that's like 200 grams?

14  A.  That's correct.

15  Q.  And you've testified that that could run anywhere from --

16  A.  Yeah, 6 to 9,000.

17  Q.  Okay.  Assuming that there are -- assume a user who uses

18  .2 grams of heroin as a user quantity.  And so, therefore,

19  assume there are five user quantities in a gram.  Are you with

20  me?

21  A.  Um-hmm.

22  Q.  How many user quantities would then be in 8 ounces of

23  heroin?

24  A.  I'm sorry.  I would be able to rattle this off the top of

25  my head if I had had more than two hours of sleep.  But since

Kubic - D

1   I'm on the stand --

2   Q.  Do you have a calculator?

3   A.  And we're doing word problems.  So eight times 25.

4           200.  And we're saying two-tenths -- well, two-tenths

5   of a gram, that would be a thousand doses.

6   Q.  A thousand doses in 8 ounces?

7   A.  That's correct.

8   Q.  I won't ask you about when a bus leaves New York,

9   Mr. Kubic, okay?

10  A.  Okay.

11  Q.  So based on your training and experience then, would an

12  8-ounce quantity be consistent with a distribution quantity or

13  a possession, a user quantity?

14  A.  That would be a distribution quantity.

15  Q.  Okay.  Let's move on to the manufacture of heroin.

16          Earlier you talked about diluting heroin as it goes

17  down the pyramid.

18  A.  (Nods head.)

19  Q.  Are you familiar with cutting agents that are typically

20  used with heroin?

21  A.  I am.

22  Q.  Tell the jury about what you have seen.

23  A.  So for the gunpowder heroin, it's real easy to cut it with

24  another powdered substance since gunpowder heroin is kind of

25  brown in color, almost mocha colored.  I've seen coffee

473

Kubic - D

1   creamer.  I've seen mocha-flavored coffee creamer used.

2          You could probably use flour.  You can basically use

3   anything that's going to be a light powdery substance that's

4   not going to harm your end user too much.

5          Lactose is one of the products that's used.

6   Typically when we're getting to places where cutting agents are

7   used, they're -- most folks will have their favorite cutting

8   agent that they're using just because they know that works, and

9   they like it.

10  Q.  Have you seen sugar used as a cutting agent?

11  A.  I have.  Sugar is used.  Sugar -- especially if they're

12  dealing with some black tar because you can -- you can heat the

13  sugar up, caramelize it, and it sort of looks like black tar

14  when you try to mix it.  It doesn't work that well, but it does

15  work.

16  Q.  And then you mentioned lactose.  What is lactose?

17  A.  It's a milk sugar.  And you can buy it on line.  You can

18  buy it in health food stores.  I think people add it -- I'm not

19  a parent, but I understand people add it for kid's formula.

20  It's commonly used in the pharmaceutical industry in pills

21  because it doesn't add much taste.  It binds whatever your

22  active ingredient is in its closest form.

23  Q.  I'm going to show you what's marked and admitted as

24  Government's 112.

25          Do you know what this is?

Kubic - D

1   A.  It's a lot of bags of lactose.

2   Q.  Okay.  Have you ever -- in your thousands of

3   investigations, have you ever seen this particular brand of

4   lactose?

5   A.  No, I have not.

6   Q.  Okay.  And does that mean, then, it's not used in heroin

7   dilution?

8   A.  Not at all.

9   Q.  Tell the jury what you mean.

10  A.  I think I've mentioned everybody's got their favorite cut,

11  what they know works.  And there's a lot of sources for lots of

12  different cuts.

13          Lactose, a lot of people sell it.  Obviously, whoever

14  is using this lactose likes it, is buying it in bulk.  Just

15  like everything else, it's probably cheaper in bulk.  And

16  that's part of their signature product.

17  Q.  Okay.  Have you and your team executed search warrants at

18  stash houses?

19  A.  We have.

20  Q.  What is a stash house?

21  A.  A stash house -- what we call a stash house is either a

22  house or an apartment that is typically pretty vacant.  Its

23  primary use is to hide your drugs and your cash.

24          You can also use that place to what's -- go count

25  your money, to get it ready to ship south, to cut up -- to --

Kubic – D

1    to cut up and package your drugs to get ready to push out to

2    the street, or to your next distributor below you.  A place to

3    go hang out when you don't want to be at home.

4            Typically really sparsely furnished.  You know, maybe

5    a mattress or two, some blankets, a couple of tables.  Maybe a

6    few seats, a couch, possibly a TV.  Not much else.

7    Q.  And do people live at stash houses?

8    A.  Occasionally we've seen organizations that are rotating

9    people through the Portland area.  As individuals within their

10   organization get arrested or get heated up in a different city,

11   they'll bring them to Portland, and vice versa.  They'll ship

12   them out of Portland.  And they'll often put them up in the

13   stash house.  One, because they have a place that's available.

14   And, two, they recognize that having somebody who seems to come

15   and go on relatively normal business hours makes the place look

16   more realistic to the neighbors and also provides a level of

17   security for their products.

18   Q.  And when you and your team have done search warrants at

19   stash houses, what are you looking for in a drug case?

20   A.  We're looking for drugs, cash, scales, packaging material,

21   old packaging material, stuff that's been -- so the big kilo

22   wrappers or the pound wrappers that have been just discarded

23   somewhere.  We're looking for drug records.  Even though most

24   people communicate electronically, the bulk of the dealers that

25   I've interacted with over the years still maintain some sort of

1    paper ledger.  It's just simpler to scratch the numbers and

2    names on a piece of paper than it is to type it into your

3    smartphone.  Weapons, we expect to find weapons, or we're not

4    surprised when we find weapons.  We're finding more and more

5    weapons nowadays.  Cell phones.  Lots of old cell phones.  Lots

6    of times they're dumping phones.  The phones fail, they just

7    throw them in a drawer.

8    Q.  What about defense measures at these houses?

9    A.  We'll find those.  Barricaded doors, surveillance cameras,

10   barricaded internal doors, extra locks on doors inside of

11   apartments or houses.

12   Q.  All right.  Sergeant Kubic, you've talked to us about

13   pyramid structure distribution.  I'm going to ask you now to

14   describe the dispatch model.

15          Are you familiar with that term?

16   A.  Yes, I am.

17   Q.  Tell the jury what -- what a dispatch model is.

18   A.  So a lot of organizations, when they get larger, are no

19   longer necessarily having -- they have moved away from the

20   owner/operator model.  Be a way to look at it.

21          Smaller dealers will go buy their product, and then

22   they personally will take all of the phone calls, requests

23   for -- for heroin, for whatever they're selling and then

24   they'll go make arrangements to deliver that product to their

25   customers.

Kubic - D

1          As an organization gets larger, they're going to move
2   away from that model, and they'll have a person that becomes a
3   dispatcher.  Somebody who sits somewhere -- can be anywhere,
4   nowadays, with a cell phone.  And that phone number is the
5   phone number that is given out to the customers.
6          A person calls that phone, tells them who they are
7   and what they want; or texts that phone, tells them who they
8   are, what they want and where they want to meet.  The
9   dispatcher will figure out where -- where and when to have
10  somebody meet them.  Will tell the customer where to go.  And
11  then will oftentimes use a separate phone to call their
12  runners, the people working for them; and tell them where to
13  go, who they're going to be meeting, and how much to supply
14  with, and what price to expect in return.
15  Q.  In that model of the dispatch organization, are there -- is
16  there a role for people who transport drugs?
17  A.  Yeah.  Yeah.  So you'll -- you'll have -- when an
18  organization gets to the point that it can work the dispatch
19  model, it may still be buying their -- their drugs from a
20  different organization that just specializes in bringing the
21  drugs up to this area.  But they may grow and like -- we've
22  seen this happen a number of times -- to the point where they
23  can establish a direct connection to Mexico or to Southern
24  California, and they'll send their own people to pick the drugs
25  up and bring them up.  So a person will be, (A), a transport

1  person.

2          And, again, that saves them money because they're not

3  having to buy from Costco.  Instead, they're now buying

4  directly from Coca-Cola, and so cutting out one of the

5  middlemen.

6  Q.  What are the business benefits to the dispatch model?

7  A.  There's a lot of benefits to the model.  It provides the

8  ability to be very flexible in that the dispatcher can be

9  anywhere.

10          And your runners, your delivery people can be mobile,

11  can be anywhere.  Provides you with security because of that,

12  if the dispatcher never touches the drugs or the money; which

13  we see a lot of.  They just sit somewhere.  They're making

14  calls and passing calls on.  Then if law enforcement tracks

15  that phone number -- say we find somebody who tells us, This is

16  the number I call for drugs.  And we get a ping order up on

17  that phone.  And we find out where it is, and we make contact

18  with that person; they're going to be, to all external

19  purposes, clean.  They won't have any drugs on them.  They

20  won't have any money on them.  They won't have any weapons.

21          They may have a job that they're working already and

22  just handling this phone on the side.  But they're -- they're

23  calling the shots and making things happen.  And they have more

24  customers that way.  You can handle a lot more customers if you

25  have runners and you're not the one going out on the street,

Kubic - D

1   making these individual deliveries.

2   Q.  And so in that model, is the dispatcher taking the calls --

3   in your experience, does that dispatcher ever interact with

4   customers?

5   A.  Typically not when it gets to that level.  They may have at

6   one point in the game.  They may have been that street-level

7   person that has worked -- built their business to the point

8   that they can hire some people to start doing street level

9   deliveries and they can move up.

10  Q.  You mentioned -- so, moving up?

11  A.  Absolutely.  Moving up.  So if you -- if you start out as a

12  small-time dealer, it's really -- it really isn't that much

13  different than -- than running a small ma-and-pa grocery or

14  convenience store.  Right?  You start out and you're on

15  location.  You have a limited customer base.  And for whatever

16  reason -- perhaps the population density gets bigger where

17  you're at, your customer base starts to grow and one day you

18  decide, you know, I can probably afford to open up a second

19  store.

20          And all of a sudden, one day, you're no longer in the

21  store behind the counter.  You're in an office somewhere and

22  you're handling inventory and moving -- shipping it out to

23  different stores and having it all happen.

24          Exact same thing happens in the drug world.  At some

25  point you no longer need to go out and make the deliveries.

480

Kubic - D

1   You have people making deliveries for you.  And you're

2   essentially brokering deals, making the connections, and making

3   sure that the accounts balance.

4   Q.  And what if -- what if one person in that organization, the

5   dispatch organization, gets arrested?

6   A.  Yeah.  It depends on where they get arrested.

7           So in Multnomah County, for instance, if we arrest

8   somebody for -- say they've got a couple of ounces of heroin on

9   them and they have no prior record.  They have no person crimes

10  associated with it.  It's just a simple distribution of a

11  controlled substance arrest.  They're going to go to jail.

12  They'll get photographed and fingerprinted.  They'll get booked

13  in.  And odds are, in less than 24 hours, they will be recogged

14  out.  They will be released.  They'll have an address that they

15  can give, somewhere they live.  They'll have a phone number,

16  possibly a place that they claim they're working, and they'll

17  be out on the street.

18          And with a -- and that's what we're seeing with these

19  larger dispatch models where I was talking about moving people

20  around.  When that happens to one of their people, the answer

21  for these organizations is to move them to a different city,

22  where they've got the exact same set up.

23  Q.  And when that person is moved to a new city, does he fill

24  somebody else's role, how does that work?

25  A.  If he was -- let's assume he was a street -- he's

481

Kubic - D

1  delivering on -- out on the street.  And he'll probably step

2  right into that role in the next city.  And just -- they'll

3  give him a phone, give him a car, supply him possibly with a

4  crash pad, and put him to work.

5  Q.  And in that new city --

6  A.  Um-hmm.

7  Q.  -- does the person need to develop a new customer base?

8  A.  No, no.

9  Q.  Why?

10  A.  The franchise is already there, the company's already

11  there.  It's like Domino's.  Right?  If you're a Dominoes

12  delivery guy, then you move from Portland to Eugene and you

13  want to work for Domino's.  And you have a good history with

14  the franchise over in Portland, and perhaps that franchise

15  owner even owns the franchise in Eugene.  They'll hire you.

16  And they'll put you to work in Eugene.  And you, as the

17  delivery guy, you're not worried about who the customers are.

18  You're just taking direction and going and delivering pizzas.

19  Q.  And in this model, when you're new, do you introduce

20  yourself to your new customers?

21  A.  Some do, some don't.  Yeah.

22  Q.  And what do those introductions typically look like in the

23  drug world?

24  A.  Very cursory.  Nicknames.  A lot of nicknames.  Flocko,

25  Gourdo, Quero.  Yeah.  Names that reflect some sort of personal

1    attribute of the person doing the delivery.

2    Q.  Let's talk about how the product gets to Portland in the

3    first place.

4            How does this heroin arrive here?

5    A.  The bulk of it that we're aware of is being driven to

6    Portland.  Coming up I-5, coming up 97, in what we call load

7    cars.

8            So cars that occasionally have what we call a trap.

9    So an actual hidden compartment.  Or it's built and designed to

10   hide their drugs.  Also, they'll use a lot of natural voids in

11   cars; areas that the manufacturer leave open but accessible,

12   where drugs can be hidden in.

13           Some organizations will go farther than that and hide

14   drugs in stuff like drive shafts.  They'll actually drop the

15   drive shaft off the vehicle, cut it open, fill it with dope,

16   weld the drive shaft back, put it on.  False gas tanks.  You

17   can -- you can be pretty creative, as far as hiding drugs in

18   vehicles, and you can put a lot of dope in a car.

19   Q.  Have you ever seen dope in an airbag compartment?

20   A.  Yeah, that's -- that's fairly typical.  Passenger side

21   airbag, pull that out, and replace the airbag.  It's a huge

22   void.  Great place to hide dope.

23   Q.  And then are you familiar with certain things that

24   transporters and dealers can do to -- besides traps, to sort of

25   hide the idea that they have dope?

Kubic - D

1    A.   Yeah.   Masking agents.   You know, lots of little, what we

2    call -- police technical term -- the felony forest.   It's when

3    you see somebody that's driving along and they've got 12 air

4    fresheners hanging -- the little tree -- trees hanging from

5    their rearview mirror.   I find that a little overwhelming, but

6    we see that all the time.

7         You'll stop a car, and there will be dryer sheets

8    spread throughout the car, unused dryer sheets.   Detergent,

9    just spilled on the floor, in the trunk, on the seats.   They

10   wrap the -- they wrap their drugs in plastic, put it in -- use

11   Seal-A-Meals to evacuate it.   Wrap that in axle grease, pepper,

12   another layer, yet another layer.

13   Q.   Why all the smells?

14   A.   All the smells, they're worried about dogs primarily.   But

15   heroin has also got a very distinctive odor.   It's a strong

16   vinegary smell.   And once you've smelt it once -- you stop the

17   vehicle and you smell that overwhelming order of vinegar coming

18   out of it, and you've got some other indicators as well, you

19   probably know what you've got.

20   Q.   Finally, Sergeant, I want to talk about the phones.

21   A.   Okay.

22   Q.   Is it common to see drug dealers with one phone or more?

23   A.   Multiple phones is common.

24   Q.   Why?

25   A.   Typically they will have a personal phone and a work phone

484

Kubic - D

```
1    and possibly multiple work phones, depending on their level

2    within the organization.

3    Q.   Are you familiar with the idea or concept of a burner

4    phone?

5    A.   Yes.

6    Q.   Is that also known as a track phone?

7    A.   Track phone is a brand of phone that's used as a burner

8    phone.

9    Q.   And what is a burner phone?

10   A.   Burner phone is a cheap phone that's not going to be easily

11   traceable to use.  Something that you can go into 7-Eleven, put

12   cash down, get a cell phone with some minutes on it and a phone

13   number.  And short of us getting lucky figuring out where that

14   phone was purchased, going back to that store within the two

15   weeks to 30 days max that they would maintain video

16   surveillance and getting that video surveillance to actually

17   work and downloading it and figuring out who bought that phone,

18   by the video -- which would probably not be great -- there's no

19   way to figure out who owns that phone.

20   Q.   And so when somebody buys a track phone, for instance, at

21   7-Eleven or KMart, whatever, do you have to register your track

22   phone or pay a bill for it?

23   A.   You have different ways of doing that.  The companies would

24   like you to register online and connect a credit card to it and

25   so they can start up-selling you.  But you can do simple things
```

Kubic - D

1    like going back to the place, or other stores that specialize

2    in that, in selling them, and just buying additional minutes

3    for cash.  You essentially get a card that you enter some

4    numbers into the phone and now you've -- you've -- you've

5    topped off your phone.

6    Q.  As a narcotics investigator is there certain techniques you

7    have to investigate cell phones before you have the cell phone

8    in hand?

9    A.  Yes.

10   Q.  So before you seize a phone from a dealer, for example --

11   A.  Yes.

12   Q.  -- what are the things you can look at?

13   A.  So you can subpoena phone records and -- for a cell phone.

14   And depending on your cell service provider, what you should

15   get back is call origination, call destination.

16           So what number got -- was -- what was the phone that

17   was used?  Which is what you're asking for.  What number did

18   that phone call -- it will tell you what time that call started

19   and what time that call ended.  It will tell you -- again, this

20   depends on cell service provider -- where that phone was when

21   it started the call and where that phone was when the call

22   ended.

23           So -- and it may tell you that based on just cell

24   tower location, which is a general area.  It may give you GPS

25   location, which is very specific.  But what you'll see is if

1    the phone's moving -- you know, the phone call could start in

2    Portland, and it's a long call and maybe it terminates in

3    Troutdale.  And so you would see that.

4    Q.  And looking at those kinds of records, before you even have

5    the phone, are you able to look at patterns that a call is --

6    is using?

7    A.  Yeah, call pattern analysis, link analysis.  There's

8    software out there that will do that for you.  But, yes, you

9    look for frequent calls.  Is there some numbers that are called

10   often?  If you know some users or phone numbers, so you know

11   that somebody's calling to order up and you see the call come

12   in consistently and then another number being consistently

13   dialed out.  And then the call going back to the user or the

14   text going back to the user.  Well, actually, you wouldn't --

15   you wouldn't see texts.  I take that back, on -- on those type

16   of call records.  But a call going back to the users, then you

17   can start drawing conclusions about what the intermediate call

18   is about.

19   Q.  And so why can't you see text messages in these call

20   records that you subpoena?

21   A.  Because the phone companies maintain call records not for

22   us but for themselves; to track, one, their billing and, two,

23   how their service is working.

24        The phone companies need to be able to bill each

25   other for the use of the towers.  And they need to be able to

1   bill the customer.  And if the customer is griping about their

2   bill, they need to be able to tell the customer what that bill

3   was.  Texts don't fall into that structure with the phone

4   companies, so they don't track texts at all on those kind of

5   records.

6   Q.  So how about after you seize a cell phone in a narcotics

7   investigation?  What are some things you can do with a seized

8   phone?

9   A.  With a seized phone, depending on the encryption and

10  whether it's a locked phone or not, you can -- what we call --

11  dump the phone.  There's hardware and software available that

12  you can plug the phone into.  Essentially a computer.  And it

13  will take all of the data out of the phone.  It will capture

14  all of your text messages that are stored on the phone.  And

15  those of you who may have a smartphone, especially if you pull

16  up your text message history, many of us will have text

17  messages between friends and family that go back as long as

18  you've had that phone.  You can just go back and look, right?

19  If that's there and it's not locked, then likely we can access

20  that and see all of that history.

21  Q.  Contact lists?

22  A.  Yes.  We can see the contact list.

23  Q.  Photographs?

24  A.  Yep.  Pretty -- long/short of it is anything you can see on

25  that phone, if we can access it, we can get it onto a computer,

1   and pull it up take a look.

2   Q.  And so when you say "dump," you don't mean throw the phone

3   out, do you?

4   A.  No, no.  It's just a term of art.  When you plug the phone

5   into the cable and it starts dropping the data on to your PC.

6   Q.  Okay.  Sergeant Kubic, final question.

7           If you don't seize a cell phone in an investigation,

8   are you still able to obtain those records you described?

9   A.  The records from the phone dump?

10  Q.  No, the records from the phone company.

11  A.  Yes.  The phone company records, providing you get on it

12  soon enough and they still have them, yes, you can get those.

13  Q.  And have you encountered thrown-away phones in your drug

14  investigations?

15  A.  All the time.

16  Q.  And sometimes have you still been able to find evidence

17  from phone companies about those phones?

18  A.  We have.

19          MS. BOLSTAD:  Nothing further on direct.

20          THE COURT:  Thank you.

21          Mr. Andersen.

22          MR. ANDERSEN:  Thank you.

23                      CROSS-EXAMINATION

24  BY MR. ANDERSEN:

25  Q.  I've got a few questions Mr. -- or Sergeant Kubic.

Kubic - X

1          Now, you talked a little bit earlier about load cars

2   or about transportation that might be employed by -- by people

3   in the organization you were describing.

4          And you talked a little bit about some of the, I

5   guess, markers you might -- you might look for if you stop a

6   car or if you do something like that.  You mentioned the trees,

7   the dryer sheets, things like that.

8          Are there any other indicators that might indicate to

9   you that -- or an investigator that there's suspicion -- or

10  that would up somebody's suspicion?

11  A.  There's -- there's so many -- there are tons of indicators.

12          Everything has to be viewed in context and -- and

13  what's going on at that stop and what your history is.  If --

14  if this is a stop of somebody that you have some background on

15  and -- and you have some intelligence on versus just if it's a

16  cold patrol, just pulled you over for speeding and starts

17  noticing stuff.

18  Q.  Well, let's say it's a cold stop, like you're saying.  You

19  noted some of those issues.

20          Are there any other sort of issues, that are sort of

21  baseline?

22  A.  Absolutely.  You're looking -- if somebody's nervous --

23  excessively nervous, if you have multiple people in the vehicle

24  and there are stories, as you're talking to them, engaging them

25  in conversation, if their stories are very consistently -- or

1    considerably different.  Loose portions of the vehicle in a

2    newer vehicle.  A vehicle that doesn't add up where the

3    destination is versus where it's coming from or where it's

4    registered.

5          Yeah.  There's -- there are many things to explore.

6    Q.  What about things like registration?  Is there anything

7    about registration that would --

8    A.  Sure.  So tip -- a lot of load cars are rental vehicles.

9    So you have somebody who's driving the vehicle, who is not the

10   person who rented the vehicle.  Same thing.  You had somebody

11   driving a vehicle and it's not registered to them.  They don't

12   know who the registrant is.  You ask them about who the

13   registered owner is, they don't know.  So inconsistencies.

14   Q.  Okay.  So if the driver's not the registered owner, that's

15   an issue.

16         What about license plates, anything like that?

17   A.  Okay.  I --

18   Q.  I -- I'm just asking generally, if the license plate, for

19   example, came back to a different car, that might be --

20   A.  Oh, that -- that now is a completely -- well, that is an

21   issue, but that also escalates us into thinking perhaps it's a

22   stolen vehicle.  So you may not -- not have a load car.  You

23   may have some other criminal activity.

24         Basically, good police work on the side of the road,

25   when you're -- when you've pulled someone over for speeding is

Kubic - X

 1   what doesn't fit?  And it's -- there's no universal to tell you

 2   what fits every time because it's the big picture.  It's the

 3   context.

 4   Q.  Okay.  And you also, I think you were -- you were saying

 5   earlier about -- you talked about people that might come into

 6   town and sort of jump into an already running organization.

 7           I mean, would you agree that those people would want

 8   to try to maintain -- would not want their identity to be

 9   publicly revealed?  I mean, you said they obviously didn't

10   introduce themselves with their names, or anything like that.

11   Right?  Is that --

12           I'm not sure if that question really is much of a

13   question.  Let me rephrase it.

14           I mean, you're -- in general, in these types of

15   organizations, would you agree that the people that are

16   involved would want to maintain anonymity to whatever extent

17   they could?

18   A.  Absolutely.

19           MR. ANDERSEN:  That's all I have.  Thank you.

20           THE COURT:  Counsel.

21           MR. SEPP:  Thank you, your Honor.

22           THE COURT:  Excellent.

23                       CROSS-EXAMINATION

24   BY MR. SEPP:

25   Q.  Good morning, Sergeant.

1    A.  Good morning.

2    Q.  I've had some issues with the microphone the last couple

3    days.

4            Okay.  Now, going back to just talking right now and

5    focus attention on the multiple cell phones.  And the purpose

6    of that is so that one doesn't interact with the other,

7    business and personal?

8    A.  There is -- there is business and personal issues.  There's

9    also the -- the concern that if we, in law enforcement, go up

10   on one phone, that we don't, it doesn't open up the entire

11   network to us.  And that if you're using multiple phones, you

12   could have one personal phone; you keep everything out of that,

13   that's clean.  And then you might have multiple work phones.

14   So one phone to communicate if you're -- if you're the dispatch

15   center.  One phone to communicate with customers.  One phone to

16   communicate with your -- your runners out in the field.  I've

17   seen organizations where they even assigned each runner a

18   separate phone, and dispatch will have separate phones for each

19   runner.

20           So they're compartmentalizing it as much as possible.

21   Basically, a cell structure, not unlike a terrorist

22   organization.  The more you cellularize it, the more difficult

23   it is for us to figure out how it all connects and who all is a

24   part of it.

25   Q.  And would that purpose be frustrated if you -- the second

1    phone had the same phone number as the first?

2    A.  Well, the -- if both phones have the same number, that's --

3    they're the same phone.  It doesn't -- if I have two phones, as

4    far as the -- yes, you have two physical devices.

5            But if you have two physical devices with the same

6    phone number, only one of those is really going to work.

7    Right?  Like when you upgrade from your old phone to a new

8    phone, for some period of time you have two phones with the

9    same number, but the reality is only one of those two work

10   because you only brought one online.

11   Q.  Right.  So that would just in essence be one phone?

12   A.  Correct, one phone.

13   Q.  And the idea of the burner phone that you can buy at the --

14   well, almost anywhere, now.

15   A.  (Nods head.)

16   Q.  That is so that it cannot be traced.  Correct?

17   A.  That makes it -- that -- that is -- whether it's being used

18   for that or not, that is certainly, for some people, a feature.

19   Q.  And, again, that purpose would be frustrated if on your

20   phone you were carrying a multi -- a long-term contract?

21   A.  Well, it --

22   Q.  If a phone user had a long-term contract --

23   A.  Right.  Then it's not -- they're not -- they're frustrating

24   themselves if their goal was to stay anonymous.

25   Q.  And now in telling a little bit about the stash house --

Kubic - X

1  A.  Um-hmm.

2  Q.  -- in your experience, have you ever encountered a stash

3  house where they had -- had people living there that were just

4  regular people not associated with the dope organization?

5  A.  Yes, I have.

6  Q.  And just a couple more, and these are going to be very

7  obvious.

8         Now, you described the hidden compartment.  Now, a

9  good hidden compartment, then, is hard to find?

10  A.  By definition, yes, sir.

11  Q.  Yes, I know, lawyers' questions.

12         And very -- and the object is to make sure that no

13  one can see it, so the drugs aren't discovered?

14  A.  Absolutely.

15         MR. SEPP:  That's all I have.

16         THE COURT:  Redirect?

17         MS. BOLSTAD:  Nothing your Honor.

18         THE COURT:  Thank you, sir.  You're free to go.

19         MS. BOLSTAD:  Government calls Pat McNair.

20         THE COURT:  Thank you.

21         Good morning.  Please face the jury and deputy there.

22         Raise your right hand to be sworn.

23         (Witness sworn.)

24         THE WITNESS:  I do.

25         THE CLERK:  Please take a seat.

1        THE COURT:  Bring yourself close to the microphone,

2    please.  Tell us your full name, and spell all of it, please.

3        THE WITNESS:  Sure.  It's Patrick Allen McNair.  It's

4    P-A-T-R-I-C-K, A-L-L-E-N, M-C-N-A-I-R.

5        THE COURT:  Thank you.

6        Counsel.

7                    DIRECT EXAMINATION

8

9    BY MS. BOLSTAD:

10   Q.  Good morning.

11   A.  Good morning.

12   Q.  Would you introduce yourself to the jury.

13   A.  Again, I'm Patrick McNair.  I'm a detective for the City of

14   Beaverton, and I'm assigned to the West Side Interagency

15   Narcotics team.

16   Q.  Is that the WIN team?

17   A.  Correct.  The WIN team for short.

18   Q.  How long have you worked on the WIN team?

19   A.  Approximately three-and-a-half years.

20   Q.  And how long, overall, with the Beaverton Police

21   Department?

22   A.  Since 2006.  So just shy of ten years.

23   Q.  What type of law enforcement training have you received?

24   A.  I attended the police academy in the state of Florida,

25   where I was a certified police officer.  That was after I

1    graduated from college with a Bachelor's degree in criminology

2    and sociology.

3         I then completed the field training program with the

4    Collier County Sheriff's Office in Florida where I worked for

5    approximately 18 months before I moved out here to Oregon and

6    was hired with the Beaverton Police Department.

7         After being hired with Beaverton Police Department,

8    I -- I attended the Florida State Police Academy -- I mean, the

9    Oregon State Police Academy.  I graduated from there.  I also

10   did a field training program with the Beaverton Police

11   Department.

12        That's where we're assigned a training officer to

13   ride with who's going to be teaching you the ins and outs of

14   what you're doing.  After that, specific to drug

15   investigations, I did a period of four months where I worked

16   with the WIN team, in what we called the WIN emersion training.

17   So they took me off patrol and let me work with the WIN

18   investigators.  And that was in 2010.

19        And so I had four months of actually being involved

20   in, you know, these investigations and actually being able to

21   help and learn while doing.

22        I did the FTAP program with the WIN team.  And,

23   again, that's when you come over to the WIN team, you're

24   assigned somebody to walk you through the training program.

25   You know, teach you each different aspects of the drug

1    investigations and make sure that you've been introduced to as

2    many aspects as possible.

3                I've completed the detectives academy through the

4    state of Oregon.  That was a 40-hour class which just covers

5    the basics of investigations in general.  It touches on drug

6    investigations but it's also persons crimes.

7                I'm a member of the Oregon Narcotics Enforcement

8    Association, and I've attended two of their conferences, as

9    well as the California Narcotics Officers Association.  Also

10   attended two conferences there.  And those conferences kind of

11   touch on smaller amounts of different drug investigations.  So

12   you attend maybe four different classes over the period of two

13   days.  And I've had -- so a total of 16 classes, probably,

14   through them.

15               I've also done interview, interrogation training;

16   training about finding hidden compartments and concealed

17   contraband in vehicles; drug trafficking organizations or DTO

18   investigations.  Had specific training on wiretap

19   investigations, money laundering, overdose investigations,

20   including investigating the overdose deaths under **Len Bias**

21   laws.

22   Q.  Were you involved in a **Len Bias** investigation in late March

23   2014?

24   A.  Yes, I was.

25   Q.  And did you have a partner in that investigation?

498

McNair – D

1    A.   I did.

2    Q.   Who?

3    A.   I worked with Detective Sommer Andersen.

4    Q.   Right here to my left?

5    A.   That's correct.

6    Q.   So Detective Andersen has already testified.  She

7    summarized the events from the beginning, up to March 31st and

8    Shane Baker's buy from his source.  Are you with me?

9    A.   Yes.

10   Q.   And so what I want you to do is to focus on the moment of

11   Shane Baker and his buy from his source on the 31st through the

12   end of your investigation.

13   A.   Okay.

14   Q.   Okay?

15            And for the jury, the March 31st event is in Count 9

16   of the Indictment.

17            THE COURT:  And please slow your pace down.  I know

18   you're used to talking fast.

19            We need to all understand it.  And we're also

20   translating.  So it's important that you keep your pace a

21   little slower.

22            THE WITNESS:  Yes, ma'am.

23   BY MS. BOLSTAD:

24   Q.   Do you know what a controlled buy is?

25   A.   Yes.

499

McNair - D

1    Q.  Tell the jury what it is.

2    A.  Sure.  A controlled buy is where we use a confidential

3    informant, which is somebody who is working with us, law

4    enforcement, but they're not generally law enforcement

5    themselves.

6         We use that person to -- who has access to a drug

7    dealer, because I don't have a drug dealer that I can go

8    purchase drugs from, and we actually have them purchase drugs

9    on our behalf for our investigation, using money that we

10   provide; all while we're conducting surveillance, recording the

11   phone calls, and, where it gets its name -- controlling the

12   circumstances of the buy and keeping surveillance the entire

13   time.

14        So, for example, we would meet with an informant,

15   check and search the informant.  If the informant has a

16   vehicle, we would search the informant's vehicle.  We would

17   make sure they don't have any of their own money, you know, to

18   maybe purchase anything on their own.  Make sure they don't

19   have the drugs already with them, so that we're ensuring that

20   the dugs actually come from the target of the investigation.

21        Then we would provide them with our own money that we

22   took out, have people sign a receipt for the money, follow them

23   during surveillance while they go and meet with the drug

24   source.  Continue to follow both the informant and the drug

25   source after the drug transaction and meet with the informant

McNair - D

1  again.

2          Then we would obtain the drugs that were purchased

3  from the informant and do what we call a debrief.  So we would

4  talk to the informant, ask them what happened.  The details

5  that maybe we couldn't see on surveillance; what happened

6  inside of -- inside of the vehicle, maybe, where the deal

7  location occurred.  Or if it happened in the house, details

8  about what happened in the house and how they purchased the

9  drugs.  And then we would take the drugs into evidence and

10 proceed from there.

11 Q.  So it sounds like after the buy that you're talking about,

12 people follow the source of supply.

13 A.  Correct.

14 Q.  Why not arrest the source of supply who's just sold drugs?

15 A.  Sure.  Ultimately our goal, when we're doing these

16 investigations is to identify as much of the drug distribution

17 network as possible.  We want to identify locations where drugs

18 are being hidden and stashed.  We want to identify the

19 residences of the people involved.

20          We also want to, you know, identify -- there may be

21 other co-conspirators involved that aren't actually present

22 during the drug transaction, things like that.

23 Q.  On March 31st, did you monitor a phone call made by

24 Mr. Baker to his source?

25 A.  Yes, I did.

McNair – D

1   Q.   What number did Mr. Baker call?

2   A.   So he called 442-400-4202.

3   Q.   And did you observe who he had that phone number saved as

4   in his contacts?

5   A.   Yes.

6   Q.   What was the contact for the 442 number?

7   A.   It was saved in Shane Baker's phone as Mexican Bobby.

8   Q.   Do you know the provider for that phone?

9   A.   It was Verizon Wireless.

10  Q.   Okay.  So Verizon services the 442 number?

11  A.   Correct.

12  Q.   And on the 31st, where did the controlled buy take place?

13  A.   It took place at the 7-Eleven parking lot, which is at 6335

14  Southeast Harmony Road, which is the Milwaukie, Portland area.

15  Q.   And is that in Oregon?

16  A.   It is in the District of Oregon.

17  Q.   Okay.  What time did Mr. Baker initiate the calls?

18  Approximately, if you have it.

19  A.   The first calls would have been probably just prior to

20  10:00 p.m.

21  Q.   And then what time did the buy occur with Mr. Baker

22  actually -- well, let me back up.

23         Did Mr. Baker actually go to the buy?

24  A.   Yes, he did.

25  Q.   And what vehicle was he in?

McNair - D

1    A.  He was in his own vehicle.

2    Q.  Okay.  Are you aware of what time he was at the 7-Eleven?

3    Yes, he arrived at 10:39 in the evening.

4    Q.  Okay.  Prior to you sending Mr. Baker to this buy, had he

5    told investigators how it typically goes for him?

6    A.  Yes.

7    Q.  And did he, in that description, provide vehicle

8    descriptions of who arrives to deliver the drugs?

9    A.  Yes.

10   Q.  And so were you and your team on the lookout for specific

11   vehicles?

12   A.  We were.

13   Q.  What were you looking for?

14   A.  There was a Honda sedan that he had described and a red

15   S.U.V.

16   Q.  Okay.  Did any vehicles arrive to the 7-Eleven matching

17   either description?

