1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3  UNITED STATES OF AMERICA,        )
                                    )  Case No. 3:14-CR-267-BR
4          Plaintiff,               )
                                    )
5  v.                               )  November 6, 2015
                                    )
6  FABIAN SANDOVAL-RAMOS(1) and RAUL )
   ARCILA(3),                       )
7                                    )
           Defendants.              )
8  _____ )  Portland, Oregon

9

                    TRANSCRIPT OF PROCEEDINGS
10                      (Jury Trial – Day 4)

11      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:          AMANDA M. LeGORE
                             CSR, RDR, FCRR, CRR, CE
23                           U.S. Courthouse
                             1000 SW Third Avenue Rm 301
24                           Portland, OR  97204
                             (503)326-8184

25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:        LEAH BOLSTAD
 2                             (Assistant U.S. Attorney)
                               ELISSA GOLOBORODKO
 3                             (Certified Law Student)
                               U.S. Attorney's Office
 4                             1000 SW Third Avenue
                               Portland, OR  97204
 5                             (503)727-1000

 6

 7   FOR DEFENDANT SANDOVAL-
     RAMOS:                    BENJAMIN ANDERSEN
 8                             121 SW Salmon Street
                               1420 World Trade Center
 9                             Portland, OR  97204
                               (503)222-2510
10

11   FOR DEFENDANT ARCILA:     ROBERT SEPP
                               2350 Willamette Falls Drive, Suite 9
12                             West Linn, OR  97068
                               (503)998-7719
13

14

15   INTERPRETERS:             STEVEN MUZIK
                               TINA MACHUCA
16
     ALSO PRESENT:             SUSAN COOKE
17

18

19

20

21

22

23

24

25
```

1                              INDEX

2                                       Page

3   Jury Instructions...................748,829
    Closing Arguments
4    By Ms. Bolstad.....................774,825
     By Mr. Andersen...................797
5    By Mr. Sepp.......................817
    Verdict...........................857

6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

729

1          (Friday, November 6, 2015; 8:04 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  All right.  We are on the record for day

6   4 of trial and to complete the jury instruction conference

7   before we proceed with the jury later this morning.

8          Counsel should have before them a version called

9   draft 6, which is still a work in progress.

10         I will note for the record that after we adjourned on

11  the record, counsel and I worked together about an hour

12  generating draft 6.  I've already made suggested changes to

13  that, and I expect there may be additional ones from counsel

14  this morning and I want to hear those.

15         But before I do that, I want to finalize once and for

16  all the verdict forms and the special verdicts questions, so

17  that there aren't any more issues about that.

18         The last issues around the verdict forms involved the

19  special verdict question with respect to Count 1.  The form I

20  have, draft 3 -- which was drafted on November 5 -- has the

21  following after the "not guilty/guilty" options for Count 1.

22             If you found the defendant not guilty on Count 1,

23             do not answer the following special verdict

24             question on foreseeability.

25             If you found the defendant guilty on Count 1,

730

Colloquy

1            answer the following special question:  Special

2            verdict question, Did the Government prove beyond

3            a reasonable doubt that death resulting from the

4            use of heroin distributed by the conspiracy in

5            Count 1 was a reasonably foreseeable result of

6            that conspiracy?  Yes?  No?

7       I think that's an accurate statement, but I want to

8  be sure everyone is in agreement with that formulation for the

9  special verdict form.  And that would apply to both defendants.

10       Ms. Bolstad?

11       MS. BOLSTAD:  No objection.

12       THE COURT:  Mr. Andersen?

13       MR. ANDERSEN:  Your Honor, I don't have any objection

14  to that.

15       My only issue just is the confusion that that will

16  raise.  But I think we've gone over that.  I don't want to

17  re-raise that again.

18       THE COURT:  Well, and we'll talk a bit more about

19  that in the text.

20       I did change, again, the language about why -- why

21  I'm asking this question, trying to distinguish it from the

22  elements in the text.

23       So I'm looking, at the moment, at the verdict form

24  that is for Mr. Arcila.  And it, of course, has four counts,

25  whereas the verdict form for Mr. Sandoval-Ramos has but two.

731

Colloquy

1  Counts 1 and 2 are identical on both.

2          Do the parties have any objection to these verdict

3  forms as they're before you, in draft 3?  If not, we'll go

4  ahead and finalize them.  Of course, taking away the references

5  to "drafts" in the footers and in the headings and just having

6  it read "verdict" under the title and in the footer.

7          MS. BOLSTAD:  Just as to the verdict?

8          THE COURT:  Just as the verdict form --

9          MS. BOLSTAD:  No objection.

10         MR. SEPP:  No objection.

11         MR. ANDERSEN:  Your Honor, my other objection to this

12  would just be the issues that I've raised previously about the

13  elements but --

14         THE COURT:  Let me be clear for the record.  I have

15  ruled that with the confusion in the case law concerning the

16  status of the so-called resulting-in-death allegation, that the

17  Government must prove that as an element for Count 1.  And I'm

18  so instructing the jury.  Because there is also a question in

19  the case law with respect to this potential issue of

20  foreseeability and a due process-type challenge for certain

21  defendants who may be too remote to the actual end-user who

22  died, I agree with the Government that a special verdict

23  question needs to be.  You have an exception to that format --

24  to that formulation and to the fact I'm asking it.  You don't

25  need to continue to state that.  I think that's very clear.

Colloquy                                    732

1          MR. ANDERSEN:  Right.

2          THE COURT:  All right.  So Ms. Wells will prepare

3   final forms of verdict, and they'll be distributed to you in a

4   few minutes.

5          Now, I'm on the draft, called draft No. 6 of the jury

6   instructions.  And, again, the format you see next will no

7   longer be labeled a "draft."  The references in the heading and

8   the footer will be removed.

9          I sent you -- and the table of contents will be

10   finalized once the body is finalized, which hasn't yet

11   happened, so don't be concerned with the pagination.  But do

12   tell me if you see any issue on the table of contents in terms

13   of the headings.  I don't.

14          The first place I found a need to make a change was

15   on what was my page 7, under the heading "what is evidence."

16          The -- where I -- actually, that was not a change.

17   That was a change I dictated last night.  Element 3 has the

18   statement:

19          For example, I instruct you that the parties agree

20          Justin Delong died as a result of a heroin

21          overdose.

22          Ms. Bolstad, we discussed generally whether you

23   wanted another stipulation added there, and I don't know if you

24   do.

25          MS. BOLSTAD:  I do.  And I -- the only other

Colloquy

1    stipulation that I think the jury needs in writing -- actually,

2    it's the only other stipulation we have, is about lab testing.

3    And the exact language of our stipulation was also proposed by

4    the defense, about how this lab testing we've agreed to it but

5    the lab does not test for identifying whether the heroin at the

6    bottom was the same at the top, in summary.

7            THE COURT:  You need point me to specific language

8    you want me to insert.  I don't --

9            MS. BOLSTAD:  The exact stipulation that we -- that

10   we filed.

11           THE COURT:  It's about nine lines long.  I'm not

12   going to put that much in front of the jury.  I read it to them

13   during the trial.

14           I'm going to summarize it more closely -- or more

15   generally, if you insist on it being here.  But I'm not going

16   to add that much bulk.  It's an undue weight, and it takes it

17   out of context.

18           MS. BOLSTAD:  And, to be clear, I only want the first

19   line; the defense wants the rest.  So if you don't want to add

20   it, I have no objection.

21           THE COURT:  Let me read what's in the stipulation.

22           The parties stipulate that the drugs in this case

23           were laboratory tested and confirmed to be heroin

24           in the amount reflected in the lab reports marked

25           as Government's Exhibits 34, 38, 56, and 63.  This

Colloquy

1    stipulation was reached to save time and forgo the

2    need for lab chemist testimony.  Although the

3    laboratories identified the drugs as heroin, there

4    is no test or analysis in these separate exhibits

5    that establish the purity of any particular sample

6    or that would establish that any seized quantities

7    shared the same identical chemical composition as

8    any other seized quantities.

9    Ms. Bolstad, what do you want?  Last call.

10   MS. BOLSTAD:  The first sentence.

11   THE COURT:  Mr. Andersen?

12   MR. ANDERSEN:  Your Honor, I do think the first

13   sentence is fine.  I don't think we need a lot of that

14   explanation about the laboratory, or anything like that.  But I

15   do think if we could have a second sentence just that there was

16   no test for purity or for -- I don't know how to phrase it

17   exactly, but the sameness or difference.

18   MR. SEPP:  Maybe this is -- there was no test done to

19   distinguish the sources of the heroin or -- I don't want to get

20   into the purity and stuff.  So I don't think a jury --

21   MR. ANDERSEN:  Yeah, there was no test that shows

22   that they are from the same --

23   THE COURT:  So there is no test or analysis that

24   establishes any seized quantity shared the same identical

25   chemical composition as any other seized quantities.

735

Colloquy

1        MR. SEPP:  Yeah.

2        THE COURT:  Ms. Bolstad?

3        MS. BOLSTAD:  No objection.

4        THE COURT:  All right.  So I'll give that to you in

5   the text edited here, to add -- so item 3 will read:

6            Any agreed facts that had been pointed out to you

7            during the trial.  For example, I instruct you

8            that the parties agree Justin Delong died as a

9            result of heroin overdose.  In addition, the

10           parties stipulate that the drugs seized in this

11           case were laboratory tested and confirmed to be

12           heroin in the amounts reflected in the lab reports

13           marked as Government -- Government Exhibits 34,

14           38, 56, and 63.

15           Now I'm not dictating any more.

16           I had proposed:  "There is no test or analysis."

17           Maybe there is.

18           There was no test or analysis in this case.

19           There was no test or analysis of these exhibits that

20   establishes any seized quantity shared the same or identical

21   chemical composition as any other seized quantities.

22        MS. BOLSTAD:  No objection.

23        MR. ANDERSEN:  No objection.  I think we can even

24   pare down that first sentence to say the drugs seized were

25   heroin, and take out the language about lab testing, and all of

736
Colloquy

1  that.

2          THE COURT:  Well, I think the Government needs that

3  for reference.

4          MR. SEPP:  It's acceptable.  No objection.

5          THE COURT:  Okay.  Well, then we have -- the next

6  change I propose is when we get to the charges against the

7  defendants.

8          Does anyone have anything to add before we get to

9  Count 1?

10         MS. BOLSTAD:  Nothing, your Honor.

11         MR. ANDERSEN:  No.

12         MR. SEPP:  No.

13         THE COURT:  All right.  On what is my page 17,

14  heading, "Elements of Count 1, conspiracy to distribute heroin

15  resulting in death charged against both defendants," in the

16  first paragraph that "for example" sentence is being deleted

17  because it was moved to the area we were just discussing.

18         On element three, I wanted visually to separate

19  the -- the element from the definition that follows, so I'm

20  starting a new paragraph with the words "resulted in death

21  means."

22         So the third element will read, standing alone,

23  "Justin Delong used heroin, distributed in the course of this

24  conspiracy, which resulted in his death."  And then, paragraph,

25  "Resulted in death means."

Colloquy

1          And then I sent you redrafted text for the two

2  paragraphs to follow that definitional paragraph.  I sent you

3  that by e-mail.

4          Everyone's seen that.

5          Any objection to what I sent?

6          MS. BOLSTAD:  No objection.

7          MR. ANDERSEN:  No objection.

8          MR. SEPP:  None, your Honor.

9          THE COURT:  And then I do not have any other changes.

10  Does anyone else?

11          MR. SEPP:  It's not a critical one, but page 14.

12          THE COURT:  Under?

13          MR. SEPP:  Under conspiracy generally, "Counts 1 and

14  2."  I thought someone had asked for -- if you go down one,

15  two, three, four, five, six -- the seventh line, "conspiracy,

16  knowing of its objects and purpose," is that going to be

17  included or not?  Or --

18          THE COURT:  I'm sorry.  I'm on --

19          MR. SEPP:  Oh, sorry.

20          THE COURT:  Conspiracy generally?

21          MR. SEPP:  Yes.

22          THE COURT:  Counts 1 and 2.  I know we did make some

23  change last night.  Maybe that didn't get carried over.

24          MR. SEPP:  And I could have missed it.  It could have

25  ended up being instructed at the end.

738
Colloquy

1          THE COURT:  Let me just read through.  Stop me where
2   you think I need to make a change.
3          MR. SEPP:  Okay.
4          THE COURT:  Before I instruct you as to the
5          elements, the Government must prove beyond a
6          reasonable doubt, in order for you to find either
7          or both of the defendants guilty of the conspiracy
8          charges in each of Counts 1 and 2, I will explain
9          in general the law relating to the crime of
10         conspiracy.  Conspiracy --
11         Is this where I need to be?
12         MR. SEPP:  No, no.  It's -- if it helps, the font
13  changes if you go through this.
14         THE COURT:  It may have been -- it doesn't change on
15  mine.  It may be a formatting issue.
16         MR. SEPP:  If you go to "elements of Count 1," the
17  part we just edited, and just go up two paragraphs.
18         THE COURT:  "In Count 1, the Government charges"?
19         MR. SEPP:  Yeah.  And then if you go up, there's a
20  full paragraph above that; and then the one above that.  And
21  then it starts, "The Government must also prove beyond a
22  reasonable doubt."
23         THE COURT:  Okay.
24         MR. SEPP:  And then it goes --
25         THE COURT REPORTER:  I'm sorry.  I need you to --

739

Colloquy

```
1            THE COURT:  Hold on.  Hold on.

2            MR. SEPP:  Sorry.

3            THE COURT:  The paragraph you are talking about

4    starts, "Thus, with respect to each of Counts 1 and 2"?

5            MR. SEPP:  Correct.

6            THE COURT:  "The Government must prove beyond a

7    reasonable doubt that there was a plan to distribute heroin as

8    an object or purpose of the alleged conspiracy."

9            That's the way we edited it last night.

10           MR. SEPP:  Correct.

11           THE COURT:  "The Government must also prove beyond a

12   reasonable doubt that each defendant became a member of the

13   alleged conspiracy, knowing of its object and attempting" --

14           MR. SEPP:  Right.  That's where I thought we were

15   going to add "of its objects or purpose."

16           THE COURT:  No, we took out --

17           MR. SEPP:  We took out that?

18           THE COURT:  We took out the plural because there's

19   only one object and one purpose here, distributing heroin.  At

20   least that was my interpretation.

21           Ms. Bolstad or Mr. Andersen, tell me if I'm wrong.

22           MR. ANDERSEN:  Well, if I understand Mr. Sepp, I

23   think he's just saying, just insert "object or purpose" there.

