1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,         )
                                      )   Case No. 3:14-CR-267-BR
4            Plaintiff,               )
                                      )
5   v.                                )   April 14, 2016
                                      )
6   FABIAN SANDOVAL-RAMOS(1) and RAUL )
    ARCILA(3),                        )
7                                     )
             Defendants.              )
8   _____)   Portland, Oregon

9

10                  TRANSCRIPT OF PROCEEDINGS
                      (Imposition of Sentence)

11        BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:          AMANDA M. LeGORE
                             CSR, RDR, FCRR, CRR, CE
23                           U.S. Courthouse
                             1000 SW Third Avenue Rm 301
24                           Portland, OR  97204
                             (503)326-8184
25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:        LEAH BOLSTAD
 2                             (Assistant U.S. Attorney)
                               ELISSA GOLOBORODKO
 3                             (Certified Law Student)
                               U.S. Attorney's Office
 4                             1000 SW Third Avenue
                               Portland, OR  97204
 5                             (503)727-1000

 6

 7   FOR DEFENDANT SANDOVAL-
     RAMOS:                    BENJAMIN ANDERSEN
 8                             121 SW Salmon Street
                               1420 World Trade Center
 9                             Portland, OR  97204
                               (503)222-2510
10

11   FOR DEFENDANT ARCILA:     ROBERT SEPP
                               2350 Willamette Falls Drive, Suite 9
12                             West Linn, OR  97068
                               (503)998-7719
13