18   A.  Yes.  A red S.U.V. arrived at approximately 10:41.

19   Q.  And was Mr. Baker successful in purchasing drugs?

20   A.  Yes.

21   Q.  Did he -- how much drugs?

22   A.  Approximately 8 ounces or a half pound.

23   Q.  And afterwards, did he deliver those to you?

24   A.  Yes, he did.

25   Q.  What was the package?  What did it look like?

McNair - D

1    A.  It was tightly wrapped with Saran Wrap.  And when we later

2    unraveled that, it was a brown powdery substance inside of a

3    heat-sealed bag.

4    Q.  Did you send that quantity to the Oregon State Police Crime

5    Lab?

6    A.  Yes, we did.

7    Q.  I would like to show you Government's 56.

8        MS. BOLSTAD:  And this has been marked and admitted.

9        THE COURT:  Thank you.

10   BY MS. BOLSTAD:

11   Q.  Do you recognize this?

12   A.  I do.

13   Q.  What is it?

14   A.  It is an Oregon State Crime Lab report.

15   Q.  And what did the lab confirm here?

16   A.  The lab confirmed that the item we submitted from that

17   controlled buy tested positive for heroin, and that it was

18   200.22 net grams.

19   Q.  Okay.  Was this the heroin from March 31st?

20   A.  Yes.

21   Q.  Is 200 more than 100?

22   A.  Yes.

23   Q.  Thank you.  I would -- I like the obvious questions, too.

24       Okay.  Earlier, you told the jury about the

25   importance of following vehicles afterwards.  So did that

McNair - D

1   happen after the March 31st buy?

2   A.  Yes, it did.

3   Q.  Where did that red S.U.V. go?

4   A.  It went to a residence close by.  To the 7-Eleven.

5   Q.  Did your team obtain a license plate on the vehicle?

6   A.  Not that evening, we did not.

7   Q.  Later?

8   A.  Later, the following day, we -- we did surveillance.  The

9   evening of the buy, the car parked inside of the garage, so we

10  couldn't get the license plate.

11          The following day we did surveillance and saw the

12  vehicle leave the garage and we were able to get the license

13  plate.

14  Q.  What was that plate, if you remember?

15  A.  It's 827DRK.

16  Q.  So you mentioned it went into a garage.  What was the

17  address of that location?

18  A.  That's 11759 Southeast 64th.  I believe it's "Court."  And

19  it's Milwaukie.

20  Q.  What did you do with the information of that address?

21  A.  I contacted Portland General Electric, who was the electric

22  provider for the residence, and obtained information about the

23  power subscriber who -- who was assigned to pay the power bill.

24  Q.  What name did you obtain?

25  A.  It showed that Fabian Sandoval-Ramos was the person on the

McNair - D

1  power.

2  Q.  And did your team later obtain paper documentation of that

3  fact?

4  A.  Yes, we did.

5  Q.  I'm going to show you Government's 57.

6      What is this?

7  A.  That's a subpoena return from Portland General Electric.

8  Q.  And this has been marked and admitted.

9      What does it show you here?  What -- what should we

10  look at?

11  A.  Down at the bottom portion, it shows the response to the

12  subpoena, which was a request for the subscriber information

13  for the address on 64th.  And it shows in there that it was --

14  the customer of record was Fabian Sandoval-Ramos.  It provides

15  his identifying information as well.

16  Q.  And does it give a start date?

17  A.  It does.  It shows that the account was initiated July 13th

18  of 2011.

19  Q.  Okay.  Does it show a move-out date?

20  A.  Yes.

21  Q.  What's that date?

22  A.  It's April 14th, 2014.

23  Q.  Is that after your investigation concluded?

24  A.  Yeah.  Just under two weeks after.

25  Q.  So once you had the name Fabian Sandoval-Ramos, what do you

506
McNair - D

1    do with a name?

2    A.  We checked it in Washington and in Oregon D.M.V. records.

3    Q.  And what information did you learn?

4    A.  I learned that Fabian Sandoval-Ramos had a different

5    address listed on his Oregon driver's license record.

6    Q.  What was that address?

7    A.  That's 7915 Southeast King Road, Apartment No. 2.  And it's

8    also in Milwaukie, Oregon.

9    Q.  Did the D.M.V. records of either state show any vehicles

10   registered in his name?

11   A.  Yes.  I ran a separate query under Oregon for vehicles

12   registered under the name Fabian Sandoval-Ramos.  And I found

13   that the Honda Passport with the plate 827DRK, the same vehicle

14   that we had seen at the location on 64th, was registered to

15   Fabian Sandoval-Ramos.

16   Q.  And is that the same vehicle that delivered to Shane Baker

17   on the 31st?

18   A.  Yes.

19   Q.  Let's talk about that second address.  I'm going to call it

20   location 2.  Okay?

21   A.  Okay.

22   Q.  7915 Southeast King.

23        Is this the first time you had learned of location 2

24   in your investigation?

25   A.  Yeah, after we ran Fabian's name in D.M.V. records, that's

507

McNair - D

1    the first time we found that address.

2    Q.  Okay.  Just a moment.

3              (Pause, Ms. Bolstad and the defense attorneys

4              conferring.)

5              MS. BOLSTAD:  And, your Honor, may I show a diagram?

6    No objection.

7              THE COURT:  Yes, you may approach the witness.

8              If you're going to use the easel, you need to move it

9    out to where the jurors can see it without blocking the vision

10   of the witness or the parties.

11             Move it back a bit so the witness can see it.  Angle

12   it so the jurors can see it.

13             MS. BOLSTAD:  Right.  That's important.

14             THE COURT:  It's not as easy as it sounds.

15             MS. BOLSTAD:  Defense counsel, can you see?

16             MR. SEPP:  (Nods head.)

17             THE COURT:  Go ahead.

18             MS. BOLSTAD:  Oh, I better turn it around.

19             THE COURT:  Does this have a number, for reference?

20             MS. BOLSTAD:  This is Government's Demonstrative 1.

21             THE COURT:  All right.  Go ahead.

22   BY MS. BOLSTAD:

23   Q.  Do you recognize this map?

24   A.  I do.

25   Q.  And what do we see here?

508

McNair - D

1  A.  This is an overhead view of the area of Milwaukie that

2  would encompass both the deal location at the 7-Eleven, which

3  we're calling location No. 1, the address on 64th and location

4  No. 2, the address on King Road.

5  Q.  And I see pictures associated with each address.  First,

6  are the pictures of the residences shown?

7  A.  Yes, they are.

8  Q.  Okay.  And I also see pictures of people.

9         Are those the people associated with those locations?

10 A.  Yes.  Those are some of the people associated at those

11 places.

12 Q.  Okay.  So were you able to -- were you able to determine a

13 distance between location 1 and location 2?

14 A.  Yeah, it's less than two miles driving.

15 Q.  And what is the proximity of those two locations, 1 and 2,

16 to the 7-Eleven on Harmony?

17 A.  Location No. 1 is approximately .3 or a third of a mile

18 from the 7-Eleven.  And location No. 2 is right around two

19 miles.

20 Q.  The photograph of Mr. Fabian Sandoval-Ramos, I'm going to

21 show you, on the screen in front of you, Government Exhibit --

22 I believe it's 50 -- 59.

23        Did you obtain a photograph of him?

24 A.  Yes.

25 Q.  Is this it?

McNair - D

1   A.   That is.

2   Q.   Okay.  Washington D.M.V?

3   A.   That is a Washington D.M.V. photograph, yes.

4   Q.   So once you had the name Fabian Sandoval-Ramos and the

5   photograph that's associated with that name, did you show it to

6   anybody?

7   A.   I did.  I sent that photograph, and the photograph only, by

8   e-mail to a group of people who work in the Washington County

9   jail.

10          They're called the WIN, which is the narcotics team.

11   The WIN jail liaisons.  So they're people who are deputies in

12   the jail, but they're our liaisons.  So they help us if we have

13   questions of somebody that's in the jail.

14          So I e-mailed this photograph to the WIN liaisons and

15   asked that it be shown to Shane Baker.

16   Q.   What instructions did you give the liaison in making that

17   showing?

18   A.   I asked them to show this photograph, and ask if Mr. Baker

19   recognized the person in the photograph.

20   Q.   Did your liaison in the jail know anything about your

21   investigation from your -- had you provided him with

22   information?

23   A.   Other than the photograph and asking him to show, I didn't

24   provide any information about the case.

25   Q.   And so my question is this:  Did the deputies at the jail

McNair - D

1  know who this was?

2  A.  No.

3          MR. ANDERSEN:  I object.  He can't testify to what --

4          MS. BOLSTAD:  I'll rephrase.

5          THE COURT:  Rephrase the question.

6  BY MS. BOLSTAD:

7  Q.  Did you send a photograph with any identifying marks on it

8  to the jail?

9  A.  No.  The only thing that was there was the actual

10  photograph as an attachment, and then my e-mail request to show

11  the photograph.  I didn't have any information about who this

12  was or who we suspected it to be, or anything.

13  Q.  Okay.  And what did you learn back from your jail liaison?

14  A.  I got an e-mail back from Deputy Howell, who is one of the

15  jail liaisons, who said that Mr. Baker identified this person

16  as the person that Mr. Baker knew to be Mexican Bobby.

17  Q.  What day did that information from Mr. Baker -- what day

18  did he look at the photo?

19  A.  April 1st, I believe.

20  Q.  Okay.  Was that the day following the March 31st buy?

21  A.  Yes, it was.

22  Q.  Let's talk about April 2nd.

23          MS. BOLSTAD:  And, ladies and gentlemen, we're now

24  moving into Count 10 but also Counts 1 and 2.

25  BY MS. BOLSTAD:

McNair - D

1    Q.  Prior to April 2nd, did your team come up -- did your team

2    obtain judicial authorization to search any of these locations?

3    A.  On the 2nd, we obtained a search warrant for location

4    No. 1.

5    Q.  Okay.  Did you have a -- I'm sorry.  Did you have a search

6    warrant yet for location No. 2?

7    A.  No.

8    Q.  When, if ever, did you obtain a search warrant for location

9    2?

10   A.  It was a short time after we executed the search warrant at

11   location No. 1.

12   Q.  So working with your partner Detective Andersen, can you

13   tell the jury what your operational plan was for April 2nd?

14   A.  Sure.  So our plan was to set surveillance units around all

15   three of these locations:  The 7-Eleven, which was the deal

16   location; the location No. 1, which was where we saw the car go

17   back to; and location No. 2, which we believed to be a

18   residence likely involved in this case.

19          We planned to use Mr. Baker to make another phone

20   call for another delivery, and then our intent was to watch

21   what activity that would spur around these locations.  That

22   might lead us to have more information about which location was

23   involved and how they were involved.

24          And our plan was then, once we made the order, to

25   follow whoever left these locations and went to the deal

McNair - D

1    location, and then to eventually stop them and arrest them.

2    Q.  Is it fair to say that at this stage you didn't yet know

3    where the drugs were coming from?

4    A.  That is correct.

5    Q.  Okay.  You knew they had come from a vehicle.  Is that

6    fair?

7    A.  Yeah, we knew that they had been delivered to the deal

8    location in that red S.U.V., but we did not know where the

9    drugs had come to prior to that deal.

10   Q.  Were you -- were you with Mr. Baker when he placed the

11   phone calls on April 2nd?

12   A.  I was.

13   Q.  Where were you?

14   A.  At the Washington County Sheriff's Office, up in the

15   detective's office.

16   Q.  And did you record the phone calls of Mr. Baker?

17   A.  Yes, we did.

18   Q.  Do you know approximately what time he initiated contact

19   with his source?

20   A.  It was about 3:45 in the afternoon.

21   Q.  And was there one call or multiple calls?

22   A.  There were two initial phone calls to set up the

23   transaction.  And then, later on down the road, there was a

24   couple more calls.

25   Q.  Is one of the initial calls -- did it go unanswered?

McNair – D

1    A.    I don't remember.  I -- I think they both connected.

2    Q.    Okay.  I'm going to play you what's been marked and

3    admitted as Government Exhibit 60.  And I'll note for the

4    record that there's a beep between two separate calls.  Okay?

5            So I'll have you listen to this, and then I'll ask

6    you what it is you just heard.

7    A.    Sure.

8            THE COURT:  For the record, the court reporter need

9    not transcribe the exhibit.  To the extent the interpreter is

10   able, given the quality of the call, interpretation should be

11   provided.

12           Go ahead.

13           (Pause, audio playing.)

14   BY MS. BOLSTAD:

15   Q.    Do you recognize those calls?

16   A.    I do.

17   Q.    Okay.  What did we hear?

18   A.    You heard me in the background, talking to Mr. Baker before

19   he made the phone call and making sure he was ready to make the

20   calls.  And then a series of phone calls setting up the drug

21   transaction at the same location as the prior deal.

22   Q.    Okay.  And did they sound -- there was a beep in the middle

23   there.  Do you know how much time elapsed between the first

24   portion and the second?

25   A.    I believe it was just a few minutes.

McNair - D

1    Q.  Okay.  And did that seem to be in the right order?

2    A.  Yeah.  I mean, it seemed to go with what I would expect.

3    Q.  Okay.  At some point we hear a voice say, We had a good

4    call.  Was that your voice?

5    A.  That was my voice over the radio, advising everybody else

6    who was on surveillance.

7    Q.  And what were you telling them to do?

8    A.  To prepare for movement from the locations they were

9    watching.

10   Q.  Were there any discussions of price or type of drug in this

11   call?

12   A.  No.

13   Q.  And the "I'll be at the store," what did that mean?

14   A.  Well, "I'll be at the store at the same location," that, to

15   me, meant that it was going to be the same location as before,

16   which is the 7-Eleven store.

17   Q.  Okay.  Detective McNair, we will hear from witnesses, after

18   your testimony, about the traffic stop on the vehicle, okay?

19   So I don't want to get too in-depth on this.

20           But before we move on, could you summarize to the

21   jury what happened with the 7-Eleven store on April 2nd, to put

22   in context the rest of your testimony?

23   A.  Sure.

24   Q.  So a green Honda that had departed from location No. 1,

25   drove over to the 7-Eleven.  It slowly rolled through the

1  7-Eleven parking lot and then around the block.  Then the

2  vehicle drove away.  And a few minutes later, we had a vehicle

3  stop the car.  A marked patrol car.

4  Q.  And was anything found inside that green Honda Civic?

5  A.  Yes.

6  Q.  What?

7  A.  There was additional heroin.  Approximately 392 grams in

8  two separate amounts.  One was approximately 8 ounces and

9  labeled with an 8.  And one was approximately 5 ounces, and

10 labeled with a 5.

11 Q.  When that green Honda Civic was slowly circling around the

12 7-Eleven, were there calls received by Mr. Baker?

13 A.  Yes.

14 Q.  And were you still with Mr. Baker when that delivery was

15 about to happen?

16 A.  Yes.

17 Q.  Were you looking at his phone?

18 A.  Yes.  I had his phone with me, so that I had control of the

19 phone.  And before I would let him get -- answer a phone call,

20 I would make sure I looked at it.

21 Q.  Okay.  And so at the -- are you also hearing from

22 surveillance officers on the scene?

23 A.  Yes.  I had my police radio in the same room.

24 Q.  Okay.  So tell us about the calls received by Mr. Baker.

25 A.  Mr. Baker received a phone call from the same phone number

1  that we called to place the order, and asked him where he was.

2          Mr. Baker explained that he was in a silver car in

3  the parking lot, as I had direct the him to say.  And then,

4  eventually, in one of the phone calls, the person who we were

5  calling Mexican Bobby on the phone, asked him to go to a

6  different location and to follow the Honda to the Lowe's.

7  Q.  Had that ever happened before with Mr. Baker, to your

8  knowledge?  Go to a different location?

9  A.  No.

10 Q.  What do you think was happening?

11 A.  I believed that they were suspicious because his vehicle

12 wasn't there.

13 Q.  Whose vehicle wasn't there?

14 A.  Because Shane Baker's vehicle wasn't at the 7-Eleven, we

15 believed that the suspects delivering it were apprehensive

16 about stopping.

17 Q.  And his -- why wasn't his vehicle at the 7-Eleven?

18 A.  Because he was in custody at the Washington County jail.

19 Q.  Okay.  And so did you also hear from surveillance agents at

20 the 7-Eleven about the traffic stop?

21 A.  I did.

22 Q.  Did they stop the car in a different location, or where was

23 it stopped?

24 A.  Yeah, it was somewhere -- I don't know the exact location.

25 I would have to see it.  Somewhere -- but it was somewhere

517
McNair - D

1  between the 7-Eleven and en route to the Lowe's.

2  Q.  Okay.  Let's move ahead to the search warrant at location

3  1.

4          Did you leave Mr. Baker in jail?

5  A.  I did.  Once we had stopped the green Honda car, I then

6  lodged him back at the jail, and I drove out to Milwaukie from

7  Hillsboro.

8  Q.  Okay.  Did you participate in the search of location 1?

9  A.  I did.

10  Q.  What time did that begin?

11  A.  They executed the search warrant approximately 5:45, I

12  believe.

13  Q.  p.m.?

14  A.  p.m., yes.

15  Q.  And Agent Blankenship will testify about the details of

16  that search.

17          Could you summarize what was found at location 1?

18  A.  Sure.

19          We found approximately 13,000 dollars in cash.  And

20  that was out of a couple of different locations in the house.

21          We found a bunch of drug packaging materials that

22  clearly were used packaging materials, similar to the stuff we

23  had seen the drugs packaged in that we obtained.  Lots of

24  pastic wrap, heat-seal packages, things like that.  And some of

25  that was dirty, and I could actually still smell the -- smell

McNair - D

1   the heroin on it.

2           So we also found things like drug packaging that had

3   not yet been used.  Heat sealers, heat-seal packaging, large

4   Costco-size boxes of plastic wrap.  So we found some drug

5   records, some cutting agents, or agents used to dilute the

6   drugs.

7   Q.  Okay.

8   A.  I believe that's it.

9   Q.  Did you see any signs of heroin addiction or use at

10  location 1?

11  A.  No.  I didn't find any evidence that would lead me to

12  believe they were being used there.

13  Q.  No needles?

14  A.  No needles, nothing like that.

15  Q.  Did you leave location 1, at some point?

16  A.  I did.

17  Q.  Where did you go?

18  A.  I went over to the area of location 2.

19  Q.  Before you left location 1, did you observe any cutting

20  material or things used to dilute drugs?

21  A.  I did, in the kitchen.

22  Q.  I'm going to show you Government's 77.

23          What is this?

24  A.  That's a photograph of the kitchen of location No. 1.  And

25  in the photograph, you can see the large -- it's actually

519

McNair - D

1    Costco-brand plastic wrap.

2              Behind that, you can see bags of lactose, which is a

3    white powder milk sugar substance which is used as a cutting

4    agent often; as well as a cut-open bag of sugar, which could

5    also be used as a cutting agent.

6    Q.  And so during that search at location 1, did anyone see

7    Fabian Sandoval-Ramos at location 1?

8    A.  No.

9    Q.  Were you still looking for him, though?

10   A.  Yes.

11   Q.  And why was that?

12   A.  Well, again, we believed that he was, at that time, Mexican

13   Bobby; and on the power and subscriber; and somehow involved in

14   this investigation.  And, by that time, we had actually --

15   surveillance had seen him at location No. 2.

16   Q.  Okay.  And why did you believe Fabian Sandoval-Ramos was

17   Mexican Bobby?

18   A.  Based on Shane Baker's ID of his D.M.V. photo as the person

19   he knew as Mexican Bobby.

20   Q.  And have you changed your mind about whether he is in fact

21   Mexican Bobby?

22   A.  I would say that Mexican Bobby is more a figurehead name.

23   I don't know that there's an actual Mexican Bobby as -- as much

24   as there are different people that answer phones.

25   Q.  Tell us how your time at location 2 began.

McNair – D

1  A.  It began with the execution of the search warrant at

2  location No. 2.

3  Q.  I'm going to show you Government's 101.

4       What is this?

5  A.  That's a photograph of the front of location No. 2.

6  Q.  And do you remember what time you arrived at location 2, on

7  April 2nd?

8  A.  I don't remember the exact time I got there.  I -- I was

9  out there in the area of location 2, helping on surveillance

10  prior to the actual execution of the search warrant.  And

11  that -- the execution was at about 9:30 p.m.

12  Q.  Okay.

13       THE COURT:  Ms. Bolstad, before we get too deep into

14  location No. 2, we do need a morning recess.  If this is going

15  to be brief, you could do it; otherwise, we should adjourn.

16       MS. BOLSTAD:  I think a break would be appropriate.

17       THE COURT:  All right.  Ms. Boyer, would you move the

18  chart, so that it's out of the jurors' way.

19       Ladies and gentlemen, we will take our 15-minute

20  morning recess.  Remember, do not talk about the case or let

21  anything involving it cross your path.  Don't do any research

22  or any other outside inquiry about the case.  Time for a break.

23       Please stand, ladies and gentlemen, for the jury.

24       Watch your step, jurors.  We'll be back in session in

25  15 minutes.

521

McNair - D

1           (Jurors exit, 10:30 a.m.)

2           THE COURT:  You may step down, Detective McNair, and

3   watch your step around this chair.

4           THE WITNESS:  Thank you.

5           THE COURT:  All right.  Anything for the record

6   before we recess?

7           MS. BOLSTAD:  No, your Honor.

8           MR. SEPP:  No, your Honor.

9           THE COURT:  15 minutes, please.

10          (Recess taken, 10:42 a.m.)

11          THE COURT:  Is there anything for the record before

12  we ask the jury in?

13          MS. BOLSTAD:  No, your Honor.

14          MR. SEPP:  Nothing, your Honor.

15          THE COURT:  All right.  Please be seated, or you can

16  stay standing.

17          At your convenience, please bring the jury in.

18          (Jurors enter, 10:51 a.m.)

19          THE COURT:  Thank you, everyone.  Please be seated.

20          Ms. Bolstad, you may continue.

21          MS. BOLSTAD:  Thank you, your Honor.

22  BY MS. BOLSTAD:

23  Q.  Detective McNair, we were just talking about location 2.

24          I think we left off with your arrival.

25          Do you remember approximately what time?

McNair - D

522

1   A.  Again, we executed the search warrant around 9:30 p.m., and

2   I probably arrived at least an hour before, in the area.

3   Q.  Okay.  And were other members of your team already at

4   location 2?

5   A.  Yes.

6   Q.  Were they there conducting surveillance?

7   A.  Yes, they were.

8   Q.  We're going to hear from one of those deputies later.

9          Can you summarize what you learned, when you arrived

10  at L2, about Fabian Sandoval-Ramos?

11  A.  Sure.  I had learned that Detective Miller, who had been

12  there on surveillance, had seen Fabian going in and out

13  multiple times from location No. 2.  I also learned, during the

14  course of surveillance, that Detective Miller saw a female

15  leave location No. 2 with a trash bag and dispose of it in the

16  dumpster, the community dumpster at the apartment complex.

17  Q.  When the search warrant happened, were photographs taken?

18  A.  Yes.

19  Q.  I'm going to walk through some of those.  I would like to

20  show you Government Exhibit 103.

21          What is this?

22  A.  That's a photograph outside of location No. 2.  And that's

23  a second-story window overlooking the front door area of the

24  residence.  And you can see a black surveillance camera.

25  Q.  And is it over the door of apartment 2?

McNair – D

1   A.   Yes.

2   Q.   Let's look at Exhibit 104.

3            What is this?

4   A.   That's another surveillance camera.

5   Q.   Same location?

6   A.   Still on the front of the residence, different -- different

7   window.

8   Q.   Whose cameras are those?

9   A.   They go -- they feed into location No. 2.  So the residence

10  of location No. 2, I would assume.

11  Q.   So are you sure they're not -- they don't belong to the

12  apartment complex?

13  A.   None of the other locations had them.  And, again, they

14  feed directly into this residence and not -- like a central

15  manager's office, or something.

16  Q.   Did you observe any surveillance equipment inside apartment

17  2?

18  A.   I remember surveillance equipment, but I don't remember

19  exactly where it was.

20  Q.   Okay.  I'm going to show you Government Exhibit 105.

21            What is this?

22  A.   This is inside the living area of location No. 2.  You

23  could see the dining table in the kitchen and that slider goes

24  out to a back -- small back patio area.

25  Q.   Let's look at 106.

1    A.  This is also a photograph in the living area.  You can see

2    the stairs coming down from the second story of location No. 2

3    and the front door would have been basically where the stair

4    landing is.

5    Q.  107.

6    A.  107 is a photograph of a checkbook found inside of location

7    No. 2 with the names Fabian Sandoval-Ramos and Imelda

8    Sanchez-Olivera.

9    Q.  And is that the address of location 2?

10   A.  Yes, and it lists the address of location 2 on the checks.

11   Q.  Could you summarize what was observed evidentiary-wise

12   inside of location 2?

13   A.  Sure.  Again, we found the checkbook.  There was insurance

14   information on a dresser with Fabian's name on it.  There were

15   some airline tickets, bank statement information, and what

16   looked to be drug records found in the master bedroom.

17   Q.  Did you find any pay stubs or work -- work documentation?

18   A.  No.

19   Q.  I'm going to show you Government Exhibit 122.

20           We have heard testimony earlier in this case.  Do you

21   know who this individual is?

22   A.  I believe that's D.M.V. photograph of Carlos

23   Sandoval-Ramos.

24   Q.  Okay.  Is this a picture that later, in the investigation,

25   was shown to Mr. Baker?

McNair – D

1    A.   Yes.

2    Q.   Okay.  Did you see Carlos Sandoval-Ramos, the person

3    pictured in 122, did you see him at either location 1 or 2?

4    A.   No.

5    Q.   Did you see him at any time during your investigation?

6    A.   I have never seen him, other than the photograph.

7    Q.   Did you find any drugs at location 2?

8    A.   No.

9    Q.   Any huge amounts of cash?

10   A.   No.

11   Q.   Any digital scales?

12   A.   No.

13   Q.   Any needles or evidence of drug use?

14   A.   No.

15   Q.   A family home?

16   A.   It was.

17   Q.   Kids live there?

18   A.   Yes.

19   Q.   How many, do you know?

20   A.   I don't remember.  Two or more.

21   Q.   Any babies?

22   A.   No.

23   Q.   I would like to show you Government Exhibit 110.

24            What is this?

25   A.   This is a photograph of the community dumpster, which would

1  be in front of location No. 2.  And in the background, you can

2  actually see the building and the front door of location No. 2.

3  Q.  When was this photograph taken?

4  A.  This was taken a couple months ago.

5  Q.  Okay.  So about what time of the day?

6  A.  This was mid-day.  I drove out there, took it.

7  Q.  Back on April 2nd, did you look in that dumpster?

8  A.  I did.

9  Q.  Did you guys take pictures of the dumpster on April 2nd?

10 A.  I took pictures of things we found in the dumpster, but I

11 don't recall taking pictures of the actual dumpster.

12 Q.  Okay.  Tell the jury about your search of the dumpster.

13 Who had the pleasure of getting in there?

14 A.  I did.

15 Q.  Wonderful.  Tell us about that.

16 A.  Sure.  Went out to the dumpster area.  Again, it was dark.

17 So had flashlights.  I actually physically climbed into the

18 dumpster and started looking through the -- the bags.

19 Q.  What did you find?

20 A.  I found one bag in particular that had paperwork torn up,

21 which was a T-mobile phone bill with -- you could read parts of

22 the name; that appeared to be Fabian Sandoval, partially cut

23 off on each side.  But it was the right letters.

24      We also found numerous bags of the same lactose that

25 you had seen in the other photos at location No. 1.  They were

1    probably -- I don't know, maybe 10 or so full, unopened bags

2    inside of the same trash bag as the phone bill.

3    Q.   What do you mean, unopened?

4    A.   They were sealed, like they hadn't been used yet.  Like

5    they were brand new.

6    Q.   Did you find anything else in the dumpster?

7    A.   We did.  We found at the bottom of the dumpster -- right

8    near where that bag was found, we found an LG phone that had

9    been broken.  And the battery cover and the battery had been

10   removed and were found in another spot in the dumpster.  And,

11   again, it was completely broken.

12            Looked bent, snapped in half, almost.

13   Q.   Start with the lactose.

14            I'm going to show you Government's Exhibit 111.

15   A.   And, yeah, this is the photograph we took of the trash bag,

16   that I had the pleasure of going through.  And in it, you can

17   see the torn-up pieces of paper that had the phone bill, as

18   well as the multiple bags of unopened lactose powder.

19   Q.   Were those lactose bags outside the bag or inside of the

20   bag?

21   A.   They were found inside of the bag, and it was closed.

22   Q.   Let's look at 112.

23   A.   That's a closer photograph of the same lactose bags found

24   in the trash bag.

25   Q.   Do you know what lactose is used for in general?

1   A.   Yeah.  As far as legitimate uses, you can -- it's used

2   sometimes in baby formula -- as a small portion of the baby

3   formula.  It can be used pharmaceutically for a filler for

4   pills, things like that.  Some supplements that it can be used

5   in.  It's just milk sugar.

6   Q.  And with the -- did -- legitimate uses that you're aware

7   of -- like, for example, the baby formula -- how much lactose

8   is used at a time?

9   A.   Of the recipes I've looked at, it's maybe four tablespoons,

10  to make 36 ounces of baby formula.  And each tablespoon is like

11  a gram -- or a couple grams.

12  Q.  How many grams are in each of these bags?

13  A.  400 and change.  It's a pound.

14  Q.  Prior to seeing this lactose on April 2nd, had you ever

15  seen this brand at any of your prior search warrants in drug

16  houses?

17  A.  No, never.

18  Q.  I'm going to show you Government Exhibit 113.

19          Can you point out -- I think if you touch the

20  screen -- I'm not sure.  If you touch the screen, you can maybe

21  show the jury the name that you were referring to.

22          THE COURT:  Bonnie, would you show the witness how to

23  point on the screen.

24          That's all right.  We have a font you have to use,

25  so -- there we go.

McNair - D

1    BY MS. BOLSTAD:

2    Q.   We've zoomed in?

3    A.   You have now zoomed into the area that has the partial name

4    that you can see.  It has a T-mobile bill and part of an F for

5    Fabian.  And most of Sandoval.  What I suspect is.

6    Q.   And then let's look at Government Exhibit 114.

7                Do you recognize this?

8    A.   I do.

9    Q.   What is it?

10   A.   That's the broken cell phone I found in the dumpster.

11   Q.   I'm going to bring you Government's 115.  Take a look at

12   what's inside.

13   A.   And this is the cell phone, as well as the battery cover

14   and battery that we found.

15   Q.   Okay.  And what do you notice about this phone?

16   A.   The phone's been broken.  Both sides of the phone have been

17   cracked as if it had been bent in half.

18   Q.   Okay.  When you found the phone in the dumpster, was it

19   together, in all of its relevant parts?

20   A.   No.  Again, the phone piece itself was separate.  And then

21   we had to search around for the cover and the battery.

22   Q.   After your search of the dumpster -- well, let me ask you

23   this.  Did you find anything else in the dumpster?

24   A.   I don't believe there was anything else of interest.

25   Q.   Okay.  After your search of the dumpster, did you

McNair - D

1  participate in interviews with witnesses?

2  A.  I did.

3  Q.  Who did you interview first?

4  A.  Imelda Sanchez-Olivera.

5  Q.  Second?

6  A.  Fabian Sandoval-Ramos.

7  Q.  Did you interview any other people on scene?

8  A.  No.

9  Q.  Okay.  We're not going to go into what Ms. Sanchez-Olivera

10  told you.

11  A.  Okay.

12  Q.  Was it a long interview?

13  A.  They were pretty brief interviews, both of them.

14  Q.  And after you had spoken with Ms. Sanchez-Olivera, did you

15  then go talk to Mr. Fabian Sandoval-Ramos?

16  A.  Yes.

17  Q.  Separate location?

18  A.  Yeah.  Just a -- a short distance away.

19  Q.  Prior to your discussion with Mr. Sandoval-Ramos, was he

20  advised of his **Miranda** rights?

21  A.  Yes, he was.

22  Q.  And what language did this all happen in?

23  A.  It was all in Spanish.

24  Q.  Do you speak Spanish?

25  A.  I do not.

531

McNair – D

1   Q.  Who did?

2   A.  Special Agent Dan Riley, with DEA.  He was on the scene,

3  and he translated the interview.

4   Q.  And where was this interview taking place?

5   A.  There's a -- a -- an adjacent parking lot to the apartment

6  complex, where there was a small business, like a small trip

7  mall.  And there's a front covered area that was lit, so we

8  walked over there.

9   Q.  And who all was present for this interview?

10  A.  I was present, detective Andersen was present, and Special

11  Agent Riley.

12  Q.  Anyone else from law enforcement?

13  A.  Not that I remember.

14  Q.  Did you hear Special Agent Riley advise him of rights?

15  A.  Yes.

16  Q.  Did Mr. Sandoval-Ramos make an indication that he

17  understood those rights?

18  A.  Yes.

19  Q.  Did he speak with you?

20  A.  He did.

21  Q.  At any point did you let Mr. Fabian Sandoval-Ramos know the

22  circumstances of this investigation?

23  A.  Yes.

24  Q.  Did you inform him of the seriousness of -- the idea that

25  someone had died?

532

McNair – D

1  A.  Yes, we did.

2  Q.  And did he choose to speak with you?

3  A.  He did.

4  Q.  Describe for us the atmosphere of that interview.

5  A.  It was casual conversation tone.  Again, it was through

6  translations, so we would speak to Fabian and have to be

7  translated.

8  Q.  How long did it take?

9  A.  I couldn't tell you exactly, but probably less than 30

10  minutes.

11  Q.  At any point in your discussion with Mr. Sandoval-Ramos,

12  did he appear confused by the questions being asked?

13  A.  No.

14  Q.  Did it appear that he could communicate with Special Agent

15  Riley?

16  A.  Yes.

17  Q.  And were any part of his communications with you in

18  English?

19  A.  No.

20  Q.  Did it appear that he understood what you were asking in

21  English?

22      MR. ANDERSEN:  Objection, I think that calls for

23  speculation.

24      THE COURT:  It does not.  But phrase the question

25  more specifically with respect to what this witness observed,

McNair - D

1  whether he observed any indication that there was not

2  communication.

3          The conclusion, of course, is for the jury to draw,

4  based on whatever they hear about this.

5  BY MS. BOLSTAD:

6  Q.  So tell the jury, were you asking questions in English?

7  A.  When we first talked to him, I tried to ask him if he spoke

8  English, but clearly he didn't speak English.

9  Q.  And so in the interview, were you asking questions in

10 English that were then translated?

11 A.  Yes.

12 Q.  Did Mr. Sandoval-Ramos wait to answer the questions until

13 they had been translated?

14 A.  Yes.

15 Q.  What did Mr. Sandoval-Ramos say when you interviewed him?

16 A.  Well, we asked him about his broken phone that we found.

17 And he explained that the phone broke.

18         MR. ANDERSEN:  Your Honor, I'll object to this.  I

19 think it's hearsay.  I think we might be hearing from the

20 actual translator, who might be better able to explain what he

21 actually heard.

22         THE COURT:  Well, let me take this in two parts.

23         First, a statement made by the defendant is not

24 hearsay.  It is an admission of a party opponent.  So the

25 hearsay statement is over -- objection is overruled.  The fact

McNair - D

1   that this may be cumulative, however, is worth pursuing.

2            Can we not just wait until we get the information

3   from the actual translator?

4            MS. BOLSTAD:  We could, your Honor, but it does

5   inform the context, and there's only three statements made.  So

6   I would like to cover it now.

7            THE COURT:  All right.  I'll overrule the objection.

8            Go ahead.

9   BY MS. BOLSTAD:

10  Q.  What did Mr. Fabian Sandoval-Ramos tell you?

11  A.  He told us that his phone had broken between 5:00 and 6:00

12  p.m., and that he then put it in the dumpster.