24   Singular "object or purpose."

25           Is that what you're saying?
```

740

Colloquy

1            MR. SEPP:  Yeah.

2            MR. ANDERSEN:  Which makes it a little more

3    consistent with the paragraph overall.

4            THE COURT:  Okay.  I'm missing -- what line,

5    specifically?

6            MR. ANDERSEN:  If I'm understanding Mr. Sepp, I think

7    he's saying on that last -- the last line I have is,

8    "accomplish the same."  But right above that line, it just says

9    "object."  Whereas to maintain consistency, I believe it --

10    Mr. Sepp is saying it should be "object or purpose."

11            THE COURT:  Yes.  That's true.

12            So that line now reads:

13            The Government must also prove beyond a reasonable

14            doubt that each defendant became a member of the

15            alleged conspiracy knowing of its object or

16            purpose and intending to help accomplish the same.

17            Thank you, Mr. Sepp.

18            MR. SEPP:  That is it, your Honor.

19            THE COURT:  Okay.  Other typographical errors,

20    formatting, anything?

21            All right.  Ms. Bolstad, anything before we run this

22    in final, for your last review?

23            MS. BOLSTAD:  No, your Honor.

24            THE COURT:  Mr. Andersen?

25            MR. ANDERSEN:  No, your Honor.  Assuming we'll have

741
Colloquy

1  an opportunity to make final objections and exceptions.

2         THE COURT:  A brief one.  This is -- we're down to

3  the wire now.  We're going to run this as final.  And if you

4  have anything else that needs to be changed, I need to know

5  now.

6         MR. ANDERSEN:  No.  I'm just talking about my general

7  objections, and that goes back to the elements and all of that.

8  I don't want to rehash that right now.

9         THE COURT:  Very fine.

10         MR. SEPP:  No objection, your Honor.

11         THE COURT:  Thank you, Mr. Sepp.

12         (Pause, Court and law clerk conferring.)

13         THE COURT:  All right.  May I have your attention,

14  please.

15         I would like to now preview any issues that may

16  relate to the closing arguments.  I want to be sure each

17  counsel has hopefully an uninterrupted opportunity to make the

18  arguments you want to make.  As with opening statements, I want

19  you to preview with each other anything that you want to show

20  to the jury that is not an admitted exhibit.

21         The Government may use -- I just want everybody to

22  have notice of the demonstrative exhibits that have been used

23  during the trial.  But if there's something new, some other

24  chart or summary that's been prepared to help for closing, that

25  needs to be displayed.

742
Colloquy

1    There is none?

2    MS. BOLSTAD:  There is none.

3    THE COURT:  All right.  If you're going to use the

4 big chart here that is a replica of the one that is also in the

5 electronic system, I want it on the electronic system, too,

6 when it's shown, so that the defendants can see.  Because it

7 will be too hard for everyone to see if you have it facing the

8 jury.

9    MS. BOLSTAD:  It will be on the electronics as well.

10    THE COURT:  Very good.  Very good.

11    About how long do you believe your closing argument

12 will take?  Just about.

13    I hope not more than a half an hour.

14    THE COURT:  Okay.

15    MS. BOLSTAD:  I haven't run it, so we'll see.

16    THE COURT:  I'm not putting any time limits.  I'm

17 just trying to determine.

18    All right.  So if we get the jury in at 8:45, it will

19 take a half an hour to do the instructions.

20    We'll start closing arguments about 9:15.

21    Mr. Andersen?

22    MR. ANDERSEN:  Your Honor, in terms of previewing, I

23 don't have any new evidence or anything of that nature, or

24 charts or anything.

25    As the Court knows, I am operating under some degree

743

Colloquy

1  of constraints due to the agreement that we're operating under.

2  I believe that by commenting on the evidence and what it shows,

3  I will not be violating that.  I don't --

4          THE COURT:  Well, the evidence is closed now.  The

5  Government is not permitted to offer any new evidence.  But

6  you're under an order not to make an argument that violates the

7  promise your client made.

8          MR. ANDERSEN:  Right.

9          THE COURT:  Ms. Bolstad, I need your attention here.

10          Did you hear what Mr. Andersen was saying?

11          MS. BOLSTAD:  He's concerned about violating the

12  pretrial ruling, yes.

13          THE COURT:  Well, and the position you might take if

14  he argued inconsistently with the proffer agreement.

15          So what I've said is the evidence is closed.

16          MS. BOLSTAD:  (Nods head.)

17          THE COURT:  But what if there's a perceived violation

18  during closing arguments?

19          MR. ANDERSEN:  I don't anticipate there will be.  My

20  intention is to comment on the evidence and -- and direct the

21  jury about --

22          THE COURT:  Yes, you are free to direct the jury to

23  draw reasonable inferences from what they heard.  What they

24  heard.  Not because you believe it --

25          MR. ANDERSEN:  Right.

744

Colloquy

1          THE COURT:  -- or because your client contends it.

2    But because reasonable jurors should be able to draw this

3    inference and this inference, and that should create reasonable

4    doubt.

5          All right.  Please don't anyone use the golden rule

6    and ask the jurors to put themselves in the shoes of any of the

7    people involved here.  You have to focus on the reasonable

8    person and what a reasonable person might infer or conclude.

9    Don't ask them to personalize this.

10          All right.  Well, we're waiting for those final jury

11    instructions and verdict forms.  We can sit in recess.  If

12    anyone needs to use the facilities, do that.  If the defendants

13    need to step out, do that before we start the morning session.

14    They may do that.

15              So we're off the record.

16              (Recess taken, 8:25 a.m.)

17          THE COURT:  Final jury instructions are on your

18    tables.

19          I need to know if I have any objection before I run

20    the 13 copies for the jurors.

21              (Pause.)

22          THE COURT:  The jurors are ready to go.

23          We still need time to photocopy, so I need people to

24    respond.

25              Mr. Andersen?

745

Colloquy

1          MR. ANDERSEN:  Your Honor, I have no objection to the

2     form of these jury instructions.

3          My objection, just for the record, is to that

4     elements thing.  And, specifically, I do believe that to show a

5     conspiracy to distribute heroin, you need to show in -- or

6     resulting in death, you need to show intent to also have a

7     resulting death.  I've brought that up before.  I'm just

8     raising it for the record.  But other than that and the other

9     objections I have already raised, I have no objection to the

10    form.

11         THE COURT:  Thank you.

12         To the jury verdict forms as well?

13         MR. ANDERSEN:  Correct.

14         THE COURT:  Counsel?

15         MR. SEPP:  I'm fine as to the verdict form.  And the

16    edits are consistent with what we discussed on the record

17    earlier.  I'm fine.

18         MS. BOLSTAD:  No objection to any of it.

19         THE COURT:  All right.  We will now make 15 copies.

20         13 for the jurors, one for the court reporter, one

21    for me.  And as soon as that copying is done, please,

22    Mr. Minetto, line up the jurors as soon as the copy is made.

23         THE CLERK:  Okay.

24         MR. ANDERSON:  Your Honor, as clarification, I

25    understand the Court will be reading the bulk of the jury

On

746

Colloquy

1    instructions before --

2        THE COURT:  All except the deliberations instruction.

3    I'll save that for the end.

4        (Pause.)

5        THE COURT:  Counsel, while we're waiting, let's

6    confirm for the record your review of the exhibits.  You've

7    confirmed that they've been sorted and comport with your

8    records of that which is received.

9        MR. ANDERSEN:  Your Honor, I believe from both the

10   defendants we have eight total exhibits.  Those have been

11   submitted, I believe, and everybody's in agreement they're in

12   and everything is fine.

13       THE COURT:  Has the Government's representative

14   confirmed that?

15       MS. BOLSTAD:  Yes, your Honor.

16       THE COURT:  Excellent.  All right.  And --

17       MR. ANDERSEN:  So the Government's --

18       THE COURT:  Let me just make a point, too.  That, for

19   the record, the heroin exhibits have been identified in the

20   docket.  They're not going to the jury, as I explained

21   yesterday.  So we'll have a record that they'll remain out of

22   the jury's physical possession unless the jury asks for them.

23   In which case, as I indicated yesterday, we'll call for the

24   exhibits.  An agent will bring them to the courtroom, display

25   them without comment for the jurors as they view them.  And

Colloquy

1  then once -- without comment, also, and then once the jurors

2  are finished, they'll be taken back into the Government's

3  custody.

4          MR. ANDERSON:  I believe the Court also indicated

5  that counsel might be present for that as well.  Is that --

6          THE COURT:  No, it's a deliberative process.  It will

7  be under the supervision of the bailiff, but an agent will

8  simply be the custodian of the document so that there's a chain

9  of custody without comment.

10         And the jurors will be instructed that they can

11  observe without comment.  That is, if they ask for these

12  exhibits.

13         MR. ANDERSON:  And as to the --

14         MR. SEPP:  Oh, I was just going to say, as to the

15  exhibit list that the Government is going to be presenting, we

16  had -- there were a few objections to how they worded some

17  stuff.  And --

18         THE COURT:  It's a little late to be raising this.

19         MR. SEPP:  Oh, no, no, no.  This isn't on the actual

20  exhibit.  It's that they may provide it and send it back.

21         MS. BOLSTAD:  We made the change.

22         MR. SEPP:  Oh, you did.  Then there's no objection.

23         It was more or less so they could follow it.

24         THE COURT:  All right.  So it's my understanding that

25  the physical exhibits that are not heroin or money will be

748

Jury Instructions

1   physically going to the jury.  In addition, there is an

2   electronic version of all the documentary evidence which is

3   going to the jury electronically.  And the bailiff then will be

4   showing the jurors how they may use that evidence, view it in

5   an electronic format when they deliberate.  Are we ready?

6               THE CLERK:  No, we're still copying.

7               THE COURT:  Still copying.  Okay.

8               (Pause, Court and clerk conferring.)

9               THE COURT:  All right.  As soon as you have the

10  copies, just open the door and let us know the jurors are ready

11  to come in, so we can get started.

12              (Pause.)

13              THE COURT:  Are you ready?

14              Please rise for the jury.

15              (Jurors enter, 9:05 a.m.)

16              THE COURT:  Thank you, everyone.  Please be seated.

17              Good morning, jurors.  Welcome back.  We're now ready

18  to proceed with the legal instructions and the argument part of

19  the trial.

20              I'm going to give you most of these instructions now.

21  There are a few I'll hold back to finish up with after the

22  arguments.

23              You've just received your own personal work copies of

24  a verdict form with respect to each of the two defendants, and

25  your own personal copy of the instructions.

Jury Instructions

749

1            I'm going to read these instructions to you.  You can

2    follow along, if you wish.  You don't have to.  They're

3    available to you as you work through this morning and then, of

4    course, as you deliberate.

5            But before I do that, I want to focus on the verdict

6    forms.  They are the so-called list of charges you had asked

7    for and that I wanted to put in context so you remember which

8    charges you'll be considering as you listen to the law and then

9    listen to counsel's advocacy.

10           I have verdict forms here, too, that are identical to

11   yours except mine have the word "original" written at the top

12   in red (indicating).  These are the ones that count in the

13   sense that these are the ones your presiding juror will fill

14   out at the conclusion of your deliberations.

15           As I mentioned yesterday, your first job, when the 12

16   of you start deliberating, is to pick one person to be your

17   presiding juror.  That person doesn't have any greater say or

18   vote but does act as your administrator to ensure everything is

19   orderly.

20           Here's the bottom line.  No mark goes on the form

21   until all of the evidence has been considered and all 12 of you

22   agree on a particular answer; whether that answer is not guilty

23   or guilty, whether that answer has to do with quantities, and

24   other questions I've put on the form.  So just keep that in

25   mind as we go forward.

Jury Instructions

1          Unanimous means all 12 must agree before the

2    presiding juror makes a mark on these versions (indicating).

3    You can mark all over you want -- all you want on your own work

4    copies.

5          So let's look, first, at Mr. Sandoval-Ramos's

6    verdict.

7                It states:  We the jury being duly impaneled and

8                sworn hereby find the following unanimous verdicts

9                in the case against the defendant, Fabian

10               Sandoval-Ramos, Count 1, conspiracy to distribute

11               heroin resulting in death.  The options are, of

12               course, not guilty or guilty.

13               And then there's an instruction:

14               If you found the defendant not guilty on Count 1,

15               do not answer the following special verdict

16               question on foreseeability.

17               If you found the defendant guilty on Count 1,

18               answer the following special verdict question,

19               which is, Did the Government prove beyond a

20               reasonable doubt that death resulting from the use

21               of heroin distributed by the conspiracy in Count 1

22               was a reasonably foreseeable result of that

23               conspiracy?

24               I'll explain more about that in the instructions, but

25    the answers will be yes or no.

Jury Instructions

1          Then Count 2 is the second conspiracy charge.  It

2    does not have the resulting-in-death part.  It's charged

3    against both the defendants.

4          And, of course, we'll get into those details in a

5    minute.  But, again, the options will be not guilty or guilty.

6          Yes, ma'am?

7          JUROR NO. 7:  This is distracting.  She's speaking

8    here.  Can she move to the side?

9          THE COURT:  Thank you very much.

10         Will the interpreters please mind moving to the other

11   side of the room because the voice is carrying.

12         Thank you.

13         I think they were positioned there to see things, but

14   we'll work it out.

15         If you can't see, let me know, and then we'll move.

16         So the options on Count 2, not guilty or guilty.

17         There's a special verdict question there, too.  This

18   one has to do with quantity, not resulting in death.

19         If you found the defendant not guilty on Count 2, do

20   not answer the special verdict form because it won't apply.

21         But if you do find the defendant guilty on Count 2,

22   answer the following special verdict question as to quantity.

23         Did the Government prove beyond a reasonable doubt

24             that the quantity of heroin involved in Count 2

25             was 1,000 grams, 1 kilogram or more?

752

Jury Instructions

1        The options will be yes or no.

2        Now, on -- you'll see on Mr. Sandoval-Ramos's form,

3   it then says, "Your deliberations are concluded."  That --

4   that's because he has but two charges against him.

5        And then there will be a place to date and sign the

6   form.  If you are able to return a verdict today, today is

7   November 6th.

8        The verdict form for Mr. Arcila is identical as to

9   Counts 1 and 2.  I'm going to move to page 3 of that form,

10  which shows the two additional charges Mr. Arcila is facing.

11       Count 9, possession with intent to distribute heroin.

12  There, the option is, again, "not guilty, guilty."  And I'll be

13  giving you the specific elements in the written packet in just

14  a moment.

15       There's a quantity question for Count 9:

16            Did the Government prove beyond a reasonable doubt

17            that the quantity of heroin involved in Count 9

18            was 100 grams or more?

19            Yes or no.

20            You would not be answering the quantity question

21            if you find him not guilty on Count 9.

22       And the very same format exists for Count 10.  It's a

23  different possession with intent to distribute heroin charge on

24  a different date, and I'll explain that in a minute.  But the

25  format is the same.

Jury Instructions

1              So four counts for Mr. Arcila.  Special verdict

2    questions applicable in Mr. Arcila's case to every count.  But

3    only if he is found guilty on a count would you consider the

4    special verdict question on that count.  All right?

5              Let's turn to the instructions, jurors.

6              And as I say, you may follow along with me or not.

7    It's up to you.

8              Now that you have heard all of the evidence, it is my

9    duty to instruct you on the law that applies to this case.  You

10   each have a copy of these instructions to consult as you

11   deliberate.

12             Please note that pages 2 and 3 of the instructions

13   are a table of contents to help you find a particular subject

14   if you choose to seek it while you're deliberating.

15             It is your duty to weigh and to evaluate all of the

16   evidence calmly and dispassionately and, in that process, to

17   decide what the facts are.  To the facts as you find them, you

18   must apply the law as I give it to you, whether you agree with

19   the law or not.

20             As you deliberate, you must not be influenced by any

21   personal likes or dislikes, opinions, prejudices, or sympathy,

22   and you must ultimately decide the case solely on the evidence

23   received during the trial and on these instructions.  You will

24   recall that you took an oath promising to do just that at the

25   beginning of the case.  You must follow all of these

Jury Instructions

1   instructions and not single out some and ignore others.  They

2   all are equally important.

3           Please, do not read into these instructions or into

4   anything I have said or done during the trial that I have an

5   opinion about what verdict you should return.  That matter is

6   entirely up to you.

7           Because you must base your verdict only on the

8   evidence and on these instructions, I remind you one last time

9   that you must not be exposed to any other information about the

10  case or the issues it involves.  Except for discussing the case

11  with your fellow jurors during deliberations, do not

12  communicate with anyone in any way and do not let anyone else

13  communicate with you in any way about the merits of the case or

14  anything to do with it.  This includes discussing the case in

15  person, in writing, by phone or electronic means, via e-mail,

16  text-messaging, social media, or any Internet chat room, blog,

17  website, or other feature.

18          This applies to communicating with your family

19  members, your employer, the media or press, and the people

20  involved in the trial.  If you are asked or approached in any

21  way by anyone about your jury service or anything about this

22  case, you must respond that you've been ordered not to discuss

23  the matter, and to report the contact to the Court.

24          Do not read, watch, or listen to any news, media, or

25  other accounts or commentary about the case or anything to do

Jury Instructions

1  with it.  Do not do any research, such as consulting

2  dictionaries, searching the Internet, or using other reference

3  materials.  And do not make any investigation or in any other

4  way try to learn about the case on your own.

5          The law requires these restrictions to ensure the

6  parties have a fair trial based on the same evidence that each

7  party has had an opportunity to address here in open court.  A

8  juror who violates these restrictions jeopardizes the fairness

9  of these proceedings, and a mistrial could result that would

10  require the entire trial process to start over.  If any juror

11  is exposed to any outside information, please notify me or

12  Mr. Minetto immediately.

13          The presumption of innocence and the Government's

14  burden of proof.  The fact that criminal charges have been

15  brought against the defendants, Fabian Sandoval-Ramos and Raul

16  Arcila, is not evidence and does not prove anything.  Each of

17  the defendants has pleaded not guilty to the charges against

18  him, and each defendant is presumed to be innocent of any

19  wrongdoing.

20          This presumption of innocence remains in full force

21  and effect unless and until the Government proves a defendant

22  guilty of a particular charge or charges beyond a reasonable

23  doubt.

24          The sole burden of proof in this case is on the

25  Government, which has the burden to prove every element of each

756

Jury Instructions

1  of the charges in this case beyond a reasonable doubt.  Proof

2  beyond a reasonable doubt is proof that leaves you firmly

3  convinced a defendant is guilty.  It is not required, however,

4  that the Government prove guilt beyond all possible doubt.

5  Thus, a reasonable doubt is a doubt based on reason and common

6  sense.

7          A reasonable doubt may arise from a careful and

8  impartial consideration of all of the evidence or from a lack

9  of evidence.  A reasonable doubt, however, is not based on

10  speculation or guesswork.  If after careful and impartial

11  consideration of all of the evidence you are not convinced

12  beyond a reasonable doubt that the Government has proved a

13  defendant guilty of a particular charge, it is your duty to

14  find the -- that defendant not guilty of that charge.

15          On the other hand, if after such careful and

16  impartial consideration you are convinced beyond a reasonable

17  doubt that the Government has proved a defendant guilty of a

18  particular charge, it is your duty to find the defendant guilty

19  of that charge.

20          In deciding whether the Government has proved a

21  defendant guilty beyond a reasonable doubt of any of the

22  charges, you must not consider what sentence or punishment the

23  Court may impose in the event you find a defendant guilty of

24  any charge.

25          So what is evidence?  In deciding the facts, you may

Jury Instructions

1  consider only the evidence received in the case which consists

2  of the sworn testimony of each witness, the exhibits which have

3  been received into evidence and which will be with you in the

4  jury room, except as I have already explained as to the heroin

5  exhibits.  And, three, any agreed facts that have been pointed

6  out to you.

7        For example, I instruct you that the parties agree

8  Justin Delong died as a result of a heroin overdose.  In

9  addition, the parties stipulate that the drugs seized in this

10  case were laboratory tested and confirmed to be heroin in the

11  amounts reflected in the lab reports marked as Government

12  Exhibits 34, 38, 56 and 63.  There was no test or analysis of

13  these exhibits that establishes any seized quantities shared

14  the same or identical chemical composition as any other seized

15  quantity.

16        So what is not evidence?  The following things are

17  not evidence, and you may not consider them in deciding what

18  the facts are.

19        The arguments, statements, and questions by the

20  lawyers are not evidence.  The lawyers are not witnesses.

21  Although you must consider a lawyer's questions to understand

22  the answers of a witness and, thus, to evaluate the witness's

23  testimony as a whole, the lawyer's questions are not evidence.

24        Similarly, what the lawyers say in their opening

25  statements, closing arguments, and at other times is intended

Jury Instructions

1   to help you interpret the evidence, but it is not the evidence.

2   If you remember the evidence differently from how the lawyers

3   describe it, your memory of the evidence controls.

4         Objections by the lawyers are not evidence.

5   Attorneys may raise an objection when they believe a question

6   or a witness's answer is improper under the Rules of Evidence.

7   Remember not to concern yourself with why a lawyer made the

8   objection.  Instead, simply follow my ruling about the

9   objection.

10        If I sustained an objection to certain evidence, that

11   matter is now out of the case and you must not consider it in

12   your deliberations.  Similarly, any other matter that I've told

13   you to disregard is not evidence, and you must not consider it

14   in your deliberations.

15        Anything you may have seen or heard when the Court

16   was not in session is not evidence.  This is true even if what

17   you see or hear out of court is about the case or is said or

18   done by someone connected with the case.  Remember, you must

19   decide the case only on the evidence received during the trial.

20        Finally, as already noted, the fact that criminal

21   charges have been brought against the defendant is not

22   evidence.

23        Now, evidence may be direct or circumstantial.

24   Direct evidence is the direct proof of a fact, such as

25   testimony of an eyewitness about what the witness personally

759

Jury Instructions

1   saw, or heard, or did.