14

15   INTERPRETER:              STEVEN MUZIK

16

17

18

19

20

21

22

23

24

25
```

1              (Thursday, April 14, 2016; 2:14 p.m.)

2

3                    P R O C E E D I N G S

4

5           THE COURT:  Good afternoon, everyone.  Please be

6   seated.

7           Ms. Bolstad.

8           MS. BOLSTAD:  Thank you, your Honor.

9           This is the United States versus Fabian

10  Sandoval-Ramos and Raul Arcila, Case No. 14-CR-267.

11          Leah Bolstad for the United States.

12          Mr. Andersen is here on behalf of Fabian

13  Sandoval-Ramos, who is being assisted by a court certified

14  interpreter, Mr. Muzik.  And Raul Arcila is present in court,

15  in custody, and represented by Mr. Sepp.

16          We're here for the time and place set for sentencing

17  for both of these defendants, who went to trial in November

18  2015.  And after a four-day jury trial, they were convicted on

19  Counts 1 and 2, for Defendant Sandoval-Ramos; and Counts 1, 2,

20  9, and 10, for Defendant Arcila.

21          THE COURT:  All right.  I sent to counsel this

22  morning a message indicating I wanted to begin first by

23  addressing defendants' arguments concerning the proper

24  guideline calculations generally as they relate to each of

25  them.  And then we'll move to those specific guideline issues

1     that are specific to either one of the defendants.  And then

2     we'll -- we'll continue to proceed, to get to a place where the

3     advocacy can turn to what would be a reasonable sentence, once

4     the correctly calculated guideline range is in place.  So we're

5     ready to proceed with that.

6            Ms. Bolstad?

7            MS. BOLSTAD:  Thank you, your Honor.

8            And as part of that guideline analysis, at your

9     suggestion, I'm also -- I would like address the merger issue

10    right up front.

11           THE COURT:  Yes.

12           MS. BOLSTAD:  Your Honor, Mr. Sepp raises a good

13    point about merger in this case.  Merger is typically a state

14    court concept that -- over in federal court, we worry about the

15    double jeopardy concerns that arise from charging a defendant

16    or convicting a defendant of two conspiracies that basically

17    involve the same agreement.

18           On that point, there are things that differentiate

19    the conspiracies alleged in Count 1; mainly the players

20    involved.  However, the Government concedes that it is -- at

21    its heart, it's the same agreement in each of those counts.

22    Count 1 and 2, at its heart, the agreement is to distribute

23    heroin.

24           What differs between the two counts is the sentencing

25    enhancements that apply.  So Count 1, the sentencing

1    enhancement is the resulting in death.  And the Government

2    charged the case with all six defendants in that count, meaning

3    they all had an agreement to distribute heroin.  And as a

4    result of the distribution of that heroin, death resulted.

5    That applied to to all six of them.

6            Count 2, there was a big difference in the players

7    involved in this heroin distribution conspiracy in terms of the

8    amounts they were dealing.

9            So the bottom-level participants, Mr. Rosa and

10   Ms. Godvin, they were not properly alleged to have taken part

11   in a conspiracy with the amounts involved being over a

12   kilogram.  So they are not charged in Count 2.

13           In Count 2, the sentencing enhancement is over a

14   kilogram of heroin, which these two defendants -- the fugitive

15   defendant, Ramirez-Coronel, and co-defendant, Shane Baker --

16   they are in Count 2.

17           So the solution that the Government proposes at this

18   sentencing stage is that Count 1, as to both of these

19   defendants, really drives the bus.  It's the conspiracy to

20   distribute heroin and the sentencing enhancement applicable to

21   that count of a 20-year minimum that is really what's on the

22   table here.

23           It would have been possible to charge the sentencing

24   enhancement in Count 2 as an enhancement in Count 1, which

25   would have muddied the waters when it came to jury instructions

1    and not knowing who was going to be going to trial at the time

2    of charging; if that's makes sense.

3            So I think that the solution the Government is

4    proposing is that we dismiss Count 2 at sentencing to avoid any

5    potential issues with the double jeopardy issues raised by

6    Mr. Sepp.

7            THE COURT:  Are you making that motion now?

8            MS. BOLSTAD:  I would move to dismiss Count 2,

9    without prejudice.  Because if this case comes back from the

10    Ninth Circuit, for whatever reason, I would like to be able to

11    address that at a later time.

12            THE COURT:  All right.  There is a motion made to

13    dismiss Count 2.

14            Defendants' response?  Mr. Sepp?

15            MR. SEPP:  If I may have a moment to talk with

16    Mr. Andersen.  I did not anticipate this.

17            THE COURT:  You may.

18            MR. SEPP:  Thank you, your Honor.

19            THE COURT:  Nor did I.

20            (Pause, Mr. Andersen and Mr. Sepp conferring.)

21            MR. SEPP:  Defendant Raul certainly has no objection

22    to the motion to dismiss.

23            MR. ANDERSEN:  Nor do I, your Honor, on behalf of

24    Mr. Sandoval.

25            MS. BOLSTAD:  And, your Honor, I would like to defer

1    your ruling on that motion until after we decide Count 1 and

2    the mandatory minimum applicable.  Obviously, I don't want to

3    dismiss Count 2 until I know what's going to happen with the

4    rest of the counts.

5           THE COURT:  Mr. Sepp and Mr. Andersen, do you have

6    any position with the respect to the without prejudice part of

7    the motion which, evidently, is a provisional motion to be made

8    and ruled on after I do the guideline analysis on Count 1?

9           MR. SEPP:  Well -- well, naturally, I would prefer

10    with prejudice.  But I think, in -- in the end, we get to where

11    we're -- where we want to be today.  And if it is appealed, you

12    know, it starts all over again.

13           And I -- I would think that in order to -- you know,

14    judicial economy and to get to the crux of the real argument

15    today, which is Mr. Andersen's argument about mandatory

16    minimums, I would maybe re-address this to see whether the

17    motion is going to actually be presented to the Court and then

18    decide at that moment --

19           THE COURT:  All right.  Let's -- let's defer the

20    issue of with or without prejudice.

21           Let's focus, for the moment, then, on Count 1 and the

22    arguments about the proper guideline calculation with respect

23    to Count 1, the base offense level, enhancements and the like;

24    and the triggering of -- or not -- the mandatory minimum

25    sentence.

1          And then I'll proceed as to Count 1, with -- with the

2    analyses you're about to give, make a ruling on Count 1, and

3    then the Government can perfect its motion as to Count 2.  And

4    then, with respect to Mr. Arcila, of course, we have the two

5    other counts that are in the -- additional to those that

6    Mr. Sandoval-Ramos has.

7          So, Ms. Bolstad, would you summarize, please, the

8    Government's position in response to Mr. Andersen's arguments

9    about the base offense level question.  And then Mr. Andersen

10   can, in the nature of a reply, and otherwise, make the points

11   that need to be addressed.

12         I would like to be clear as to what the Government's

13   view is, especially in light of those arguments.

14         MS. BOLSTAD:  Yes, your Honor.

15         The Government's view -- the Government agrees with

16   the PSR writer that the base offense level for Count 1 is a 38

17   under 2D1.1(a)(2).

18         That guideline reads that the base offense level is a

19   38 if the defendant is convicted under 21 U.S.C. 841(b)(1).

20   Any of the amount penalty provisions are listed there; so (a),

21   (b), and (c).  And the offense of conviction establishes that

22   death or serious bodily injury resulted from the use of the

23   substance.

24         So, in this case the Indictment alleges the

25   triggering language in the statute that death resulted from the

1    use of the heroin distributed by this conspiracy.  The jury was

2    asked on Count 1, if that element -- it was treated as a third

3    element, consistent with **Alleyne**, and whether the Government

4    had proved that third element that death resulted, beyond a

5    reasonable doubt.  The jury so found with its verdict.

6           We don't get a conviction on Count 1, in which the

7    Court had those three elements, without the jury making that

8    finding.  And because they made that finding because these two

9    defendants were convicted on Count 1 as alleged and as

10   instructed in the jury instructions, we have that triggering

11   language in the statute for a 20-year minimum.  That same

12   language triggers Base Offense Level 38.

13          THE COURT:  Thank you.

14          Mr. Andersen.

15          MR. ANDERSEN:  Your Honor, the Government is right.

16   There are two requirements.  And I don't want to just reiterate

17   my sentencing -- my amended sentencing memorandum that I

18   apologize for filing just about two hours ago.

19          But I do think that the sentencing guidelines

20   themselves are clear, and they do have a number of listed

21   offenses; specifically, 21 U.S.C. 841.

22          Mr. Sandoval was convicted under 846, your Honor.

23   That is not one of the enumerated statutes that United States

24   Sentencing Guideline 2D1.1(a)(2) applies to.

25          So without getting to the second crux -- which I

1    would like to address briefly.  But without getting to that

2    second element, that -- the death result, I think that it is --

3    that by its very language, that sentencing guideline should not

4    apply because he was not convicted under 841.  He was convicted

5    under 846, as a conspiracy.

6            THE COURT:  And the basis of your argument, that he

7    was convicted under Section 846 and not Section 841?

8            MR. ANDERSEN:  Your Honor, for that I did cite one

9    case for the support of that.  Part of the issue with filing my

10    memorandum so late is that I was not able to research that

11    entirely.  But I think that **United States versus Shabani**, cited

12    in my amended sentencing memorandum, does make that pretty

13    clear.

14            It says there -- it refers to Statute 846, as the

15    drug conspiracy statute.  Mr. Shabani, in that case, was

16    charged with conspiracy to distribute cocaine in violation of

17    that statute.  So that is the statute.  And it was a conspiracy

18    charge.  It was a conspiracy theory under which Mr. Sandoval

19    was convicted.

20            That, I believe, is a distinct --

21            THE COURT:  Well, let's begin with the Indictment.

22            MR. ANDERSEN:  Right.

23            THE COURT:  Is he charged under Section 846 in the

24    Indictment in Count 1?  Is he charged under 841 in the

25    Indictment in Count 1?

1           MR. ANDERSEN:  He's charged -- there are both

2    statutes listed in the Indictment.

3           THE COURT:  How could I possibly conclude that he was

4    not found guilty of violating Count 1, given the course of the

5    evidence at trial, the elemental outline for the jury, and the

6    instructions given?

7           MR. ANDERSEN:  Well, your Honor, I -- I understand

8    the Court's position on that.  My -- my position is that the

9    citations to the statutes are themselves not --

10          THE COURT:  Controlling?

11          MR. ANDERSEN:  Not controlling.

12          THE COURT:  All right.

13          MR. ANDERSEN:  And I also, your Honor -- I would cite

14   back to that case.  But, your Honor, this was not a substantive

15   charge against Mr. Sandoval.

16          THE COURT:  What is not a substantive charge?

17          MR. ANDERSEN:  I'm sorry.  Count 1 was not a

18   substantive charge.  Count 1 was the conspiracy with the

19   objective to violate that -- that law.  I think that is a

20   distinction that is important.

21          I also note that it could -- that the Sentencing

22   Guidelines Commission could have included 846 in -- in their

23   sentencing guidelines list of -- of the triggering statutes.

24   It did not.  I think that that is an important thing to

25   consider, as well.

1          THE COURT:  But that argument, I'm sorry, only tracks

2     if it's legitimate to say the defendant was not convicted under

3     841.  The guideline clearly asserts it's based on Level 38 if

4     the conviction's under 841.

5          So, really, the legal question then is am I to

6     construe, as a matter of law, for guideline base offense

7     purposes, that the defendant only was convicted under 846 and

8     not 841?

9          So -- because your authority, the case you're relying

10    on, was only brought to my attention most recently -- and I