13  Q.  What about the lactose?

14  A.  He denied that it was used for a cutting agent.

15  Q.  And did you -- did you relay to Mr. Sandoval-Ramos that

16  investigators had seen a woman throwing something out?

17  A.  Yes.

18  Q.  And what did he have to say about that?

19  A.  He couldn't explain why that happened.

20  Q.  Did he deny that that happened?

21  A.  No.

22  Q.  And you mentioned this idea of 5:00 to 6:00 p.m., was he --

23  was he giving you that specific time frame?

24  A.  Yes.

25  Q.  Do you recall approximately what time Mr. Raul Arcila and

McNair - X

1    Mr. Placido Ramirez Coronel were stopped on April 2nd?

2    A.  It was approximately 5:30.  Maybe somewhere between 5:20

3    and 5:30 p.m.

4    Q.  I would like to show you Government's 108.

5              Earlier you mentioned that you -- your team found

6    drug records at L2.

7              Is this the drug records that were found?

8    A.  Yes.

9    Q.  And we'll hear from investigator Miller on that topic.

10              Finally, did you find any other cell phones besides

11   the broken phone from a dumpster for Mr. Sandoval-Ramos?

12   A.  We did.  Including an iPhone that was found in the master

13   bedroom, I believe.

14   Q.  I'm going to show you 109, if I can find it.

15              (Witness handed exhibit.)

16   BY MS. BOLSTAD:

17   Q.  Does this appear to be an iPhone?

18   A.  This is in fact an iPhone.

19   Q.  Okay.  Does that look like what was seized at L2?

20   A.  Yes.

21   Q.  Any evidence of heroin use in that home?

22   A.  No.

23              MS. BOLSTAD:  Nothing further on direct.

24              THE COURT:  Cross.

25              MR. ANDERSEN:  Thank you, your Honor.

McNair - X

CROSS-EXAMINATION

1

2    BY MR. ANDERSEN:

3    Q.  Now, let's -- I just want to have a -- one question

4    about -- you mentioned you sent an e-mail to your colleague at

5    the jail.  Did you save that e-mail?

6    A.  I did not.

7    Q.  You didn't print that out?

8    A.  I don't remember printing it out.  No.

9    Q.  You've got no record of that e-mail?

10   A.  No.

11   Q.  Now, you also mentioned, when you went to L2 -- what we're

12   calling L2, you saw a surveillance camera; what you thought was

13   a surveillance camera outside.

14          Now, have you seen -- or were you at L1?  And did you

15   see the -- the television equipment, and all of that sort of

16   thing that was set up there?

17   A.  Yes, L1 also had surveillance.

18   Q.  Well, here's my question.  There was the same -- there was

19   no -- there was no set up like that at L2, was there?

20   A.  I don't remember --

21   Q.  You --

22   A.  I don't remember specifically where the equipment went to.

23   Q.  Do you remember what it was?  You said you -- you -- what's

24   the surveillance equipment you're talking about?

25   A.  I don't remember specifically what it is.  I was only

1  inside of location No. 1 -- or location No. 2 briefly.  I

2  remember walking through and at some point seeing surveillance

3  equipment.

4  Q.  But you don't remember what that was or where that was, or

5  anything about that?

6  A.  No.  I could look at the photos and see if I see anything

7  in there, but I don't recall.

8  Q.  In your recollection, there was not the type of set up that

9  you saw at L1?

10  A.  Right.  L1 had -- literally, in the living room, it was on

11  the TV.

12  Q.  And there was nothing like that?

13  A.  Not that I remember, no.

14  Q.  And there was no -- oh, what do you call it?  Barricades on

15  the door, or anything of that nature?

16  A.  At location No. 2?

17  Q.  Correct.

18  A.  No.

19  Q.  How many officers were involved in serving that search

20  warrant on L2?

21  A.  Don't know exactly, but I would guess probably ten or so by

22  the time it was done.

23  Q.  Were they armed?

24  A.  Yeah.  I would assume everybody was armed.

25  Q.  And were you there for the entry?

McNair - X

1  A.  I was.

2  Q.  Was it a forcible entry or -- how would you -- how did you

3  get in the --

4  A.  I believe we knocked, and they came to the door.  There

5  were people in the living area.

6  Q.  And you mentioned this casual conversation.  Was that --

7  that was after you entered?  And, obviously, you had secured

8  the house, to whatever extent --

9  A.  Right.  So the house would be secured.  Basically would

10  corral everybody in one spot.  We would search, make sure there

11  was nobody else hiding, everything like that.  And then

12  normally we kind of do a walk through to kind of get an idea if

13  there is any obvious evidence we want to discuss in the

14  interview before we then go talk.

15  Q.  Do you remember handcuffing any of the family members you

16  found there?

17  A.  I don't remember who was handcuffed but -- so -- it would

18  be -- I would expect that some people -- adults, normally, we

19  handcuff, initially.  But I don't -- in this particular

20  instance, I don't remember who particularly was handcuffed.

21  Q.  And I believe you found there was an adult -- at least one

22  or two adults there besides Mr. Sandoval?

23  A.  Yeah.  There was Mr. Sandoval-Ramos -- I can't remember the

24  female's name.  But two adult females as well.

25  Q.  Okay.  And then there were three children there.  Right?

McNair - X

1    A.   I believe so, yes.

2    Q.   That's all.  Thank you.

3    A.   Thank you.

4              THE COURT:  Mr. Sepp?

5              MR. SEPP:  I have nothing -- no questions of this

6    witness.

7              THE COURT:  Thank you.  Redirect?

8              MS. BOLSTAD:  None, your Honor.  Thank you.

9              THE COURT:  Thank you, sir.  You're free to go.

10             THE WITNESS:  Thank you, your Honor.

11             THE COURT:  Next witness, please.

12             MS. BOLSTAD:  The Government calls Deputy Olson.

13             THE COURT:  Sir, please watch your step.  Come all

14   the way up to the witness chair.

15             THE WITNESS:  Okay.

16             THE COURT:  Remain standing.  Face the jury and the

17   deputy there.  Raise your right hand to be sworn.

18             (Witness sworn.)

19             THE WITNESS:  I swear.

20             THE CLERK:  Please take a seat.

21             THE COURT:  All right.  When you're situated, get

22   yourself close to the microphone, please.

23             THE WITNESS:  All right.

24             THE COURT:  Tell us your full name, and please spell

25   it all.

540

Olson – D

1          THE WITNESS:  Peter Douglas, Olson.  P-E-T-E-R,

2     D-O-U-G-L-A-S, O-L-S-O-N.

3          THE COURT:  And you must slow down as you testify.

4     All of us are trying hard to understand.  But especially here

5     we have translations going real time, so please slow down.

6          Go ahead, Counsel.

7                     DIRECT EXAMINATION

8     BY MS. GOLOBORODKO:

9     Q.   Good morning.

10    A.   Good morning.

11    Q.   Could you please tell the Court how you're employed?

12    A.   I'm a deputy for the Washington County Sheriff's Office,

13    and have been since July 31st of 1998.

14    Q.   Now, as a deputy with the Washington sheriff's office, what

15    are your general duties?

16    A.   Right now I'm in patrol.  I was assigned to the Westside

17    Interagency Narcotics team with a narcotic K-9.

18         THE COURT:  You do need to slow down.

19         THE WITNESS:  Sorry.

20    BY MS. GOLOBORODKO:

21    Q.   You said you had a K-9?

22    A.   Yes, ma'am.

23    Q.   How long have you been a K-9 officer?

24    A.   Six years.  I retired him in July of this year.

25    Q.   And were you working with your K-9 -- what's his name?

1  A.   Tau, T-A-U.

2  Q.   Were you working with him on April 2nd, 2014?

3  A.   Yes, I was.

4  Q.   Now, how long had you and Tau -- or Tau been working

5  together?

6  A.   About four-and-a-half years, going on five years.

7  Q.   In terms of drug interdiction of traffic stops, what are

8  some of the indicators of drug trafficking that you have been

9  trained to look for?

10  A.   Well, during the traffic stop or prior to the traffic stop?

11  Q.   Just during.

12  A.   During the traffic stop?

13          The driver's nervousness, things that don't look

14  normal; where they're coming from.  If they're coming from a

15  long distance, they have very limited amount of items in their

16  car; maybe a lot of fast food like they've been traveling a

17  long distance; maybe pieces of the car that look like it had

18  been taken apart and put back together, those type of things.

19  Q.   I don't really want to get into details.

20          So could you just briefly summarize what kind of

21  training you and Tau have had?

22  A.   In 2009, we -- we completed a 240-hour K-9 narcotic

23  detection school through the Beaverton Police Department.  We

24  had ongoing training every month.  Minimum of 16 hours.  And

25  then we went to conferences about every six months.

542

Olson - D

1   Q.   Now, just in a typical traffic stop involving drugs, please
2   describe what you and Tau would do.
3   A.   We would begin searching the exterior of the vehicle for
4   the odor of narcotics.  So I would instruct my dog to start
5   wherever it was safe for him to start, and he would work low as
6   we worked a counterclockwise pattern around the vehicle for the
7   odor of narcotics.
8   Q.   Now, what if you found -- or what if he smelled narcotics
9   on the outside?
10   A.   He -- he's trained to get as close as he possibly can to
11   that odor and then alert.  Which his alert was a scratch.  He
12   would scratch at the odor.
13   Q.   We -- what do you mean when you say "alert"?
14   A.   The -- the alert is the final response.  So he would -- he
15   would -- I would call it an alert when he would go to -- in the
16   final response, and he would begin scratching to the closest
17   point he could get to that odor he's trying to find.
18   Q.   So when you say "alert," you mean he smells a narcotic?
19   A.   Yes, ma'am.
20   Q.   Okay.  And if he smelled something on the outside, would
21   you and he go in the car?
22   A.   Yes, ma'am.
23   Q.   Okay.  So have you had any experience in assisting the WIN
24   team with drug investigations?
25   A.   Yes.

543

Olson - D

1   Q.   To what extent?

2   A.   Most of my time was dedicated to WIN.   They were my first

3   assignment.   But I also went out and did patrol stuff over the

4   last six years.

5   Q.   And did Tau have any experience with them as well?

6   A.   Yes.   He's been with me ever since I was attached to the

7   WIN team.

8   Q.   So were you involved in the WIN team investigation in late

9   March and early April of 2014 with the traffic stop on April

10  2nd?

11  A.   Yes, ma'am.

12  Q.   Where was that stop?

13  A.   It was on -- in Milwaukie, on Highway 229, I believe.

14  Q.   And what kind of car was it?

15  A.   It was a 2000 -- 2001 Honda Civic.

16  Q.   Do you remember what color?

17  A.   It was -- I wrote down it was green.

18  Q.   And what time was the stop?

19  A.   That was at 5:12 in the evening.

20  Q.   And did you deploy Tau?

21  A.   I did.

22  Q.   What happened?

23  A.   He alerted to the exterior of the vehicle.   We went inside

24  the vehicle and he also alerted in there.   We found a

25  substantial amount of heroin.

544

Olson – D

1    Q.   Where did you find it?

2    A.   The airbag had been removed and a little basket had been

3    made inside where the airbag belongs, and the heroin was laying

4    in there.

5    Q.   Which airbag?

6    A.   On the passenger side, front passenger side.

7    Q.   Now, earlier, you testified about things that you have been

8    trained to look for in vehicles when it comes to drugs.

9    A.   Yes.

10   Q.   You mentioned alterations, things that don't look like

11   they're part of the car.

12          Did you observe any of those signs with the Honda?

13   A.   I did.  The rear bumper where Tau had alerted to, one of

14   the times he had alerted to on the exterior of the vehicle was

15   different screws had been placed in the –- the plastic bumper

16   that goes around on the back of the vehicle.

17   Q.   Now, what did you do after the traffic stop?

18   A.   I went to the location of the search warrant and assisted

19   them with searching the house with my dog.

20   Q.   Which search warrant?

21   A.   The search warrant at 11759 Southeast 64th Avenue,

22   Milwaukie, Oregon.

23   Q.   And can you describe how you and Tau searched the home?

24   A.   We began –- this particular one, we went in, and we did the

25   family room first.  I usually let my dog dictate where he wants

Olson - D

1  to search a residence, as long as it's safe to do so.  But

2  there was other people, so we -- we began in the family room of

3  the -- this residence.

4  Q.  So were there any places in that home, in particular, that

5  Tau alerted to?

6  A.  Yes, the family room.  There was a laundry room off of the

7  family room.

8  Q.  Now, I'm going to show you Government Exhibit 78.  It's

9  already been admitted.

10 A.  Okay.

11        THE COURT:  It will be on your screen to the left,

12 sir.

13 BY MS. GOLOBORODKO:

14 Q.  Do you recognize this?

15 A.  Yeah.  That was the plastic bag -- like a grocery plastic

16 bag on the side of the washer/dryer that Tau had alerted to.

17 Q.  Do you know what was in the bag?

18 A.  There was other plastic bags inside, but I could smell

19 heroin.

20 Q.  So that -- okay.  Now, while at the scene, were you able to

21 determine, I guess, what was in it?  Like you said, there was a

22 smell.  Could you see what was in it?

23 A.  I continued searching.  I mean, obviously, I looked in it.

24 I could see some plastic bags or vacuum-type bags inside there.

25 But I continued searching with my dog.

1   Q.  All right.  Now, did you also run Tau through the bedroom

2   areas?

3   A.  Yes, I did.

4   Q.  And were there any alerts?

5   A.  Yes.  In the back bedroom -- and we usually label them, but

6   I didn't put it in my report.  It was the back bedroom that

7   faced the back of the house.  I -- I got three alerts in

8   that -- that room.  It had a bathroom that was attached to it.

9   Q.  What did you find with those alerts?

10  A.  In between the mattress I found some cash.  There was an

11  alert in the closet up high where we found more cash, and there

12  was another alert.

13  Q.  How about any other rooms?  You mentioned there were some

14  bedrooms and then a living area.

15  A.  Yeah, there was two other bedrooms and a living room.  And

16  there was -- let me see.  There was -- there was no interest in

17  Tau searching those rooms.  So we have people come behind us

18  and search behind us.  So we were -- we're the initial

19  searchers, with the dog.

20  Q.  All right.  Now, finally, did you run Tau in the backyard?

21  A.  I did.

22  Q.  And why?

23  A.  There was some information that was relayed to me that

24  maybe there was some narcotics hidden in the backyard.

25  Q.  And did -- did you find anything?

Olson - X

1  A.   No.   Tau showed interest to a -- a tree that was in the

2  backyard.   But I didn't get an alert to search in the area

3  where it was located.

4           MS. GOLOBORODKO:   No further questions.

5           THE COURT:   Thank you.

6           Mr. Andersen?

7           MR. ANDERSEN:   No questions.

8           THE COURT:   Thank you.

9           Mr. Sepp?

10          MR. SEPP:   Thank you.   Thank you, your Honor.

11                    CROSS-EXAMINATION

12  BY MR. SEPP:

13  Q.   Just to confirm, the room -- the three alerts that Tau

14  noted to, that was -- could we call it the master bedroom?

15  A.   Yeah, that's what I would call it.

16  Q.   Okay.   And then nothing in the other two sub bedrooms?

17  A.   Or the living room.

18  Q.   Or living room.

19          MR. SEPP:   Okay.   Thank you.

20          THE COURT:   Any other questions?

21          MS. GOLOBORODKO:   No, your Honor.

22          THE COURT:   I'm sorry.   Yes.   Ms. Goloborodko, any

23  other questions?

24          MS. GOLOBORODKO:   No, your Honor.   Thank you.

25          THE COURT:   All right.   You're free to go, sir.

1              THE WITNESS:  Thank you, ma'am.

2              THE COURT:  Go ahead.

3              MS. BOLSTAD:  The Government next calls Detective Tim

4    Miller.

5              THE COURT:  Please come all the way to the witness

6    chair and remain standing.

7              Face the jury and the deputy there.  Raise your right

8    hand to be sworn.

9              (Witness sworn.)

10             THE WITNESS:  I do.

11             THE CLERK:  Please take a seat.

12             THE COURT:  Bring yourself close in to the

13   microphone, please.

14             Tell us your full name, and spell all of it.

15             THE WITNESS:  Timothy Keith Miller.

16             T-I-M-O-T-H-Y, K-E-I-T-H, M-I-L-L-E-R.

17             THE COURT:  Thank you.

18             Counsel.

19                       DIRECT EXAMINATION

20   BY MS. BOLSTAD:

21   Q.  Where do you work?

22   A.  I work for the Washington County Sheriff's Office.

23   Q.  How long have you been there?

24   A.  About 16-and-a-half years.

25   Q.  And what's your assignment?

1  A.   Currently, I am a detective in our investigations division,

2  assigned to work in child abuse cases.

3  Q.   Back in 2014, March, April, what were you working on then?

4  A.   I was assigned to the Westside Interagency Narcotics team,

5  or the WIN team, as a narcotics investigator.

6  Q.   Have you, in your experience with WIN, have you worked on

7  overdose investigations?

8  A.   Yes.

9  Q.   And have you received training to become a law enforcement

10  officer?  I don't need you to go through all of it, but have

11  you?

12  A.   Yes.

13  Q.   And could you tell the jury about your specific training

14  when it comes to surveillance?

15  A.   Well, I've -- I was assigned to the Westside Interagency

16  Narcotics team for about -- or for about five years.

17          During that time, I received hundreds of hours of

18  training in surveillance, surveillance techniques.  I have

19  actually instructed new students and investigators in

20  surveillance techniques.

21          Prior to that, prior to my assignment at WIN, I was

22  with the Regional Organized Crime and Narcotics task force, or

23  ROCN task force, for three years; which was a multi-agency task

24  force that worked in Portland and Multnomah and Washington

25  County, Columbia County, working high-level narcotics cases.

550

Miller - D

1    And I received a lot of training sur -- in surveillance

2    techniques during my tenure there, as well.

3    Q.  Approximately how many surveillance operations have you

4    been involved in?

5    A.  Probably several hundred.

6    Q.  Were you involved in an investigation of an overdose death

7    of Mr. Delong in late March 2014?

8    A.  Yes.

9    Q.  What was your role?

10   A.  I was assisting the case agents, again, with surveillance,

11   as they developed their investigation.

12   Q.  Did you conduct surveillance on March 31st, when Mr. Baker

13   ordered drugs from his source?

14   A.  Yes.

15   Q.  Where did you conduct surveillance?

16   A.  The surveillance was conducted in and around the 7-Eleven,

17   which is located at the corner of Harmony Road and I think it's

18   Lynwood Avenue in southeast, in Clackamas.

19          The case agents in this case had developed

20   information from their informant or the person that -- that

21   they were interviewing at the time, that this person received

22   their drugs or did a lot of their drug transactions in that

23   particular parking lot.

24   Q.  And the jury's heard from Mr. Baker.  So -- is the

25   informant you're talking about, is that Mr. Baker?

Miller - D

1  A.  Yes.  Yes.

2  Q.  Okay.  On March 31st, did Mr. Baker go to that 7-Eleven on

3  Harmony?

4  A.  Yes.

5  Q.  Do you know approximately what time he arrived in the lot?

6  A.  I think it was around 10:39 in the evening.

7  Q.  And with the surveillance, what were officers looking for

8  at that 7-Eleven?

9  A.  We had received information from the case agents not only

10  about the location but potential cars that the -- the source of

11  drugs may show up in, which was, I think, a blue Honda and a --

12  a Nissan Pathfinder -- or not a Pathfinder but a Nissan -- some

13  sort of S.U.V.

14  Q.  And did you have a color for that S.U.V.?

15  A.  Red.

16  Q.  Did you see any vehicle like either of those two in the

17  area?

18  A.  Yes.  At one point, I think it was a couple minutes later,

19  at about 10:41 p.m., the surveillance units had radioed that

20  the CI was -- or, I'm sorry, Mr. Baker was now in a red S.U.V.

21  And that red S.U.V. had left the parking lot of the 7-Eleven.

22  And we had watched it do a short trip around the neighborhood,

23  around that 7-Eleven, before returning and dropping the --

24  dropping Mr. Baker back off in the parking lot.

25  Q.  How long did that short trip take?

Miller - D

1    A.    Probably a minute.

2    Q.    And then did surveillance units follow that red S.U.V. from

3    the area after Mr. Baker got out?

4    A.    Yes.    It -- so we followed it to -- north, as I think it

5    left on Lynwood.    And then it turned on a road called Furnberg,

6    and then ultimately turned north on 64th Avenue.

7            And by the time surveillance units were able to see

8    the vehicle, it was pulling into a garage.    But the garage was

9    then lowering, so we weren't able to get the license plate on

10    the vehicle.

11    Q.    How long did it take for that S.U.V. to go from the

12    7-Eleven to the garage?

13    A.    Again, it was probably only about a minute.

14    Q.    And was that garage located at location 1, the house on

15    64th?

16    A.    Yes.    The -- after -- after the vehicle had gone in the

17    garage, at one point I had driven by and multiple people had

18    driven by to get the -- to confirm the numbers that were on the

19    house.

20    Q.    And did you relay the numbers on the house to the

21    detectives working the case?

22    A.    Yes.

23    Q.    Okay.    I would like to move on to April 2nd, 2014.

24            Did you help with surveillance on that date?

25    A.    Yes.

1   Q.  I'm going to show you Government's 64.  It's marked and

2   admitted.

3             Do you recognize this location?

4   A.  Yes, that's 11759 Southeast 64th.

5   Q.  During the operation on April 2nd, were you in radio

6   communication with your team?

7   A.  Yes.

8   Q.  And why -- tell the jury why it's important to have that

9   radio communication.

10  A.  Well, when you have a lot of -- a lot of components that

11  are going on in the case, you have a -- oftentimes you'll have

12  surveillance units set up at multiple locations, so -- to be

13  able to hear what's going on at one location and be aware that

14  that may affect the location that you're watching is important.

15  Q.  And so where were you to -- at the start of the day on

16  April 2nd, with surveillance?

17  A.  I started to the north of this residence.  It's a dead-end

18  street, several houses to the north.  I was just parked along

19  the side of the road, watching the front of this residence.

20  Q.  What time of day were you watching the residence?

21  A.  I believe we started out -- I don't remember the exact time

22  but it was in the -- probably midafternoon, early afternoon

23  time.

24  Q.  And did you receive information from Detective McNair that

25  informed you about what to be on the lookout for?

Miller - D

1  A.  Yes.  We received information.  We were basically looking

2  for movement.  I knew that Detective McNair was going to be

3  meeting with Shane Baker again, and they were going to be

4  ordering an amount of drugs from the -- from the suspects.  And

5  so we were just watching -- once those phone calls were made,

6  we're in a position to watch and see what movement happens

7  after that and note those observations.

8  Q.  Okay.  And so what did you see after you received

9  information that the call had been made?

10  A.  At some point after that, surveillance, it was at a

11  different location that was off of King Road.  I remember that

12  someone had radioed there was a green Honda Accord that had

13  left that location.  And within the amount of time that it

14  would have taken to drive from there to where I was at, it

15  arrived at this location.

16        Basically, it pulled on to 64th Street from Furnberg.

17  Pulled up to the house like it was going to go in -- pull into

18  the house -- or park in front of the house but it stopped.  And

19  then they drove right up to, basically, where I was parked.

20  Q.  So before we get there, is what you're saying that you

21  heard information from location at King Road?

22  A.  Yes.

23  Q.  I'm going to show you what's Government's demonstrative 1,

24  to give a map to you to refer to.

25        So you were stationed where?

555

Miller - D

1   A.  I was at location 1, off of 64th.

2   Q.  And after Mr. Baker placed the call, what did you hear

3   happened at location 2?

4   A.  That there was a green Honda Accord that had left that

5   location and someone, again, had radioed the surveillance team

6   that.  And then shortly after that, I observed a green Honda

7   Accord arrive at location 1.

8   Q.  Okay.  And so you mentioned it pulled close to you.

9           What happened?

10  A.  It pulled up right alongside me, and the occupants in the

11  car looked at me.  There was a little bit of awkwardness there.

12          And then they basically just turned around, drove to

13  the south end of the street, and then went east on Furnberg.

14  I, of course, relayed this information to -- to units that were

15  on the surveillance team.

16          And then shortly after that there was three

17  individuals -- Hispanic individuals that walked up to the --

18  that came from that direction and walked up to location 1.

19  Q.  So did you see where the green Honda Civic was when those

20  three individuals walked up to location 1?

21  A.  No.

22  Q.  Okay.  Going back to this moment where they pull up to you,

23  you said it was awkward.

24          Were you in a marked police vehicle?

25  A.  No.

Miller - D

1    Q.  Were you in police uniform?

2    A.  No.

3    Q.  Could they see into your window?

4    A.  It would have been difficult.  It had a lot of tint, I

5    believe, the vehicle I was in.

6    Q.  Contact-wise, were there a lot of cars with people sitting

7    there in the afternoon?  Or paint a picture for the jury, so

8    they know why that was awkward for you.

9    A.  It's -- it's a residential neighborhood.  It's a dead-end

10   road.

11          The -- there would be no reason for you to drive down

12   to the dead-end road unless you lived at the dead-end road.

13   Because if you -- if you see on the map here, there's just

14   basically a big field where the road dead-ends.  There's

15   nothing else there.

16          And -- and knowing -- after seeing the -- the car

17   stop and pause in front of the residence and then drive to

18   where I was, obviously led me to believe that they were

19   interested in why I was -- why somebody would have been parked

20   there.

21   Q.  What happened after you saw those three males approach

22   location 1 on foot?

23   A.  Well, from my vantage point, they walked up the driveway.

24   I assumed went in the house.  And then it was sometime after

25   that -- shortly after that -- there was two individuals that I

557

Miller - D

1  saw leave from the direction of the house and, again, walk down

2  to Furnberg Street and then walk east.  So I relayed that

3  information over -- over the radio.

4          I knew at the time that the -- the plan was to

5  eventually write -- apply for a search warrant for this

6  location, so then it becomes like a tactical -- investigators

7  or law enforcement that's going to end up serving the search

8  warrant on this house.  Like to know how many people are

9  potentially in the house that we may encounter when we serve

10  the search warrant.

11          So there's two individuals that left, leaving what

12  we -- or what I believed was still one in the house.

13  Q.  And where did the green Honda Civic go?

14  A.  I had heard surveillance units say that it had parked near

15  a park near Furnberg Park, which is maybe about a block and a

16  half, two blocks away from the residence.  And then

17  surveillance units followed that vehicle.

18          The initial plan that been relayed to me was -- is

19  that the transaction -- that the case agents had ordered the

20  drug transaction was to take place, again, at the 7-Eleven at

21  Harmony Road and Lynwood Road, I think, or Avenue.  I'm not

22  sure.  It's Lynwood, in Clackamas.

23          I had heard investigators relay that the location had

24  been changed, and I believe they had changed it to a Lowe's

25  store that was off of highway 224.

1        And at some point in between, the plan was that law

2  enforcement would pull the car over.

3  Q.  And do you know if that happened or not?

4  A.  Yes.

5  Q.  Were you involved in that traffic stop?

6  A.  No.

7  Q.  So did you stay at location 1?

8  A.  Yeah, I stayed there for -- I don't know.  It was a while

9  after that.  And then left and then swapped out with somebody

10  else, basically, at that point to go because I was assisting

11  with the entry for the search warrant that was now signed and

12  ready to be served.

13  Q.  Which location was that later search warrant for?

14  A.  Location 1.

15  Q.  Okay.  And so did you participate in the entry and search

16  of location 1?

17  A.  The entry and initial securing of the residence, yes, I was

18  involved in that and then the initial walk through.

19  Q.  Okay.  And then what happened next for you?

20  A.  They -- the case agents requested that somebody go to the

21  King Road address and get eyes on, as we call it, or basically

22  get to a spot where we can observe that residence, which was an

23  apartment.

24  Q.  Do you -- oh, I'm sorry.  Go ahead.

25  A.  Oh, I was just going to say, it was my understanding there

1  was, again, discussions that -- I wasn't involved with them --

2  that there -- there may be an application for a search warrant

3  for that residence as well.

4  Q.  Do you remember approximately what time you went to

5  location 2?

6  A.  I remember I got there about 6:40 in the evening.

7  Q.  And what was your -- did you have an assignment or a label

8  for your role?

9  A.  Well, basically my role was to get eyes on or, you know,

10  make observations of 7915 Southeast King Road, apartment No. 2.

11  Q.  Okay.  I'm going to show you Government's Exhibit 101.

12          Is this the location you were surveilling?

13  A.  Yes.

14  Q.  And were you able to take notes while you're conducting

15  surveillance?

16  A.  No.

17  Q.  So how do you keep track of what you're seeing?

18  A.  Usually we have a note taker assigned.  Somebody who --

19  whose job is -- they're -- they're typically not, you know, in

20  there making observations they're just writing down what other

21  people are observing.

22  Q.  Could you tell the jury approximately where you were

23  situated to conduct surveillance?

24  A.  Well, the apartment complex parking lot is kind of -- it's

25  kind of like a U, and I was about in the middle, facing east.

1   Nosed in, facing east.  And then I was in the back of my

2   vehicle, looking out a quarter panel window to the south, at

3   the apartment.

4   Q.  What did you see after your arrival at location 2?

5   A.  I remember there was a silver Nissan Armada that was parked

6   out front.  There was a gold Chevy -- I think it was an Astro

7   van.  In fact, it may be the same van that's in this picture

8   here.

9           And those two vehicles were side by side.  At some

10  point I saw the person we were labeling at S1.

11  Q.  What does S1 mean?

12  A.  S1 is subject one.  It's -- S1, subject one, person 1.

13  It's basically how we reference people that we've identified in

14  the surveillance over the radio.  So we're not going say, like,

15  first names or last names, or anything like that.  We'll just

16  get a list of people and then just go, S1, S2, S3, S4.  And so

17  everyone has the information.  They can call out who it is

18  they're seeing.

19  Q.  And in terms of location 2, how many subjects were involved

20  in your surveillance?

21  A.  There was only one, as far as I knew.

22  Q.  So did you -- how did you know what S1 looked like?

23  A.  At some point, the case agents had given us a picture.  I

24  don't remember if it was a printed out copy or if it was

25  e-mailed or texted or -- I don't remember that but --

Miller - D

1  Q.  And who -- what was the name of subject 1?

2  A.  I believe it was Fabian Sandoval.

3  Q.  And so did you see Mr. Sandoval at that location?

4  A.  Yes.

5  Q.  Tell us about that.

6  A.  Shortly after I arrived there, there was a Hispanic

7  gentleman who was wearing a black -- like a sweatshirt or

8  pullover-type jacket that had the L.A. Dodgers' symbol on the

9  front of it.  And I observed that person entering and exiting

10  the front door of location 2.

11  Q.  And would that be apartment 2?

12  A.  Yes.

13  Q.  What was he doing?

14  A.  He appeared to be working on the vehicles that were parked

15  out front, going in between the two.  At one point I remember

16  the hood was up on the silver Armada.  You know, I don't know

17  exactly what they were doing.  Basically working on the car, I

18  guess.

19  Q.  And approximately what time were these observations of

20  subject 1?

21  A.  Again, I first observed him there around 6:40 in the

22  evening, right up until the time that I left, which was, I

23  think, around 8:20, so --

24  Q.  Okay.

25  A.  A little under two hours.

562

Miller - D

1  Q.  And when you say working on these vehicles, do you have

2  anything specific?

3  A.  Just, you know, again, with the hood up on the Armada,

4  under the hood.  You know, in between the vehicles.  I could

5  see that he was in between them, the doors were open.  Just --

6  I don't know what exactly he was doing in between the vehicles.

7  Or walking around and going in and out of the house during the

8  time I was there.

9  Q.  So it sounds like you were at this location at least

10 between 6:40 and 8:20-ish?

11 A.  Yes.

12 Q.  And during that time frame, how many times did Mr. Sandoval

13 go into the apartment?

14 A.  I would say six or seven times.

15 Q.  How many times did he go out?

16 A.  Probably six or seven.

17 Q.  Did you see any other individuals going into or out of

18 location 2?

19 A.  Yes.  At one point there was a black female that had looked

20 like she had come from across the street.  And she was carrying

21 a clipboard, or something to that effect.  She at one point had

22 walked into the apartment.  I -- my -- I don't know if I can

23 say what I assumed what she was --

24 Q.  Let's not assume.

25 A.  Okay.  I -- I don't know what her role was.  At one point

563

Miller - D

1  there was a younger Hispanic female who came out of the

2  apartment, and she was carrying a white plastic trash bag.  And

3  she went over to the dumpster, which is basically right --

4  right -- right out the -- the door and across the parking lot.

5  And put some -- put the trash in there.  And then went back in

6  the apartment.

7  Q.  Do you what time that took place?

8  A.  I think that was around 7:25 p.m. in the evening.

9  Q.  Is that an observation you would have called out to the

10 person taking notes for you?

11 A.  Yes.

12 Q.  And had you reviewed those notes later?

13 A.  Yes.

14 Q.  And is that dumpster trip-documented?

15 A.  Yes.

16 Q.  And what time did it take place, according to the notes?

17 A.  7:25 p.m.

18 Q.  Why did that stand out to you?

19 A.  Well, obviously the -- there was a car that had come from

20 this location and went to the location where we were now

21 serving a search warrant on, so don't know if that person

22 has --

23        MR. ANDERSEN:  Your Honor, I object.  I think he's

24 just speculating about --

25        THE COURT:  The objection is sustained, jurors.

564

Miller - D

1   Disregard the answer.  Rephrase the question, if you want to

2   pursue it, to elicit a response for which the witness has

3   personal knowledge.

4   BY MS. BOLSTAD:

5   Q.  Detective Miller, during your surveillance here, how

6   many -- how many dumpster trips did you observe from apartment

7   2?

8   A.  Two.

9   Q.  Okay.  And did those trips -- were those significant to

10  you?

11  A.  Yes.

12  Q.  Why?

13  A.  Again, we're preparing -- or case agents are applying for a

14  search warrant for this location, so we're worried about the

15  obvious destruction of evidence.

16  Q.  So you've mentioned 1, with a female.  What was the other?

17  A.  At some point Mr. Sandoval himself came out of the

18  apartment and walked up to the dumpster area.  And then, again,

19  proceeded to walk around my car and appeared to be interested

20  in -- in my car.

21  Q.  Did that make you nervous?

22  A.  Yes.

23  Q.  Did you talk to him?

24  A.  No.

25  Q.  Do you know what time Mr. Sandoval walked around your car?

565
Miller - D

1  A.  I don't.  I would have to refer to my notes and when

2  exactly that was.  It was after the -- I know it was after the

3  Hispanic female had taken the trash bag to the dumpster.

4  Q.  Which was at 7:25?

5  A.  Yes.

6  Q.  And approximately what time was his last entry into

7  apartment 2?

8  A.  I -- it was sometime after eight o'clock because at that

9  point I had -- I think it was around 8:22.  I had switched out

10  with another investigator.  "Switched out" meaning there was

11  another investigator who took my spot, basically, where I was

12  parked, to continue the observation.

13  Q.  Do you know what time agents executed the search warrant at

14  location 2?

15  A.  I don't remember the exact time.  I know it was sometime

16  after nine o'clock.

17  Q.  And did you participate in the search?

18  A.  Yes.

19  Q.  Was Mr. Sandoval inside or outside when that search

20  happened?

21  A.  He was inside the residence when we executed the search

22  warrant.  Whether -- I don't know if he stayed inside the

23  residence the whole time we were searching because I was

24  upstairs in a bedroom, and I don't know where Mr. Sandoval was.

25  Q.  And did you seize any evidence?

1    A.    Yes.

2    Q.    Do you remember what you seized?

3    A.    Yes.    This was a yellow piece of paper with what I thought

4    were drug records.    It was found in a shoe box in the closet.