2           Circumstantial evidence is indirect evidence.  That

3   is, proof of one or more facts from which you could find that

4   another fact exists, even though that other fact has not been

5   proved directly.

6           The law does not prefer one kind of evidence over the

7   other.  You should consider both kinds of evidence and then

8   decide how much weight to give to any particular piece of

9   evidence.

10          There were times during the trial when some evidence

11  was received for a limited purpose only and I instructed you

12  about the limited way you could consider each such item of

13  evidence.  As you deliberate, you must follow all limiting

14  instructions I gave you during the trial and you must consider

15  any evidence which was admitted for a limited purpose only for

16  that limited purpose and not for any other purpose.

17          In deciding the facts in this case, you may have

18  decide which testimony to believe and which testimony not to

19  believe.

20          You may believe -- sir?

21          MR. ANDERSEN:  Your Honor, I'm sorry.  There appears

22  to be a problem with the headphones.

23          THE COURT:  Let's address it.

24          (Pause.)

25          MR. ANDERSEN:  Thank you.

Jury Instructions

1          THE COURT:  Are you hearing me now, sir?  Yes?

2          All right.  Thank you.

3          MR. ANDERSEN:  Yes.

4          THE COURT:  Please let me know if we need to adjust.

5          I'll start again with respect to witness testimony.

6          In deciding the facts in this case, you may have to

7    decide which testimony to believe and which testimony not to

8    believe.  You may believe everything a witness says, or part of

9    it, or none of it.  In considering the testimony of any

10   witness, you may take into account the opportunity and the

11   ability of the witness to see or to hear or to know the things

12   testified to; the witness's memory; the witness's manner while

13   testifying; the witness's interest in the outcome of the case;

14   and whether the witness has any bias or prejudice; whether any

15   other evidence, including earlier statements by the witness,

16   contradicted the witnesses's testimony; the reasonableness of

17   the witness's testimony in light of all of the evidence; and

18   any other factors you find bear on the believability of a

19   witness, including whether any witness has previously been

20   convicted of a crime.

21          In particular, witness Shane Baker has prior

22   convictions for uttering a forged instrument, grand theft,

23   delivery of heroin, delivery of methamphetamine, and for being

24   a felon in possession of a firearm.

25          Witness Morgan Godvin has two prior convictions for

761
Jury Instructions

1   possession of heroin.

2        And witness Michael Rosa has prior convictions for

3   possession of heroin, forgery, and theft.

4        You may consider the fact a witness has been

5   convicted of a crime in the past when deciding whether or not

6   to believe the testimony of that witness and how much weight to

7   give to that testimony, but not for any other purpose.

8        You've heard testimony about an eyewitness

9   identification.  In deciding how much weight to give to

10  eyewitness testimony, you should consider the capacity and

11  opportunity of the eyewitness to make the observations

12  testified to in light of the length of time for observation and

13  the conditions at the time of observation, including lighting

14  and distance; whether the identification was the product of the

15  eyewitness's own recollection or was the result of later

16  influence or suggestiveness; whether the eyewitness made any

17  other inconsistent identifications and the relative strength or

18  weakness of such identifications; whether the eyewitness had

19  any other familiarity with the person identified; the length of

20  time between when the eyewitness observed the person and when

21  the witness identified the person; and the totality of

22  circumstances surrounding the eyewitness's identification.

23       A defendant in a criminal trial has a constitutional

24  right not to testify and does not have any burden to prove

25  innocence.  You may not draw any inference of any kind from the

1    fact that Mr. Sandoval-Ramos and Mr. Arcila did not testify.

2            You have heard evidence that witnesses Shane Glenn

3    Baker, Morgan Elizabeth Godvin, and Michael James Rosa each

4    have pleaded guilty to crimes arising out of the same events

5    for which the defendants are now on trial.

6            You have also heard evidence that each of these

7    witnesses is receiving benefits from the Government in this

8    case in exchange for their guilty pleas.

9            In particular, you should examine the testimony of

10   each of these witnesses with greater caution than that of other

11   witnesses.  And, in doing so, you should consider whether and

12   to what extent their testimony may have been influenced by the

13   receipt of such benefits.  And, in this regard, I instruct you

14   that under federal law there is a mandatory minimum sentence of

15   20 years imprisonment when a defendant is found guilty of

16   distributing heroin that results in another person's death.

17   The State of Oregon does not have an equivalent penalty

18   enhancement for distribution of a controlled substance that

19   results in death.

20           When the federal penalty for a crime, including a

21   mandatory minimum of imprisonment -- sorry.  I'll say that

22   again.

23           When the federal penalty for a crime includes a

24   mandatory minimum term of imprisonment, the Court must impose a

25   sentence that is no less than that minimum unless certain

Jury Instructions

1   exceptions apply.  One exception to a mandatory minimum

2   sentence is known as a 5(k)(1) departure for substantial

3   assistance and applies only if the Government first asks the

4   Court and the Court agrees to impose a reduced sentence because

5   of such substantial assistance.

6          You have heard testimony that either or both

7   defendants made certain statements.  In considering this

8   evidence, it is for you to decide whether a defendant actually

9   made any such statement.  And, if so, how much weight to give

10  to it.

11         In making those decisions, you should consider all

12  the evidence about the statement, including the circumstances

13  under which the defendants may have made it.

14         You have heard testimony from persons who, because of

15  education or experience, were permitted to provide background

16  evidence and to state opinions, together with the reasons for

17  their opinions.

18         Opinion testimony of any kind should be judged just

19  like any other testimony.  You may accept it or reject it and

20  give it as much weight as you think it deserves, considering

21  the witness's education and experience, the reasons given for

22  the opinion, and all of the other evidence in the case.

23         Certain charts and summaries have been admitted in

24  evidence.  Remember the charts and summaries are only as good

25  as the underlying evidence that supports them.  You should

Jury Instructions

1    therefore give them only such weight as you think the

2    underlying evidence deserves.

3            So, now, turning to the charges against the

4    defendants.  The Government has charged Defendant Fabian

5    Sandoval-Ramos with committing two separate crimes; and

6    Defendant Raul Arcila with committing four separate crimes, as

7    I am about to explain.

8            In Count 1, the Government charges each of the

9    defendants with conspiracy to distribute heroin resulting in

10   death in violation of Section 841 and 846 of Title 21 of the

11   United States Code.  In Count 2, the Government charges each of

12   the defendants with conspiracy to distribute heroin in

13   violation of Sections 841 and 846 of Title 21 of the United

14   States Code.  And the Government also alleges this conspiracy

15   involved 1,000 grams or more of heroin.

16           In Counts 9 and 10, the Government charges only

17   Defendant Arcila with possession with intent to distribute

18   heroin in violation of sections -- Section 841 of Title 21 of

19   the United States Code.  In these two counts, 9 and 10, the

20   Government also alleges each crime involved 100 grams or more

21   of heroin.

22           Please note Counts 3 through 8 are not pending in

23   this trial.

24           If you find Defendant Sandoval-Ramos guilty of the

25   offense charged in Count 2 or find Defendant Arcila charged

1  guilty of any offenses in Counts 2, 9, and/or 10, you must then

2  determine whether the Government proved beyond a reasonable

3  doubt that the amount of heroin involved in the offense equaled

4  or exceeded certain weights.

5      Your determination of weight must not include the

6  weight of any packaging material.  Your decision as to weight

7  must be unanimous.  The Government does not have to prove that

8  the defendant knew the exact quantity of heroin involved in the

9  offense.

10      And, finally, before I get to the details of the

11  charges, mere presence at the scene of a crime or mere

12  knowledge that a crime is being committed is not sufficient to

13  establish that a defendant committed the crime of conspiracy to

14  distribute heroin resulting in death, conspiracy to distribute

15  heroin, or possession with intent to distribute heroin.  The

16  defendant must be a participant and not merely a knowing

17  spectator.  A defendant's presence may be considered by the

18  jury, along with all of the other evidence.

19      Now, some general comments about the law of

20  conspiracy as it relates to Counts 1 and 2.

21      A conspiracy is a kind of criminal partnership.  An

22  agreement of two or more persons to commit one or more crimes.

23  The crime of conspiracy is the agreement itself to do something

24  unlawful.  It does not matter whether the crime agreed upon was

25  actually committed.

Jury Instructions

1          For a conspiracy to have existed, it is not necessary

2    that the conspirators made a formal agreement or that they

3    agreed on every detail of the conspiracy.  But it is not enough

4    that they simply met, discussed matters of common interest,

5    acted in similar ways, or perhaps helped one another.  All of

6    you must find that there was a plan to commit the crime alleged

7    in the particular count, 1 or 2, as an object of the

8    conspiracy, with all of you agreeing as to the particular crime

9    which the conspirators agreed to commit.

10          Thus, with respect to each of Counts 1 and 2, the

11    Government must prove beyond a reasonable doubt that there was

12    a plan to distribute heroin as an object or purpose of the

13    alleged conspiracy.  The Government must also prove beyond a

14    reasonable doubt that each defendant became a member of the

15    alleged conspiracy knowing of its object or purpose and

16    intending to help accomplish same.

17          A person becomes a member of a conspiracy by

18    willfully participating in the unlawful plan with the intent to

19    advance or further the object or purpose of the conspiracy even

20    though the person does not have full knowledge of all of the

21    details of the conspiracy.  Furthermore, one who willfully

22    joins an existing conspiracy is as responsible for it as the

23    originators.  On the other hand, one who has no knowledge of a

24    conspiracy but happens to act in a way which furthers some

25    object or purpose of the conspiracy does not thereby become a

767
Jury Instructions

1  conspirator.  Similarly, a person does not become a conspirator

2  merely by associating with one or more persons who are

3  conspirator -- conspirators, nor merely by knowing that a

4  conspiracy exists.

5          So turning now to the elements of Count 1, conspiracy

6  to distribute heroin resulting in death, charged against both

7  defendants.

8          In Count 1 the Government charges each of the

9  defendants with conspiracy to distribute heroin resulting in

10  death in violation of Sections 846 and 841 of Title 21 of the

11  United States Code.

12          In order for either or both defendants to be found

13  guilty of Count 1, the Government must prove each of the

14  following elements beyond a reasonable doubt as to that

15  defendant.

16          First, beginning on or about March 20, 2014, and

17  ending on or about April 4, 2014, there was an agreement

18  between two or more persons to distribute heroin, which means

19  to deliver or to transfer possession of heroin to another

20  person with or without any financial interest in that

21  transaction.

22          Second, the particular defendant joined in the

23  agreement knowing of its purpose to distribute heroin and

24  intending to help accomplish that purpose.

25          And, third, Justin Delong used heroin distributed in

Jury Instructions

1  the course of this conspiracy which resulted in his death.

2  "Resulted in death" means that Justin Delong's use of that

3  heroin was the cause in fact of his death.

4         It is not sufficient that Justin Delong's heroin use

5  was merely a contributing factor to his death.  Instead, the

6  Government must prove that but for Justin Delong's use of the

7  distributed heroin, he would not have died.  Thus, in order to

8  satisfy this third element, the Government must prove beyond a

9  reasonable doubt that Justin Delong's use of the distributed

10  heroin was the cause in fact of his death, but the Government

11  need not prove that his death was a foreseeable result of the

12  heroin distribution conspiracy or that the defendants knew or

13  should have known that the distributed heroin would cause his

14  death.

15         If you find a defendant not guilty of the conspiracy

16  charged in Count 1, then please move on to Count 2 and do not

17  answer the special verdict question on that defendant's verdict

18  form for Count 1.  But if you do find the defendant is guilty

19  of the conspiracy charged in Count 1, you must then determine

20  whether the Government also proved beyond a reasonable doubt

21  that death resulting from the use of the distributed heroin was

22  a reasonably foreseeable result of the Count 1 conspiracy, even

23  though this factor is not necessary to prove a defendant guilty

24  of Count 1 in the first instance.

25         For this special verdict question, please note the

Government does not have to prove that the defendant knew or
intended the exact overdose death would occur or new the
identity of the person who dies.  In order for you to answer
yes to this special verdict question, the Government must prove
beyond a reasonable doubt that it was reasonably foreseeable to
the defendant that overdose deaths could occur as a result of
users ingesting the distributed heroin.

Elements of Count 2, conspiracy to distribute heroin
charged against both defendants.

In Count 2, the Government charges each of the
defendants with conspiracy to distribute heroin in violation of
Sections 846 and 841 of Title 21 of the United States Code.
The Government also alleges this conspiracy involves 1,000
grams or more of heroin.  In order for a defendant to be found
guilty of Count 2, the Government must prove each of the
following elements beyond a reasonable doubt as to that
defendant.

First, beginning in February 2014 and ending in April
2014, there was an agreement between two or more persons to
distribute heroin, as previously defined.  And, second, the
particular defendant joined in the agreement knowing of its
purpose to distribute heroin and intending to help accomplish
that purpose.

If you find either or both of the defendants not
guilty of Count 2, do not answer the special verdict question

1  as to Count 2.

2          But if you find either or both of the defendants

3  guilty of this charge, you must also determine whether the

4  Government proved beyond a reasonable doubt that 1,000 grams or

5  more of heroin was involved in that offense.  And I've already

6  pointed out to you where that is on the verdict form with

7  respect to Count 2.

8          Now, the last two counts, 9 and 10, which are

9  possession with intent to distribute heroin, charged only

10  against Defendant Arcila.

11          In Counts 9 and 10, the Government charges the

12  Defendant Raul Arcila with possession with intent to distribute

13  heroin in violation of Section 841 of Title 21 of the United

14  States Code.

15          The Government may prove Defendant Arcila is guilty

16  of Count 9 and/or Count 10, either by proving that Defendant

17  Arcila personally committed the crime as charged or by proving

18  Defendant Arcila aided and abetted Placido Ramirez-Coronel,

19  Mexican Bobby, and/or Defendant Sandoval-Ramos in committing

20  that crime.

21          So when you deliberate on each of Counts 9 and 10,

22  you will consider whether the Government has proved beyond a

23  reasonable doubt that Defendant Arcila personally committed the

24  crime of possession with intent to distribute heroin, or that

25  Defendant Arcila aided and abetted Placido Ramirez-Coronel,

Jury Instructions

1    Mexican Bobby, and/or Defendant Sandoval-Ramos in doing so.

2          In order for the defendant to be found guilty of

3    either Count 9 or 10 because he personally committed the crime,

4    the Government must prove both of the following elements beyond

5    a reasonable doubt.

6          First, Defendant Arcila knowingly possessed heroin or

7    some other controlled substance on or about March 31, 2014,

8    Count 9; and/or on or about April 2, 2014, which is Count 10.

9          And, second, the defendant possessed it with the

10   intent to distribute it to another person.

11         The Government does not have to prove that the

12   defendant knew the exact quantity of heroin involved in the

13   offense, nor does it matter whether the defendant knew that the

14   substance was heroin.  It is sufficient that the defendant knew

15   that it was some kind of prohibited drug.  I instruct you as a

16   matter of federal law that heroin is a controlled substance.

17         An act is done knowingly if the defendant is aware of

18   the act and does not act through ignorance, mistake, or

19   accident.  The Government is not required to prove that the

20   defendant knew that his acts or omissions were unlawful.

21         You may consider evidence of the defendant's words,

22   acts, or omissions, along with all of the other evidence, in

23   deciding whether the defendant acted knowingly.

24         A person has possession of something if the person

25   knows of its presence and has physical control of it or knows

772

Jury Instructions

1    of its presence and has the power and intention to control it.

2            To possess with intent to distribute means to possess

3    with intent to deliver or transfer possession of the controlled

4    substance to another person with or without any financial

5    interest in the transaction.

6            And, finally, with respect to aiding and abetting --

7    which, again, applies only to Counts 9 and 10 -- to prove

8    Arcila guilty of possession with intent to distribute heroin by

9    aiding and abetting, the Government must prove beyond a

10   reasonable doubt, first, possession with intent to distribute

11   heroin as defined in these instructions was committed by

12   Placido Ramirez-Coronel, Mexican Bobby, and/or defendant

13   Sandoval-Ramos.

14           Second, Defendant Arcila knowingly and intentionally

15   aided, counseled, commanded, induced, or procured Placido

16   Ramirez-Coronel, Mexican Bobby, and/or Defendant Sandoval-Ramos

17   to commit each element of possession with intent to distribute

18   heroin.

19           And, third, Defendant Arcila acted before the crime

20   was completed.  It is not enough that the defendant merely

21   associated with Placido Ramirez-Coronel, Mexican Bobby, and/or

22   Defendant Sandoval, or unknowingly or unintentionally did

23   things that were helpful to them or was present at the scene of

24   the crime.  The evidence must show beyond a reasonable doubt

25   that Defendant Arcila acted with the knowledge and intention of

Jury Instructions

1    helping Placido Ramirez-Coronel, Mexican Bobby, and/or

2    Defendant Sandoval-Ramos commit the crime.

3         If you find Defendant Arcila is guilty of either or

4    both Counts 9 and 10, you will also determine whether the

5    Government proved beyond a reasonable doubt that the amount of

6    heroin possessed with intent to distribute by the defendant or

7    someone he aided and abetted was more or less than 100 grams.

8    And, again, there's a special question on the verdict form for

9    that point.

10        Again, final reminder, all questions are answered,

11   all verdicts are returned based on the unanimous agreement of

12   all jurors, the Government having the burden to prove these

13   matters beyond any reasonable doubt.

14        Now, those final instructions I'll give to you after

15   we've heard from counsel.

16        Ladies and gentlemen, thank you for your attention to

17   the instructions.  It's now time to turn our attention to

18   counsel, who have the opportunity to make their closing

19   arguments to you.  Because the Government does have the burden

20   of proof here, Ms. Bolstad gets to speak first and last.  After

21   the defense counsel each have an opportunity to make their

22   arguments, she will have an opportunity to offer rebuttal

23   comments.  When that's finished, I'll give you the final piece

24   of the instruction and the case will be yours.

25        But we have plenty of time this morning, so I just

Closing Argument - By Ms. Bolstad                774

1  urge you to sit back and listen carefully to what each of the

2  lawyers has to offer.

3          They intend to be helpful here, and it's important

4  that you give them your attention.

5          So, for the Government, Ms. Bolstad.

6          MS. BOLSTAD:  Thank you, your Honor.

7          May it please the Court, Counsel, Defendants, ladies

8  and gentlemen.  Thank you for your attention in this case.

9          When this case began, I told you that you were going

10  to hear about a book.  A book with five chapters.  It started

11  with a tragic beginning.  Justin Delong used heroin, he died.

12          Like any book, there are many characters in this

13  story.  Some of those characters, you heard, have good and bad

14  within them.  In fact, each of the characters in this book.

15          You heard about the law enforcement officers who

16  respond to these overdose deaths.  It's not a great part of

17  their job.  It happens all too often.  You heard about what

18  those characters do.  They work.  They work them hard.  They

19  start and treat that scene like a homicide.  They put in long

20  hours, and they work up the chain.

21          And the purpose of that work is to get to the heart

22  of this problem.  And the heart of this problem is not the

23  people using the drugs at the bottom.  That's the negative and

24  terrible and tragic consequence that this state is going

25  through and a lot of other states in America.

Closing Argument - By Ms. Bolstad

775

1        But the problem is at the top of those chains.  It's

2   with these organizations that are making hundreds of thousands

3   of dollars by putting a product into our market that is not

4   regulated by the FDA.  It's not regulated by anything except

5   this courtroom.

6        Their activity is regulated here in the court of

7   criminal law and the laws of the United States of America.  And

8   the laws of the United States of America say you may not

9   distribute heroin.  The laws of the United States of America

10  say if you distribute heroin and people die because of it, you

11  will face penalties.  And that is absolutely why we are here

12  today.

13       We started the case with chapter 1, a death.  We

14  moved to the next link in the chain, chapter 2, chapter 3,

15  chapter 4.  And we got to the end of the book.  The end of the

16  book is the conspiracy between these two defendants.  The end

17  of the book is where I start today.

18       At the beginning of this case, I told you there were

19  two issues that you would have to decide.  There's a lot of

20  elements and a lot of charges, but it boils down to two key

21  things.

22       First, did each of these defendants participate in a

23  conspiracy to distribute heroin?  That's the first question,

24  really.

25       Second, whether that heroin distributed by their

Closing Argument – By Ms. Bolstad

1    conspiracy resulted in the death of Justin Delong.

2            So I'm going to start where the case ended.  Let's

3    talk about the conspiracy.

4            A conspiracy is an agreement.  That's what it really

5    comes down to.  The Court gave you the three elements of

6    conspiracy.  I have to prove all three for Count 1.  That there

7    was an agreement between two or more persons to distribute

8    heroin.  Second, that each defendant -- and you have to decide

9    it separately, per defendant -- did he join that conspiracy,

10   knowing of its purpose and intending to help accomplish it.

11           And the third element of Count 1 is proving that

12   Justin Delong's death resulted from heroin distributed by this

13   conspiracy.

14           Conspiracy is an agreement.  It's a criminal

15   partnership.  And in criminal partnerships -- you heard from

16   our witnesses, criminals don't come up with formal contracts.

17   They don't draw up papers and sign and say, I, Fabian

18   Sandoval-Ramos, join this conspiracy, and I am here to sell

19   drugs.  They don't do that.  That's stupid.

20           Instead, how do we know if there's a conspiracy, if

21   there's no contract?  We look at the things that link each

22   defendant to the overall picture.

23           And in this case, you heard about five major pieces

24   of evidence that link these two men to two locations.

25           (Pause, referring.)

777

Closing Argument - By Ms. Bolstad

 1      MS. BOLSTAD:  Let's start with the paper trail.

 2  Okay?

 3      On March 31st, you heard evidence that Shane Baker

 4  was used by the police to make a controlled buy.  And the whole