11    haven't had a chance carefully to review that case -- I need

12    you to unpack that case now and explain why its analysis should

13    cause me to reach the conclusion you're asking.  So let's --

14    take me back to that case, and -- and answer first for me, in

15    that case was the defendant charged under 841?  Was the

16    Indictment in that case an 841 Indictment?

17         MR. ANDERSEN:  Your Honor, a part of the problem with

18    my filing such a lengthy submission is I'm not as well-versed

19    on **Shabani** as I should be.  I do not -- my reason for citing to

20    **Shabani** was that that was clearly the -- it may well be dicta,

21    but it was a pretty clear recitation of the count -- the crime

22    of conviction that Mr. Shabani was convicted of.  That he was

23    not -- it did not mention anything about 841 when, clearly, he

24    was convicted of a conspiracy to commit a drug trafficking

25    offense.

1          THE COURT:  Well, just because a person in a case is

2    convicted of a conspiracy citing one statute --

3          MR. ANDERSEN:  Right.

4          THE COURT:  -- doesn't mean that your client was

5    convicted of a conspiracy citing that statute when the

6    Indictment explicitly alleged the triggering statute, 841.

7          So what else about the case you're citing is

8    persuasive or analytical?  How do I get to the place where I am

9    required, as a matter of law, to conclude the base offense

10   level for 841 doesn't apply in this case?

11         MR. ANDERSEN:  Your Honor, I would bring a couple

12   issues that I believe support my position.  I would refer first

13   to the statute 841 itself.  That says it shall be unlawful for

14   any person to knowingly -- knowingly or intentionally

15   manufacture, distribute, dispense, possess, or intent to

16   manufacture, et cetera.  That's not what -- although that

17   statute is cited, that's not what Mr. Sandoval was accused of.

18   He was accused of conspiring, of having an agreement; the

19   objective of which was to commit that offense.  He's not

20   accused of the substantive offense.  He's not accused of

21   actually doing that.  I think that --

22         THE COURT:  He's accused of conspiracy to commit that

23   offense --

24         MR. ANDERSEN:  Right.

25         THE COURT:  -- in a manner that resulted in death,

1    with the enhancement language that --

2              MR. ANDERSEN:  Right.

3              THE COURT:  So -- go ahead.

4              MR. ANDERSEN:  I would also cite to **Pinkerton**, just

5    generally.  And I cited to **Pinkerton** earlier on, when we had

6    this similar discussion about jury instructions, as the Court

7    may recall.  And that goes to the basic idea of what a

8    conspiracy is.  A conspiracy is a -- is a different offense.

9              The language in **Pinkerton** -- I believe I have -- I

10   can refer to my earlier submission on the jury.  But, in

11   general, the language -- what **Pinkerton** and a number of other

12   cases that I cited in that memorandum go to is the fact that a

13   conspiracy, itself, is a different offense than the substantive

14   crime.

15             THE COURT:  What is the guideline direction in

16   assessing a guideline base offense level for a conspiracy, as

17   opposed to --

18             MR. ANDERSEN:  Your Honor --

19             THE COURT:  -- the substantive offense, which is the

20   object of the conspiracy?

21             MR. ANDERSEN:  Your Honor, 2D1.1 is entitled

22   "unlawful manufacturing," et cetera.  And it also includes

23   attempt or conspiracy.  So I believe that that guideline does

24   apply to attempt and conspiracy.

25             For that reason, I do believe that 2D1.1(a)(5) does

1    apply to a conspiracy.  Then we have to fall back on what the

2    amounts involved were.

3            THE COURT:  Okay.  Let me take another look at the

4    guideline before I ask another question.

5            (Pause, referring.)

6            MR. ANDERSEN:  Sure.

7            THE COURT:  All right.  Go ahead with your point.

8            MR. ANDERSEN:  I do have a citation, the **Pinkerton**

9    citation -- if I can just quote that -- about the differences

10   between -- that is -- here's a quote:

11           The commission of the substantive offense and a

12           conspiracy to commit it are separate and distinct

13           offenses.

14           The citation to that is **Pinkerton versus the United

15   States**, 328 U.S. 640 at 643 --

16           THE COURT:  Mr. Anderson, I don't dispute that as a

17   matter of law.

18           What I'm trying to determine here is what is the

19   correct base offense level analysis in a situation where, as

20   here, your client was charged with conspiracy and convicted of

21   conspiracy.  And you're conceding 2D1.1 is the proper

22   guideline.  And the Indictment asserted he was charged with

23   conspiracy and 841 was cited, and the -- the guideline refers

24   to 841.  And you're seeking to have me basically disregard

25   those references.  And I'm having trouble understanding -- I've

1    never had this argued, so I don't -- maybe I'm missing

2    something, but I need you to help me understand what you're

3    telling me.

4             MR. ANDERSEN:  I appreciate that, your Honor.

5             What I am saying is that if we go back to just the

6    language of that sentencing guideline itself --

7             THE COURT:  Which one, now?

8             MR. ANDERSEN:  I'm sorry.  I'm referring to (a)(2).

9             THE COURT:  (a)(2).

10            MR. ANDERSEN:  The Level 38.  It says, "If the

11   defendant is convicted under a number of statutes."

12            And I agree with the Court that the issue then

13   becomes, Has he been convicted under that statute?

14            And my position is no, he has not.  He has been

15   convicted under 846.  He has not been convicted of any

16   substantive offense.  He's been convicted of an inchoate crime,

17   which itself is a separate and distinct crime from the crime of

18   841.  He is convicted under 846.

19            As **Pinkerton** says -- and as the Court has noted

20   also -- the conspiracy and the substantive offense that may be

21   the object of that conspiracy are separate and distinct.

22            And so the fact that 841 was cited in the Indictment

23   does not control.  In fact, the Indictment clearly says that he

24   is -- I mean, he is charged with a conspiracy to essentially

25   violate 841.  He's not charged with 841 itself.

1          THE COURT:  So the title of the guideline is

2     unlawful -- I'm skipping some words -- trafficking including

3     possession with the intent to commit these offenses, attempt,

4     or conspiracy.

5          So the guideline clearly anticipates it applies to a

6     conspiracy.  Your client's charged and convicted of a

7     conspiracy.

8          MR. ANDERSEN:  I agree.

9          (Pause, referring.)

10          THE COURT:  And what you're saying is in (a)(2), when

11     it says the defendant has to be convicted under 841(b)(1)(A),

12     (b)(1)(B), or (b)(1)(C) and does not explicitly reference 21

13     U.S.C. 846 -- the attempt or conspiracy statute -- even though

14     the title says conspiracy, somehow that guideline would not

15     apply?  Is that what you're saying?

16          MR. ANDERSEN:  With one, I think, important caveat.

17     I agree that 2D1.1 does apply.  Its title clearly indicates

18     that it applies to attempts and conspiracy.  But that -- that

19     specific (a)(2) only applies to specific enumerated crimes.

20          THE COURT:  Where in that guideline 2D1.1, then,

21     would your client's conspiracy conviction fall?

22          MR. ANDERSEN:  D1.1(a)(5).  There is no specific

23     enumeration about (e)(5) (phonetic).  That's the catchall.  If

24     the other ones do not apply, then go to the drug guideline

25     table.

1          THE COURT:  I'm sorry.

2          (Pause, referring.)

3          MR. ANDERSEN:  It's -- I'll wait for the Court.

4          (Pause, referring.)

5          THE COURT:  Did you say D?

6          MR. ANDERSEN:  No.  If I did, I misspoke.

7          2D1.1(a)(5).

8          THE COURT:  (5).

9          MR. ANDERSEN:  And the reason I get there, your

10   Honor, is because D1.1(a) lists out five.  And it's either, (1)

11   or (2) or (3) or (4), or the catchall, (5).  I believe this

12   does --

13          THE COURT:  Okay.  And (5) -- (a)(5) -- 2D1.1(a)(5),

14   what do you contend the base offense level is?

15          MR. ANDERSEN:  As to Count 1, your Honor, I contend

16   that it is -- according to the PSR, I think it should be a

17   Level 26.

18          And the reason I get there, your Honor, is because

19   the drug quantity table at sub C lists out at least 400 grams

20   but less than 700 grams.  That was -- the amount recovered, I

21   believe, was about 600 and --

22          THE COURT:  The jury found a quantity, though.

23          MR. ANDERSEN:  That's to Count 2.

24          THE COURT:  They still made a factual finding, beyond

25   a reasonable doubt, of quantity.

1          What's the base offense level for the quantity the

2    jury found?

3          MR. ANDERSEN:  30.  But that's to Count 2.  But I

4    agree that that should apply to --

5          THE COURT:  Okay.  They made a factual finding.

6          MR. ANDERSEN:  I agree.

7          THE COURT:  All right.  So your argument is Base

8    Offense Level 38 does not apply because the defendant was not

9    convicted of the substantive offense at Section 841.  Instead,

10   the defendant was convicted of a conspiracy offense.

11         And because conspiracy under 846 is not enumerated

12   under 2D1.1(a)(2), one must go to (a)(5), where you contend the

13   base offense level is 26.  Because -- say again the reason for

14   your quantity --

15         MR. ANDERSEN:  Your Honor, if we -- if we are

16   discussing Count 1 alone --

17         THE COURT:  I'm talking about Count 1.

18         MR. ANDERSEN:  Then I would -- then I -- the PSR

19   found that there was 660 -- I believe, roughly -- grams.  That

20   puts him at Level 26.

21         I do -- for purposes of discussion, I agree that --

22   that it was found that there was more than within a kilogram

23   involved, and that would put him at Level 30.

24         THE COURT:  So let me ask you one more question

25   before I hear from Mr. Sepp and then go back to Ms. Bolstad.

1            What about the mandatory minimum?  And is this,

2     notwithstanding, a Level 26?  If a mandatory minimum applies,

3     that is the -- that is the guideline range.

4            MR. ANDERSEN:  Um-hmm.

5            THE COURT:  If there is a mandatory minimum, the --

6     even if it is a Base Offense Level 26, the guideline range is

7     the mandatory minimum, if it's higher than a -- an otherwise

8     correctly calculated guideline range.  Isn't that right?

9            MR. ANDERSEN:  Right.

10           THE COURT:  Now, did you have -- I couldn't tell from

11    your papers.  But your point was that the mandatory minimum 20

12    years does not apply here?

13           MR. ANDERSEN:  Your Honor, I do -- it is also my

14    position, that the mandatory minimum does not apply here.  And

15    the reason, your Honor, for that is the language of the

16    Indictment for Counts 1 and 2.  And -- switch gears here a

17    little bit.  But they are obviously very -- or -- the same sort

18    of issue.

19           If I can refer to the Indictment under which he was

20    charged.

21           THE COURT:  I've got it in front of me, yes.

22           Count 1.

23           MR. ANDERSEN:  He was charged -- with a number of

24    other people -- with conspiring, and with others known, to

25    distribute heroin, a Schedule I controlled substance, in

1     violation of 841.

2               THE COURT:  And 846.

3               MR. ANDERSEN:  And 846.

4               THE COURT:  Um-hmm.

5               MR. ANDERSEN:  I believe that is incorrect, actually,

6     that he was charged under 846.  But that's -- we've already

7     addressed that issue.  We're not going to get into that

8     anymore.

9               Then there's a period.  That's the end of the object

10    of the conspiracy.

11              It does go on to say that the jury further charges

12    that it resulted -- that the use of heroin resulted in death.

13    I appreciate that -- that that could be seen as a sentencing

14    enhancement factor.  My argument that I just made is that it is

15    not.

16              But, essentially, what I'm saying about the mandatory

17    minimum is that it applies, according to 846, if the object of

18    the conspiracy was -- essentially was a triggering event.  The

19    object of this conspiracy, as charged and as proven to the

20    jury, was to distribute heroin, period.  It was not an object

21    to cause death.  It was not an object to deliver more than a

22    kilogram.  Those are not the objects of Count 1 or 2.  Those

23    may have been results, as alleged.  Those may have been results