5    Q.    Which closet?

6    A.    The master bedroom closet.

7    Q.    And whose room was that?    Do you know?

8    A.    I believe that was Mr. Sandoval's room.

9    Q.    I'm going to show you Government's 108.

10            Do you recognize this?

11   A.    Yes.

12   Q.    Is this what you seized?

13   A.    Yes.

14   Q.    Why did you think this was a drug record?

15   A.    Well, because I know from my training and experience that

16   drug dealers, drug traffickers, will oftentimes -- based on the

17   number of customers they have -- keep track of amounts that

18   they either owe or owe to them; for, you know, either amounts

19   of dope or amounts of money.

20            So just -- looking at the piece of paper and having,

21   you know, a total on there and then minus a certain amount and

22   then minus another amount, kind of a running log, so to speak,

23   of -- of, like I say, this could be, you know, what they owe

24   their supplier, what a customer owes them.

25            MS. BOLSTAD:    I have nothing further on direct.

Miller - X

1          THE COURT:  Cross.

2          MR. ANDERSEN:  Thank you.

3                      CROSS-EXAMINATION

4   BY MR. ANDERSEN:

5   Q.  Now, Detective Miller, you mentioned that, I think,

6   Detective Davis -- I'm sorry.  Is it detective or -- is it --

7   are you a detective?

8   A.  Yes.

9   Q.  You know -- you mentioned Detective Davis would also take

10  notes as you made observations.  Is that what you were saying?

11  A.  Correct.

12  Q.  Now, have you reviewed Detective Davis's notes?

13  A.  Yes.

14  Q.  Is there any notation on those notes about who you were

15  calling S1 coming around the -- around your car or going to the

16  dumpster?

17  A.  Can I look at the notes?

18  Q.  Certainly.  Do you have it?

19  A.  Yes.  I'm sorry.  What was your question?

20  Q.  I'm just wondering if you can see if there's any notation

21  about that?

22  A.  Oh, you mean like who is S1?

23  Q.  No, just whether or not S1 came and circled your car, or

24  anything of that nature.

25  A.  Yeah, I -- let's see.  (Pause, referring.)  At eight

1    o'clock, Detective Davis noted that I had said S1 is north,

2    through the parking lot, out of my sight.  That was when he

3    actually walked out to the dumpster, by the dumpster, by my

4    car, to the north, and was out of my sight at that point.

5              So it was at that point.

6    Q.  Okay.  So there's no notation about walking around your

7    car, or anything like that?

8    A.  No.

9    Q.  You also mentioned that the person you were calling S1 was

10   working on the -- on -- what -- you assumed he was working

11   on -- on an Armada, the silver Armada.  Right?

12   A.  Yes.

13   Q.  And you were saying he was kind of all around, up and down,

14   under the hood --

15   A.  Yes.

16   Q.  -- of that car?

17             And you tried to start it at one point?

18   A.  Yes.

19   Q.  Now, you mentioned that you found the yellow paper in the

20   shoe box in the closet.  Do you remember what else was in that

21   shoe box?

22   A.  I don't.

23   Q.  Do you remember any -- anything about the general nature of

24   whatever was in the shoe box?

25             Was there anything else in there, do you recall?  Or

1  you just have no recollection?

2  A.  I don't recall.

3          MR. ANDERSEN:  Thank you.  That's all.

4          THE COURT:  Cross?

5          MR. SEPP:  I have nothing for this witness, your

6  Honor.

7          THE COURT:  Redirect?  Redirect?

8          MS. BOLSTAD:  Nothing further, your Honor.  Thank

9  you.

10          THE COURT:  Thank you, sir.  You're free to go.

11          THE WITNESS:  Thank you.

12          THE COURT:  Give me an estimate on timing for the

13  next witness, please.

14          MS. BOLSTAD:  I think 20 to 30 minutes, your Honor.

15          THE COURT:  Then we'll recess for lunch now, and

16  we'll aim to be back in session at just a little bit after

17  1:00.  I want to be sure you have a full hour for lunch.  But

18  as soon as you're back, we'll be ready to go.

19          All right, jurors?

20          Same instructions.  Please enjoy the lunch.  Leave

21  your notes on the chair.  Watch your step as you go out.

22          (Jurors exit, 11:55 a.m.)

23          THE COURT:  Are there matters for the record now, for

24  the Government?

25          MS. BOLSTAD:  No, your Honor.

                              Colloquy

1              THE COURT:  Counsel?

2              MR. SEPP:  Nothing, your Honor.

3              THE COURT:  All right.  So please be ready to go at

4    least five minutes before 1:00, and I want an update at that

5    point on jury instructions.  Okay?

6              Thank you.

7              (Recess taken.)

8              (Court resumes, 1:05 p.m.)

9              THE COURT:  Thank you, everyone.  Please be seated.

10             I've been reviewing the Government's submission,

11   which is filing 199, on the foreseeability question.

12             I don't believe we have enough time, before we have

13   to continue with the jury, to take it up right now, and so I

14   don't want to take time right now unless the parties have

15   already agreed it's a proper statement of the law and everyone

16   uniformly requests that I modify the existing drafts

17   accordingly.  If so, we'll take a few minutes to do that and

18   then generate new drafts for your consideration.

19             Ms. Bolstad?

20             MS. BOLSTAD:  This is my understanding.

21             I conferred with the defense prior to the Court

22   taking the bench.  I don't believe that either defense has an

23   objection to the Government's request to add a special verdict

24   question on reasonable foreseeability.  I tried to clarify it

25   was not the same as finding an element.

Colloquy

1          THE COURT:  I have a concern about guiding the jury

2    with respect to the standard of reasonably foreseeable.  You

3    didn't offer a definition of what that means, what is

4    reasonably foreseeable.  And I envision that -- you defined it

5    by defining -- by using the term in the definition.  You didn't

6    provide me with any suggested description.

7          So I'm going to take a look at that myself in the

8    interim before we go farther.

9          MS. BOLSTAD:  Yes.

10         THE COURT:  In the meantime, Mr. Andersen and

11   Mr. Sepp, do you have a position on this Government request?

12         MR. ANDERSEN:  Your Honor, this does go to some of

13   the issues I have already previously raised about what the

14   elements of the specific offenses are.  And reserving those

15   issues that I've already raised, I don't have any -- I mean,

16   understanding the rulings of the Court on those issues, I don't

17   have any objection to this.

18         THE COURT:  Do you think the term "reasonably

19   foreseeable" needs to be defined?  Or -- or does that have a

20   common meaning that rational jurors can apprehend in the

21   context of this discussion?

22         MR. ANDERSEN:  Well, I think it does have a generally

23   understood definition, but I do think it is a specific legal

24   term as well.  I think that it could -- it could use a sentence

25   or two for explanation, just on what it actually means.

Colloquy

1          So I guess the answer is, yes, I think that it could

2     be --

3          THE COURT:  Well, I'm willing to ask my law clerk to

4     look for definitions.  I'm not sure I can generate that which

5     the Government is requesting.

6          Yes.

7          MS. BOLSTAD:  And the Government -- I looked for a

8     definition in the model instructions under any instruction.

9     It's never defined, and I take that to mean it's because it has

10    a common meaning.

11         I looked at the wire fraud instruction.  It was the

12    most helpful.  It's 8.124.

13         THE COURT:  Okay.  We'll look at it.

14         Mr. Sepp, what would you like to add?

15         MR. SEPP:  I'm in agreement.

16         THE COURT:  Your next witness is who?

17         MS. BOLSTAD:  Tony Carley.  He's here and ready to

18    take the stand.

19         THE COURT:  Go ahead and approach.  Take a seat or

20    stand near the witness chair.

21         Are there matters we need to take up, apart from

22    instructions, off -- outside the jury's presence right now?

23         MS. BOLSTAD:  Briefly, the Government has showed

24    defense counsel several summary exhibits we intend to offer

25    through the testimony of Detective Andersen after Deputy

573
Colloquy

1    Carley, agents Blankenship, and Riley.

2         So she will be the fourth witness of the afternoon.

3         THE COURT:  All right.

4         MS. BOLSTAD:  I did not hear any objections from the

5    defense about the summaries.

6         MR. ANDERSEN:  Your Honor, assuming that that is the

7    basis -- or that Detective Andersen will lay the basis for

8    those summaries, I think that we have no objection to them.

9         THE COURT:  All right.

10        MR. SEPP:  That was my understanding of the

11   conversation.

12        THE COURT:  Thank you.

13        So all of us will stand when the jurors come in.

14   Everyone else will be seated.

15        Please stay standing, so you can be sworn.

16        THE WITNESS:  Yes, your Honor.

17        THE COURT:  Thank you.

18        (Pause.)

19        (Jurors enter, 1:11 p.m.)

20        THE COURT:  Thank you, everyone.  Please be seated.

21        Jurors, the Government's next witness is before you.

22        Sir, would you face the jurors and the deputy.  Raise

23   your right hand to be sworn.

24        (Witness sworn.)

25        THE WITNESS:  Yes, I do.

574

Carley - D

1          THE CLERK:  Please take a seat.

2          THE COURT:  Bring yourself around, closely to the

3    microphone, please.  Closer.

4          Tell us your full name, please, and spell all of it.

5          THE WITNESS:  My name's Anthony Carley.

6    A-N-T-H-O-N-Y.  Last of Carley, C-A-R-L-E-Y.

7          THE COURT:  Thank you.

8          Counsel.

9                        DIRECT EXAMINATION

10   BY MS. BOLSTAD:

11   Q.  Good afternoon, Deputy.  Could you please tell the jury how

12   you're employed?

13   A.  I work for the Washington County Sheriff's Office.

14   Q.  How long have you been there?

15   A.  Since 2005.

16   Q.  And do you have a current assignment?

17   A.  I'm currently assigned as a deputy to the Washington County

18   Sheriff's Office.

19   Q.  Back in March of 2014, where were you assigned?

20   A.  I was assigned as a task force officer, assigned to the

21   DEA, the Portland district office.

22   Q.  And explain to the jury, what does that mean?

23   A.  So I was -- I was previously assigned to the Westside

24   Interagency Narcotics team through the sheriff's office in

25   Washington County, and then I was moved into the position of a

1    task force officer assigned to the DEA, the Portland district

2    office of the DEA, which is still closely working with the

3    Westside Interagency Narcotics team.  But specifically my

4    full-time duties were with the special agents with the DEA in

5    Portland as a drug task force.

6    Q.  And would you help the DEA investigate drug cases involving

7    Washington County?

8    A.  Yes, I would.

9    Q.  Okay.  How long have you been with the WIN team before you

10   became a TFO?

11   A.  A little over three years.  Approximately three years.

12   Q.  And by TFO, I mean task force officer.  Is that what you --

13   A.  Yes, ma'am.

14   Q.  Could you estimate how many narcotics investigations you

15   have taken part in over the course of your career?

16   A.  I would estimate it to be over -- over a hundred.

17   Q.  And have you had the opportunity to speak with suspects in

18   those cases?

19   A.  Yes, I have.

20   Q.  Were you involved in a **Len Bias** investigation in April

21   2014?

22   A.  Yes, I was.

23   Q.  How did you become involved?

24   A.  Detective Andersen, with the Westside Interagency Narcotics

25   team, contacted me and advised me of their investigation up to

1    that point.  And I was, like I said, the drug task force

2    officer with the DEA.  And the investigation was going towards

3    that -- the federal side of -- of things in the investigation.

4    And -- and it provided me information and kind of got me going

5    with them in the investigation.

6    Q.  And did the WIN team ask for your assistance because of

7    your federal assignment?

8    A.  Yes.

9    Q.  Do you remember the day that you became involved?

10   A.  It was the 30 -- sorry, the 29th.

11   Q.  Okay.  And did you apply for any search warrants in this

12   case?

13   A.  Yes, I did.

14   Q.  Tell us about that.

15   A.  I applied for a search warrant on April 2nd to the address

16   of 11759 Southeast 64th Avenue in Milwaukie.

17   Q.  Okay.

18   A.  And also for a vehicle, a Honda Passport with license plate

19   827 David, Robert, King; DRK.

20   Q.  And did you obtain judicial authorization for both that

21   location and the vehicle?

22   A.  Yes, I did.

23   Q.  What time did you get that search warrant signed?

24   A.  It was signed at 4:25 p.m. on April 2nd.

25   Q.  And in applying for that search warrant, did you provide

1   facts to a judge?

2   A.  Yes, I did.

3   Q.  I want to ask you about who -- so in laying out your facts,

4   did you identify someone that you believed lived at location 1?

5   A.  Yes, we did.

6   Q.  Who was that person that you believed lived at location 1?

7   A.  Fabian Sandoval-Ramos.

8   Q.  Did you take part in the execution at the house on 64th?

9        We've been calling it location 1.

10  A.  Yes, I did.

11  Q.  Okay.  When you searched location, did you find Fabian

12  Sandoval-Ramos?

13  A.  No, we did not.

14  Q.  Okay.  What time did you do the search warrant at location

15  1?

16  A.  It was at 5:45 p.m.

17  Q.  How long did it take?

18  A.  Oh, probably -- you mean to secure the residence or to

19  complete the search?

20  Q.  To complete the whole thing.

21  A.  Probably at least three hours.

22  Q.  Had anyone been arrested prior to your search warrant at

23  location 1?

24  A.  Yes.

25  Q.  Who?

1  A.  Raul Arcila -- Arcila and Ramirez Coronel.

2  Q.  Did you participate in interviewing either one of those

3  individuals?

4  A.  Yes, I did.

5  Q.  Which one?

6  A.  Both, actually.

7  Q.  Okay.  Where did your interview take place?

8  A.  At location 1.

9  Q.  Prior to your interviews, did you advise Mr. Arcila of his

10  **Miranda** rights?

11  A.  Yes, I did.

12  Q.  And did you enter -- or advise the other people you

13  interviewed as well?

14  A.  Yes, I did.

15  Q.  Did you do so in English or in Spanish?

16  A.  In both.

17  Q.  Explain to us how that happened.

18  A.  There was a Spanish translator there who also works for the

19  Washington County Sheriff's Office, Deputy Debon (phonetic)

20  Tate.  And he assisted with the -- the reading of the search

21  warrant to all -- or to the people at the location and, to

22  everybody, **Miranda** rights.

23  Q.  And when you say "read," was -- were the **Miranda** rights

24  read from something?

25  A.  Yes, they were.

Carley - D

1    Q.   What was that?

2    A.   An issued -- an issued card that I received or have with

3    me.

4    Q.   Do you have it today?

5    A.   I do.

6    Q.   And are the rights on that card, are they in English or in

7    Spanish?

8    A.   They're in both.

9    Q.   Okay.  And were both versions read to Mr. Arcila and

10   Mr. Ramirez Coronel?

11   A.   Yes, they were.

12   Q.   In summary, did you advise these individuals that they did

13   not need to speak with you?

14   A.   Yes, I did.

15   Q.   That they had the right to stay silent?

16   A.   Yes, ma'am.

17   Q.   And did you advise them that anything they said could be

18   used against them in a court of law?

19   A.   Yes, I did.

20   Q.   Did these individuals acknowledge that they understood what

21   you had read to them?

22   A.   Yes, they did.

23   Q.   How did you get that acknowledgment?  Was it everybody at

24   once or one at a time?

25   A.   Individually asked each person, as they -- as they heard

580

Carley - D

```
 1   them, if they understood each one.  And you get an individual

 2   answer from each person.

 3   Q.  You also mentioned reading the search warrant?

 4   A.  Yes, ma'am.

 5   Q.  What do you mean?

 6   A.  The -- the search warrant, in its entirety, is read to any

 7   occupants found or arriving at the residence that you have a

 8   signed search warrant for.

 9   Q.  And when you say "in its entirety," what is that document

10   that you would read to these people?

11   A.  Basically explaining the authority, signed by the judge,

12   the location and/or the vehicle -- in this case, both -- and

13   their descriptions.  And then basically the items that the

14   court is authorizing to be searched for.

15   Q.  And did those items involve drug trafficking evidence?

16   A.  Yes, they did.

17   Q.  Let's move to the interviews.  Prior to conducting those

18   interviews, did you determine whether they needed to be in

19   English or in Spanish?

20   A.  Yes, I did.

21   Q.  How did you make that determination?

22   A.  Well, I -- I asked individually all of them if -- if they

23   understood English well or spoke English well.  And it was kind

24   of -- you kind of get a sense for if you even just speak a

25   normal sentence whether or not somebody's understanding or
```

581

Carley - D

1   comprehending the question you just asked.  And I made sure

2   that I got specific answers from all three, stating whether or

3   not they understood English well.

4   Q.  Who was the third person?

5   A.  It was Coronel-Morga.

6   Q.  Was that Mario Coronel-Morga?

7   A.  Yes, ma'am.

8   Q.  And so who, if anyone, was interviewed in English?

9   A.  Mr. Arcila and Coronel-Morga.

10  Q.  And did Mr. Arcila -- how do you know he spoke English?

11  A.  He answered in English when I asked him if he understood --

12  well, when I asked him if he understood his rights and when I

13  asked him if he understood English or spoke English well; well

14  enough for us to continue talking, he answered in English and

15  in the affirmative.

16  Q.  Okay.  And did you have your entire conversation with him

17  in English?

18  A.  Yes, I did.

19  Q.  Did you have a Spanish translator available and nearby in

20  case he needed it?

21  A.  Yes, we did.

22  Q.  And did he need any translation?

23  A.  No, he did not.

24  Q.  What about Mr. Ramirez Coronel?

25  A.  Mr. Ramirez Coronel did need a Spanish translator.

Carley – D

1  Q.  Did Mr. Ramirez Coronel speak any English with you?

2  A.  Not that I recall.

3  Q.  And what about Mario Coronel-Morga?

4  A.  Coronel-Morga did not need a Spanish interpreter.

5  Q.  So he spoke English?

6  A.  Yes, very well.

7  Q.  Okay.  So tell us about the interviews.

8      Were they all at once or one at a time?

9  A.  Individually.

10  Q.  Who went first?

11  A.  I first talked to Ramirez Coronel.

12  Q.  Second?

13  A.  Mr. Arcila.

14  Q.  Third?

15  A.  Coronel-Morga.

16  Q.  Where did you conduct those interviews?

17  A.  In the garage of location 1.

18  Q.  And so what I want you -- we're not going to talk about the

19  interviews of Mr. Ramirez Coronel or Mr. Coronel-Morga.  I want

20  to focus on the interview you had with Mr. Arcila.  Okay?

21  A.  Okay.

22  Q.  So set the scene for us.  You said you're in the garage.

23      Who else is there?  What's the atmosphere?

24  A.  The garage -- the roll-up garage door's open.  There's a

25  man door, leading into the -- into the garage.

1          Periodically there would be an investigator or a

2    searcher who would walk through the garage.  But basically it

3    was myself, Detective Andersen conducting the interview with --

4    with Mr. Arcila.

5    Q.  Were you the only two law enforcement agents in the garage

6    at the time?

7    A.  Yes, we were, other than just a -- a walk through,

8    basically, into the -- into the man door, through the search of

9    the house.

10   Q.  And what was the tone of your discussion like with

11   Mr. Arcila?

12   A.  He seemed calm.  Didn't -- didn't seem to be amped up, or

13   anything like that.

14   Q.  Did he seem confused at any time?

15   A.  No, he did not.

16   Q.  How did your interview start?

17   A.  I just started with a basic question, how long he had lived

18   at the residence.  And he stated that he had been at the

19   residence approximately three to four months.

20          And I asked him -- I asked him about -- and then I

21   just jumped into asking him about the green Honda Civic and

22   the -- where they were headed, and the traffic stop and --

23   Q.  At your interview, did you know that he had been in that

24   green Civic?

25   A.  Yes, I did.

1  Q.  Okay.  And before you interviewed him, were you made aware

2  of what was found in the green Civic?

3  A.  Yes, I was.

4  Q.  What was that?

5  A.  The heroin.

6  Q.  And so you said you wanted to just confront him with this?

7  A.  Correct.

8  Q.  Okay.  Tell us about that.

9  A.  Well, we had information, you know, leading up to -- where

10  we knew what he was doing, what they were doing, where they

11  were going in that car.  And I wanted to kind of see, you know,

12  what his answer was going to be right off the bat and see how

13  truthful he was going to be about what they were -- what they

14  were out doing.

15  Q.  Okay.  And did he have an explanation for what they were

16  out doing?

17  A.  He said that they were going to the Home Depot to buy -- to

18  get some things.

19        He really had a pretty vague explanation as to what

20  they were doing; he and Ramirez Coronel.

21        And I again confronted him about what was found in

22  the vehicle and the information that I had; where we knew why

23  they had left and where they were going to the predetermined

24  location.

25  Q.  At the time you interviewed Mr. Arcila, had you already

1  completed your interview of Mr. Placido Ramirez-Coronel?

2  A.  Yes.

3  Q.  Okay.  And the information that Mr. Arcila told you about

4  going to Home Depot, was that consistent or inconsistent with

5  what Mr. Placido Ramirez-Coronel told you, without going into

6  what he said?

7  A.  It was inconsistent.

8  Q.  Okay.  And did -- what did you make of that?

9  A.  Well, I -- he was being untruthful.  Arcila was being

10  immediately untruthful during the -- during the interview.

11  Q.  Okay.  And were you aware of what surveillance vehicles had

12  observed about the green Civic, specifically?  Did they see it

13  go to a Home Depot?

14  A.  No, they did not.

15  Q.  And did you confront Mr. Arcila with that fact?

16  A.  Yes, I did.

17  Q.  What did he say?

18  A.  He denied being involved in any sort of illegal activity

19  after I confronted him about what we found and -- and that his

20  Home Depot story wasn't matching up.  And -- and he basically

21  said that if -- if Ramirez -- Ramirez Coronel was conducting --

22  doing something illegal without him knowing about it, that that

23  was -- basically wasn't his problem, or he wasn't involved in

24  it.

25  Q.  Okay.  And is that possible?

1    A.   It is.

2              MR. SEPP:  Object.

3              THE COURT:  He says it is possible.

4              Do you want -- do you want to --

5              MR. SEPP:  No, no, no.  Withdrawn.

6              THE COURT:  Okay.  Go ahead.

7    BY MS. BOLSTAD:

8    Q.   So given that that was his story, his explanation to you,

9    which is possible, what explanation did you ask him next?

10   A.   I asked him if -- if he -- if his fingerprints would be

11   found on the packaging of the -- of the heroin packages that

12   were found in the hidden compartment in the vehicle.

13   Q.   And what did he say to that?

14   A.   He said, well, probably.

15              He said -- actually, I quoted it, Well, yeah,

16   probably.

17   Q.   Did he provide any further information that you recall

18   about the fingerprint statement?

19   A.   Well, after that, I asked him, Well, why would that -- why

20   would that be, if he wasn't involved in any of this activity?

21   And he says -- why would he -- why would that be found?  And

22   then he kind of alluded to that, well, he touched the -- he

23   would have touched the packaging or the plastic while it was in

24   the kitchen.  As, like, some sort of, you know, it was just in

25   the kitchen, so maybe he touched it type of a thing.

1    Q.   And is he the one who brought up the kitchen?

2    A.   Yes.

3              MS. BOLSTAD:  Nothing further on direct, your Honor.

4              THE COURT:  Mr. Andersen.

5              MR. ANDERSEN:  Nothing further.

6              THE COURT:  Thank you.

7              Mr. Sepp.

8              MR. SEPP:  Thank you, your Honor.

9                         CROSS-EXAMINATION

10   BY MR. SEPP:

11   Q.   Now, did you write a report outlining or detailing your

12   interview of Mr. Arcila?

13   A.   Yes, I did.

14   Q.   Did you bring that with you?

15   A.   Yes, I did.

16   Q.   Could you turn to -- I think it is page 5 of 7 of your

17   report.

18   A.   Yes.

19   Q.   Okay.  Could you point to where it says in here that

20   Mr. Arcila -- excuse me, that Mr. Arcila mentioned that it

21   was -- brought up the kitchen?

22   A.   I did not -- that is not in my report.

23   Q.   What's in your report is that he just mentioned the

24   fingerprints could be on the packaging.  Correct?

25   A.   Correct.

Carley – ReD

1  Q.  And obviously, if he's lived there, he could have touched
2  the packaging?
3  A.  Correct.
4  Q.  How long did this -- best estimate, how long did the
5  interview last?
6  A.  Maybe ten minutes.
7  Q.  And everyone was just standing in the garage, or was there
8  a couch or something out there?
9  A.  No, we were standing.
10         MR. SEPP:  That's all.  Thank you.
11         THE COURT:  Redirect.
12         MS. BOLSTAD:  Yes.
13                    REDIRECT EXAMINATION
14  BY MS. BOLSTAD:
15  Q.  Deputy Carley, who else was present, law enforcement-wise,
16  during your interview with Mr. Arcila?
17  A.  Detective Andersen.
18  Q.  Okay.  And prior to your testimony today, did you have a
19  chance to review Detective Andersen's report of the interview?
20  A.  Yes, I did.
21  Q.  And in reading her report, did that trigger additional
22  memories on your part?
23  A.  Yes, it did.
24  Q.  Okay.  Do you remember Mr. Arcila talking about the
25  cellophane in the kitchen, even though it's not in your report?

                    Blankenship – D

1    A.  I do, yes.

2              MS. BOLSTAD:  Nothing further on redirect.

3              THE COURT:  All right.  Thank you, sir.  You may step

4    down.

5              THE WITNESS:  Thank you, your Honor.

6              THE COURT:  Next witness?

7              MS. BOLSTAD:  The Government calls Josh Blankenship.

8              THE COURT:  Please face the jury and the deputy

9    there.

10             Raise your right hand to be sworn.

11             (Witness sworn.)

12             THE WITNESS:  I do.

13             THE CLERK:  Please take a seat.

14             THE COURT:  Bring yourself close in there.  Thank

15   you.

16             Tell us your full name, and spell all of it.

17             THE WITNESS:  Joshua Blankenship.  J-O-S-H-U-A.  Last

18   name is B-L-A-N-K-E-N-S-H-I-P.

19             THE COURT:  Counsel.

20             MS. BOLSTAD:  Thank you, your Honor.

21                       DIRECT EXAMINATION

22   BY MS. BOLSTAD:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  Could you please introduce yourself to the jury.

1  A.  My name is Josh Blankenship.  I'm a special agent with the

2  Drug Enforcement Administration here in Portland.

3  Q.  How long have you been with the Drug Enforcement

4  Administration?

5  A.  I've been a special agent since November of 2012.

6  Q.  What kinds of cases have you worked on?

7  A.  We've worked on mid- to high-level drug trafficking cases.

8  Q.  Could you describe some of your training and background,

9  prior to -- or -- or in your role as a DEA agent?

10  A.  It started with a 17-week basic training course down in

11  Quantico, Virginia.  It was a full-time training.  We did --

12  they covered hundreds of hours of instruction on surveillance,

13  report writing, testifying, confidential source handling,

14  interview and interrogation techniques, affidavit writing,

15  search warrant executions, tactical -- tactical situations,

16  covering them.  And also covered money laundering.  The

17  means -- pretty much all of the means drug traffickers use

18  to -- the whole supply chain of drugs; from the manufacturing,

19  all the way to the distribution of the end user.  And then also

20  how the -- the drug traffickers will take the proceeds, try to

21  conceal them, and actually use them to launder, and pretty much

22  the whole scope of drug trafficking.

23  Q.  Could you estimate how many investigations you've been

24  involved with?

25  A.  I've been involved in excess of 30 investigations.

Blankenship - D

1  Q.  Okay.  And is a DEA investigation, on average, larger than

2  a simple traffic stop?

3  A.  Yes.

4  Q.  Tell the jury about that.

5  A.  Our average DEA investigations can last well over a year

6  long.  In average, they can be a year to two years long.  They

7  usually can start out with information passed from local

8  agencies about narcotics trafficking.  Once it reaches a

9  certain level, sometimes they will contact us, and we can bring

10  a lot more resources to the table to be able to further

11  investigation up the chains.

12          Our investigations generally lead us into ultimately

13  the drugs coming in out of Mexico and outside the jurisdiction

14  of the law -- local law enforcement.

15  Q.  Okay.  And have some of your investigations involved

16  heroin?

17  A.  Yes.

18  Q.  Are you familiar with Fabian Sandoval-Ramos?

19  A.  Yes.

20  Q.  Did you investigate him in 2014?

21  A.  Yes.

22  Q.  What was your role in the investigation?

23  A.  My role in the investigation began when I was -- assisted

24  the search warrant at location 1.  And then I actually was the

25  applicant in -- or the affiant for the search warrant for

Blankenship – D

1    location No. 2.

2    Q.  And at the time you became involved, and the DEA, how many

3    different counties were involved in the case?

4    A.  At least three different counties.  It was Washington

5    County, Multnomah County, and Clackamas County.

6    Q.  Okay.  And what level in the chain of distribution was the

7    investigation at when you became involved?

8    A.  We were up to the fourth level of the investigation.

9    Q.  So you mentioned location 1.  Who wrote that search

10   warrant?

11   A.  TFO Tony Carley.  Or Deputy Carley now.

12   Q.  Okay.  I want to talk about the context of the search

13   warrant execution.

14          Were you aware of what had happened prior to the

15   search warrant at location 1 that day?

16   A.  Yes, I was.

17   Q.  Okay.  And tell the jury what you knew.

18   A.  What I knew is that Washington County had been working up

19   the different levels of a **Len Bias** case.  They had identified a

20   high-level heroin supplier and that they had conducted a

21   controlled purchase from this supplier.  And then they

22   contacted Deputy Carley to assist with getting a search warrant

23   for the location of that supplier.

24   Q.  I'm going to ask you some timing questions.

25          Do you know what time of day Mr. Baker made a call to

Blankenship – D

1    his source of supply to order the quantity of drugs?

2    A.   Yes.  It was between 3:45 and four o'clock in the afternoon

3    on April 2nd.

4    Q.   And do you know what time the later phone calls between

5    Mr. Baker and the number for Mexican Bobby -- do you know what

6    time those later calls took place?

7    A.   Yes.  The call took place at about 4:50 in the evening.

8    Q.   Where were you physically located when the Baker calls were

9    placed to order the drugs?

10   A.   When Baker called to order the drugs initially, at about

11   3:45, I was actually in a church parking lot with other members

12   of the Washington County team, preparing to execute the search

13   warrant.

14   Q.   And were you still in that parking lot when Mr. Baker let

15   Mexican Bobby know that he was here at the location?

16   A.   No, I was not.

17   Q.   Okay.  At some point, while you were in that church parking

18   lot, did you observe any vehicles linked to this investigation?

19   A.   Yes.

20   Q.   Tell the jury about that.

21   A.   While we were in the church parking lot, preparing, we

22   heard on the radio -- the surveillance radio, because everyone

23   had their radios on, that a green Honda Civic had departed

24   location No. 2.

25            And then just a minute or two later, while we were in

1    the parking lot, we saw a green Honda Civic drive by, and it

2    appeared to be heading towards L1.

3    Q.   Did you see a Honda Civic?

4    A.   Yes, I did.

5    Q.   What color?

6    A.   It was like a -- a teal greenish.

7    Q.   Which direction was it going when you saw it?

8    A.   South on 64th Street.

9    Q.   And what direction was it going, location-wise, in this

10   case?

11   A.   It was heading toward the direction of L1 and also towards

12   the 7-Eleven.  Those are both in that general direction.

13   Q.   Do you know what time -- do you know what time the green

14   Honda Civic arrived at or left the area of location 1?

15   A.   Could I review my notes?

16   Q.   Please do.

17   A.   It was at approximately -- around five o'clock.

18   Q.   Okay.  Do you know if Mr. Baker received phone calls after

19   that green Honda Civic left the area of L1?

20   A.   Yes.

21   Q.   What was the nature of the calls Mr. Baker received after

22   the green Civic left location 1?

23   A.   After -- it was -- the calls were made, basically telling

24   Mr. Baker, hey, follow the green Honda over to the Lowe's

25   parking lot.

595

Blankenship – D

1   Q.  And did that happen?

2   A.  No, that did not happen.

3   Q.  Why not?

4   A.  Because there's -- they executed a traffic stop and pulled

5   over the green Honda Civic.

6   Q.  Okay.  And do you know what time the traffic stop of the

7   Honda Civic took place?

8   A.  The traffic stop, probably -- approximately around 5:20.

9   5:20, 5:25.

10  Q.  Did you participate in that traffic stop or the search of

11  the vehicle?

12  A.  No, I did not.

13  Q.  Do you know what was seized?

14  A.  Yes, I do.

15  Q.  How do you know what was seized?

16  A.  Because DEA processed the evidence that was seized.

17  Q.  And were you part of that processing?

18  A.  Yes, I was.

19  Q.  I'm going to show you what's been marked and admitted as

20  Government Exhibit 61.

21  A.  (Handed exhibit.)

22  Q.  Do you recognize that?

23  A.  Yes.

24  Q.  What is it?

25  A.  It is the wrappings of a -- that heroin was concealed in

1    the glove -- or the -- the trap inside the green Honda.

2    Q.  And did that contain heroin?

3    A.  Yes, it did.

4    Q.  How much heroin?

5    A.  Approximately 13 pieces.

6    Q.  And did you submit those 13 pieces to the DEA laboratory?

7    A.  Yes, I did.

8    Q.  I'm going to show you what's marked and admitted as

9    Government's 62.

10   A.  (Handed exhibit.)

11   Q.  Do you recognize that?

12   A.  Yes, I do.

13   Q.  Is that what you're talking about?

14   A.  Yes, it is.

15   Q.  And on the screen in front of you, I'll pull up Government

16   63.

17            So when you sent those -- that item to the

18   laboratory, did the laboratory test the drugs?

19   A.  Yes, it did.

20   Q.  Okay.  And did they send you the results of their testing?

21   A.  Yes, they did.

22   Q.  So looking at Government 63, does this look like something

23   you recognize?

24   A.  Yes.  That is our form to submit the drugs to the -- to the

25   drug laboratory.

597

Blankenship - D

1   Q.  Okay.  And I'm going to ask to move to page 3 of this

2   report.

3           Have you reviewed the results from the lab?

4   A.  Yes.

5   Q.  And how much was the gross weight of the material as

6   reflected in the lab report?

7   A.  393.9 grams.

8   Q.  Okay.  And would that gross weight include the packaging?

9   A.  Yes.

10  Q.  Okay.  What was the net weight of the drugs after testing?

11  A.  323.5 grams, plus or minus .02 [sic] grams.

12  Q.  And does that net weight include packaging?

13  A.  No.

14  Q.  I'm going to move on to the search of location 1.

15          Oh, actually, I'll go back to this.

16          So are you aware of how much Mr. Baker ordered?

17  A.  Yes.

18  Q.  How much?

19  A.  8 ounces.

20  Q.  And it sounds like -- do you know how many grams 8 ounces

21  or eight pieces of heroin would be?

22  A.  I'm horrible with math.  But eight times 25.  So about 200

23  grams.

24  Q.  Okay.  And it sounds like you seized more?

25  A.  Yes.

1    Q.   What is -- what is your explanation for that?

2    A.   Well, the -- the heroin was packaged into two separate

3    burrito-type-shaped packages, and one was marked with 8 and one

4    was marked with 5.

5    Q.   Had Mr. Baker ordered 5?

6    A.   No.

7    Q.   Let's talk about the search at L1, location 1.

8          Was that before or after the traffic stop?

9    A.   That was after.

10   Q.   And you said it was at 4 -- 5:45?

11   A.   Yes.

12   Q.   Could you summarize what agents found at location 1.

13   A.   They found approximately about 13,230 dollars in U.S.

14   currency.  They found drug packaging materials.  They found,

15   like, vacuum seal bags.  They found multiple digital scales.

16   And they found packages of lactose, which is a cutting agent,

17   used.  And then cell phones, and a couple other items.

18   Q.   And did you go inside location 1?

19   A.   Yes, I did.

20   Q.   I'm going to show you a few photographs and ask you to

21   describe to the jury what is pictured.

22          But before I do, did you make any observations about

23   the kitchen area of location 1?