 5  purpose of that controlled purchase of drugs was so that police

 6  could figure out where are these drugs coming from?  Remember?

 7  They let the car get away after the buy happened because they

 8  wanted to follow that car to where the drugs were coming from,

 9  and they followed that vehicle to location 1.  That is the

10  stash house that you heard a lot of evidence about.  The two

11  people living at that residence, among others, were Raul Arcila

12  and Placido Ramirez-Coronel.

13      Now the police have a location.  That's the beginning

14  of a paper trail.  You heard Detective Pat McNair talk about

15  what he can do once he has a location.  First, he looks at the

16  power subscriber.  Who pays the bills at location 1?  Not the

17  guy -- not a guy who lives there.  Fabian Sandoval-Ramos pays

18  the bills (pointing).

19      So now Detective McNair has a name:  Fabian

20  Sandoval-Ramos.  He runs that name in the D.M.V. records.  And

21  what does he get from that paper trail?  A lot of information.

22      Detective McNair learns that Fabian Sandoval-Ramos

23  actually has a new address in D.M.V.  He doesn't have the

24  address of location 1.  He has the address at location 2.  A

25  residence that's less than two miles away from location 1.

778

Closing Argument - By Ms. Bolstad

1          With the name Fabian Sandoval-Ramos in D.M.V.
2   records, he also learns that Mr. Fabian Sandoval-Ramos is the
3   registered owner of the vehicle that delivered the drugs on
4   March 31st.
5          Finally, with D.M.V., he gets a picture.  That's
6   pretty key because he shows that photograph of Fabian
7   Sandoval-Ramos to Shane Baker.  Shane Baker says, That's the
8   guy.  That's the one I recognize.  It's the person he has
9   nicknamed in his phone "Mexican Bobby."  And you heard
10  Mr. Baker testify about that.  He told you flat out, I never
11  knew the guy's full legal name.  I just came up with a
12  nickname, and I called him Mexican Bobby.  Because when I call
13  for drugs, that's the guy who I've met.  I met him at the very
14  beginning.  After I met him at the very beginning, he would
15  send other people to deliver the drugs.
16         So Fabian Sandoval-Ramos is not the guy in the red
17  Honda Passport.  He's not the guy dropping off 8 pieces at a
18  time.  He's the guy who met Shane Baker, to begin.  He's the
19  guy paying bills at location 1, where the drugs are stored,
20  packaged, and delivered.  That's your paper trail.
21         The second huge category of evidence that links these
22  two men and these two locations was the surveillance
23  observations of our law enforcement officers.
24         So obviously we've already talked about March 31st.
25  Surveillance followed the vehicle to location 1.

779

Closing Argument - By Ms. Bolstad

1          What about on April 2nd, when this whole case came to

2    a conclusion?  That's a key day, April 2nd.

3          You heard Detective McNair talk about using Shane

4    Baker to make a call from Shane Baker's place in custody.  They

5    used his phone.  They called Mexican Bobby to order up 8.  And

6    after that call was placed on the afternoon of April 2nd, you

7    heard that this team of agents had surveillance at all three

8    locations:  Location 1, location 2, and the 7-Eleven where the

9    deals take place.  And on that day, they saw something very

10   interesting.

11         When Baker called for drugs, a green Honda Civic at

12   location 2 -- which is Fabian Sandoval-Ramos's place -- a green

13   Civic went from that location to the stash house, location 1.

14   Very suspicious activity.  You heard from Detective Miller that

15   the vehicle came right up to his car and looked suspiciously

16   inside, and he thought maybe he had been made.

17         The Civic parked far away from location 1.  The

18   occupants walked in on foot.  Minutes later, they emerged from

19   location 1, went back to that green Honda Civic, and drove

20   directly to the 7-Eleven.  That surveillance links all three

21   locations, both defendants on one day in time.

22         The third piece of surveillance that was really

23   interesting is what happens after they're caught.  So after the

24   police pull that vehicle over around the 7-Eleven, after the

25   police pull Raul Arcila and Placido Ramirez-Coronel out of that

Closing Argument - By Ms. Bolstad

1   green Civic, what happens after the police find 13 ounces, 13

2   pieces of heroin in the vehicle?  The police are watching

3   location 2.  They want to see what happens with Fabian

4   Sandoval-Ramos.

5          He was walking in and out of his apartment, seven --

6   six to seven times in that hour-and-a-half time frame or

7   two-hour time frame that Tim Miller was watching.  And while

8   Tim Miller was watching at location 2, after the runner's been

9   caught, he sees Fabian Sandoval-Ramos go to the dumpster.

10  Remember?  He also saw a female emerge from location 2 with a

11  white trash bag, to throw it out into the community dumpster.

12  All of this happens within the minutes and two hours after

13  these runners are arrested.

14         The third major piece of evidence linking the

15  conspiracy, linking the defendants to it, is the signature

16  cutting agent that was found at both locations.

17         You remember at location 1, agents found just

18  boatloads of packaging material, Saran Wrap, and lactose.  And

19  you heard that lactose is something that can be used to dilute

20  drugs.

21         Sergeant Kubic testified he's never actually seen

22  that lactose, that particular product in his drug search

23  warrants.

24         I think some of the other agents testified that way

25  as well.  So the fact that it's at location 1 is interesting.

Closing Argument – By Ms. Bolstad

1    But what links the two defendants is that the same lactose

2    product was found at location 2, not inside Fabian's house but

3    in the dumpster outside.  Why?  There were no drugs at location

4    2.  There was not a lot of cash at location 2.  The thing that

5    Fabian Sandoval-Ramos actually had and he knew he had to get

6    rid of was that lactose because he knew that connected him to

7    location 1 and all of that drug evidence that you keep at a

8    stash house.  That's the thing he had to throw away.  The

9    lactose and, of course, his cell phone, after breaking it in

10   half.

11          The fourth major category that links all of these

12   defendants -- these two -- plus Placido Ramirez-Coronel, who is

13   not with us, are the drug records.  Agents told you they found

14   this notebook at location 1.  They sent that notebook to the

15   lab.  You heard from Mr. Solis from the DEA.  He found the

16   fingerprints of all three of those men in one drug notebook.

17          You'll have the drug notebook with you, back in your

18   jury room.  You can touch it, hold it.  You can observe the

19   fingerprint stickers where Mr. Solis found the fingerprints

20   (indicating).  You have his fingerprint results as exhibits

21   that you can cross-reference.

22          I want you to look at this book.  See the entries for

23   "pure."  The entry for "pelon," which is Mr. Raul Arcila's

24   nickname.  And look at what this notebook does not have.  No

25   legitimate use.  This isn't a place where they're writing down

782

Closing Argument - By Ms. Bolstad

1   messages for each other, or somebody called.  This is where

2   they keep track of who owes them money.  And all three prints

3   in one book, at location 1, is very key evidence of this

4   conspiracy.

5           The fifth major piece of evidence that links the two

6   defendants to the conspiracy, it's all about the phones.  You

7   heard at the beginning of this case how important cell phones

8   are to drug trafficking.  It is the tool of the trade.

9           You heard from Detective Andersen, at the end of

10  yesterday, about her look at the very specific time frame on

11  April 2nd.  The reason that law enforcement agents looked at

12  April 2nd phone records is because they were on-scene.  The

13  police could actually observe Shane Baker make a call, and so

14  they know exactly when it was made.  That's the orange

15  notations in this slide.  You'll have this as an exhibit with

16  you.

17          So they know when Mr. Baker called to order 8, and he

18  called that dispatch phone number; the 442 phone number saved

19  as "Mexican Bobby."

20          The tolls tell the story.  After Mexican Bobby takes

21  the call for 8, puts that phone down.  That phone doesn't make

22  other calls.  Do you know why?  You heard from the expert.

23  That's the phone used to take calls from customers.  You put

24  that phone down.  And if you're Mexican Bobby, you pick up the

25  phone that you talk to your co-conspirators with; which is the

783

Closing Argument - By Ms. Bolstad

1    760 number.  That's the number that you call and you tell

2    Placido, It's time to go.  You've got to go deliver 8.  You see

3    multiple calls between Placido Ramirez-Coronel and Che.  Che is

4    the dispatcher.

5           Right after Baker calls to say that he has arrived at

6    the location at that 7-Eleven, you see the dispatcher phone,

7    Che, calls Placido Ramirez-Coronel.

8           It's at that point, at 5:20, that these surveillance

9    teams are seeing the green Honda Civic circling the area, and

10   they're feeling uncomfortable about what they see.  They don't

11   see Mr. Baker, so they call his phone and tell him to change

12   locations.

13          The traffic stop, yellow line, that is something law

14   enforcement knows happened.  You don't have to infer anything.

15   They were there.  After that traffic stop, look at the records

16   that happen.  There are two calls from the dispatcher, Che, to

17   Placido Ramirez-Coronel.  Probably can't get ahold of him

18   because Mr. Ramirez-Coronel is under arrest.

19          At 5:39, Fabian Sandoval-Ramos, somehow he knows, and

20   he's in touch with the dispatcher.  Sandoval-Ramos calls

21   Ramirez-Coronel as well.  No answer.

22          Then there are two calls between Fabian

23   Sandoval-Ramos and Che.  Something has happened.  We are

24   caught.  They have our runners.

25          There's more calls between the two of them, and

Closing Argument – By Ms. Bolstad         784

1   somewhere in that time frame, after 5:42, when they know

2   they're caught, Fabian Sandoval-Ramos breaks his phone and he

3   throws it away.

4           You'll also have the summary exhibit that this came

5   from with you in the jury room.  This is a more detailed look

6   at April 2nd.

7           So those are the categories of evidence that tie

8   these two defendants together in a drug conspiracy.

9           I want to talk to you about knowingly.  The

10  Government has to prove that each defendant entered the

11  conspiracy, that they joined it knowing of its purpose.  So how

12  do we prove what somebody knows?

13          The jury instructions tell you that you may consider

14  evidence of his words, of his acts, omissions, along with all

15  the other evidence to figure out that these guys know what they

16  were doing.  I want to walk you through some of those things

17  for each defendant.

18          First, let's start with Defendant Fabian

19  Sandoval-Ramos.  Look at his actions.  He threw out the things

20  that make him guilty, so that's important.  You don't see that

21  he was throwing out other things.  He threw out the things that

22  make him guilty.

23          He's the guy who has the vehicles, those vehicles

24  that had the trap compartments.  Those are his.  They're in his

25  name.

785
Closing Argument - By Ms. Bolstad

1        How about the drug records at location 2 -- I mean --
2   I'm sorry.  They're at location 1, with the fingerprints.  But
3   Tim Miller also found drug records at location 2.  You have
4   that as Exhibit 108.  That's Fabian's house.  And in his closet
5   is that yellow slip of paper saying, I owe.  "Debo," I owe.
6   And it's right next to "gorditas."  You heard from Dan Riley,
7   from the DEA, the fluent Spanish speaker.  He has seen the word
8   "gorditas" to refer to heroin.

9        What else was Mr. Sandoval-Ramos?  Well, you have the
10  links with his phone and the dispatch phone that we just talked
11  about.  But, specifically, you have lengthier records than just
12  April 2nd.  We gave you more.

13       Exhibit 124 are the -- the tolls from the phone
14  company on that phone that was in the dumpster.  Because we
15  should be curious about what Fabian was doing with that phone
16  before April 2nd.  If you look at those tolls, you will see
17  over 30 contacts between the dumpster phone and Che, the 760
18  dispatch phone.  Thirty contacts between March 20th and April
19  2nd.

20       You'll also see in Exhibit 123 -- look at March 2nd
21  of that exhibit.  There is a single phone contact between
22  Mexican Bobby and Fabian Sandoval-Ramos, and it happens on
23  March 2nd.  And we don't know exactly what was said in that
24  call.  But what we do know is that Fabian is definitely in
25  touch with this Mexican Bobby dispatcher.

786

Closing Argument - By Ms. Bolstad

1        Look at his statements to the police after he got

2    arrested.  This man was told you don't have to say anything.

3    You have the right to remain silent.  Anything you do say can

4    be used against you here.  So, ladies and gentlemen, I'm using

5    it against him.

6        He told the police, My phone broke somewhere between

7    5:00 and 6:00 p.m., so I threw it away.

8        Now, we're all familiar with what it looks like to

9    drop your phone and have the screen crack.  This phone is bent.

10   This phone has purposeful contact to bend it and break it.  And

11   it's not thrown away whole.  It's separated and thrown into

12   three pieces in the trash.  That's how badly he wanted to

13   distance himself from evidence of his guilt.  You will have

14   Exhibit 115 with you in the jury room.  Please open up 115,

15   look at the broken phone.

16       Finally, for Fabian Sandoval-Ramos, you have the

17   identification of the eyewitness Shane Baker.  Looked at the

18   picture, said, That's him.  That's the guy I've been dealing

19   with.

20       Let's turn to Defendant Raul Arcila.  What links him

21   as a knowing participant in the conspiracy?  You've got to look

22   at his actions and his words.

23       Raul Arcila was involved in two drug deliveries of 8

24   pieces.  He was also living at that stash house.  The pictures

25   are in your exhibit binders.  That stash house is a place where

Closing Argument - By Ms. Bolstad

1   you cannot live without knowing what's going on.

2           There's -- the living room is -- consists of a couch

3   and surveillance equipment.  The front door has a jammer in

4   place.  You can't get in or out of that house without removing

5   the jammer.

6           The kitchen is not a place for making food.  The

7   kitchen is a place for packaging drugs.  That's all it was.

8   Scales, packaging equipment, and a heat sealer.  You cannot

9   live there without knowing what's going on.

10          His statements:  I'm not involved.  I'm not involved

11  in any drug dealing.

12          What about on this packaging here, sir?  Are your

13  fingerprints going to be on the packaging?

14          Oh, yeah, probably.  But only because I touched the

15  cellophane in the kitchen.

16          So you have to evaluate that statement.

17          I mean, maybe.  Maybe he touched the packaging in the

18  kitchen and maybe he didn't know about the drugs.  That might

19  fly except for one huge thing.  On his cell phone are text

20  messages about drug dealing.  He's talking about pounds and

21  halves and money.  And that's right in the same time frame as

22  all of this is happening.  Raul Arcila knows exactly what he's

23  doing.

24          You also have Mr. Baker identifying Raul as somebody

25  who participated in delivering drugs.  Which brings me to the

788

Closing Argument - By Ms. Bolstad

 1  third element of Count 1, and it's really the second major

 2  issue I told you about.

 3          So the first issue, is there a conspiracy?

 4  Absolutely.  The second issue is did the drugs from that

 5  conspiracy result in death?  And so that's why we went very

 6  carefully through the chain of distribution.

 7          We started with Morgan -- we started with Mr. Justin

 8  Delong, at the very bottom.  We next heard from Morgan Godvin.

 9  She's the one who shared her heroin with him, one gram for 80

10  dollars.  And that one gram, it's about this size (indicating).

11  This is what was left of his one gram found under his body.

12  It's like Russian roulette.  You never know how strong it's

13  going to be.  That's what caused his death.

14          You heard from Ms. Godvin, and she told you about the

15  horrific pain that you go through when you have heroin

16  withdrawal.  She told you -- she admitted to the police at the

17  time, she admitted to you on the witness stand that she dealt

18  the drug.  And she was forthcoming with the agents on scene.

19  She said, I get my drugs from my roommate, Mike Rosa.  He lives

20  right upstairs.  It's a very convenient source.

21          So the police talk to Mr. Rosa.  He too admitted to

22  being a drug dealer.  They found a lot of evidence about drug

23  trafficking with him.

24          And Mr. Rosa is a drug dealer.  He admitted that he

25  allows Morgan to -- to buy his drugs on credit.  And then he

789

Closing Argument - By Ms. Bolstad

1   told the police where he gets his heroin.  The police worked

2   with Mr. Rosa to make a buy from Mr. Baker.

3           Same thing happened.  Mr. Baker admits to being a

4   drug dealer, and he tells the police where his drugs come from.

5   That's what led to Mexican Bobby and the conspiracy.

6           You will hear from the defense soon, and I can

7   predict for you that the defense will tell you, You can't

8   believe these criminals who testified.  You can't believe them.

9           And I'm not asking you to find these defendants

10  guilty based on the words of criminals.  I'm just not.  And the

11  police don't just take the word of criminals, either.  It's

12  definitely a start.  Definitely a start.  But what the police

13  do is they look for corroboration.  Right?  If Ms. Godvin is

14  saying that Mr. Rosa's her source, we're going to corroborate

15  that.  And if Mr. Rosa is going to say his source is Mr. Baker,

16  we're going to look at the phones.  And Mr. Rosa's biggest lie

17  in this case is when the police told him after that initial

18  buy, Don't go talk to Mr. Baker.  We are investigating

19  Mr. Baker.

20          He lied to the police because he did go buy more

21  heroin from Mr. Baker.  He did that.  And that's not good

22  because he broke the rules.  Right?  But what that lie tells

23  you is that Mr. Rosa had nowhere else to go for heroin.  That

24  was his source.  It was his sole source of supply.  That's how

25  badly he needed heroin.

Closing Argument - By Ms. Bolstad

790

1          And Mr. Baker's information about where he gets his

2    drugs is all verified in those phone records that you have in

3    the exhibits.

4          The pattern that was determined is very telling.

5    It's the same pattern that played out on April 2nd; the pattern

6    that was observed by law enforcement.  And so they don't have

7    to guess.

8          Baker calls for drugs to Mexican Bobby.  Mexican

9    Bobby picks up a different phone to call his colleagues and

10   tell them to go deliver the drugs.  Multiple calls take place.

11   That pattern happened on all of the prior deals.  You can look

12   at those records for the dates of March 29th, March 31st, April

13   2nd.  It's the dispatch model of distribution.  You heard from

14   Sergeant Kubic all about that.

15         And so the second major issue, whether the heroin

16   distributed by these defendants, whether it's that heroin that

17   resulted in death, that second issue was first; from the bottom

18   up, that's how the chain was worked.  Second, each member of

19   the chain at the higher levels confirmed that he or she

20   distributed below.  So bottom up; top bottom.  And it was all

21   confirmed by Detective Andersen looking at phone records.  What

22   you do not have in evidence, there is zero evidence of other

23   sources of supply.  There's not even -- there's not even

24   speculation about other sources of supply.  This is the chain.

25   It's the only chain you heard about.

Closing Argument - By Ms. Bolstad                791

1          Based on those three elements we've gone through for

2    Count 1, I'm asking you to find each defendant guilty beyond a

3    reasonable doubt.

4          If you find the defendants guilty on Count 1, then

5    you are asked by the Court to answer a special verdict

6    question.  This is where it might get confusing, so I want to

7    take a moment to clarify.

8          There's a special verdict question about whether

9    people dying is a foreseeable result.  Foreseeability is not an

10   element of Count 1.  Okay?

11         So you have to decide Count 1 first, based on the

12   three elements that are in the instructions.  If you find that

13   it's guilty, then you turn to this question.

14         This question asks, Is it foreseeable?  When you sell

15   heroin, is it foreseeable that people are going to die?

16         You heard -- you heard the evidence.  This is an

17   epidemic.  People are dropping dead left and right.

18         And if your business sells one product, you better

19   know what that product is all about.  If you're a businessman,

20   that's your one product, it has one natural consequence.

21   People use it.  They use it to get high.  In so doing, some of

22   them die.

23         Larry Lewman told you that this is an exploding

24   epidemic.  One that is unlike any he has seen.  It is unlike

25   the China white heroin from Ohio.  This is heroin, black tar

Closing Argument - By Ms. Bolstad

792

1   heroin coming up from Mexico.  And each dose that a user takes

2   is like Russian roulette.  It's gunpowder heroin.  Each time,

3   there's a risk of death.

4          You heard from the testifying co-defendants.  What

5   terrible numbers.  Do you remember when I asked them, Do you

6   know anyone who's died?  Oh, each of them knows people who have

7   died.  The irony of ironies:  The dead victim in this case,

8   Mr. Justin Delong, he sold heroin that killed Tim Goshorn's

9   brother.  Justin Delong is no angel.  He's a heroin addict.

10  One who sold heroin to feed his own habit.

11         So the -- the issue of whether people know that using

12  heroin might cause death, that's just -- there's no other

13  result.  It's absolutely foreseeable to the defendants.

14         Count 2, conspiracy.  It's a lot like Count 1, except

15  it does not have the third element.

16         I'm not going to cover these elements again.  You

17  just need to find agreement.  Each one joined it, knowing of

18  the purpose, and intended to help accomplish the purpose.

19         The special verdict question on Count 2, is it a --

20  is it a distribution conspiracy that involved over 1,000 grams?

21  Absolutely.  Let's go to the evidence.

22         You heard the stipulation about lab testing.  The

23  exhibits are all in your binders.  The lab tested each quantity

24  of heroin that was seized by the police.  Okay?

25         So we can only test what we actually seize, but the

Closing Argument - By Ms. Bolstad          793

1   conspiracy is so much more than what we are able to seize.  The

2   grand total of what the police got is 663 grams.  That's from a

3   five-day period with one customer stream.

4          You're smart people.  You'll be able to do the math.

5   Shane Baker is not the only customer for this organization.

6   That would be ridiculous if he was.

7          And Shane Baker's distribution stream, there's over

8   600 grams in five days.  Multiply that out.

9          Beyond Shane Baker and the five days, you know that

10  Mr. Baker was buying from this group for all of March, eight

11  pieces at a time.

12         But you don't have to rely on Mr. Baker.  You have to

13  look at what was seized at location 1 (indicating exhibits).

14  Drug packaging, location 1.  Pure, pure, pure.  DEA, Special

15  Agent Josh Blankenship told you about the packaging.  This

16  stuff was found by the laundry -- in the laundry room at

17  location 1.  It's like a puzzle.  Some of these are broken

18  apart.  But he counted at least six of these packages.  And he

19  told you that each package, which has brown residue and smells

20  of vinegar, each one holds at least one kilo of heroin.  That's

21  1,000 grams, 2,000 3,000, 4,000, 5,000, 6,000 grams of heroin,

22  plus the lab testing of the items we seized.  It is easily over

23  1,000 grams of heroin.

24         You heard from Sergeant Kubic about the drug pricing.

25  I like to talk about pricing and profit because the difference

1    in the chain of distribution here is that the three people at

2    the bottom of the chain, Ms. Godvin, Mr. Rosa, and Mr. Baker,

3    they're in this business because they're addicts.  They're

4    doing it -- they started doing it to feed their addiction.  It

5    went from there.

6            These defendants, they're not in the business to feed

7    their addiction.  There's no evidence of heroin use at their

8    house.  They're in the business for the money (indicating

9    exhibit).  And there's a lot of money to be made.

10           You heard about Mr. Baker's profits that he

11   squandered on video poker.  From one customer, Mike Rosa,

12   buying four pieces at a time, Mr. Baker profited 1,000 dollars

13   he made 250 on each ounce.  He had four of those customers to

14   whom he would distribute one to two times a week.  That's Mr.

15   Baker's profit.  Imagine the profit of Mr. Arcila and

16   Mr. Sandoval-Ramos.

17           Moving on to Counts 9 and 10.  These counts focus

18   just on Mr. Arcila.  They are from single date and time events.

19   They are not the overall conspiracy, but they're part of it.

20           So you -- the question for you is whether Mr. Arcila

21   knowingly possessed heroin and whether he possessed it with the