24    as found by the jury.  But they were not the object of the

25    conspiracy as found by the jury.

1          And as 846 indicates, because the object of the

2    conspiracy as charged was simply to distribute heroin, the

3    applicable sentencing regime is merely the sentencing regime

4    for distribution of heroin, which has a maximum of 20 years and

5    no minimum.

6          And I further say that if you look at the -- at 846,

7    specifically, the last -- after the last comma, it makes clear

8    that the commission of which was the object of the attempt or

9    conspiracy, they could have -- Congress could have decided not

10   to even include that and it might have made my argument a

11   little less clear.  But the fact that they clearly delineated

12   the triggering event to be whatever the object of the

13   conspiracy was is a big issue.

14         I cited a case in my brief concerning that, your

15   Honor, **Macias Valencia.**

16         In **Macias Valencia,** somebody -- Mr. Macias was

17   convicted of an offense that triggered a mandatory minimum

18   because he attempted to do it.  So the Court's reasoning in

19   that was that according to 846, it is not the actuality of what

20   happened; it is not the result of what happened.  It is the

21   intent of the parties.  It is the object of the attempt or

22   conspiracy that triggers the mandatory minimum.

23         THE COURT:  Well, essentially you're arguing that the

24   Government is deemed to have charged and would have had to

25   prove that the conspiracy was to distribute heroin for the

1    purpose of causing death, and that's not the way case law has

2    interpreted the resulting-in-death enhancement.  It is the

3    intention to commit the conspiracy to distribute the heroin.

4    It is the fact of resulting in death which has to be proved

5    beyond a reasonable doubt to unanimity that provides the

6    enhancement.  And I just don't have any authority to accept the

7    argument you're making but clearly you're preserving it.

8            I want to pause for just a minute because I need to

9    track a statutory reference.  Then I would like to hear from

10   Mr. Sepp and then Ms. Bolstad on this question.

11           Give me just a moment, please.

12           (Pause, referring.)

13           THE COURT:  So I'm just refreshing.  And, for the

14   record, 841(b)(1)(C) is the penalty provision on which the

15   Government and the PSR base their analysis.  And it says, in

16   relevant part, and if death or serious bodily injury results

17   from the use of such substance, shall be sentenced to a term of

18   not less than 20 years.

19           So your point is that that's a substantive mandatory

20   minimum and that the conspiracy does not trigger that?

21           MR. ANDERSEN:  Your Honor, conspiracy and the

22   substantive crime are different.  He was not charged with the

23   substantive crime.

24           The -- and I think what **Macias Valencia** goes to stand

25   for is -- is the notion that the conspiracy is, itself, a

1   distinct crime.

2        The result in **Macias** -- in **Macias**, there was a

3   reverse sting, and they were going to deliver -- I forget what

4   the quantity was.  But a quantity enough to trigger a mandatory

5   minimum to the defendant.  But it was an undercover who was

6   going to deliver it.

7        He showed up.  He had the cash.  He was going to go

8   through with the -- with the offense.  He was going to buy

9   the -- whatever the amount of drugs was -- was supposed to be.

10       He was convicted -- or I believe he actually pled

11  guilty in that case to an attempt and a conspiracy to do

12  that -- that act.

13       The mandatory minimum was triggered, even though

14  there was never any -- any drugs anywhere near anybody.  And

15  the reason it was triggered was because the substantive -- or,

16  I'm sorry, the separate offense of conspiracy -- the intent,

17  the object, the purpose of that conspiracy and attempt was to

18  acquire an amount of drugs that would trigger it.

19       In this case, this is no -- the object of the

20  conspiracy, the intent, the purpose of the conspiracy as

21  charged and as proven, was simply to deliver heroin, period.

22       I've got a couple -- in preparation this morning,

23  your Honor, for today's hearing, I looked at some other

24  Indictments that I do believe charge conduct that -- that is a

25  conspiracy but also triggers the mandatory minimum.

1           And in those cases -- I can find them in my pile

2    here, momentarily.

3           The defendants were charged with conspiracy to

4    deliver, for example, more than a thousand grams of heroin,

5    with -- so the intent of the conspiracy was to deliver a

6    thousand grams of heroin.  That was included in the object of

7    the conspiracy.  That is a different animal than what we have

8    here.

9           What we have here is a conspiracy.  The object,

10   purpose, intent of which was to deliver heroin, period, with a

11   further enhancement that may be, could be used for sentencing

12   or for whatever purpose the Government intended for was also

13   accused but it was not accused as part of the object of the

14   conspiracy.  And 841 -- I'm sorry.  846 makes conspiracy and

15   attempts into separate crimes, and it applies the punishment to

16   the crimes; not on the result like it does in 841 but on the

17   object of that conspiracy, the purpose, the intent.  Which, in

18   this case, was simply to distribute heroin.  The result doesn't

19   matter to 846.  The result doesn't matter according to **Macias**

20   **Valencia**.  It's the intent, it's the object of the conspiracy

21   that's charged and proven.

22           THE COURT:  All right.  I think I understand your

23   point, even if it's only just now being presented.

24           Mr. Chef -- Sepp.  Sorry.  What's your view of this?

25           MR. SEPP:  I wholeheartedly agree with Mr. Anderson's

1    arguments on this.

2           We had divided these up with me arguing the double

3    jeopardy, and him arguing his mandatory minimum, if it doesn't

4    apply.

5           The only distinction between these two is that the

6    Counts 9 and 10, on my client, do -- he was convicted of an

7    actual distribution.  But I don't think those have much of a

8    bearing on Mr. Andersen's argument as those two crimes are --

9    are conspiracy and conspiracy to Count 1 and 2.

10          So I -- I joined him in his -- his argument that the

11   object of the conspiracy was merely to distribute the heroin,

12   and the results were death and a thousand grams, were actually

13   distributed, as found by the jury.

14          I can't really add much more than what Mr. Anderson's

15   already argued, unless you have a specific question I might be

16   able to address.

17          THE COURT:  Thank you, Mr. Sepp.

18          So, Ms. Bolstad.

19          MS. BOLSTAD:  Your Honor, I think that we should

20   return to the statute itself.  If you read 846, it is very

21   clear 846 is our conspiracy statute.

22          It reads:  Any person who attempts or conspires to

23          commit any offense defined in this subchapter,

24          shall be subject to the same penalties as those

25          prescribed for the offense, the commission of

1              which was the object of the conspiracy

2              Mr. Anderson concedes that the object of the

3      conspiracy in Count 1 was distribution of heroin.

4              Because the object of the conspiracy is distribution

5      of heroin, we look at the penalty provisions under 841A1.

6      841A1 is cited in Count 1.  Count 1 basically charges these

7      defendants with conspiring -- conspiring to break the law.

8      What law?  Distributing heroin.

9              So when we go back to 841A1, all of the penalty

10     provisions that are included in B1 for distributing heroin

11     apply equally to people who are charged and convicted of

12     conspiring to violate that law.

13             The statute controls here, and the guidelines are

14     consistent with the statute.

15             846 is never even mentioned in 2D1.1, save the title.

16     The conspiracy is mentioned in the title.  But when you go back

17     to the table and look at for violations of that particular

18     statute, the conspiracy statute 846, appendix A, with the list

19     of statutes, directs you to go to 2D1.1.

20             There is no other place to go in the guidelines for

21     violations of 846.

22             THE COURT:  All right.  Give me a minute here.  I

23     need to do a calculation before we continue.

24             (Pause, referring.)

25             THE COURT:  Okay.  I need to go back to the premise,

1    then, that counsel has been discussing with me, and that is the

2    proper base offense level.

3              The Government maintains it should be 38.  Yes?

4              MS. BOLSTAD:  Yes.

5              THE COURT:  Mr. Andersen, you maintain it's 26, for

6    the reasons indicated?

7              MR. ANDERSON:  For Count 1.  Correct.

8              THE COURT:  We're on Count 1.

9              And?

10             MR. SEPP:  We agree 26, yes.

11             THE COURT:  I'm overruling the defendant's

12   objections.  I'm adopting the guideline analysis of the Base

13   Offense Level 38, exactly for the reasons Ms. Bolstad has

14   argued and as the guideline calculation was described in the

15   presentence report -- and, of course, this is an issue that is

16   now preserved for appeal -- I think district courts around the

17   country would be quite surprised to learn if, Mr. Andersen your

18   position is accurate because that's not how this has been

19   applied in every other case of this nature I've seen.  But I

20   certainly do not disregard your argument as frivolous in any

21   way.  I understand it -- as I say, it's preserved.  But, as I

22   say, the plain reading of the guideline, the plain reading of

23   the Indictment, the elements of the offense and, in the end,

24   the guideline itself -- which I'm required to follow for

25   purposes of assessing a base offense level -- call for adoption

1    of the PSR recommendation of 38.

2            So that is the Court's ruling on base offense level.

3            Now, are there other issues about base offense level

4    before we move on to roles and these other issues that are

5    individual to the defendants?  Anything else, before we do

6    that?

7            All right.  Let's move, then -- we'll first do

8    Mr. Sandoval-Ramos's particular guideline adjustments.  Then,

9    Mr. Sepp, we'll do yours.  I'll calculate the advisory deadline

10   ranges.  And then we can move to the more important part from

11   my perspective, and that is why you're advocating for a

12   particular sentence as a reasonable sentence.

13           And then, gentlemen, if either of you wish to address

14   me before I make a final decision, that will be the time.

15           So, Mr. Andersen, you disagreed with the guideline

16   analysis for a three-level up-charge, a three-level upward

17   adjustment for role.

18           Ms. Bolstad, you agree there should be some

19   adjustment upward but not three.  As I recall, you were arguing

20   for two.

21           MS. BOLSTAD:  (Nods head.)

22           THE COURT:  Why don't you, Ms. Bolstad, explain why

23   the guideline recommendation of three is not accurate.  Why

24   your recommendation of two is.  And then, Mr. Andersen, we'll

25   take your position on that enhancement.

1          MS. BOLSTAD:  Your Honor, I think there are good

2    justifications for why the PSR recommended a three-level

3    increase.  Primarily, the scope of this organization.

4          This conspiracy clearly involved five or more

5    participants and was extensive.  And that's really the

6    difference in the guideline between a three-level bump versus a

7    two-level bump.

8          I think this defendant should get only a two-level

9    leadership bump.  He was an organizer or a leader in a criminal

10   activity.  The evidence shows that there were two people under

11   his direction.  Those are the two men at the stash house:  The

12   co-defendant, Raul Arcila; and co-defendant fugitive, Placido

13   Ramirez-Coronel.

14         However, there were other members of this conspiracy,

15   including the person from whom the defendant obtained the drugs

16   down in California.  Maybe that was one person or more.  Plus

17   we have the upper-level dealers in the Portland area conspiring

18   with the defendant, such as Shane Baker.

19         I think that there's a difference in this defendant's

20   conduct, compared to the men who were living at this stash

21   house, living in mattresses on the floor.  The comparison is

22   Raul Arcila is living at this stash house where co-defendant,

23   Sandoval-Ramos, pays for the power.  He's living in this place

24   that's devoted to manufacturing drugs.  And, as the evidence

25   showed at trial, there were security implements in place:  The

1    DoorJamber to keep out robbers, police.  There were -- this