24   A.   It was very scarce.  Like a lot of the cabinets were pretty

25   much empty.  Like in -- at one point, you opened up a cabinet

Blankenship – D

1    and it was completely empty except for a digital scale sitting

2    in it.  And it just seemed really -- there was not much -- not

3    many items in there at all.

4    Q.  Let's pull up Government's 70.

5              What is shown here?

6    A.  One of the kitchen cabinets.

7    Q.  And what's in that cabinet?

8    A.  You've got sealing materials for the vacuum sealers.

9    You've got just some Ziploc-type bags.  You've got sugar.  An

10   oil filter.  And just some over-the-counter medications.

11   Q.  Is there a silver item on the second shelf?

12   A.  Yes, there is.

13   Q.  Do you know what that is?

14   A.  I believe that is duct tape.

15   Q.  Okay.  Is that used in drug packaging, in your training and

16   experience?

17   A.  Yes, it is.

18   Q.  Let's look at 71.  What -- what is pictured here?

19   A.  More vacuum-sealed packaging material, several rolls of it,

20   smaller bags.

21   Q.  Government's 72.

22   A.  A digital scale.

23   Q.  Government's 73.

24   A.  Another digital scale.

25   Q.  That looks pretty small.  Is that -- are you -- have you

600

Blankenship - D

1  ever seen a digital scale that size?

2  A.  Yes, I have.

3  Q.  And were both of those items seized by the DEA?

4  A.  Yes, they were.

5          MS. BOLSTAD:  Okay.  And those would be Government's

6  74 and 75, for the jury.

7  BY MS. BOLSTAD:

8  Q.  Let's look at Government's 76.  What is that?

9  A.  That is a vacuum-seal machine.

10  Q.  And do you know what it is used for?

11  A.  It could be -- have a wide array of uses.  But mainly in

12  situations like this, we see that it is used to vacuum seal in

13  drugs, to try and conceal the smell.

14  Q.  Okay.  I'm going to show you Government Exhibit 77.

15          Do you recognize this picture?

16  A.  Yes.

17  Q.  What is pictured here?

18  A.  You have an extremely large role of Costco-brand food wrap

19  and then also the packages of lactose and some open bags of raw

20  sugar.

21          MS. BOLSTAD:  Could you pull up the next exhibit.

22  BY MS. BOLSTAD:

23  Q.  What is that?

24          MS. BOLSTAD:  Oh.  (Pause, conferring.)

25  BY MS. BOLSTAD:

601

Blankenship – D

1  Q.  Do you recognize what's in 78?

2  A.  Yes.

3  Q.  What is it?

4  A.  It is a plastic bag that a bunch of drug packaging -- used

5  drug packaging materials were located.

6  Q.  What area of the room was --

7  A.  That was in the laundry room.

8  Q.  And did you go into the laundry room?

9  A.  Yes.

10  Q.  I would like to show you Government 79.

11        Do you recognize that picture?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  That is me holding out -- stretching out that -- the drug

15  packaging material that was inside that bag, located next to

16  the washer or dryer; whatever that was.

17  Q.  Okay.  So when -- when agents seized that bag, did it

18  contain many different bags within it?

19  A.  Yes, it did.

20  Q.  And did you, at a later date, separate those bags out?

21  A.  Yes, I did.

22  Q.  And in your separation process, did you even spread out the

23  cellophane?

24  A.  Yes, I did.

25  Q.  And is that what is pictured?

602

Blankenship - D

1    A.   Yes, it is.

2    Q.   Are those your hands?

3    A.   Yes, they are.

4    Q.   And what is the word that is seen on that packaging?

5    A.   Puro.

6    Q.   Do you speak Spanish?

7    A.   No, I don't.

8    Q.   Okay.  I would like you to take a look at Government 80.

9    I'm spreading it out here in front of you.  Can you see that?

10   A.   Yes, I can.

11   Q.   Okay.  And is part of 80, is it that puro bag that you

12   spread out?

13   A.   Yes, it is.

14   Q.   Okay.  What were the rest of those individual bags in

15   Government Exhibit 80?

16   A.   Those are a bunch of vacuum-seal bags that appeared to have

17   been cut open.

18   Q.   And did they -- why were they significant to you?

19   A.   They're significant to us because they looked like they had

20   residue from heroin.  Like they were used -- used to seal

21   heroin inside them.

22   Q.   Okay.  Did you count how many bags -- how many complete

23   used bags you had?

24   A.   Yes.

25   Q.   Do you know what that count was?  I might not have it --

Blankenship - D

1   A.   I believe it was six.  It was six or more.

2   Q.   Do you know the quantity of heroin that could fit in each

3   of those bags?

4   A.   Easily a kilo.

5   Q.   One kilo per bag?

6   A.   Yes.

7   Q.   Did you test any of these bags at the laboratory?

8   A.   No, we did not.

9   Q.   I mean for drugs?

10  A.   No.

11  Q.   Okay.  Were those bags tested at the laboratory for

12  fingerprints?

13  A.   Those bags, yes, they were.

14  Q.   And did we get any results from that?

15  A.   No, we did not.

16  Q.   Did you have a chance to smell those bags?

17  A.   Yes, I did.

18  Q.   What did they smell like?

19  A.   They had the same vinegary smell that's common to heroin.

20  Q.   I want to talk about cash.  When you summarized, you said

21  agents found, I think, approximately 13,000 dollars.

22  A.   Yes.

23  Q.   Where in the house was the money found?

24  A.   It was found in two locations.  It was found -- I believe

25  approximately 5,000 dollars of it, and change, was found in the

604

Blankenship - D

1   family room of the location.  And then another, I believe,

2   8,000 dollars, approximately, was found in the back bedroom of

3   the residence.

4   Q.  And drug records, did you seize drug records at this

5   location?

6   A.  Yes, we did.

7   Q.  Where in the house were the drug records?

8   A.  The drug records were -- may I review my notes?

9   Q.  Yes.

10  A.  (Pause, referring.)  They were located in the closet in the

11  back bedroom of the residence.  The same bedroom that the

12  money -- or the U.S. currency was found.

13  Q.  Okay.  I'm sorry I missed that.

14           Did you say where the drug records were found?

15  A.  They were found in the back bedroom, the same back bedroom

16  that the 8 -- the approximately 8,000 dollars in cash was

17  found.

18           MS. BOLSTAD:  Okay.  I would like to pull up

19  Government Exhibit 99.  And could we go to page 4.

20  BY MS. BOLSTAD:

21  Q.  This is marked and admitted as Government 99.

22           Do you see an entry in this record at the top left?

23  A.  Yes.

24  Q.  And what does it say?

25  A.  It appears to say S -- like 1200 pure or -- yes, S 1200

Blankenship – D

1    pure, and then 15 to 13,500.

2    Q.  Let's go to the top of page 6.

3         Do you see an entry at the upper left?

4    A.  Yes.

5    Q.  And what does it say?

6    A.  It says "milio" and then "mil pelen."

7    Q.  Not a Spanish speaker?

8    A.  Not a Spanish speaker.

9    Q.  Okay.  Was this notebook, was it sent to the DEA lab for

10   fingerprint analysis?

11   A.  Yes, it was.

12   Q.  And I noticed earlier in the picture you had gloves on.

13        Did you have gloves on when searching location 1?

14   A.  Yes, I did.

15   Q.  And did the other agents searching the scene have gloves

16   on?

17   A.  Yes, they did.

18   Q.  Okay.  While you were searching that house, did

19   Mr. Arcila -- was he able to go walk around the house while you

20   were searching?

21   A.  No, he was not.

22   Q.  Would he have been able to touch this notebook while agents

23   were searching?

24   A.  No.

25   Q.  Did you participate in the interviews at location 1?

Blankenship – D

1  A.  No, I did not.

2  Q.  Okay.  Did you have a later role with location 2?

3  A.  Yes, I did.

4  Q.  Tell us about that.

5  A.  My later role with location 2 is that I was -- actually

6  applied for the search warrant for location No. 2.  And then I

7  also assisted in searching and collecting evidence at location

8  No. 2.

9  Q.  Who was present when agents arrived at location 2?  I mean,

10  by nonlaw enforcement, who was present?

11  A.  Fabian Sandoval-Ramos.  Imelda, I believe, his wife.  And

12  another -- may I review my notes?

13  Q.  Yes.

14  A.  Okay.  (Pause, referring.)

15  Q.  I don't need exact names.

16  A.  Okay.  It was another older female, and then I believe two

17  younger females and some juveniles.

18  Q.  Did you see any babies on the scene?

19  A.  No, I did not.

20  Q.  And do you know who the other adult female -- do you know

21  who she was?  Not name-wise, but did she live there?

22  A.  No, she didn't.  She was a neighbor or a friend.

23  Q.  And what time was your search warrant at location 2

24  executed?

25  A.  I believe it was executed at around 9:30.  9:15, 9:30 in

Blankenship - D

1    the evening.

2    Q.  Did agents find any drugs at location 2?

3    A.  No, they did not.

4    Q.  Any evidence of drug use?

5    A.  No.

6    Q.  What, if anything, was found at location 2?

7    A.  At location 2, we found what we believe is drug records.

8    We found some cell phones.  We found in the dumpster a lot of

9    packaging of the same lactose that was at L1.  We found also a

10   broken cell phone in the dumpster as well.  And then other

11   miscellaneous items belonging to Fabian -- that had the name

12   Fabian Sandoval-Ramos and his wife's name on it, too.

13   Q.  Do you have your DEA exhibit log with you?

14   A.  Yes, I do.

15   Q.  Okay.  I'm going to ask you about one of the cell phones,

16   the iPhone.

17   A.  Yes.

18   Q.  Did DEA seize an iPhone?

19   A.  Yes, they did.

20   Q.  Where or from whom did they seize that iPhone?

21   A.  The iPhone was actually on the nightstand, located to the

22   right of -- the iPhone was located on the nightstand in the

23   master bedroom.

24   Q.  Okay.  Let me show you Government Exhibit 82.  It's not up

25   with you, is it?  82?

Blankenship - D

1    A.   No.   (Handed exhibit.)

2    Q.   And does this look like the iPhone that was seized?

3    A.   Yes, it does.

4    Q.   Did agents later examine that phone and download its

5    contents?

6    A.   Yes.

7    Q.   And we'll hear about that later.

8             Did you participate in the interviews at location 2?

9    A.   No, I did not.

10   Q.   Finally, Agent Blankenship, I would like to talk to you

11   about a vehicle.

12            Earlier, from Deputy Carley, we heard that the search

13   warrant for location 1 also included a vehicle.

14   A.   Yes.

15   Q.   What vehicle were agents authorized to search?

16   A.   A '98 Honda passport.

17   Q.   While you were executing search warrants at location 1 and

18   location 2, did anyone find that Honda Passport?

19   A.   No, they did not.

20   Q.   Was it found sometime later?

21   A.   Yes.   It was found the next morning, at like 1:30 in the

22   morning.   Police found it actually located down in Happy

23   Valley, about 90th and Southeast Causey.

24   Q.   And did they seize the vehicle?

25   A.   Yes, they did.

609

Blankenship – X

1  Q.  Did they search it?

2  A.  Not on scene.  They transported it to the Washington County

3  Sheriff's Office, and then it was later searched.  The –– the

4  search warrant on it was executed out at the Washington County

5  Sheriff's Office.

6  Q.  And who was the registered owner that have vehicle?

7  A.  Fabian Sandoval-Ramos.

8  Q.  And so when it was later searched, did agents find any

9  evidence of drug trafficking?

10  A.  Yes.  They found another trap compartment built into the

11  passenger-side airbag, where the passenger-side airbag should

12  be.

13  Q.  And was it full of drugs or empty entirely?

14  A.  Empty.

15          MS. BOLSTAD:  Nothing further on direct.

16          THE COURT:  Mr. Andersen.

17          MR. ANDERSEN:  Thank you, your Honor.

18                    CROSS-EXAMINATION

19  BY MR. ANDERSEN:

20  Q.  Agent Blankenship, you mentioned you wrote an affidavit for

21  a search warrant for L2.  Right?

22  A.  Yes.

23  Q.  Now, in that search warrant, you talked about the

24  surveillance that it was your understanding that had been going

25  on in the Honda Civic.

Blankenship - X

1   A.   Yes.

2   Q.   And in that, you wrote that the Honda Civic left from the

3   area of L2.  There's nothing in -- so, I mean, your knowledge,

4   at that point, was not that they had left the actual building

5   or anything of that nature.  It was that they had left -- it

6   had been in the area and was coming towards L1.  Is that

7   accurate?

8   A.   It had departed, I believe, the -- I would have to review

9   the actual affidavit.  But I -- it was the -- right, the area

10  at L2.  At the parking lot area, yeah.

11  Q.   Area of L2.  Okay.

12          Now, in this affidavit, also, you mention that you

13  had seized 30,000 dollars of currency at L1; but now you're

14  saying 13.

15  A.   Yes.

16  Q.   So what -- what happened to the 30,000?

17  A.   Well, what that was is the DEA process of when we find

18  currency, U.S. currency, is that we take all of the seized

19  currency -- or all of the currency we're going to seize, we put

20  it into a bag.  First we have to determine who it possibly

21  belongs to.  So if there's multiple people there, we ask them,

22  Is any of this yours?  Then we separate it out.

23          In this case nobody claimed ownership of it.  So we

24  put it into one bag and then we seal it on site, and we have

25  somebody witness.  And then when we take that currency, we then

Blankenship – X

1   take it over to a banking institution.  That's where the bag is

2   opened up and then an official count is made and they convert

3   it into a check.

4           And at that time, just looking at the shear amount of

5   cash, it looked like it could have been 30,000 dollars.  But we

6   don't actually conduct an official count on scene.

7   Q.  So you were just guessing when you said 30,000?

8   A.  Yes, I was.  It was an estimation.

9   Q.  Now, in the search -- the search warrant on L2, were you

10  present for the entry into -- into that?  Were you present

11  there when it was going on?

12  A.  No, I was not.

13  Q.  Okay.  So what you just described is kind of your

14  understanding of what the search warrant at -- at L2, I'm

15  talking about, not L1?

16  A.  Yeah, the search warrant at L2, I was actually meeting with

17  Ms. Bolstad at the time they actually made entry.  I was

18  obtaining a copy of the search warrant, so that we could

19  actually read it to them.

20          And then right after they made entry and secured the

21  residence, that's when I came on scene.

22  Q.  Okay.  And did you see anybody -- people in custody, or

23  what did you see?

24  A.  Yes.  Everybody was in -- well, Mr. Sandoval-Ramos was in

25  custody; handcuffs, I believe.  Then everyone else was already

1    in the living room, seated on the couches.

2    Q.  And did -- did you involve yourself in any of the search of

3    that -- of L2?  Or were you just there as observing?  Or what

4    was your role in the search?

5    A.  I assisted searching in certain areas.  I was mainly

6    collecting the evidence and preparing my reports.

7    Q.  Did you find any paystubs, or any -- anything like that?

8    Or what sort of documentary evidence did you find?

9    A.  I found, I believe, insurance -- insurance documents.

10   There were some check -- a checkbook with Mr. Sandoval's name

11   and stuff on it.  I do not -- I do not recall, but I don't

12   believe if -- I don't believe we found any paystubs.

13   Q.  Okay.  You don't have any recollection, either way?

14   A.  I don't.

15   Q.  But, I mean, from your -- appearances, it did look to be

16   just a normal house, with normal things that you would expect

17   to find in a normal house.  Right?

18   A.  Yes.

19   Q.  Was it a big house?  Was it a small house?

20         It was an apartment, right?

21   A.  It was kind of like a duplex, where you had a -- a

22   downstairs living room with a kitchen on the back.  And then

23   you go upstairs, and then you have two bedrooms and a bathroom.

24   Q.  So would you characterize that as a small apartment?

25   A.  Well --

Blankenship – X

1   Q.   It's not a studio, obviously?

2   A.   It's not a studio, but it's a larger apartment.

3   Q.   Okay.  It's got two bedrooms, you said?

4   A.   Yes.

5   Q.   And there were three children living there and two adults,

6   as far as you could tell?

7   A.   I believe so.

8           MR. ANDERSEN:  I think that's all.  Thank you.

9           THE COURT:  Counsel?

10          MR. SEPP:  Thank you, your Honor.

11                        CROSS-EXAMINATION

12  BY MR. SEPP:

13  Q.   Good afternoon.

14  A.   Good afternoon.

15  Q.   Can I direct your attention to Government's Exhibit 79.

16          Oop, 78.  My bad.

17          Okay.  This is the -- what appears to be shopping

18  bag --

19  A.   Yes.

20  Q.   -- on the outside --

21          Okay.  Was the shopping bag sent for prints at all?

22  A.   No.

23  Q.   And it looks like it's wedged in there pretty good.

24  A.   From my recollection, it was just kind of dropped down

25  there next to it.

614

Blankenship - X

1   Q.  Okay.  But it was completely -- all of the -- those

2   exhibits lined up there, the -- the -- the kilo bags you

3   described them as, they were completely inside the -- the

4   plastic shopping bag?

5   A.  Yes.

6   Q.  Okay.  And then if I could get your -- I believe you had it

7   up there, Exhibit No. 74.  Or did she take it back?  It's a

8   scale.

9   A.  No, I do not have that up here.

10  Q.  Okay.  Well, do you remember which one it is?

11  A.  I don't know off the top of my head.

12  Q.  Okay.

13         MR. SEPP:  It's the two scales.  The little one and

14  the big one.

15  BY MR. SEPP:

16  Q.  These two here (indicating)?

17  A.  (Handed exhibit.)  Yes.

18  Q.  Was 74 --

19         MR. SEPP:  I'll leave these up here, and go back to

20  the microphone.

21         THE WITNESS:  Okay.

22  BY MR. SEPP:

23  Q.  Were any prints recovered from 74, Exhibit 74?

24  A.  I do not recall, off the top my head.

25  Q.  Okay.

Blankenship – X

1    A.  I don't have the fingerprint report in front of me, either.

2    Q.  Okay.  What about -- do you recall whether any fingerprints

3    were recovered from 76, the larger scale?

4    A.  I do not recall, off the top of my head.

5    Q.  Do you recall whether fingerprints were recovered from

6    anything other than the black notebook?

7    A.  Not a hundred percent, but I don't believe so.

8    Q.  Do you know whether any of the stretch-lite [sic] was sent

9    for fingerprinting?

10   A.  Stretch --

11   Q.  Okay.  So the -- it's No. 70 -- item -- or Exhibit 78, it's

12   the Costco stretch-lite [sic] cellophane.

13   A.  Oh, the -- the one that was wrapped up inside that bag?

14   Q.  No, no, no.  It's -- if you could just look at number --

15   it says 78, but I don't think that's right.  I have it in here

16   as 78 -- or, sorry, my bad.  I'm -- 77.

17   A.  No, that was not.

18   Q.  Were any of the packaging -- package -- alleged drug

19   packaging items sent for fingerprinting?

20   A.  Just the ones in that bag that was located next to the --

21   in the laundry room.

22   Q.  And you said the -- the Mead notebook with the drug

23   records --

24   A.  Yes.

25   Q.  -- that was found in the back bedroom?

616

Blankenship – ReD

1    A.   Yes.

2    Q.   Is that also -- did you go into that bedroom?

3    A.   Yes, I did.

4    Q.   Is that the one with the attached bathroom?

5    A.   I believe so.  Yes.

6    Q.   (Pause, referring.)  Did you -- were you the one who

7    recovered any of the personal identification of Mr. Raul

8    Arcila.

9    A.   Could I refer to my notes?

10   Q.   Yes, yes, yes.  Yes.

11   A.   No, I was not.

12           MR. SEPP:  Okay.  Thank you.

13           THE COURT:  Redirect.

14           MS. BOLSTAD:  Your Honor, permission to reopen as to

15   one evidentiary item, 109.

16           THE COURT:  Go ahead.

17                    REDIRECT EXAMINATION

18   BY MS. BOLSTAD:

19   Q.   Agent Blankenship, I made a mistake earlier.  I handed you

20   the wrong phone.

21   A.   Oh.

22   Q.   Could you look at your DEA drug record -- evidence records

23   of seized items for N5.

24   A.   Yes.

25   Q.   Do you see that entry?

617

Blankenship — ReX

1    A.   Yes.

2    Q.   And at location 2?

3    A.   Yes.

4    Q.   What was N5, the item that you logged in evidence?

5    A.   It is described as an iPhone brand cellular phone on the

6    nightstand.

7    Q.   Earlier, I handed you 82.

8         I would like to actually show you Government's 109.

9    A.   (Handed exhibits.)  Yes.

10   Q.   Do you recognize 109?

11   A.   Yes, I do.

12   Q.   Why do you recognize 109?

13   A.   'Cause that is the iPhone located at location No. 2.

14   Q.   And is it marked as N5 in the DEA bag?

15   A.   Yes, it is.

16        MS. BOLSTAD:  Government moves to offer 109.

17        THE COURT:  Any objection?

18        MR. ANDERSEN:  No.  Thank you.

19        MR. SEPP:  No.

20        THE COURT:  All right.  It's received.

21        MS. BOLSTAD:  Nothing further on direct or redirect.

22        THE COURT:  And on the reopened direct, any other

23   cross as to this piece?

24                    RECROSS-EXAMINATION

25   BY MR. ANDERSEN:

618

Blankenship – ReX

1    Q.  Just for clarification, did you previously identify 82 as

2    the cell phone that you had seized at L2?

3    A.  Yes, I did

4    Q.  But that was wrong?

5    A.  Yes, that was wrong.

6    Q.  Okay.  Thank you.

7              THE COURT:  Anything else, Mr. Sepp?

8              MR. SEPP:  No, nothing.

9              THE COURT:  All right.  Sir, thank you.  You may step

10   down.

11             Ms. Boyer, would you assist in collecting the

12   exhibits from the witness stand.

13             Next witness, please.

14             MS. BOLSTAD:  The Government calls Dan Riley.

15             THE COURT:  All right.  Agent Riley, please come

16   here, all the way to the witness chair.

17             Face the jury and the deputy there.  Raise your right

18   hand to be sworn.

19             (Witness sworn.)

20             THE WITNESS:  Yes.

21             THE CLERK:  Please take a seat.

22             THE COURT:  Bring yourself close in, all the way in

23   to the microphone.

24             Tell us your full name and spell all of it, please.

25             THE WITNESS:  Daniel Riley.  D-A-N-I-E-L.  R-I-L-E-Y.

Riley - D

1    THE COURT:  Thank you.

2    Counsel.

DIRECT EXAMINATION

4    BY MS. GOLOBORODKO:

5    Q.  Could you please tell the Court how you're employed.

6    A.  I'm currently employed as a special agent with the Drug

7    Enforcement Administration.

8    Q.  And how long have you worked for the DEA?

9    A.  A little over five years now.

10   Q.  And did you have any prior law -- law enforcement

11   experience before that?

12   A.  No.

13   Q.  During your time with the DEA, can you tell us about your

14   duties and area of investigation?

15   A.  As a special agent, I have investigated narcotics

16   investigations; the full range.  I've investigated street-level

17   crimes, as well as international, complex smuggling

18   conspiracies between South America and the United States.

19   Q.  Now, you mentioned South America.

20          Do you have any experience outside of the United

21   States?

22   A.  Yes, I do.

23   Q.  Where?

24   A.  Well, I started my career in Puerto Rico.  I worked there

25   for three years.  And then, during that time, I worked cases

Riley - D

620

that touched into the Dominican Republic, Colombia, and other

South American spots.  And through the Caribbean as well.

Q.  What kind of cases?

A.  The full range.  I've worked smuggling through boats.

Cocaine cases, primarily, when I was in Puerto Rico.

In Portland, I've worked interstate drug trafficking

cases to deal primarily with meth and also some heroin as well.

Q.  Now, as a narcotics investigator, can you describe your

training -- training and experience in investigating these

types of narcotics cases?

A.  Yes.  At the beginning of my career, I spent 20 weeks in

the DEA academy, where I was trained on all aspects of

narcotics investigations, to include legal education; affidavit

and report writing; interviewing techniques; arrest techniques.

Pretty much everything that was needed.  Firearms, as well,

to -- to be an agent.

Q.  And can you estimate how many narcotics investigations

you've been involved in over the course of your career?

A.  In excess of 50 separate investigations.

Q.  And, on average, how many suspects were involved in the

average investigation?

A.  That -- that could vary quite a bit.  If it was a

street-level case, public housing, sometimes there were well

over a hundred defendants or suspects.  There could be, on

average, I would say between 10 to 15.  Some as small as one,

Riley - D

1   and others were quite a bit larger.

2   Q.  And have you participated in wiretaps on drug trafficking?

3   A.  Yes, I have.

4   Q.  In just English or in another language?

5   A.  English and Spanish.

6   Q.  Are you fluent in Spanish?

7   A.  Yes, I am.

8   Q.  Now, how familiar are you with common code words for heroin

9   and methamphetamine?

10  A.  I am very familiar.

11  Q.  Common street -- what is the common street slang for

12  heroin?

13  A.  A lot of different words have been used.  Specifically,

14  you'll -- you'll often hear some sort of reference to black

15  because the heroin here is black in color.  Such as tires.  Or

16  it will even just be called black.  Another term that's often

17  used is anything of feminine nature, such as the word "woman."

18  Or in Spanish they'll use -- in Spanish there's feminine and

19  masculine versions of words.  And they'll use the feminine

20  version of a word as to refer to heroin.  Because the word for

21  heroin in Spanish is feminine, so --

22  Q.  What is that word?

23  A.  "Heroína."

24  Q.  Are there any other words that are used?

25  A.  Words that I've seen, they've just been called

Riley - D

1    specifically, "mujeres," which means women; or "gorditas,"

2    which means, little fat women; and any sort of variation of

3    that.

4    Q.  And what about meth?

5    A.  For meth, I've seen words such as "crystal," "glass."  And

6    then they'll also just say words like "clear."  "Cake" is

7    another one that I've seen.  Just -- just variations on those.

8    Q.  And you mentioned earlier that you're fluent in Spanish.

9           How long have you been been speaking Spanish?

10   A.  I -- I first learned Spanish when I was 19.  I spent two

11   months in an intensive language school.  Afterwards, I spent 22

12   months in Chile, where I spoke the language about -- about 90

13   percent of the time.  Subsequently, I took advanced college

14   courses in Spanish, and then I spent three years in Puerto Rico

15   for this job, where I spoke Spanish, interviewing suspects,

16   witnesses.  Use the language quite regularly.

17   Q.  Now, do you recognize the Spanish word for "vidrio"?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  It means glass.

21          THE COURT:  Excuse me.  Can you spell that word,

22   please, for the --

23          MS. GOLOBORODKO:  Yes.  V-I-D-R-I-O.

24          THE COURT:  Thank you.

25   BY MS. GOLOBORODKO:

Riley – D

1   Q.  And you just said that glass is slang for meth.  Correct?

2   A.  Yes.

3   Q.  Now, what about the Spanish word "puro"?  What does that

4   mean?

5   A.  That means.

6           THE COURT:  Spell it, please.

7   BY MS. GOLOBORODKO:

8   Q.  P-U-R-O

9   A.  That means pure.

10  Q.  Okay.  Now, what about the Spanish word, "pelon," spelled

11  P-E-L-O-N?

12  A.  That means bald.

13  Q.  And are these slangs for any -- anything else?

14  A.  Well, "vidrio" could be as it means, "glass."  It's another

15  word for methamphetamine, which is crystal; and crystal shards

16  is the common description for methamphetamine.  The form that

17  it takes is clear, and you can see through it.

18          I'm sorry, what was the --

19  Q.  "Puro" and "pelon."

20  A.  Well, in the -- sorry.  What was the rest of the question?

21  Q.  Are they slang for anything?

22  A.  "Puro," I haven't used as a slang term itself.  Just in a

23  description for --

24  Q.  What does it mean?

25  A.  It means "pure."

1   Q.   Okay.  And then what about "pelon"?

2   A.   That's -- that's a nickname that they give to bald guys.

    If you're bald, they might call you pelon.

4   Q.   And have -- have you had the opportunity to speak to

5   suspects involved in drug dealing?

6   A.   Yes, I have.

7   Q.   Drug customers as well?  I'm sorry, users and customers?

8   A.   Yes.

9   Q.   Now, so we're going to talk about this investigation.

10            Now, are you familiar with Fabian Sandoval-Ramos?

11  A.   Yes, I am.

12  Q.   Okay.  Were you involved in an investigation of

13  Mr. Sandoval-Ramos and his co-conspirators in early April 2014?

14  A.   Yes, I was.

15  Q.   And what was your role?

16  A.   I assisted in the investigation that was going on at the

17  time.  Specifically, I assisted in processing evidence that was

18  seized at a house after search warrant.  I translated for

19  interviews of Mr. Sandoval-Ramos and his wife.  And -- and then

20  I later on reviewed text messages and -- of cell phones that

21  were seized as part of this investigation, and I submitted

22  evidence for further analysis to our laboratory.

23  Q.   Now, the search of location 1, did you seize anything?

24  A.   Yes, I processed the evidence that I seized at that

25  location.

625

Riley - D

1   Q.  And what did you seize?

2   A.  Specifically, I seized some wrappings that were consistent

3   with drug wrappings and some plastic that was consistent with

4   drug wrappings.

5   Q.  Those drug wrappings (pointing)?

6   A.  Yes, those drug wrappings.

7   Q.  It's Government Exhibit 80, for the record.

8           Now, you mentioned that you also participated in

9   interviews.

10  A.  Yes.

11  Q.  So which interviews did you assist in with the

12  Spanish-language interpreting?

13  A.  I assisted with Mr. Sandoval-Ramos and his wife, Imelda.  I

14  can't -- I'm sorry.  I can't remember her last name right now.

15  Q.  Now, I'm not going to ask you about Ms. Sanchez-Olivera's

16  statements, or anything like that.

17          THE COURT:  Slow down, please, Counsel, and speak up.

18  BY MS. GOLOBORODKO:

19  Q.  Sorry.  I'm not going to ask you about

20  Ms. Sanchez-Olivera's statements.

21          I just want to focus on Mr. Sandoval-Ramos.

22  A.  Okay.

23  Q.  So where did the interview take place?

24  A.  We interviewed Mr. Sandoval out in front of his residence

25  on King Street.

Riley - D

1  Q.  You say "we."  Who -- who was there?

2  A.  Myself, Detective Hegland, and Detective McNair.

3  Q.  Hegland?

4  A.  Andersen.

5  Q.  I guess formerly Hegland, now Andersen?

6  A.  Correct.

7  Q.  Now, in communicating with Mr. Sandoval-Ramos were you

8  speaking Spanish with him?

9  A.  Yes, I was.

10  Q.  And so how -- how would it work?

11  A.  Basically, Detective Andersen or McNair would ask him

12  questions in English.  If he didn't understand them, I would

13  clarify them for him in Spanish.  He would respond in Spanish,

14  and then I would translate that into English.

15  Q.  You say if he didn't understand?

16  A.  Yes.  He would understand some of the questions, or most of

17  them -- most -- most of the questions.  But if he didn't

18  quite -- excuse me.  He would understand most of it in English.

19  If he didn't or needed clarification, I would give that to him

20  in Spanish.

21  Q.  And did you understand what he was saying?

22  A.  Yes, I did.

23  Q.  And so you -- you confirmed that if he didn't understand

24  English, you would make sure he understood in Spanish?

25  A.  Right, that he understood the questions, yes.

1  Q.  All right.  Now, what did he say during that interview?

2  A.  He was basically asked about his involvement in drug

3  trafficking.  He denied involvement in drug trafficking during

4  that interview.  He was also questioned about a cell phone that

5  had been recovered that was broken, and he -- he admitted that

6  the phone was his and was broken but he couldn't explain how it

7  was broken or why it was broken.  Also admitted that he had

8  recently thrown it away into the garbage.  He was also

9  questioned further about a can of -- a white powder substance.

10  I can't remember the name of it right now.  But -- and about

11  why he had told his wife to throw it --

12          MR. ANDERSEN:  Your Honor, I object.  I think he's

13  talking about hearsay evidence.  We've already talked about

14  this.

15          THE COURT:  Well, no.  He's talking about why your

16  client made a statement, according to this witness; not what

17  she said.  He's talking about a statement he made to his wife,

18  not --

19          MR. ANDERSEN:  No, I -- I understand the Court's

20  ruling.

21          THE COURT:  The issue we talked about were statements

22  by his wife.  Those are excluded.  Statements he made to the

23  witness are not excluded.  They are statements of a party

24  opponent.

25          But let's get back to what the question is, and so

1    the witness can be focused specifically, without giving a

2    narrative.

3                THE WITNESS:  So --

4                THE COURT:  Wait for a question, please.

5                THE WITNESS:  Okay.

6    BY MS. GOLOBORODKO:

7    Q.  So you mentioned that he -- there was -- he denied any use

8    of some powdery substance.

9                Did he talk about that powdery substance, or the

10   lactose?

11   A.  Yes.  The -- he was questioned about that.  And -- and he

12   stated to us that he had told his wife to throw it away but had

13   not -- did not have an explanation for why he told her to throw

14   it away.

15   Q.  Okay.  So now did you play a role after April 2nd in

16   submitting evidence to the DEA lab?

17   A.  Yes, I did.  I submitted several exhibits to the laboratory

18   for fingerprint analysis.

19   Q.  Okay.  What -- what did you submit?

20   A.  They were drug ledgers that are -- suspected drug ledgers

21   that were -- were found at the residences.  We wanted to see if

22   they contained fingerprints on them.

23   Q.  Anything else?

24   A.  Yes, but I don't remember what it was.  I apologize.

25   Q.  Was there any packaging material?

629

Riley - D

1   A.   Yes.   The packaging material was submitted as well.

2   Q.   Now, finally, with your Spanish-language skills, was your

3   assistance needed when looking at text messages that were in

4   the seized cell phones, that were in Spanish?

5   A.   Yes.

6   Q.   And did you examine the phone that was found in the

7   dumpster, the broken one?

8   A.   Yes.

9   Q.   And did you look at the cell phone that was seized from

10  Raul Arcila at the traffic stop?

11  A.   Yes.

12  Q.   I'm going to bring it up and show you that phone.

13               (Witness handed exhibit.)

14               THE COURT:   Wait till you're back at your table to

15  ask your question, and you're near a microphone, please.

16  BY MS. GOLOBORODKO:

17  Q.   Do you recognize that?

18  A.   Yes.

19  Q.   Is that the phone that you seized from Mr. Arcila?

20  A.   Yes.

21               THE COURT:   What's the exhibit number, please?

22               MS. GOLOBORODKO:   84.

23               THE COURT:   Thank you.   Go on.

24  BY MS. GOLOBORODKO:

25  Q.   I have another exhibit that I would like to show you.

Riley - D

1              Actually, it's going to be Exhibit No. 98.

2              Now, do you recognize the messages in this exhibit?

3    A.   Yes.   These are messages that were pulled out of the phone.

4    Q.   Okay.   Can you translate them?   Or had you already -- I'm

5    sorry.   You already did translate them.

6    A.   Yes.   I reviewed the text messages and found these messages

7    in Spanish and subsequently translated them.

8    Q.   Okay.   And why did you alert the case agent about these

9    particular text messages?

10   A.   I recognized in these conversations many words and phrases

11   that are consistent with drug trafficking language.

12   Q.   Like what?

13   A.   For example, in here -- for one thing, the conversation is

14   somewhat vague.   For example, in this first message here it

15   says:   "Well, that's a lot."

16              Not referring to anything specifically.

17              "And I don't have many people, but if you'll do me

18              for a half and" --

19              And then the message ends.

20              But terms like "a half," or "that's a lot" -- "half,"

21   I would believe it to be referring to a half a pound or a half

22   of an ounce or half a kilogram; some undetermined quantity.

23              Later on down here, he says, "But firm at 350."

24              That's pricing that I know to be consistent with drug

25   pricing.

Riley – D

1          And then the next slide over, which continues on in

2   the same conversation -- if we can have that one brought up.