22   intent to distribute.

23           How do I prove what someone intended?  You can't look

24   inside their brain.  That's why I called Sergeant Kubic to tell

25   you about whether 8 ounces is a distribution quantity or a user

Closing Argument - By Ms. Bolstad

1    quantity.  And he told you, easily, that the amount of heroin

2    seized from Mr. Arcila's vehicle, each time, is a distribution

3    quantity.  Thousands upon thousands of user quantities.  There

4    are thousands of these little gram quantities in 8 ounces of

5    heroin.

6          Did Mr. Arcila know that heroin was there?  Yes.  He

7    thinks his fingerprints would be on it possibly, and he's

8    living at a den of drug dealing.

9          Each of those counts, 9 and 10, has a special verdict

10   question.  8 ounces, remember my obvious question of the week?

11   Is that more than 100 grams?  Yes.  Please check the box yes

12   for 9 and 10.

13         At the end of the day, the case comes down to a lot

14   of evidence linking these two men to a lot of evidence of drug

15   dealing.

16         In the jury instructions, Judge Brown tells you to

17   use your common sense and your reason.  I know you have that.

18   Please employ it here in your deliberations.

19         These men conspired together to distribute drugs, to

20   make money.  And, unfortunately, one of the consequences of

21   their business is that people die.

22         This book that we have read to you this week is not

23   the solution to that problem.  There are other books that

24   address the solution.  But it's one part of the solution.  We

25   have to knock off the head of these organizations that's

796

Closing Argument – By Ms. Bolstad

1   putting this poison into our market and into our community.

2   This book is one of the answers.  There are other answers as

3   well.

4               I ask you to find each defendant guilty beyond a

5   reasonable doubt.  Thank you.

6               THE COURT:  Thank you, Ms. Bolstad.

7               Jurors, we'll take a 15-minute recess.  Give you a

8   chance to stretch your legs, and so forth, before we have

9   defendants' arguments.

10              Do not talk about the case yet.  The time is coming,

11  but not yet.  Watch your step, please.  Notes and papers on the

12  chair still.  Thank you.  Watch your step.

13              (Jurors exit.)

14              THE COURT:  Thank you, everyone.

15              Are there any other matters for the record we need to

16  note before the recess?

17              Ms. Bolstad?

18              MS. BOLSTAD:  No, your Honor.

19              THE COURT:  Mr. Andersen?

20              MR. ANDERSEN:  No, your Honor.

21              MR. SEPP:  No.

22              THE COURT:  Okay.  15 minutes, please.  Thank you.

23              (Recess taken, 10:24 a.m.)

24              THE COURT:  Anything for the record before we

25  proceed?

797
Closing Argument - By Mr. Andersen

1          MS. BOLSTAD:  Not for the Government.

2          MR. SEPP:  Nothing.

3          THE COURT:  All right.  Mike, would you see if you

4     can find Mr. Minetto.  Ask him to please bring in the jurors.

5          (Jurors enter, 10:43 a.m.)

6          THE COURT:  Please rise for the jury.

7          Thank you, everyone.  Please be seated.

8          All set, jurors?

9          All right.  Please now give your attention

10    Mr. Andersen on behalf of Mr. Sandoval-Ramos.

11         Counsel.

12         MR. ANDERSEN:  Thank you, your Honor.

13         Ladies and gentlemen, I was here a few days ago, and

14    what I said then is the same thing I'm going to say now, at

15    least to begin.

16         You're going to hear a lot of evidence about drug

17    dealing, about heroin.  Right?  About the lifestyle.  I think

18    we heard about two days of that sort of testimony.  I also said

19    you're not going to hear a whole lot about Fabian

20    Sandoval-Ramos.

21         But I would like to talk first about those two days

22    that we heard; about -- about the supposed chain.  Right?

23         There's two big issues at stake here.  One is whether

24    this chain is sufficient.  And the other is whether or not

25    Mr. Sandoval was involved in a conspiracy; whether or not the

Closing Argument – By Mr. Andersen

 1    evidence that we've all seen and heard can lead you to that

 2    conclusion beyond a reasonable doubt.

 3            So let's start off from the beginning.

 4            Now, the Government has just said that there's zero

 5    evidence of any other sources of supply.  Right?  And as you

 6    heard from Detective Andersen, it's important to determine the

 7    credibility of these witnesses in the chain.  Right?  Because

 8    you need them to be credible because they're going back in

 9    time.  Right?  You're not doing a controlled buy before the

10    death.  You're not able to do that.  You're just making the

11    chain up from the testimony -- not making the chain up.  You're

12    creating this idea of a chain from the testimony of each one of

13    these witnesses.  So it's very important to look at each one of

14    these witnesses.

15            But let's start with Mr. Delong himself.

16            Now, you've got in evidence some of the text messages

17    that he was sending that night.  Right?  We've got the

18    Government's Exhibits 10 and 13.  Both of those are text

19    messages from Mr. Delong's phone.

20            You've also got Defense Exhibit 201.  And I would

21    like you to take a look at that one also, when you're back in

22    the jury room, because that helps paint the picture of the

23    beginning of this -- of this story.  Right?

24            And what we can see from these three exhibits is that

25    Mr. Delong is reaching out to find somebody to give -- to sell

Closing Argument - By Mr. Andersen                799

1  him some heroin.

2          Who does he reach out to?  He reaches out to Morgan

3  Godvin.  We know that.  He reaches out to Cat.  Right?  We know

4  that.  She's the one who gave him a ride.  He is starting out

5  somewhere in Aloha, in Beaverton.  He needs to get -- to get to

6  Morgan at least, he needs to get across town, over to Gresham.

7  Right?  She lives at 187th Street, I think.

8          So this series of text messages starts coming out of

9  his phone.  He says, to Cat -- he says, Hey, Cat, you know, I'm

10  looking to get some heroin.  What about you?

11          She says, well -- she says, Yes, I would like some

12  heroin too.  Can I get a dub from you?  Like, do you mind

13  hooking me up with, like, a dub, she says.  So she's in on

14  this -- on this deal, too.

15          And, now, in this text message exchange, if you look

16  at about 11:15, Justin says, that sounds good.  I'm trying

17  Morgan but I've already got Nick.  Right?  So that's clear

18  evidence of another source of supply already.  Right?

19          And do we know what happened with Nick Post?  Well,

20  we know from the text messages in Defense Exhibit 201 that they

21  did make a deal.  That Nick Post did have something to give

22  Justin Delong.

23          And then he gets stuck on the side of the highway.

24  Right?  I-5.  He's somewhere on I-5.  He's stuck.  He needs a

25  ride real bad.  He writes "bad" in capitals here.  Take a look

1    at the exhibit when you get back there.  All right?

2         So we know Nick Post has heroin, too.  We know Nick

3    Post needs a ride real bad.  We know that Justin Delong has got

4    a ride from Cat.

5         But what we don't know is what happened with Cat or

6    what happened with Nick Post.  Right?  Because the

7    investigators didn't bother to find Cat or Nick Post.  Right?

8    They had the phone number, they had the name, they -- they knew

9    who they were.  Did they go and find them?  No.  Because that's

10   how these types of operations work.  You heard from a bunch of

11   investigators about that.  Right?  You get to the death.  You

12   just start moving.  You start moving, you start moving.  You

13   heard from the DEA agent it takes months to put together a case

14   against somebody for drugs.  Right?  It took three days here,

15   four days.  Because they're moving, they're moving, they're

16   moving.  Right?

17        You heard from Detective Andersen that it's helpful

18   if you have three or four sources of supply for each level of

19   the chain because then you can investigate them all.  But is

20   that how it works?  Do you think that's how it works?  Do you

21   want that, if you're an investigator?  No.  You want to know

22   who I can go up the chain next.  Who I can get next, next,

23   next, because we're going.  We've got three days to do this.

24   We've got four days.  We're not going to set up surveillance

25   and wiretaps and anything that extensive.  They had

Closing Argument - By Mr. Andersen

1    surveillance here.  Right.  But they're moving quick.

2           So they don't have time to talk with Nick Post.  They

3    don't have time to talk to Cat when it appears at least Cat was

4    the last person to see him alive.  Was she there with him when

5    he used?  Was she using then, too?  We don't know.  We don't

6    know.

7           All right.  Did they ever go pick up Nick, who's

8    waiting by the side of the interstate, as they're coming back

9    from Gresham to go to Aloha?

10          Look at the text messages (indicating).  Right?  And

11   look at the last one that's unsent.  That's Justin saying,

12   Sorry, Nick, I can't pick you up.  That's unsent.  Didn't ever

13   send that.  So that, right there, is something to begin with

14   when you think about whether or not there's zero evidence of

15   other sources of supply.  Right?  So consider that.

16          But let's keep moving up the chain that -- that the

17   Government wants you to move up.  All right?

18          We get to Morgan Godvin, and she admits that she gave

19   heroin to Justin Delong.  That seems pretty clear.  She doesn't

20   know anything about what happened afterwards.  She doesn't know

21   if they went and picked up Nick Post.  She can't know.

22          And nobody in this chain can know what the person

23   below them was doing.  They can confirm that at some point they

24   gave him heroin.  They can say, Yeah, in the past I gave him

25   heroin, too, and I just gave him heroin on a controlled buy.

Closing Argument - By Mr. Andersen

1    They can confirm that.  But that doesn't rule out other

2    sources.  Right?

3            So let's talk about Morgan Godvin.  She has a pretty

4    good set up.  Right?  But listen to some of the testimony she

5    said.  She saw her role in part as supplying heroin to others

6    when their sources of supply weren't supplying them.  So that,

7    right there, is even evidence that somebody who is looking to

8    get supplied by heroin might have to go through one or two

9    three different sources of supply.  Right?

10           If I call Fred -- right? -- he's the guy I like to go

11   through.  Maybe he's out that day, so I need to call somebody

12   else.  Because you heard a bunch of testimony about how if

13   you're using heroin, if you're addicted to heroin, you need to

14   get your supply or else it's like razor blades.  It's like the

15   flu times a hundred.  A couple of different people said that.

16   It's kind of curious that it's the same way of describing it.

17   But it's the flu times a hundred.  So you need to make sure, as

18   a user, that you've got a steady source of supply.  And that

19   means you've got to be able to go to multiple sources if you

20   need to.  Right?

21           And that's what Morgan Godvin said.  She acted as one

22   of those sources of supply for people when they had problems

23   with any other sources.

24           So where did Morgan Godvin get her heroin?  I think

25   it seems pretty clear that she got it from her roommate.  That

Closing Argument - By Mr. Andersen

1    seems like a pretty good set-up for her.  But she also talked

2    about other sources she had had in the past.  She knows other

3    people, too.

4            But let's move up to Michael Rosa.  Right?  Is there

5    any other evidence of him having any other sources of supply?

6    Of course, there is.  He just went to Ohio, and he came back

7    with heroin.  Right?  He says that he came back with the China

8    white heroin.  But is that evidence of another source of

9    supply?  It sure is.

10           And then let's kind of take a step back, too, and get

11   back to this investigation.  Because how do these

12   investigations work?  Right?  You're moving quick.  And when

13   you're moving quick, you need to make people move with you.

14           And how do you make them move?  You come up to them,

15   just like everybody testified -- this is what happened to them.

16   The police come up to them and say, Hey, this isn't just a

17   normal delivery drug -- delivery of heroin charge we've got you

18   on.  You know, you heard Sergeant Kubic talked about how in a

19   regular delivery you might go to jail for a day.  All right?

20   And then you get released.  This is not one of those.  Right?

21           The police come to you and say, Hey, you need to give

22   us a solid lead on somebody or you're looking at 20 years.  You

23   need to tell us who your supplier is.  Right?

24           They don't say, Who are your suppliers.  Right?  Who

25   did you buy heroin from in the last week?  Well, I bought from

Closing Argument - By Mr. Andersen

804

1  Fred.  I bought from Johnny.  I bought from Shane.  Right?

2  That's not what you want to hear when you're investigating a

3  case.  You want to hear one person that you can make a bust on.

4  Right?

5           Does that mean it's true?  Maybe, maybe not.

6           And once you give up one of your sources of supply,

7  you're stuck.  Right?  That's it.  And then you sign a

8  cooperation agreement.  And you have got these in evidence.

9  Take a look at them.  Right?

10          And what happens if you breach the cooperation.

11 Right?  Any deal you got is gone.  There you go.  There's the

12 20 years that the police are talking about to you at the

13 beginning.  Right?

14          So if you don't stick with what you said initially,

15 if you don't help the Government move up a chain, well, then

16 you've got problems.  Right?  Because who decides whether or

17 not you break this agreement?  It says right here, The

18 determination of whether these cooperation terms have been

19 breached rests exclusively with the USAO.  That's the United

20 States Attorney's Office.

21          And how do you breach these terms of cooperation?

22 Well, if you give false or incomplete or misleading testimony

23 or information.  Right?  So if you start changing your story,

24 you might have some problems.  If you get up here and testify,

25 Well, I am Michael Rosa.  Right?  I buy from Shane and -- I buy

Closing Argument - By Mr. Andersen

1    from Shane.  Right?  But I also buy from -- who -- he named

2    some other sources.  He said -- who were his sources?  I'll get

3    back to that in a little bit.  All right?  He said, Oh, well, I

4    had those sources, but they were afterwards.

5           And that brings me to another point about Michael

6    Rosa that's pretty curious.  Right?  He gets the ounce from

7    Shane Baker, surreptitiously, against what the police are

8    telling him.  And that's important because it shows that he's

9    not entirely trustworthy, one.  But what happens after that?

10   He gets this ounce.  Right?  He uses that to continue dealing,

11   to get more money.  And then four days later, five days later,

12   when Morgan Godvin comes back to the apartment, what's going

13   on?  Tim Goshorn is there separating out more heroin to

14   deliver.  He's breaking up more heroin, so they can go sell

15   that heroin.  Because the operation keeps continuing because

16   you've got multiple sources of supply.  You're able to maintain

17   a steady business.  Because if you don't, your customers are

18   going to go to one of their other sources of supply.  Right?

19   That's not good.  You want to keep your customers happy.  So

20   you need to -- if you're going to be a conscientious dealer

21   like Michael Rosa is, you need to maintain a source of supply

22   that is going to be able to supply your customers.  All right?

23   So that means you don't put all of your eggs in one basket

24   because people get busted.  Right?

25           So let's move up one more level, to Shane Baker.  All

806
Closing Argument — By Mr. Andersen

1    right?  What do we know about Shane Baker?  Well, we do know

2    this.  Three months before, he was involved in a heroin

3    overdose case.  Right?

4            The police came to him then and said, Hey, Shane

5    Baker.  Right?  Do you think it went the same way?  Well, what

6    did he do?

7            He said, Oh, I'll give you a source of supply.

8    Menito, he's my guy.  So they go and bust Menito.  But does

9    Shane Baker stop?  No, because he has multiple sources of

10   supply.  He can continue to sell, and he does.  Right?  You

11   heard about him testifying about Shorty.  Right?  He was

12   trying -- he was meeting Shorty and getting together with

13   Shorty.  And Shorty was supplying him in January.  Right?

14           He turns in Menito in January.  Right?  So people get

15   arrested.  And sometimes they get arrested because you have to

16   sell them out because you have got to stay out of jail, just

17   like Shane Baker did three months before.  Right?

18           How do you stay out of jail?  Well, point to Menito.

19   They go get Menito.  There goes Menito.  And you're still on

20   the street.  Right?  Shane Baker is still on the street.  And

21   for those three months, he continues to deal and he continues

22   to cultivate.  Does he cultivate multiple sources of supply

23   again?  Do you think that's reasonable?

24           Now, here's another thing, too, I forgot to mention

25   about -- about the investigation.  There was some surveillance

807

Closing Argument – By Mr. Andersen

1    on a bunch of different places.  One of the places they

2    surveilled was Morgan Godvin and Michael Rosa's house, Tim

3    Goshorn's house.

4          And I think you heard from Detective Andersen about

5    this sort of odd thing they saw.  They saw this woman go into

6    the apartment and then come out of the apartment.  Right?  Get

7    a shoebox and go back into the apartment.

8          Is that evidence?  Is there zero evidence of a --

9    other sources of supply?  Is that evidence of another source of

10   supply?  What do you think is in that shoebox?  We don't know.

11   Right?  But you can use your common sense.  All right?

12         Why would somebody go into a house that we all know

13   is a house where drug dealing is going on, come out of the

14   house, get a shoebox, and come back in.  What is in the

15   shoebox?  Is it shoes?

16         So we get to Shane Baker.  And what happens with

17   Shane Baker?  Right?  They say, Shane Baker, where do you get

18   your stuff?  He knows how the game is played.  Right?  He's

19   played it before.  He says, Oh, I've got one source of supply.

20   It's Mexican Bobby, Mexican guy.  Right?  Chubby.  He's got

21   hair.  Got ears.  Right?

22         So he goes -- he sets up the buy with Mexican Bobby.

23   He calls Mexican Bobby.  Apparently in California.  Right?

24   That's where Mexican Bobby is, apparently.

25         And then they do the investigation.  They find Fabian

Closing Argument - By Mr. Andersen

1    Sandoval-Ramos's name.  And what do they do?  They get a

2    picture of Fabian Sandoval-Ramos, and they send it to the jail.

3            You heard what Shane Baker said.  Right?  Somebody

4    came in from the jail and said, Is this Mexican Bobby.  And he

5    said, Yeah, Mexican.  He's got ears.  Right?  Sure.  Right?

6    I'll tell you whatever you want.

7            And that brings me to his testimony.  I don't know if

8    you were watching his testimony.  He was pretty interesting.

9    When it got to the point -- you know, the Perry Mason moment

10   where he points out -- right?  He points out.  Who's Mexican

11   Bobby?  Right?  He points to Fabian Sandoval-Ramos.  Right?

12           But then what happens next?  He says, Oh, well, I --

13   does he have ears?  Can I see his ears?  Oh, I guess he has

14   ears.  Maybe that's Mexican Bobby.  See but, at the beginning,

15   he knows what he's supposed to do.  He's supposed to point out

16   the bad guy.  Right?  He's supposed to point out Mexican Bobby.

17   Because if he doesn't, there goes his cooperation agreement.

18   Right?

19           But then when he thinks about it, he goes, Well, I

20   don't know.  He was in the back of a car.  I saw him, you

21   know -- did I see him?  It could have been him.  It could have

22   been that other picture they showed me.  Right?  He didn't even

23   remember the second time that the police came in, about a week

24   later.  Right?  But what he did remember was that when he goes

25   into heroin withdraw he has hallucinations.  Right?  He's got

Closing Argument – By Mr. Andersen                    809

1   the flu times a hundred.  Right?

2           So when the police come in and show him another

3   photo, is he going to sit there and ponder and think about it?

4   Or was he just going to say whatever it takes to keep this

5   thing moving?  Right?

6           And then, finally, when they have another meeting

7   about two months later, when the Government shows him a couple

8   more photographs, then he starts having troubles.  Right?  When

9   it's not just one photograph, then he starts having troubles

10  with his identification.  All right?

11          When I showed him a picture, that you didn't get to

12  see, he said, Oh, that could be him too.  Right?  And what did

13  he say?  He said, He's a Mexican, and he's got ears.  Right?

14  He's got earlobes.

15          You know, another thing that was interesting about

16  what Shane Baker was saying, too, is that he described this

17  process that he would do about mixing heroin and kind of

18  boiling it.  I don't know if you followed all of that.

19          It was tough to follow some of what Mr. Baker was

20  saying.  But he talked about how he would get heroin and he

21  kind of would melt it down.  He would get some powder.  He

22  would let it cool.  You know, he would make some black tar.  He

23  would mix in whatever cut he was mixing in.  Right?  So he's

24  changing this heroin.  And that's kind of interesting, too.

25          You know, I think it was Michael Rosa who described,

Closing Argument - By Mr. Andersen                    810

 1  when he was getting his supply, it would vary.  Right?
 2  Sometimes it would be powdery, sometimes it would be tar,
 3  sometimes it would be something different.  Right?  And that
 4  goes back to this idea that if you are supplying people with
 5  heroin, they need the heroin, you need to make sure your supply
 6  is going to be steady.  So you need to have -- if either one
 7  doesn't have it, then maybe dealer 2 will have; maybe dealer 3
 8  will have it.

 9          So based on this idea from Shane Baker -- right? --
10  the Government knows that they've got Mexican Bobby now.
11  Right?  They have an ID.  They know what they're going for.  So
12  then the next part of the investigation starts happening.

13          And I think it's important to keep in mind what the
14  investigators are doing at this point.  Right?  They're not
15  investigating the whole -- they're focused on where they need
16  to go because they think that's where the chain leads them.
17  And that's -- that might make sense -- right? -- for -- from an
18  investigation standpoint.  But we're talking about a different
19  thing now.  We're talking about whether or not the evidence
20  shows beyond a reasonable doubt.  Right?

21          So they start with the second part of the
22  investigation.  They -- let's -- they go to Fabian's -- Fabian
23  Sandoval-Ramos's house.  Right?  Knock on the door.  They're
24  all -- ten police officers, or more.  Right?  They don't
25  remember handcuffing anybody.  But there's three kids there.

Closing Argument – By Mr. Andersen

811

 1    There's a family, wife.  All right.  And they start searching

 2    the house and searching the house.  And they don't really find

 3    anything, you know.

 4          What they do find is this yellow piece of paper that

 5    you've got in evidence.  I forget what number it was.  But take

 6    a look at that.  And, you know, when I asked Detective Miller

 7    about that -- all right, I said, Well, some other officers have

 8    already -- I didn't say that to him.  But other officers had

 9    already talked about the context of things.  When you're

10    looking for evidence, the context matters.  Right?  So I asked

11    Detective Miller, What's the context of this shoebox?  What

12    else did you find in the shoebox?

13          I don't know.

14          Does it matter?  Were they tax records?  Were they

15    love notes?  Were they pay stubs?  Who knows?  Right?  Because

16    that's not the focus of the investigators at that point.  The

17    focus is just to grab stuff that helps their case.  Right?

18    Because they know what they've got.  They've got Mexican Bobby.

19    Case closed.  All right.  So that's the approach.

20          And then the description of -- of the interview with

21    Mr. Sandoval-Ramos was kind of interesting, too.  You heard

22    Detective McNair talk about that interview, and he described it

23    as casual.  It was just a casual talk.  Do you think that's

24    accurate?  Do you think that's accurate?  Is it casual to have

25    ten armed agents come into your house and search through

Closing Argument – By Mr. Andersen

1    everything?  Herd your family together?  Are you going to have

2    a casual conversation after that?  Is that casual?  Maybe from

3    the agent's point of view.

4         You know, and then -- by then, the Mexican Bobby ID

5    starts to fall apart.  Right?  But what's the agent's approach

6    to that?  You heard -- I think it was Agent Blankenship talk

7    about that.  Right?

8         What's agent -- what's Mexican Bobby now?  Well, he's

9    sort of an idea.  Right?  We -- it could have been Fabian