2    is -- the kitchen was a drug manufacturing center of activity.

3              So Fabian Sandoval-Ramos distanced himself from that

4    stash.  He insulated himself by living nearby, within two

5    miles, with his family in a much nicer home.

6              So between these two defendants, it's clear the

7    evidence shows that Fabian Sandoval-Ramos is the man who has

8    the connection to the source of supply, brought large

9    quantities of drugs to his stash house, where it was the

10   responsibility of people below him to -- to weigh out those

11   drugs, package them up, and then go do the very dangerous task

12   of delivering those drugs to customers.

13             Fabian Sandoval-Ramos let people below him do that

14   task.

15             And, for that, I think he warrants a two-level

16   increase for leadership.

17             THE COURT:  Mr. Andersen.

18             MR. ANDERSEN:  Thank you, your Honor.

19             I'm just trying to find the applicable guideline.

20             (Pause, referring.)

21             MR. ANDERSEN:  Your Honor, the issues -- there are a

22   couple of issues.  The main issue, I believe -- although it's

23   been cited in the PSR and by the Government just a moment

24   ago -- is that somehow, because Mr. Sandoval's role as being as

25   it was he necessarily directed people just doesn't follow.

1    There is no evidence that he ever directed anybody.

2           Just because he lived about two miles away, just

3    because he was on the lease for the house, none of that -- none

4    of that is evidence that he directed anybody.  And that's the

5    issue here.

6           The evidence presented at trial, your Honor, was that

7    Shane Baker called up the Mexican Bobby.  And the evidence

8    presented at trial was Mexican Bobby was to telephone down in

9    California.  And the telephone in California then directed

10   members of the conspiracy to deliver the drugs.

11          There's no evidence that Mr. Sandoval ever directed

12   anybody.  The fact that --

13          THE COURT:  But Mr. Baker's use of that term was

14   connected to your client in terms of the photograph and his

15   physical description of him.

16          I think the term was -- was given different meanings.

17   But it's clear that your client was implicated squarely by

18   Mr. Baker as someone who was not just at the bottom of this

19   organization but in a more supervisory or a greater position of

20   responsibility than those guarding the drugs at the house.

21          MR. ANDERSEN:  Your Honor, I disagree with that based

22   on the testimony provided by Mr. Baker.  He was not -- he did

23   not -- I don't believe -- identify -- he did not identify

24   Mr. Sandoval, after I questioned him on the stand about --

25          THE COURT:  I think that goes to weight.  There was

1   an implication.  The photo, his physical description of your

2   client, and then the photo itself.

3          I don't think it's fair to say that he, your client,

4   is among the least culpable in the group.  He has a role.  It's

5   more than the least culpable.  I agree with you he is not the

6   organizer and at the top of the chain.  And I think the

7   Government's perspective that the role adjustment should apply

8   but at the lowest level that the guideline permits -- 2, as

9   opposed to 3 or 4 -- is actually an accurate way to view,

10  relatively, your client's involvement.

11         So if I'm missing something, please tell me, and then

12  we'll finish this and move to the next part.

13         MR. ANDERSEN:  Your Honor, I'm specifically

14  addressing whether or not he was a leader or a manager.  His

15  role or culpability, I think, is a little bit divorced from

16  what the guideline says.  And that says if he was a manager or

17  a leader or organizer or some -- of others, if he's directing

18  others, then that's an issue.

19         There's simply no -- I don't think that the -- the

20  testimony presented by Mr. Baker rises to the level of -- that

21  he directed them -- that Mr. Sandoval directed anybody.

22         The evidence -- the hard evidence, we know of, is

23  that he called to California; California called to the fugitive

24  co-defendant; and the fugitive co-defendant then -- then

25  delivered.  That's what hard evidence shows.

1          I think Mr. Baker's identity of Mr. -- of whoever

2     Mexican Bobby was, was vague at best, and I don't think it was

3     really -- I don't think it rises to the level that indicates

4     that Mexican Bobby is Mr. Sandoval.  Other than that, there is

5     no evidence that he ever directed anybody.

6          THE COURT:  Ms. Bolstad, anything else on role?

7          MS. BOLSTAD:  Just on that topic.  I think it's

8     important to remember Mr. Baker's testimony about how the

9     relationship began.

10          Mr. Baker testified that his friend Shorty introduced

11     Mr. Baker to this new source of supply.  He described that

12     source of supply as this man, Fabian Sandoval-Ramos, and

13     remembered meeting this man.  And it was in that meeting with

14     him that Fabian Sandoval-Ramos gave Mr. Baker a phone number,

15     and explained, This is who you'll call.  This is the number to

16     call when you need drugs.  And Mr. Baker proceeded to say,

17     That's what I would do, but then other people would come

18     deliver those drugs.

19          So the inference is clear.  Mr. Sandoval-Ramos is the

20     businessman.  He's making the connect to a high-level dealer.

21     And he's directing that dealer that when you call for drugs --

22     in fact Mr. Baker would deal with runners, people at lower

23     levels of this conspiracy, who would take the risk and

24     distribute those drugs.  Those are the men who get arrested by

25     the police.  So I would ask you to impose the two-level

1    increase.

2            THE COURT:  The PSR writer recommended that the Court

3    increase the base offense level by three levels.  3B1.1 directs

4    a three-level enhancement under Subsection (b) if the defendant

5    was a manager or a supervisor but not an organizer or leader

6    and the criminal activity involved five or more participants or

7    was otherwise extensive, increase by three levels.

8            That is compared to Subsection C, which provides, if

9    the defendant was an organizer, leader manager, or supervisor

10   in any criminal activity other than as described in A or B,

11   increase by two levels.

12           I'm satisfied by a preponderance of the evidence that

13   Mr. Sandoval-Ramos was at least an organizer, leader, manager,

14   or supervisor, and I am going to apply a role adjustment but

15   only at two levels because it is an issue of degree.  And in

16   light of Mr. Andersen's arguments, I believe on a preponderance

17   standard a two-level enhancement is established here.

18           So paragraph 33, in Mr. Sandoval's PSR is now changed

19   to a two-level enhancement.  Paragraph 35 then is a total of

20   40.  Paragraph 38 is a total of 40.  And then

21   Mr. Sandoval-Ramos also made a motion for a Criminal History

22   departure based on overrepresentation, as I recall.

23           Is that right, Mr. Anderson?

24           MR. ANDERSEN:  Yes, your Honor.

25           THE COURT:  He, according to the PSR, is at Criminal

1    History Category III with a 2005 DUI, a diversion and

2    conviction upon guilty plea; and 2013 DUI out of California.

3              So you're arguing from Level 3 to Level 2, or from

4    Level 3 to Level 1?  And why?

5              MR. ANDERSEN:  Your Honor, I would ask to impose

6    Level 1.

7              And the reason I am asking to make a departure, in

8    general, is that I do believe that the two can -- well, the one

9    conviction, your Honor, as I understand it, the -- it was a

10   diversion from 2005.  That was never a conviction.  Although

11   the guidelines do allow for the counting of a diversion, there

12   was never a conviction for that -- that offense.  So that, I

13   believe, is something to take into account in making this

14   determination that his criminal history is overrepresented.

15             The other reason that the criminal history is as high

16   as it was was because Mr. Sandoval-Ramos did have a warrant out

17   of California for failure to complete his -- his treatment.

18             As I noted in my memorandum to this effect,

19   Mr. Sandoval was in Oregon at the time, and it was very

20   difficult to get that completed.  That is no excuse for not

21   having completed it, but that is -- that, I believe, is

22   different than someone who might get more for doing other

23   crimes or any other reason, other than getting his diversion --

24   or, I'm sorry, his treatment completed.

25             So those are reasons that the Court could depart

1  under the guidelines.

2         The guidelines, in discussing this, I believe give

3  quite a bit of deference to the Court.  They say the Court

4  may -- the Court may depart downward under certain

5  circumstances.

6         One of the -- or the -- the example that the

7  guidelines give -- and I'll read it.  I'm reading from the

8  application notes for Sentencing Guideline 4A1.3.  I'm reading

9  application note 3, in part.

10        And it says, If, for example, a defendant had two

11            minor misdemeanor convictions close to ten years

12            prior to the instant offense and no other evidence

13            of prior criminal behavior, that could be a

14            situation which would warrant a downward

15            departure.

16        In this case, there is one conviction.  It is

17  relatively recent in comparison to that -- that example.  But

18  his other conviction was from about ten years ago.  And -- I'm

19  sorry.  It wasn't even a conviction.  It was a diversion.  So I

20  believe that this is the sort of case which does merit some

21  degree of downward departure.

22        I would leave that to the discretion of the Court as

23  to -- as to how far that you want to go.  But, in reality, he

24  does have one conviction for DUI.

25        And that, I think, could be grounds for the Court to

1   find that he should more -- more correctly be a Level 1,

2   Criminal History Category I.

3           So I would ask the Court to depart downward to that

4   effect.

5           THE COURT:  Ms. Bolstad, on the criminal history

6   issue.

7           MS. BOLSTAD:  Your Honor, I would defer to probation

8   on this.

9           I grant to the defense that he is scoring four points

10  total, and those four points come from what appears to be two

11  DUIs, which are misdemeanors.

12          DUIs are one of the most dangerous offenses we have,

13  but they are misdemeanors.  And so the difference between four

14  points and three points is a Criminal History Category, so he

15  could be down in Category 2, if the Court were to grant his

16  motion.

17          I don't have a huge objection to that, but I'll defer

18  to probation.

19          THE PROBATION OFFICER:  Your Honor, I would just

20  point out that had he not had a warrant at that time, he would

21  still have been on active supervision for this second DUI.  So

22  he would still have two levels for being under a criminal

23  justice sentence for that, so I don't think it's

24  overrepresented.

25          THE COURT:  Well, I don't think anyone's quarreling

1   with the technically applied part of the guideline.

2            THE PROBATION OFFICER:  No.  What I'm saying is

3   defense counsel has made the argument that he had this warrant

4   because he was unable to finish treatment.  What I'm saying is

5   even if he had finished treatment, he would have still been

6   under supervision at the time of --

7            THE COURT:  Exactly.  But my point is, one way or the

8   other, technically it's correctly counted; whether it's under

9   what actually happened or the point you're raising.

10           The real question is whether treating the defendant

11  in Criminal History Category III is a fair representation of

12  the seriousness of his criminal history, in light of the entire

13  purpose of the guidelines.

14           So, either way, it would get him where he is.  But

15  that doesn't mean the Court shouldn't consider whether that's a

16  fair projection of what his criminal history seriousness is

17  over time.  So thank you.

18           THE PROBATION OFFICER:  Okay.

19           THE COURT:  Appreciate that.

20           I'm granting the defendant's motion.  I'm departing

21  one level, to Criminal History Category 2 on the basis that

22  under all of the circumstances the criminal history for

23  Mr. Sandoval-Ramos, as correctly calculated, overrepresents the

24  seriousness of his criminal history.

25           So for Mr. Sandoval-Ramos, then, the base offense

1   level is 38, plus 2 for the role adjustment as noted.  That

2   takes to us 40, Criminal History Category II, Offense Level 40.

3   The initial guideline range is 324 to 405 months.

4           So let's leave Mr. Sandoval-Ramos where we are,