3   This is -- this is a continuation of the conversation, this top

4   one.  The message here, it says -- it says:

5               It's that we have to pay for pounds, bro, and it

6               won't be worth it selling halves at that price.

7               I'm only letting you have it like that.  Crazy.

8          And so they're negotiating pricing.  And he

9   specifically says "pounds," and then he's saying that they're

10  selling half -- half-pounds at that price, then -- then they're

11  just not going to be able to -- it's a negotiation for pricing,

12  is the way I understand it.

13  Q.  And which phone is this from?

14  A.  I believe this is from the Exhibit 84.

15  Q.  Mr. Arcila's phone?

16  A.  Yes.

17  Q.  Okay.  Now, finally, I want to show you another exhibit.

18  It's Exhibit 108.  So this is DEA Exhibit N3.

19  A.  Okay.

20  Q.  And we heard earlier today, Detective Tim Miller seized

21  this item from Mr. Sandoval-Ramos's closet.

22          And if you would take a look at that.

23  A.  Yes.

24  Q.  And help me understand the three Spanish-language words on

25  the sheet.

1              On the top you have "gordita"?

2    A.   Yes.

3    Q.   And then you have "debo"?

4    A.   Debo, yes.  And that word means "I owe."

5    Q.   Okay.  Followed by "vidrio"?

6    A.   Yes.

7    Q.   Followed by "debo"?

8    A.   Yes.

9    Q.   So what does that mean?

10   A.   Well, taken in the context of the whole page, there's

11   clearly some math being done.  And from looking at this, I

12   believe that "gordita" is a reference to heroin.  "Vidrio" is a

13   reference to methamphetamine.  And the person doing the math

14   here is trying to figure out how much they owe for the drugs

15   that they've purchased and are distributing.  And they

16   specifically -- or he or she specifically writes, "I owe," on

17   the bottom there of each one.

18              MS. GOLOBORODKO:  Thank you.  No further questions.

19              Mr. Andersen.

20              MR. ANDERSEN:  If you would bring that right back up.

21              Thank you, your Honor.

22                         CROSS-EXAMINATION

23   BY MR. ANDERSEN:

24   Q.   Now, it looks to me like that says "gordito" at the top.

25   A.   It could be either one.

Riley - X

1  Q.  So you don't know what that says?  Could be "gordito,"

2  "gordita"?

3  A.  It could be either one, yes.

4  Q.  Could "gordito" be a person?  Just like "pelon" is for

5  "bald," "gordito" is for "fat"?

6  A.  Yes, potentially.

7  Q.  So you really don't know what that means?  Is that what

8  you're saying?  Right?

9  A.  I don't know specifically what that meant, when that was

10  written down, no.

11  Q.  Right.  Okay.  So it could be that whoever's writing this

12  thing, owes "gordito," a person, whatever, 3,000 dollars?

13  A.  Yes.

14  Q.  Whatever that is?

15  A.  Yes.

16  Q.  Okay.  All right.

17         Let's move on to a couple other things.  Thank you.

18         Now, in your experience in speaking with Hispanics or

19  Mexican people who are speaking Spanish, is it your experience

20  that a lot of times it's -- well, let me rephrase that.

21         Do you think that people can understand a language

22  generally easier than they might be able to speak it?

23  A.  Yes.

24  Q.  So like you could -- even if you -- well, especially -- I

25  mean, you described your situation.  You lived in Chile for

634

Riley - X

1   almost two years, it sounds like.

2   A.  Yes.

3   Q.  And it was -- was that your experience?  You could

4   understand it better than you could speak it, at least

5   initially?

6   A.  Yes.

7   Q.  And when you had -- when you participated in this interview

8   with Mr. Sandoval, where did you describe you were?  You said

9   you were outside.  Were you ever inside a -- a patrol car or a

10  car, or anything of that nature?

11  A.  No.  The interview took place primarily out in front of the

12  residence.

13  Q.  Did you -- do you recall how many -- or did you participate

14  in the interviews of any of the other people that were there?

15  There was, like, two people.  Right?

16  A.  Mr. Sandoval's wife.  And then I spoke with other people

17  that were there as well, that only spoke Spanish.  The kids,

18  things like that.  Or -- if they only spoke Spanish, I was just

19  there to help communicate whatever needed to be communicated.

20  Q.  So was there an interview with any -- any of the children?

21  A.  No.  No.  Just questions, like, "Are you okay?" things like

22  that.

23  Q.  Do you remember who, if anybody, was in handcuffs

24  throughout that time?

25  A.  At -- at that residence specifically?

Riley - X

1    Q.  Right.

2    A.  Just Mr. Ramos -- or, excuse me, Mr. Sandoval.

3    Q.  Is that your distinct recollection, or are you just

4    assuming that?

5    A.  No, he was handcuffed at one point.  Sometimes he was not

6    handcuffed, as well.

7              MR. ANDERSEN:  That's all.  Thank you.

8              MR. SEPP:  Thank you, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. SEPP:

11   Q.  I just have one question for you.

12             Over here.

13   A.  Yes.

14   Q.  Did you have any indication of whether or not Mr. Arcila

15   typed these text messages or someone else used his phone and

16   typed those text messages?

17   A.  I don't know that, no.

18             MR. SEPP:  Okay.  That's all I have.  Thank you.

19             THE COURT:  Redirect.

20             MS. GOLOBORODKO:  Nothing further.

21             THE COURT:  All right.  Thank you, sir.  You may step

22   down.

23             Your next witness.

24             MS. BOLSTAD:  Your Honor, at this time the parties

25   need to confer about something before the next witness.  I have

1   two remaining.

2           THE COURT:  All right.  We'll take a little early

3   recess, then, jurors.

4           Notes on the chair.  We're making fine progress here.

5   I'll be able to give you a status report a bit later today.

6   We're doing as expected.

7           Please don't talk about the case.  Please, please.

8           Leave your notes on the chair.  We'll see you in

9   about 15 minutes.

10          Watch your step walking out the of room, please.

11          (Jurors exit, 2:35 p.m.)

12          THE COURT:  All right.  Is this a matter for the

13  record or private conferral?

14          MS. BOLSTAD:  I think just conferral.

15          THE COURT:  Okay.  Go ahead and be seated, folks.

16          MS. BOLSTAD:  We could do it after -- if you need to

17  address something --

18          THE COURT:  I'm just sitting here patiently waiting.

19  Go ahead.

20          (Pause, counsel conferring.)

21          MS. BOLSTAD:  And the parties are finished with my

22  conference.

23          THE COURT:  Yes.  I'm going to have some questions

24  for you in just a moment, please.

25          MR. ANDERSEN:  Your Honor --

1          THE COURT:  Just a minute, please.

2          MR. ANDERSEN:  Sorry.

3          THE COURT:  (Pause, referring.)

4          All right.  What did you want to add before I have my

5    issues?

6          MS. BOLSTAD:  Nothing, your Honor.  The parties are

7    in agreement.  We have a -- Mr. Andersen intends to offer an

8    exhibit for the defense through Detective Andersen, when she

9    testifies and I have no objection to that.

10         THE COURT:  All right.  What did you want to note,

11   Mr. Andersen?

12         MR. ANDERSEN:  Your Honor, Mr. Sandoval has just

13   alerted me he does need to go to the bathroom at some point.

14         THE COURT:  We'll take a break just as soon as we

15   cover a few matters.  Just give me a few minutes.

16         MR. SEPP:  No, I was just --

17         THE COURT:  I want to take up with each of the

18   defendants the question whether they will or will not be

19   choosing to testify.

20         And we'll do that after they've had an opportunity

21   for their recess.  But I don't want to move the jury in and out

22   of the room if we're getting close -- if we're getting close,

23   Ms. Bolstad, to your resting.

24         MS. BOLSTAD:  It's all relative.  But I have two

25   witnesses.  I anticipate them taking at least one hour total,

Riley - X

1    perhaps more.

2            THE COURT:  All right.  Well, then I -- I do want to

3    have the conversation.  I'll just take another recess when the

4    Government rests, subject to a later confirmation about receipt

5    of exhibits.  I don't want to take the jury's time to do that.

6            I want to question, again, the premise, Ms. Bolstad,

7    you're making in this new instruction request on page 2.

8            I think what you're asking me to tell the jury is the

9    Government doesn't have to prove foreseeability in order to get

10   a conviction on Count 1.

11           MS. BOLSTAD:  Correct.

12           THE COURT:  But you're asking me to ask the jury to

13   find whether the Government, nevertheless, proved

14   foreseeability in a verdict form.

15           MS. BOLSTAD:  In a special verdict question.

16           THE COURT:  Okay.  This is very confusing, the way

17   you've laid it out because it's -- the way you've laid it out

18   makes it sound like it doesn't have to be proved and yet it

19   does have to be proved.  So I'm going to try to rephrase that.

20           MS. BOLSTAD:  Thank you, your Honor.

21           THE COURT:  All right.  I wanted to clarify your

22   point.

23           Okay.  Let's everyone here take ten minutes, and then

24   we'll be ready for the next witness.  Who is?  Solis?

25           MS. BOLSTAD:  Sergio Solis, yes.

Riley - X

1            THE COURT:  I'll be right back.

2            (Recess taken, 2:41 p.m.)

3            THE COURT:  Thank you, everyone.  Please be seated.

4            All right.  Is the Government ready to proceed?

5            MS. BOLSTAD:  Yes, your Honor.  We -- our next

6    witness is Sergio Solis.

7            THE COURT:  All right.  Sir, are you Mr. Solis, Agent

8    Solis?  Please come here to the witness chair.

9            We'll be bringing the jury in.

10           We'll all stand when the jury enters.  When I ask

11   everyone to be seated, will you please stay standing.

12           THE WITNESS:  Thank you.

13           THE COURT:  And you'll be sworn.

14           (Pause.)

15           THE COURT:  Please rise for the jury.

16           (Jurors enter, 2:58 p.m.)

17           THE COURT:  Thank you.

18           Please be seated.

19           Ladies and gentlemen, the next Government witness is

20   Agent Solis, who is before you.

21           Would you face the jurors, please, and the deputy.

22   And raise right hand to be sworn.

23           (Witness sworn.)

24           THE WITNESS:  Yes, I do.

25           THE CLERK:  Please take a seat.

640

Solis – D

```
 1              THE COURT:  Bring yourself close in to the
 2    microphone, please.
 3                   Tell us your full name, and spell it all.
 4              THE WITNESS:  My name is Sergio; middle name,
 5    Alejandro; last name, Solis.  And S-E-R-G-I-O, for the spelling
 6    of the first name.  S-O-L-I-S for the spelling of last name.
 7              THE COURT:  And the middle name?
 8              THE WITNESS:  Alejandro, A-L-E-J-A-N-D-R-O.
 9              THE COURT:  Thank you, sir.
10              Counsel.
11                        DIRECT EXAMINATION
12    BY MS. BOLSTAD:
13    Q.  Good afternoon.
14    A.  Afternoon.
15    Q.  Could you please introduce yourself to the jury.
16    A.  Hi, my name is Sergio Solis.
17    Q.  Where do you work?
18    A.  I work for the Drug Enforcement Administration in
19    Pleasanton, California.
20    Q.  And what is your job title?
21    A.  I'm a fingerprint specialist with the western lab.
22    Q.  How long have you held that position?
23    A.  For a little over five years.
24    Q.  Prior to 2010, did you have other law enforcement
25    positions?
```

1    A.   Yes.

2    Q.   Tell us about those.

3    A.   Prior to the DEA, I used to work for the City of Concord as

4    a forensic specialist.  I worked there for approximately 12

5    years.  And prior to the City of Concord, I used to work with

6    the San Joaquin County Sheriff's Department.  I worked there

7    for approximately seven years, and my primary duties were

8    evidence custodian.

9    Q.   Did you -- did you receive any special training in order to

10   become a fingerprint specialist?

11   A.   Yes.

12   Q.   Tell us about that.

13   A.   I attended a field evidence technician course in 1998.  It

14   was an 80-hour course.  And approximately 20 hours of that

15   course were dedicated to latent print examinations,

16   comparisons, and recovery of latent prints.

17        I also attended a 40-hour basic F.B.I. fingerprint

18   course in San Jose, California, of which it was also entitled

19   "The recovery, comparison, and identification of latent

20   prints."

21        I have taken additional training in the use of

22   digital imaging systems for the same purpose of documenting

23   latent prints and using digital imaging for comparison and

24   identification purposes.

25   Q.   Do you go through an annual proficiency examination with

Solis - D

1  the DEA crime lab?

2  A.  Yes, I do.

3  Q.  What is a proficiency examination?

4  A.  Once a year, an outside vendor -- known as Collaborative

5  Testing Services -- provides a -- a test, which is mainly

6  comparison of latent prints to known prints.

7  Q.  What is the purpose of such a proficiency examination?

8  A.  To test -- to -- to test one's ability.  And to see -- it's

9  also used as a study, as well, for the -- I guess, the -- the

10  testing of how accurate an examiner can be in latent print

11  examinations.

12  Q.  And how have you scored?

13  A.  I have scored perfect scores.

14  Q.  How many fingerprint examinations have you conducted in the

15  course of your law enforcement career?

16  A.  I have compared hundreds of thousands of comparisons.

17  Q.  And during your five years with the DEA, does the DEA

18  actually keep track of the numbers?

19  A.  Yes.

20  Q.  So what are those numbers?

21  A.  My last recording -- I get these numbers during the

22  evaluations.  And from my last evaluation, I've compared -- I'm

23  sorry.  I've examined over 1500 exhibits and recovered over

24  14 -- I'm sorry.  1500 exhibits, 14,000 individual items, and

25  recovered a little over 3,000 latent prints.

643

Solis – D

Q.  And so let's talk about items and exhibits.  Is a single

notebook one exhibit?

A.  Yes.

Q.  And are –– is each page within that exhibit an item?

A.  Oh, I'm –– I'm sorry.  The –– that is incorrect.

Q.  Please correct me.

A.  An item could be a single notebook.  But an exhibit is a

package that contains the individual items inside.

Q.  Okay.  Let's talk about your fingerprint analyses.

        What is typically asked of you by agents in the

field?  What are they asking you to do?

A.  To attempt to recover latent prints from the –– an item.

Q.  Okay.  And so are those items sent to you from agents in

the field?

A.  Yes.

Q.  And how do you –– what process do you follow?

A.  Once an item has been submitted for –– for processing, I

would obtain the item through our evidence custodian.  First,

do a visual examination of that item for any possible visible

prints that may have been due to some kind of stain.  It could

be –– it could be a bloodstain, it could be some kind of

visible contaminant leaving an impression.

        I then would go to the next process, which that

depends on the texture of the item.  If it's a plastic

material, I would use a process known as cyanoacrylate ester,

1    also known as Super Glue.  And that would process that item,

2    and develop latent prints in a white residue manner.

3            After that, if necessary, I would use a dye stain

4    solution.  I would apply a solution that is called rhodamine

5    6G, and then I visualize it under a laser.  Under the laser,

6    stained latent prints with the Super Glue would then become

7    visible, and I would then photograph them and document them and

8    recover them for further comparison purposes.

9            Other items, such as paper items, require a different

10   technique.  After a visual examine, I would then use a process

11   known as ninhydrin.  Ninhydrin is a liquid solution which would

12   react to amino acids.  And if any latent prints are present on

13   that item, it would develop in a purplish-reddish color, of

14   which would already become visible to the naked eye.  Then I

15   would -- maybe with some additional lighting, I would then

16   photograph them and preserve them for future steps.

17   Q.  Okay.  And when agents send you items from the field for

18   analysis do they also provide you with suspect names and/or

19   standard print cards from those suspects?

20   A.  Yes.

21   Q.  Okay.  I'm going to put up a demonstrative just for you and

22   not for the jury.

23            Could you identify what this item is?

24   A.  This is what is known as a standard known fingerprint card.

25   Q.  And just for the record, does this have anything to do with

Solis – D

1   this particular case?

2   A.  No.

3   Q.  Just an example of a fingerprint standard?

4   A.  Yes.

5        MS. BOLSTAD:  Okay.  The Government would ask to

6   publish to the jury.

7        THE COURT:  For illustration only.  Go ahead.

8   BY MS. BOLSTAD:

9   Q.  And so tell the jury what a fingerprint standard card --

10  what does it involve?  How is it made?  How deliberate is the

11  process?

12  A.  To create a standard -- a fingerprint card, it's directly

13  obtained from a known individual, either through the process of

14  employment, applying for a background check -- I'm sorry, in

15  conducting a background check, or also during the booking

16  process in jail; a person's fingerprints are recorded on a

17  known fingerprint card.  It could be either through ink or, now

18  with computers, through what's known as Livescan.

19       MS. BOLSTAD:  And, your Honor, there appears to be a

20  problem with the jury monitors.

21       And perhaps the witness could just hold up the paper

22  copy.

23       THE COURT:  Do you have it with you?

24       MS. BOLSTAD:  Yes.

25       THE COURT:  I meant the witness, but that's all

1  right.

2        Actually, Ms. Bolstad, you just walk in front of the

3  jury, please, demonstrating slowly so they can see.

4        (Ms. Bolstad complying.)

5  BY MS. BOLSTAD:

6  Q.  So I would like to return to the idea of how deliberate is

7  the process when such a fingerprint standard is made.

8  A.  It's a deliberate process, as I expressed before.  It's

9  made from -- directly from a known subject.

10 Q.  And in terms of the how it's made, what is actually done

11 with the fingers?

12 A.  An attempt is made to recover as much ridge detail as

13 possible on the tips of the fingers.  So the person conducting

14 the recording would roll a subject's fingerprints from one end

15 of the fingernail to the other end of the fingernail as best as

16 possible, trying to avoid smudges or smears.

17 Q.  Contrast that to real life, where people leave fingerprints

18 on items.  What is the difference?

19 A.  Usually a print left on an item is made inadvertently.  It

20 is usually through the handling an item and usually not

21 the -- the whole part of the finger is usually not recorded.

22 Q.  You've spoken of latent fingerprints, I believe.

23 A.  Yes.

24 Q.  What is a latent fingerprint?

25 A.  "Latent" means hidden.  So it's a hidden print to the naked

1   eye.

2   Q.  And are there some surfaces that are more likely to have

3   fingerprints -- or retain fingerprints than other surfaces?

4   A.  Yes.

5   Q.  Tell us about what's better for retaining fingerprints.

6   A.  Those items would include smooth, clean, and nonporous

7   surfaces.

8   Q.  What's an example of a porous surface?

9   A.  Cloth material.

10  Q.  Okay.  And in those cases where you are able to identify a

11  latent print from a piece of evidence, how do you go about

12  determining who made that fingerprint; who left it?

13  A.  I'm sorry.  Would you repeat the question.

14  Q.  In -- in those cases where you're able to identify with

15  your eye, or through the process you described -- so where --

16  where you're able to find a fingerprint, how do you go about

17  determining what finger or person made that fingerprint?

18  A.  First, I conduct anal -- an analysis of the recovered or

19  developed latent print.  I determine how suitable it is for

20  identification purposes.  I look for the quality of the ridge

21  detail and present minutiae, characteristics; and the quantity

22  of those characteristics.

23          I then would obtain known cards submitted from -- the

24  name submitted by the agent.  And look for ridge formations

25  first on -- or patterns, and narrow it down to a particular

Solis - D

1    finger.

2           I then would look for characteristics found already

3    on the latent print that match -- that would match on that

4    known finger.  So those characteristics need to match

5    relatively in the same place, in the same position.

6    Q.  What percentage of items that get submitted to you for

7    testing -- what percentage of those items are you actually able

8    to develop fingerprints for analysis?

9    A.  Currently, we're averaging about a -- a 20 percent recovery

10   rate.

11   Q.  And so what does that mean?  Does that mean 80 percent of

12   items don't have fingerprints?

13   A.  No.

14   Q.  Explain.

15   A.  Fingerprints are very susceptible to destruction.  They --

16   if you touch an item, that does not necessarily mean that

17   you'll leave an identifiable fingerprint.  You will leave a

18   partial, which may be smudged or smeared.  In the process of

19   collection from an agent, as it is placed into a packaging

20   material, it may also smudge or smear on an item.  And that's

21   also through -- up until, you know, I obtain the item.  Also, a

22   person would have to have enough either perspiration or some

23   kind of contaminant material to actually leave an impression on

24   the item.

25           So if a person has really dry hands or has some kind

1    of -- of powdery substance on their hands that will not leave

2    moisture on the surface, that may not record -- leave a

3    recordable latent print.

4    Q.  What are some examples of contaminants that help create a

5    usable fingerprint?

6    A.  As far as contaminant, it could mean, you know, the

7    hands -- you use it for many -- you touch your face.  Some

8    people have oily skin and they -- they'll touch their

9    fingers -- rub their fingers on their face and leave the

10   contaminant on -- on the finger ridges.  They touch their hair,

11   the hair contains amino acids, so they leave that contaminant.

12   Also during -- eating greasy foods, you know, some -- something

13   that you physically hold that may leave a contaminant item on

14   the surface.

15   Q.  Okay.  You've talked about surfaces.  Have you been asked

16   to look at drug packaging materials before for fingerprint

17   evidence?

18   A.  Yes.

19   Q.  What kind of drug packaging materials have you looked at?

20   A.  We receive a lot of plastic bags, such as Ziploc bags,

21   sandwich bags, heat-seal bags.  And we also get items with --

22   with tape surfaces.

23   Q.  Are plastic bags and drug packaging that you've described,

24   is that a good surface for obtaining identifiable prints?

25   A.  It is a generally good surface, as it is smooth.  And

1  unless it's contaminated by some other material, it should be

2  clean and nonporous.

3  Q.  Okay.  Let's talk about this case now.

4      Did you process and compare fingerprints from

5  evidence items that were seized in this investigation and

6  submitted to you?

7  A.  Yes.

8  Q.  What did the agents submit to you for analysis?

9  A.  He submitted items of -- of -- plastic in nature and also

10  notebooks that contained paper sheets.

11  Q.  Did you also analyze digital scales?

12  A.  Yes, I did.

13  Q.  Okay.  When the agents submitted those items to you, did

14  they provide you with names of suspects and their fingerprint

15  card?

16  A.  In this case, the names and identifiable numbers were

17  supplied.

18  Q.  Okay.  And were you able to obtain fingerprint standards

19  for those individuals?

20  A.  Yes.

21  Q.  Let's look at Government Exhibit No. 80.  Actually, it's

22  physical --

23      (Pause, referring.)

24      (Witness handed exhibits.)

25  BY MS. BOLSTAD:

Solis - D

1   Q.   And do you recognize these items?

2   A.   (Pause, referring.)   From these items, I recognize one of

3   these items.

4   Q.   Okay.   What was the DEA exhibit number?

5   A.   N10.

6   Q.   Okay.   And from your reports, is N10 something that you

7   analyzed?

8   A.   Yes.

9   Q.   I see -- are there any handwritten notations on those

10   items?

11   A.   Yes.

12   Q.   Are those your notations?

13   A.   Yes.

14   Q.   Okay.   So once you received this item from the field, what

15   did you do with it?

16   A.   I conducted those exams I mentioned before.   I first

17   conducted a visual exam for the presence of already visible

18   print impressions.   It is of a plastic material, so I then

19   proceeded for the Super Glue method.   And after the Super Glue

20   method, I proceeded with the rhodamine 6G dye stain and laser.

21   Q.   And were you able to develop any fingerprints of value?

22   A.   I did not.

23   Q.   How about the scales?

24          You -- you mentioned that you received digital scales

25   from the field.

Solis – D

1   A.   Yes.

2   Q.   I'm going to show you Government 74 and 75.  (Pause,

3   referring.)

4              Start with 75.

5   A.   (Handed exhibit.  Pause, referring.)

6   Q.   Government's 74.

7   A.   (Handed exhibit.)

8   Q.   Do you recognize those items?

9   A.   Yes, I do.

10  Q.   Did you examine them for fingerprints?

11  A.   Yes.

12  Q.   Were you able to develop any fingerprints of value?

13  A.   Yes.

14  Q.   Let's talk about that.

15             What was -- what were you able to identify?

16  A.   In exhibit -- labeled as N8 on one of the packages, a

17  latent print was suitable for identification but was not

18  identified.

19             A latent print from a smaller scale (indicating) was

20  developed, and that latent print was identified to one of the

21  subjects provided by the agent.

22  Q.   Which subject?

23  A.   I would have to refer to my report to give a clear name.

24  Q.   Do you have your report with you?

25  A.   Yes, I do.

Solis - D

1    Q.   Please go ahead and review that, and let me know when

2    you're ready.

3    A.   The latent print recovered in people's Exhibit 74 was

4    identified to Placido Ramirez-Coronel.

5    Q.   Do you know which finger of Placido Ramirez-Coronel that

6    print was made from?

7    A.   May I refer to my report?

8    Q.   Please do.

9    A.   It was identified to the right thumb of Placido

10   Ramirez-Coronel.

11   Q.   Okay.  Let's turn, now, to your processing of the DEA

12   Exhibit N6, which is Government's 99.  It will come up on the

13   screen in front of you.

14   A.   Okay.

15   Q.   So you -- did you examine drug records or notebooks that

16   were sent to you in this case?

17   A.   Yes.

18              (Pause, Ms. Bolstad conferring.)

19              MS. BOLSTAD:  Sorry.  I'm going to show you the

20   notebook.

21              (Witness handed exhibits.)

22   BY MS. BOLSTAD:

23   Q.   Do you recognize Government Exhibit 99?

24   A.   Yes.

25   Q.   Okay.  And is that what you examined?

Solis – D

1    A.   Yes.

2    Q.   Did you take photographs in your process of looking for

3    fingerprints?

4    A.   Yes.

5    Q.   Okay.  (Pause, conferring.) I would like to show you what

6    has been not marked and admitted.  So I'm just going to show

7    you jpeg 278.

8            And do you recognize this photograph?

9    A.   Yes.

10   Q.   Why do you recognize it?

11   A.   It is the steno pad that I processed, and the label that I

12   placed next to it for identifiable purposes.

13           MS. BOLSTAD:  Permission to publish to the jury.

14           THE COURT:  Any objection?

15           MR. ANDERSEN:  No objection.

16           MR. SEPP:  (Shakes head.)

17           THE COURT:  Yes, go ahead and publish.

18   BY MS. BOLSTAD:

19   Q.   Between those two notebooks that are Government Exhibit 99,

20   how many fingerprints were you able to develop?

21   A.   I believe there were approximately 13 fingerprints and

22   approximately three palm prints.

23   Q.   I want to focus on just one notebook, the steno pad.  Okay?

24   A.   Yes.

25   Q.   Did you examine the outside cover of this notebook, as well

Solis - D

1   as the inside cover?

2   A.   Yes.

3   Q.   Did you also go page-by-page through the notebook?

4   A.   Yes.

5   Q.   And of the fingerprints that you were able to develop from

6   this steno pad, did any have sufficient ridge detail for your

7   analysis?

8   A.   Yes.

9   Q.   How many had sufficient ridge detail?

10  A.   I would have to refer to my report.

11  Q.   Sorry.  Go ahead.

12          MS. BOLSTAD:  And while you're looking, any objection

13  to showing the jpegs during Mr. Solis's testimony?  Just

14  publishing, not admitting?

15          MR. ANDERSEN:  No.

16          MR. SEPP:  (Shakes head.)

17          THE COURT:  All right.  Go ahead.

18  BY MS. BOLSTAD:

19  Q.   How many were you able to develop?

20  A.   From the steno pad --

21  Q.   Yes.

22  A.   -- there were eight fingerprints suitable for

23  identification, and there were two latent prints, one of which

24  was a palm print, and one which appears to be the joint of a

25  finger.

656

Solis – D

1  Q.  Okay.  I'm going to go through three different photos from

2  within that notebook with you, one by one.  Okay?

3         And I'm going to start with your jpeg 280, which will

4  be published to the jury.

5         Do you recognize this photo?

6  A.  Yes.

7  Q.  What is it?

8  A.  It is the inside of the main cover to the steno pad.

9  Q.  And I see what appear to be two white marks.  What are

10 those?

11 A.  One is a -- a scale.  And on top of the scale is the --

12 what we call a latent print depiction, which -- and the

13 laboratory number.

14 Q.  So I'm zooming in on one of those stickers.

15        Is that next to a fingerprint?

16 A.  Yes.

17 Q.  Okay.  And do you assign a label to each print that you're

18 able to develop?

19 A.  Yes.

20 Q.  And so going back to the total picture there, which numbers

21 did you assign to these two latent fingerprints?

22        MS. BOLSTAD:  Maybe we should zoom back in.

23        THE WITNESS:  One was N6, which is the exhibit

24 number.  Point 1-1-A, which that means it's the first latent

25 print documented.

Solis - D

1          And then the other marking is N6.1-2-A, which is the

2     second latent print documented.

3     Q.   Sticking with -- or not.

4          Let's go to 1.1 -- or 1-1.

5          And is it on the screen in front of you?

6     A.   Yes.

7          THE COURT:   Barely.

8     BY MS. BOLSTAD:

9     Q.   Is this a good print for your purposes of analysis?

10    A.   Yes.

11    Q.   What makes it a good print?

12    A.   What it has, it has what appears to be a pattern of a right

13    slope loop fingerprint.   And there also appears to be some

14    visible ridge characteristics.

15    Q.   And were you able to make a comparison of this latent print

16    to one of the known suspects presented to you?

17    A.   Yes.

18    Q.   And who were you able to make that comparison to?

19    A.   May I refer to my report?

20    Q.   Yes.   And please do, throughout.

21    A.   Thank you.

22          That latent print developed was identified to Placido

23    Ramirez-Coronel, and it was identified to the left index

24    finger.

25    Q.   Okay.   Let's look at the same cover page but print 1-2.

Solis – D

1       Were you able to identify this print to any of the

2  known suspects?

3  A.   Yes.

4  Q.   Which suspect?

5  A.   This print was identified to Fabian Sandoval-Ramos, and it

6  was identified to the right index finger.

7  Q.   Okay.  I would like to go now to jpeg 281.

8       Do you recognize this photograph?

9  A.   Yes.

10  Q.   Which page in the notebook is it?

11  A.   It appears to be the front page of the notebook.

12  Q.   Okay.  And I see approximately five stickers on this page.

13       Did you assign labels to the -- to certain areas of

14  the page?

15  A.   Yes.

16  Q.   And do those labels correspond to fingerprints?

17  A.   Yes.

18  Q.   Which numbers were assigned to these fingerprints?

19  A.   N6.1-3-A through N6.1-7-A.

20  Q.   And were you able to identify these prints to any of the

21  known suspects in this case?

22  A.   Yes, with the exception of one latent print.

23  Q.   Was that 1-5?

24  A.   Yes.

25  Q.   Okay.  Let's leave that one out.

1          And could you tell the jury, one by one, which

2    suspect prints you were able to confirm.

3    A.  From latent print marked N6.1-3-A, it was identified to

4    Placido Ramirez-Coronel.

5          Latent print N6.1-4-A was identified to Fabian

6    Sandoval-Ramos.

7          Latent print N6.1-6-A was identified to Fabian

8    Sandoval-Ramos.

9          And latent print N6.1-7-A was identified to Placido

10   Ramirez-Coronel.

11   Q.  Let's move on to -- I want to focus on a particular

12   developed print from this page.  Okay?

13          Let's look at Government Exhibit 116 regarding print

14   1-4.

15          Oh, and this is just for you, Mr. Solis.

16          Do you recognize Government Exhibit 115?  I'm sorry,

17   116?

18   A.  Yes, I do.

19   Q.  What is this document?

20   A.  It is a comparison chart of a latent print developed to a

21   known fingerprint to which it was identified to.

22   Q.  What is shown on the left?

23   A.  The latent print developed.

24   Q.  And is that the one from the item of evidence?

25   A.  Yes.

Solis – D

1   Q.  And what is shown on the right?

2   A.  The known fingerprint.

3           MS. BOLSTAD:  The Government offers Exhibit 116.

4           MR. ANDERSEN:  Your Honor, if I could ask one

5   question in aid of --

6           THE COURT:  You may.

7           MR. ANDERSEN:  Mr. Solis, are these your numbers that

8   you put on here?  Those are your markings?

9           THE WITNESS:  Yes.

10          MR. ANDERSEN:  This is what you produced?

11          THE WITNESS:  Yes.

12          MR. ANDERSEN:  I have no objection.

13          THE COURT:  Counsel?

14          MR. SEPP:  I have no objection, your Honor.

15          THE COURT:  Thank you.  It is received, and may be

16  published.

17  BY MS. BOLSTAD:

18  Q.  Did you -- let's talk about those numbers next to the

19  arrows.  What do the arrows point to?  What is significant

20  about these numbers?

21  A.  These are pointing to characteristics in the latent print

22  and in the known print that matched to each other.

23  Q.  Is there any particular area of focus in this exhibit that

24  we should look at?

25  A.  Yes.

661

Solis – D

1    Q.  Which part?

2    A.  What appears to be the middle portion of the latent print

3    and the middle portion of the known print.

4    Q.  And would you like us to zoom in, or would you like to just

5    describe that?

6    A.  You may zoom in.

7    Q.  Which part would you like zoomed?  The latent side or the

8    known?

9    A.  The latent would be fine.

10   Q.  Okay.  Okay.  So what are some areas that are important to

11   you of that middle portion of the print?

12   A.  Well, what I -- upon my analysis -- and I was marking the

13   ridge characteristics, as I described earlier, where there are

14   bifurcations of ridges.  Basically one ridge which splits into

15   two, or ridge endings where the ridge appears to end abruptly.

16        If you look in the middle on the latent print, which

17   is the print on the left, there appears to be what -- a long

18   enclosure of -- of ridges basically making an elongated circle.

19   Right above it there appears to be a short ridge with a spur --

20   what appears to be a spur.

21        And below that, there appears to be another ridge

22   going down the middle of the enclosure.  And it appears to

23   split into two.  The enclosure appears to be split into two.

24   And then, again, there appears to be two bifurcations -- appear

25   to be next to each other.  When I first looked at this print, I

Solis – D

1    referred to it as a tooth.  That's the way it just kind of

2    appeared.  And that was unique, and that was my starting point

3    for comparison purposes from the latent to the known.

4    Q.  And are all of these unique points of comparison on the

5    latent being compared to a known fingerprint of Fabian

6    Sandoval-Ramos?

7    A.  Yes.

8    Q.  Okay.  From, like, a standard fingerprint card?

9    A.  Yes.

10   Q.  Which finger from Mr. Sandoval-Ramos made that print?

11   A.  Would you please return to the -- to refresh my memory.

12   Q.  Yeah.

13   A.  That latent print was identified to the left thumb of

14   Fabian Sandoval-Ramos.

15   Q.  And in your opinion, then, is this left thumb the source of

16   the latent print found on Exhibit 99?

17   A.  Yes.

18   Q.  I would like to pull up a final page from within Government

19   Exhibit 99, which is jpeg 283.

20          Do you recognize what you see in front of you?

21   A.  Yes.

22   Q.  What is it?

23   A.  It is an additional inner page in this steno pad.

24   Q.  Do you know which page of the steno pad?

25   A.  I do not, no.

663

Solis – D

1    Q.  But it's not the same as the first page that we were

2    previously looking at?

3    A.  Correct.

4    Q.  I see three stickers on this page.  Were these three

5    stickers identifiable to you?

6          I'm sorry.  Were the prints next to those stickers

7    identifiable?

8    A.  Yes.

9    Q.  Okay.  We'll wait for it to come back to life.

10          (Indicating monitor.  Pause.)

11    BY MS. BOLSTAD:

12    Q.  Which numbers did you assign to the developed fingerprints

13    on this page?

14    A.  I assigned N6.1-9-A, N6.1-10-A, and N6.1-11-A.

15    Q.  And were 1-10 and 1-11 the only two identifiable prints?

16    A.  Yes.

17    Q.  Which suspect, if any, were you able to identify and

18    associate with the fingerprints that you developed?