10   Sandoval-Ramos, maybe.  I don't know.  Does it really matter?

11   Yeah.  Does it really matter?  I think it does.  But to the

12   agents, it doesn't really because they're just moving.  They're

13   moving.  Right?

14        And so what is the evidence that the Government

15   contends shows that Mr. Sandoval-Ramos had an agreement with a

16   specific objective; that is, to deal heroin?  What's the

17   evidence?  I think the Government listed five things.

18        All right.  The paper trail, the surveillance,

19   packaging, drug records, the phones.

20        Let's talk about the paper trail.  All right.  What's

21   the paper trail?  Is that ownership of the car?

22        And the prosecutor said that Fabian was paying the

23   bills.  Fabian Sandoval-Ramos was paying the bills at the --

24   what do you call it?  L1.  Is there any evidence he was paying

25   the bills there?  Is there any evidence that he was the one

813
Closing Argument - By Mr. Andersen

1    paying the bills?  He's on the -- on the -- on the account.

2    Right?  He's on the car.  Right?  That goes back to -- let's

3    think about -- what Sergeant Kubic was saying.  Right?  About

4    how these types of operations work.  All right?  You've got

5    to -- you want to move with anonymity.  Right?

6          So if I'm Placido Ramirez-Coronel, I don't want to be

7    driving around with a car registered to Placido Ramirez-Coronel

8    necessarily.  So is it -- so what does that mean?  Right?  What

9    does that mean, the paper trail?

10          All right.  We talked about the surveillance.  We

11   never see Mr. Sandoval at that house at L1.  The -- the

12   evidence never shows him at that house.

13          And, you know, the surveillance idea brings up

14   another issue, too, that the Government was kind of raising in

15   their case about this surveillance camera.  Right?  There's a

16   surveillance camera at L1.  And there's a surveillance set up

17   at L1.  And there's the bar to the door at L1.  And that's all

18   evidence to consider about L1.

19          And then we get to L2, and what happens?  Well, I

20   asked -- who was it?  Blankenship, maybe.  About what sort of

21   evidence of surveillance there was at L2.  And he just said,

22   Oh, there's surveillance equipment.  But he didn't take

23   pictures of that.  He didn't note that as some sort of

24   important issue.  Do you think it would be an important issue?

25   Did you hear any evidence of a TV setup or about a -- barring

Closing Argument - By Mr. Andersen

814

1    the door, or any of these other measures that you hear about at

2    L1.   Right?

3             The testimony was that was his house.   Right?   That's

4    where his family lived.

5             You know, and this lactose -- the Government brings

6    up the lactose, too.   Right?   That's thrown away.   Right?   It's

7    not opened.   It's not used.   It's thrown away.   And look at

8    the -- the picture there of the lactose in evidence.   It's in a

9    garbage bag with other garbage.   Right?   And what's the garbage

10   that's there?   It's a phone bill with Fabian Sandoval-Ramos's

11   name on it.   Right?   Is that -- is that -- I mean, is that --

12   is that -- is that evidence of trying to hide it?   Maybe.   It's

13   shredded up.   Right?   But would you put your phone bill in

14   there?

15            There was a lot of talk about the phone, too, being

16   sort of separated.   But you heard Agent McNair -- Detective

17   McNair was crawling around in the dumpster quite a bit.   Right?

18   So what happens with the separated -- you know, here's the

19   phone here and here's the back of the phone there.   Right?   Is

20   agent -- is Detective McNair crawling around and moving

21   everything around when he's crawling around in the dumpster?

22   Probably.   Right?

23            Then we get to this -- this notepad (indicating).

24   Right?   Fingerprints on the notepad.   On the first page.

25   Right?

1      But you heard from Mr. Solis that doesn't indicate

2  that there was writing on here when the fingerprints were put

3  on here.  That doesn't indicate that the person holding it was

4  writing.  And, in fact, what it could indicate is that, you

5  know, you write on one page, you flip the page to tear it off.

6  Right?  You tear it off.  Right?  There's nothing on the page

7  below.  Right?  You want to write notes to someone, you write

8  it on the notepad, you tear it off.  All right?  Count the

9  pages in here.  It's a hundred sheets.  Is there a hundred

10 sheets in here?

11     So what does that show?  That shows he handled that

12 at one point.  That doesn't show anything about whether or not

13 there were drug records on it, whether or not those are even

14 drug records.  So what does that show?  Right?

15     And then we get to the phones, which do show

16 connection.  But what does that show?  Look through those toll

17 records.  You know, we've got a summary that is provided by the

18 Government.  I tried to ask a couple of questions about that.

19 Just -- it seemed like some things were a little -- and I think

20 it's accurate for what it's worth.  But what does it really

21 mean?  Right?  This 34-second phone call that we kind of went

22 back and forth with Detective Andersen about.  That's not

23 actually a 34-second phone call.  That's not even a phone call.

24 That shows up that that's missed.  All right?  So are these

25 communications?  Are these phone calls?  Or what do they mean?

816
Closing Argument – By Mr. Andersen

1   What does that show?  Does that show that there's an agreement?

2   All right?  Because at the end of the day, that's the issue.

3          We've already talked about the death, whether or not

4   that's connected.  Whether or not you believe beyond a

5   reasonable doubt that every one of those connections is rock

6   solid.  Right?

7          Now we're talking about the agreement.  And what's

8   Mr. Sandoval's role in this agreement?  What does the evidence

9   show about his role?  Is he Mexican Bobby?  Because it doesn't

10  seem like it.  Is he the big boss man?  What's his role?

11  Right?  Why in a -- in an operation -- as Detective Kubic

12  described, in an operation where you want to try to maintain

13  anonymity, why is his name all over everything?  Does that make

14  sense?  Is that his role?

15         So those, I think, are all some things to consider

16  about this case.  Right?  And at the end of the day, or at the

17  end of -- I guess, before noon, you're going to get a chance to

18  look through all of the evidence.  Right?  To talk about what

19  you heard, talk about the investigation, talk about the

20  evidence.  All right?  And then what?  What do you do?  Right?

21  You've got to decide whether or not the evidence that you've

22  heard convinces you beyond a reasonable doubt that the evidence

23  you heard from Morgan Godvin, Michael Rosa, Tim Goshorn, Shane

24  Baker -- right? -- all of the officers involved, whether or not

25  that convinces you beyond a reasonable doubt that

817

Closing Argument – By Mr. Sepp

1   Mr. Sandoval-Ramos is -- what?  What is he?  Does it convince

2   you beyond a reasonable doubt he's Mexican Bobby?  What does it

3   convince you beyond a reasonable doubt he was?  What's his

4   agreement?  All right?  Is -- does he have an agreement to

5   deliver heroin?  Is that what the evidence shows or not?

6   Because if it's there, it's there.  But if it's not, it's not.

7   All right?  If it's there, it's there.  If it's not, it's not.

8          So, you know, you're going to have this verdict form

9   that we talked a little bit about.  Here it is (indicating).

10  Here's my copy, at least.  Right?  You're going to have to

11  decide what you mark on that.  Whether or not it's there.

12  Whether or not beyond a reasonable doubt you can convict

13  Mr. Sandoval-Ramos of being -- what?  Well, can you decide

14  what?

15         Because if you can't -- because if you can't decide,

16  then the verdict is not guilty.  And that's what I'm asking to

17  you put on that verdict form.

18         THE COURT:  Thank you, Mr. Andersen.

19         Jurors, please give your attention now to Mr. Sepp,

20  on behalf of Mr. Arcila.

21         MR. SEPP:  Thank you, your Honor.

22         THE COURT:  Counsel.

23         MR. SEPP:  Good morning.

24         Well, as you can imagine, a lot of what I was going

25  to argue and sum up in closing you just heard.  And I'm not

818

Closing Argument - By Mr. Sepp

 1  going to go over it all in detail.  A lot of it is the same,
 2  except for there will be some distinctions.
 3          I'm not going to go over the biasness that you
 4  potentially can or will or won't find as to Mrs. Godvin,
 5  Mr. Rosa, and Mr. Baker.  You've heard that enough.
 6          As far as the state -- excuse me, the Government
 7  telling us that -- or telling you that there is no evidence of
 8  a substantial other source or even another source, I believe
 9  you heard enough about that.  I was going to refer to --
10          INTERPRETER MACHUCA:  Your Honor, I'm terribly sorry.
11  The interpreters are not able to hear Mr. Sepp completely.
12          MR. SEPP:  Thank you.  I will speak up.
13          THE COURT:  All right.  Excuse me, though.  It seems
14  like the last few remarks you made may not have been
15  interpreted.  So would you go back and make your last couple
16  points again --
17          MR. SEPP:  Sure.
18          THE COURT:  -- as far as the Government telling us
19  that there is no evidence of a substantial other source.
20          MR. SEPP:  As far as the Government saying that there
21  is no other source, that's not entirely true.  The text
22  messages that Mr. Delong engaged in on his last couple -- the
23  28th and the 29th show that there was communication to Nick
24  Post.  You'll have those.  You'll be able to view those and
25  make your own determination.  I won't need to go over that

Closing Argument – By Mr. Sepp

1  again.

2        The main difference here is my client is mere

3  presence.  It is not a crime to be -- it is not criminal to be

4  found at the scene of a crime.  It is not criminal to be -- to

5  be around other criminals.  Your mere presence around other

6  people who are committing crimes does not make you part of that

7  crime or part of that conspiracy.

8        The jury instructions that you were read, it outlines

9  that.  You'll have those with you.

10        Now, the evidence that the -- the Government has

11  offered against Mr. Arcila comes directly from a controlled buy

12  on March 31st, a controlled buy on April 2nd, and evidence

13  recovered at what has been referred to as L1.  I will start

14  with what occurred at the controlled buy on March 31st.

15        The only person -- the only evidence that places him

16  there on March 31st is the testimony that you heard from

17  Mr. Shane Baker.

18        Mr. Shane Baker, in that testimony, had no details.

19  He could offer nothing to substantiate the days -- what the

20  clothing was Mr. Arcila was wearing, if he wore glasses, a hat,

21  any kind of distinction.  In fact, he did say that he -- when

22  he made these deals, his primary focus and what he was

23  concentrating on was the exchange of the money for the heroin.

24  He was checking the heroin out, and making sure what he paid

25  for he got; holding the weight.  He sat in the back seat.  He

Closing Argument - By Mr. Sepp

1  didn't sit in the front.  He didn't stare at Mr. Arcila.  He
2  sat in the back.  He would have seen his earlobes.  He didn't
3  identify Mr. Arcila's earlobes.  He just pointed to Mr. Arcila
4  in court today.  He was the only person that was sitting next
5  to me.
6          Let's take this a step back.  In Washington County,
7  when he identified Mr. Arcila from a photo lineup or a photo
8  stack, the testimony was he was grumpy that day.  He was not
9  happy.  He was coming off of -- you know, he's coming off of
10 heroin.  Did he really want to be there?  Probably not.  Did he
11 want to really -- was he concentrating?  Was he paying
12 attention to the pictures?  Or was he just looking at a picture
13 and saying, I've seen him.  I've seen him.  I've seen him.
14 I've seen him.  And on and on.  We don't know, you know.  No
15 one can get into his mind.  No one can get into the mind of a
16 recovering heroin addict.
17         Now, again -- now, I go back -- back to the March
18 31st testimony by Mr. Baker.  Interestingly enough, at no point
19 did he identify Mr. Arcila as the person who handed him the
20 drugs, who handed him -- made the exchange.  All he said was
21 that he was present.  Mere presence.  Doesn't say he took an
22 active role.  There's no testimony that Mr. Arcila took an
23 active role in the dealings that were happening between the
24 drug dispatch conspiracy the state -- excuse me, the Government
25 is alleging and Mr. Baker.

Closing Argument – By Mr. Sepp

821

1    Now, moving forward to the -- April 2nd.  My client
2    was indeed part of that controlled buy.  Mr. Arcila was
3    arrested and taken into custody on that day.
4    As you'll see, when reviewing all of the evidence
5    plus the exhibits you'll get in the back, again, as I said in
6    the opening, the car's not registered to him.  He wasn't the
7    driver.  He doesn't keep insurance on that car.  That is all
8    Mr. Sandoval-Ramos.  Well, the registration, excuse me.  He was
9    in the passenger seat.
10    As Mr. Kubic said -- and I asked him a question
11    that -- basically, a hidden compartment.  Is it a hidden
12    compartment?  He said yes.  And the point of that is so that if
13    law enforcement looks into the vehicle, they don't see an
14    obvious alteration to the vehicle.  It's hidden.  There's no
15    evidence that Mr. Arcila knew about the compartment.
16    Secondarily, on that issue, there were no
17    fingerprints recovered from either the heroin that was taken
18    from within the compartment on April 2nd.  Nor were there any
19    fingerprints.  And I don't think they would have been DNA.  But
20    there was no evidence showing that he operated whatever
21    mechanism was required to open and then shut the -- the -- the
22    hidden trap, the hidden trapdoor compartment.  There's no
23    evidence to support that he even knew it was there.
24    Now, they did collect evidence, quite a lot of it,
25    from L1.  And you'll see it all.  They sent quite a few items

1    to Mr. Solis, to have them analyzed for any kind of latent

2    prints that they could discover.  They did discover latent

3    prints.  They discovered multiple prints for

4    Mr. Placido-Ramirez.  Several from Mr. Sandoval-Ramos.  They

5    found one, one print from Mr. Arcila on this Mead -- on this

6    Mead notebook, which the Government alleges are drug records.

7    Whether they're drug records or they're not drug records,

8    that's a determination that is wholly up to the 12 of you.

9           What does need to be pointed out -- and co-counsel

10   for the defense, Mr. Andersen, already pointed out that

11   Mr. Solis testified that there is no way that you can show at

12   what point the print was put on the paper, nor how long it had

13   been there, what was on there prior to the print; none of that.

14          And simply put, it could have been as simple as him

15   pushing this out of the way.  No -- no grabbing.  Because

16   Mr. Solis had testified that he did analyzations of both this

17   and the back side.

18          So there's no evidence that Mr. Arcila did anything

19   more than have one -- at one point (demonstrating), have his

20   right thumb touch -- well, the page marked at the tabby here.

21   That's it.  There's nothing more on here.

22          What they did find of Mr. Arcila's at the L1 location

23   were some common things that you would have on you if you were

24   staying at a place.  There was personal identification, a

25   driver's license.  There was an old bill from a medical

823

Closing Argument - By Mr. Sepp

1    procedure and a couple of other personal effects showing his

2    name and an address.  An address from Tualatin.

3         What you'll also note is when you look at the

4    exhibits, where those personal effects were fine -- were found,

5    excuse me, were not in the master bedroom where all of the

6    money was found, where all of the -- the other drugs -- excuse

7    me, the -- the alleged drug book was found.  It was termed as

8    the master bedroom.

9         There will be no connection between Mr. Arcila's

10   items' location and the location of the items recovered from

11   the master bedroom.  That was not his room.

12        If you recall about what Sergeant -- Sergeant Kubic

13   had testified about, that there are -- there are times -- and

14   it's quite possible for you to be -- for the distribution

15   organization to use people not associated with the distribution

16   to live in the home to give it a sense of normalcy.  I believe

17   he said to make it look like people are coming and going, so

18   that it doesn't raise suspicion.

19        I doubt many of you have much familiarity but --

20   being through a home after it's been searched.  But in this

21   case, you can see from the pictures that all of the cupboards

22   were left wide open.  All of the drawers were pulled out.

23        That makes it appear that as you walk through, that

24   the packaging material, the scales, and all of the alleged

25   other drug distribution paraphernalia was just out in the wide

824
Closing Argument – By Mr. Sepp

1    open for anyone to see.  But we don't know if that was what it

2    was.  What we can assume is that some were in cupboards.  Were

3    those cupboard doors open or closed?  We don't know.  Did

4    Mr. Arcila have access to just come in and use all of the

5    cupboards?  Or were -- was he restricted to his cupboard; the

6    others restricted from his cupboard?  We don't know that

7    answer, and the defense doesn't have to prove that in any --

8    any sort of manner.

9           April 2nd, when he was taken into custody, he made a

10   statement to -- I believe it was TFO Carley.  You know, he

11   asked him, are your fingerprints going to be on the drugs?  Or

12   the drug packaging, depending on how you infer the question.

13          Mr. Arcila said, Yeah, probably.

14          Well, yeah.  They probably could have been.  He lived

15   there.  The cellophane that wraps the drugs, it's not just used

16   for illegal purposes.  You can wrap a turkey sandwich in it.

17   You can wrap millions of other things in it that aren't

18   illegal.  And if he had touched that cellophane and he was

19   worried that his fingerprints were going to be on there, well,

20   he was forthright.  He explained to the -- to Officer Carley

21   that, yeah, they could be on there.

22          Next.  Next we have his demeanor when he's being

23   interviewed.  He's testified that he was calm.  Well, if he was

24   just busted for having -- if my math is right -- 13 ounces of

25   heroin in a car, you would think he would be a tad bit nervous

Rebuttal Closing Argument - By Ms. Bolstad <sup>825</sup>

1   if there's a search going on at his home, there were multiple

2   cops walking in and out of the garage and he was being

3   interviewed by an armed police officer.  But he was calm.  He

4   had nothing to hide.  Why?  Because he was just there.  He was

5   just hanging out with people he shouldn't have been hanging out

6   with.  Bad people, as it turns out in the end.  But hanging out

7   with a bad person doesn't make you a criminal.

8          In the end, when you put all of the evidence together

9   and you look, you analyze it, and you compare it as it should

10  be compared to each individual defendant and you compare what

11  they have against Mr. Arcila and what they don't have, I think

12  the only conclusion you could make is that there's doubt.  Did

13  he knowingly get himself involved in this?  Did he take steps

14  to aid someone after the fact of a crime being committed?  No,

15  he did not.  He was just a dumb person, who made a dumb

16  mistake, and he shouldn't pay the price for that.  He hung out

17  with bad people.

18          And, in the end, I don't -- I hope that that's not --

19  in the end, that is not -- not enough proof beyond a reasonable

20  doubt, and I ask that you return not guilty verdicts.  Thank

21  you.

22          THE COURT:  Thank you, Mr. Sepp.

23          Rebuttal, Ms. Bolstad.

24          MS. BOLSTAD:  Thank you, your Honor.

25          I'm only going to address a couple of things.  Okay?

826

Rebuttal Closing Argument – By Ms. Bolstad

1        First, the last text from Justin Delong, that unsent

2   message to Nick Post was an apology for not picking Nick up.

3   And I'll give you one possible explanation for why it's unsent,

4   is Justin Delong died.

5        Two, Mr. Rosa's other sources.  You heard zero

6   evidence that Michael Rosa had other sources of supply during

7   the relevant time period.  Mr. Rosa's deception to the police

8   proves the point that he had no other sources.

9        Even when the police told him to stay away from

10  Mr. Baker, that's where Mr. Rosa had to go because it was his

11  only source.

12       Mere presence for Mr. Raul Arcila.  You'll read your

13  instruction, and I ask you to view Mr. Sepp's argument in the

14  context of the mere presence instruction.  One cannot claim

15  mere presence when he has his dirty fingerprints in drug

16  records.  And those -- that fingerprint is not on the cover.

17  It's not on the back.  It's on page 5.  You have the stickers

18  in the notepad.  And my notes from Mr. Solis's testimony says

19  that Mr. Arcila's right thumb is N-6 1-11.  It's on page 5, a

20  page full of amounts owed.

21       Fourth point.  Mr. Andersen told you about the drug

22  records found at his client's location, which is location 2.

23  And at his client's location we found Exhibit 108.  It's the

24  yellow strip of paper with "gorditas" on it.

25       And Mr. Andersen wants us to look at the context of

Rebuttal Closing Argument - By Ms. Bolstad

1    what that note was found in.  It was found in a shoebox.  And

2    his question to you is, Was it found with paystubs?  Paystubs

3    of Mr. Sandoval-Ramos?  Well, you'll recall, I asked the agents

4    who searched location 2, Did you find any paystubs showing

5    legitimate employment?  They found zero.  Because Fabian

6    Sandoval-Ramos, his job is to sell drugs, and you don't get

7    paystubs for that.

8            Finally, this idea of the Mexican Bobby and

9    Mr. Andersen's question of does it matter?  Well, let's remind

10   you of the demonstrative exhibit.  You don't have this in

11   evidence.  This was just used as a demonstration in trial.  It

12   does matter and it doesn't.  Okay?

13           So, first of all, when Shane Baker identifies a

14   photograph, it's almost the simplistic way that a person who

15   calls Domino's, associates the guy who delivers Domino's with

16   Domino's.  That guy who delivers, he's Domino's in your phone.

17   When Baker calls Mexican Bobby to order up, that number was

18   initially given to him at the meeting with Fabian

19   Sandoval-Ramos and some other person of Hispanic descent.  Of

20   course Mr. Baker associates Fabian Sandoval-Ramos with that

21   phone number that's given to him.  It turns out that Fabian

22   Sandoval-Ramos is not in fact Mexican Bobby.

23           Because that Mexican Bobby phone number is down in

24   the Los Angeles area.  It is the dispatch phone that we heard

25   about.  Customers call Domino's, but Domino's uses a different

828

Rebuttal Closing Argument – By Ms. Bolstad

1    number to direct its drivers.

2            And, finally, the fingerprints for

3    Mr. Sandoval-Ramos.  It's not on the cover of the document, as

4    Mr. Andersen suggests.  You heard testimony from Mr. Solis that

5    Fabian Sandoval-Ramos's left thumbprint is found on the first

6    page of the notebook.

7            That means after you lift the cover, it's on page 1.

8            Where is that?

9            MR. SEPP:  (Pointing.)

10           MS. BOLSTAD:  I want you to look at this when you go

11   back to deliberate (indicating).  Because when you open a

12   cover, one of Fabian's prints is on that cover.  The left thumb

13   is on the notepad, probably because he's right-handed.

14           Use these facts.  Make the inferences that make sense

15   to you.  But, at the end of the day, this is not a case about

16   people being merely present at homes.  The phone tolls rebut

17   that entirely.  All of this phone traffic that happens once

18   caught, that paints the picture.  Because when you're caught by

19   the police and you have time to make maybe one phone call,

20   that's when you call your boss and you say we're -- the jig is

21   up.

22           And then your boss calls, Fabian Sandoval-Ramos, the

23   Portland representative of this operation, to talk about where

24   are the runners?  What's happened?  We're caught.  Time to

25   break our phones.  Time to act like we don't know anything

Final Jury Instructions

1   about anything.

2           Thank you for your attention.  Please find these two

3   defendants guilty beyond a reasonable doubt of all charges.

4           THE COURT:  Thank you, Ms. Bolstad.

5           All right.  Jurors, I need to spend a little more

6   time with you, not much, and then it will be in your hands.

7           Mr. Minetto.

8           (Pause, the Court and the clerk conferring.)

9           THE COURT:  All right.  So, Mr. Dahl, I would like to

10  address you first, as our faithful alternate juror.  When you

11  leave the room, there will be some details with Mr. Minetto,

12  and then you'll be separated from this group of 12.

13          We've ordered lunch for you.  If you would like to

14  wait for it, Mr. Minetto will give you a place to wait and eat

15  it here, if you would like; or take it with you.

16          When you leave the room, he'll need to have your

17  notes.  He'll keep them here securely, in case you need to come

18  back, and he'll need your contact information.  We'll be

19  keeping you posted.

20          If, after the deliberations, the other jurors are

21  able to proceed to completion without us needing to call you

22  back, you'll get that instruction.  You can tell him then