5   there.  And, Mr. Sepp, please now take me to the individualized

6   issues for your client on guideline matters.

7           MR. SEPP:  Thank you, your Honor.

8           We're objecting to the fact that there should be a

9   weapon harassment based on the sole -- well, the evidence that

10  I'm aware of is there is a picture of my client holding what

11  appears to be a weapon and what appears to be a drugs.  In

12  actuality, they're not drugs.

13          No weapons were ever recovered from this scene at

14  the -- any arrest or any search of either location 1 or

15  location 2.

16          I did a very extensive search on cases where the gun

17  enhancement was allowed.  And in all of them, a weapon was

18  actually found at one of the scenes that were searched; in a

19  car, a house, a second house.  But in this case, there was

20  nothing -- no weapons found at this level.

21          The only weapons that were found were well down the

22  road on a -- I can't remember which -- which defendant it was,

23  but my client would never have had knowledge of that.

24          There's zero -- zero evidence to show -- even if the

25  picture is of a weapon and/or drugs and/or whatever, it helps

1    corroborate that it could be in advance of the conspiracy.

2           There's no time stamp on the picture.  It could have

3    been taken well before Mr. Arcila was recruited into the

4    conspiracy.  It could have been taken -- as I said, just well

5    before the conspiracy was even -- he was recruited but he

6    hadn't joined yet.

7           And aside from the picture, that's the only evidence

8    that was ever presented that there was -- my client ever

9    possessed a firearm.  I don't believe that it could be linked

10   to the -- to the process of the conspiracy.  It can't be linked

11   to aiding and abetting and moving forward; or he had possession

12   of it during the conspiracy or the -- or any of the 9 and 10,

13   the possession -- or the actual distributions themselves.

14           THE COURT:  All right.  Thank you, Mr. Sepp.

15           Ms. Bolstad, with respect to that enhancement?

16           MS. BOLSTAD:  Mr. Sepp is correct.  We did not seize

17   an actual firearm in this case.  But at Fabian Sandoval's

18   house, we seized an empty gun case; a case that clearly was for

19   a firearm.

20           And at Mr. Raul Arcila's stash house, where he lived,

21   at location 1, we found ammunition in that same kitchen where

22   drugs were being manufactured.  And the Court will recall the

23   pictures of that kitchen.  This is not a place stocked with

24   food and pots and pans.  It was drugs, drug packaging, and a

25   bullet on -- on an otherwise empty shelf.

1          So that, in connection with the photograph of

2    Mr. Arcila, holding the firearms, those photographs are GPS

3    located at location 1, the same location where we found the

4    bullet; the Government would submit is sufficient evidence to

5    apply the two-level bump for a dangerous weapon being connected

6    with the offense.

7          THE COURT:  I think it's a close question here, and

8    it is I think too close to speculative to meet the standard of

9    what is more probably true than not.  And, therefore, I'm

10   sustaining the defendant's objection to the enhancement at

11   paragraph 32 and not applying it.

12         That then changes paragraph 36 to a total adjusted

13   offense level, I should say, of 38.  And then we move to

14   criminal history.

15         Are there other issues there for Mr. Arcila?

16         MS. BOLSTAD:  Yes, your Honor.

17         THE COURT:  Go ahead.

18         MS. BOLSTAD:  The Government has -- I wrote in my

19   sentencing memo that I think Mr. Arcila's criminal history is

20   overstated.  I believe he penciled out at a CHC IV, which are

21   for two DUII misdemeanor offenses and one Burglary 2 in the

22   state of California, where we don't have a description of what

23   occurred there.  But a Burglary 2 in California can be a

24   misdemeanor offense.  It can be -- it's referred to as a

25   commercial burglary.  So that could be like a shoplifting.  And

1    I'll note that he did not receive a very significant sentence

2    at all for that crime.  So I would have no objection to

3    reducing his criminal history as overrepresented, down to a CHC

4    III.

5              THE COURT:  Well, his 5 -- his score of 5 is enhanced

6    by the fact that he was on probation.

7              So he was actually a score of 7, which places him in

8    Category IV.

9              MS. BOLSTAD:  Correct.  And so I'm -- I think that

10   the 7 is on the edge of Category 3 and 4, and I would have no

11   objection to moving him into Criminal History Category III.

12             THE COURT:  All right.  Mr. Sepp, your point on

13   criminal history.

14             MR. SEPP:  I have no objection to that; shifting it

15   from Category IV to III.

16             She pointed out that it is a 7, the low end of the

17   Category IV, which means he would be placed amongst people in

18   that category who have at least got both 1 or 2 felony

19   convictions; whereas he doesn't have any.  His history is that

20   of drunk driving.  The majority of his -- his convictions here,

21   the two are for drunk driving in Clackamas; drunk driving in

22   Washington County.

23             At the time of these convictions he was certainly

24   abusing alcohol, and that's reflective in getting two DUIs,

25   within a year.  Unlike the fact that he's -- he's in prison

1    now -- excuse me, in jail now, and he's gone through

2    rehabilitation and the fact that he is planning on going to

3    the -- apply for ADAP.  Once he goes to federal prison, he will

4    deal with the fact that he will no longer have a substance

5    abuse problem.  And that will seriously minimize any chance of

6    his recidivism, based upon the fact that aside from these

7    charges we're here for today, it is alcohol or substance abuse

8    related.  And will clear his mind.  When he comes out, I don't

9    believe there's a chance that he'll be -- he will not reoffend.

10              THE COURT:  I am adjusting the defendant's Criminal

11   History Category by way of a downward departure, given these

12   arguments, from Category IV to Category III.  At Offense Level

13   38, Category III, the guideline range is 292 to 365 months.

14              And, again, I'll just note for the record that the

15   arguments that were made but that I did not adopt by

16   defendants, each of them -- individually and collectively --

17   with respect to the correctly calculated guideline range and

18   the question of -- well, all of those issues that we've

19   addressed, those are preserved for the record.

20              But now I need to turn to determining what is a

21   reasonable sentence to impose.  The guideline range just

22   calculated is but one factor the Court must take into account.

23              With respect to Mr. Sandoval-Ramos, then,

24   Ms. Bolstad, does the Government move to dismiss Count 2,

25   before we continue?

1              MS. BOLSTAD:  Yes, your Honor.

2              THE COURT:  All right.  I am granting the

3    Government's motion to dismiss.

4              If, Mr. Andersen, you wish to be heard after today on

5    the question of whether the dismissal should be with or without

6    prejudice, you may make a motion to make it with prejudice.  I

7    think, for purposes today, moving forward, I'll note that it is

8    without prejudice.  That's the form of the Government's motion.

9    You have leave to challenge that part after today, but I don't

10   think we need to take the time now to deal with that part.

11             MR. ANDERSEN:  Thank you.

12             THE COURT:  That said, we have but one charge,

13   Mr. Andersen, I need to address with your client.  And I

14   suppose, again, Ms. Bolstad, you should proceed first, to

15   address the sentence you believe is reasonable under all the

16   circumstances; there being a mandatory minimum sentence of 20

17   years and a maximum penalty of life.

18             MS. BOLSTAD:  Your Honor, the Government in this

19   case -- I recommend that the Court impose a sentence for

20   Mr. Sandoval-Ramos of 252 months, followed by five years of

21   supervised release, a fee assessment.

22             Mr. Sandoval-Ramos exercised a leadership role in

23   this case.  For that reason, I'm recommending that his sentence

24   be higher than Mr. Arcila.  Just to preview, I'm going to

25   recommend that Mr. Arcila get the mandatory minimum, the 240

1    months.

2              This is -- the nature of this offense is horrific.

3    As the Court lived through that trial, you heard about the

4    young men and women who were impacted by this deadly poison of

5    heroin that is a scurge on our community.  It's a scurge on the

6    communities across the country.  It's not just young men and

7    women.  It's middle-aged.  It's older men and women.  This drug

8    impacts everybody, without regard.

9              And there was no evidence in this case that these two

10   defendants used the drug.  They are not drug addicts.  They

11   were not captive to the grasp of this drug.  They were

12   businessmen making thousands of dollars by selling poison that

13   ends up killing people.

14             And the drug is so addictive, the grasp that it has

15   on people, as you heard from Morgan Godvin and Michael Rosa and

16   Shane Baker, is that becomes the only thing in life that

17   matters.  Not having that heroin is the worst sickness on

18   earth.

19             And these men didn't experience that and their

20   families didn't experience that.  They sold it, they made

21   money, they profited while people are dying.

22             So the nature of the offense is one of the worst we

23   see in federal court.  It is very serious.  That's why Congress

24   has such high penalties for it.

25             Unlike our co-defendants, these defendants made very

different choices about how to proceed with their case.

No one can fault them for the choices they made, but here we are with the consequences of those choices. Each of them is subject to a 20-year mandatory minimum, which is wholly appropriate based on the conduct here. They sold drugs in a conspiracy that found their way to Mr. Delong, who used that heroin. He overdosed, and he died a painful oxygen-depriving horrific brain death, alone.

Mr. Delong's family is not able to be here today. But you will recall the compassion with which Mr. Delong's mother spoke at the sentencings of Morgan Godvin. She is devastated that her son is dead. She is devastated that her son's friend also has to face the consequences; that Morgan Godvin had to go to prison. She recognized how devastating this drug is in the community. And she was not out for revenge. She has not asked for restitution. She's just a -- a soul who is never going to be the same.

These defendants made their choices. They -- Mr. Sandoval-Ramos sort of attempted to cooperate. It was some of the least-productive cooperation I have ever encountered in my career. I think it was misleading in nature, it was not the full truth, it was not helpful, and then I think Mr. Sandoval-Ramos even made the later decision to come in and lie about what it was that he understood and did not understand in that proffer process.

1        And he testified under oath in front of this Court,

2   and this Court made findings about his -- about his testimony

3   in the context of other witnesses.  And while you didn't come

4   out and say I think he was lying, you found that his

5   presentation was not to be believed in light of the

6   presentations of the other witnesses in that matter.

7        Now, his guideline range, as the Court has

8   calculated, is 324 months to 405 months.  So I'm asking a

9   sentence below that range as something that is sufficient and

10  not greater than necessary.

11       Twenty-one years is a long time.  I recognize that.

12  It is not to be lightly taken or imposed.  But I think that 21

13  years is necessary to avoid unwanted sentencing disparities

14  between this defendant and Mr. Arcila, so I'm asking the Court

15  to impose that 21-year sentence; which, again, is well below

16  the guideline range that we've calculated today.

17       THE COURT:  Thank you.

18       Mr. Andersen.

19       MR. ANDERSEN:  Thank you, your Honor.

20       There are a number of factors to consider under

21  3553A, one of which was expounded upon just a moment ago.

22       There are other factors that I would like to address

23  as well, your Honor, and those go to the history and

24  characteristics of the defendant, the need to reflect the

25  seriousness of the offense, promote respect for the law,

1    provide just punishment, and to deter both others and

2    potentially Mr. Sandoval.

3         And the main one I would like to address is the

4    history and characteristics of the defendant.  But, first, I

5    would like to point out, your Honor, as noted by the Government

6    correctly I think, 20 years is a long time; 21 years is a long