19    A.  The latent print marked as N6.1-10-A was identified to

20    Placido Ramirez-Coronel.  And latent print N6.1-11-A was

21    identified to Raul Arcila.

22    Q.  And which finger of Mr. Arcila did you identify as having

23    made that fingerprint?

24    A.  The right thumb finger.

25    Q.  I want to focus on that fingerprint, which is 1-11.

                          Solis – D

1            Let's pull up Government Exhibit 117, just for

2      Mr. Solis, please.

3              I'm going to actually just show you, Mr. Solis,

4      Government Exhibit 117.

5      A.  (Handed document.)

6      Q.  Do you recognize that page?

7      A.  Yes, I do.

8      Q.  Is this similar to the comparison that you did for the

9      other print we talked about, which is Government's 116?

10     A.  Yes.

11     Q.  Okay.  Did you make that document?

12     A.  Yes.

13     Q.  Is it a side-by-side comparison?

14     A.  It is.

15     Q.  And did you make the numbered marks around this latent

16     print and the known standard?

17     A.  Yes.

18              MS. BOLSTAD:  The Government would -- moves to offer

19     Government's 117.

20              MR. ANDERSEN:  I have no objection.

21              MR. SEPP:  No objection.

22              THE COURT:  It's received.

23              Please publish.

24     BY MS. BOLSTAD:

25     Q.  What is shown on the left side of Government's Exhibit 117?

Solis – D

1   A.   A photograph of the latent print developed.

2   Q.   Was that developed from the notebook?

3   A.   Yes.

4   Q.   Okay.  And what is shown on the right?

5   A.   The known fingerprint used in the comparison.

6   Q.   And was it known from a particular subject?

7   A.   Yes.

8   Q.   Who?

9   A.   Raul Arcila.

10  Q.   And is that his known right thumb?

11  A.   Yes.

12  Q.   Was anything particularly significant to you in the

13  comparison?

14  A.   Yes.

15  Q.   Which portion would you like us to zoom in on?

16  A.   Well, what the -- what appears to be the middle, it appears

17  like a double loop area in the middle.

18  Q.   What did you observe that was unique in this comparison?

19  A.   My screen is showing two known prints.  (Pause.)

20            I am now showing a latent print from a previous court

21  exhibit.

22  Q.   Stand by.  (Pause.)

23            Is this accurate, Mr. Solis?

24  A.   Yes, it is.

25  Q.   Okay.  And so what was unique to you in this fingerprint

666

Solis - D

1  comparison?

2  A.  Well, what I first observed was the double loop formation

3  in this whorl.  It's called a whorl print.  Whorl prints --

4  there are different types of whorl prints.  There is what is

5  called a central pocket loop, a plain whorl, and a -- what's

6  called a double loop whorl.  And this is referred to as a

7  double loop whorl.

8           I concentrated in the area at the inner portion of

9  the -- of this whorl, and I noticed what appeared to be an

10  enclosure as well; the lower portion of the -- of the -- of the

11  whorl.  And I noticed the bifurcation made on that lower

12  portion.  I then went one ridge to the right and up, and I

13  noticed an additional bifurcation from that enclosure.  And I

14  would -- then went to a few ridges to the left of that and

15  found where another -- yes, where the ridge appears to do a

16  recurve.  Appears to also touch the -- another ridge right

17  above that.  And one ridge to the left of that is another

18  bifurcation.

19           And from there, I was able to then proceed and do

20  what's called a ridge count from one point to another.  And it

21  went to clearer areas of the -- of the latent print.

22  Q.  And in addition to the count, did this side-by-side

23  comparison also have those unique qualities in the same

24  locations?

25  A.  Yes.

1  Q.  And in your opinion, is Mr. Arcila's right thumb the source

2  of the latent print?

3  A.  Yes.

4  Q.  And just stepping back a step in the analysis, Mr. Solis,

5  did you find two fingerprints on this single page from the drug

6  record?

7  A.  I found a total of three, but two were identifiable.

8  Q.  And besides Mr. Arcila's print, who was the source of the

9  other fingerprint on the same page?

10  A.  That was a subject by the name of Placido Ramirez-Coronel.

11          MS. BOLSTAD:  Nothing further on direct.

12          THE COURT:  Mr. Andersen.

13          MR. ANDERSEN:  Thank you.

14                    CROSS-EXAMINATION

15  BY MR. ANDERSEN:

16  Q.  Mr. Solis, if I understood you right, what -- what you're

17  testing for basically is the amino acids left by fingerprints.

18  Right?  Or by the finger ridges of somebody's hands, or

19  whatever part of their skin?

20  A.  Yes.  In some cases it's the amino acids and others, it's

21  just any kind of perspiration or moisture.

22  Q.  So when we're talking about paper, are we talking about

23  amino acids?  Or could it also be the moisture you're talking

24  about?

25  A.  It's mostly amino acids.

1  Q.  Okay.  Now, isn't it -- it's true that different people

2  have -- you sort of talked about this earlier, but different

3  people could leave -- could have different types of amino acids

4  or produce more or less amino acids?

5  A.  True.  Yes.

6  Q.  And even the same person could produce more or less amino

7  acids at any particular time?

8  A.  Yes.

9  Q.  Okay.  And when you're -- when you're testing a

10  fingerprint, then, you're not necessarily able to tell when in

11  time that fingerprint was left.  Right?

12  A.  Correct.

13  Q.  Or how long it had been there, say?

14  A.  Correct.

15  Q.  And, now, the prosecutor was using some words like

16  "confirmed" and "made," and you were using terms more like

17  "identified."

18         Now, is it true that there's not really a -- a

19  confirmation, necessarily?  What -- how would you describe what

20  the process is you're doing?

21  A.  Well, we are trying to identify a latent print as having

22  been made by a particular subject, and that is -- that is

23  because the latent print -- or, I mean, a known fingerprint of

24  a person remains persistent and is known to be unique to an

25  individual person.  So my term is referred to as being

Solis - X

1    identified to.

2    Q.  Now, is that known to be unique, or is that just assumed to

3    be unique?

4    A.  It is known to be unique.

5    Q.  Has there been a test of every single fingerprint in the

6    world of everybody?

7    A.  No, but there has been sufficient comparisons in the last

8    hundred years to come to the conclusion that fingerprints are

9    made random -- I mean, the finger ridges are created random and

10   unique to every individual.

11   Q.  So you know it based on -- on that?

12   A.  On studies, yes.

13   Q.  So -- so are you saying there are studies saying that

14   fingerprints are unique?

15   A.  Yes.

16   Q.  Okay.  Is there a standard by which you would determine

17   whether or not an identification is adequate?  For example, if

18   you had three similarities between the latent print and an

19   identifiable print or 10, or 15, or 20, is there any standard

20   like that?

21   A.  No.

22   Q.  So that up to you as the individual identifier, or how is

23   that -- is that up to you?

24   A.  Yes.  And it's also based on circumstances of -- unique to

25   a particular case.

1          May I give an example?

2    Q.  Sure.

3    A.  An example would be if you have a crime committed in a

4    boat, and you have a bloody print left on the murder weapon

5    with only -- with three points of identification, only three

6    visible characteristics.  You may have a pattern or just a

7    ridge flow that you cannot use for identifiable purposes but

8    you only have a limited number of people on that boat.

9          So with that limited number of people and the three

10   identifiable points of characteristics that do not match

11   anybody else, you can pretty much ascertain that that print was

12   made by the individual.

13   Q.  Well, it sounds like that's excluding others, not actually

14   making an identification.  That's just excluding other

15   identifications.  Right?

16   A.  It is an exclusion of others.  And based on the known-to-be

17   bloody print and having those characteristics that do not match

18   anybody else, you're now left by excluding.  Yes, you're making

19   an identification to the one subject that was not excluded.

20   Q.  So if you were presented with a -- I guess this

21   hypothetical with the boat, then you would assume that it would

22   be one of the members that you knew to be in the boat, based on

23   whatever evidence you had?

24   A.  Correct.

25   Q.  Okay.  Is there any way, also, to tell, for example, if --

671

Solis - X

1    I mean, we already talked about the timing.  There's no way to

2    tell the timing of a fingerprint.  But is there a way to tell

3    if something else was on the page, like writing or any other

4    substance, or anything like that, when the fingerprint was

5    made?

6    A.   No.

7            MR. ANDERSEN:  Okay.  Thank you.  That's all.

8            THE COURT:  Counsel.

9            MR. SEPP:  Just one question.

10                          CROSS-EXAMINATION

11   BY MR. SEPP:

12   Q.   Did you check every page, front and back, in N6?

13   A.   Yes.

14           MR. SEPP:  Okay.  That's all I have.  Thank you.

15           THE COURT:  Redirect, Ms. Bolstad?

16           MS. BOLSTAD:  Nothing, your Honor.

17           THE COURT:  All right.  Sir, you are free to go.

18   Ms. Bolstad.

19           MS. BOLSTAD:  The final witness will be Detective

20   Andersen.

21           We will finish by 5:00.

22           THE COURT:  Well, that's good to know.  I had some

23   other things in mind in addition.  But, yes, all right.

24           Detective, would you come back to the witness chair.

25           She's already sworn.

Andersen – D

```
 1          Yes, jurors, you'll recall this witness took the oath

 2   previously.  She remains under oath.

 3              Go ahead and take a seat.

 4              THE WITNESS:  Thank you.

 5                      DIRECT EXAMINATION

 6   BY MS. BOLSTAD:

 7   Q.  Detective, we've heard about phones seized in this case.

 8              Were you able to examine those phones for evidence of

 9   drug trafficking?

10   A.  Yes, I was able to examine the downloaded contents of those

11   phones.

12   Q.  Let's start with Ms. Godvin, Mr. Rosa, and Mr. Baker; their

13   phones.

14              Did you examine Ms. Godvin's phone?

15   A.  Yes, I did.

16   Q.  Did you observe any evidence suggesting that she had a

17   source for heroin other than Mr. Rosa in March 2014?

18   A.  No.

19   Q.  Did you examine Mr. Rosa's phone?

20   A.  I did.

21   Q.  Did you observe any evidence suggesting that he had a

22   source for heroin other than Mr. Baker in -- in March 2014?

23   A.  No.

24   Q.  Did you examine Mr. Baker's phone?

25   A.  I did.
```

673

Andersen – D

1  Q.  Did you observe any evidence suggesting that he had a

2  source for heroin, other than Mexican Bobby, in March 2014?

3  A.  No.

4  Q.  Let's talk about the traffic stop on April 2nd.

5        Did investigators seize a cell phone from Mr. Arcila?

6  A.  Yes.

7  Q.  Were you able to examine the contents of that phone?

8  A.  Yes.

9  Q.  What was the phone number assigned to Mr. Arcila's phone?

10  A.  If you don't mind, I've made a summary of those notes.  I

11  would like to refer to it, as we go, for those numbers.

12  Q.  Please do so.

13  A.  Thank you.

14  Q.  If there's an objection, we'll hear it.

15  A.  The number in Mr. Arcila's phone as the contact for that

16  phone was 971-279-0581.

17  Q.  Were you able to obtain the call logs from Mr. Arcila's

18  phone, meaning the calls received by the phone and the calls

19  placed by the phone?

20  A.  Yes.

21  Q.  And have you compiled those logs into Exhibit 126?

22  A.  Yes.

23        MS. BOLSTAD:  The Government would move to admit 126.

24        MR. ANDERSEN:  I have no objection.

25        MR. SEPP:  No objection.

674

Andersen – D

1            THE COURT:  Thank you.  Received.

2            Please publish and proceed.

3   BY MS. BOLSTAD:

4   Q.  And on the screen in front of you, is this the first page

5   of that exhibit of the call logs from Mr. Arcila's phone?

6   A.  Yes.

7   Q.  I see the parties are listed at points on this sheet.

8            Are those the contacts as he had them listed in his

9   phone?

10  A.  Correct.  If there was a contact for a number stored in the

11  contacts section of the phone, the program that extracted that

12  data from the phone, as I would print these or run these

13  reports, would combine those into one item.

14           So where it shows the "to" or "from," and a phone

15  number, the name that appears next to it -- if there is one --

16  comes from that contact list from that same device.

17  Q.  Let's talk about Mr. Ramirez-Coronel, the traffic stop on

18  April 2nd.

19           Did agents seize a cell phone from him?

20  A.  Yes.

21  Q.  Were you able to examine the contents of that phone?

22  A.  Yes.

23  Q.  And did you put the call logs from within that phone into

24  Government Exhibit 127?

25  A.  Yes.

Andersen – D

1        MS. BOLSTAD:  Government moves to admit 127.

2        MR. ANDERSEN:  No objection.

3        MR. SEPP:  No objection.

4        THE COURT:  Thank you.  Received.

5        Publish, and proceed, please.

6  BY MS. BOLSTAD:

7  Q.   Like Mr. Arcila's phone, were the contacts as saved what is

8  shown in Exhibit 127?

9  A.   Yes.

10 Q.   So these are not your labels for the contacts, but those

11 are the labels that were in the phone itself?

12 A.   Exactly.

13 Q.   Let's go to location 2.

14        How many cell phones were seized from location 2 that

15 belonged to Fabian Sandoval-Ramos?

16 A.   Two.

17 Q.   And is one of those the dumpster phone?

18 A.   Yes.

19 Q.   We'll get to that in a moment.

20        Is the other the iPhone?

21 A.   Yes.

22 Q.   Is that Government's 109?

23 A.   I don't have a reference to know if that is accurate.  But

24 if you say it is, I believe it would be.

25 Q.   Okay.  So let's talk about the iPhone.

1        Were you able to examine the contents of that phone?

2   A.   Yes.

3   Q.   And what was the phone number of it?

4   A.   The contact number for the iPhone was 503-313-6547.

5   Q.   When you examined the iPhone, in general -- oh, and let me

6   just stop here and -- did you put the information that you're

7   testifying to into a summary?

8   A.   I did.

9   Q.   And right now, are we laying a foundation for your summary

10  to be later shared with the jury?

11  A.   Yes.

12  Q.   Okay.  And so these -- these items might become known to

13  you later, they might not.

14          When you examined the iPhone from Fabian

15  Sandoval-Ramos's house, what was the phone number assigned to

16  that phone?

17  A.   The one I just stated, 503-313-6547.

18  Q.   Did you observe evidence of drug trafficking on that phone?

19  A.   No.

20  Q.   Did it appear to be a normal usage phone?  By normal usage,

21  I mean pictures of family, friends, et cetera?

22  A.   I don't recall what photos were on the phone.

23  Q.   Okay.  Did Mr. -- did Fabian Sandoval-Ramos's iPhone, did

24  it have the number for Raul Arcila in it?

25  A.   It did.

Andersen - D

1   Q.  Saved as the same number you testified to earlier for Raul

2   Arcila?

3   A.  It wasn't saved to the name Raul Arcila, but that phone

4   number was saved in the contact list.

5   Q.  What was it saved as?

6   A.  Pelon.

7   Q.  P-E-L-O-N?

8   A.  That's right.

9   Q.  In examining the contents of the phone seized from

10  Mr. Ramirez-Coronel, Placido Ramirez-Coronel, did that phone

11  have Mr. Raul Arcila's phone number in it?

12  A.  It did.

13  Q.  What was it saved as?

14  A.  Pelon.

15  Q.  And when you were looking in Placido Ramirez-Coronel's

16  phone, did you observe the iPhone phone number of Fabian

17  Sandoval-Ramos, 503-313-6547?

18  A.  Yes.

19  Q.  And what was that contact number saved as in Placido

20  Ramirez-Coronel's phone?

21  A.  That was saved as one word, "Flavian," which was

22  F-L-A-V-I-A-N.

23  Q.  Was that same iPhone number for Flavian, was that number

24  saved in Raul Arcila's phone?

25  A.  Yes.

Andersen – D

1    Q.   What was it saved as?

2    A.   As one word, "Fabi," F-A-B-I.

3    Q.   Do you believe these to be nicknames for Fabian?

4    A.   That would be my assumption.

5    Q.   Did you observe any other contacts in Placido

6    Ramirez-Coronel's phone for a similar nickname?

7    A.   Yes.

8    Q.   What was the nickname?

9    A.   Let me refer to my notes here for a moment.

10        There was a nickname "Faby," F-A-B-Y, as -- in the

11   contact list in Placido Ramirez's phone.

12   Q.   What was the number associated with F-A-B-Y?

13   A.   That was 206-473-7989.

14   Q.   Let's talk about the phone found in the dumpster at

15   location 2.

16        Were you able to examine the contents of that phone?

17   A.   Not the call contents or the text message contents, or

18   things of that nature.

19   Q.   Okay.  Were you able to determine the phone number assigned

20   to that broken phone?

21   A.   Yes.

22   Q.   Did part of your determination involve looking at

23   Mr. Ramirez-Coronel's phone and that Faby, F-A-B-Y, number?

24   A.   Part of it, yes.

25   Q.   Okay.  Did you look into the phone number assigned as Faby

679

Andersen – D

1    in the Placido Ramirez-Coronel's phone?  And what I'm asking is

2    did you request records from the cell phone company for

3    206-473-7989?

4    A.   Yes.   Those requests -- those records were requested, yes.

5    Q.   And did you receive those records?

6    A.   Yes.

7    Q.   Which phone company provided them?

8    A.   It was a prepaid phone from Verizon.

9    Q.   And did you place those records from Verizon in

10   Government's Exhibit 124?

11   A.   I believe so, yes.

12            MS. BOLSTAD:  Government moves to offer 124.

13            MR. ANDERSEN:  No objection.

14            MR. SEPP:  No objection.

15            THE COURT:  Received.

16            Please post it, and proceed.

17   BY MS. BOLSTAD:

18   Q.   Tell the jury what we see in these call records, in terms

19   of the columns.

20   A.   Sure.

21            The first column on the left is labeled "Network

22   Element Name," and that's a column that refers to a geographic

23   location that covers hundreds of cell phone towers.  Lots and

24   lots of cell phone towers.  Other phone records that we'll

25   sometimes review will have specific cell phone towers

1   themselves listed for calls, where this one just gives a

2   network element.  So it's just a name for -- typically a region

3   that covers a very large number of cell phone towers.

4           The next number over is the mobile directory number,

5   which is just a number for which we've requested records.  So

6   you'll see, as -- every single line of this column has that

7   same number.

8           The next number is a dialed digit number, which is

9   the number dialed by the person making the phone call.  And the

10  next number is a call direction, which shows whether it's an

11  incoming or an outgoing call.

12          The next column is listed "Seizure DTTM," for date

13  and time.  And it lists the date -- date and time that the

14  record was created.  And the seizure duration is listed in

15  seconds for the length of seconds of that particular call.

16          And then finally, at the very end, is the calling

17  party number, which lists which phone number was used to place

18  the call.

19  Q.  When you sent that subpoena request, did you -- did you

20  refer to the ESN number from the seized phone?

21  A.  I don't know if that was included as part of the request in

22  general, but it was something that was received in response.

23  Q.  Okay.  And so what was the -- what are the last three

24  digits of the ESN on the back of the dumpster phone?

25  A.  That's E48.

Andersen – D

1  Q.  And did that ESN number come back as listed on those

2  Verizon records?

3  A.  It did.

4  Q.  And did that give you a clue about whether the -- what the

5  phone number might be to the dumpster cell phone?

6  A.  Yes.  That same -- the whole entire number was a match from

7  the records provided by Verizon for that 206 phone number and

8  the actual device recovered in the dumpster.  Looking at the

9  back of that device, you can see that number on the back.

10  Q.  And what does "ESN" stand for?

11  A.  I'm not entirely sure, but I think it stands for, like,

12  equipment serial number or electronic serial number.

13        And it's -- I know that the purpose of that number is

14  it's a unique number that identifies a particular handset.

15        MS. BOLSTAD:  The government moves -- oh, thank you.

16  BY MS. BOLSTAD:

17  Q.  We've heard evidence about Mr. Baker's calls to a Mexican

18  Bobby phone number with area code 442.

19  A.  Yes.

20  Q.  Did you request records for the provider -- the service

21  provider for that phone number?

22  A.  For the 442 number, yes.

23  Q.  Okay.  And did you receive those -- those toll records and

24  use them for Government Exhibit 123?

25  A.  Yes.

682

Andersen – D

1          MS. BOLSTAD:  Government moves to offer Exhibit 123.

2          MR. ANDERSEN:  No objection.

3          MR. SEPP:  No objection.

4          THE COURT:  Thank you.  Received.

5          Please publish, and proceed.

6    BY MS. BOLSTAD:

7    Q.  During the March 2014 time frame, based on these tolls for

8    the 442 number, were you able to determine the location, the

9    physical location of the 442 phone?

10   A.  We could get an idea based on that network element name.

11   It would give a large region.

12          So in this case, on this first page, if you look down

13   along that first column, the first many records list Los

14   Angeles gateway, followed by Los Angeles 44, which would be

15   network nicknames for that large group of towers there.

16          And it's just -- it's just a matter of where the call

17   is routed through.  I don't think it necessarily absolutely

18   confirms that the handset is present in that location.  In

19   fact, as we go forward through the list, you'll see that at

20   times the network element will jump from one to the next, even

21   within a very brief period of time.  So unlike a specific cell

22   phone tower, where you can pinpoint where that tower is

23   located, this is just listing a larger area.

24   Q.  Okay.  And although you cannot pinpoint exact location, do

25   you believe that the lengthy sequences of Los Angeles, Los

1    Angeles, Los Angeles, do you believe that that means the phone

2    was in the area of Los Angeles during those time frames?

3    A.   I believe that it could have been, yes.

4    Q.   Was there also a time period in March 2014 where the

5    network element or location identifier listed Hillsboro?

6    A.   There is.   In fact, even on this page, if we go back one,

7    there's a line where it lists Hillsboro individually in the

8    midst of other Los Angeles locations.   Whereas, going

9    forward -- like predominantly, all through the date of March

10   16th, all of the calls are routed through that Hillsboro

11   network name as a call.

12   Q.   And in the same time period, Detective Andersen, did you

13   compare the tolls from the phone with the 206 area code, the

14   phone found in the dumpster?

15   A.   Yes.

16   Q.   What was the location of that dumpster phone in the same

17   relevant periods?

18   A.   If you would like to bring it back up to the -- the prior

19   record that we just reviewed.

20   Q.   I think that's Government's 124.

21   A.   And so we begin in Hillsboro.   And continuing to move

22   forward, we are seeing Hillsboro, Seattle, Hillsboro as a large

23   area for the call network.

24           And then later in the month, Los Angeles is listed;

25   among other locations.

Andersen - D

1   Q.   What about from March 31st to April 2nd?

2   A.   March 31st through April 2nd, Hillsboro, Seattle shown on

3   this page here.   The next page, Hillsboro, Seattle, Seattle,

4   Hillsboro, and again.

5   Q.   And can you say with certainty where the phone was at any

6   particular date?

7   A.   No.

8   Q.   Okay.   Are you comfortable with the idea that these

9   locations are associated with that phone somehow?

10  A.   Yes.

11  Q.   Do you also have call records that you found within the

12  cell phones seized from Mr. Arcila and Mr. Ramirez-Coronel,

13  which were admitted as 126 and 127?

14  A.   Yes.

15  Q.   Did you examine those seized cell phone call logs in

16  conjunction with the toll records provided by the service

17  providers for the other two phones?

18  A.   I did.

19  Q.   What were you looking for?

20  A.   I was looking to see if there was a pattern of contact or a

21  link of contact as you move from one person involved in this

22  case to another, to see who was talking to whom.

23  Q.   I would like to show you, and you alone, Government Exhibit

24  129.

25             I'll show it to you in paper form, while I'll let you

Andersen - D

1  work on that.

2  A.  Thank you.  (Handed document.)

3  Q.  Did you make this document?

4  A.  I did.

5  Q.  How did you make it?

6  A.  What I made is -- it began with a spreadsheet, where I

7  copied and pasted the different downloads from the different

8  devices, whether it was from the phone company or whether it

9  was extracted from the phone itself.  And then put them all in

10 the same order so they were in chronological form.  So that

11 rather than looking only at one person's calls and then moving

12 on and looking at only another person's calls, I was able to

13 see all of the calls in one setting, organized by date.

14 Q.  Did you first focus on a particular time period for this

15 document?

16 A.  For this document, I focused only on April 2nd.

17 Q.  Why did you focus on that date?

18 A.  That was a date that we had a lot of information that we

19 knew that was directing certain events that were happening,

20 calls that we were directing to be placed.  And then also

21 things we knew to be true as far as traffic stops we had

22 conducted -- or a traffic stop, I should say, and then search

23 warrants that were later executed.  So I had different times to

24 refer to that I knew certain events were occurring, to compare

25 to the phone calls that were made and received.

Andersen - D

1  Q.  Okay.  And have you checked and rechecked the accuracy of

2  your summary?

3  A.  I have.

4  Q.  And did you check it against those items received from the

5  phone companies and from the seized phones?

6  A.  I did.  And I believe them to be accurate, to the best of

7  my ability.

8          MS. BOLSTAD:  The Government moves to admit summary

9  Exhibit 129.

10          (Pause, counsel conferring.)

11          MR. ANDERSEN:  I have no objection to that your

12  Honor.

13          THE COURT:  Thank you.

14          MR. SEPP:  No objection except for that the jury be

15  known that they can compare it to the actual logs themselves to

16  show that it is indeed accurate.

17          THE COURT:  So, Jurors, a summary exhibit is offered

18  as a convenience to you, to help collect data points about

19  evidence, but the summary isn't evidence.  It is just the

20  witness's effort to collect certain parts of it.  So it's only

21  as good as the reliability of the data collected.  And it's --

22  for you to rely on the summary, you have to be able to know for

23  yourself whether it's accurate, and that would be left for you

24  to determine.

25          So as a summary, the witness is -- I'm sorry, the

687

Andersen – D

1    exhibit is received.

2            Go ahead.

3    BY MS. BOLSTAD:

4    Q.  And so please explain to the jury what this document

5    contains.

6    A.  At the very top, I included a legend, which would just show

7    which phone number belongs to which person involved in this

8    case.

9            Starting with the top, with the phone number that was

10   saved in Shane Baker's two phones as Mexican Bobby, the 442

11   number, followed by the phone that was found in the dumpster at

12   location No. 2, followed by the phone that was seized from Raul

13   Arcila with the corresponding phone number, the phone that was

14   seized from Placido Ramirez-Coronel, the phone -- the iPhone

15   that was found within location 2, and then tolls received for

16   another number as well.

17           And then below that list, in order of date and time,

18   from older to newer, with the hours listed in sort of a 24-hour

19   format where, you know, 1:00 p.m. would be 1300 hours, listing

20   the calls; date and time the call was captured up by the tolls

21   or by the download; the length of the call; the person -- or

22   the phone number that initiated the call; the phone number that

23   received the call or the destination number; the contact name,

24   if any, that was from a device.  And then a description on the

25   far right there of the summary that I had created of what

1    the -- each individual line was.

2                MS. BOLSTAD:  Could we go to the bottom of this 129.

3                MS. COOKE:  This page?

4                MS. BOLSTAD:  This page.

5                I'm sorry, the bottom of the next page.

6    BY MS. BOLSTAD:

7    Q.  I see in the middle of this a black mark for traffic stop

8    on Honda.

9                Did you enter that information?

10   A.  I did.

11   Q.  And what did you base that on from where you entered it in

12   the chart?

13   A.  I based it on our knowledge of when we had made those

14   calls, as far as when we saw movement of that vehicle, and then

15   about how long after that I recall the traffic stop occurring,

16   as well as the fact that after about that seven -- or, sorry,

17   5:25 to 5:30 p.m. range, any phone calls that were placed to

18   Placido Ramirez-Coronel's phone or Raul Arcila's phone were not

19   able to be answered, did not appear to be answered; because at

20   that point they were both detained.

21   Q.  Okay.  We are having a little bit of a technical problem,

22   so I want to switch gears and move to your examination of other

23   phones in this case.  Okay?  And we'll come back to this topic

24   once we're set.

25                Did you look at Mr. Baker's phone content, about his

1   contacts with Mr. Rosa in the week leading up to Justin

2   Delong's death on March 29?

3   A.  I did.

4   Q.  Did you see messages between Mr. Baker and Mr. Rosa?

5   A.  Yes.

6   Q.  Starting on March 22, what did you observe?

7   A.  I would like to refer to my police report during this,

8   to -- to summarize the messages I had reviewed in those

9   documents.

10          Beginning on March 22nd -- give me just one moment to

11  find the right spot here.  (Pause, referring.)

12          Okay.  So I saw messages from -- back and forth

13  between Michael Rosa's phone, which was saved in Baker's phone

14  as Mikey 2, which is a phone number of 971-804-1412, with Shane

15  Baker's phones on March 22nd, 2014; March 24th, 2014; and March

16  29th, 2014.

17  Q.  Why those particular dates?

18  A.  I focused on dates that were within the last week, leading

19  up to the overdose death of Justin Delong.

20  Q.  Okay.  And what did you learn?

21  A.  So I learned that on March 22nd, Michael Rosa's phone sent

22  Shane Baker's phone a message at 11:13 p.m., stating that his

23  order was short.  And I am familiar with this in prior

24  investigations.  That, you know, again, drugs are sold by

25  weight.  And so if a person orders a certain amount, it's an

1    order placed by a weight requirement or a weight request.  And

2    if what's provided doesn't weigh out to be what they expect,

3    that would be an order being short.

4            Another conversation from the 23rd, from 10:45 p.m.,

5    they discuss a meeting near Powell and 82nd Avenue in Portland,

6    where Baker, his phone sends a message to Rosa's phone, stating

7    that he had to leave the area due to cops being everywhere.

8    And Rosa responds with a message, No worries.  Not like I'm

9    out, or anything.

10           And I interpret that to mean that it wasn't a problem

11   for Rosa because he wasn't out of heroin, and it wasn't a

12   problem to wait.

13           The following day, at 10:29 p.m., Shane Baker's phone

14   sent Michael Rosa's phone a message, saying:

15           I'm on my way to town now.  Got yours on me for

16           five or six.  How many?

17           Rosa responds:  Five.

18           And Baker replies:  Okay.  5.20 is what I have for

19           you.

20           And the message exchange continues back and forth

21   with a discussion to meet at McDonald's on Foster, at 82nd.

22   Q.  Were there other messages between Mr. Rosa's phone and

23   Mr. Baker on March 28th?

24   A.  Yes.

25   Q.  Tell us about that, in brief.

Andersen - D

1  A.  On March 28th at 3:58 p.m., Baker's phone sent a message to

2  Rosa's phone that read:

3          What's up with you?  I need to grab that money.

4          Rosa replied, about nine hours later, at 1:14 a.m.,

5  on March 29th, 2014, saying:

6          Sorry, didn't see your message until right now.

7          I'm going to need to grab more tomorrow, anyway,

8          so I'll have it all for you.

9          Baker's phone replied:  Okay.  Just call me in the

10         morning then.

11         And the following afternoon, March 29th, 2014, at

12  1:07 p.m. -- I have a typo in my report, where it says:

13         Rosa texts Baker his address.  Baker --

14         THE COURT REPORTER:  I need you to speak slower,

15  please.

16         THE COURT:  I have a typo in my report?

17         THE WITNESS:  Yes.  It should read:

18         Baker texts Rosa his address as 4200 Southwest

19         Canyon Road, 107 Ave., Beaverton, Oregon.

20  BY MS. BOLSTAD:

21  Q.  Detective Andersen, we've heard evidence in this case that

22  Mr. Rosa went to Ohio and returned in -- in March and around

23  this time period.

24         While he was gone, do you know who was using

25  Mr. Rosa's phone?

1  A.  I believe that Mr. Goshorn was using Mr. Rosa's phone.

2  Q.  Okay.  And was that with Mr. Rosa's permission?

3  A.  Yes.

4  Q.  And was Mr. Goshorn operating at Mr. Rosa's direction?

5  A.  Yes.

6  Q.  Still in furtherance of the conspiracy?

7  A.  Yes.

8  Q.  Okay.  Let's talk about Mr. Baker's phone content about any

9  contacts with the Mexican Bobby phone number in the week prior

10 to Justin Delong's death.

11        Did you see such connection between Baker and Mexican

12 Bobby?

13 A.  I did.

14 Q.  Tell us about that.

15 A.  So beginning, again, with a review starting a week prior,

16 on March 22nd, 2014, we see Baker's phone calling the Mexican

17 Bobby number at 8:24 p.m. and 10:25 p.m. that same day, March

18 22nd.

19        And let me find --

20        (Pause, referring.)

21 BY MS. BOLSTAD:

22 Q.  Do you know the total number of calls placed or received

23 between Mr. Baker and the 442 Mexican Bobby number?

24 A.  I believe it was 30 calls during that time frame.

25 Q.  The one-week time frame?

Andersen – D

1   A.   Yes.

2   Q.   How many of those 30 calls were at your direction?

3   A.   11 calls.

4   Q.   And are those 11 calls then something that you or Detective

5   McNair observed happening?

6   A.   Yes.

7   Q.   Was there any pattern of activity between Mr. Rosa's calls

8   with Mr. Baker compared to Mr. Baker's calls to Mexican Bobby

9   in that week time frame?

10  A.   Yes.

11  Q.   What was the pattern you observed?

12  A.   (Pause, referring.)  Just one moment.  (Pause, referring.)

13          So I see that Baker's phone has contacts with Mexican

14  Bobby in proximity to when there are meets with Michael Rosa or

15  conversations with Michael Rosa.

16          Prior to the text that Rosa had sent about being

17  shorted on March 22nd, Shane Baker's phone had called the

18  Mexican Bobby number six times on that date.

19          On March 29th, at 10:29 p.m., Baker had agreed to

20  sell 5 ounces to Rosa in Portland, as we discussed a bit ago.

21  Foster and 8 –– 82nd Avenue.  And Baker had contacted the

22  Mexican Bobby number twice on March 24th, at 10:25 p.m. and

23  again at 11:32 p.m.

24  Q.   Did you have information, when you were reviewing these

25  phone tolls, about March 29th and Mr. Rosa's meeting with

1    Mr. Baker on the afternoon of the 29th?

2    A.  I did.  I had reviewed all of this after all of my

3    interviews were concluded.

4    Q.  And on that afternoon, when Mr. Rosa reports that he was

5    with Mr. Baker when Mr. Baker contacted his source, did you

6    look for that time frame on March 29th, in the records for

7    Mexican Bobby?

8    A.  I did.

9    Q.  What did you observe?

10   A.  I saw that the phone records for that Mexican Bobby number,

11   the 442 number, showed a call from one of Baker's phones to

12   that Mexican Bobby number at 4:03 p.m.  And then additional

13   calls that evening at 8:48 p.m. and 8:54 p.m.

14   Q.  Is that consistent with what Mr. Rosa reported about when

15   he met with Mr. Baker?

16   A.  Yes.  Mr. Rosa told me he met with Mr. Baker around 4:00

17   p.m. that day on the 29th.  And that Mr. Baker had called his

18   source, and that Mr. Baker was supposed to be resupplied later

19   that evening; which is why he could only sell Baker 4 ounces

20   that afternoon instead of the 5 that Rosa had requested.

21   Q.  Let's talk about the 442 number then.

22          I'm curious about -- you're seeing these patterns.

23   Is that correct?  With Baker calling Mexican Bobby?

24   A.  Yes.

25   Q.  Did you look, then, at what would happen with Mexican Bobby

Andersen - D

1   after Mr. Baker called that number?

2   A.   Yes, to see who would Mexican Bobby call.

3   Q.   And who did Mexican Bobby call?

4   A.   Mexican Bobby didn't call.

5   Q.   Did he not call anyone on that phone that -- any of the

6   records that you've put into evidence in this case?

7   A.   Right.   There were no calls placed out that would explain

8   contacts with numbers like Placido Ramirez-Coronel or others

9   involved in this case.

10  Q.   Well, we're talking about patterns.   Did you look at what

11  would happen when Mr. Baker called that 442 number?   Did you

12  look for some other phone that might have made outgoing calls

13  after that?