23  whether to destroy the notes or you want them for your own use.

24  If you're needed, of course, we'll bring you back and give you

25  more instruction.

1        But I want to thank you, sir, for your attentive

2   service.  It may sound corny, but they also serve who sit and

3   wait.  Without the protection of an alternate juror, we were

4   running significant risks in a trial that has a lot of work

5   already invested in it.  And so your role has been very

6   important, and I appreciate your service.

7        And I hope the next time you get subpoenaed or you

8   hear someone getting subpoenaed to jury duty, you will tell

9   them it's our duty and it's worth the effort.  So thank you,

10  sir.

11       Jurors, now I'm addressing the remaining 12 of you.

12       Upon your return to the jury room, your first duty is

13  to elect one of your number to serve as your presiding juror.

14  That person will preside over your deliberations and speak for

15  you as necessary here in court.  You will then discuss the case

16  with your fellow jurors in order to reach agreement, if you can

17  do so.

18       Your verdict, whether guilty or not guilty, must be

19  unanimous.  As I've already noted, even the questions on the

20  special verdict.  All matters on the verdict form must be

21  marked only when all 12 jurors have agreed on an answer.

22       Each of you must decide the case for yourself, but

23  you should do so only after you've considered all the evidence,

24  discussed it fully with your fellow jurors, and listened to the

25  views of your fellow jurors.

1          Do not be afraid to change your opinion if the

2     discussion persuades you that you should, but do not come to a

3     decision simply because other jurors think it is right.

4          It is important that you attempt to reach a unanimous

5     verdict but, of course, only if each of you can do so after

6     having made your own conscientious decision.  Do not change an

7     honest belief about the weight and effect of the evidence

8     simply to reach a verdict.  Your verdict must be based solely

9     on the evidence and on these -- and on the law as I have given

10    it to you in these instructions.

11         Again, nothing I have said or done during the trial

12    is intended to suggest what your verdict should be.  That is a

13    matter entirely up to the 12 of you.

14         Some of you have taken notes during trial.  Whether

15    or not you took notes, you should rely on your own memory of

16    what was said.  Notes are only to assist your memory.  You

17    should not be overly influenced by notes, whether they're your

18    notes or another juror's notes.

19         I've already explained to you the two verdict forms

20    that have been prepared.  And again, to distinguish them from

21    yours, they have in red, in capital letters, "original."  These

22    are the ones the presiding juror should complete (indicating).

23         If it becomes necessary during your deliberations to

24    communicate with me, you may send a note through Mr. Minetto,

25    signed by your presiding juror or by one or more members of the

Final Jury Instructions

1    jury.  No member of the jury should ever attempt to communicate

2    with me except by a signed writing, and I will respond to the

3    jury concerning the case only in writing or here in open court.

4         If you send out a question, I will need to consult

5    with the lawyers before answering it, which may take some time.

6    You may continue your deliberations while waiting for the

7    answer to any question.

8         But, remember, you're not to tell anyone, including

9    me, how the jury stands -- numerically or otherwise -- on the

10   question of guilt of the defendant until after you've reached a

11   unanimous verdict or have been discharged.

12        So let me just explain that point a bit.  We've

13   worked very hard -- I have, in consultation with counsel -- to

14   ensure all the legal standards you need are here.  This is the

15   best I can do.  However, if I haven't made the point clear and

16   you do have a question, please send it out.  But please don't

17   give us any indication on the question what the status of your

18   vote count might be.  All right?  Things change.  I don't want

19   to know about your thinking.  If there's an issue, however, you

20   need me to address, please let me know.

21        Otherwise, we will be waiting on you as you have

22   waited on us patiently through the trial.

23        I understand lunch is due around noon.  May I suggest

24   that you start your deliberations by getting your presiding

25   juror selected.  Then the lunches will arrive.  You don't have

833
Final Jury Instructions

1   to deliberate during lunch if you don't want to.  But all 12

2   jurors need to be in the room when the evidence is being

3   discussed.

4          So please don't -- if you take a break -- engage in

5   small group discussions about any piece of evidence.  It's

6   important that everybody hears everybody's opinion when you're

7   deliberating.

8          Now, you may have -- oh, yes.

9          JUROR NO. 4:  Is there a list -- a summary list of

10  all of the items that were entered into evidence?

11         THE COURT:  That's just what I was going to get to.

12         JUROR NO. 4:  Perfect.

13         THE COURT:  All right.  You mean the exhibits?

14         JUROR NO. 4:  Right.

15         THE COURT:  There is an index in front of a paper

16  book that has all of the Government's exhibits.

17         And there's an index for defense exhibits, too, yes?

18  Is there an index of the eight?

19         MR. ANDERSEN:  I believe so.  Yes, there is.

20         THE COURT:  And here's the other point.  You may have

21  noticed in the jury room the big monitor.  All of the paper

22  exhibits are also in an electronic format which is searchable.

23         Mr. Minetto will give you instructions on how to do

24  that, so that if you want, you can call up an exhibit and

25  everyone can see it at once, as opposed to physically passing

Final Jury Instructions                834

1    the same document around.

2             You may use the paper.  You may use the electronic

3    version.  You may use both.  Whatever is most helpful for you.

4    All right?

5             Now, if it does become necessary during your

6    deliberations for you to see the exhibits I'm not sending to

7    you -- the heroin, the money -- send a note to Mr. Minetto that

8    indicates that you want to see those exhibits.  I'll then call

9    for an agent to bring them to the courtroom.  They'll be

10   displayed out in front of the bench here.  And an agent will be

11   standing by.  Because since they're controlled substances, they

12   have to stay in a chain of custody.  The agent will simply be

13   standing there, without comment, and is not allowed to engage

14   you, and you're not allowed to ask questions of them.

15            Don't talk about what you see, but if you think you

16   need to point something out to another juror because it related

17   to something you're talking about, go ahead and do that.

18            Wait until you're back to the jury room to actually

19   express your observations or your discussion about those

20   exhibits.  All right?

21            So they'll be brought out here.  You'll see.  You'll

22   not comment.  You'll go back to the jury room to discuss.  If

23   you need to see them again, just say so.

24            And as I said yesterday, although the normal

25   adjournment time is what we've done, 4:30 to five o'clock,

Colloquy

1    depending on what -- where we've been, adjournment today is

2    entirely up to you.  If you do not have a verdict by that time

3    and you want to stay -- all 12 of you want to stay, then we

4    will stay.

5              If you do not have a verdict and you do not want to

6    stay, then I'll be instructing you that you're free to go but

7    to come back Monday morning and we'll set a time to start the

8    deliberations.  And when all 12 of you are here, then you'll

9    begin.

10             So we'll let you know, Mr. Dahl whether the verdict

11   is reached today or whether the jurors go home today.  All

12   right?

13             Any questions or concerns, jurors, before I send you

14   out; this time, with all of your papers and all of your notes

15   and with an instruction to talk about the case?

16             Okay.  Mr. Minetto.

17             (Clerk duly sworn.)

18             THE CLERK:  I do.

19             THE COURT:  All right.  Ladies and gentlemen, please

20   follow Mr. Minetto.

21             Thank you, ladies and gentlemen, for rising for the

22   jury.

23             (Jurors exit, 11:46 a.m.)

24             THE COURT:  Thank you, everyone.  Please be seated.

25             Does the Government have any matter for the record,

Colloquy

1    at this point?

2            MS. BOLSTAD:  No, your Honor.  Thank you.

3            THE COURT:  All right.  For defendants, yesterday I

4    noted that a motion for judgment as a matter of law were deemed

5    to have been made by each of the defendants.  And that if

6    either wanted argument on those motions as presumed, especially

7    in light of the Court's view of the evidence in the light most

8    favorable to the Government, I would hear it at this time.  If

9    you want to make any additional argument or record on those

10   points, now's the time.

11           Mr. Andersen?

12           MR. ANDERSEN:  I don't have anything further for the

13   record, your Honor.

14           THE COURT:  All right.  Mr. Sepp, anything else?

15           MR. SEPP:  No.  I would just like to -- quickly just

16   point out that the chain-of-distribution argument would be that

17   it was broken at the very lowest level based on the not

18   following through on the Nicholas Post --

19           INTERPRETER MUZIK:  The interpreter cannot hear.

20           MR. SEPP:  Sorry.

21           THE COURT:  Speak up, please.

22           MR. SEPP:  Based on the Nick Post text messages and

23   that they were not -- they didn't follow up to determine

24   whether or not the sole source of the drugs came from the next

25   level up, as a -- but from Godvin.

Colloquy

1          THE COURT:  That is certainly an argument --

2          MR. SEPP:  Yes.

3          THE COURT:  -- and was made to the jury.  It is not

4     an argument, however, that only has one potential resolution.

5     And therefore, again, since the standard for such motion is for

6     the Court to view the evidence only in the light most favorable

7     to the Government, I am satisfied that if the jury only looked

8     at the evidence in the light most favorable to the Government,

9     rational jurors could find each of the defendants guilty of

10    each of the counts charged against each beyond any reasonable

11    doubt.  Whether they will or not, of course, remains to be

12    seen.

13          So, Counsel, I need you to leave, at Mr. Minetto's

14    desk, the telephone number or numbers at which you wish to be

15    contacted if we need you or when we have a verdict.  Please

16    stay within 15 minutes response time.

17          If the jury has a question, I will forward it to you

18    by e-mail.  But I'm going to want you personally present in the

19    courtroom to deal with it, and we'll be bringing your clients

20    into court to deal with any question that comes from the jury.

21    And, of course, the defendants will be back for any other

22    proceedings on the record, including any interaction with the

23    jury.

24          So it's in their hands.

25          Thank you, everyone.  We're in recess.

838
Colloquy

1          (Court adjourned, 11:49 a.m.)

2          (Court resumes, 2:57 p.m.)

3          THE COURT:  All right.  Everyone, we are back on the

4    record at 2:55, or so.  Within the last 15 minutes, we've

5    received a note from the jury -- jury, signed by Aaron Arnold,

6    quote:  We need Rosa and Baker's testimony, close quotes.

7          I consulted with Ms. LeGore.  Her records show that

8    Mr. Rosa testified from 1:52 until 3:11 p.m., for a total of 1

9    hour and 19 minutes.  Mr. Baker testified from 3:35 to 4:56

10   p.m., a total of one hour and 20 minutes.  A readback of all of

11   their testimony would take at least two hours and 40 minutes.

12         It is three o'clock.

13         I suggest a response to the jury, first, to let them

14   know that I do not intend to give them a transcript of anyone's

15   testimony.  There is too much risk of undue weight to any one

16   particular piece.

17         So I want to tell them, No. 1, the testimony is

18   available only in the form of the court reporter reading back

19   questions and answers, which is estimated to take about two

20   hours and 30 minutes total.

21         Do they still want that or is there something

22   specific, potentially, the Court could focus on in the record

23   to assist them without taking 2 hours and 30 minutes to read

24   back the entire process.  At least that's an approach.

25         Ms. Bolstad?

839

Colloquy

1              MS. BOLSTAD:  I don't have an objection to your

2    approach.

3              THE COURT:  Do you have another suggestion?

4              MS. BOLSTAD:  I don't.

5              THE COURT:  Counsel?

6              MR. ANDERSEN:  I don't particularly have any

7    objection, nor do I have another suggestion.  Although it

8    sounds like if we engage in some sort of discussion, they may

9    say we want a specific spot, and then I guess we can address

10   that.

11             MR. SEPP:  I don't have an objection.  I think maybe

12   we should try to narrow down the issue, like Mr. Andersen and

13   as you had suggested.

14             THE COURT:  All right.  Give me a moment.  I'll --

15   I'll draft something to read to you for your consideration as a

16   response, which would be given to them in writing.

17             Right now they're on break -- they're not on break.

18   They did not want a break.  All right.

19             (Pause, referring.)

20             THE COURT:  All right.  Counsel, here is a proposed

21   response:

22             Jurors, in order to provide you the testimony of

23             Mr. Rosa and Mr. Baker, we will have to reconvene

24             the proceedings in the courtroom.  And

25             Mrs. LeGore, the court reporter, will read back

Colloquy

1          the entire presentations of these witnesses by

2          stating, in quotes, Question, and then reading a

3          question.  Followed by, quote, Answer, close

4          quotes, and then reading the answer until the

5          presentation is concluded.

6          Mr. Rosa testified between 1:52 and 3:11 p.m.

7          Mr. Baker testified between 3:35 and 4:56 p.m.,

8          for a total of about two hours and 40 minutes on

9          11-4-15.

10          If you wish a readback, and we begin that now, it

11          will take until about six o'clock p.m. today to

12          complete that process.

13          A written transcript of the testimony is not

14          presently available, and Mrs. LeGore will be

15          reading back from her notes.

16          In lieu of a readback of all of their testimony,

17          if there are particular parts of the testimony you

18          wish to hear again, I can attempt to isolate those

19          parts only for readbacks.

20          Please advise.  Judge Brown.

21          MS. BOLSTAD:  No objection from the Government.

22          MR. ANDERSEN:  That's fine.

23          MR. SEPP:  No objection.

24          THE COURT:  Let me finish that.  I'll print it and

25  sign it.

841

Colloquy

1        I would like you to stay here because they may have a

2   quick response.

3            (Pause.)

4        THE COURT:  So I suspect it will be a few minutes, at

5   least, before the jurors respond back.  If the marshals believe

6   it's necessary to move the defendants out of the courtroom

7   until we have a response, you may do that, and then we'll call

8   you back.

9        I just -- I suspect we'll hear an answer pretty

10  quickly.  They've got a -- a question, so they're going to

11  respond to that question pretty quickly.  So I'm thinking it

12  will be time saved for you to wait just a bit.

13           (Pause.)

14       THE COURT:  So it's now 3:20.

15       The juror, Mr. Arnold, sent out the following

16  question in response to the note I delivered.

17           Quote:  Did Rosa purchase drugs from Baker after

18           his return from Ohio, Sunday the 23rd to Friday

19           the 28th?

20           And then he notes:  Instead of the testimony

21           request previously submitted.

22       So, first of all, I guess, if counsel can identify

23  whether there was a particular sequence that you recall asking

24  of the witnesses, either of them, that address this, let me

25  know.  Otherwise, I'm going to have Ms. LeGore start a search

842

Colloquy

1    first of Mr. Rosa's testimony to search for Mr. Baker's name.

2    And then we'll -- we'll start looking for references.

3            I don't know if the question was asked.  I don't --

4    because I -- I don't remember it that way.  But nobody's

5    indicating an immediate recollection of that.

6            MS. BOLSTAD:  Well, I have -- I have input.

7            THE COURT:  Yes.

8            MS. BOLSTAD:  I don't know if it's as distinct as

9    answering the question did he buy after his return.  I know

10   there was testimony addressing his trip to Ohio, and I did

11   ask --

12           THE COURT:  Baker's trip?

13           MS. BOLSTAD:  Mr. Rosa's.

14           THE COURT:  Oh, I'm sorry.  Mr. Rosa's trip.

15           MS. BOLSTAD:  And I asked him questions about in his

16   absence where was his heroin coming from, and he said

17   Mr. Baker.  And in his absence, Mr. Goshorn was using Mr.

18   Rosa's phone, and Mr. Goshorn, I believe, purchased from

19   Mr. Baker.

20           THE COURT:  Well, I think what we need to do is find

21   out if we have any specific ranges of testimony that are

22   responsive to the request.  And if we can find a

23   question/answer, question/answer that relate to that, we can

24   identify segments to read back.  So we're going to start doing

25   that.  I'll help you.

843

Colloquy

1          (Recess taken, 3:23 p.m.)

2          (Court resumes, 3:50 p.m.)

3          THE COURT:  Let us go on the record.  While we've

4   been off the record, counsel and I have reviewed, with the

5   court reporter's assistance, the testimony of Mr. Rosa and

6   Mr. Baker in an effort to determine whether there was evidence

7   specifically responsive to the question asked by the jurors.

8          The jurors asked this question:

9          Did Rosa purchase drugs from Baker after his

10             return from Ohio, 23rd, Sunday, to 28th, Friday.

11         In Mr. Rosa's testimony, counsel and I located a

12   reference to a transaction on Saturday the 29th.  And in

13   Mr. Baker's testimony, we located references to sales, quote,

14   In the week leading up to March 31st and the police, end

15   quotes.

16         I propose to respond to the jurors as follows, and I

17   would like your suggestions and positions.

18             Jurors, you've asked for testimony concerning your

19             follow-up question, Did Rosa purchase drugs from

20             Baker after his return from Ohio, Sunday, 23rd, to

21             Friday, 28th.

22             Counsel and I have reviewed the testimony of both

23             Mr. Rosa and Mr. Baker and have located testimony

24             about a specific transaction on Saturday the 29th;

25             and testimony about sales, quote, in the week

844

Colloquy

1          leading up to March 31 -- 31st and the police,

2          close quotes.

3          Would you like those sections of testimony read

4          back to you in context, question mark.

5     MS. BOLSTAD:  I suggest additions.

6     What you have read so far, I have no objection with.

7          I think there might also be testimony from other

8  witnesses who were not --

9     THE COURT:  They haven't asked, and I'm not

10  searching.

11     MS. BOLSTAD:  I think the question is, Is there

12  testimony.  It doesn't ask who gave the testimony.

13     THE COURT:  Yes, but this is -- all right.  I'm not

14  going to be searching the record to answer a specific question.

15          I can ask if there are other witnesses who -- we've

16  limited -- I've limited the search to Rosa and Baker.  If there

17  are other witnesses who they believe answered this, I can

18  attempt to search those.

19     MS. BOLSTAD:  I believe Detective Andersen addressed

20  this in her testimony of yesterday afternoon, but I would have

21  to look at her testimony of yesterday afternoon to be sure.

22     THE COURT:  Okay.  Let me -- actually, they didn't

23  ask for testimony.  They're asking a specific question.

24          Let me just -- let me make a modification here, and

25  then I'll ask for your reaction again, Ms. Bolstad, and then

845

Colloquy

1    counsel.

2              (Pause.)

3              THE COURT:  All right.  Here's an approach,

4    Ms. Bolstad; then counsel can react.

5              Jurors, you've asked this question:

6              Did Rosa purchase drugs from Baker after his

7              return from Ohio?

8              In light of your previous question, counsel and I

9              have reviewed the testimony of both Mr. Rosa and

10             Mr. Baker, but we have not attempted to review the

11             testimony of other witnesses who may or may not

12             have addressed this subject.

13             In the testimony of Mr. Rosa and Mr. Baker, we

14             have located testimony about a specific

15             transaction on Saturday the 29th and testimony

16             about sales, quote, in the week leading up to

17             March 31st and the police.  Would you like those

18             sections of testimony read back to you in context?

19             If any testimony is read back to you, remember you

20             must consider it in the context of all of the

21             evidence at trial and not give it undue emphasis.

22             Just as I instructed you about using your notes,

23             in the end you must rely upon your own memory of

24             all of the evidence.  Thus, these excerpts of

25             testimony, if read back to you, should be

Colloquy

1          considered in light of the evidence as a whole.

2          MS. BOLSTAD:  I agree with all of that.  And, in the

3     interim, I've been able to come up with where I think I have

4     addressed the question specifically through Detective

5     Andersen's testimony.

6          THE COURT:  We're not going to volunteer that.  I'm

7     not volunteering that because I am not --

8          MS. BOLSTAD:  She testified to text messages between

9     Baker and Rosa.

10          THE COURT:  And if the jurors want to ask about

11     Detective Andersen, we'll make the effort to find that, but it

12     is not the Court's duty to answer questions of the jurors about

13     the evidence.  It runs the risk of affecting their

14     deliberations and directing them.

15          MS. BOLSTAD:  I agree.  I think that if we're

16     offering them testimony, that's the testimony I would like

17     because it addresses the question being asked.

18          THE COURT:  I'm not going to offer testimony from a

19     witness they haven't made.  If they ask for more, we'll

20     consider it.

21          So I'm saying -- I'm telling them:  But we have

22          not attempted to review the testimony of other

23          witnesses who may or may not have addressed this

24          subject.

25          I can add, "If there is another witness whose

847

Colloquy

1    testimony you want me to review, please advise."  I'm not

2    directing them toward an answer to a question.  It's improper

3    to do that.  They need to know what the answers are to the

4    evidence in their own views, and I can't help them.

5           The only reason I'm doing this is that they

6    identified Rosa and Baker in the first place in their first

7    question; which wouldn't have answered their question anyway.

8           MS. BOLSTAD:  Right.  The question is answered

9    elsewhere.

10          THE COURT:  All right.  I'll -- I'll tell them that

11   they need to say if there's anyone else's testimony they want

12   to review.

13          Let me add that, and then I'll get your last

14   reaction.  And then to see if defense counsel have anything

15   more to add.

16          MS. BOLSTAD:  Could we look for it while you type?

17          THE COURT:  She can read it later, but I'm not

18   volunteering a witness's answer.  It is not the Court's

19   function to do that.  If they have a question about a witness's

20   testimony, they can ask for the witness's testimony, but I'm

21   not going to isolate one witness out of 21 -- 20 and pick and

22   choose.  It is improper.  It will come back to you as quick as

23   lightning from the Court of Appeals.  I am not doing that.

24          MS. BOLSTAD:  I understand.  I think we are picking

25   and choosing by focusing on Rosa and Baker's testimony.  We

848

Colloquy

1  have artificially focused on that.

2         THE COURT:  No, I have not artificially done it

3  because they sent out a question.

4         MS. BOLSTAD:  That doesn't mention testimony.  It's a

5  question that doesn't reference testimony.

6         THE COURT:  Their first question was:  Instead of the

7  testimony request previously submitted, which was for Rosa and

8  Baker.

9         And when I told them it would take three -- two and a

10  half hours to read that, they focused on a subject.  As I

11  infer, it implies Rosa and Baker's testimony.  If they want to

12  identify another witness, we'll provide another witness.

13         Let me try again.

14         (Pause.)

15         THE COURT:  All right.  Ms. Bolstad, one last time:

16              Jurors, you have asked this question:  Did Rosa

17              purchase drugs from Baker, after his return from

18              Ohio, Sunday, 23rd, to Friday 28th.

19         You know, it occurs to me I should simply say, at

20  that point, the answer to that question depends upon your view