7    time.  Clearly, I -- I have preserved the issues about whether

8    or not the mandatory minimum apply and -- and the guidelines.

9    I don't want to go into those again.

10        But assuming the Court's -- understanding the Court's

11   ruling to that effect, I think that 20 years is -- is

12   sufficient.  20 years is two decades, your Honor.  20 years --

13   I -- I listed a number of things that 20 years will mean to

14   Mr. Sandoval.  That will mean he won't see his children

15   graduate.  He won't see his children get married, have

16   children.  Excuse me.  (Pause.)  So the question is, is that

17   sufficient but not overly punitive?

18        I don't disagree with some of what the Government has

19   said about the problems of heroin.  As -- I do disagree that

20   the best way of dealing with that is to incarcerate people for

21   lengthy amounts of time.  I understand that that is -- that is

22   one of the main tools in the criminal justice toolbox.

23        And -- but, your Honor, it still remains to the Court

24   to decide what is sufficient but not -- but not greater than

25   necessary to comply with those factors.

1          I would like to address the history and

2    characteristics of the defendant.  I did include a memorandum

3    from my investigator about her interview.  (Pause.)

4          I did get some letters from his family that reflect

5    the same thing.  Sorry, I did not -- (pause, crying.)

6              THE COURT:  Do you need a few minutes, Mr. Andersen?

7              MR. ANDERSEN:  I apologize, your Honor.

8              THE COURT:  It's all right.  These are different

9    issues.

10             I appreciate the responsibility you're taking in your

11   role.

12             MR. ANDERSEN:  And, your Honor, what those interviews

13   and what the letters I did give to the Court illustrate is that

14   Mr. Sandoval was a -- a loving father.  He provided for his

15   family.  The PSR, I think, details a long work history in -- in

16   furtherance of that love and support.  I -- I think that's some

17   of the characterizations of Mr. Sandoval's motives.  I don't

18   agree with -- I think that he did get involved in a drug

19   conspiracy.  As a noted in my sentencing letter, he understands

20   that and he agrees, I think, with -- with the concept that --

21   he accepts responsibility for -- for the choices that he did

22   make.  He did get involved with the drug conspiracy, and we're

23   not denying that.

24             Your Honor, I think his role in the drug conspiracy

25   seems a little less clear to me.  As I explained it in my

1    sentencing letter, I think that he came upon this drug

2    conspiracy innocently.

3            As I noted in my sentencing letter, he did -- he met

4    with who I believed is the real Mexican Bobby.  Due to the fact

5    that he's a Shade Tree auto mechanic.  He learned the skills

6    that he uses to be a Shade Tree auto mechanic from his father,

7    growing up in Mexico, who had a machine shop.  And Mr. Sandoval

8    was -- basically grew up in a machine shop, and learned all

9    sorts of things about being a mechanic.

10           He fixed cars.  He bought and sold cars.  He fixed

11   them up.  That was one of his side businesses.  Again, in

12   furtherance of the support that he gave to his family.

13           In meeting with Mr. -- with Mexican Bobby -- I

14   detailed a bit.  And I don't want to spend too much time on it.

15   He did mention to Mexican Bobby that he did have a house that

16   he was going to have to abandon, due to the fact that he was

17   not able to keep a better job that he had found.  And that, I

18   think, led to his involvement with this conspiracy.

19           Now, he could have -- I agree, he could have -- once

20   he realized what was going on, he could have walked away.  I'm

21   not denying that.  He is -- he does bear responsibility for his

22   choices, as he himself, I believe, will tell you momentarily.

23   But that does not detract from the fact that the history and

24   characteristics of Mr. Sandoval are what they are.

25           I do believe that 20 years would promote respect for

1    the law.  I do believe that 20 years provides deterrence not

2    only to Mr. Sandoval, who I believe will be deported at the end

3    of whatever sentence is imposed.  But it is unclear to me --

4    and I cited, briefly, some scholarly research on this.  It is

5    unclear to me what 20 years versus 21 or 25 or -- or any number

6    above -- above would really do in terms of deterrence any

7    further than 20 years would do.

8         I just don't see -- although the guidelines allow for

9    it and, clearly, as -- as cited by the Court, the maximum here

10   is a lifetime imprisonment.  That's -- that is clearly --

11   reflects the -- the concept -- or reflects the seriousness of

12   the offense.  But 20 years, I think, should surely be

13   sufficient, your Honor.  That's about what I have to say.  That

14   is what I have to say.

15        THE COURT:  Are there -- is there a request for

16   designation to a particular facility, Mr. Andersen?  And any

17   other sentencing recommendations you wish?

18        MR. ANDERSEN:  Your Honor, I believe that due to the

19   fact that he will most likely be deported at the end, he is

20   unavailable for some treatment programs.  That's unfortunate.

21   But I would ask if the Court is willing for a recommendation to

22   appropriate treatment programs.

23        His -- his history does reflect a potential problem

24   for alcohol abuse.  He does have two run-ins for drunk driving.

25   That could be something that may be available to him.

1          I would also note, your Honor, in the pretrial

2    detention that Mr. Sandoval has been -- in pretrial, he has

3    availed himself of a number of programs that are available to

4    him, including religious counseling, including a work -- he has

5    worked at the -- at the kitchen in -- at Columbia County.  He

6    went through a process, that I discussed with the captain at

7    Columbia County, that not many people go through to get

8    certification for food handling.

9          So he has evidenced the desire and ability to avail

10   himself of programs and better -- that could potentially better

11   himself, so I would ask that any of those programs being

12   available.  His family does live in the Portland metro area.  I

13   think that placement at Sheridan would be the most appropriate,

14   or potentially other locations nearby.  Sheridan is the only

15   one that we would request designation to with the understanding

16   that the Bureau of Prisons may not comply with that request.

17          I don't have any other --

18          THE COURT:  Does your client wish to make a

19   statement?

20          MR. ANDERSEN:  I believe he does.

21          THE COURT:  All right.  Sir, would you stand, please.

22          Good afternoon.

23          THE DEFENDANT THROUGH THE INTERPRETER:  Good

24   afternoon.

25          First of all, I would like to say that I am very

1    sorry for the death of Mr. Justin.  I know that it's not easy

2    for a family to go through that.  My family, with my wife, did

3    also.

4            What I'm not in agreement with is that I be

5    classified as a leader when it's clear that I was not a leader.

6    We're talking about Mexican Bobby.  Mexican Bobby was the

7    leader.  You can see that Placido was the one that got orders

8    from him, not me.  How is it possible that I would be the

9    leader, if I had been living in a house with two bedrooms for

10   over ten years; and with a daughter who's 16, one who's 12, and

11   one is -- (Interpreter speaking to defendant.) 11.

12           I understand that I need -- I need to be punished,

13   but I don't think it's fair that I be punished for a death that

14   I don't think I was responsible for.

15           I am aware that I am being punished for the acts for

16   which I take responsibility.  And like the prosecutor said, I

17   tried to cooperate, but lied; I never lied to them.  I always

18   told them the truth.  If they didn't believe me, well, that's

19   another problem.  I was always honest.

20           If we're going to talk about dishonesty, how can you

21   apply more truth to an addict like Baker and the things that he

22   said than the things that I said.

23           (Pause, Mr. Andersen, the interpreter, and the

24           defendant conferring.)

25           THE DEFENDANT THROUGH THE INTERPRETER:  When the

1   agents arrived at my home to arrest me, they arrested my

2   daughters.  And I don't think that's right or normal.  When the

3   agents testified here, they denied that they ever arrested or

4   put handcuffs on anyone else.

5           And based -- that it was only me, and that makes me

6   angry.  That's not true.  They were lying.  That's all.

7           (Pause, Mr. Andersen speaking with the defendant.)

8           THE DEFENDANT THROUGH THE INTERPRETER:  I accept

9   responsibility for my actions, but I would request a fair

10  sentence.

11          THE COURT:  All right.  Thank you, sir.

12          Let me just note for the record that the guideline

13  range I calculated with the two-level upward enhancement for a

14  leadership role was 262 months to 327 months.  I'm sorry.  It

15  was 324 months to 405 months.

16          If I did not apply the two-level upward enhancement,

17  the range would be 262 to 327 months.  And, in any event, the

18  Government's request here is for 252 months, which is below the

19  guideline range even if the enhancement did not apply.

20          In the end, that guideline enhancement is simply a

21  factor.  It's not one that's going to control the day here

22  because I agree with the Government and with Mr. Andersen that

23  the guideline range, as I've calculated it, is probably too

24  high under all of the circumstances to meet the balancing

25  responsibility I'm required to meet under the statute.

1          The Government is arguing that I should sentence the

2    defendant to a term of one year longer than the mandatory

3    minimum.

4          The defendant, while objecting to the application of

5    the mandatory minimum in the context we've described earlier

6    makes an important point.  The difference between 20 years and

7    21 years is really what's at issue here relative to those

8    recommendations.

9          The Court's fundamental duty here is to impose a

10    sentence that is enough but not greater than necessary; to

11    punish very serious criminal conduct, to promote respect for

12    the law, and to take into account the degree of seriousness

13    here that ended up costing a young man his life.  That the

14    defendant asserts now that he is not responsible for

15    Mr. Delong's death is quite unfortunate, given all that has

16    been demonstrated in the many proceedings that have led to

17    today.  He clearly is responsible for that death, in that he

18    was a key conspirator in the conspiracy that led to the

19    distribution to him and his death that night.  To say otherwise

20    is simply disrespectful and not persuasive.

21          Nevertheless, I believe, under all of the

22    circumstances, Mr. Sandoval-Ramos is fairly punished with the

23    Congressional mandatory minimum of 20 years.

24          So, sir, would you stand, please.

25          For all of those reasons, I am imposing a sentence of

1    20 years on Count 1.  I believe by the time the defendant

2    completes that sentence, he will be in his mid to late '50s.

3              He will, in all likelihood, be deported from the

4    United States.  The 20-year penalty for what was a business

5    transaction for this gentleman, repeated on a regular basis,

6    that did in fact prey upon the addiction of Mr. Delong and

7    others similarly situated is, I think, fairly punished with

8    that minimum.  It's an entirely different question what

9    sentence would be imposed if that minimum was not in place, and

10   that is not a matter as to which I intend to speculate.

11             So the defendant is committed to the custody of the

12   Bureau of Prisons for that term:  20 years.  After which he's

13   required to be subject to the Court's supervision for an

14   additional five years in supervised release.

15             If he is in the United States upon the completion of

16   his sentence, he's required to report to the nearest United

17   States probation officer within 48 hours of release.

18             He must obey all United States laws, including laws

19   concerning entry into the United States.  Thus, if he is

20   deported, he must not return to the United States unless he has

21   the permission of the United States Government to do so, has

22   notified the United States attorney and the United States

23   probation officer in this district.

24             If he enters this country illegally while he is on

25   supervised release, he will be returned to prison in this case.

1    He will be prosecuted for an illegal reentry crime.

2              A 100 dollar statutory assessment is imposed.