14  A.   Yes.

15  Q.   What number were you able to identify a phone number that

16  made outgoing calls?

17  A.   Yes.

18  Q.   What was that number?

19  A.   That was 760-296-9882.

20  Q.   And I want to show you a demonstrative.

21          I hope it doesn't break the whole system.

22          THE COURT:   We're good.

23  BY MS. BOLSTAD:

24  Q.   What does -- I'm showing you what is Government

25  demonstrative 130.

1            What -- what do you see?

2  A.  I see images of Shane Baker, Placido Ramirez-Coronel,

3  Fabian Sandoval-Ramos, and Raul Arcila at the top of the page.

4  Superimposed over a map are Shane Baker and Placido

5  Ramirez-Coronel hovering over Oregon.  And a phone number down

6  near the bottom of the page, the Mexican Bobby 442 number, with

7  a line drawn from Shane Baker, up in Oregon, down to that

8  number, the 442, which is on top of the state of California.

9            MS. BOLSTAD:  The Government asks permission for

10  publication.

11            THE COURT:  As a demonstrative?

12            MS. BOLSTAD:  Yes, 130.

13            THE COURT:  Any objection?

14            MR. ANDERSEN:  So we're not offering this into

15  evidence?

16            THE COURT:  It is only a visual aid, and it will only

17  be used in closing arguments, not to go to the jury.  It is a

18  demonstrative exhibit, not a summary.

19            MR. ANDERSEN:  I have no objection.

20            THE COURT:  Go ahead.

21            MR. SEPP:  No objection.

22            THE COURT:  As a demonstrative.  So this is just a

23  picture of the testimony, so to speak.  It will be used when

24  the case is argued to you tomorrow.

25            You won't have it in the jury room with you, though.

Andersen – D

1    So if you think it's of use, you may make notes about it.

2              Ms. Bolstad.

3              MS. BOLSTAD:  Thank you, your Honor.

4    BY MS. BOLSTAD:

5    Q.  And so is this the pattern that you've testified to that

6    you were looking at as when Shane Baker would call Mexican

7    Bobby?

8    A.  Yes.

9    Q.  And then you testified that that 442 number did not make

10   outgoing calls after said calls took place?

11   A.  Correct.

12   Q.  And what was the other number you identified that did make

13   outgoing calls?

14   A.  760 -- sorry -- 296-9882.

15   Q.  Okay.  How did you make the determination that there was

16   this other phone, 760-296-9882?

17   A.  In reviewing all of the records together as a group, we're

18   looking at one and then referring to another to see.  As Shane

19   Baker is calling that Mexican Bobby number, what -- what phone

20   numbers are calling Placido Ramirez-Coronel and Fabian

21   Sandoval-Ramos and Raul Arcila.  And I found that there was a

22   number that very commonly was calling Placido Ramirez-Coronel

23   after Shane Baker would call this Mexican Bobby number.  And

24   the number that called Placido Ramirez-Coronel after Shane

25   Baker would place those calls was that 760-296-9882 number.

1    Q.  Were you able to determine where the 760 number was

2    physically located during this pattern that you're talking

3    about?

4    A.  No.  The records I received were from Verizon, and they

5    were the same as what we just looked at for the other 206

6    number, where it just lists a larger market name.

7    Q.  Do you have a general geographic area?

8    A.  In a similar way, at times, it appears to be in Oregon or

9    Washington, and at times it appears to be in California.

10   Q.  Okay.  Did you observe any phone calls between the Mexican

11   Bobby phone number and either of the numbers that you have

12   linked to Fabian Sandoval-Ramos?

13   A.  Yes.

14   Q.  Tell us about that.

15   A.  There was one call that was in the phone records provided

16   by Verizon for the 442 number from March 2nd to the number that

17   was associated to Fabian Sandoval-Ramos's iPhone.

18   Q.  Given that the 442 phone number appears to be in the

19   general geographic area of California during this time frame --

20   and is that the case?  It was in California during the week

21   before Mr. Delong's death?

22   A.  Correct.  There's a brief period of time around the very

23   middle part of March where it appears to potentially be either

24   in Los Angeles or in the Oregon, Hillsboro market.

25   Q.  What does that fact mean to you?

Andersen - D

1    A.   That when Shane Baker would call the number he had to

2    obtain heroin, the person he was calling was likely not the

3    person who was delivering the heroin to him.  That he was

4    calling a dispatcher phone, as we've heard about.

5    Q.   Did you look for the 760 phone number in Placido's phone?

6    A.   I did.

7    Q.   What was it saved as in Placido Ramirez-Coronel's phone?

8    A.   That was saved as one word -- one word of "Che," C-H-E.

9    Q.   And that -- did you look for the 760 phone number in Fabian

10   Sandoval-Ramos's iPhone?

11   A.   I did.

12   Q.   Did you find this number in his iPhone?

13   A.   I did.

14   Q.   Was it saved as a contact?

15   A.   Yes.

16   Q.   What was the name of the contact?

17   A.   It was one letter:  "G."

18   Q.   I want to turn your focus to a very specific time frame:

19   April 2nd, 2014, the hours before the buy that Shane Baker set

20   up that day.

21          Did you examine that time period closely?

22   A.   I did.

23   Q.   And did you examine it in a context of your phone tolls and

24   the seized call logs from the phones?

25   A.   I did.

700

Andersen - D

1  Q.  Did you follow the same process you've already described in

2  making that summary Exhibit 129?

3  A.  Yes.

4  Q.  And did you make an additional Exhibit -- a summary Exhibit

5  131?

6          You might know the number.  It's on --

7  A.  I did not make that.

8  Q.  Did you assist in the production of that document?

9  A.  I did.

10  Q.  Is this data, in 131, from your summary 13 -- I'm sorry.

11  From your summary 129?

12  A.  It is.  I've compared it line by line, and the data on this

13  is reflected in my summary.

14          MS. BOLSTAD:  The Government moves to offer summary

15  Exhibit 131.

16          THE COURT:  As a summary, yes.

17          Counsel, any objection?

18          MR. SEPP:  Sorry.  No.

19          MR. ANDERSEN:  No.

20          THE COURT:  Than you.

21  BY MS. BOLSTAD:

22  Q.  Detective Andersen, could you please go through the data on

23  summary Exhibit 131 with the jury and don't go too fast.

24  A.  Sure.

25          So what we have on the left is a list of dates and --

1    I'm sorry.  Just a list of times, followed by a summary of

2    who's calling whom, with some faces to the names, to the right.

3            And so, beginning, all of these calls are on April

4    2nd of 2014.  The first is Shane Baker calling the Mexican

5    Bobby number he has saved in his phone, at our direction, to

6    order the 8 ounces that we later seized.  And that call was

7    placed at 3:43 p.m.

8    Q.  And so this -- for this entire summary exhibit, is every

9    orange coded entry a call from Mr. Baker's phone?

10   A.  Yes.

11   Q.  Or to --

12   A.  Or to.

13   Q.  -- Mr. Baker's phone?

14   A.  Correct.

15   Q.  And were each of those orange entries actually observed by

16   you or Detective McNair on Baker's phone?

17   A.  Yes.

18   Q.  Okay.  What else do you see?

19   A.  So the next line listed is a call at 4:11 p.m., where that

20   number, the 760 number, saved as Che in Placido Ramirez's

21   phone, called Placido Ramirez-Coronel.

22           That's followed by Placido Ramirez returning another

23   call to Che at 4:26 p.m.  And at 4:48 p.m., Placido

24   Ramirez-Coronel called Fabian Sandoval-Ramos.

25           At 4:49 and 4:53 p.m., there were two calls between

Andersen — D

1    Che and Placido Ramirez-Coronel.

2            And then at 4:58 p.m., Baker calls the Mexican Bobby

3    number, the 442 number, to say that he's arrived at the

4    7-Eleven.

5    Q.  After that call was placed by Mr. Baker at 4:58, is that

6    when Detective McNair notified surveillance teams to be on the

7    lookout?  For move --

8    A.  That's my understanding of that.

9    Q.  On the lookout for movement?

10   A.  Correct.

11   Q.  Okay.  So what happened in the phone records after

12   Mr. Baker arrived at the meeting location?

13   A.  At 4:59 and 5:19 p.m., there were two calls between the Che

14   number, the 760 number, and the Placido Ramirez-Coronel number.

15           And at 5:19 p.m., the Mexican Bobby number called

16   Shane Baker, and the person on the phone asked where Shane

17   Baker was.  And Shane Baker told the person he had arrived.

18           A minute later, at 5:20 p.m., the Che number again

19   called Placido Ramirez-Coronel.  And one minute later, Shane

20   Baker received a phone call from the number he had stored as

21   Mexican Bobby, the 442 number, telling him to change locations;

22   to go to the Lowe's instead of the 7-Eleven.

23           At 5:22 p.m., Placido Ramirez-Coronel calls the 760

24   number he has saved as Che.  And one minute later, Shane Baker

25   receives a phone call from the Mexican Bobby number, the 442

1    number, again, talking about the change in location.

2            Several minutes later, at 5:27 p.m., Placido

3    Ramirez-Coronel calls the Che number again.  And then at some

4    time around that 5:30 p.m. time frame is when the traffic stop

5    occurs.  And that's noted by the yellow line that says "traffic

6    stop."

7            After that, at 5:30 and 5:32 p.m., there are two

8    calls from Che, reaching out to Placido Ramirez-Coronel,

9    followed by 5:39 p.m., Sandoval-Ramos calling Ramirez-Coronel.

10   Followed by 5:39 p.m., Fabian Sandoval-Ramos then calls twice

11   out to Che, the 760 number, which is saved in his phone under

12   the name "G."

13           At 5:41 p.m. -- actually, I'm sorry.  I take that

14   back.  The phone calls -- the two calls that were placed were

15   not placed from the iPhone.  They were placed from the 206

16   number that came from the dumpster.

17           At 5:41 p.m., two additional calls from the Che

18   number to Placido Ramirez-Coronel.  And then 5:41 and 5:42

19   p.m., two more calls from Fabian Sandoval-Ramos's phone, that

20   was found in the dumpster, to the number saved as "Che" in

21   Placido Ramirez's phone.  That was also saved as "G" in the

22   other Fabian Sandoval-Ramos phone.

23   Q.  And in your summary, 129, is the exact phone that made the

24   call, is that included in that document?

25   A.  Yes.  The document includes the -- the time; as well as the

704

Andersen – D

1  length of the call in seconds; the originating phone number

2  itself; the destination number; and then the name, if any,

3  saved in the contact list, next to that.

4  Q.  Below the yellow line on this page, the yellow line being

5  the traffic stop, was there the ability of Mr. Arcila or

6  Mr. Ramirez-Coronel —— were their phones able to be —— were

7  they able to take calls or place calls after the traffic stop?

8  A.  No, their phones were kept from them.

9  Q.  Okay.  Have you seen this kind of pattern before?

10 A.  Yes.

11 Q.  And in your experience in the field, does this pattern

12 represent a type of organization?

13 A.  Yes.

14 Q.  What type?

15 A.  Dispatch-runner organization.

16 Q.  The events on April 2nd, were those events highly

17 controlled and done at law enforcement direction?

18 A.  Yes.

19 Q.  Did you observe this pattern, looking at the call records

20 from earlier in the month of March?

21 A.  Yes.

22 Q.  Did you have great control or observation over the events

23 prior to March 29th?

24 A.  No.

25 Q.  Given what you observed in this controlled day and time,

Andersen – X

1   were you able to find patterns similar, earlier in March?

2   A.  Yes.

3   Q.  Tell us about what you found, in terms of patterns.

4   A.  So just as on April 2nd, when we did the controlled buy

5   where we seized 8 ounces in Milwaukie on March 31st, this same

6   call pattern was present.

7          Shane Baker would reach out to call Mexican Bobby to

8   place his order, and then Placido Ramirez-Coronel's phone would

9   receive a phone call from the number he had saved as Che.

10  Q.  Not from the Mexican Bobby phone?

11  A.  Not from the Mexican Bobby phone.

12  Q.  That was on the 31st?

13  A.  Correct.

14  Q.  Did you see the pattern on any other dates in March?

15  A.  Yes.

16  Q.  What date?

17  A.  March 22nd, March 24th, March 27th, and March 29th.  Just

18  focusing on that week prior to -- I'm sorry -- to the death of

19  Justin Delong.

20         MS. BOLSTAD:  Nothing further are on direct, your

21  Honor.

22         THE COURT:  Mr. Andersen.

23         MR. ANDERSEN:  Thank you.

24                    CROSS-EXAMINATION

25  BY MR. ANDERSEN:

Andersen - X

1    Q.  I'm going to look at just this demonstrative 129.

2              THE COURT:  For the jury?

3              MR. ANDERSEN:  I'm sorry.  That is -- I believe that

4    has been admitted before the jury.

5              THE COURT:  Yes.  So if you're going to ask the

6    witness about it, display it to the jury, please.

7              Thank you.

8              Go ahead.

9    BY MR. ANDERSEN:

10   Q.  And I'm on the second page there.

11             I'm just trying to make out -- now, this is a

12   summation that you said of -- of the toll records that you

13   compiled.  Correct?

14   A.  Yes.

15   Q.  Now, for example, I've looked at -- it's the second -- if

16   you look in the green section of that part highlighted, I'm

17   looking at the second part, 4-2-14 at 17:39.

18   A.  Yes.

19   Q.  And it says it's a 34-minute -- or a 34-second call.

20   Right?  Would you agree with that?

21   A.  Yes.  There's two records that reflect that call.  The one

22   that you referenced that says 34 seconds and the one that's

23   directly above it.

24             So in red, where it says, Call placed from 206 to the

25   360 and the word -- the word "Faby" is next to it, in quotes,

 1    that's the phone as it was reflected on Placido's phone.

 2              The call, as it's reflected on Fabian

 3    Sandoval-Ramos's and on the tolls from the 260 number -- sorry,

 4    the 206 number, show it as a 34-second call.

 5              So if you imagine, on Fabian Sandoval-Ramos's end, on

 6    the 206 line, as you dial a number and it rings and it rings

 7    and it rings and no one answers, there's a time elapse there.

 8              On the records from Placido's phone, it just shows as

 9    a missed call.  So there was no time length captured because

10    his phone doesn't reflect it as a call that any length of time

11    was captured on because he never answered it.

12    Q.  Okay.  So it sounds to me like these numbers -- the

13    duration numbers don't necessarily coincide with any actual

14    call.  You could -- in this situation, you have 34 seconds.

15    But it was never actually a call --

16    A.  Yeah.  If you're placing the call and there's time elapsed

17    while the phone is ringing or going to voice mail, there's an

18    elapsed time recorded by the phone company, there, to bill you

19    for those minutes.

20              If you're a person who has a device and the device

21    just rings and rings and you never answer it, your phone just

22    marks that as a zero-second call that you never answered.  So

23    that's what the difference is between those two.

24    Q.  Okay.  So if you're calling me, my phone might say zero, if

25    I just let it ring forever, and your phone might say --

708

Andersen – X

1  A.  The elapsed time it was ringing.

2          MR. ANDERSEN:  Sorry.  Did you get my question?

3          THE COURT REPORTER:  Yes.

4  BY MR. ANDERSEN:

5  Q.  And I think your answer was yes?

6  A.  It was the elapsed time it was ringing, yes.

7  Q.  Maybe for clarity's sake, I should re-ask that.

8          Just to clarify, if -- for example -- you wanted to

9  call me and -- and I just let it ring -- I'm sure I wouldn't do

10  that if I knew you were calling.  But my phone might say zero,

11  and your phone might say 200 seconds, or however long?

12  A.  Probably not 200, unless I was leaving a really long voice

13  mail, begging you to call me back.

14  Q.  Or just -- or if I didn't have an answering machine, or for

15  whatever reason --

16  A.  Exactly.

17  Q.  So -- I mean, it sounds to me like the numbers don't

18  necessarily coincide with any particular length of time of a

19  call necessarily.  Right?

20  A.  If they're provided from the phone company, they typically

21  would because they're produced in a way that allows the phone

22  company to bill for minutes of air time that are used.

23          So if there are records that were drawn from a phone

24  download, that would be a different case.  But the records that

25  are toll specific would have a more accurate reflection of

1   number of seconds elapsed.

2   Q.  Well, but it did, when we already figured out that this 34

3   is not accurate.  Right?

4   A.  Well, we would assume -- or we would infer that that's 34

5   seconds where the phone calling from the dumpster is ringing

6   and ringing and ringing for 34 seconds, as the phone is never

7   answered on the other end.

8   Q.  Right.  So in terms of actual talk time, that 34 doesn't

9   have anything necessarily to do with any sort of talk time, is

10  what I'm asking.

11  A.  I don't know whether the phone company bills on talk time

12  or just open line time.

13  Q.  Well, I'm not talking about billing.  I'm just saying, if

14  we look at this same one we've been looking at, 34 seconds

15  doesn't mean that anybody talked to anybody else for 34 seconds

16  while on the phone line?

17  A.  Correct.  It means that that line was open for 34 seconds,

18  according to Verizon.

19  Q.  Right.  So my question -- I -- I think you've answered this

20  a couple of times, but I'm not clear on the answer.

21        That 34 seconds is not tied to a specific talk time

22  of anybody talking.  Right?

23  A.  It's tied to an open line time, if -- you could put it that

24  way.

25  Q.  Okay.  Would you answer my question yes or no?

Andersen – X

1  A.  Rephrase your question.  I'm sorry.

2  Q.  Well, my question is does the -- the 34 seconds is not tied

3  to a talk time.  Right?

4  A.  In this particular instance, no.

5  Q.  Okay.  So we can assume that all of the other numbers

6  aren't necessarily tied to a talk time.  They might be tied to

7  an open line time, which might also indicate that there was

8  talking going on, but not necessarily.  Right?

9  A.  Well, I think it would depend on the context.  Like if we

10  have calls where Mr. Baker is on the phone and we know we

11  observe those, we know that those are meaningful talk time

12  conversations.

13  Q.  Well, not necessarily a message situation either, right?

14         If we know Mr. Baker is calling somebody and you know

15  he's talking, you're not sitting there with stopwatch, timing

16  how long he's talking necessarily, are you?

17  A.  Well, if we could play a recording of a call that was made,

18  we could compare it to the length of time the call was open on

19  the phone tolls, and that would give us an idea of how much

20  time has elapsed.

21  Q.  Okay.  All right.  All right.

22         Let's see.  I think that's all of the questions I

23  have on that particular subject.

24         Now, I mean, this is clear, but you can't necessarily

25  tell who's talking on the phones just by looking at the phone,

Andersen - X

1   right --

2              THE COURT REPORTER:  I need you to slow down, please.

3              THE COURT:  You really must slow down.

4         And it is the end of the day, and we do want to wrap

5   up the witness.  But this is obviously very important material

6   for you to clarify, so take it slower.

7              MR. ANDERSEN:  Thank you.

8   BY MR. ANDERSEN:

9   Q.  This should be a simple question.

10        You can't necessarily tell, just by looking at the

11  phone records, if any particular person was the particular

12  person actually using the phone.  Right?

13  A.  Exactly.  By the phone records alone, you couldn't be sure.

14  Q.  If I may, I'm going to switch gears.

15        And I'm going to show you an exhibit that I believe

16  is going to be Defense 207.  I think that's where we're up to.

17             (Pause, conferring.)

18             THE COURT:  Is that the next in order, Mr. Sepp?

19             MR. SEPP:  I think it's '08.

20             MR. ANDERSEN:  '08?

21             MR. SEPP:  Yeah, should be 2008 (phonetic).

22             THE COURT:  208.

23             MR. SEPP:  208.

24             MR. ANDERSEN:  Thank you.

25             MS. COOKE:  It is.

1          MR. ANDERSEN:  Thank you.

2     BY MR. ANDERSEN:

3     Q.  Well, first of all, are you familiar with just general jail

4     booking records, and things of that nature?

5     A.  Generally.

6     Q.  Could you look at that, and can you identify that?  That

7     first page of that exhibit?

8     A.  Yeah.  It looks to be a summary of the Clackamas County

9     receipt for a defendant which, in this case, is listed as

10    Placido Ramirez-Coronel.  And it has a date and time of May

11    27th, 2014, at 4:56 p.m.

12         And it lists a citizen adjacent to Placido's name of

13    Magdalena Ramirez-Coronel, with an address in Ukiah, and an

14    amount posted of bail of 15,000 dollars, with some additional

15    notes of a date to appear in court.

16    Q.  Okay.  And were you actually -- were you involved in

17    this -- in this transaction at all?  Are you familiar with this

18    actual transaction?  The paying of bail?

19    A.  Yes.

20         MR. ANDERSEN:  Your Honor, I would like to admit

21    Defense 208.

22         THE COURT:  Any objection?

23         MS. BOLSTAD:  No objection.

24         MR. SEPP:  No objection.

25         THE COURT:  208 is received, may be published.

713

Colloquy

1          Please proceed.

2          MR. ANDERSEN:  I don't have any particular questions

3    or any particular other questions about this piece of evidence.

4    But --

5          THE COURT:  All right.  Go on with your -- conclude

6    your cross, please.

7          MR. ANDERSEN:  That is all of the cross that I have.

8    Thank you.

9          THE COURT:  Thank you.

10         Mr. Sepp.

11         MR. SEPP:  I have nothing for this witness, your

12    Honor.

13         THE COURT:  Redirect, Ms. Bolstad.

14         MS. BOLSTAD:  Nothing, your Honor.  Thank you.

15         THE COURT:  Subject to confirming the receipt of your

16    exhibits, does the Government rest?

17         MS. BOLSTAD:  The Government does rest.

18         THE COURT:  All right.  So, jurors, let me just give

19    you the plan for tomorrow.

20         You've heard all of the evidence you're going to hear

21    from the Government in its case-in-chief.  I need to confer

22    with the parties outside your presence after you leave for the

23    day to determine whether the defendants are going to to offer

24    any evidence.

25         Remember, they don't have to.  Neither has any burden

1    to prove innocence, and they don't have any burden to offer

2    witnesses.  But they also have the right to do that.  So I'm

3    going to get that worked out tonight.

4            We're also going to finish our work regarding those

5    jury instructions and the verdict form.

6            Tomorrow, you'll either have some evidence -- some

7    more evidence or you won't.  But once that evidence is

8    concluded, I will move directly to the jury instructions.  And

9    I will review with you the legal framework, the verdict forms,

10   so that when you hear the lawyers' closing arguments, you can

11   understand where they fit in the legal context.  Please don't

12   make any lunch plans for tomorrow.  The Court will provide you

13   lunch.  We'll have menus waiting for you when you come.  And my

14   reason for that is to just respect your time as much as

15   possible.  We may have to take a lunch break during arguments

16   and to ensure that we don't take any longer than necessary,

17   we'll have lunch for you here so it doesn't -- we can kind of

18   condense that travel time.

19           And then once the arguments are finished, and I have

20   just a brief follow-up of an instruction, then the case will

21   come to you.

22           There isn't any right or wrong amount of time to

23   deliberate, and I can't predict for you how long that will be.

24           It will be up to you tomorrow -- well, let me first

25   make the point, Mr. Dahl, assuming everyone stays well and is

1    here when the case goes into deliberation, then we'll be

2    separating you from your fellow jurors under my instruction

3    that you not talk about the case with anyone until you hear

4    further word from me.

5           If it became necessary during the jury's

6    deliberations because someone couldn't finish, then you would

7    be called in to service.  All of the 12 jurors would have to

8    start deliberating anew because all 12 have to agree on the --

9    on the verdict based on a consideration of the evidence in your

10   presence.

11          So for you, once -- once the jury goes out, I'll give

12   you some instructions.  You'll be free to leave the building,

13   but we need you in a position where you could return, if

14   necessary.

15          The jurors who do begin deliberation, your first duty

16   will be to pick one of the 12 to be your presiding juror,

17   basically your spokeperson here in court, to speak with me

18   about the verdict and so -- so forth.

19          If -- once the case gets to you in the afternoon --

20   all 12 of you decide there's not enough time to complete the

21   process, then we'll recess at the normal hour unless all 12 of

22   you vote to stay; in which case, we will stay with you if

23   that's what you want to do.

24          But I also don't want to create any expectation that

25   you must stay past the normal close of business on Friday,

Colloquy

1    after a long and intense review over a lot of information.  It

2    will be up to you.

3            If you do find, in the time available, that you are

4    able to return a complete verdict on all matters, then we'll

5    deal with it.  If you're not, then we'll recess you for the

6    weekend, to have you come back for deliberation on Monday

7    morning, and so forth.  So I wanted to give you an idea just

8    what to expect time-wise.

9            It will help if we start a little earlier with you

10   tomorrow, and I know traffic is just crazy right now.

11           Let's try to have you in the room at 8:45, traffic

12   permitting your arrival then.  You'll find menus, as I say,

13   when you get here in the morning.  Please fill them out before

14   you come into court, so we can make those arrangements.

15           Questions, jurors?  Any of you, about those

16   logistics?

17           Okay.  Notes on the chair.

18           Do not talk about the case, do any research, let

19   anything about its issues cross your paths tonight.

20           Please, really, just relax.  And tomorrow we'll be

21   ready to go forward for the last presentation of any evidence

22   you're going to hear.  Don't know what that will be, but I'll

23   be ready for instructions as soon as that decision is announced

24   to you.  All right?

25           All right.  Everyone please rise for the jury.

Colloquy

1          (Jurors exit, 4:52 p.m.)

2          THE COURT:  All right.  Let's be seated.

3          I need to find out whether -- well, first of all,

4     there are a number of things that have to -- to be accomplished

5     before tomorrow morning.

6          I want to ensure that all of the exhibits the parties

7     expect are in evidence, are in evidence.  And so you're going

8     to need to work through that so that someone can make a

9     confirming statement to me.

10          It is your responsibility to double-check the clerk's

11     list, to ensure that that which you believe is in evidence is

12     and to confirm that the exhibits that do go to the jury are in

13     fact evidence.  You need to do that double-checking.

14          I want to focus now on whether the defendants, either

15     of them, have any evidence to offer.

16          Mr. Andersen, will you be offering any evidence

17     beyond what you already have, on behalf of Mr. Sandoval-Ramos?

18          MR. ANDERSEN:  No, I don't believe so.

19          THE COURT:  All right.  Mr. Sepp?

20          MR. SEPP:  No, your Honor.

21          THE COURT:  All right.

22          So, Mr. Sandoval and Mr. Sepp [sic], I need to speak

23     with you now about this right that you have not to testify or

24     the right to take the witness stand in your own defense if you

25     wish to do so.

Colloquy

1          Each of your lawyers have just reported that you will

2   not be calling other witnesses and neither of you wishes to

3   testify.  This is your absolute right.  The jury cannot infer

4   from your decision not to offer evidence or your own testimony

5   anything negative, and I will be telling them that.

6          On the other hand, the right to testify is also your

7   right.

8          It does not belong to your lawyer, Mr. Arcila.

9          It does not belong to your lawyer,

10  Mr. Sandoval-Ramos.  It is your personal rights.

11         And even if your lawyers have talked to you about

12  this and pointed out to you that there may be risks if you take

13  the witness stand in your own defense, particularly in

14  cross-examination by the Government's lawyers, in the end it's

15  your choice.

16         And if either of you wishes to testify even over the

17  advice to the contrary by your lawyer, I will give you that

18  opportunity because it is your right.

19         Mr. Sandoval, do you understand?

20         DEFENDANT SANDOVAL-RAMOS:  (Nods head.)

21         THE COURT:  Answer out loud?

22         THE DEFENDANT THROUGH THE INTERPRETER:  Yes.

23         THE COURT:  Mr. Arcila, do you understand?

24         DEFENDANT ARCILA:  Yes, your Honor.

25         THE COURT:  All right.  And so knowing that,

719

Colloquy

 1 | gentlemen, do each of you choose not to testify in this case in

 2 | your trial?

 3 |            Mr. Arcila?

 4 |            DEFENDANT ARCILA:  I do not, your Honor.

 5 |            THE COURT:  You do not want to testify?

 6 |            DEFENDANT ARCILA:  No, your Honor.

 7 |            THE COURT:  All right.  So you are choosing not to

 8 | testify?

 9 |            DEFENDANT ARCILA:  Correct, your Honor.

10 |            THE COURT:  Mr. Sandoval, same question.

11 |            Are you choosing not to testify?

12 |            THE DEFENDANT THROUGH THE INTERPRETER:  Yes.

13 |            THE COURT:  Gentlemen, have you had enough time to

14 | talk to your lawyers about this important decision?

15 |            Mr. Arcila?

16 |            DEFENDANT ARCILA:  Yes, your Honor.

17 |            THE DEFENDANT THROUGH THE INTERPRETER:  Yes.

18 |            THE COURT:  And you're sure, each of you, that this

19 | is what you want to do?

20 |            DEFENDANT ARCILA:  Yes, your Honor.

21 |            THE DEFENDANT THROUGH THE INTERPRETER:  Yes.

22 |            THE COURT:  Because if you are found guilty, any

23 | argument you make later that somehow you were prevented from

24 | testifying, it would be inconsistent with what you're telling

25 | me now.  So I want to be certain this is in fact your personal

720

Colloquy

1    final decision.

2              Is it, Mr. Arcila?

3              DEFENDANT ARCILA:  Yes, your Honor.

4              THE DEFENDANT THROUGH THE INTERPRETER:  Yes.

5              THE COURT:  All right.  I'm satisfied each of the

6    defendants is fully advised and competent and each is making a

7    knowing, intelligent, and voluntary waiver of -- not a waiver

8    but choosing to stand on each's right to remain silent.

9              And so with that, all of the evidence is in, subject

10   again to confirming the receipt of exhibits.

11             I'm also going to reserve at this time any motions

12   the defendants wish to make for judgment of acquittal as a

13   matter of law.

14             In my view, the evidence, when viewed in the light

15   most favorable to the Government on each of the four counts, is

16   sufficient for the case to go to the jury.  If either defendant

17   wishes to make a formal motion, you can tell me that you make

18   the motion now and we will argue it after the case goes to the

19   jury.

20             But I believe time is of the essence, so that we are

21   ready to get the case to the jury.  After tracking the evidence

22   carefully, it is a circumstantial evidence case and a direct

23   evidence case.  And the jury has many inferences to draw in a

24   network of a number of overlapping facts that may or may not be

25   sufficient to convince them beyond any reasonable doubt.  But

Colloquy

1    if I view only the inferences in favor of the Government, which

2    I'm required to do in response to such a motion, if I only look

3    at the evidence that supports the Government's theories, I'm

4    satisfied that rational jurors could and -- could find beyond

5    any reasonable doubt that each of the defendants is guilty of

6    the charges brought against them.

7           I'm not making any comment on these special verdict

8    questions we've been working through, but a motion for judgment

9    of acquittal would not be affected by a special verdict

10   question.  These have to do with quantities and factors.

11          So if either lawyer wants to reserve the opportunity

12   to make the motion later, you may.  But that's my view of how

13   we need to use our time right now.

14          Mr. Andersen?

15          MR. ANDERSEN:  Your Honor, I would certainly like to

16   take the opportunity to reserve that right, but I understand

17   the Court's ruling on that.

18          THE COURT:  All right.

19          MR. SEPP:  I would also like to reserve.

20          THE COURT:  All right.  We'll consider the motions

21   made and tentatively denied and allow -- which allows each

22   lawyer an opportunity to review the matter again with me on the

23   record once I get the case to the jury.

24          All right.  So we need to work through jury

25   instructions.  I know you all must be quite fatigued.  I am,

Colloquy

1    and I've only been listening.  This has been a very

2    detail-laden day.

3         The options I suggest are the following.  First, you

4    now have draft 3 of a verdict form and draft 5 of jury

5    instructions.

6         One option is for you to take those and work with

7    them among yourselves or via e-mail, and the like, so that when

8    we are first together in the morning, we can work through any

9    additional issues.

10        Another option is for us to take a recess and then

11   resume in about 30 minutes, when you've had an opportunity for

12   a break, and we can work through the matters tonight.

13        In that -- that second option, if either or both of

14   the defendants wish not to be part of the discussion around

15   law, so that they can leave, that would be fine.  They could

16   waive their appearance.  But, as I say, I'm satisfied to do

17   this first thing in the morning when everyone is fresh.  But we

18   do need to move quickly at that point so that I can settle the

19   instructions, after hearing any final arguments you have about

20   the matter.

21        We'll take out the defendants -- I think the only

22   option in the instruction right now is defendants not

23   testifying so that would stand, but I'll double-check that.

24        And then I wouldn't print a final version of the

25   instructions until tomorrow morning, once we've talked through

723

Colloquy

1   all of the issues on the record, which I would like to do at

2   eight o'clock.

3           Can the marshals have the defendants here at eight

4   o'clock, to report?

5           THE MARSHAL:  Yes, your Honor.

6           THE COURT:  And, Mrs. LeGore, can you be on the

7   record at eight o'clock?

8           THE COURT REPORTER:  Yes.

9           THE COURT:  Mr. Minetto, can we be on the record at

10  eight o'clock?

11          THE CLERK:  No problem.

12          THE COURT:  So option 1 or option 2?  Recess now and

13  pick up the final discussion tomorrow morning?

14          You're not going to get a -- a pristine set of

15  instructions, then, until we're finished.  But most of the

16  other things are not in contest, if you want to copy them or

17  use them for your closing arguments.

18          MR. SEPP:  I prefer to get it done tonight.

19          THE COURT:  Okay.

20          MR. SEPP:  That's my vote.

21          MS. BOLSTAD:  I would as well, your Honor.

22          THE COURT:  All right.  Two to one, that's it.  We'll

23  stay.

24          Now, please speak with your clients about whether

25  they want to be here.

724

Colloquy

1          MR. SEPP:  My client wishes to not stay.

2          THE COURT:  Okay.

3          MR. SEPP:  Just to leave.

4          (Pause, Mr. Andersen and Defendant Sandoval-Ramos

5          conferring.)

6          MR. ANDERSEN:  Your Honor, I have just discussed with

7   Mr. Sandoval.  I believe he would like to be excused from the

8   jury instructions debate.

9          THE COURT:  All right.

10          So, gentlemen, again you have a right to be here.

11   But if you're telling me you're tired, you would rather not

12   stay and -- tomorrow morning, I'll review with you what was

13   decided.  You're free to go.

14          Is that your choice, Mr. Arcila?

15          DEFENDANT ARCILA:  Yes, your Honor.

16          THE COURT:  Sir, is that your choice?

17          THE DEFENDANT THROUGH THE INTERPRETER:  Yes, your

18   Honor.

19          THE COURT:  So the defendants are excused with the

20   waiver of appearance just made from the jury instructions

21   conference we're going to have.

22          We are going to take a break.

23          Mrs. LeGore is -- has been working all afternoon.  We

24   can go off the record.  But let me ask a question off the

25   record before you leave the room.

725

Colloquy

1          (Off-the-record discussion.)

2          THE COURT:  Okay.  So back on the record.

3          I've suggested to counsel that we have our final

4   instructions conference mostly off the record.  That we excuse

5   Mrs. LeGore for the evening.  And then tomorrow morning we can

6   put on the record any issues that need to be preserved about

7   exceptions or corrections or additions, which we'll do first

8   thing at eight o'clock tomorrow morning.

9          That said, Mrs. LeGore, you are free to go and we are

10  off the record.

11          (Off-the-record discussion.)

12          (Court adjourned.)

13                          --oOo--

14

15  I certify, by signing below, that the foregoing is a correct

16  stenographic transcript of the oral proceedings had in the

17  above-entitled matter this 2nd day of June, 2016.  A transcript

18  without an original signature or conformed signature is not

19  certified.  I further certify that the transcript fees and

20  format comply with those prescribed by the Court and the

21  Judicial Conference of the United States.

22

           /S/ Amanda M. LeGore

23          _____

24          AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
              CSR No. 15-0433  EXP:  3-31-2018
25