21  of the entire record.  But in light of your previous question,

22  we've reviewed -- let me do that.

23         (Pause, referring.)

24         THE COURT:  The answer to that question depends

25              upon your view of all of the evidence.  But in

Colloquy

1        light of your previous question, counsel and I

2        have reviewed the testimony of both Mr. Rosa and

3        Mr. Baker but we have not attempted to review the

4        testimony of other witnesses who may or may not

5        have addressed this subject.

6        In the testimony of Mr. Rosa and Mr. Baker, we

7        have located testimony about a specific

8        transaction on Saturday, the 29th, and testimony

9        about sales in the week leading up to March 31st

10       and the police.  Would you like those sections of

11       testimony read back to you in context?

12       As noted, we have only reviewed the testimony of

13       Mr. Rosa and Baker, in light of both of your

14       questions.  If there is another witness's

15       testimony you would like reviewed for this

16       particular subject, please advise.

17       If any testimony is read back to you, remember you

18       must consider it in the context of all of the

19       evidence at trial and not give it undue emphasis.

20       Just as I instructed you about using your notes,

21       in the end you must rely upon your own member --

22       memory of all of the evidence.  Thus, these

23       excerpts of testimony, if read back to you, should

24       be considered in light of the evidence as a whole.

25       Ms. Bolstad.

850

Colloquy

1        MS. BOLSTAD:  The Government knows there's testimony

2    that addresses the answer to this question.  And I think I

3    would prefer, rather than the long answer, a question back to

4    the jury:  Do you want us to focus only on Rosa and Baker, or

5    do you want us to answer the question?

6        THE COURT:  Well, I'm not going to search the record

7    for them, and I'm not going to volunteer to search the record

8    for them.  I'm not really able to the answer the question for

9    them.

10       MS. BOLSTAD:  I know the answer to the question is in

11   the testimony of --

12       THE COURT:  I'm not able to answer that question.

13   The jury is never instructed by the Court where the answer to a

14   question is.

15       MS. BOLSTAD:  Exactly.  And my fear is that the

16   answer we're giving them directs them only to Rosa and Baker's

17   answers.

18       THE COURT:  Then I'm going to say I'm not able to

19   answer the question.  If they want me to search a particular

20   witness's testimony for a particular reference, I will.  Please

21   advise.  And then I won't tell them about Rosa and Baker.

22       MS. BOLSTAD:  That's the Government's position.

23       THE COURT:  Let me try that.

24       (Pause, referring.)

25       THE COURT:  All right.

851

Colloquy

1              Jurors, you have asked this question:  Did Rosa
2              purchase drugs -- and so forth.  It is not
3              appropriate for me to try to answer that question
4              because you are the sole judges of the facts, and
5              the answer to that question depends entirely upon
6              your view of all of the evidence.
7              If there is a particular witness or if there are
8              particular witnesses whose testimony you want me
9              to review to see if this subject is discussed
10             specifically so that excerpts of their testimony
11             can be read back to you, please advise, and I will
12             undertake that review.  In the meantime, continue
13             your deliberations.
14             MS. BOLSTAD:  I think that that is a more appropriate
15   answer to the question.  I think that we could propose an
16   additional solution --
17             THE COURT:  Which is?
18             MS. BOLSTAD:  I don't want to hide things from them.
19   I have no objection to presenting Mr. Baker's answer,
20   Mr. Rosa's answer that we've identified; so long as I can
21   present the third one.  But I understand the Court's position
22   on that.
23             THE COURT:  Well, unless all the parties want and
24   agree that I give them three specific references, I refuse to
25   do that because they have not asked for the detective's

852

Colloquy

1   testimony.  They identify two witnesses.  Then they identified

2   a question.

3             MS. BOLSTAD:  Right.

4             THE COURT:  And the proper answer to the question is

5   the one I've ultimately settled on.  I can't answer a question

6   for them.  I can't because it's not for me to weigh and

7   evaluate the evidence.  But I think I can say, if there are

8   particular witnesses whose testimony they want read back to

9   them as to that particular subject, I will undertake a review

10  and try to find those references, but they need to work on it

11  on their own.

12            So what's your position, Mr. Andersen?

13            MR. ANDERSEN:  Your Honor, clearly, this is a

14  difficult issue because they're asking a question of fact, and

15  it's not anybody's place except for them to determine what the

16  facts are.

17            THE COURT:  So you agree with my most recent first

18  response?  It's not appropriate for me to answer?

19            MR. ANDERSEN:  Yes, I do.  But it then becomes

20  difficult, if we're even highlighting the issue; about them

21  fishing through the testimony for an answer.

22            THE COURT:  It's just that I discouraged them from

23  listening to three hours of testimony, and I don't want them to

24  have an instruction from the Court that I won't help them.

25            If there is a specific question they have, I will

Colloquy

1    undertake to help them find what they're looking for.  We do

2    readbacks.  But if the jurors don't want to spend two hours and

3    40 minutes on what may turn out to be the wrong approach, that

4    wouldn't be helpful anyway.

5           So do you object to my saying to them if there is a

6    particular witness or if there are particular witnesses whose

7    testimony they want me to review to see if this subject is

8    discussed specifically, please advise and I'll undertake that

9    review?

10           MR. ANDERSEN:  I -- I think that that's appropriate.

11   My only reservation -- and I guess my only objection to that --

12   would be just asking them to then go fishing and see if they

13   catch the right witness.  But I don't know that there's any way

14   around that.

15           THE COURT:  Well, another way around it is to agree

16   with the prosecutor that we direct them.  But I -- I would

17   never do that unless all parties agreed.  I think that's

18   picking and choosing, and it's not for the Court to do.

19           If they have a specific focus that they want read

20   back, fine.  But the Court can't put a thumbnail on it or a

21   flashlight on it and say read this section and not that

22   section.  So --

23           MS. BOLSTAD:  Could the parties confer?

24           THE COURT:  Of course you can confer.

25           (Pause, counsel conferring.)

854
Colloquy

1          MR. ANDERSEN:  Your Honor, we have conferred.  I

2     don't think we've come to an agreement.

3          THE COURT:  Then I'm going to answer the question.

4     I'm not going to sit and let you just think; unless you think

5     that would be beneficial.  If you want more time to do that,

6     tell me.  Otherwise, it's getting late in the day.  I need to

7     give the jurors a response.

8          MR. ANDERSEN:  I think the response that you have

9     now --

10         THE COURT:  Listen to the additional modification

11    I've made.  I've set out the question.

12              It is not appropriate for me to try to answer that

13              question because you are the sole judges of the

14              facts and the answer to that question depends

15              entirely upon your view of all of the evidence.

16              If there are particular portions of testimony you

17              would like read back to you -- and that's without

18              regard to a witness.

19              So I just say, If there are particular portions

20              you would like read back to you, please advise and

21              I will undertake a review of the record with

22              counsel to try to assist you.

23         MR. ANDERSEN:  I think that's fine.

24         MR. SEPP:  That's acceptable, your Honor.

25         MS. BOLSTAD:  That's acceptable.

855

Colloquy

1      THE COURT:  All right.  I'll sign that, and get you a

2  copy.  And then I suppose we'll see what their response is.

3      (Recess taken, 4:19 p.m.)

4      (Court resumes, 4:22 p.m.)

5      THE COURT:  Back on the record.

6      The jurors first asked for a readback of all of the

7  evidence, and I discouraged that because of the time it took.

8      Then they sent out this factual question, which I

9  can't answer.

10      I first suggested responding with information that

11  there is testimony in the area of the -- testimony from the two

12  witnesses they named in their earlier question.

13      Now Ms. Bolstad is certain there's testimony from

14  Detective Sommers [sic] that's responsive, but I refuse to pick

15  and choose.

16      The answer I last read to you seems circular because

17  there -- first, they ask for two witnesses.  And I've said I

18  can do that, but it will take two hours and 40 minutes.  But to

19  just tell them there are -- if there are particular portions of

20  testimony, I think, is not helpful and it's not responsive.  So

21  I want to think about this a little more.

22      (Pause.)

23      THE COURT:  All right.  Here's a new proposed final

24  paragraph to the jurors.

25      If there are particular witnesses who you recall

856

Colloquy

1             addressed this issue and you would like portions

2             of their testimony read back to you, please advise

3             which witnesses' testimony you wish reviewed, and

4             I will undertake that review with counsel to try

5             to assist you.

6             MR. ANDERSEN:  I don't have any particular objection

7   to that.

8             Another response could be just a simple, The facts

9   are for you to decide.  I cannot answer that.  And leave it at

10  that.

11            THE COURT:  I'm not going to do just that because if

12  there's something they want their memories refreshed on and

13  they tell me, I don't want to leave them with the impression

14  that that help is not available because that's not true.

15            Let me try again.

16            (Pause.)

17            THE COURT:  All right.

18            If there are particular witnesses who you recall

19            address this issue and you would like portions of

20            their testimony searched for this issue and read

21            back to you to assist your memory, please identify

22            those witnesses and I will undertake a review of

23            the record with counsel to try to find portions of

24            their testimony that may assist you.

25            If any testimony is read back to you, remember you

1           must consider it in the context of all of the

2           evidence at trial and not give it undue emphasis,

3           just as I instructed you about using your notes.

4           In the end, you must rely upon your own memory of

5           all of the evidence.  Thus, these excerpts of

6           testimony, if read back to you, should be

7           considered in light of the evidence as -- as a

8           whole.

9           MS. BOLSTAD:  No objection.

10          MR. ANDERSEN:  I think that's fine.

11          MR. SEPP:  (Nods head.)  Yeah.

12          THE COURT:  All right.  Give me just a minute to

13   proofread this.

14          In the meantime, you might get those excerpts ready

15   in the event they choose to take us up on this.

16          (Recess taken, 4:30 p.m.)

17          (Court resumes, 5:03 p.m.)

18          THE COURT:  Good evening, everyone.  Please be

19   seated.

20          The Court reports that the jury has a verdict.

21          They're not -- there was not any response to the

22   message I sent to them in response to their last question.

23          So please bring them in.

24          (Pause.)

25          (Jurors enter.)

Verdict

1       THE COURT:  Thank you, everyone.  Please be seated.

2       Mr. Arnold, are you the presiding juror?

3       THE JUROR:  I am.

4       THE COURT:  Has the jury reached a verdict for each

5  defendant?

6       THE JUROR:  We have.

7       THE COURT:  And has your verdict been unanimous on

8  every mark or answer you've placed on each form?

9       THE JUROR:  Every one.

10       THE COURT:  Thank you.  Would you please hand them to

11  Mr. Minetto.

12       (Pause, the Court handed document.)

13       THE COURT:  All right.  In summary, the jury has

14  found the defendants guilty on all charges, and answered yes on

15  all verdict questions.

16       I want to read the verdicts in their entirety.

17       Will Mr. Fabian Sandoval-Ramos please rise, sir.

18       We the jury, being duly impaneled and sworn, hereby

19  find the following unanimous verdicts in the case against the

20  defendant, Fabian Sandoval-Ramos, Count 1, conspiracy to

21  distribute heroin resulting in death, the verdict is guilty.

22       In response to the special verdict question, Did the

23  Government prove beyond a reasonable doubt that death resulting

24  from the use of heroin distributed by the conspiracy in Count 1

25  was a reasonably foreseeable result of that conspiracy?

Verdict

1    Answer, yes.

2              Count 2, conspiracy to distribute heroin, the verdict

3    is guilty.

4              Special verdict question:  Did the Government prove

5    beyond a reasonable doubt that the quantity of heroin involved

6    in Count 2 was 1,000 grams, 1 kilogram or more?  Answer, yes.

7              And dated this 6th day of November, Aaron Arnold,

8    presiding juror.

9              Did I read that correctly, Mr. Arnold?

10             THE JUROR:  Yes, ma'am.

11             THE COURT:  Please be seated, sir.

12             Mr. Arcila, would you rise, please.

13             In your case, the verdict reads:

14             We the jury, being duly impaneled and sworn, hereby

15   find the following unanimous verdicts in the case against the

16   defendant, Raul Arcila, Count 1, conspiracy to distribute

17   heroin resulting in death, the verdict is guilty.

18             The special verdict question:  Did the Government

19   prove beyond a reasonable doubt that death resulting from the

20   use of heroin distributed by the conspiracy in Count 1 was a

21   reasonably foreseeable result of that conspiracy?  Answer, yes.

22             Count 2, conspiracy to distribute heroin, the verdict

23   is guilty.

24             Special verdict question:  Did the Government prove

25   beyond a reasonable doubt that the quantity of heroin involved

Verdict

1    in Count 2 was 1,000 grams, 1 kilogram or more?  Answer, yes.

2              Count 9, possession with intent to distribute heroin,

3    the verdict is guilty.

4              Special verdict question:  Did the Government prove

5    beyond a reasonable doubt that the quantity of heroin involved

6    in Count 9 was 100 grams or more?  Answer, yes.

7              Count 10, possession with the intent to distribute

8    heroin, the verdict is guilty.

9              The special verdict question:  Did the Government

10   prove beyond a reasonable doubt that the quantity of heroin

11   involved in Count 10 was 100 grams or more?

12             Again, dated this 6th day of November, 2015, and

13   signed by Mr. Arnold.

14             Mr. Arnold, did I read that correctly?

15             THE JUROR:  Yes, ma'am.

16             THE COURT:  Thank you, sir.  You may be seated.

17             Counsel, are there any inquiries before these

18   verdicts are received and the jury discharged?

19             MS. BOLSTAD:  No, your Honor.

20             THE COURT:  Mr. Andersen?

21             MR. ANDERSEN:  Your Honor, if we could poll the jury.

22             THE COURT:  A general poll?

23             MR. ANDERSEN:  That would be fine.

24             THE COURT:  So I would propose, then, to poll the

25   jurors, first, with respect to their verdict as to

Verdict

1    Mr. Sandoval-Ramos as a whole:  Is this your verdict?  Answer

2    yes or no.  Is that adequate?

3              MR. ANDERSEN:  I think so.

4              THE COURT:  And then, Mr. Sepp, I assume, you want

5    the same?

6              MR. SEPP:  Correct, your Honor.

7              THE COURT:  All right.  So, jurors, a poll has been

8    requested.  This simply is to confirm in open court that there

9    is indeed a unanimous agreement.

10             I'm going to first ask the clerk to read your names

11   in order, so that you can answer the following question:

12             Is this verdict, the one I just read with respect to

13   Mr. Sandoval-Ramos, your personal verdict?

14             If it is, say yes.  If it is not, say no, when your

15   name is called.

16             Mr. Minetto.

17             THE CLERK:  Mr. Zepeda?

18             THE JUROR:  Yes.

19             THE CLERK:  Mr. Arnold?

20             THE JUROR:  Yes.

21             THE CLERK:  Ms. Roberts?

22             THE JUROR:  Yes.

23             THE CLERK:  Ms. Luppino?

24             THE JUROR:  Yes.

25             THE CLERK:  Mr. Unger?

862

Verdict

1          THE JUROR:  Yes.

2          THE CLERK:  Mr. Hunter?

3          THE JUROR:  Yes.

4          THE CLERK:  Ms. Crockett?

5          THE JUROR:  Yes.

6          THE CLERK:  Ms. Liegel?

7          THE JUROR:  Yes.

8          THE CLERK:  Mr. McDonald?

9          THE JUROR:  Yes.

10         THE CLERK:  Ms. Chatterton?

11         THE JUROR:  Yes.

12         THE CLERK:  Mr. Givens?

13         THE JUROR:  Yes.

14         THE CLERK:  Mr. Demello?

15         THE JUROR:  Yes.

16         THE COURT:  And with respect to the verdict on

17  Mr. Arcila, as I read it, the four counts and the special

18  verdict questions, same question:  Is this your verdict?

19         THE CLERK:  Mr. Zepeda?

20         THE JUROR:  Yes.

21         THE CLERK:  Mr. Arnold?

22         THE JUROR:  Yes.

23         THE CLERK:  Ms. Roberts?

24         THE JUROR:  Yes.

25         THE CLERK:  Ms. Luppino?

Verdict

1      THE JUROR:  Yes.

2      THE CLERK:  Mr. Unger?

3      THE JUROR:  Yes.

4      THE CLERK:  Mr. Hunter?

5      THE JUROR:  Yes.

6      THE CLERK:  Ms. Crockett?

7      THE JUROR:  Yes.

8      THE CLERK:  Ms. Liegel?

9      THE JUROR:  Yes.

10     THE CLERK:  Mr. McDonald?

11     THE JUROR:  Yes.

12     THE CLERK:  Ms. Chatterton?

13     THE JUROR:  Yes.

14     THE CLERK:  Mr. Givens?

15     THE JUROR:  Yes.

16     THE CLERK:  Mr. Demello?

17     THE JUROR:  Yes.

18     THE COURT:  All right.  The jurors each confirm

19  unanimity in the verdict as reported by the presiding juror and

20  read by the Court.

21         Are there any other matters that need to be addressed

22  before this jury is discharged and the verdicts received?

23     MS. BOLSTAD:  No, your Honor.

24     MR. ANDERSEN:  No.  Thank you.

25     MR. SEPP:  No, your Honor.

864

Verdict

1          THE COURT:  Ladies and gentlemen, your official

2     duties are now concluded in this case.

3          I want to thank you for your very attentive work in

4     what was a very difficult matter.  No matter when I looked at

5     you, all of you were paying attention all the time.  And you

6     worked very hard, as reflected also by the questions you sent

7     out, that you were thinking through things.

8          Your duty is now at an end, and all the orders I've

9     been giving you are now over.  You are going to be free to

10    speak to whomever you want about whatever you want concerning

11    this experience.

12         I need to point out a couple of things.  Under our

13    rules of professional responsibility, the lawyers are not

14    allowed to contact you.  If for any reason you wish to reach

15    out to any of them, you are free to do that.  And if you wanted

16    contact information, we would be happy to provide it.

17         As I said, you're free to speak to whomever you want

18    about whatever you want.  But remember the point I made the

19    other day.  What you say in the jury room to one another, I

20    think you all expect, is kept -- is to be kept among you.

21    You're free to express your own opinions.  You probably should

22    not be expressing the opinions of other people because the --

23    that process is a community one that's confined to the jury

24    room.

25         Now, I'm going to discharge you with my personal

1    thanks for the great service you've provided, this duty that we

2    talked about on Tuesday morning.  I hope the experience renews

3    your faith in our democracy, in our Constitution.  And I hope

4    that when you're next called or if you hear of a friend or a

5    neighbor who is called, you will encourage them to serve

6    because of this important role in our process.

7            If any of you have any questions of me or any

8    suggestions as to how we can improve these processes, I would

9    be happy to stay and visit with any of you who want to stay in

10   your jury room.  I'll be there in a few minutes.  Or you can

11   send a message in and I'll try to be responsive.  But it's

12   late.  It's Friday night.  And all of you are now free to go.

13           If, as I say, any of you do stay, I'll be in your

14   jury room in a few minutes.  All right?

15           Everyone please rise one last time for the jury.

16           (Jurors exit, 5:15 p.m.)

17           THE COURT:  Please be seated.

18           These original verdicts will be placed in the record.

19   And, Counsel, if you want copies of them tonight, you can wait

20   a few moments and Mr. Minetto will provide them.  Otherwise,

21   you can get them out of the docket.

22           I'm ordering a presentence report.

23           It seems to me that unless the parties think they

24   want separate proceedings, it might be a good idea to have a

25   joint sentencing proceeding in light of the joint trial.  But

866

Colloquy

1    if the parties want separate proceedings, we can do that, too.

2    For now, I propose to schedule the matter as a joint sentencing

3    proceeding, since the defendants were, as I say, tried jointly

4    and much of the information overlaps.  And then if any party

5    wants it differently, you can ask for a different schedule as

6    the matter goes forward.

7           I propose Monday, February 22, or Monday, February

8    29.  Either of those days, at any time of day.  Or Thursday,

9    February 18, in the afternoon.

10          Preferences?

11          MS. BOLSTAD:  I prefer Monday.

12          THE COURT:  Mondays are better?

13          MS. BOLSTAD:  (Nods head.)

14          THE COURT:  Mr. Andersen?

15          MR. ANDERSEN:  Same, your Honor.  Either of those --

16          THE COURT:  Mondays?

17          All right.  Mr. Sepp?

18          MR. SEPP:  I'm going to need the 29th.

19          THE COURT:  The 29th?

20          MR. SEPP:  Yes.

21          THE COURT:  All right.  And about how much time are

22   you thinking we should set aside for sentencing?  A half a day

23   or less?

24          MR. ANDERSEN:  I think that would be wise.  I don't

25   know that we need a whole half a day, but I think that could

1  be --

2          THE COURT:  Let's set it for Monday the 29th at 9:30

3  in the morning then, and we'll reserve the rest of the morning.

4          Counsel will be contacted by the presentence writers

5  for your input.

6          You need to collect the exhibits that you've offered,

7  and Mr. Minetto will help you with that.

8          As I told the jurors, I'm going to go visit with

9  them.  Counsel, if you want to wait a few minutes, if they have

10 any feed back, I'll bring it to you.  If you're not here when

11 I'm finished with them, I'll send you a message to that effect.

12         I want to thank each of you, counsel, for a very

13 professional job trying an exceedingly difficult case.

14         Mr. Sepp, you brought up many issues on your client's

15 behalf.  And it was clear to me, in light of the questions the

16 jurors sent out, they thought closely about exactly the points

17 you raised.  And that stage was set by you, Mr. Andersen.

18         Ms. Bolstad did a masterful job pulling together a

19 lot of evidence here and presenting it concisely for the jury.

20 And I want to thank you all for that professional effort.

21         Mr. Sandoval-Ramos and Mr. Arcila, the next step

22 involves gathering information about you and your background.

23 Your lawyers are very experienced in this and will be

24 ultimately presenting to me letters and arguments on your

25 behalf.

1          But once the sentencing day comes, my mind will

2   remain open until I've heard all of the presentations and until

3   I've heard from each of you personally if you wish to speak to

4   me.  You will not have to, but you will have the opportunity to

5   speak to me directly before any final decision is made.

6          So I want you to know I, of course, cannot make any

7   promises except to tell you my mind remains open until the last

8   word is said and then a decision will be made.

9          All right.  Anything else for the record tonight?

10         MS. BOLSTAD:  No, your Honor.  Thank you.

11         THE COURT:  Mr. Andersen?

12         MR. ANDERSEN:  No, thank you.

13         MR. SEPP:  Nothing, your Honor.

14         THE COURT:  All right.  We're in recess.

15         (Conclusion of proceedings.)

16                          -0-

17

18

19

20

21

22

23

24

25

869

*Certificate*

--oOo--

I certify, by signing below, that the foregoing is a correct
stenographic transcript of the oral proceedings had in the
above-entitled matter this 2nd day of June, 2016.  A transcript
without an original signature or conformed signature is not
certified.  I further certify that the transcript fees and
format comply with those prescribed by the Court and the
Judicial Conference of the United States.

/S/ Amanda M. LeGore
_____

AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
CSR No. 15-0433  EXP:  3-31-2018