3              The defendant is required to provide a DNA sample, if

4    requested of him by his probation officer.

5              I recommend but cannot require that the Bureau of

6    Prisons designate the defendant to the Sheridan facility to be

7    near family.  I recommend but cannot require that the defendant

8    be afforded all treatment for which he qualifies,

9    notwithstanding the immigration issues that might otherwise

10   disqualify him.

11             Count 2 has been dismissed against this defendant on

12   the record indicated.

13             Is there anything else, Ms. Bolstad, for this matter?

14             MS. BOLSTAD:  No, your Honor.  Thank you.

15             THE COURT:  Mr. Andersen?

16             MR. ANDERSEN:  No, thank you.

17             THE COURT:  All right.  Please be seated.

18             With respect to Mr. Arcila, Ms. Bolstad, your

19   recommendation, please.

20             MS. BOLSTAD:  Your Honor, the Government recommends

21   for Mr. Arcila a sentence of the mandatory minimum, 240 months

22   imprisonment, followed by five years of supervised release and

23   a 100 dollar fee assessment.

24             I think that sentence is an appropriate sentence in

25   light of the nature of the offense, which I won't repeat, and

1  Mr. Arcila's role and repeated conduct of delivering a highly

2  addictive poison that ends up killing people.

3          THE COURT:  Are you making the same motion to dismiss

4  Count 2 as to this defendant?

5          MS. BOLSTAD:  I am, your Honor.  And then as to

6  Counts 9 and 10, I would ask for the Court to impose sentences

7  on those Counts to be run fully concurrent with Count 1.  These

8  three counts together, grouped for sentencing purposes.

9          THE COURT:  So on Count 9, the range is 5 to 40

10 years.  On Count 10, likewise.

11         Are you asking for anything more than five years

12 concurrent on each of those two counts, in light of the

13 mandatory minimum on Count 1?

14         MS. BOLSTAD:  No, your Honor, I'm not.

15         THE COURT:  All right.  So 20, 5, and 5; concurrent.

16 Yes?

17         MS. BOLSTAD:  Yes, your Honor.

18         THE COURT:  Thank you.

19         Mr. Sepp, good afternoon, again.

20         MR. SEPP:  This has been but a small portion of

21 Mr. Arcila's life.  One to three months of a 26-year-old's

22 life, and it all went wrong.  He may not have been addicted to

23 the heroin, but he did have his addictions.  He is addicted to

24 alcohol.  He is an alcoholic.  He also was using cocaine as he

25 disclosed to the -- in the PSR, for two -- two to three times a

1    week during this time.  So he, too, was an addict.  He, too,

2    suffered from substance abuse issues.

3            He was targeted.  He was asked to come join.  He was

4    asked to go party at this home.  And as the party got going,

5    decisions that he made were wrong.

6            He is a loving son.  He has a supportive family.  He

7    was forced to live through a horrific injury that his mother

8    suffered.  These all affected him.  Whether or not that's the

9    reason he started drinking, I don't know.

10           The testimony and the evidence that came out showed

11   that he, in this call-in order distribution system, he

12   essentially was nothing more than a runner.  He was told to go

13   in a car and drive in that car, and drugs were delivered from

14   that car.

15           He is -- he's not a leader.  He is merely just -- for

16   lack of a better word -- a mid-level employee.

17           It's tragic that a life was lost, and I'm not going

18   to debate the disparage of heroin in this country, specifically

19   this city.  But he has taken advantage -- since he's been

20   incarcerated, he has -- not unlike Mr. Sandoval, he did get

21   certified to work in the kitchen.  He did take advantage of the

22   substance abuse treatment programs as best he could.  At

23   Columbia County, he also joined a religious group.  I would ask

24   that any treatment that he qualify for be made available to

25   him.  He has shown an interest in -- as I mentioned earlier,

1    the drug and alcohol program that the prison offers.  He would

2    like to get into that immediately.  He would designate --

3              Bakersfield?

4              Bakersfield prison, if possible, to be --

5              THE COURT:  To be close to family?

6              MR. SEPP:  Correct.

7              He does have family members here in support of him.

8              I think the recommendation of the Government is fair.

9              Twenty years for someone who's in his mid-20s is an

10   eternity.  He is going to be in his mid-40s when he gets out.

11   If he does start a family, he's going to have to start very

12   late in life.

13             He's -- it's going to promote respect for the law,

14   and it's going to hammer home the severity of this crime by

15   doing 20 years.

16             Not really much more to -- to add to this that I

17   haven't already included in the submission I mailed to you this

18   last week some time.

19             I ask that, you know, he be sentenced to the 20

20   years, as the Government recommended, and then the five and

21   five to run at the same time and be done --

22             THE COURT:  Which are the minimums across the board?

23             MR. SEPP:  Yes.

24             THE COURT:  Mr. Arcila, good afternoon.

25             THE DEFENDANT:  Good afternoon.

1          THE COURT:  Is there anything you would like to say,

2     sir?

3          DEFENDANT ARCILLA:  I just want to apologize to the

4     Court.  And, you know, it's a sad tragedy that has happened.

5     There's nothing that I can say that will bring Mr. Delong back.

6     But hopefully, with the help of God, we have strength.  Not

7     only his family but also my family, because they're both

8     suffering.  You know, my parents are already elderly.  So by

9     the time -- if I ever do get out, I don't think they'll be

10    around.

11         I don't have any girlfriend, I don't have a wife, I

12    don't have kids.  And hopefully, if I do get out, it's not too

13    late to start a family.  And that's all I have to say.

14         Thank you.

15         THE COURT:  Thank you, sir.

16         Well, Mr. Sepp's points about Mr. Arcila not having

17    been a leader, or at least not much of one as has been

18    discussed with Mr. Sandoval-Ramos, those points are all

19    swallowed by the fact of the mandatory minimum at 20 years.

20    Both Mr. Arcila and Mr. Sandoval-Ramos are treated identically,

21    at least with respect to that minimum.  Certainly the Court

22    does and did have authority to sentence higher than that.  But

23    in my judgment, under all of the circumstances here, as I've

24    already noted with respect to Mr. Sandoval-Ramos, a sentence of

25    20 years there was sufficient for him.  And I don't believe

1    Mr. Arcila, in any way, is more culpable than

2    Mr. Sandoval-Ramos.  Each of these gentlemen did have

3    opportunities, as the prosecutor referenced, to resolve their

4    cases differently.  And I'm certain they regret those

5    opportunities were not seized.

6            The truth of the matter is there was a jury trial for

7    each of them, evidence presented and confronted.  A jury

8    evaluating the sufficiency of the Government's case.  And with

9    respect to every issue presented to the jury, the Government

10   established to the jury's unanimous consent guilt beyond a

11   reasonable doubt and the sentencing factors enumerated on the

12   verdict.

13           And so in many respects, with respect, Mr. Arcila, to

14   you, the law controls what the sentence is.  I don't believe

15   there's any reason at all for me to exercise discretion to

16   sentence you above these minimums.  There's also not any

17   authority for me to sentence you below them.

18           And so I am imposing a sentence on Count 1 of 20

19   years, the mandatory minimum.  On Count 9, five years,

20   mandatory minimum.  On Count 10, five years mandatory minimum,

21   Counts 9 and 10 to run concurrently with each other and Count

22   1, such that they will be served while you're serving on Count

23   1.

24           There is a 100 dollar statutory assessment on each of

25   those three counts.

1          Count 2 is dismissed on the Government's motion, as

2   indicated.

3          I do recommend that the Bureau of Prisons designate

4   you to a facility in the Bakersfield, California, area; or as

5   near thereto as is possible so that you may be near family, but

6   I don't control those decisions.  Those are for the Bureau of

7   Prisons to make.

8          I recommend that you be offered and that you seek out

9   all treatment, programming, and job training that otherwise is

10  available to you.  It will be up to you to make the best of

11  these days.

12         I'm certain you are remorseful, and that has been

13  expressed.  There isn't anything anyone can do to turn this

14  clock back, but you can do something to make positive use of

15  the time are you in prison, as can Mr. Sandoval-Ramos himself,

16  and I hope that each of you do.

17         There is a five-year period of supervised release I'm

18  imposing on each of the three counts, just as I said for

19  Mr. Sandoval-Ramos.  Although you may be deported from the

20  United States, the -- if you're not, then you're required to

21  report to a probation officer -- a United States Probation

22  Office within 48 hours if you're ever released.  And then a

23  five-year period of supervision will begin that includes, among

24  other things, the primary requirement that you obey all laws:

25  The laws of the United States, our 50 states, local

1    governments.  And that means if you are deported, you cannot

2    return unless you can do so legally.  If you come back

3    illegally, after a deportation for this serious of a crime, the

4    act of returning alone is punishable by up to 20 years in

5    prison just for coming back.

6                DEFENDANT ARCILA:  (Nods head.)

7                THE COURT:  So you must take that seriously.

8                You must provide a DNA sample, if requested by your

9    probation officer.

10               Ms. Bolstad, are there any other matters to address

11   for Mr. Arcila?

12               MS. BOLSTAD:  No, your Honor.

13               THE PROBATION OFFICER:  Excuse me, your Honor.

14               THE COURT:  Counsel, anything else.

15               MR. SEPP:  No, nothing, your Honor.

16               THE PROBATION OFFICER:  Your Honor?

17               THE COURT:  Yes.

18               THE PROBATION OFFICER:  Mr. Arcila is actually a U.S.

19   citizen.  He was born in California, and so we do have the --

20               THE COURT:  I apologize.  I overlooked that.  I'm

21   sorry.

22               THE PROBATION OFFICER:  We have the standard

23   conditions, and also mental health conditions and --

24               THE COURT:  So five years of supervised release, here

25   in this country.  Same first condition:  Obey all laws.

 1          And then there are a number of standard conditions.

 2   Report truthfully and regularly to your probation officer.

 3   You -- I'm going to impose a no-alcohol condition.  Meaning

 4   that until a judge says otherwise, you cannot drink alcohol.

 5   You cannot go to a place where alcohol is the primary item for

 6   sale:  A tavern, a bar, et cetera.

 7          Hopefully, when you're released, you will have

 8   addressed these issues and that condition won't be needed.  But

 9   you would have to ask your probation officer to ask the Court

10   to change it before you could ignore it.

11          THE DEFENDANT:  Okay.

12          THE COURT:  I'm requiring that you have an updated

13   mental health evaluation at the time you start supervision so

14   that if you do have counseling needs, think can be addressed

15   based on what your situation is then and not assuming what they

16   are now.  They'll all change, and you will too; hopefully for

17   the better.

18          And thank you for bringing that to my attention.  I

19   apologize for overlooking that.

20          Ms. Bolstad?

21          MS. BOLSTAD:  Nothing further, your Honor.

22          THE COURT:  Mr. Sepp?

23          MR. SEPP:  Nothing further, your Honor.

24          THE COURT:  Gentlemen, good luck to you.  We are in

25   recess.

1        (Conclusion of proceedings.)

2

3                          --oOo--

4

5   I certify, by signing below, that the foregoing is a correct

6   stenographic transcript of the oral proceedings had in the

7   above-entitled matter this 6th day of June, 2016.  A transcript

8   without an original signature or conformed signature is not

9   certified.  I further certify that the transcript fees and

10  format comply with those prescribed by the Court and the

11  Judicial Conference of the United States.

12          /S/ Amanda M. LeGore

13     _____

14      AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
            CSR No. 15-0433  EXP:  3-31-2018

15

16

17

18

19

20

21

22

23

24

25